# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

SANHO CORPORATION,

       Plaintiff,

  v.

KAIJET TECHNOLOGY
INTERNATIONAL LIMITED, INC.;
KAIJET TECHNOLOGY
INTERNATIONAL CORPORATION;
MAGIC CONTROL TECHNOLOGY;
STARVIEW GLOBAL LIMITED, each
doing business as "J5Create;" and
DOES 1-10,

       Defendants.

This Document Relates to *C.A. No. 1:20-cv-02150-TCB*

**C.A. No. 1:18-cv-05385-SDG**

Consolidated with
C.A. No. 1:20-cv-02150-TCB

**<u>Jury Trial Demanded</u>**

# PLAINTIFF SANHO CORPORATION'S
# <u>OPENING CLAIM CONSTRUCTION BRIEF</u>

## **<u>TABLE OF CONTENTS</u>**

I.  Overview of Patent.................................................................................1

II. Claim Construction Legal Standard.......................................................4

III. Qualifications of a Person of Ordinary Skill in the Art ("POSITA")..................8

IV. Construction of Agreed Claim Phrases/Terms....................................8

V. Construction of Disputed Claim Phrases/Terms ................................9

    A. Disputed Claim Phrase No. 1 – "main port module for connecting to an end-user device, the main port module having first and second unit ports" (Asserted Claim 1) .........................................................9

        1.  The proposition that a module is "self-contained" and "separate and apart from other modules" should be rejected ................................12

        2.  "Contains" should be replaced by "having two and only two" port units ................................................................................14

        3.  "Connecting" should be replaced by "directly connecting" given that there are no intervening device connections shown in the intrinsic evidence .....................................................................15

    B. Disputed Claim Phrase No. 2 – "data port module" (Asserted Claim 1).......17

    C. Disputed Claim Phrase No. 3 – "data transmission control module" (Asserted Claim 1) ...........................................................19

    D. Disputed Claim Phrase No. 4 – "video port module" (Asserted Claim 1).....22

    E. Disputed Claim Phrase No. 5 – "USB conversion unit" (Asserted Claim 9) ...................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## CASE LAW

*Boss Control, Inc. v. Bombardier, Inc*., 410 F.3d 1372 (Fed. Cir.2005) ...................7

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) .........5, FN 1

*Chimie v. PPG Indus., Inc*., 402 F.3d 1371 (Fed. Cir. 2005) ...................................7

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535 U.S. 722, (2002)........5

*Home Diagnostics, Inc. v. LifeScan, Inc*., 381 F.3d 1352 (Fed. Cir. 2004) .............6

*Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ...........................................................................................................5

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U. S. 370 (1996).........................................................................5

*Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) .................................*passim*

*Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011) ........................................................................................ 14-15

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318 (2015) ...................................7

*Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576 (Fed. Cir. 1996).....................6

I.     **Overview of Patent**

U.S. Patent No. 10,572,429 (the "429 Patent") describes "a port extension apparatus for providing better usage and utilization efficiency ports of end-user devices." **Exhibit A** (429 Patent, Abstract). Example embodiments of the invention address low and/or inefficient usage of ports associated with an end user device. *Id*., 1:25-26, 2:61-64. Specifically, the 429 Patent addresses "the limited size of an end-user device, [whereby] only a few ports can be provided." *Id*., 1:16-18. "[T]he space between the ports provided [in the prior art] is relatively tight. When a port in an end-user device is in use to connect to a particular device … other ports in the end-user device can easily become inaccessible for connecting another device." *Id*., 1:18-24.

FIGURE 1 shows an exemplary port extension apparatus in accordance with one embodiment of the invention, positioned in between an end user device (120) such as a computer (*see id*., 5:9-14), and a to-be-connected device (110) such as a USB flash drive or a mobile phone (*see id.* at 3:49-52):



*Id.*, Fig. 1, 2:29-31.

As shown above, in this embodiment, the port extension apparatus includes the following modules: (a) main port module (10) for connection to an end-user device; (b) first data port module (20); (c) data transmission control module (30); (d) second data port module (40); (e) video port module (50); (f) third data port module (60); and (g) memory card R/W module (70). "When a to-be-connected device connects to the first data port module, the first data port module and the main port module form a transmission path enabling data transmission between the to-be-connected device and the end-user device." *Id.*, Abstract. When the to-be-connected device connects to the second data port module, the data transmission control module controls the data transmission between the to-be-connected device and the

2

end-user device. *Id*. When the to-be-connected device connects to the video port module, the data transmission control module receives the to-be-displayed information from the end-user device and transmits the information to the to-be-connected device to display. *Id*. This increases the utilization efficiency of the end-user device port. *Id*., 2:20-21, 6:31-32.

FIGURE 2 presents another exemplary embodiment of a main port module (10) and data transmission control module (30):



*Id*., FIG. 2, 2:32-34. Main port module (10) can be a first port unit (11) and a second port units (12). Transmission control module (30) can be various units, including USB control unit (31) and USB conversion unit (32).

Asserted Claim 1 of the 429 Patent recites:

1.     A port extension apparatus for extending ports of an end-user device comprising:

3

> a main port module for connecting to an end-user device, the main port module having first and second port units;
>
> a first data port module operatively connecting to the first port unit;
>
> a data transmission control module operatively connecting to the second port unit via a first data transmission port of the data transmission control module;
>
> a second data port module operatively connecting to a second data transmission port of the data transmission control module; and
>
> a video port module operatively connecting to a third data transmission port of the data transmission control module; wherein
>
> when a to-be-connected device connects to the first data port module, the first data port module and the main port module form a transmission path enabling data transmission between the to-be-connected device and the end-user device;
>
> when a to-be-connected device connects to the second data port module, the data transmission control module controls data transmission between the to-be-connected device and the end-user device; and
>
> when a to-be-connected device connects to the video port module, the data transmission control module receives the to-be-displayed information from the end-user device to the to-be-connected device to display.

*Id.*, 6:46-7:6 (emphasis added to indicate disputed terms for construction).

Claim 4 recites:

> 4.     The port extension apparatus as described in claim 2, wherein the data transmission control module comprises a USB (Universal Serial Bus) control unit, a USB conversion unit, a memory card conversion unit, a mode control unit and a mode conversion unit.

*Id.*, 7:19-23 (emphasis added to indicate disputed term for construction).

## II.     **Claim Construction Legal Standard**

The patent monopoly "is a property right; and like any property right, its boundaries should be clear. This clarity is essential to promote progress, because it

4

enables efficient investment in innovation. A patent holder should know what he owns, and the public should know what he does not." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730–31 (2002). Thus, the purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U. S. 370 (1996).  "The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc*., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

The interpretation of the scope and meaning of disputed claim terms presents a question of law for the court to decide. *Markman*, 517 U.S. at 372. The focus of claim construction is at all times centered on the language of the claims. *Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).

Usually, the words of a claim are given their plain and customary meaning, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips*, 415 F.3d at 1312-13 (citation omitted). There are two exceptions to this general rule: (1) when a patentee sets out a definition and acts as his own lexicographer;[1] or (2) when the patentee disavows

---

[1]  To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

the full scope of a claim term, either in the specification or during prosecution. *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1580 (Fed. Cir. 1996). "Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc*., 381 F.3d 1352, 1358 (Fed. Cir. 2004). The person of ordinary skill in the art is deemed to read the claim terms in the context of the patent as a whole, including the specification. *Phillips*, 415 F.3d at 1313.

A claim term's meaning "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "[T]he claims themselves provide substantial guidance as to the particular claim terms." *Id*. "[T]he context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question are useful for understanding the ordinary meaning." *Id*.

The patent's specification is "always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582).

The court should also consider the patent's prosecution history, another component of the intrinsic evidence used to supply the proper context for claim construction. *Phillips*, 415 F.3d at 1317 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent.").

The prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation[,]" and for that reason, may lack "the clarity of the specification[.]" *Id*. When this occurs, the prosecution history is less useful for claim construction purposes. *Id*.

During prosecution, a patentee may limit the scope of the invention by making the claim scope narrower than it would otherwise be according to the claim language itself. *Id*.; *see also Chimie v. PPG Indus., Inc*., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

A court may also consult extrinsic evidence, including "expert and inventor testimony, dictionaries, and learned treatises." *Phillips,* 415 F.3d at 1317; *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015) (court may make subsidiary factual determinations in claim construction based in part on extrinsic evidence). Of course, the weight given to the extrinsic record is typically less significant than that given to the intrinsic record. *Phillips,* 415 F.3d at 1317; *see also Vitronics*, 90 F.3d at 1584 ("Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence[.]"); *Boss Control, Inc. v. Bombardier, Inc*., 410 F.3d 1372, 1377 (Fed. Cir. 2005).

There is no magic formula to follow in considering these sources of evidence. *Phillips*, 415 F.3d at 1324. All that matters "is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id*. The construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

## III.   Qualifications of a Person of Ordinary Skill in the Art ("POSITA")

Given the field of invention of the 429 Patent, a person of ordinary skill in the art ("POSITA") is a person having at least an undergraduate degree in electrical engineering, computer engineering or comparable field of study, with 1-2 years of experience researching, designing, developing, and/or testing computer hardware components and peripherals.

## IV.   Construction of Agreed Claim Phrases/Terms

The First Amended Joint Claim Construction Statement recites the following agreed constructions:

| Claim Term (Patent Claims): | Agreed Upon Construction: |
|---|---|
| "USB control unit" ('429: 5-12) | Plain and ordinary meaning |
| "data transmission port" ('429: 1-17) | Plain and ordinary meaning |
| "operatively connecting" ('429: 1-17) | Joining to facilitate direct data transmission |
| "data port" ('429: 5-12) (independent of the term "data port module") | Plain and ordinary meaning |

Dkt. 231, at 2.

## V.   Construction of Disputed Claim Phrases/Terms

### A.   Disputed Claim Phrase No. 1 – "main port module for connecting to an end-user device, the main port module having first and second port units" (Asserted Claim 1)

| Sanho's Construction[2] | Defendants' Construction |
|---|---|
| One physical communication access point of a circuit board having only first and second interface connectors[3] to which an end-user device may directly connect | self-contained component, separate and apart from other modules, that contains a first and second port unit for connecting to an end-user device |

The main port module (10) is shown as one access point having two wired

connections (each between the port extension apparatus and an end-user device),

---

[2]   The Parties' proposed constructions are those presented in the First Amended Joint Claim Construction Statement.  Dkt. 231.

[3]   To avoid confusion, "having only first and second interface connectors" is synonymous with "having two and only two interface connectors," as opposed to "having only first and second interface connectors" and no other parts whatsoever.

wherein a first interface connector of a circuit board of the port extension apparatus is capable of forming a first wired connection with a first port of an end-user device, and a second interface connector of the circuit board that is capable of forming a second wired connection with a second port of the end-user device. Ex. A, FIGS. 1-2, 4:5-6. For example, FIGURE 2 shows port units (11) and (12) within main port module (10):



*Id.*, FIG. 2 (emphasis added). "In all embodiments, when the to-be-connected device 110 connects to the first data port module 20, data directly transmits between the first data port module 20 and the end-user device 120 via main port module 10." *Id.*, 3:39-42. This is illustrated in the foregoing figure by the green line connecting the data transmission port (201) of the first data port module (20) to the device connection port (111) of the first port unit (11) of main port module (10). *Id.*, 3:11, 4:8-9, 5:1-6, 5:28-35. A POSITA reading the claim language in light of the

specification would conclude that the "main port module" therefore refers to an access point with two ports to connect to the end user device (120).

Affirming this construction, the patentee during prosecution differentiated claim 1 from the prior art, arguing  that claim 1 presents a different configuration from *Muhammed*, with the configuration of claim 1 presented as follows:



**Exhibit B** (September 15, 2019 Response to Office Action), at 8 (SANC000966) (emphasis added). The red box shows a main port module having exactly two port units. The first and second port units located within the main port module were specifically called out by the patentee as differentiating Muhammed. *Id.*, at 9 (SANC000967). The configuration shows a "wired connection" between an end-user device (e.g., computer) and a to-be-connected device (*e.g*., a USB flash drive). *Id*., at 7 (SANC000965). The connection to the end-user device in FIGURES 1 and 2 of the 429 Patent are shown as point-to-point connections.

Based on the claim language, the specification, and the prosecution history, the Court should adopt Sanho's proposed construction: One physical communication

access point of a circuit board having two and only two interface connectors to which an end-user device may directly connect.

The remaining argument in this section is devoted to addressing three key problems with Defendants' proposed construction. The most objectionable portions are: "<u>self-contained</u> component, <u>separate and apart from other modules</u>, that <u>contains</u> a first and second port unit for <u>connecting</u> to an end-user device."

        1.    *The proposition that a module is "self-contained" and "separate and apart from other modules" should be rejected.*

"Self-contained" can be understood as complete, having all that is needed, and independent. While the intrinsic evidence teaches that the various modules are <u>distinguishable</u> from each other, neither the claim, nor the specification, nor the file history refer to any module (much less all modules) as being "self-contained."

Defendants use the following definitions to defend the use of "self-contained" in their proffered construction:

| Source | Definition of "module" |
|---|---|
| *McGraw Hill Computer Desktop Encyclopedia*<br><br>(**Exhibit C** (KAIJET 7721-7723)) | *Module* - "A self-contained hardware or software component that interacts with a larger system" |
| *Oxford Dictionary of Computer Science*<br><br>(**Exhibit D** (KAIJET 7734-7736)) | *Module* – "1. A programming or specification construct that defines a software component[;] 2. A component of a hardware system that can be subdivided" |
| *Microsoft Computer Dictionary* | *Module* – "1. In programming, a collection of routines and data structures that performs a particular task or |

| | |
|---|---|
| (**Exhibit E** (KAIJET 7737-7742)) | implements a particular abstract data type[;] 2. In hardware, a self-contained component that can provide a complete function to a system and can be interchanged with other modules with similar functions[.]" |
| *Cambridge Dictionary Online*<br><br>(**Exhibit F** (KAIJET 7745-7747)) | *Module* – "one of a set of separate parts that, when combined, form a complete whole"; "one of a set of separate parts that can be joined together to form a larger object"; "a part of a computer or software system or program that has a function and works together with other related parts" |

*See* Dkt. 231, at 4. Some of these definitions of "module" do not even use "self-contained." A more fitting definition of "module" – consistent with the teachings of the 429 Patent – is the *Cambridge Dictionary Online* definition: a part of a computer system that has a function and works together with other related parts. Such a definition may be considered "if the court deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quotation omitted).

The intrinsic evidence does not support "self-contained," nor the connotation that any module is independent. Furthermore, while a jury can readily understand "distinguishable," it may be confused as to the meaning of "self-contained." Moreover, "distinguishable" is preferable to "separate and apart from other modules" because the intrinsic evidence shows interdependence and interactivity between and among the modules. *See, e.g.*, Ex. A, FIGS. 1-2. For example, claim 1 recites that "the <u>first</u> data port module <u>and</u> the <u>main</u> port module <u>form</u> a transmission

path[.]" Claim 1 further states that "when a to-be-connected device connects to the video port module, the data transmission control module receives the to-be-displayed information from the end-user device." Therefore, while the "main port module" is distinguishable from other modules, it need not necessarily be "separate" and "apart from" all other modules at all times. To the contrary, the 429 Patent recognizes a certain level of interaction and interdependence between and among modules. Like various dictionary definitions of "module" cited by Defendants, it is more accurate to say that in a system, each module works together with other related parts of the system. *See* Ex. F (KAIJET_7747, defining "module" as "a part of a computer or software system or program that has a function and works together with other related parts").

> 2. *"Contains" should be replaced by "having two and only two" port units.*

FIGURE 2 shows two port units (11) and (12) within main port module (10). The configuration of claim 1 provided during prosecution to differentiate prior art shows a main port module having two, and underline two, port units that can physically connect to the end user device. *See* Ex. B, at 8 (SANC000966). There are exactly two port units within the main port module of the 429 Patent. Here, there is no reason to divorce the teachings of the specification and prosecution history describing the main port module with two port units from the language of the claim. *See Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011)

("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than … allow the claim language to become divorced from what the specification conveys is the invention").

> 3. *"Connecting" should be replaced by "directly connecting," given that there are no intervening device connections shown in the intrinsic evidence.*

The context of the claim language, the specification and the prosecution history counsel in favor of using "directly connecting" in the construction. First, in Claim 1, the word "connecting" is used five times, each time to signify a direct connection (*i.e.,* a point-to-point connection without an intervening connection points):

(1)     a main port module for <u>connecting</u> to an end-user device, the main port module having first and second port units;

(2)     a first data port module operatively <u>connecting</u> to the first port unit;

(3)     a data transmission control module operatively <u>connecting</u> to the second port unit via a first data transmission port of the data transmission control module;

(4)     a second data port module operatively <u>connecting</u> to a second data transmission port of the data transmission control module; and

(5)     a video port module operatively <u>connecting</u> to a third data transmission port of the data transmission control module.

Ex. A, 6:48-60 (emphasis added). These five connections are <u>all</u> shown as point-to-point, or direct connections in the patent figures:

15



*Id.*, Fɪɢ. 2 (emphasis added). The parties also agreed that "operatively connecting" as used in Claim 1 should be construed as "joining to facilitate <u>direct</u> data transmission." Dkt. 231, at 2 (emphasis added).

Moreover, Fɪɢᴜʀᴇ 2 shows a wired, point-to-point connection between the first and second port units (11, 12) and the end user device (120). Ex. A, Fɪɢ. 2; *see also id*., Fɪɢ. 1 (showing direct connection between main port module (10) and end user device (12)); *id*., 3:39-42, 5:28-35; *see also* Ex. B, at 8 (SANC000966, configuration diagram showing wired point-to-point connections).

The claim language, specification, and prosecution history demonstrate that Sanho's construction "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Phillips*, 415 F.3d at 1316 (quotation omitted). It is thus the proper construction. If the Court adopts Defendant's construction in whole or in part, the construction should be modified to read as

follows: "*an access point <u>distinguishable</u> from other modules, <u>having two and only</u> two port units for <u>directly</u> connecting to an end-user device*."

**B.**   **<u>Disputed Claim Phrase No. 2 – "data port module" (Asserted Claim 1)</u>**

| Sanho's Construction | Defendants' Construction |
|---|---|
| One physical communication access point suitable for connecting to a data transmission device[4] for facilitating data transmission | self-contained component, separate and apart from other modules, having an interface through which data is transferred from the to-be-connected device to the port extension apparatus and vice versa |

Claim 1 references "a <u>first data port module</u> operatively connecting to the first port unit" and "<u>a second data port module</u> operatively connecting to a second data transmission port of the data transmission control module[.]" Ex. A, 6:50-57 (emphasis added).

The specification shows these first and second data port modules as follows:

---

[4]  For claim construction purposes, Sanho equates a "data transmission device" with a "to-be-connected device" (*e.g.*, device (110)). *See* Ex. A, FIGS. 1-2.



*Id.*, Fig. 2 (emphasis added). Given the diagram, a POSITA would understand that the first and second data port modules each have separate physical ports for receiving data transmitted to the port extension apparatus from the to-be-connected device (110). *See id*., 3:39-42 ("In all embodiments, when the to-be-connected device 110 connects to the first data port module 20, data directly transmits between the first data port module 20 and the end-user device 120 via main port module 10"). Each data module is shown to be a part of a port extension device that serves as a separate communication access point for connecting to a data transmission device (*e.g.*, device 110) and facilitating data transmission. *See also* Ex. B, at 8 (SANC000966, showing configuration diagram).

As with the first disputed term, the Court should reject "self-contained component, separate and apart from other modules" – the references to "self-contained" and "separate and apart from other modules" are not supported by the

plain meaning of "module," and are even contradicted by the intrinsic evidence showing interaction and interdependence between the various modules. Plaintiffs are <u>not</u> opposed to an alternative construction modeled after Defendants' construction but modified to read: *"a component <u>distinguishable</u> from other modules, having an interface through which data is transferred from the to-be-connected device to the port extension apparatus and vice versa."*

### C. <u>Disputed Claim Phrase No. 3</u> – "data transmission control module" (Asserted Claim 1)

| Sanho's Construction | Defendants' Construction |
|---|---|
| A data management assembly for controlling data traffic, selecting and switching input devices and optionally converting media | self-contained component, separate and apart from other modules, that electronically transfers information between the end-user device and the to-be-connected device |

Sanho's construction aligns with the intrinsic evidence. "[T]he data transmission control module controls the data transmission between the to-be-connected device and the end-user device." Ex. A, Abstract, 1:61-64, 3:26-30. Claim 1 states that:

> when a to-be-connected device connects to the second data port module, the <u>data transmission control module</u> controls data transmission between the to-be-connected device and the end-user device; and

> when a to-be-connected device connects to the video port module, the <u>data transmission control module</u> receives the to-be-displayed information from the end-user device to the to-be-connected device to display.

19

(emphasis added); *See also* Ex. A, 3:11-20, 3:26-36. Moreover, FIGURE 2 shows the data transmission control module (30) situated as an intermediate component situated between various modules which can connect simultaneously to various to-be-connected devices (110) and the second data port (12) of main port module (10) for connecting to the end user device (120). *See also* Ex. B, at 8 (SANC000966, configuration showing data transmission control module situated between second data port module, video port module and main port module). The specification states that the data transmission control module 30 "includes USB control unit 31, USB conversion unit 32, memory card conversion unit 33, mode control unit 34, and mode conversion unit 35." Ex. A, 4:11-16. A POSITA would understand that when multiple devices (110) are connected to the port extension apparatus, including the second data port module and video port module, the data transmission control module 30 governs the transmission of data between to-be-connected devices (110) and port unit (12), which connects to the end user device (120).



*See* Ex. A, F<small>IG</small>. 2. This may optionally include conversion to the proper media format, if necessary. *Id*., 5:54-58.

The data transmission control module thus acts as an intermediary where there is no point-to-point connection. "Different from the first data port module 20, when the to-be-connected device 110 connects to other port modules (e.g., the second data port module 40, the video port module 50), <u>data transmission needs to pass through the data transmission control module 30 between the to-be-connected device 110 and the end-user device 120</u>." *Id.*, 3:43-48 (emphasis added).

Conversely, Defendants' construction is flawed. As shown above, the plain meaning of "module" does not support "self-contained" and "separate and apart from other modules", and the intrinsic evidence shows interaction and interdependence between the various modules. Moreover, Defendants' construction

omits the "control" function. Sanho is <u>not</u> opposed to this modified construction: "*a distinguishable component situated between other modules that controls electronical transfer of information between the end-user device and to-be-connected devices.*"

### D.   <u>Disputed Claim Phrase No. 4</u> – "video port module" (Asserted Claim 1)

| Sanho's Construction | Defendants' Construction |
|---|---|
| One physical communication access point suitable for connecting to a video transmitting device and facilitating video transmission | self-contained component, separate and apart from other modules, having a port dedicated outputting a video signal |

As shown above, "self-contained" and "separate and apart from other modules" are not supported by the plain meaning of "module," or the intrinsic evidence showing interaction and interdependence between modules. Sanho is <u>not</u> opposed to: "*a component, <u>distinguishable</u> from other modules, having a port dedicated outputting a video signal.*"

### E.   <u>Disputed Claim Phrase No. 5</u> – "USB conversion unit" (Asserted Claim 9)

| Sanho's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning, wherein plain and ordinary means a converter that converts one USB standard to another USB standard and/or optionally converts between a data transmission mode and a power supply mode | a USB unit that converts a data port module between a data transmission mode and a power supply mode |

Sanho's construction is driven by the obvious, given the embodiments presented in the specification. The to-be-connected device (110) can be a USB flash drive. Ex. A, 3:52. The second port unit 12 may be a Type-C male port. *Id.*, 5:24-25. In such a case, a POSITA would understand that a USB conversion unit is needed to convert traditional USB (type A) to USB type C, and vice-versa, for example:



*See id.*, F_{IG}. 2 (12, 32, and 110).

Defendants incorrectly posit that a USB conversion unit is understood as a unit that converts a data port module between a data transmission mode and a power supply mode. The intrinsic evidence does not reference a "data transmission mode" or "a power supply mode." If the to-be-connected device is a mobile phone, the conversion unit may charge the mobile phone. *Id.*, 5:20-23. Not all to-be-connected devices in the specification are mobile phones (*e.g.*, "USB flash drive, mobile phone, or display device"). *Id.,* 3:50. It is possible to build a port extension apparatus within the scope of the 429 Patent regardless of whether a mobile phone is a to-be-connected device. Furthermore, the claims are silent as to whether any to-be-connected-device needs to be a mobile phone. However, Sanho is <u>not</u> opposed to the following construction: "*a unit that converts between USB standards and/or charges a USB-compatible mobile phone*."

Dated: March 12, 2021          Respectfully submitted,

By:   */s/ Steven G. Hill*
    Steven G. Hill
    GA Bar No. 354658
    Martha L. Decker
    GA Bar No. 420867
    **HILL, KERTSCHER & WHARTON, LLP**
    3350 Riverwood Parkway, Suite 800
    Atlanta, Georgia 30339
    Telephone: (770) 953-0995
    Facsimile: (770) 953-1358

    **ARI LAW, P.C.,**

Ali A. Aalaei
CA Bar No. 254713
  *(admitted pro hac vice)*
Benjamin Martin
CA Bar No. 257452
*(admitted pro hac vice)*
90 New Montgomery St., Suite 900
San Francisco, CA 94105
Tel: 415-830-9968
Fax: 415-520-9456

*Attorneys for Plaintiff Sanho Corporation*

## CERTIFICATION OF COMPLIANCE

I hereby certify that the forgoing brief has been prepared with one of the font and point selections approved by the Court in LR 5.1(B) [Times New Roman 14-point] and does not exceed the page limit set forth in LR 7.1(D).

Dated: March 12, 2021            By:   */s/ Steven G. Hill*
                                       Steven G. Hill

                                       *Attorneys for Plaintiff Sanho Corporation*

25

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SANHO CORPORATION,

      Plaintiff,

   v.

KAIJET TECHNOLOGY
INTERNATIONAL LIMITED, INC.;
KAIJET TECHNOLOGY
INTERNATIONAL CORPORATION;
MAGIC CONTROL TECHNOLOGY;
STARVIEW GLOBAL LIMITED, each
doing business as "J5Create;" and
DOES 1-10,

      Defendants.

This Document Relates to *C.A. No. 1:20-cv-02150-TCB*

**C.A. No. 1:18-cv-05385-SDG**

Consolidated with
C.A. No. 1:20-cv-02150-TCB

**Jury Trial Demanded**

## CERTIFICATE OF SERVICE

I certify that on the 12th day of March, 2021, I caused to be electronically transmitted the foregoing document to the Clerk of the Court using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to participants and law firm who are registered CM/ECF users, and will be served by the CM/ECF system.

By: ***/s/ Steven G. Hill***
     Steven G. Hill
     *Counsel for Plaintiff Sanho Corporation*

26