UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SANHO CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC., dba "j5create;" and DOES 1-100,<br><br>Defendants, | Case No. 1:18-cv-05385-SDG |
| SANHO CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC.; KAIJET TECHNOLOGY INTERNATIONAL CORPORATION; MAGIC CONTROL TECHNOLOGY; STARVIEW GLOBAL LIMITED, each doing business as "J5Create;" and DOES 1-10,<br><br>Defendants. | Consolidated with<br>Case No. 1:20-cv-02150-TCB |

**KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC. AND
KAIJET TECHNOLOGY INTERNATIONAL CORPORATION'S
OPENING CLAIM CONSTRUCTION BRIEF**

# **TABLE OF CONTENTS**

I.  THE KAIJET ENTITIES' PROPOSED CONSTRUCTIONS REFLECT THE DEVICE CLAIMED AND DESCRIBED IN THE '429 PATENT.....2

II. THE LEGAL STANDARDS OF CLAIM CONSTRUCTION SUPPORT THE KAIJET ENTITIES' PROPOSED CLAIM CONSTRUCTIONS .......5

III. THE KAIJET ENTITIES' PROPOSED CONSTRUCTIONS ARE SUPPORTED BY THE INTRINSIC AND EXTRINSIC EVIDENCE .......7

  A.  A "Module" is a "Self-Contained Component, Separate and Apart From Other Modules" ......................................................................7

    1.  A "main port module for connecting to an end-user device having first and second port units" is a "self-contained component, separate and apart from other modules, that contains a first and second port unit for connecting to an end-user device" ................................................................................10

    2.  A "data port module" is a "self-contained component, separate and apart from other modules, having an interface through which data is transferred from the to-be-connected device to the port extension apparatus and vice versa"....................................12

    3.  A "video port module" is a "self-contained component, separate and apart from other modules, having a port dedicated to outputting a video signal" ..........................................................15

    4.  A "data transmission control module" is a "self-contained component, separate and apart from other modules, that electronically transfers information between the end-user device and the to-be-connected device" .....................................17

  B.  A "USB conversion unit" is "a USB unit that converts a data port module between a data transmission mode and a power supply mode" ...............................................................................................19

IV. THE COURT SHOULD ADOPT THE KAIJET ENTITIES' PROPOSED CONSTRUCTIONS ...................................................................23

i

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Acceleron, LLC v. Dell, Inc.*,
  No. 1:12-cv-4123-TCB, 2018 U.S. Dist. LEXIS 223273
  (N.D. Ga. Nov. 14, 2018) ...................................................................15

*Allergan USA, Inc. v. Medicis Aesthetics, Inc.*,
  No. SACV 13-1436 AG (JPRx), 2014 U.S. Dist. LEXIS 156570
  (C.D. Cal. Aug. 12, 2014)...................................................................12

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006) .............................................................13

*Every Penny Counts, Inc. v. American Express Company*,
  563 F.3d 1378 (Fed. Cir. 2009) .....................................................1, 11

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA Inc.*,
  450 F.3d 1350 (Fed. Cir. 2006) ...................................................17, 22

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) .............................................................5, 6

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) .........................................................14

*Nystrom v. Trex Company, Inc.*,
  424 F.3d 1136 (Fed. Cir. 2005) ...........................................................8

*Phillips v. AWH Corporation*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................1, 5, 6, 7, 8, 10

*Rexnord Corporation v. Laitram Corporation*,
  274 F.3d 1336 (Fed. Cir. 2001) .........................................................18

*Rheox, Inc. v. Entact, Inc.*,
  276 F.3d 1319 (Fed. Cir. 2002) ...........................................................6

*Stumbo v. Eastman Outdoors, Inc.*,
  508 F.3d 1358 (Fed. Cir. 2007) .........................................................13

ii

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ........................................................................................5, 6

*Warner-Lambert Co. v. Purepac Pharmaceutical Co. (In re Gabapentin Patent Litigation)*,
    503 F.3d 1254 (Fed. Cir. 2007) .........................................................................1

**Other Authorities**

CAMBRIDGE DICTIONARY (Online) ............................................................................10

COMPUTER DESKTOP ENCYCLOPEDIA (9th ed. 2001) ...............................................10

MERRIAM-WEBSTER DICTIONARY (Online) ..............................................................19

MICROSOFT COMPUTER DICTIONARY (5th ed. 2002) ..........................................10, 13

Under Local Patent Rule 6.5 and the Court's Amended Scheduling Order (ECF 208), defendants Kaijet Technology International Limited, Inc. and Kaijet Technology International Corporation (the "KaiJet Entities"), separate and apart from all other defendants, submit this Opening Claim Construction Brief on disputed terms in U.S. Patent No. 10,572,429 (ECF 204-1 ("the '429 Patent")) as set forth in the parties First Amended Joint Claim Construction Statement (ECF 231).

All words in a patent claim have meaning, and the purpose of claim construction is to determine that meaning in the eyes of a person having ordinary skill in the art as of the effective filing date of the patent.[1] Because "the court's obligation is to ensure that questions of the scope of the patent are not left to the jury" it must "assign 'a fixed, unambiguous, legally operative meaning'" to claim terms.[2] While there is a large body of case law on the rules of claim construction, two are especially relevant here: (1) the specification is "the single best guide to the meaning of a disputed term"[3] and (2) "[a] construction rendering a claim term redundant or superfluous is to be avoided."[4]

The KaiJet Entities' proposed constructions are guided by these two rules, among others. They are based on the teachings of the '429 Patent specification and file history—sometimes using language directly from these sources—and follow technical dictionaries. The KaiJet Entities' proposed constructions are also unambiguous and provide the Court

---

[1] *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).
[2] *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1386 (Fed. Cir. 2009).
[3] *Phillips,* 415 F.3d at 1315.
[4] *Warner-Lambert Co. v. Purepac Pharm. Co. (In re Gabapentin Patent Litig.)*, 503 F.3d 1254, 1263 (Fed. Cir. 2007).

an easy path to fulfill its obligation to clarify the '429 Patent claims for the jury. In contrast, Plaintiff's proposed constructions insert ambiguity rather than provide clarity. Many of Plaintiff's proposed constructions are seemingly pulled out of thin air and pay no attention to the '429 Patent specification, prosecution history, or even the words of the claims themselves. Adopting Plaintiff's proposed constructions would leave a jury with more questions than answers about the scope of the '429 Patent claims, defeating the purpose of this claim construction process. The Court should adopt the KaiJet Entities' proposed constructions.

## I.   THE KAIJET ENTITIES' PROPOSED CONSTRUCTIONS REFLECT THE DEVICE CLAIMED AND DESCRIBED IN THE '429 PATENT

The '429 Patent specification describes a port extension apparatus for extending ports of an end-user device, such as a laptop computer.[5] In the background section, the '429 Patent explains that the number of ports on end-user devices are often limited and are positioned closely together due to the overall size of the end-user device.[6] It expresses concern that due to the size and position of ports on the end-user device, a to-be-connected device connected to one port might block access to another port of the end-user device.[7]

To allegedly address this issue, the '429 Patent specification discloses a "port extension apparatus" that purports to resolve "low and/or inefficiency port usage problems in end-user devices."[8] The described port extension apparatus can include up to seven "modules" each having "data transmission ports" to connect to the other modules within

---

[5] Exhibit A, ECF 204-1 ("'429 Patent"), Abstract.
[6] *Id*. at 1:14-24.
[7] *Id*.
[8] *Id.* at 1:36-39.

2

the port extension apparatus.[9] FIG. 1 (below) shows the modules (10, 20, 30, 40, 50, 60, 70) and data transmission ports (201, 301, 401, 501, 601, 701, 301, 302, 303, 304, 305):



The '429 Patent specification explains that when a "to-be-connected device 110" is connected to the various "port modules," transmission paths "via a wired connection" are formed between the "to-be-connected device 110" and the "end-user device 120."[10] The "main port module 10 includes a first port unit 11 and a second port unit 12," each of which can connect to the "first port 1201" and "second port 1202" of the port extension apparatus.[11] When the ports on the end-user device are both USB-C female ports, the first and second port units of the main port module are corresponding USB-C male ports.[12]

Claim 1 of the '429 Patent, the only independent claim, recites:

---

[9] *Id.* at 3:5-20; FIG. 1.
[10] *Id.*
[11] *Id.* at 4:5-6; FIG. 2.
[12] *Id.* at 5:28-32.

3

1. A port extension apparatus for extending ports of an end-user device comprising:

**a main port module for connecting to an end-user device, the main port module having first and second port units**;

a first **data port module** operatively connecting to the first port unit;

a **data transmission control module** operatively connecting to the second port unit via a first data transmission port of the data transmission control module;

a second data port module operatively connecting to a second data transmission port of the data transmission control module; and

a **video port module** operatively connecting to a third data transmission port of the data transmission control module;

wherein when a to-be-connected device connects to the first data port module, the first data port module and the main port module form a transmission path enabling data transmission between the to-be-connected device and the end-user device;

when a to-be-connected device connects to the second data port module, the data transmission control module controls data transmission between the to-be-connected device and the end-user device; and

when a to-be-connected device connects to the video port module, the data transmission control module receives the to-be-displayed information from the end-user device to the to-be-connected device to display.[13]

During prosecution, the Patent Office rejected the pending claims as obvious over U.S. Pat. No. 6,650,649 ("Muhammad") and U.S. Pat. App. Pub. No. 2011/0317076 ("Chen"). Muhammad discloses an extension system for expanding the number of interface

---

[13] *Id.* at 6:46-7:6 (disputed terms in bold first time in claim).

modules that interface with a communications system.[14] To distinguish the device described in the '429 Patent from Muhammad, the applicant amended the claims and argued that "the first and second extension interface module in Muhammad shouldn't be considered as equal to the first and second port units in claim 1, as the first and second port units **are contained in the main port module**."[15] The Patent Office allowed the claims after considering the amendment and argument.

## II.   THE LEGAL STANDARDS OF CLAIM CONSTRUCTION SUPPORT THE KAIJET ENTITIES' PROPOSED CLAIM CONSTRUCTIONS

Claim construction is a question of law to be decided by the Court.[16] A claim term is generally given "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . [read] in the context of the entire patent, including the specification."[17] Claim construction begins with the intrinsic evidence of the patent—the claims, the specification, and the prosecution history.[18]

While the language of the claims themselves is the first source for interpretation, the specification and the prosecution history also provide "evidence of how the [PTO] and the inventor understood the patent."[19] The specification is "the single best guide to the meaning of a disputed term," and is the "best source for understanding a technical term."[20] The

---

[14] Exhibit B, Response to Non-Final Office Action dated June 21, 2019 ("Office Action Response") at 8-9.

[15] *Id.* (emphasis added).

[16] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).

[17] *Phillips,* 415 F.3d at 1312-13.

[18] *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

[19] *Phillips*, 415 F.3d at 1317.

[20] *Phillips*, 415 F.3d 1315.

"prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."[21] Arguments made during prosecution to overcome prior art can narrow the scope of a claim.[22]

A court can turn to evidence outside the patent and prosecution history ("extrinsic evidence") as a claim construction aid,[23] but extrinsic evidence is less significant than intrinsic evidence.[24] That said, the Federal Circuit has observed that "dictionaries and treatises can be useful in claim construction," and since "dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention."[25]

"A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."[26] For the '429 Patent, the KaiJet Entities propose that such a person would have at least a bachelor's degree in electrical engineering or equivalent coursework, and at least a year of experience developing electronic device accessories including port hubs and port extenders. Less work

---

[21] *Teva Pharms.*, 135 S. Ct. at 841.
[22] *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002).
[23] *Markman*, 52 F.3d at 980 (quotations omitted).
[24] *Phillips*, 415 F.3d at 1317.
[25] *Id.* at 1318.
[26] *Id.*

experience may be compensated by a higher level of education, such as a Master's degree, and vice versa.

## III. THE KAIJET ENTITIES' PROPOSED CONSTRUCTIONS ARE SUPPORTED BY THE INTRINSIC AND EXTRINSIC EVIDENCE

### A. A "Module" is a "Self-Contained Component, Separate and Apart From Other Modules"

"Module" appears in four of the disputed claim terms, and a primary dispute between the parties is how to interpret it. The '429 Patent specification and prosecution history imply that a "module" is a self-contained component, separate and apart from other modules, and contemporaneous technical dictionaries support that implication. As a result, the KaiJet Entities' proposed constructions consistently reflect that a "module" is a separate, self-contained component. Plaintiff's proposed constructions do not.

Courts often start claim construction with the widely accepted meaning of commonly understood words.[27] The commonly understood meaning of "module" is a self-contained and interchangeable part combinable with other "modules" to form various designs. For example, modular furniture is made from separate, interchangeable, and independent modules combined to create a variety of furniture designs. Modular buildings and modular homes include separate, interchangeable, pre-built modules mixed and matched to create different floor plans. Use of modules allows a designer to efficiently create designs of various arrangements by combining different self-contained and separate

---

[27] *See Phillips*, 415 F.3d at 1314 ("the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.")

components. The widely accepted, common understanding of module is a self-contained and separated component.

The use of "module" in the '429 Patent does not deviate from this widely accepted and common meaning. Claim 1 recites five separate "modules" that each "connects" to another module of the claimed "port extension apparatus."[28] While the '429 Patent specification does not define "module," it consistently calls separate and self-contained components "modules," which informs its proper construction. [29] For example, FIG. 1 shows seven independent "modules" connected via their various "ports" and at their various "ends," suggesting that they are self-contained, independent, and interchangeable.[30] The '429 Patent specification explains that data transfer paths to the "end-user device" differ for the "first data port module" and the "second data port module," suggesting that these "modules" are separate and independent of each other.[31] The '429 Patent specification also explains that while the "video port module 50" includes ports of "current technologies," the "invention extends to future video ports," suggesting that the video port module could be easily replaced with a different "module" supporting "future

---

[28] '429 Patent, 6:46-7:6.

[29] *See Nystrom v. Trex Co., Inc.,* 424 F.3d 1136, 1145 (Fed. Cir. 2005) (affirming construction of "board" to refers to "wood cut from a log" because of patentee's consistent usage of "board" as such in specification); *Phillips* 415 F.3d 1315 (specification is "single best guide to meaning of a disputed term").

[30] '429 Patent, 1:46-50; 3:10-20.

[31] *Id.*, 3:43-48 and 4:12-15 ("device 110 connects to the first data port module 20, data directly transmits between the first data port module 20 and the end-user device 120 via main port module 10," but "[d]ifferent from the first data port module 20, when the to-be-connected device 110 connects to other port modules . . . data transmission needs to pass through the data transmission control module 30").

video ports."[32] There is nothing in the '429 Patent specification describing a module as anything other than a self-contained, physically independent, and discrete component.

The prosecution history of the '429 Patent also supports that a module is a self-contained component, separate and apart from other modules. During prosecution, the applicant narrowed the pending claims by focusing on the "configuration of the port extension apparatus in claim 1" and arguing that "the coupling and/or connecting method of interior configuration of the port extension apparatus of claim 1 is totally different from" the cited prior art.[33] The applicant focused specifically on the fact that the "first and second port units are contained in the main port module."[34] To stress the differences, the applicant created a diagram showing the modular nature of the claimed "port extension apparatus":



These statements confirm that the '429 Patent's use of "module" is the same as its ordinary and customary meaning: a self-contained component separate from other modules.

While not as important as intrinsic evidence, technical dictionaries can be especially useful in claim construction because they "endeavor to collect the accepted meanings of

---

[32] *Id.*, 4:52-55.

[33] Response to Non-Final Office Action dated June 21, 2019, 8-9.

[34] *Id.*

terms used in various fields of science and technology."[35] Here, technical dictionaries support the KaiJet Entities' proposed construction. According to McGraw Hill's Computer Desktop Encyclopedia, a module is "[a] self-contained hardware or software component that interacts with a larger system."[36] Microsoft's Computer Dictionary similarly defines module as "a self-contained component that can provide a complete function to a system and can be interchanged with other modules that provide similar functions."[37] This follows the Cambridge Dictionary that defines a module as "one of a set of separate parts which, when combined, form a complete whole."[38] The intrinsic and extrinsic evidence support that a "module" is a self-contained component, separate and apart from other modules, and the KaiJet Entities have applied this to their constructions.

1. A "<u>main port module for connecting to an end-user device having first and second port units</u>" is a "**self-contained component, separate and apart from other modules, that contains a first and second port unit for connecting to an end-user device**"

| Plaintiff's Proposed Construction | KaiJet Entities' Proposed Construction |
|---|---|
| one physical communication access point of a circuit board having only first and second interface connectors to which an end-user device may directly connect | self-contained component, separate and apart from other modules, that contains a first and second port unit for connecting to an end-user device |

The KaiJet Entities' proposed construction for "main port module for connecting to

---

[35] *Phillips*, 415 F.3d 1318.
[36] Exhibit C, *module*, COMPUTER DESKTOP ENCYCLOPEDIA (9th ed. 2001).
[37] Exhibit D, *module*, MICROSOFT COMPUTER DICTIONARY (5th ed. 2002).
[38] Exhibit E, *module*, CAMBRIDGE DICTIONARY (Online) (https://dictionary.cambridge.org/us/dictionary/english/module)

an end-user device having first and second port units" inserts the proper construction of "module" within the term to arrive at a claim construction that is no more or less than what is claimed. It is correct.

Plaintiff's proposed construction—requiring "one physical communication access point of a circuit board"—is incorrect because it conflicts with claim 1 and the '429 Patent specification. Claim 1 requires that the "main port module" have "first and second port units." The '429 Patent specification describes the first and second port units in one embodiment as "a Type-C male port or a USB male port."[39] "***One physical*** communication access ***point*** of a circuit board" cannot have two "male ports." In addition, the '429 Patent specification describes that the "main port module" has a "first end" and a "second end."[40] But "***one physical*** . . . ***point***," cannot have both a first end and a second end.

Plaintiff's proposed construction is also incorrect because it is internally inconsistent and ambiguous.[41] It requires that a main port module be a ***single*** "physical communication access point of a circuit board," but also requires that a main port module have ***two*** different "interface connectors." A main port module cannot be simultaneously "one communication access point" and have "two interface connectors." Because Plaintiff's construction inserts

---

[39] *Id.*, 5:24-27.
[40] '429 Patent, 1:47-50; 3:11-17.
[41] *See Every Penny Counts*, 563 F.3d at 1383 (stating that, because "the court's obligation is to ensure that questions of the scope of the patent claims are not left to the jury" it must "assign 'a fixed, unambiguous, legally operative meaning to the claim[s]'").

more ambiguity into the "main port module" term instead of less,[42] in addition to conflicting with the '429 Patent specification, the Court should reject it.

> **2.    A "<u>data port module</u>" is a "self-contained component, separate and apart from other modules, having an interface through which data is transferred from the to-be-connected device to the port extension apparatus and vice versa"**

| Plaintiff's Proposed Construction | KaiJet Entities' Proposed Construction |
|---|---|
| one physical communication access point suitable for connecting to a data transmission device for facilitating data transmission | self-contained component, separate and apart from other modules, having an interface through which data is transferred from the to-be-connected device to the port extension apparatus and vice versa |

The Court should adopt the KaiJet Entities' construction because it gives meaning to each word of "data port module," follows the specification, and provides clarity to that claim term. In contrast, Plaintiff's proposed construction renders "module" superfluous and injects ambiguity in the claim term.

As explained above, the term "module" has a widely held and understood definition as a self-contained and separate component. The KaiJet Entities' proposed construction reflects this; Plaintiff's proposed construction does not. The concept of "module" or "modularity" is wholly absent from Plaintiff's proposed construction.

Making matters worse, Plaintiff's construction of "data port module" appears to

---

[42] *See Allergan USA, Inc. v. Medicis Aesthetics, Inc.*, No. SACV 13-1436 AG (JPRx), 2014 U.S. Dist. LEXIS 156570, at *14 (C.D. Cal. Aug. 12, 2014) ("Plaintiffs' construction would frustrate a comparison of the patented invention to the allegedly infringing invention. Courts construe claim terms in order to assign a fixed, unambiguous, legally operative meaning to the claim. Plaintiff's construction is too vague to provide such a meaning.") (citations omitted)

render "module" superfluous, which is incorrect.[43] While Plaintiff's proposed construction includes "one physical communication access point suitable for connecting to a data transmission device," this language is more akin to the definition of a "port," not a "port module." A "port" is an "interface through which data is transferred between a computer and other devices . . . a network, or a direct connection to another computer," that may "be dedicated solely to input or output."[44] Plaintiff's proposed construction only gives meaning to "port" but not "module," improperly removing the concept of a "module" from the claim.[45]

The '429 Patent specification distinguishes between "ports" and "port modules," putting Plaintiff's proposed construction in conflict with the specification. For example, the specification explains that each of the first data port module 20, the second data port module 40, the video port module 50, the third data port module 60, and the memory card R/W module 70, have respective physical access points for data transmission in the form of "data transmission ports" 201, 401, 501, 601, and 701.[46] The data transmission control module also has several "data transmission ports" (*i.e.*, physical access points for data transmission) 301, 302, 303, 304, and 305.[47] Under the teachings of the '429 Patent specification, there is a difference between a "port" and a "port module." Plaintiff's

---

[43] *See Stumbo v. Eastman Outdoors, Inc.,* 508 F.3d 1358, 1362 (Fed. Cir. 2007) ("A claim construction that renders claim language superfluous is almost always incorrect.").

[44] Exhibit D, *port*, MICROSOFT COMPUTER DICTIONARY (5th ed. 2002).

[45] *See Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim").

[46] '429 Patent, FIGS. 1 & 2; 3:10-20.

[47] *Id.*

proposed construction makes no such distinction.

In contrast, the KaiJet Entities' proposed construction is better because it gives meaning to both "module" (*i.e.*, "self-contained component, separate and apart from other modules") and "port" (*i.e.*, "having an interface through which data is transferred").[48] The remainder of the KaiJet Entities' construction for "data port module"—"from the to-be-connected device to the port extension apparatus and vice versa"—is consistent with the '429 Patent specification and provides clarity to the claim term. The '429 Patent specification explains that "[w]hen a to-be-connected device connects to the first data port module, the first data port module and the main port module form a transmission path enabling data transmission between the to-be-connected device and the end-user device," and that that "[w]hen a to-be-connected device is connected to the port extension apparatus via the second data port module, the data transmission control module controls data transmission between the to-be-connected device and the end-user device."[49] The KaiJet Entities' proposed construction clarifies, based on the teachings of the '429 Patent specification, that claimed first and second "data port modules" are port modules through which data between the to-be-connected device and port extension apparatus flows.

Plaintiff's proposed construction, on the other hand, inserts ambiguity into "data port module" by including phrases that make the term more confusing and less clear. For example, the phrase "data transmission device" in Plaintiff's proposed construction causes

_____

[48] *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.")

[49] '429 Patent, Abstract; 1:61-64 (emphasis added).

confusion because it is unclear whether the "data transmission device" of Plaintiff's proposed construction is the claimed "end-user device," the claimed "to-be-connected device," or some other third "device" not explicitly recited in the claims. While the '429 Patent specification refers to a "to-be-connected device" and an "end-user device," it does not refer to a "data transmission device." Plaintiff's proposed construction is also ambiguous due to it including the phrase "facilitating data transmission." The '429 Patent specification does not use the words "facilitating" or "facilitating data transmission," and it provides no description of how the first or second data port modules "facilitate data transmission," or perform any function related to facilitating data transmission. Courts strongly disfavor adopting claim constructions introducing ambiguity, and Plaintiff's proposed construction does just that.[50]

3. **A "<u>video port module</u>" is a "self-contained component, separate and apart from other modules, having a port dedicated to outputting a video signal"**

| Plaintiff's Proposed Construction | KaiJet Entities' Proposed Construction |
|---|---|
| one physical communication access point suitable for connecting to a video transmitting device and facilitating video transmission | self-contained component, separate and apart from other modules, having a port dedicated to outputting a video signal |

The issues related to the parties' proposed constructions for "video port module" are similar to those discussed above regarding "data port module." The KaiJet Entities'

---

[50] *See Acceleron, LLC v. Dell, Inc.,* No. 1:12-cv-4123-TCB, 2018 U.S. Dist. LEXIS 223273, at *26 (N.D. Ga. Nov. 14, 2018) (rejecting claim construction including phrase "predetermined manner" because "'predetermined manner' is not found in the specification, has no meaning to a person of ordinary skill, and will be confusing to the jury").

proposed construction gives meaning to the word "module" and is based on the '429 Patent specification while Plaintiff's proposed construction renders the word "module" superfluous and injects ambiguity into the claim.

As with the other module terms, the KaiJet Entities' proposed construction captures the concept of a module as a self-contained and separate component. The remainder of its proposed construction—that a "video port module" has "a port dedicated to outputting a video signal" is rooted firmly in the '429 Patent specification. Every embodiment of the "video port module" in the '429 Patent specification describes a port dedicated to outputting a video signal to the "to-be-connected device."[51] For example, the '429 Patent specification explains that "[w]hen the to-be-connected device connects to the video port module, the data transmission control module *receives* the to-be-displayed information *from the end-user device and transmits to the to-be-connected device to display*."[52] It also explains that when "the to-be-connected device 110 connects . . . via the video port module 50, the data transmission control module 30 receives instructions from the end-user device 120 with to-be-displayed information; and further transmits the to-be-displayed information to the to-be-connected device 110 to display."[53] The '429 Patent specification further explains that when a device is connected via the video port module, the "mode control unit 34 controls the mode conversion unit 35 to convert the to-be-displayed information to the proper format for the display device to display" through the video port

---

[51] '429 Patent, Abstract, 1:65-2:3, 2:16-20, 3:31-36, 4:56-64.
[52] '429 Patent, 2:17-20 (emphasis added).
[53] *Id.*, 3:29-36.

module.[54] A video port module, according to the '429 Patent specification, is dedicated to outputting a video signal, and the KaiJet Entities' proposed construction reflects this.[55]

Plaintiff's proposed construction again renders "module" superfluous by only focusing on the concept of a "port" in its proposed construction. As noted above, the phrase "one physical communication access point suitable for connecting" may describe a "port" but it does not describe a "port module." Nothing in Plaintiff's proposed construction of "video port module" captures the concept of a module. In addition, the phrase "connecting to a video transmitting device and facilitating video transmission" in Plaintiff's proposed construction is nearly identical to the language used in Plaintiff's proposed construction of "data port module," but substituting "data" with "video." It likewise achieves the same result of rendering "video port module" ambiguous. The '429 Patent specification does use the phrase "video transmitting device" and it is not clear whether the "video transmitting device" is the "end-user device" or "to-be-connected device" of claim 1. In addition, nowhere does the specification describe "facilitating video transmission." The Court should not adopt Plaintiff's proposed construction.

4.    **A "data transmission control module" is a "self-contained component, separate and apart from other modules, that electronically transfers information between the end-user device and the to-be-connected device"**

| Plaintiff's Proposed Construction | KaiJet Entities' Proposed Construction |
|---|---|
| a data management assembly | self-contained component, separate and |

---

[54] *Id.*, 4:47-64.

[55] *See Inpro II Licensing, S.A.R.L. v. T-Mobile USA Inc.,* 450 F.3d 1350, 1355 (Fed. Cir. 2006) (while "claims need not be limited to the preferred embodiment when the invention is more broadly described, 'neither do the claims enlarge what is patented beyond what the inventor has described as the invention.'").

| for controlling data traffic, selecting and switching input devices and optionally converting media | apart from other modules, that electronically transfers information between the end-user device and the to-be-connected device |
| --- | --- |

A "claim term should be construed consistently with its appearance in other places in the same claim."[56] The KaiJet Entities have consistently applied this principle and construed "module" as a self-contained and separate component for each of the disputed claim terms. Its proposed construction for "data transmission control module" is no exception. The remainder of KaiJet Entities' construction—that the data transmission control module "electronically transfers information between the end-user device and the to-be-connected device"—has explicit specification support. While the '429 Patent specification is generally light on functional specifics, it explicitly states that "the data transmission control module 30 controls the data transmission between the to-be-connected device 110 and the end-user device 120."[57]

Plaintiff has ignored the principle of construing terms consistently within a claim for its proposed construction of "data transmission control module." Plaintiff seeks to substitute "module" for the word "assembly" even though Plaintiff does not use "assembly" or a similar word in its other proposed constructions for the "module" claim terms. And nowhere does the '429 Patent specification refer to a "module" as an "assembly." Plaintiff's introduction of the concept of "assembly" has no support and is inconsistent.

Plaintiff's proposed construction for "data transmission control module" also finds

---

[56] *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001).

[57] *See e.g.*, '429 Patent, 2:13-16.

no support in the '429 Patent specification because it limits the "data transmission control module" to something that performs the functions of "selecting and switching input devices and optionally converting media." Nowhere does the '429 Patent specification describe the "data transmission control module" as selecting devices, switching devices, or otherwise controlling data traffic. While the specification discusses that the "mode conversion unit" of the "data transmission control module" can convert to-be-displayed information to the proper format before transmitting the information to a display device, the specification does not describe doing so "optionally."[58] Simply put, Plaintiff's proposed construction is not based the intrinsic evidence, and Plaintiff has not cited to any supporting extrinsic evidence. Plaintiff's unsupported proposed construction must be rejected.

**B.**   **A "USB conversion unit" is "a USB unit that converts a data port module between a data transmission mode and a power supply mode"**

| Plaintiff's Proposed Construction | KaiJet Entities' Proposed Construction |
|---|---|
| Plain and ordinary meaning, wherein plain and ordinary means a converter that converts one USB standard to another USB standard and/or optionally converts between a data transmission mode and a power supply mode | a USB unit that converts a data port module between a data transmission mode and a power supply mode |

The plain language of "conversion unit" suggests a unit converting "from one use to another,"[59] and a "USB conversion unit" would be a unit converting from one USB use to another. But the plain language of "USB conversion unit" does not provide insight, either

---

[58] '429 Patent, 4:61-65; 5:54-58; 6:5-6.
[59] Exhibit F, *conversion*, MERRIAM-WEBSTER DICTIONARY (Online) (https://www.merriam-webster.com/dictionary/conversion)..

alone or within the context of claim 4,[60] as to between what two USB uses it converts.

The '429 specification provides some guidance, albeit in a single paragraph:

For example, when the to-be-connected device 110 is a mobile phone and the end-user-device 120 is a computer, the mobile phone connects to the port extension apparatus 100 through the third data port module 60. The USB control unit 31 controls the data transmission between the mobile phone and the computer; or through the control of the USB mode conversion unit 32 to charge the mobile phone.[61]

The last sentence of this paragraph explains that the USB control unit, not the USB conversion unit, controls the data transmission between the to-be-connected device (the mobile phone) and the end-user device (the computer). Though grammatically clunky, the remainder of the sentence—separated by the conjunction "or"—states that in the alternative, a mobile phone can be charged "through the control of the USB mode conversion unit 32." Thus, the USB mode conversion unit 32 (identified as "USB Conversion Unit 32" in FIG. 2) is used for charging the mobile device via the third data port module 60. The KaiJet Entities' proposed construction of "USB conversion unit" as "a USB unit that converts a data port module between a data transmission mode and a power supply mode" is appropriate because the '429 Patent specification provides no other functional description of a USB conversion unit.

To its credit, Plaintiff's proposed construction for "USB conversion unit" captures the power charging aspect, but also seeks to expand the scope of the term by adding a

---

[60] "USB conversion unit" appears in claim 4 which recites "The port extension apparatus as described in claim 2, wherein the data transmission control module comprises a USB (Universal Serial Bus) control unit, **a USB conversion unit**, a memory card conversion unit, a mode control unit and a mode conversion unit."

[61] '429 Patent, 5:17-23 (emphasis added).

second possible function not described in the '429 Patent specification: "convert[ing] one USB standard to another USB standard." There is no support in the '429 Patent specification for this, and Plaintiff cites to no extrinsic evidence for support either.

In fact, assuming that the claimed port extension apparatus converted between USB standards, the '429 Patent specification suggests that such functionality would be performed by either the data port modules or the USB control unit 31, not the USB conversion unit 32. FIG 2, annotated below, shows the only embodiment described in the specification including a USB conversion unit.



In FIG 2, the USB conversion unit is included in the transmission path between the third data port module 60, which the specification describes as "for a Type-C female port or a Lightning female port,"[62] and the second port unit 12, which the specification describes

---

[62] '429 Patent, 5:15-16.

as "a Type-C male port or a USB male port."[63] This first transmission path is shown in blue and purple in the annotated FIG. 2 and may require a USB standard conversion.

The second data port module 40, which the specification describes as "for a USB female port,"[64] is also in electronic communication with the second port unit 12. This second transmission path is shown and red and purple, with purple indicating the portion of the first transmission path and second transmission path that overlap. The second data port module 40, like the first, may also require USB standard conversion. Since the only component in both the first and second transmission paths is the USB *control* unit 31, it is likely the component performing USB standard conversion in the claimed port extension apparatus. The USB *conversion* unit is only in the first transmission path. This, coupled with the disclosure that the USB conversion unit is for charging, suggests that the USB conversion unit does not perform USB standard conversion.

There is nothing in the '429 Patent specification suggesting the USB conversion unit does anything other than convert the functionality of the third data port module between data transmission mode and power supply mode. Plaintiff's proposed construction broadens "USB conversion unit" beyond what the '429 Patent specification describes, and the Court must reject it for that reason and adopt the KaiJet Entities' proposed construction instead.[65]

---

[63] *Id.*, 5:25-27.
[64] *Id.*, 5:7-8.
[65] *See Inpro II Licensing*, 450 F.3d at 1355.

## IV.   THE COURT SHOULD ADOPT THE KAIJET ENTITIES' PROPOSED CONSTRUCTIONS

The KaiJet Entities submit that their proposed claim constructions should be adopted.

DATED this 12th day of March, 2021.

s/ *Andrew G. Strickland*
Andrew G. Strickland
GA Bar No. 335298
Ryan P. Gentes
GA Bar No. 421695
Robert A. Madayag, III
GA Bar No. 123699
William B. Dyer III
GA Bar No. 236915
LEE & HAYES, P.C.
75 14th Street, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: ryan.gentes@leehayes.com
Email: robm@leehayes.com
Email: bill.dyer@leehayes.com
Email: andrew.strickland@leehayes.com

Robert J. Carlson
WSBA Number 18455
*Admitted Pro Hac Vice*
LEE & HAYES, P.C.
701 Pike Street, Ste. 1600
Seattle, WA 98101
Telephone: (206) 315-4001
Email: carlson@leehayes.com

Rhett V. Barney
WSBA Number 44764
*Admitted Pro Hac Vice*
LEE & HAYES, P.C.
601 W. Riverside Ave., Ste. 1400
Spokane, WA 99201
Telephone: (509) 324-9256
Email: rhettB@leehayes.com

*Attorneys for Defendants KaiJet*
*Technology International Limited, Inc. and*
*KaiJet Technology International Corporation*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2021, I caused the foregoing Defendants KaiJet Technology International Limited, Inc. and KaiJet Technology International Corporation's Opening Claim Construction Brief to be filed with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing (NEF) to counsel of record.

    Ali A. Aalaei
    Alexander Chen
    Benjamin Martin
    Tuan Tiet
    Steven G. Hill
    Martha L. Decker


                                    s/ *Andrew G. Strickland*
                                    Andrew G. Strickland
                                    GA Bar No. 335298
                                    *Attorneys for Defendant KaiJet*
                                    *Technology International Limited, Inc. and*
                                    *KaiJet Technology International Corporation*

LEE & HAYES, P.C.
75 14th Street, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: andrew.strickland@leehayes.com