IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SANHO CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC., dba "j5create;" and DOES 1-100,<br><br>Defendants, | Case No. 1:18-cv-05385-SDG |
| SANHO CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC.; KAIJET TECHNOLOGY INTERNATIONAL CORPORATION; MAGIC CONTROL TECHNOLOGY; STAR VIEW GLOBAL LIMITED, each doing business as "J5Create;" and DOES 1-10,<br><br>Defendants. | Case No. 1:20-cv-02150-SDG<br>[Consolidated Case] |

AMENDED[1] SPECIAL MASTER'S REPORT AND
RECOMMENDATION REGARDING CLAIM CONSTRUCTION

---

[1] This Report and Recommendation corrects an error that appears on page 22 in the original R&R (Dkt. No. 282), filed September 5, 2021, wherein the recommended construction for the phrase "video port module" has been changed, as noted in bold, from: "In view of the above recommended constructions of 'main port module' and 'data port module,' the term 'video port

Pursuant to this Court's Order dated January 20, 2020 (Dkt. No. 226), the following is the report and recommendation from the undersigned Special Master regarding claim construction of the patent-in-suit, U.S. Patent No. 10,572,429 ("the '429 Patent") owned by Plaintiff Sanho Corporation ("Sanho"). Sanho has accused Defendants Kaijet Technology International Limited, Inc. and Kaijet Technology International Corporation (collectively, "Kaijet"), Majic Control Technology, and Star View Global Limited ("Star View") of infringing at least Claim 1 of the '429 Patent.

In accordance with the Local Patent Rules, Sanho, Kaijet and Star View submitted their Second Amended Joint Claim Construction and Prehearing Statement (Dkt. No. 261), Opening Briefs (Dkt. Nos. 240, 241 and 242), Response Briefs (Dkt. Nos. 263, 262 and 265) and Sanho's Sur-Reply Brief (Dkt. No. 266). Arguments were presented at a hearing on June 18, 2021 regarding the claim construction of the disputed terms/phrases. At the request of the Special Master

---

module' is recommended to mean -- *a component interacting with a larger system and having a defined boundary distinct from other modules in the system, wherein the component has an interface for transmitting **data between the to-be-connected device and the end-user device** and directly connects to the to-be-connected device --*." to: "In view of the above recommended constructions of 'main port module' and 'data port module,' the term 'video port module' is recommended to mean -- *a component interacting with a larger system and having a defined boundary distinct from other modules in the system, wherein the component has an interface for transmitting **to-be-displayed information from the end-user device to the to-be-connected device** and directly connects to the to-be-connected device --*."

during the hearing, Star View and Sanho filed respective post-hearing briefs, Dkt. Nos. 270 and 271.

Subsequent to the hearing, Sanho and KaiJet parties reached "modified 'Final Proposed Constructions'" regarding three of the disputed claim terms: "main port module," "data port module," and "video port module." At the post-hearing request of the Special Master, the parties filed Supplemental Construction Briefs regarding the respective revised claim construction terms. Dkt. Nos. 274 and 275.

This report and recommendation follows a careful review of the respective pleadings on claim construction, as well as the parties' presentations at the hearing.

## Claim Construction Standard

It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). The purpose of claim construction is to give claim terms the meaning understood by a person of ordinary skill in the art at the time of the invention. *Id.* at 1312–14. The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman v. Westview Instruments, Inc.,* 517 U. S. 370, 372 (1996). "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to

'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. CompuServe Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001).

As is stated in *Canvs Corp. v. United States*, 126 Fed. Cl. 106, 112-113 (2016):

> When construing patent claims, the court looks first to intrinsic evidence, then if needed, to extrinsic evidence. *Suffolk Techs., LLC v. AOL Inc.,* 752 F. 3d 1358, 1362 (Fed. Cir. 2014) ("After considering this intrinsic evidence, a court may also seek guidance from extrinsic evidence such as expert testimony, dictionaries, and treatises.") (citing *Phillips*, 415 F. 3d at 1317-18). Intrinsic evidence includes the patent claims and specification as well as the patent prosecution file history. This evidence "is the most significant source of the legally operative meaning of disputed claim language." [Citation omitted].

Generally, the words of a claim are given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. . . ." *Phillips*, *supra* at 1312-13 (citation omitted). The person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the specification, rather than solely in the context of the particular claim in which the disputed term appears. *Phillips*, *supra* at 1313.

In some instances, the meaning of a claim term as understood by one of skill in the art "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely

4

accepted meaning of commonly understood words." *Phillips, supra* at 1314.
"[T]he claims themselves provide substantial guidance as to the particular
claim terms." *Id.* Both "the context in which a term is used in the asserted
claim" and the "[o]ther claims of the patent in question are useful for
understanding the ordinary meaning." *Id.* The specification is "always highly
relevant to the claim construction analysis. Usually, it is dispositive; it is the
single best guide to the meaning of a disputed term." *Phillips, supra* at 1315
(quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir.
1996)). In short, the claims "must be read in view of the specification, of
which they are a part." *Markman, supra* at 979.

In construing claim terms, the court should also consider the patent's
prosecution history, another component of the intrinsic evidence used to supply
the proper context for claim construction. *Markman, supra* at 1317 ("Like the
specification, the prosecution history provides evidence of how the PTO and
the inventor understood the patent."). Unlike the specification, the prosecution
history "represents an ongoing negotiation between the PTO and the applicant,
rather than the final product of that negotiation." *Id.* For that reason, the
prosecution history "often lacks the clarity of the specification and thus is less
useful for claim construction purposes." *Id.*

The Court may also rely on extrinsic evidence which consists of all evidence external to the patent and prosecution history. *Phillips, supra* at 1317. However, the weight given to the extrinsic record is "less significant than [that given to] the intrinsic record." *Id.*

Therefore, an analysis of intrinsic evidence is usually sufficient to construe a disputed claim term, and if the intrinsic evidence is sufficient to resolve disputed claim terms, "reliance on any extrinsic evidence is improper." *Id.*; *see also Vitronics, supra* at 1584 ("Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence. . . ."); *Boss Control, Inc. v. Bombardier, Inc.*, 410 F.3d 1372, 1377 (Fed. Cir. 2005).

All of the sources of evidence discussed above have their advantages and drawbacks and varying amounts of persuasive force. There is no "rigid algorithm" or "sequence of steps" which the court must follow in considering these sources of evidence. *Phillips, supra* at 1321. All that matters "is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.*

Finally, "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248

6

(Fed. Cir. 1998) (citations omitted).  "[T]he resulting claim interpretation must, in the end, accord with the words chosen by the patentee to stake out the boundary of the claimed property." *Id.*

## Qualifications of One of Ordinary Skill in the Art

A key question in construing patent claims is what is a person of ordinary skill in the art would understand the words of a claim to mean at the relevant time. *See Phillips*, *supra* at 1313.  The level of skill in the art is "a prism or lens" through which we view the prior art and the claimed invention.  *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).

Sanho and KaiJet agreed that the qualifications of a person of ordinary skill in the art is a person having at least an undergraduate degree in electrical engineering, computer engineering or comparable field of study, with 1-2 years of experience researching, designing, developing, and/or testing computer hardware components and peripherals.  The Sanho and KaiJet also agreed that their respective experts, R. Jacob Baker, Ph.D., P.E. and Val DiEullis, Ph.D., were at least persons of ordinary skill in the art by the relevant time of the '429 Patent. Claim Construction Hearing Transcript, at page 5, lines 9-13 (Dkt. No. 273). [2]

---

[2] Star View did not proffer any opinion regarding the qualifications of a person of ordinary skill in the art, either in its briefs or during the claim construction hearing.

## Overview of the '429 Patent

The claims of the '429 Patent are directed to "a port extension apparatus for providing better usage and utilization efficiency ports of end-user devices," such as a mobile phone, a tablet, or a portable computer. '429 Patent, Abstract and col. 3, lines 37-38. "Ports (*e.g.*, headphone jack, USB (Universal Serial Bus) ports or USB-Type C ports) are provided in current end-user devices for connecting to other devices.  However, due to the limited size of an end-user device, only a few ports can be provided.  Also, the space between the ports provided is relatively tight." *Id.* at col. 1, lines 14-19.

Figure 2 of the '429 Patent illustrates one embodiment of the claimed port extension apparatus:

8



In this embodiment, the "first data port module 20, the second data port module 40, and the video port module 50 are connected to different to-be-connected devices 110 [such as a mobile phone or a USB flash drive] simultaneously and transmit data to the enduser device 120 at the same time." '429 Patent, at col. 3, lines 53-57.   "In all embodiments, when the to-be connected

device 110 connects to the first data port module 20, data directly transmits

between the first data port module 20 and the end-user device 120 via main port

module 10.  Different from the first data port module 20, when the to-be connected

device 110 connects to other port modules (e.g., the second data port module 40,

the video port module 50), data transmission needs to pass through the data

transmission control module 30 between the to-be-connected device 110 and the

end-user device 120." *Id.*, at col. 3, lines 43-48.  Figure 2 also depicts all of the

disputed claim construction terms, namely, main port module 10; data port

modules 20, 40 and 60; video port module 50; data transmission control module

30; and USB conversion unit 32.

Asserted Claims 1 and 4 of the '429 Patent recite all of the underlined

disputed claim terms:

> 1. A port extension apparatus for extending ports of an end-user
> device comprising:
>> a main port module for connecting to an end-user device, the main
>> port module having first and second port units;
>> a first data port module operatively connecting to the first port unit;
>> a data transmission control module operatively connecting to the
>> second port unit via a first data transmission port of the data
>> transmission control module;
>> a second data port module operatively connecting to a second data
>> transmission port of the data transmission control module; and
>> a video port module operatively connecting to a third data
>> transmission port of the data transmission control module; wherein
>> when a to-be-connected device connects to the first data port module,
>> the first data port module and the main port module form a

transmission path enabling data transmission between the to-be-connected device and the end-user device;

when a to-be-connected device connects to the second <u>data port module</u>, the <u>data transmission control module</u> controls data transmission between the to-be-connected device and the end-user device; and

when a to-be-connected device connects to the <u>video port module</u>, the <u>data transmission control module</u> receives the to-be-displayed information from the end-user device to the to-be-connected device to display.

4. The port extension apparatus as described in claim 2, wherein the data transmission control module comprises a USB (Universal Serial Bus) control unit, <u>a USB conversion unit</u>, a memory card conversion unit, a mode control unit and a mode conversion unit.

## Construction of Agreed Claim Phrases/Terms

| Claim Terms ('429 Patent Claims): | Agreed Upon Construction: |
|---|---|
| "USB control unit" (Claims 5-12) | Plain and ordinary meaning |
| "data transmission port" (Claims 1-17) | Plain and ordinary meaning |
| "operatively connecting" (Claims 1-17) | Joining to facilitate direct data transmission |
| "data port" (Claims 5-12) (independent of the term "data port module") | Plain and ordinary meaning |

The parties agree that other than the above terms and the disputed terms below, the claim terms of the '429 Patent should be given their customary and ordinary meaning as would be understood by a person having ordinary skill in the art as of the '429 Patent's effective filing date. Second Amended Joint Claim

Construction and Prehearing Statement, at page 2.

## Construction of Disputed Claim Phrases/Terms

Claim terms that require construction are set out below.  The remaining

disputed terms regarding the Sanho and KaiJet proposed constructions are noted in

bold.

1.  **"main port module for connecting to an end-user device having first and second port units" (Claims 1-17):**

| Sanho's Proposed Construction | KaiJet's Proposed Construction | Star View's Proposed Construction |
|---|---|---|
| a component **interacting with a larger system**, having **only two port units**, and directly connecting to an end-user device | a component **having a defined boundary distinct from other modules**, wherein the component **contains a first and second port unit** for directly connecting to an end-user device | Adopts and incorporates by reference KaiJet's proposed construction |

As to the "main port module . . ." term, the parties are now in agreement that

the module is a component and is "directly connecting to an end-use device." They

disagree with regard to (1) whether the module interacts within a larger system or

has a defined boundary separate and apart from other modules and (2) whether the

main port module has only two port units, or merely contains at least two port

units.

A.   Module is a "component interacting with a larger system" (Sanho) or "a component having a defined boundary distinct from other modules" (KaiJet)

As Sanho presents the issue, the "dispute is how to define 'module'; specifically, whether to emphasize for the factfinder the modules' interconnected relationship with each other (as Sanho proposes) or the distinct and separate nature of each module (as KaiJet proposes)." Sanho's Supplemental Brief at pages 5-6 (Dkt. No. 274). Sanho contends that its construction "is consistent with the description of modules as joined together to operate as part of the larger system," (*id.* at page 6, fn 7), citing to the following in the '429 Patent:

> *See, e.g.,* '429 Patent (Dkt. 240-1), at Fig. 1 (depicting modules joined together and interconnected); *id.* at 3:23-25 (describing modules that work together to "form a transmission path"); *id.* at 2:40-42 (describing transmission from one module to the end-user device "via" the main port module). . . .

Additionally, some of KaiJet's own dictionary definitions of "module" support Sanho's position: the McGraw Hill Computer Desktop Encyclopedia states that "module" means, *inter alia*, "a self-contained hardware or software component that interacts with a larger system" (KaiJet Exh. C, at page 626 (Dkt. No. 240-3)) and the Cambridge Dictionary Online sets out that "module" means, *inter alia*, "one of a set of separate parts that, when combined, form a complete whole" and "a part of a computer or software system or program that has a function and works together with other related parts." KaiJet Exh. F, Dkt. No. 240-6.

13

However, KiaJet's proposed construction ("a component having a defined boundary distinct from other modules") conforms to what Sanho's counsel stated during the claim construction hearing, namely, that "[Sanho is] okay with the concept that a module should have some boundaries." Hearing Transcript, at page 28, lines 10-11.

In order to "provide the jury . . . with instructions adequate to ensure that the jury fully understands . . . what the patentee covered by the claims,[3]" a court may arrive at its own constructions of claim terms, even if they differ from the constructions proposed by the parties. *Exxon Chemical Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1555 (Fed. Cir. 1995); *see also Bancorp Services, LLC v. Sun Life Assur. Co. of Canada (U.S.),* 687 F.3d 1266, 1274 (Fed. Cir. 2012) ("[T]he trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties.").

In view of the above, it is recommended that there be an amalgam of Sanho's and KaiJet's proposed constructions of "modules" such that the term is construed as -- *a component interacting with a larger system and having a defined boundary distinct from other modules in the system --*.

---

[3] *Sulzer Textil A.G. v. Picanol NV.,* 358 F.3d 1356, 1366 (Fed. Cir. 2004).

**B.**    **The main port module "having only two port units" (Sanho) or**
          **the main port module "contains at least two port units" (KaiJet)**

The "strongest point"[4] that Sanho presents to support its contention that the

main port module has "only two port units" is based on the doctrine of patent

prosecution estoppel or prosecution history disclaimer.  Generally, the doctrine of

prosecution history estoppel "estops" or limits later expansion of the protection

accorded by a claim to the patent owner when that claim was purposefully

amended or distinguished over relevant prior art to give up scope. *See, e.g.,*

*Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed. Cir. 1983); *see*

*also, MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir.

2007) ("Prosecution arguments . . . which draw distinctions between the patented

invention and the prior art are useful for determining whether the patentee intended

to surrender territory, since they indicate in the inventor's own words what the

invention is not."); *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems,*

*Inc.*, 242 F.3d 1337, 1341-42 (Fed. Cir. 2001) ("Claims are not correctly construed

to cover what was expressly disclaimed.").

During the prosecution of the application which matured into the '429

Patent, the Patent Examiner had rejected all of the claims as being obvious under

35 U.S.C. § 103 over the combination of the *Muhammad* patent in view of the

---

[4] Hearing Transcript, at page 12, line 12.

patent to *Chen*.  In the September 15, 2019 "Amendment and Remarks" in response to that rejection, the Applicant set forth arguments as to why "the port extension apparatus in the currently amended claim 1 is different from *Muhammad*."  Sanho Exh. B, page 7 (Dkt. No. 240-2).

First, Applicant argued that "the application scenarios are different," with amended Claim 1 being directed to "providing better usage and utilization efficiency ports end-user devices . . ." while "the extension system in *Muhammad* . . . relates to point to multipoint radio/wireless communication networks. . . ." *Id.* at page 8.

Applicant then set forth the following argument as to why the configurations of *Muhammad* and the invention of then-amended Claim 1 are different:

**II. The configurations are different.**

As discussed above, the configuration of the port extension apparatus in claim 1 can be illustrated as below:



While the configuration of the extension system in Muhammad can be illustrated as below (referring to col.3, ll.19-35; col.3, ll.47-63):



As apparently shown above, *Muhammad* does not disclose a video port module, and Applicant is also of the opinion that first and second extension interface module in *Muhammad* shouldn't be considered as equal to the first and second port units in claim 1, as the first and second port units are contained in the main port module. What's more, the coupling and/or connecting method of interior configuration of the port extension apparatus in claim 1 is totally different from *Muhammad*.

As stated above, claim 1 and the disclosure of *Muhammad* are different technical solutions with different configurations, having different application scenarios, and solving different technical problems. Therefore, *Muhammad* neither discloses nor teaches the port extension apparatus claimed in claim 1.

*Id.* at pages 8-9.

In its Supplemental Brief, at page 4, Sanho argues that "the patentee differentiated the *Muhammed* prior art by depicting a 'main port module' with a 'first port unit' and a 'second port unit.'" Therefore,

[b]y presenting a visual configuration having exactly two port units, embracing that configuration and using it to differentiate itself from prior art, the patentee disavowed other potential configurations. This disavowal during prosecution is reinforced by the specification, which describes exactly two port units – the first port unit 11 and second port unit 12 – in the context of the main port module.

*Id.* at page 5 (footnotes omitted).

The specification of the '429 Patent does not describe "<u>exactly</u> two port units" as Sanho contends.  Rather, the specification states that "[a]s shown in FIG. 2, main port module 10 <u>includes</u> a first port unit 11 and a second port unit 12." '429 Patent, at col. 4, lines 5-6 (emphasis added).  As stated in the <u>Manual of Patent Examining Procedure</u>, § 2111.03 (1.): "The transitional term 'comprising', which is synonymous with 'including,' 'containing,' or 'characterized by,' is inclusive or open-ended and does not exclude additional, unrecited elements or method steps."  That is consistent with Sanho's counsel's statement during the claim construction hearing that he wanted to be "clear . . . [that Sanho is] not

18

arguing that the specification contains an outright disclaimer or statement to the effect that the present invention is limited to a main port module that has two and only two port units." Hearing Transcript, at page 29, lines 12-18. Thus, the description of the main port module 10 in the specification does not exclude "unrecited" port units or limit to only two the number of port units the main port module 10 has.

Sanho contends that the above-noted argument by the Applicant during the prosecution of the '429 Patent "differentiated the *Muhammed* prior art by depicting a 'main port module' with a 'first port unit' and a 'second port unit'" and, as a result, "the patentee disavowed other potential configurations." The above figure of a representation of the apparatus of then-pending Claim 1 and the Applicant's arguments concerning it, however, do not address whether the main port module has <u>only</u> a first port unit and a second port unit. Instead, the Applicant used the figure to distinguish the overall configuration of *Muhammad* from the overall configuration of the port extension apparatus as claimed in then-pending Claim 1, noting that "Applicant is also of the opinion that first and second extension interface module in *Muhammad* shouldn't be considered as equal to the first and second port units in claim 1, as the first and second port units are contained in the main port module." Sanho Exh. B, at page 9. The Applicant never argued its device was distinguishable from *Muhammad* because of the

19

number of port units, only that the location of the first and second port units was different because they were "contained in the main port module." Thus, the legal standard for finding a disavowal of claim scope during prosecution of being "clear and unmistakable" is not met in this case. *Purdue Pharm. L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006); *see, also Poly–America, L.P. v. API Industries, Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("While disavowal must be clear and unequivocal, it need not be explicit" but it "must be clear and unequivocal"; "the standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature" – notably, "[a]mbiguous language cannot support disavowal"). There is no evidence in either the specification or prosecution of the '429 Patent of a disavowal, either explicitly or implicitly, of any claim scope regarding the number of port units in the main port module 10.   As a result of there being no patent prosecution estoppel, the recommended meaning of the phrase "having a first and second port unit" is -- *a first and second port unit* --.

Therefore, the term "main port module for connecting to an end-user device having first and second port units" is recommended to mean -- *a component interacting with a larger system and having a defined boundary distinct from other modules in the system, wherein the component contains a first and second port unit for directly connecting to an end-user device* --.   The recommended construction is

20

an amalgam of Sanho's and KaiJet's proposed constructions that, although it may

be considered "wordy," will aid the jury in fully understanding the disputed term.

2.     "data port module" (Claims 1-17):

| Sanho's Proposed Construction | KaiJet's Proposed Construction | Star View's Proposed Construction |
|---|---|---|
| A component **interacting with a larger system**, wherein the component has an interface for transmitting data between the to-be-connected device and the end-user device and directly connects to the to-be-connected device. | A component **having a defined boundary distinct from other modules**, wherein the component has an interface for transmitting data between the to-be-connected device and the end-user device and directly connects to the to-be-connected device. | Adopts and incorporates by reference KaiJet's proposed construction. |

In view of the above recommended construction of "main port module . . .,"

the term "data port module" is recommended to mean -- *a component interacting*

*with a larger system and having a defined boundary distinct from other modules in*

*the system, wherein the component has an interface for transmitting data between*

*the to-be-connected device and the end-user device and directly connects to the to-*

*be-connected device --.*

21

3. **"video port module"** (Claims 1-17):

| Sanho's Proposed Construction | KaiJet's Proposed Construction | Star View's Proposed Construction |
|---|---|---|
| A component **interacting with a larger system,** wherein the component has an interface for transmitting to-be-displayed information from the end-user device to the to-be-connected device and directly connects to the to-be-connected device | A component **having a defined boundary distinct from other modules,** wherein the component has an interface for transmitting to-be-displayed information from the end-user device to the to-be-connected device and directly connects to the to-be-connected device. | Adopts and incorporates by reference KaiJet's proposed construction. |

In view of the above recommended constructions of "main port module" and "data port module," the term "video port module" is recommended to mean -- *a component interacting with a larger system and having a defined boundary distinct from other modules in the system, wherein the component has an interface for transmitting to-be-displayed information from the end-user device to the to-be-connected device and directly connects to the to-be-connected device --.*

4.     **"data transmission control module" (Claims 1-17):**

| Sanho's Proposed Construction | KaiJet's Proposed Construction | Star View's Proposed Construction |
|---|---|---|
| A data transmission controller performing in accordance with an industry standard data transmission protocol | Self-contained component, separate and apart from other modules, that electronically transfers information between the end-user device and the to-be-connected device. | Means-plus-function term subject to 35 U.S.C. §112 ¶ 6.  This term is indefinite. |

A.     **Indefiniteness**

Star View's position is that the contested claim term "data transmission

control module" recites a function, rather than a structure, and is properly

construed as a means-plus-function element under 35 U.S.C. § 112 ¶ 6.[5]

According to Star View, the claim term is indefinite, because the '429 Patent

does not show or teach any structure associated with the "data transmission control

module."  Star View further contends that although the specification describes

---

[5] "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

various components as being "connected" to the data transmission control module,

no structure can be ascertained or inferred from these connections.

"The primary purpose of the definiteness requirement is to ensure that the

claims are written in such a way that they give notice to the public of the extent of

the legal protection afforded by the patent, so that interested members of the

public, *e.g.*, competitors of the patent owner, can determine whether or not they

infringe." *All Dental Prodx LLC v. Advantage Dental Prods.,* 309 F.3d 774, 779–

80 (Fed. Cir. 2002).  Star View, as the party asserting a claim of indefiniteness has

the burden of proving it "by clear and convincing evidence"[6], because "[t]he

claims as granted are accompanied by a presumption of validity based on

compliance with, *inter alia*, [§ 112(b)],"[7] and where practicable, "claims should be

construed to preserve their validity." *Phillips, supra* at 1327.

> The "means-plus-function" technique of claim drafting is a "convenience" for patentees that allows the expression of claim limitations in functional terms "without requiring the patentee to recite in the claims all possible structures" that could be used as a means in the invention.  *Medical Instrumentation & Diags. Corp. v. Elekta AB,* 344 F.3d 1205, 1211 (Fed. Cir. 2003); *see also* 35 U.S.C. § 112(f).  In return for this drafting convenience, patentees must disclose, in the specification, a corresponding structure for performing the claimed function.  *See Noah Sys., Inc. v. Intuit Inc.,* 675 F.3d 1302, 1318 (Fed. Cir. 2012), "If the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, then the patentee has not paid the price but is rather

---

[6] *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016).
[7] *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1367 (Fed. Cir. 2001).

attempting to claim in functional terms unbounded by any reference to structure in the specification." *Med. Instrumentation,* 344 F.3d at 1211.

*Via Vadis, LLC v. Buffalo Americas, Inc.*, 2026 WL 5239626, at *4 (W.D. Tex. 2016).

As an initial consideration of whether 35 U.S.C. § 112 ¶ 6 is applicable in this matter, the disputed claim limitation "data transmission control module" does not contain the term "means" and, therefore, presumptively, Section 112 ¶ 6 does not apply. *See, e.g., Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018). Star View counters that:

> "module" is a well-known nonce word that can operate as a substitute for "means" in the context of § 112, para. 6. . . . "'[M]odule' is simply a generic description for software or hardware that performs a specified function." . . . Generic terms such as "mechanism," "element," "device," and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word "means" because they "typically do not connote sufficiently definite structure" and therefore may invoke § 112, para. 6.

*Williamson v. Citrix Online, LLC,* 792 F.3d 1339, 1350 (Fed. Cir. 2015). This "nonce" presumption is rebutted by a preponderance of the evidence. *Advanced Ground Info. Sys., Inc. v. Life360, Inc.,* 830 F.3d 1341, 1347 (Fed. Cir. 2016).

When evaluating whether a claim limitation invokes § 112, ¶ 6, "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the

art to have a sufficiently definite meaning as the name for structure." *Williamson,*
*supra* at 1348; *Greenberg* [*v. Ethicon Endo-Surgery, Inc.*], 91 F.3d at 1583 ("What
is important is . . . that the term, as the name for structure, has a reasonably well
understood meaning in the art."). To determine whether the claim limitation at
issue connotes sufficiently definite structure to a person of ordinary skill in the art,
the intrinsic evidence is first examined and, if necessary, the extrinsic evidence is
then looked at. *Phillips, supra* at 1303.

According to Star View, the claim term "data transmission control
module" is indefinite, because the '429 Patent specification does not provide
sufficient corresponding structure for the claimed element, beyond stating that
its function is to control data flow, as per the following: "data transmission control
module 30 connects to the second end 102 of the main port module 10" ('429
Patent, at col. 3, lines 13-15); "data transmission control module 30 controls the
data transmission between the to-be-connected device 110 and the end-user device
120" (*id.* at col. 3, lines 28-30); and "data transmission control module 30 receives
instructions from the end-user device 120 with to-be-displayed information, and
further transmits the to-be-displayed information to the to-be-connected device 110
to display." *Id.* at col. 3, lines 33-36.

Sanho's expert, Dr. Baker, disagrees with Star View's argument that "data
transmission control module" is a nonce term because, in Dr. Baker's opinion, the

26

term "data transmission control" is understood to a POSITA to be a structure in the
art.  Baker Declaration, at ¶ 98 (Dkt. No. 263-1).  Dr. Baker refers to the '429
Patent specification which states that that the "data transmission control module"
"includes USB control unit 31, USB conversion unit 32, memory card conversion
unit 33, mode control unit 34, and mode conversion unit 35." '429 Patent, at col.
4, lines 11-19.  The '429 Patent also sets out that the "USB control unit 31" within
the data transmission control module "controls the data transmission between the
USB flash drive and the computer" (col. 5, lines 9-14) and "controls the data
transmission between the mobile phone and the computer." *Id.* at col. 5, lines 17-
22 and Fig. 2. According to Dr. Baker, the "USB interface was designed to carry
both data and power, such that a low-power peripheral (such as a mobile phone)
could draw power from a USB compatible host (such as a computer)."  Baker
Declaration at ¶ 38

Dr. Baker opines that:

> 100.   Data transmission controls existed in the prior art in the
> form of commercially available integrated circuits as of the
> priority date of the '429 Patent. These included, for example,
> controllers for transmitting data in accordance with one or more
> of the USB, HDMI, JEDEC, WiFi, Bluetooth or other industry
> data transmission protocols. . . . A POSITA would have looked
> to one or more of these existing industry standards as well as
> exemplary commercially available integrated circuits
> implementing one or more of these standards to understand
> fully the details of the formatting and operation of the
> controller.

101. Accordingly, a POSITA would have understood that a "data transmission control module" is a "data transmission control," which is understood in the art to refer to "a data transmission controller performing in accordance with an industry standard data transmission protocol."

Baker Declaration, at ¶ ¶ 100 and 101 (emphasis added).

Dr. Baker turns to extrinsic evidence and points out that the term "protocol" is defined as "a specific set of rules, procedures or conventions relating to format and timing of data transmission between two devices," as set forth on page 8 of the April, 2000 publication attached to his Declaration regarding USB 2.0 entitled "Universal Serial Bus [USB] Specification" (Dkt. No. 263-2). The same definition of "protocol" appears on page 2-6 of the July, 2013 publication entitled "Universal Serial Bus 3.1 Specification" (Dkt. No. 263-4), which was released to replace USB 3.0 (Dkt. No. 263-3). He declares that the USB 2.0, 3.0 and 3.1 Specifications set forth "all of the mechanical and electrical requirements necessary for anyone to create USB 2.0[, 3.0 and 3.1] compliant plugs and receptacles." Baker Declaration, at ¶¶ 42, 46 and 47. Therefore, Dr. Baker contends that, as of the priority date of the '429 Patent, a POSITA would know that USB control unit 31 is performing in accordance with the "set of rules, procedures or conventions" set forth in an industry standard data transmission protocol and, as a result, would know all of the

28

mechanical and electrical requirements, and thus the structure of, USB control unit 31.

Star View argues that the '429 Patent specification is silent on what structure corresponds to the "data transmission control module," and that Dr. Baker's Declaration "cannot supplant the complete absence of structure from the specification." *Williamson, supra* at 1354. For instance, Star View points out the following appearing in Column 5, lines 17-23 of the '429 Patent specification:

> [W]hen the to-be-connected device 110 is a mobile phone and the end-user device 120 is a computer, the mobile phone connects to the port extension apparatus 100 through the third data port module 60. The USB control unit 31 controls the data transmission between the mobile phone and the computer; or through the control of the USB mode conversion unit 32 to charge the mobile phone.

While the specification states that the "USB control unit 31 controls the data transmission between the mobile phone and the computer," Star View argues that there is no structure described regarding the interior of the USB control unit 31 to inform a POSITA as to how such control of data transmission between the mobile phone and the computer occurs. Star View's expert, Dr. DiEuliis, stated in his Declaration that:

> a POSITA understands that, in the field of electronics, 'controller' is an extremely broad term that covers various types integrated circuits . . . . Absent direction from the '429 patent, and there is none, a POSITA would not be able to identify a sufficiently definite 'controller' from the plethora of prior art 'controllers.' Thus, a

POSITA would not be able incorporate such a 'controller' to implement any embodiment of the '429 patent."

DiEuliis Dec., at ¶ 32 (Dkt. No. 265-1)[8].

But, as pointed out, *supra,* in Paragraph 101 of Dr. Baker's Declaration, rather than the broad "field of electronics," a POSITA would know after reading the '429 Patent specification and the claims that a "'data transmission control module' is a 'data transmission control,' which is understood in the art to refer to a 'data transmission controller performing in accordance with an industry standard data transmission protocol.'" Besides, as stated in *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013): "[I]t is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." Sanho is not "using expert testimony to create structure where none otherwise exists" (*Williamson, supra* at 1354) but, instead, Dr. Baker is utilizing a specific USB Standard which, in conjunction with the '429 Patent specification, provide enough information about the "USB control unit 31" to make its structure apparent to a skilled artisan.

---

[8] It is noted that Dr. DiEuliis uses the terms "control" and "controller" interchangeably. For instance, in his Declaration, he stated in paragraph 3 that he had "developed controllers for speed control, automatic focusing . . ." and, in Paragraph 4, that he had "developed and managed projects for various applications, including sensors, controls. . . ."

30

A relevant case with regard to what the term "USB" would mean to a POSITA is *DisplayLink Corp. v. Magic Control Technology Corp.*, 615 F. Supp.2d 1051 (N.D. Calif. 2009). The invention of the patent-in-suit "related to a device for converting digital display signals into analog display signals. Specifically, the claimed device converts Universal Serial Bus ('USB') signals from a computer's USB port into Video Graphics Array ('VGA') signals for a monitor." *Id.* at 1054. One of the disputed claim terms was "USB controller."

> At the hearing, MCT's electrical engineering expert, Paul S. Min, Ph.D., agreed that the term "USB" is defined by an industry accepted standard. . . . Further, Dr. Min agreed that if a person of ordinary skill in the art wanted to design a system that implemented the USB standard, he or she would turn to the most recent available USB standard. . . . Currently, this standard is contained in the Universal Serial Bus Specification Revision 2.0. . . .

> In its claim construction brief, MCT states that:

> It is common for a computer system to be attached to peripheral devices such as inkjet and laser printers. These devices usually have a cable that attaches on one end of the computer. One way these devices connect to a computer is through a USB port on the computer. The USB port and USB cable are built based upon an industry accepted USB standard. USB is generically understood in the field to refer to USB without any reference to particular versions of the standard.

> . . . . Thus, MCT itself recognizes that <u>a person of ordinary skill in the art would understand the term "USB" to reference an industry accepted standard</u>, not the shape of a port/plug. Accordingly, the court agrees with DisplayLink that

31

the term "USB" refers to a type of serial bus that meets the requirements of the industry standard.

*Id.* at 1056 (emphasis added).

Also, in *Fundamental Innovation Systems International LLC v. LG Electronics, Inc.*, 2018 WL 1608566 (E.D. Tex. 2018), the court construed the disputed claim terms "USB" and "USB controller" in the patents-in-suit relating to battery charging and power management. With regard to "USB," the court construed that term as "Universal Serial Bus as described in Universal Serial Bus Specification Revision 2.0 and related versions of this standard at the time of the claimed invention." *Id.* at *6. As to "USB controller," the court found that "'controller' is a term that is used in the USB 2.0 specification, and Plaintiff has not demonstrated that the patentee used the term 'USB controller' in a manner contrary to the USB 2.0 specification," thereby construing "'USB controller' to have its plain meaning apart from the Court's construction of 'USB.'" *Id.* at *9.

Note that MCT's expert in *DisplayLink* and the *Fundamental* court agree with Dr. Baker that if a person of ordinary skill in the art wanted to design a system that implemented the USB standard, he or she would turn to the most recent available USB standard at the time of the '429 Patent invention and, thereby, would know of the structure of the "data transmission control module."

32

Additionally, it is noted that the other defendant, KaiJet, does not contend indefiniteness of either the claim limitation "data transmission control module" or "USB conversion unit," the other claim term that Star View asserts is indefinite and which is addressed *infra*. Referring to counsel for KaiJet, counsel for Sanho stated at the claim construction hearing that:

> I think we agreed . . . that main port module is not -- is not a black box because the adjectival use of main port in front of module connotes at least some structure to a person of ordinary skill in the art, and the same for data port, and the same for video port.
>
> And our position is: it's the same for data transmission control. That data transmission control in front of module supplies the necessary connotation of structure in the context of both the intrinsic evidence and the understanding of the prior art by a person of ordinary skill in the art to warrant non-means plus function treatment.

Hearing Transcript, at page 51, lines 8-20.

Finally, I note that during the claim construction hearing, I stated that:

> <u>in my lay opinion</u>, there doesn't seem to be any structure given to any component [in the '429 Patent], be it the ones Star View is arguing about or any of the other ones. None of the modules, the memory card conversion unit, none of these in the packet appear to have any structure either in the figures or the specification.

Hearing Transcript, at page 70, lines 8-14 (emphasis added).

I went on to question Star View's counsel that if Star View's position as to "USB conversion unit" was that it was indefinite, why had Star View agreed with Sanho and KaiJet that the claim term "USB control unit" had a "plain and ordinary

meaning" (as per the Second Amended Claim Construction and Prehearing

Statement, Dkt. No. 261).  Counsel for Star View responded that it was "a strategic

decision as to which terms we were going to assert a 112 (6) argument" and that

> in the joint filing, we were explicit that we're not taking a
> position on these other terms. We simply support KaiJet's
> position on the claim construction in the sense that the non-
> 112(6) arguments in terms of what the terms in dispute mean.
> We support their arguments.

Hearing Transcript, at page 73, lines 12-22.

Having now fully considered the evidence and the arguments of the parties, I will

rely, not on my lay opinion, but on the opinion of one of ordinary skill in the art at

the time of the invention of the '429 Patent.

Since, as discussed above, a person of ordinary skill in the art would have

been able to recognize the structure of the "data transmission control module" and

associate it with the corresponding function in Claim 1,[9]  Star View has "failed to

carry its burden and the presumption against the application of § 112, ¶ 6 to the

disputed limitation remains unrebutted."  *Zeroclick, supra* at 1007-08.  As a result,

it is recommended that the claim limitation "data transmission control module" not

---

[9] *Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1381–82 (Fed. Cir. 1999).

be considered a means-plus-function term subject to 35 U.S.C. § 112 ¶ 6 and, therefore, that it is not indefinite.

If the Court does not adopt the recommendation that "data transmission control module" is not a means-plus-function term, then the function of the term is "controlling data transmission." The specification states that "when the to-be-connected device 110 is a USB flash drive and the end-user device 120 is a computer. . . USB control unit 31 controls the data transmission between the USB flash drive and the computer" (col 5, lines 9-14) and "when the to-be-connected device 110 is a mobile phone and the end-user device 120 is a computer . . . [t]he USB control unit 31 controls the data transmission between the mobile phone and the computer. . . ." '429 Patent, at col 5, lines 17-22. As noted above, Dr. Baker opines that a POSITA would have understood the USB control unit 31 to be an integrated circuit called a "USB 2.0 Hub," a "Smart Hub" a "Hub Controller" and equivalents thereof. *See* Baker Declaration, at ¶¶ 69-71, 105 and 112.

Dr. DiEuliis counters as follows:

> 36.   First, independent claim 1 recites with underline added "when a to-be-connected device connects to the video port module, the <u>data transmission control module receives the to-be-displayed information from the end-user device</u> to the to-be-connected device to display." According [to] at least one embodiment disclosed in the specification of the '429 patent, the Mode Control Unit 34 included in data transmission control module 30, and not the USB Control Unit 31

receives the video data from the end-user device. The '429 patent at column 4, lines 56-64 states the following with underline added:

> For example, when the to-be-connected device 110 is a display device, the to-be-connected device 110 connects to port extension apparatus 100 via the video port module 50, enabling data transmission with the end-user device 120. <u>End-user device 120 transmits to-be-displayed information (data and/or instructions) to the mode control unit 34. The mode control unit 34 controls the mode conversion unit 35 to convert the to-be-displayed information to the proper format for the display device to display</u>.

37.   Thus, the structure USB Control Unit 31 proposed by Dr. Baker cannot be correct at least because it does not receive the video data from the end-user according to the written description.

However, what Dr. DiEuliis ignores when he states that "the structure USB Control Unit 31 proposed by Dr. Baker cannot be correct at least because it does not receive the video data from the end-user according to the written description" is that Claim 1 does not require that the USB control unit has to be able to receive "video data." There is no reference in the claim to a video signal or video data, only that "when a to-be-connected device connects to the video port module, the data transmission control module [and, hence, the USB control unit, according to Dr. Baker] receives the to-be-displayed information [in the form of 'data and/or instructions'] from the end-user device to the to-be-connected device to display." In the preferred embodiment, the specification teaches that the to-be-displayed information may or may not need conversion to a video format. '429 Patent, at col.

36

5, lines 54-61.  Therefore, contrary to paragraph 37 of Dr. DiEuliis' Declaration, *supra*, the USB control unit 31 can receive to-be-displayed information (*i.e.*, data and/or instructions) from the end user device 120 so that is why the structure of USB Control Unit 31 would have been known to a POSITA, as proposed by Dr. Baker, is correct.

In view of the above, if the Court determines that the "data transmission control module" is a means-plus-function limitation, it is recommended that the USB control unit 31 be found to be the structure for performing the function of controlling data transmission and that "data transmission control module" is not indefinite.

B.    "A data transmission controller performing in accordance with an industry standard data transmission protocol" (Sanho) or "Self-contained component, separate and apart from other modules, that electronically transfers information between the end-user device and the to-be-connected device" (KaiJet)

If the Court finds that "data transmission control module" is not indefinite by adopting either of the above recommendations, then the disputed claim term needs to be construed.  Sanho's proposed construction ("a data transmission controller performing in accordance with an industry standard data transmission protocol") is technically correct, but it "repeats the word[s 'data transmission' that are] in the phrase being construed [which] is usually not helpful to the

37

jury." *Noah Sys., Inc. v. Intuit Inc.,* 2011 WL 6090698, at *8 (E.D. Pa. 2011).

Additionally, neither of the terms "industry standard" and "protocol" are

found in the intrinsic evidence of the '429 Patent and, therefore, would have to

be defined for the jury. Even though the construction Sanho proposes for "data

transmission control module" is, according to Dr. Baker, "understood in the

art,"[10] "[c]ompared with a plain meaning construction, [Sanho's] proposal is . . .

potentially confusing." *Network Protection Sciences, LLC v. Fortinet, Inc.,* 2012

WL 6680155 at *9 (N.D. Calif. 2012); *Sliding Door Company v. KLS Doors,*

*LLC,* 2014 WL 12591675, at n. 19 (C.D. Cal. 2014) ("[T]he Court does not

adopt . . . Plaintiff's unwieldy . . . construction which will not help the jury

define the disputed term.").  On the other hand, KaiJet's proposed construction

("self-contained component, separate and apart from other modules, that

electronically transfers information between the end-user device and the to-be-

connected device") is a "plain meaning construction."  However, in keeping with

the above construction of "module" agreed upon by Sanho and Star view, KaiJet's

proposed phrase "self-contained component, separate and apart from other

modules" is changed to *"a component interacting with a larger system and having*

*a defined boundary distinct from other modules in the system."*

---

[10] Baker Declaration, at ¶ 101.

Therefore, it is recommended that the term "data transmission control module" be construed as -- *a component interacting with a larger system and having a defined boundary distinct from other modules in the system that electronically transfers information between the end-user device and the to-be-connected device --*.

## C. Star View's Motion to Strike

In Star View's Sur-Sur-Reply Claim Construction Brief (Dkt. No. 270), it moves to strike from the record Slide Nos. 37-39 of Sanho's hearing presentation and accompanying arguments with regard to the "data transmission control module" during the claim construction hearing, including the introduction of two Federal Circuit decisions (*Samsung Electronics America, Inc. v. Prisua Engineering Corp.*, 948 F.3d 1342 (Fed. Cir. 2020) and *TEK Global, S.R.L. v. Sealant Systems International, Inc.*, 920 F.3d 777 (Fed. Cir. 2019)). Star View contends that, in view of the briefing schedule, Sanho's arguments regarding those two cases being raised at the hearing for the first time were untimely.

Star View asserted this issue during the claim construction hearing, and I allowed Star View the opportunity to file a responsive brief. Hearing Transcript, at page 68, lines 6-13. Star View's counsel responded:

> That would be fine. But I'm also prepared to address those decisions and the arguments very quickly as well.

> I sort of anticipated they were going to introduce new
> argument based on what they've done.  I can address some of the
> arguments now and would be happy to submit something on the
> 28th as well.

*Id.* at page 68, lines 14-20.

Sanho asserts that its argument, namely, that in the context the asserted

patent claim and specification, data transmission control module and its USB

control unit are structural in nature, was not presented for the first time at the

hearing and in Slides 37-39, pointing to several instances in its Sur-Reply Brief

(Dkt. No. 266) where such argument was raised.  Sanho's Response to Star View's

Sur-Sur-Reply Brief, at pages 2-4 (Dkt. No. 271).  This may be why, at the

hearing, Star View's counsel thanked me for stating that he could file a responsive

brief if he wanted to and went on to say: "But I'm also prepared to address those

decisions and the arguments very quickly as well.  I sort of anticipated they were

going to introduce new argument based on what they've done.  I can address some

of the arguments now and would be happy to submit something on the 28th as

well."  Hearing Transcript, at page 68, lines 14-20.

In addition to addressing Sanho's arguments at the hearing, Star View

distinguished the two Federal Circuit cases in its Sur-Sur-Reply Brief.  Clearly,

Star View has not been "deprive[ed] . . . of any reasonable opportunity to give a

thoughtful, supported response." *Deseret Trust Company v. Unique Investment*

*Corporation*, 2018 WL 8110959 at *4 (D. Utah 2018).  All reasonable steps have been made to ameliorate any prejudice to Star View.

In view of the above, I recommend that Star View's motion to strike from the record Slide Nos. 37-39 of Sanho's hearing presentation and accompanying arguments be DENIED.

5.  **"USB conversion unit" (Claims 4, 9 and 10):**

| Sanho's Proposed Construction | KaiJet's Proposed Construction | Star View's Proposed Construction |
|---|---|---|
| A converter utilized by manufacturers to implement one of the USB standards as detailed in the USB Specifications as of April 27, 2017. | A USB unit that converts a data port module between a data transmission mode and a power supply mode. | Means-plus-function term, subject to 35 U.S.C. §112 ¶ 6.  This term is indefinite. |

A.  **Indefiniteness**

Star View's position of why the term "USB conversion unit" is indefinite under 35 U.S.C. §112 ¶ 6 is, basically, that "the descriptions of USB conversion unit in the '429 Patent are functional and fail to sufficiently describe any structure."  Star View's Reply Brief, at page 14.  Again, the disputed term does not

contain the term "means" and, therefore, presumptively, 35 U.S.C. § 112 ¶ 6 does

not apply.  *See, Zeroclick, supra.*

In paragraph 112 of his Declaration, Dr. Baker stated that:

> . . . The USB conversion unit represents one of a class of converters
> utilized by manufacturers implementing USB standards to address
> conversion needs in the USB device-to-device context: data speed
> conversion from low/full/high speeds . . . and/or power conversion
> and supply . . . as taught, for example, in the USB 2.0 Specification
> (Exhibit 2), USB 3.1 Specification (Exhibit 3), USB Power Delivery
> Specification 2.0 v 1.2 (Exhibit 5), and other USB Specifications
> known in the art as of the April 27, 2017 priority date of the '429
> Patent. As shown herein, these converters existed in the prior art
> and would have been known to a POSITA.

Dr. DiEuliis stated the following in his Declaration (emphasis added):

> 44.  . . . "USB conversion unit" . . . does not inform a POSITA in the
> field of electrical engineering of any specific meaning that POSITAs
> would agree upon. In my opinion, the claims of the '429 patent do not
> disclose any sufficiently definite structure for "USB conversion unit."
>
> 45. Before the priority date, I personally used devices, also called
> adaptors, which convert between USB and other standards, such as
> USB to RS232 adaptors and USB to parallel port adaptors.
>
> 46. Dr. Baker, on the other hand, interprets the recited "USB
> conversion unit" in a much different way. Dr. Baker opines "a
> POSITA ... would have understood the need for USB related
> conversion in the context of a data transmission module meant to
> comply with USB standards, including conversion of data rates,
> conversion to power delivery and conversion of power supply
> requirements." Baker at 54. Thus, Dr. Baker asserts USB conversion
> unit applies to the USB standards and converting among various
> aspects of the USB standards. . . . <u>Dr. Baker's interpretation of "USB</u>
> <u>conversion unit" (viz., that it converts USB functions to other USB</u>

42

<u>functions) is much different than my experience with devices that convert between USB and other standards such as RS232.</u> . . .

47.    The difference between Dr. Baker's and my interpretation of "USB conversion unit," considering the absence of any support in the intrinsic evidence, demonstrates that the claims do not disclose sufficient structure for the term "USB conversion unit."  In my opinion, the claims of the '429 Patent do not disclose sufficiently definite structure for "USB conversion unit."

Note that Dr. DiEuliis is not saying that Dr. Baker's interpretation of "USB conversion unit" is wrong.  What Dr. DiEuliis is saying is that because Dr. Baker's interpretation of "USB conversion unit" "is much different than [his] experience with devices that convert between USB and other standards such as RS232" and coupled with "the absence of any support in the intrinsic evidence," the '429 Patent does not disclose sufficient structure for "USB conversion unit."  However, there is no support in the '429 Patent for his interpretation since there is no reference to standards such as RS232.

When asked at his deposition whether he was aware if the USB to RS232 or the USB to parallel port adaptors he had worked with had the ability to charge a mobile phone, he answered: "I don't think that's possible, physically possible." DiEuliis Deposition, at page 124, lines 10-21.  But the '429 Patent states that "[t]he USB control unit 31 controls the data transmission between the mobile phone and the computer, or through the control of the USB mode conversion unit 32 to charge the mobile phone." '429 Patent, at col. 5, lines 20-23. Thus, the adaptors with

which Dr. DiEuliis had "experience" would not function to carry out one of the embodiments of the '429 Patent, namely, the charging of a mobile phone. That means that Dr. Baker's opinion as set forth in Paragraph 112 of his Declaration, *supra,* that a POSITA would have known of the structure of the "USB conversion unit" at the time of the invention of the '429 Patent is the correct opinion.

Therefore, it is recommended that the claim limitation "USB conversion unit" not be considered a means-plus-function term subject to 35 U.S.C. § 112 ¶ 6 and, therefore, is not indefinite. However, if the Court determines that the "USB conversion unit" is a means-plus-function limitation, it is recommended that the Court find that a POSITA at the time of the invention of the '429 Patent, knowing that a USB conversion unit represents one of a class of converters utilized by manufacturers implementing USB standards to address transmission/power supply conversion needs in the USB device-to-device context and, thus, would know of the "USB conversion unit." Therefore, the term "USB conversion unit" is not indefinite.

B.   **"A converter utilized by manufacturers to implement one of the USB standards as detailed in the USB Specifications as of April 27, 2017" (Sanho) or "A USB unit that converts a data port module between a transmission mode and a power supply mode" (KaiJet)**

If the Court agrees with the recommendation that the term "USB conversion unit" is not indefinite, then the disputed term needs to be construed. The use by

44

Sanho of "USB standards" and "USB Specifications" in its proposed construction introduces technical terms that are not found in the intrinsic evidence of the '429 Patent and creates an "unwieldly . . . construction . . . which will not help the jury define the disputed term," whereas KaiJet's proposed "construction . . . clarifies the meaning in the simplest terms." *Sliding Door Company, supra* at fn. 19 and *16. As stated in *Phillips, supra* at 1316: "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." It's acknowledged that the terms "mode" and "power supply" in KaiJet's proposed construction are not found in the specification of the '429 Patent, but they are not technical terms that needs further explanation, like "USB standards" and "USB Specifications."

Therefore, it is recommended that the term "USB conversion unit" be construed as -- *a USB unit that converts a data port module between a transmission mode and a power supply mode* --.

Date: September 22, 2021

William H. Needle
Special Master