UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SANHO CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC., dba "j5create;" and DOES 1-100,<br><br>Defendants, | Case No. 1:18-cv-05385-SDG |
| SANHO CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC.; KAIJET TECHNOLOGY INTERNATIONAL CORPORATION; MAGIC CONTROL TECHNOLOGY; STARVIEW GLOBAL LIMITED, each doing business as "J5Create;" and DOES 1-10,<br><br>Defendants. | Consolidated with<br>Case No. 1:20-cv-02150-TCB |

**DEFENDANT KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  FACTUAL BACKGROUND .......................................................................... 2

   A. KaiJet US ULTRA Products ....................................................................... 2

   B. JCD382 ........................................................................................................ 3

III. ARGUMENT ................................................................................................. 4

   A. The Court Should Grant Summary Judgment of Noninfringement of the
      '429 Patent by the JCD382 (Second Action, Count I) ................................ 5

      1. No Reasonable Jury Could Conclude That the JCD382's Two
         Separate Male USB-C Connectors Satisfy Element 1[A]'s "Main Port
         Module" ................................................................................................... 5

         a)  The JCD382's separate male USB-C connectors are not "a
             component" that "contains a first and second port unit" ............. 6

         b)  Undisputed evidence shows that the JCD382's separate male
             USB-C connectors do not have a "defined boundary" ................ 8

      2. No Reasonable Jury Could Conclude That the JCD382 Satisfies
         Element 1[C]'s DTCM ........................................................................ 10

   B. The Court Should Grant Summary Judgment of Noninfringement of the
      '875 Patent, '616 Patent, and '618 Patent (First Action, Count I; Second
      Action, Count II) ...................................................................................... 11

      1. The JCD382 does not infringe the '875 or '616 Patents (First Action,
         Count I) ................................................................................................ 13

      2. Neither the JCD382 nor the JCD389 infringe the '618 Patent (Second
         Action, Count II) ................................................................................. 14

   C. The Court Should Grant Summary Judgment of Noninfringement of the
      '290 Patent with Respect to the JCD382 (Second Action, Count III) ........ 17

   D. Summary Judgment in Defendants' Favor is Appropriate as to Sanho's
      Trademark Infringement Claim (First Action, Count II) ............................. 19

i

1. Sanho does not plead common law rights .................................................19

2. Sanho's 707 Registration for HYPERDRIVE is void *ab initio* .............20

3. Additionally, Sanho cannot show likelihood of confusion as a matter of law. ...........................................................................................................22

    a)   Strength of mark .........................................................................23

    b)   The two marks are not similar ....................................................25

    c)   No intent to misappropriate goodwill .........................................26

    d)   No evidence of actual confusion ................................................27

    e)   As a matter of law, absence of likelihood of confusion justifies summary judgment for Defendants .................................................30

E. Summary Judgment in Defendants' Favor is Appropriate as to Sanho's Trade Dress Claim Count III ..........................................................................30

4. Sanho's product packaging is not inherently distinctive. ......................32

5. Sanho cannot show that its packaging has acquired secondary meaning. .................................................................................................................33

IV.   CONCLUSION ................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*,
   810 F.2d 1546 (11th Cir. 1987) ...........................................................34

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................4, 5

*Avenue CLO Fund, Ltd. v. Bank of Am., N.A.*,
   723 F.3d 1287 (11th Cir. 2013) ...........................................................27

*Aycock Eng'g, Inc. v. Airflite, Inc.*,
   560 F.3d 1350 (Fed. Cir. 2009) .....................................................20, 22

*Boost Beauty, LLC v. Woo Signatures, LLC*,
   No. 2:18-cv-02960-CAS-Ex, 2022 U.S. Dist. LEXIS 24515
   (C.D. Cal. Feb. 7, 2022)................................................................23, 25

*Braun Inc. v. Dynamics Corp. of Am.*,
   975 F.2d 815 (Fed. Cir. 1992) .............................................................34

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................4

*Claremont Polychemical Corp. v. Atl. Powdered Metals, Inc.*,
   470 F.2d 636 (C.C.P.A. 1972) .............................................................26

*Conagra, Inc. v. Singleton*,
   743 F.2d 1508 (11th Cir. 1984) ...........................................................33

*Crocs, Inc. v. ITC*,
   598 F.3d 1294 (Fed. Cir. 2010) ...........................................................12

*Dieter v. B & H Indus. of Sw. Fla., Inc.*,
   880 F.2d 322 (11th Cir. 1989) .............................................................20

*Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*,
   369 F.3d 1197 (Fed. Cir. 2004) ...........................................................31

*Echo Travel, Inc. v. Travel Assocs., Inc.*,
   870 F.2d 1264 (7th Cir. 1989) ............................................................................33

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
   543 F.3d 665 (Fed. Cir. 2008) ..............................................................13, 15, 18

*Epic Metals Corp. v. Souliere*,
   99 F.3d 1034 (11th Cir. 1996) ............................................................................31

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   796 F.3d 1312 (Fed. Cir. 2015) ............................................................12, 13, 15

*First Brands Corp. v. Fred Meyer, Inc.*,
   809 F.2d 1378 (9th Cir. 1987) ............................................................................34

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*,
   830 F.3d 1242 (11th Cir. 2016) ..........................................................................23

*Frehling Enters., Inc. v. Int'l Select Grp., Inc.*,
   192 F.3d 1330 (11th Cir. 1999) ..........................................................................25

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*,
   921 F.3d 1343 (11th Cir. 2019) ..........................................................................28

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
   589 F.3d 1233 (Fed. Cir. 2009) ..........................................................................12

*Intel Corp. v. Tela Innovations, Inc.*,
   No. 3:18-cv-02848-WHO, 2020 U.S. Dist. LEXIS 241022 (N.D. Cal.
   Dec. 22, 2020) ..................................................................................................7, 8

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*,
   722 F. Supp. 719 (S.D. Fla. 1989), *aff'd*, 931 F.2d 1519 (11th Cir. 1991) ........34

*Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*,
   716 F.2d 833 (11th Cir. 1983) ............................................................................23

*John H. Harland Co. v. Clarke Checks, Inc.*,
   711 F.2d 966 (11th Cir. 1983) ............................................................................23

*Lanard Toys, Ltd. v. Dolgencorp LLC*,
   958 F.3d 1337 (Fed. Cir. 2020) ..............................................................13, 15

*Malibu Boats, LLC v. Skier's Choice, Inc.*,
  534 F. Supp. 3d 888 (E.D. Tenn. 2021)...............................................................7

*In re Mann*,
  867 F.3d at 1582 ...............................................................................................11

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)..................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).............................................................................................5

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
  702 F.3d 1312 (11th Cir. 2012) ...............................................................31, 32, 33

*Nat'l Nonwovens, Inc. v. Consumer Prods. Enters.*,
  397 F. Supp. 2d 245 (D. Mass. 2005)...............................................................22

*OddzOn Prods. Inc. v. Just Toys, Inc.*,
  122 F.3d 1396 (Fed. Cir. 1997) ...............................................................12, 13, 15

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
  261 F.3d 1188 (11th Cir. 2001) .........................................................................23

*PlayNation Play Sys., Inc. v. Velex Corp.*,
  924 F.3d 1159 (11th Cir. 2019) .........................................................................27

*Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*,
  675 F.2d 1160 (11th Cir. 1982) .........................................................................27

*Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*,
  568 F.2d 1342 (C.C.P.A. 1977) ...................................................................32, 33

*Swint v. City of Carrollton*,
  859 F. App'x 395 (11th Cir. 2021) ....................................................................20

*Tana v. Dantanna's*,
  611 F.3d 767 ......................................................................................................23

*Tarsus Connect, LLC v. Cvent, Inc.*,
  452 F. Supp. 3d 1334 (N.D. Ga. 2020)..........................................................25, 30

*Treehouse Avatar LLC v. Valve Corp.*,
   No. 22-1171, 2022 U.S. App. LEXIS 32993 (Fed. Cir. Nov. 30, 2022)..............7

*Trilink Saw Chain, LLC v. Blount, Inc.*,
   583 F. Supp. 2d 1293 (N.D. Ga. 2008).......................................................26, 30

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992)..................................................................................31

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ............................................................5

*Vitarroz Corp. v. Borden, Inc.*,
   644 F.2d 960 (6th Cir. 1982) ...............................................................26

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000)............................................................................31, 32

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*,
   898 F.3d 1279 (11th Cir. 2018) .........................................................27

**Statutes**

15 U.S.C. § 1114(a) .................................................................................20, 22

35 U.S.C. § 171 ........................................................................................11

15 U.S.C. § 1119 .....................................................................................20

Fed. R. Civ. P. 56(a)...............................................................................4

## TABLE OF ABBREVIATIONS

| Full Name | Abbreviations |
|---|---|
| U.S. Design Patent No. D807,290 | '290 Patent |
| U.S. [Utility] Patent No. 10,572,429 | '429 Patent |
| U.S. Design Patent No. D844,618 | '618 Patent |
| Original Packaging for JCD382 Product | Accused Packaging |
| Copyright Reg. No. VA 2-103-336 | Copyrighted Registration or Copyrighted Packaging |
| Data Transmission Control Module | DTCM |
| *Sanho Corp. v. KaiJet Technology Int'l Ltd.*, No. 1:18-cv-05385 (N.D. Ga.) | First Action |
| Defendants KaiJet Technology International Corporation and KaiJet Technology International Limited, Inc, collectively | KaiJet or Defendants |
| Defendant KaiJet Technology International Limited, Inc. | KaiJet US |
| Transcript and exhibits to the July 14, 2022 deposition of KaiJet Technology International Limited, Inc. | KaiJet US 30(b)(6) |
| Transcript and exhibits to the June 30, 2022 deposition of KaiJet Technology International Corporation | KTIC 30(b)(6) |
| Defendant KaiJet Technology International Corporation | KTIC or KaiJet Taiwan |
| Main Port Module | main port module |
| Plaintiff Sanho Corporation | Sanho |
| *Sanho Corp. v. KaiJet Technology Int'l Ltd.*, No. 1:20-cv-02150 (N.D. Ga.) | Second Action |

| Full Name | Abbreviations |
|---|---|
| Complaint, D.E. 204, filed May 19, 2020 | Second Action Complaint |
| Third Amended Complaint, D.E. 89, filed Nov. 14, 2019 | TAC |
| Complaint, D.E. 89 | TAC or First Action TAC |
| Trademark Manual of Examining Procedure | TMEP |
| Trademark Reg. No. 5,442,707 | "707 Mark" or "Asserted Trademark" |

## I.   INTRODUCTION

Plaintiff Sanho Corporation ("Sanho") has sued Defendant Kaijet Technology International Limited, Inc. ("KaiJet US") regarding is line of Ultradrive USB-C dock devices.[1] Sanho alleges twelve different counts including infringement of five patents, copyright infringement, and trademark infringement, as well as other Lanham Act and state law claims.[2] But Sanho ignores the scope of its intellectual property rights.

In attempting to ban the Ultradrive line of products, Sanho seeks to use its intellectual property rights to assert dominion over all rectangularly shaped USB-C docks or hubs, product packaging with a window or the color orange, or any product name it contends is a synonym for "Hyper."[3] But neither the Asserted Patents, Copyright Registration, nor the Asserted Trademark give Sanho such sweeping authority as evidenced by the plethora of competing products available on the market.[4] Given the undisputed facts, Sanho's allegations are unreasonable and summary judgment should be granted in favor of Defendants in the First Action on Counts I-III and on the Second Action on Counts I-II and Count III (with respect to the JCD382 product).

---

[1] *See* D.E. 89 ("TAC"); *see also* D.E. 204 ("Second Action Complaint").
[2] *Id*.
[3] *See id*.
[4] *See* D.E. 125 at 15.

## II.    FACTUAL BACKGROUND

Sanho has accused Defendants of infringing claims of U.S. Utility Patent No. 10,572,429 ("the '429 Patent") and four different design patents - U.S. Design Patent Nos. D813,875 ("the '875 Patent"), D855,616 ("the '616 Patent"), D844,618 ("the '618 Patent") and D807,290 ("the '290 Patent") through the sale of the Accused Products.[5] Except for the '616 Patent, these patents were applied for and issued to Sanho's supplier GoPod Group.[6] GoPod Group transferred the patents to Sanho for this litigation.[7]

Sanho has also accused Defendants of infringing Trademark Registration Number 5,442,707 ("the 707 Mark") for HYPERDRIVE.[8] In 2017, Sanho obtained the 707 Mark registration for Class 9 goods and services including: components for personal computers, tablet computers, MP3 players, cell phones, and smart phones, namely, electrical power cords, power adapters, and batteries; styluses; and covers for tablet computers.[9] Sanho contends that its Hyperdrive products fit into this list of goods and services and that Ultradrive is confusingly similar.[10]

### A. KaiJet US ULTRA Products

KaiJet US has been selling products with the prefix "ULTRA" since as early as mid-

---

[5] SUF at ¶ 1; TAC at ¶¶ 55-64; Second Action Complaint at ¶¶ 27-53.
[6] SUF at ¶ 2; *see* D.E. 89-1; D.E. 204-1; D.E. 204-2; D.E. 204-3; *see also* Ex. 1 (Liao Dep.) at 83:16-84:12
[7] *Id.*
[8] SUF at ¶ 3; TAC at ¶¶ 65-74.
[9] SUF at ¶ 3; Tomlinson Dec. Ex. A (707 Mark).
[10] SUF at ¶ 4; TAC at ¶¶ 65-74.

2012.[11] The "ULTRA" line of products includes computer peripherals including the UltraStation (JUD500) product.[12]

## B. JCD382

In June 2017, KaiJet US first became aware of Sanho and the Hyperdrive product.[13] Like the many other companies in this space, KaiJet US wanted to sell a product that competed with the Hyperdrive.[14] KaiJet US inquired with its Taiwanese supplier, KaiJet Technology International Corporation ("KTIC"), about products with similar functions.[15] KTIC had a product available—the JCD382.[16] KTIC packaged the product using its typical packaging scheme and named the product using the preexisting "ULTRA" tradename.[17] KaiJet US purchased the j5create Ultradrive (JCD382) from KTIC, imported it to the United States, and ultimately sold it to Best Buy.[18]

---

[11] SUF at ¶ 5; Ex. 4 (Liu Dep.), 96:1-7; Akins Dec. ¶ 6, Ex. D

[12] *Id.*

[13] SUF at ¶ 6; D.E. 96-2, ¶ 5; Ex. 2 (Kaijet US 30(b)(6) (Akins)), at 151:10-16; Ex. 6 (KAIJET_5451).

[14] SUF at ¶¶ 7-8; D.E. 125 at 15; Ex. 2 (KaiJet US 30(b)(6) (Akins)) at 150:13-21; Ex. 4 (Liu Dep.), 83:7-13; Akins Dec. ¶¶ 3-4, Ex. A.

[15] SUF at ¶ 9; Akins Dec. ¶ 4.

[16] SUF at ¶ 10; Ex. 3 (KTIC 30(b)(6) (Tai) Dep.), 64:21-65:3.

[17] SUF at ¶ 11; Ex. 3 (KTIC 30(b)(6) (Tai) Dep.), at 78:4-11; Ex. 2 (KaiJet US 30(b)(6) (Akins)), 149:24-150:12; Ex. 4 (Liu Dep.), 96:1-7.

[18] SUF at ¶ 12; Ex. 2 (KaiJet US 30(b)(6) (Akins)), 133:25-134:3; Ex. 4 (Liu Dep.), 83:7-13; D.E. 146-1, ¶ 7; Ex. 11 (ESI DZ1-5081678-0); Ex. 12 (ESI DZ1-5083104-5).

### III.   ARGUMENT

Summary Judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles.[20] "Factual disputes that are irrelevant or unnecessary" are not material.[21] A factual dispute is "genuine … if the evidence is such that a reasonable jury could return a verdict for the non-moving party."[22]

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.[23] If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law.[24] The non-movant "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is genuine issue for trial.[25] If the evidence relied on by the non-movant is "merely colorable, or is not significantly probative, summary

---

[19] Fed. R. Civ. P. 56(a).
[20] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[21] *Id*.
[22] *Id*.
[23] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).
[24] *Id*. at 324.
[25] *Anderson*, 477 U.S. at 248.

judgment may be granted."[26] Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."[27]

**A. The Court Should Grant Summary Judgment of Noninfringement of the '429 Patent by the JCD382 (Second Action, Count I)**

Count I of the Second Action accuses the JCD382 of infringing several claims of the '429 Patent. To prove patent infringement, Sanho must show that the JCD382 contains each and every limitation of a '429 Patent claim.[28] The Court should grant summary judgment of noninfringement of the '429 Patent because no reasonable jury could conclude that the JCD382 contains at least '429 Patent claim 1 element 1[A]'s "main port module" or element 1[C]'s "data transmission control module" ("DTCM").[29] Because all other Asserted Claims depend from claim 1, failure to meet every limitation of claim 1 is fatal to infringement on every Asserted Claim.

**1. No Reasonable Jury Could Conclude That the JCD382's Two Separate**

---

[26] *Id*. at 249.

[27] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Anderson,* 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

[28] *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011).

[29] KaiJet uses the reference numerals for the '429 Patent claim elements provided by Sanho's technical expert, Dr. Baker. *See* Ex. 7 (8/29/22 Baker Expert Rpt.) at ¶¶ 94-98, 106-110..

**Male USB-C Connectors Satisfy Element 1[A]'s "Main Port Module"**

Undisputed evidence shows that the JCD382 does not have a main port module under the Court's construction because the JCD382's separate USB-C male connectors are not "*contained*" within "a *component*," much less one "with a defined boundary separate from other modules in the system." KaiJet US' expert, Sanho's expert, and the PTAB's Final Written Decision canceling the asserted '429 Patent claims as unpatentable all agree this is the case.

### a) The JCD382's separate male USB-C connectors are not "a component" that "contains a first and second port unit"

The Court construed element 1[A]'s main port module to require, among other things, "a *component*" that "*contains* a first and second port unit" (emphasis added).[30] Sanho alleges this element by simply drawing a red box around the two connectors on a picture of the JCD382's circuit board:[31]



---

[30] SUF at ¶ 13; D.E. 284 at 20-21; *See* D.E. 298 at 8.
[31] SUF at ¶ 14; Ex. 7 (8/29/22 Baker Rpt.) at ¶ 96.

But Sanho's expert ignores the Court's construction and does not attempt to explain how this red box is a *component* of the JCD382 that *contains* the two USB-C connectors.[32] Indeed, it isn't. As KaiJet US' expert explains, "[t]he JCD382 has no component … that corresponds to Dr. Baker's imaginary box."[33] "And selectively drawing a box around [the two connectors] does not somehow convert [them] into a distinct … component of the JCD382."[34]

During his deposition, Sanho's expert agreed with KaiJet US' expert:

Q. So the red box is an annotation; it's not a component. Right?
…
A: Yes. Same testimony. It's what I added to annotate the photographs I took. *It's not a component*.[35]

Because both experts agree that a box drawn around two male ports is not "component" that "contains" and, therefore, is not a main port module.[36]

Similarly, the PTAB rejected Sanho's identical attempt to show its own Hyperdrive

---

[32] SUF at ¶ 15; Ex. 7 (8/29/22 Baker Rpt.) at ¶¶ 94-98; *See Treehouse Avatar LLC v. Valve Corp.*, No. 22-1171, 2022 U.S. App. LEXIS 32993, at *11-12 (Fed. Cir. Nov. 30, 2022) (affirming district court's grant the defendant's motion to strike portions of the plaintiff's expert report applying an incorrect construction that omitted requirements of the adopted construction).

[33] SUF at ¶ 16; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 90.

[34] SUF at ¶ 17; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 91.

[35] SUF at ¶ 18; Ex. 8 (11/4/22 Baker Dep.), 22:24-23:5 (emphasis added).

[36] *See Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-cv-02848-WHO, 2020 U.S. Dist. LEXIS 241022, at *13-16 (N.D. Cal. Dec. 22, 2020) (granting motion for summary of noninfringement where both parties' experts agreed that the accused product lacked a required claim element); *Malibu Boats, LLC v. Skier's Choice, Inc*., 534 F. Supp. 3d 888, 910 (E.D. Tenn. 2021) (granting summary judgment of invalidity where the plaintiff's expert agreed that a person of ordinary skill in the art would find a claim term indefinite).

7

product embodied claim 1[37]:



The panel explained that a "main port module is a component having a defined and distinct boundary, *not merely two port units attached to the substrate of the overall system*. The substrate shown above is not a component having a defined and distinct boundary."[38] Like the Hyperdrive, the JCD382 merely has two USB-C ports attached to the substrate of the overall system—not a *component containing* those connectors.

### b) Undisputed evidence shows that the JCD382's separate male USB-C connectors do not have a "defined boundary"

The Court's construction of element 1[A] also requires the main port module to "hav[e] a defined boundary separate from other modules in the system."[39] Sanho's red box does not satisfy this requirement. First, Sanho's expert admits that red box is not even a *boundary* of the JCD382 but "an annotation Dr. Baker has arbitrarily drawn on an image of the JCD382 circuit board."[40] "The JCD382 circuit board simply has no feature or structure corresponding to Dr. Baker's red box."[41]

---

[37] SUF at ¶ 19; D.E. 311-1 at 54.

[38] SUF at ¶ 20; D.E. 311-1 at 55 (emphasis added); *see also id*. at 9, 10, 14.

[39] SUF at ¶ 13; D.E. 284; at 20-21; D.E. 298 at 8.

[40] SUF at ¶ 21; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 100; *see also* Ex. 8 (11/4/22 Baker Dep.), 22:14-23:5.

[41] SUF at ¶ 22; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 100.

Second, Sanho's box has an *arbitrary* border—not a *defined boundary* as required by the Court's construction—because "[a] POSITA examining the JCD382 circuit board would not readily identify the region enclosed by Dr. Baker as a distinct area of the circuit board."[42] "Dr. Baker has arbitrarily selected a region of the JCD382, in hindsight, attempting to track the court's construction."[43] And "one could draw a nearly *infinite* number of boxes around arbitrarily-selected … aspects of the JCD382 circuit board as Dr. Baker has done."[44]

Illustrating the arbitrariness of Sanho's analysis, its expert changed the border of the JCD382's supposed main port module from his opening report to his reply report.[45] In his deposition, Sanho's expert could not explain why he changed his annotation and repeatedly admitted that it "doesn't matter" how he draws the border or whether it changes.[46] Thus, Sanho's expert admits the male USB-C port units of the JCD382 collectively have no *defined boundary*, as required by the Court's construction. The PTAB reached the same conclusion, repeatedly explaining in its Final Written Decision that "mere[] port units attached to the substrate of the overall system"—like those of the JCD382—do not have

---

[42] SUF at ¶ 23; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 101.
[43] SUF at ¶ 24; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 102.
[44] SUF at ¶ 25; Ex. 10 (9/28/22 Franzon Rpt.)
[45] SUF at ¶ 26; *Compare* Ex. 7 (8/29/22 Baker Rpt.) at ¶¶ 94-96 *with* Ex. 9 (10/10/22 Baker Rpt.) at ¶ 8.
[46] SUF at ¶ 27; *See, e.g.*, Ex. 8 (11/4/22 Baker Dep.) at 9:11-14:21, 48:8-21, 56:19-57:6; *compare* Ex. 7 (8/29/22 Baker Rpt.) at ¶¶ 94-96 *with* Ex. 9 (10/10/22 Baker Rpt.) at ¶ 8.

"a defined and distinct boundary."[47]

### 2. No Reasonable Jury Could Conclude That the JCD382 Satisfies Element 1[C]'s DTCM

For similar reasons to the main port module, no reasonable jury could conclude that the JCD382 has element 1[C]'s DTCM under the Court's construction. Like the main port module, the construction of DTCM requires "a component interacting with a larger system and having a defined boundary distinct from other modules in the system."[48] No reasonable jury could conclude that Sanho's alleged DTCM satisfies this construction.

Sanho's expert identifies the DTCM as everything on side one of the JCD382 except the female ports and the box Sanho calls the main port module[49]:



---

[47] SUF at ¶ 28; D.E. 311-1, at 9; *see also id*. at 10, 14, 55.
[48] SUF at ¶ 29; D.E. 284 at 13-14, 23-39; D.E. 298 at 9.
[49] SUF at ¶ 30; *Compare* Ex. 7 (8/29/22 Baker Rpt.) at ¶ 96 *with id*. at ¶ 107.

But, like Sanho's purported main port module, its purported DTCM is completely *arbitrary* and *undefined*. "A POSITA examining the JCD382 circuit board would not recognize the region Dr. Baker calls the data transmission control module as a distinct area of the circuit board at all, much less one separate from other modules in the system."[50] Additionally, "[t]he boundary of the alleged data transmission control module differs depending whether one looks at side one or side two of the JCD382[.]"[51] Even Sanho's expert admits that it "doesn't matter" how he delineates the purported DTCM on the JCD382.[52] No reasonable jury could conclude that the JCD382 includes a DTCM under the Court's construction.

## B. The Court Should Grant Summary Judgment of Noninfringement of the '875 Patent, '616 Patent, and '618 Patent (First Action, Count I; Second Action, Count II)

Design patents are distinct from utility patents and may be issued only for an "ornamental design for an article of manufacture."[53] While a utility patent can protect the function of an object, a design patent only protects the specific way it looks. Therefore, design patents have "almost no scope" as they only protect the ornamental features of the object as depicted in the drawings.[54]

---

[50] SUF at ¶ 31; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 106.
[51] SUF at ¶ 32; Ex. 10 (9/28/22 Franzon Rpt.) at ¶ 107; Ex. 7 (8/29/22 Baker Rpt.) at ¶ 96.
[52] SUF at ¶ 33; *See, e.g.*, Ex. 8 (11/4/22 Baker Dep.), 35:3-36:14, 58:15-59:25.
[53] 35 U.S.C. § 171.
[54] *In re Mann*, 867 F.3d at 1582.

Like in a utility patent, "[a]n infringement analysis entails two steps."[55] "The first step is determining the meaning and scope of the patent claims" in dispute, i.e., claim construction.[56] Features of the design dictated by functional considerations are not subject to patent protection.[57] Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent.[58] The scope of the design will be limited to the ornamental aspects of the design and does not extend to the broader general design concept.[59]

After construction, the Court then analyzes the similarity of designs. The test for design patent infringement is whether "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design."[60] The test for whether a design patent is invalid for being anticipated by prior art is the same.[61] When the accused design and the patent's design are "sufficiently distinct" and "plainly dissimilar," the patent holder fails as a matter of law to meet its

---

[55] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

[56] *Id.*

[57] *OddzOn Prods. Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997).

[58] *Id.*

[59] *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015).

[60] *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1303 (Fed. Cir. 2010).

[61] *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009) (the ordinary observer test is the sole test for both infringement and anticipation).

burden of proving infringement.[62] A district court may grant summary judgment as to noninfringement if "the accused design could not reasonably be viewed as so similar to the claimed design that a purchaser familiar with the prior art would be deceived by the similarity between the claimed and accused designs inducing him to purchase one supposing it to be the other."[63] The Federal Circuit has often affirmed such orders.[64]

Only if the claimed and the accused designs are not plainly dissimilar will the infringement analysis then benefit from comparing the claimed design and accused designs with prior art to identify differences that are not noticeable in the abstract, but would be significant to the ordinary observer familiar with the prior art.[65] "[W]hen the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important in the eye of the hypothetical observer."[66]

### 1. The JCD382 does not infringe the '875 or '616 Patents (First Action, Count I)

Count I of the First Action accuses the JCD382 product of infringing the '875 and '616 Patents.[67] But, the ornamental design of the JCD382 is plainly dissimilar from these

---

[62] *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008); *see also Ethicon Endo-Surgery*, 796 F.3d at 1335.

[63] *Egyptian Goddess*, 543 F.3d at 670.

[64] *See, e.g., Lanard Toys, Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1347 (Fed. Cir. 2020); *Ethicon Endo-Surgery*, 796 F.3d at 1315; *Egyptian Goddess*, 543 F.3d at 683, *OddzOn*, 122 F.3d at 1407.

[65] *Egyptian Goddess*, 543 F.3d at 678.

[66] *Id.* at 676.

[67] D.E. 89 at ¶¶ 55-64.

patents, so no reasonable juror could find infringement.[68] The '875 and '616 Patents, which have nearly identical shapes,[69] claim a device with completely flat top and bottom surfaces, resulting in squared-off end faces making a 90º angle at each end.[70] The JCD382 has an entirely different shape and is plainly dissimilar with its tapered ends and faces:[71]



Both Sanho's expert and KaiJet US' expert agree that the difference between the flat shape of the '875 and '616 Patents and the tapered shape of the JCD382 would be immediately noticeable to an ordinary observer such that they would be plainly dissimilar and there would be no infringement.[72]

## 2. Neither the JCD382 nor the JCD389 infringe the '618 Patent (Second

---

[68] SUF at ¶ 34; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 164, 180.

[69] SUF at ¶ 35; Ex. 14 ('875 Patent); Ex. 15 ('616 Patent); Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶ 174; Ex. 21 (Chin Dep.), 92:10-93:4.

[70] SUF at ¶ 36; Ex. 14 ('875 Patent); Ex. 15 ('616 Patent); Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 165, 174

[71] SUF at ¶ 37; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶ 165; Ex. 17 (KAIJET000678).

[72] SUF at ¶ 38; Ex. 18 (Bressler Dep.) at 56:25-57:12; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶ 165.

**Action, Count II)**

Count II of the Second Action accuses the JCD389 and JCD382 of infringing the '618 Patent. Like above, the JCD389 has a distinctly different shape than the '618 Patent design[73]:



Both experts agree distinct differences in shape would be noticeable to an ordinary observer such that said observer would not confuse the two products.[74] Thus, no reasonable jury could find that the JCD389 infringes the '618 Patent.

While the JCD382 and '618 Patents both show a rectangular device with rounded corners and tapered ends, simply having a similar shape is insufficient to satisfy the ordinary observer test.[75] Sanho's expert concurred when he determined that the '618 Patent was not anticipated by the CN728 prior art patent under the ordinary observer test despite the two products having the same shape and nearly identical ornamental features:[76]

---

[73] SUF at ¶ 39; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 204-211.

[74] SUF at ¶ 40; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 204-211; Ex. 18 (Bressler Dep.), 56:25-57:12.

[75] *See, e.g. Lanard*, 958 F.3d at 1347; *Ethicon Endo-Surgery*, 796 F.3d at 1315; *Egyptian Goddess*, 543 F.3d at 683, *OddzOn*, 122 F.3d at 1407.

[76] SUF at ¶ 41; Ex. 22 ('618 Patent), FIGS. 1, 3-4; Ex. 23 (CN728); Ex. 24 (9/28/22 Bressler Rpt.) at ¶¶ 76-86; Ex. 18 (Bressler Dep.), 23:10-24:21, 25:15-25.



| '618 Patent | CN728 Patent |
|---|---|

Sanho's expert opined that, despite having the same tapered ends, asymmetrical feature line, and concentric circle detail, the CN728 prior art was sufficiently distinct from the '618 Patent such that an ordinary observer could easily distinguish the two designs.[77] He supported his argument with the fact that the '618 Patent design was approximately

---

[77] SUF at ¶ 41; Ex. 24 (9/28/22 Bressler Rpt.) at ¶¶ 76-86; Ex. 18 (Bressler Dep.), 23:10-24:21, 25:15-25.

20% longer than the CN728 design, proportional to its height, and the number of ports did not match.[78]

If the CN728 design does not anticipate the '618 Patent, then the JCD382 product certainly does not infringe it. The differences between the '618 Patent and the JCD382 outnumber the differences between the CN728 and the JCD382. For example, the '618 Patent design is approximately 27% longer, proportional to its height, than the JCD382.[79] The ports of the JCD382 are also oriented differently than the ports of the '618 Patent design.[80] Following the logic of Sanho's expert, these differences alone should be sufficient to find the two designs are plainly dissimilar and sufficiently distinctly. But there are also additional ornamental differences including the symmetrical material transitions of the JCD382 that are not present on the '618 Patent design and the asymmetrical feature line containing concentric circles of the '618 Patent that is not present on the JCD382.[81] These differences, taken as a whole, make the JCD382 plainly dissimilar from the '618 Patent such that an ordinary observer would not confuse the two.

## C. The Court Should Grant Summary Judgment of Noninfringement of the '290

---

[78] SUF at ¶ 42; Ex. 24 (9/28/22 Bressler Rpt.) at ¶¶ 76-86; Ex. 18 (Bressler Dep.), 23:10-24:21, 25:15-25.
[79] SUF at ¶ 43; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶ 194.
[80] SUF at ¶ 44; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 196-97.
[81] SUF at ¶ 45; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 196-97

**Patent with Respect to the JCD382 (Second Action, Count III)**

In the Second Action's Complaint, Sanho accused three products sold by KaiJet US of infringing the '290 Patent.[82] On July 29, 2022, Sanho filed supplemental infringement contentions which, for the first time, accused the JCD382 of infringing the '290 Patent.[83] But no reasonable jury could find the JCD382 and '290 Patent designs confusingly similar under the standard laid out in *Egyptian Goddess*.

The differences between the JCD382 and the '290 Patent are similar to those that Sanho's expert opined made the CN728 reference and '618 Patent plainly dissimilar. The JCD382 is both longer and skinnier proportional to its height than the '290 Patent.[84] Additionally, many prior art references have similar proportions to both the JCD382 and the '290 Patent, indicating that it would not be a distinguishing factor for an ordinary observer.[85] The number of ports, which Sanho's expert agrees is significant, are wildly different between the JCD382 and the '290 Patent.[86] The JCD382 includes twice the number of male ports and nearly twice the number of female ports claimed in the '290 Patent design.[87] The additional difference in ornamental features is similar to the differences between the '618 Patent and the JCD382 outlined above.[88] Taken together, the

---

[82] SUF at ¶ 46; Complaint in Second Action at ¶ 16.
[83] SUF at ¶ 47; Ex. 20 (7/29/22 Suppl. Infringement Contentions).
[84] SUF at ¶ 48; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 91-96.
[85] SUF at ¶ 49; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 60-74, 103-104.
[86] SUF at ¶ 50; Ex. 16 (9/28/22 Shankwiler Rpt.) at ¶¶ 79-83.
[87] *Id*.
[88] *See* Supra III.B.2.

JCD382 is plainly dissimilar from the '290 Patent and does not infringe as a matter of law. Because likelihood of confusion is an essential element of its claim, this failure provides an alternative justification for summary judgment on this claim.

**D. Summary Judgment in Defendants' Favor is Appropriate as to Sanho's Trademark Infringement Claim (First Action, Count II)**

Sanho alleges that Defendants' use of "Ultradrive" infringes Sanho's 707 Mark for Hyperdrive.[89] But as discussed in this section, Sanho's 707 Mark is invalid. With no valid trademark registration, and because Sanho has not pleaded infringement of common law trademark rights, there is no genuine issue of material fact that precludes judgment in Defendants' favor on Sanho's trademark infringement claim. Further, Sanho cannot show a likelihood of confusion between the 707 Mark and Defendants' use of "Ultradrive" as a matter of law.

**1. Sanho does not plead common law rights**

Sanho has only pleaded infringement of a registered trademark. Despite its multiple amended complaints, Sanho has never pleaded infringement of any common law trademark rights.[90] Sanho's Count III alleging unfair competition states only that Defendants' "use of the ULTRADRIVE name is a deliberate and willful effort to … trade off of Plaintiff's reputation and goodwill in the HYPERDRIVE [sic] by infringing on the 707 mark and

---

[89] TAC at ¶¶ 65-74.
[90] SUF at ¶ 51; *See* TAC.

trade dress."[91] Thus, Sanho's Lanham Act § 43(a) claim (Count III) relies on its registration, e.g., "the 707 mark," just as Sanho's Lanham Act § 32 claim (Count II) does. As shown in the next section, that registration is invalid.

Sanho might argue that the Court should nevertheless allow Sanho to assert common law rights it did not plead, but Eleventh Circuit precedent provides otherwise.[92] As a matter of law, Sanho does not plead infringement of a common law trademark.

### 2.  Sanho's 707 Registration for HYPERDRIVE is void *ab initio*

To prevail on a claim of infringement of a registered trademark under § 1114(a), Sanho must show: (1) its 707 Mark's registration is valid, and (2) Defendants' use of their "Ultradrive" mark is likely to cause confusion.[93] Sanho cannot prevail on either prong.

It is appropriate for the Court to address validity of the 707 Mark in this action. The relevant Lanham Act section, 15 U.S.C. § 1119, provides that "[i]n any action involving a registered mark the court may determine the right to registration, … and otherwise rectify the register with respect to the registrations of any party to the action." Trademark registration requires use of the mark in U.S. commerce, and "[t]he registration of a mark that does not meet the use requirement is void ab initio."[94] But Sanho did not use

---

[91] TAC at ¶ 77.

[92] *Swint v. City of Carrollton*, 859 F. App'x 395, 399 (11th Cir. 2021) (passing reference to freedom of speech did not put plaintiff's adversaries on notice she was alleging a violation of her freedom of speech at summary judgment stage).

[93] *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989).

[94] *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009).

HYPERDRIVE in connection with any of the goods in its application for registration, and therefore its registration is void.

Sanho's application to register its HYPERDRIVE trademark was granted on April 10, 2018 based on Sanho's claim of use of the mark with this exact list of goods: "components for personal computers, tablet computers, MP3 players, cell phones and smart phones, *namely, electrical power cords, power adapters, and batteries; styluses and covers for tablet computers.*"[95] Sanho submitted to the Trademark Examiner a use specimen which is a screenshot of a Kickstarter campaign with images of its Thunderbolt 3 USB-C Hub for MacBook Pro (the "Specimen").[96] Sanho's Specimen is not an electrical power cord, a battery, a stylus, or a cover for a tablet computer.[97] The Specimen also does not meet the commonly understood definition of a "power adapter."[98] Thus, Sanho's Specimen does not show use of the mark with any of the five specific goods in its application.

---

[95] SUF at ¶ 52; Tomlinson Dec. Exhibits A-B.

[96] SUF at ¶ 53; Tomlinson Dec. Exhibit C.

[97] SUF at ¶ 54; Tomlinson Dec. Exhibit C. Evidence establishes Sanho is very much aware of the issues in its description of goods. In its Interrogatory No. 13, Defendants asked Sanho to identify whether its products sold under the HYPERDRIVE mark met the description of goods in Sanho's 707 Registration. *See* Ex. 25 (Third Interrogatories to Plaintiff). In its first response on March 19, 2020, Sanho outright refused to provide an answer. *See* Ex. 26 (Plaintiff's Responses to Third Interrogatories). Over two years, later (and not long after the April 2022 deposition of Sanho's principal Daniel Chin), Sanho's counsel supplemented Sanho's interrogatory answer to state its products "can be described as" the goods listed in its 707 Registration. *See* Ex. 27 (Plaintiff's Suppl. Resps. to Third Interrogatories). Notably, this answer conflicts with Sanho's deposition testimony. *See* Ex. 5 (Sanho 30(b)(6) (Chin) Dep.), 174:1-177:25; 178:17-25.

[98] SUF at ¶ 55; Ex. 13 (Franzon Dep.), 71:10-12; 96:20-109:25; *see also* TMEP 1402.01 ("The language used to describe goods and/or services should be understandable to the

What is more, Sanho has zero evidence it was using HYPERDRIVE in association with electrical power cords, power adapters, batteries, styluses or covers for tablet computers on or before the date it filed its trademark application on August 15, 2017.[99] Since 2017, Sanho has only used HYPERDRIVE on its line of USB Hubs, which are none of the goods listed on the 707 Mark registration.[100] Because there is no issue of disputed fact that Sanho did not use the mark for the goods it claimed when it registered the mark or since, Sanho did not meet the use requirement, and the 707 Mark is void *ab initio*.[101]

Sanho cannot show that it owns a valid trademark registration, a required element of a cause of action under 15 U.S.C. § 1114(a). Summary judgment on Count II is warranted.

### 3. Additionally, Sanho cannot show likelihood of confusion as a matter of law.

Additionally, it is clear as a matter of law that there is no likelihood of consumer confusion between the 707 Mark for HYPERDRIVE and Defendants' use of "Ultradrive" in association with their products.

The Eleventh Circuit has established a multi-factor test to evaluate the likelihood of confusion between two marks:

---

average person and should not require an in-depth knowledge of the relevant field."); *Nat'l Nonwovens, Inc. v. Consumer Prods. Enters.*, 397 F. Supp. 2d 245, 253 n.9 (D. Mass. 2005) ("[A]n applicant's 'identification of goods or services should set forth common names, using terminology that is generally understood.'" (citing TMEP 1402.01).

[99] SUF at ¶ 56; Tomlinson Dec. ¶¶ 10-11.

[100] SUF at ¶ 57; Ex. 5 (Sanho 30(b)(6) (Chin) Dep.), 174:1-177:25; 178:17-25.

[101] *see Aycock*, 560 F.3d at 1357.

(1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.[102]

Among the seven factors, "the type of mark and the evidence of actual confusion are the most important," neither of which favor Sanho.[103] The Court is tasked to evaluate and weigh these factors to determine "whether consumers are likely to confuse the defendant's services with the plaintiff's services."[104]

### a) Strength of mark

"Hyperdrive" is a weak mark because there are several third-party users of "Hyperdrive" and many more users of "Hyper" and "Drive" formatives in their trademarks. The Eleventh Circuit has long recognized that the extent of third-party use of a mark is an essential factor in determining a mark's strength and this Circuit has determined that a "strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties."[105] Several other

---

[102] *Tana v. Dantanna's*, 611 F.3d 767, 774-75.
[103] *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1201 n.22 (11th Cir. 2001).
[104] *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 840 (11th Cir. 1983).
[105] *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973-75 (11th Cir. 1983); *see also Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1257 (11th Cir. 2016) (finding defendant successfully rebutted the presumption of strength by showing extensive third-party use of the mark"); *Boost Beauty, LLC v. Woo Signatures, LLC*, No. 2:18-cv-02960-CAS-Ex, 2022 U.S. Dist. LEXIS 24515, at *28 (C.D. Cal. Feb.

companies use "Hyperdrive." Defendants' trademark and copyright expert, Antonio ("Tony") Sarabia, identified at least six other trademark registrations for marks phonetically identical and visually similar to "Hyperdrive" in International Class 9, and the majority specify components for personal computers, tablet computers, MP3 players, cell phones, and smart phones.[106]

Additionally, Mr. Sarabia identified nine other phonetically identical and visually similar trademark registrations for computer-related products or batteries utilizing the term "Hyper" by itself.[107] Mr. Sarabia's findings are unrebutted by Sanho.

In fact, there are well over one hundred valid trademark registrations utilizing the term "Hyper," in combination with other terms in International Class 9, such as computer software, computer hardware, computer operating systems, computer games, computer monitors, battery chargers, and tablet computers, to name a few.[108] The number is even more staggering when viewed in conjunction with the number of registered trademark registrations utilizing the term "drive" in association with such goods.[109] A number trademark owners disclaim the term "drive" as being merely descriptive of the computer-related goods and services described.[110] This makes sense, as a "drive" is a readily defined

---

7, 2022) (BOOSTLASH mark was not strong where there were 47 live trademarks using "Boost" in cosmetics and 730 live trademarks using "Lash.").

[106] SUF at ¶ 58; Ex. 19 (Sarabia Rpt.) at 11, Ex. 30 (Sarabia Ex. J).

[107] SUF at ¶ 59; Ex. 19 (Sarabia Rpt.) at 11, Exs. 28-29 (Sarabia Exs. H-I).

[108] SUF at ¶ 60; Tomlinson Dec., Exhibit D.

[109] SUF at ¶ 61; Tomlinson Dec.., Exhibit E.

[110] *Id.*

term in the computer and technology industry.[111] Thus, undisputed evidence demonstrates Sanho's HYPERDRIVE mark is weak.

### b) The two marks are not similar

As to the similarity of the marks, a court "compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used."[112] "The mere fact that two marks contain the same word does not, in itself, make the marks 'substantially similar.'"[113] Additionally, if a trademark, like HYPERDRIVE, operates in a crowded field of similar marks on similar goods or services, slight differences in names are meaningful.[114]

Absent the shared term "drive," the remaining portions of the parties' marks are linguistically distinct. "ULTRA" and "HYPER" are objectively dissimilar in both sight and sound. Sanho may argue a definitional similarity between those terms, but long-standing precedent holds that word marks are not confusingly similar simply because convey the

---

[111] SUF at ¶ 62; Tomlinson Dec., Exhibit F.

[112] *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1337 (11th Cir. 1999).

[113] *Tarsus Connect, LLC v. Cvent, Inc.*, 452 F. Supp. 3d 1334, 1351 (N.D. Ga. 2020); *see also Boost Beauty*, 2022 U.S. Dist. LEXIS 24515, at *29 (when comparing BOOSTLASH and WOOLASH, court concluded, absent the shared term LASH, no reasonable consumer would mistake "woo" and "boost").

[114] *See Tarsus Connect*, 452 F. Supp. 3d at 1352 ("Since the marks at issue here operate in a crowded field, the differing placement of 'connect' and the inclusion of brand modifiers are sufficient to differentiate the marks.")

same or a similar meaning.[115]

Finally, assuming for the sake of argument this court finds the marks to be confusingly similar in the abstract, this circuit has repeatedly found that "marks otherwise confusingly similar in the abstract are rendered distinct by their presentation."[116] This is particularly true where one of the noticeably different marks is always or almost always presented in association with its company name.[117]

Undisputed evidence demonstrates Defendants' ULTRADRIVE Mark is always displayed with the J5create Mark on every side of its packaging and in advertisements.[118] Additionally, Sanho's HYPERDRIVE Mark is displayed on Sanho's products in stylized font with the "++" design between the words HYPER and DRIVE.[119] Therefore, the marks are dissimilar in terms of sight, sound, and commercial impression.

### c) No intent to misappropriate goodwill

The undisputed evidence in this action demonstrates Defendants were already using the dominant term ULTRA in the trademark, as early as mid-2012, for the UltraStation

---

[115] *See Claremont Polychemical Corp. v. Atl. Powdered Metals, Inc.*, 470 F.2d 636, 637 (C.C.P.A. 1972) (Evergold for metal powder and Duragold for bronze pigment not similar in appearance).

[116] *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1315 (N.D. Ga. 2008) (similar marks placed on directly competitive goods may not result in confusion where the appearance and usage of the marks is dissimilar).

[117] *See Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 969 (6th Cir. 1982) ("When similar marks are always presented in association with company names, the likelihood of confusion is reduced.")

[118] SUF at ¶ 63; Akins Dec. ¶ 5, Ex. B-C.

[119] D.E. 89-2; Tomlinson Dec. ¶ 12, Exhibits H-I.

product.[120] That date is six years before Sanho filed its application for its trademark registration for HYPERDRIVE.[121] In fact, Defendants never heard of Sanho until 2017.[122]

Furthermore, the mere fact that Defendants mentioned Sanho in e-mails involving its ULTRADRIVE name and product packaging does not equate to a finding of an intent to copy, and any such argument it does is speculative.[123] However, even if copying can be inferred, intentional copying, without more, does not support a finding of likelihood of confusion.[124]

### d) No evidence of actual confusion

The existence of actual confusion "turns on both the number of instances of confusion and the type of person confused."[125] "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, … while confusion of actual customers of a business is worthy of substantial weight."[126]

---

[120] SUF at ¶ 5; Ex. 4 (Liu Dep.), 96:1-7; Akins Dec. ¶ 6, Ex. D.

[121] SUF at ¶ 5, 52; Akins Dec. ¶ 6, Ex. D; Tomlinson Dec. Exhibit B; Ex. 4 (Liu Dep.), 96:1-7.

[122] SUF at ¶ 6; D.E. 96-2, ¶ 5; Ex. 2 (Kaijet US 30(b)(6) (Akins) Dep.), at 151:10-16; Akins Dec. ¶ 3, Ex. A.

[123] *Avenue CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (Inferences "based on speculation and conjecture" cannot defeat a motion for summary judgment).

[124] *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1293 (11th Cir. 2018) ("There is a difference between intentional copying and intentional copying *with intent to cause confusion* … Strictly, intent, or lack thereof, does not affect the eyes of the viewer.") (emphasis in original)

[125] *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1167 (11th Cir. 2019).

[126] *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982).

Additionally, if consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, this is a powerful indication the defendant's mark does not cause a meaningful likelihood of confusion.[127]

The evidence in this action establishes that, during the relevant period, Sanho sold over ████ units of its HYPERDRIVE hubs;[128] meanwhile, KaiJet US sold over ████ units of the Ultradrive hubs.[129] In light of these figures, Sanho's reliance on only two instances of purported actual confusion involving Defendants' "Ultradrive" branded product does not establish likelihood of confusion, rather the opposite.

Over the years, Sanho's and Defendants' mutual customer Best Buy apparently returned to Sanho only two of Defendants' "Ultradrive" units. To be sure, Sanho produced 30 photos of Defendants' other products returned to Sanho, but aside from the two, the other mis-returned products do not feature the "Ultradrive" mark.[130] Sanho CEO Daniel Chin testified Sanho received "50 to hundred products" from Best Buy of products from other manufacturers, not including Defendants.[131] Mr. Chin also testified that based on his

---

[127] *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019) ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion.")

[128] SUF at ¶ 65; Ex. 31 (8/29/22 Cenatempo Rpt.) at 180.

[129] SUF at ¶ 66; Ex. 31 (8/29/22 Cenatempo Rpt.) at 147.

[130] SUF at ¶ 67; Tomlinson Dec., ¶ 9, Exhibit G.

[131] SUF at ¶ 68; Ex. 5 (Sanho 30(b)(6) (Chin) Dep.) at 122:19-23.

personal experience with Best Buy returns, "[i]f you have a receipt, they will scan the receipt to process the return. If you don't have the receipt, they will scan your credit card; they scan the bar code of the return product packaging to process the return."[132] Thus, Sanho's own evidence shows the mistaken returns are not due to confusion of the parties' marks, rather they are due to erroneous product information paired with the scanned receipt code.

Defendants' trademark expert, Tony Sarabia, returned a j5create Ultradrive Minidock to Best Buy to determine whether Best Buy employees process customer returns based on brand recognition of a product.[133] Not surprisingly, he found that Best Buy employees do not process customer returns based on a product's brand recognition, which "meshes with common sense."[134] Instead, Best Buy employees scan the barcodes on, first, the transaction receipt, and then, the product box.[135] The transaction receipt lists every item bought on the transaction, and the product scan identifies the item from the transaction receipt which is being returned.[136] The assertion that Best Buy employees, who process returns for hundreds, if not thousands of different products, process returns based on their recognition of product brand identity is speculative at best. Sanho's Best Buy return theory of actual confusion fails to raise an issue of material fact, and fails as a matter of common

---

[132] SUF at ¶ 69; Ex. 5 (Sanho 30(b)(6) (Chin) Dep.) at 122:19-23, 123:13-20.
[133] SUF at ¶ 70; Ex. 19 (Sarabia Rpt.) at 19-21.
[134] *Id.*
[135] *Id.*
[136] *Id.*

sense. Instead, the fact that ULTRADRIVE and HYPERDRIVE have coexisted in the marketplace for a substantial period of time with little to no consumer confusion cuts heavily in Defendants' favor.

> ### e) As a matter of law, absence of likelihood of confusion justifies summary judgment for Defendants

Sanho's HYPERDRIVE trademark registration is invalid as a matter of law. However, assuming this court allows Sanho's registration to survive, it is proper for this court to grant summary judgment in this case.[137] On balance, the likelihood of confusion factors favor Defendants.[138]

## E. Summary Judgment in Defendants' Favor is Appropriate as to Sanho's Trade Dress Claim Count III

Sanho alleges unfair competition in violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a).[139] Sanho again asserts that "Ultradrive" infringes its "707 Mark," i.e. the trademark registration addressed in the preceding section.[140] Sanho's contentions of infringement of the 707 Mark in Count III fail for the reasons outlined above as to Count

---

[137] *Trilink Saw Chain*, 583 F. Supp. 2d at 1318 (district court granted summary judgment in favor of defendant on no likelihood of confusion where there was no evidence anyone had actually been confused by the two marks, defendant did not engage in bad faith when picking the mark, and the marks were strikingly dissimilar when they appear in the manner in which they were marketed); *see also Tarsus Connect*, 452 F. Supp. 3d at 1356 (granting summary judgment in favor of defendant on no likelihood of confusion).
[138] *See id.*
[139] TAC at ¶¶ 75-81.
[140] *Id.*, ¶ 77.

II.[141]

Sanho also asserts infringement of "trade dress," and that Defendants infringe the copyright in Sanho's packaging; Sanho contends these actions constitute unfair competition. "To bring a successful trade dress infringement claim under the Lanham Act, a plaintiff must prove that (1) the defendant's product [or in this case packaging] is confusingly similar to its product [or packaging]; (2) the similar features of the two products [or packaging] are primarily non-functional; and (3) the plaintiff's product [package] is distinctive."[142] "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold."[143] Sanho's trade dress claim fails because, at a minimum, its packaging is not distinctive.

Although the text of Section 43(a) does not "explicitly require[] a producer to show that its trade dress is distinctive, … courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion … as to the origin, sponsorship, or approval of [the] goods.'"[144] "Trade dress may become distinctive in two ways."[145] In limited circumstances, trade dress, "because [its] intrinsic nature serves to

---

[141] *See Supra* III.D

[142] *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012).

[143] *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202 (Fed. Cir. 2004) (quoting *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996)) (internal quotation marks omitted).

[144] *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).

[145] *Miller's Ale House*, 702 F.3d at 1322 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992))

identify a particular source of a product, [is] deemed inherently distinctive."[146] "Other trade dress, though not inherently distinctive, can become distinctive if it acquires 'secondary meaning, which occurs when, in the minds of the public, the primary significance of [trade dress] is to identify the source of the product rather than the product itself.'"[147]

### 4. Sanho's product packaging is not inherently distinctive.

Sanho has not produced any evidence that its packaging is so unique, unusual, or unexpected such that it will be perceived by consumers to indicate the origin of its goods.[148] It is not. Sanho's packaging is a common rectangular shape with unexceptional dimensions, and a commonly-used hangtag arrangement. Sanho uses a conventional typeface, basic colors and symbols, and no text other than basic factual information providing the product specifications.[149] As a matter of law, this unremarkable package is not inherently distinctive.

The Eleventh Circuit uses the test enumerated in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342 (C.C.P.A. 1977) to determine whether trade dress in inherently distinctive. In that test, the court considers "whether it is a 'common' basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods

---

[146] *Id.*

[147] *Id.* (quoting *Wal-Mart*, 529 U.S. at 211) (internal quotation marks omitted).

[148] SUF at 71; Tomlinson Dec., ¶¶ 9-10.

[149] SUF at ¶ 72; D.E. 89-2.

viewed by the public as a dress or ornamentation for the goods."[150] In other words, trade dress can be inherently distinctive only if "the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin."[151] There is nothing unique, unusual, or unexpected about Sanho's packaging and, therefore, it is not inherently distinctive.

### 5.   Sanho cannot show that its packaging has acquired secondary meaning.

Secondary meaning exists where there is a mental association in buyers' minds between a product's trademark and its source.[152] The plaintiff must prove that such an association exists by a preponderance of the evidence. In so doing, the following factors may be relevant: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount of sales and number of customers; (5) established place in the market; (6) amount and manner of advertising; and (7) proof of intentional copying.[153]

"In evaluating a claim of secondary meaning, consumer surveys are recognized as the most direct and persuasive evidence of secondary meaning" and courts in this circuit

---

[150] *Miller's Ale House*, 702 F.3d at 1323 (quoting *Seabrook*, 568 F.2d at 1344) (internal alterations omitted).

[151] 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 8:13 (4th ed. 2010).

[152] *See Miller's Ale House*, 702 F.3d at 1322.

[153] *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264 (7th Cir. 1989); *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508 (11th Cir. 1984).

have declined to find secondary meaning where a plaintiff cannot provide consumer surveys or other direct evidence.[154]

Here, Sanho provides neither direct consumer testimony nor any consumer surveys demonstrating consumer association between Sanho and the packaging used for Sanho's hub.[155] As illustrated above, this court may decline to find Sanho's trade dress achieved acquired distinctiveness, solely based on Sanho's failure to provide this court with any surveys, quantitative evidence, or testimony.

Sanho cannot contend that mere sales and advertising evidence supports a claim of secondary meaning. Bare advertising and sales numbers have limited probative value where there is no evidence connecting the advertising and sales dollars to the specific trade dress.[156]

---

[154] *See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 722 F. Supp. 719, 723-24 (S.D. Fla. 1989), *aff'd*, 931 F.2d 1519 (11th Cir. 1991) (plaintiff's failure to provide survey evidence is compelling evidence of no secondary meaning); *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987) (plaintiff's failure to submit survey evidence of secondary meaning supported finding that none existed); *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 827 (Fed. Cir. 1992) (concluding that the plaintiff failed to prove secondary meaning by failing to present surveys, quantitative evidence, or testimony suggesting the existence of secondary meaning with regard to the blender's design and finding that large consumer demand for the blender did not equate to the public's association of the blender design with Braun).

[155] SUF at ¶ 73; Tomlinson Dec. ¶¶ 9-10.

[156] *Braun*, 975 F.2d at 826-27 ("Braun did not proffer evidence establishing that the advertising effectively created secondary meaning as to the blender"); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) ("a large expenditure of money does not in itself create legally protectable rights. The test of secondary meaning is the effectiveness of the efforts to create it"); *Investacorp*, 722 F. Supp. at 724 ("More is

Analysis of all the relevant factors lead to the conclusion that Sanho cannot demonstrate its packaging acquired secondary meaning, i.e. that the packaging served to identify a single source of the goods it contained. Because Sanho cannot demonstrate its packaging is distinctive, either inherently or through acquired distinctiveness, Sanho's trade dress infringement claim fails as a matter of law.

## IV.   CONCLUSION

KaiJet US submits that summary judgment in favor of Defendants is warranted as to every Cause of Action asserted in these actions. To the extent the Court concludes that fact questions preclude summary judgment as to any specific Count, KaiJet US seeks an order of partial summary judgment on remaining Counts.

Respectfully submitted, this 23rd day of December, 2022.

/s/ *Ryan P. Gentes*
Ryan P. Gentes
GA Bar No. 421695
Robert A. Madayag, III
GA Bar No. 123699
William B. Dyer III
GA Bar No. 236915
Andrew G. Strickland
GA Bar No. 335298
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: ryan.gentes@leehayes.com

---

needed to establish the necessary consumer association than the mere proof of sales and growth under the mark…because such proof only measures plaintiff's effort to establish secondary meaning – it does not determine its success.").

Email: robm@leehayes.com
Email: bill.dyer@leehayes.com
Email:
andrew.strickland@leehayes.com

Robert J. Carlson
WSBA Number 18455
*Admitted Pro Hac Vice*
LEE & HAYES, P.C.
701 Pike Street, Ste. 1600
Seattle, WA 98101
Telephone: (206) 315-4001
Email: carlson@leehayes.com

Rhett V. Barney
WSBA Number 44764
*Admitted Pro Hac Vice*
LEE & HAYES, P.C.
601 W. Riverside Ave., Ste. 1400
Spokane, WA 99201
Telephone: (509) 324-9256
Email: rhettb@leehayes.com

*Attorneys for Defendants KaiJet Technology International Limited, Inc. and KaiJet Technology International Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2022, I filed a true and correct copy of the foregoing document with the CM/ECF filing system of this Court, which will serve an electronic copy to all attorneys of record.

/s/ *Ryan P. Gentes*

Ryan P. Gentes (GA Bar No. 421695)
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: ryan.gentes@leehayes.com

*Attorney for Defendants KaiJet Technology International Limited, Inc. and KaiJet Technology International Corporation*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document is written in 14 point Times New Roman font in accordance with Local Rule 5.1.

/s/ *Ryan P. Gentes*

Ryan P. Gentes (GA Bar No. 421695)
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: ryan.gentes@leehayes.com

*Attorney for Defendants KaiJet Technology International Limited, Inc. and KaiJet Technology International Corporation*