# EXHIBIT 19

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF GEORGIA**

SANHO CORPORATION                     Civil Action No. 1:18-cv-05385-SDG

         v.

KAIJET TECHNOLOGY

INTERNATIONAL LIMITED, INC., et. al,

**Expert Report of Antonio R. Sarabia II**

# TABLE OF CONTENTS

Introduction ..................................................................................................1

1.  Qualifications ........................................................................................2

2.  Methodology ..........................................................................................7

3.  Summary of main opinions....................................................................7

4.  The Sanho Copyright Registration is Very Different from the KaiJet Packaging.. .....8

5.  The Claimed Sanho Trade Dress is Very Different from the KaiJet Packaging........9

6.  Sanho Has Not Achieved Secondary Meaning for "Hyper" and "Hyperdrive" Because it is Neither the Exclusive User, nor the First User Market ...................................10

7.  Trademark Registrations with "Ultra" and "Hyper" Co-exist for Similar Products and Services. ..............................................................................................13

8.  Sanho's Use of "Hyper" Does Not Predate KaiJet's Use of "Ultra"........................16

9.  Sanho's Failure to Have Written Protection of Its Patents, Copyrights, Trademarks and Trade Dress Falls Below the Standard of Care of Consumer Product Companies which Manufacture in China. ..............................................................................16

10. Best Buy Product Return Mistakes are not the Result of Employee Confusion Between "HyperDrive" and "UltraDrive" ............................................................19

11.  Business Bases of Opinions.. ...........................................................................21

## LIST OF EXHIBITS

Exhibit A -  Resume

Exhibit B - Publications, Compensation, Cases

Exhibit C - Sources

Exhibit D – Differences between Sanho Copyright registration and KaiJet packaging

Exhibits E1 - E9 Graphics which show most differences between Sanho Copyright registration and KaiJet packaging

Exhibit F - Differences between the claimed Sanho trade dress and the KaiJet packaging

Exhibits G1 -  G11 Graphics which show most differences between the claimed Sanho trade dress and the KaiJet packaging

Exhibit H – Phonetically identical and visually similar "Hyper" marks

Exhibit I – "Hiper" battery for sale

Exhibit J - Trademark registrations phonetically identical and visually similar to "HyperDrive"

Exhibits K – Mouser sales listings, power cord and electric drive

Exhibit L – HiperDrive on sale

Exhibit M -  Hyper & Ultra trademark registrations

Exhibits N -  Invoices from Chinese company to Sanho

**Introduction**

This case involves patents, copyrights and trademarks. In general, patents protect useful inventions and certain designs. Copyrights protect artistic creations such as books, songs, sculpture and visual arts, as well as some other designs. Trademarks protect brands like Coke. Trade dress is a part of trademarks. Trade dress is a combination of usually, but not always, visual elements which the consumer associates with one company or brand. Trade dress protects some product configurations, some packaging and even certain store or restaurant appearances. Consumers use trademarks to make it easier for them to shop. They associate a trademark with a certain level of quality and make buying decisions based on that association.

 Sanho Corporation claims that KaiJet has infringed its patents, copyright, trade dress and trademarks. This report will primarily focus on one copyright claim, the trade dress claim and several trademark claims. However, it will touch on patents in the context of manufacturing contracts with Chinese companies.

KaiJet is a Kennesaw, Georgia-based supplier of computer peripherals and accessories, including devices such as the docking hub in this case. Sanho Corporation was an importer and seller of computer accessory and computer peripherals. Computer peripheral manufacturers have long made portable docking stations, hubs and adapters to enable users of laptop and tablet computers to connect items such as displays,

1

storage media, input devices (mice, keyboards, joysticks) and similar accessories. All these articles may connect to the computer via a cable (commonly referred to as a "dongle") or by a direct connection, eliminating the cable and attaching directly to the computer. Early versions of Apple's MacBook Pro laptop computers included ports to mate with connectors such as standard USB (USB-A), HDMI, and Ethernet, as well as SD card slots. The October 2016 version of MacBooks had only USB-C type ports. This led accessory manufacturers to create hardware that fit the MacBook and made it compatible with other common ports (e.g., HDMI and Ethernet). A number of manufacturers entered this business, such as Recue, Satechi, Lasuavy, Lention, Andobil, Purgo, CharJenPro, Sanho and KaiJet. This case involves the latter two manufacturers.

## 1. Qualifications.

For 35 years, I have specialized in the evaluation and development of copyright and trademark portfolios for companies. For nine years, I was employed full time by Guess?, Inc. During my employment at Guess, I constantly participated in and made management decisions about brand and design development and protection involving: (a) which designs and marks were original and protectable; (b) registration of copyrights and trademarks; and (c) the enforcement of legal rights to brands and designs. I worked closely and frequently with the design, advertising, retail store and financial departments.

I create worldwide trademark plans for companies. I have managed trademark portfolios with thousands of marks. I have managed brand and trademark establishment and protection programs in dozens of countries.

I have managed actions against trademark infringement in dozens of countries. I have managed hundreds of cases of trademark infringement litigation and thousands of non-litigated matters. "Managed" includes determining which infringements to pursue, how to pursue them and how to resolve them. I have worked with trademark infringement cases and investigations. I have trained investigators, attorneys, police and U.S. Customs agents in the U.S. and in other countries on the recognition and detection of trademark counterfeits. I have written counterfeit recognition training manuals. I have provided these manuals to investigators, attorneys, police, U.S. Customs agents and foreign government personnel.

Over 25 years ago, after I took and passed the California license test for private investigators and I met the other required qualifications; my company (Habanero Investigations, Inc.) was issued a private investigation license. To get a license (at the time I applied) the minimum necessary experience was 6,000 hours of investigative work, which I had. Virtually all of my qualifying time was in trademark investigations. I performed investigations of trademark infringement and counterfeiting for trademark owners. I allowed my private investigator license to expire in 2017.

3

I have trained investigators, attorneys, police and U.S. Customs agents in the U.S. and in other countries on the recognition and detection of counterfeits. I have written counterfeit recognition training manuals. I have provided these manuals to investigators, attorneys, police, U.S. Customs agents and foreign government personnel.

I was a founding member of the Western Anti-Counterfeiting Coalition, which is a group of trademark owners which joined to share infringement investigation expenses. Included in this group were companies such as Disney, Guess, Nike and Warner Brothers.

My intellectual property work has encompassed large companies (Nike, Guess, Dooney & Bourke and Microsoft) and young companies in their early growth stages.

My experience analyzing which brands and fashion designs are protectable includes analysis of whether the brand or design was inherently distinctive or had acquired distinctiveness. Whether a trademark or trade dress is inherently distinctive or has acquired distinctiveness is a common issue in trademark and trade dress litigation, at the U.S. Patent and Trademark Office during the trademark registration process and during trademark opposition and cancellation proceedings. Proving distinctiveness for certain marks is a prerequisite to registration on the principal register. In more than one hundred litigated matters and in thousands of non-litigated matters and thousands

4

of trademark applications and numerous oppositions that I have managed, acquired distinctiveness was often an issue.

While at Guess?, I also participated in and made management decisions about problems and disputes involving consumer product manufacturing and wholesales. I worked closely and frequently with the sales, design, advertising and accounting/financial departments. With each of these departments, I was involved with policies, contracts and management decisions.  I served with a prominent designer and regularly saw how designs were inspired, sourced  and created.  All major contracts were reviewed and negotiated by me.

I was frequently in consumer product factories so that I became familiar with the manufacturing of products from the ordering of component parts, such as fabric and trim, through fabric cutting, garment assembly, final trim, packaging and shipping. I have worked with and negotiated with many subcontractors which performed services such as sewing, cutting and trimming. I am familiar with the production process, including the creation of first quality products, seconds, irregulars and overruns. My responsibilities at Guess? included drafting all the company contracts, such as the contracts for the manufacturing of apparel, as well as enforcing the terms of those agreements.

I have worked with a variety of consumer product companies to plan their policies about the sale, storage or destruction of seconds, irregulars and overruns. I

have been responsible for the monitoring of factory conditions and reporting these conditions to consumer product companies. This work includes visiting factories in the U.S. and abroad, reviewing and critiquing factory monitoring reports and formulating the standards for consumer product factory monitoring.

Since I left Guess, I have continued to work in all the areas outlined above with a variety of consumer product business clients. I advise companies on whether new designs for fabric prints, labels, tags and decorative stitching are sufficiently different from their sources of inspiration to be original. I have met with individual designers and conducted seminars for design departments on originality. My consumer product industry work has encompassed wholesale and retail transactions for large publicly held companies and privately held companies. I have been involved in thousands of purchase transactions involving the acquisition of consumer products by companies for resale at the wholesale and retail levels both domestically and internationally.

Exhibit A is my resume. Exhibit B lists my publications in the last 10 years, my compensation and other cases in which I have given expert testimony in the last four years. Exhibit C is a list of sources I considered in reaching my opinions and conducting my analysis. I may supplement my opinions, analysis or exhibits after I review additional information. At trial, I may use my exhibits in other formats. At trial, I may substitute exhibits (such as certified copies of trademark registrations) in place of other formats used in this report.

6

**2.  Methodology.**

Over the course of my career, I have performed hundreds of distinctiveness and acquired distinctiveness analyses, most of which involved consumer products. My analysis of acquired distinctiveness in this case is based upon the same method that I and other experts use regularly in my profession. There are two main approaches used to determine acquired distinctiveness. These are the standard approaches used by professionals to determine secondary meaning in trademark and trade dress cases. One method is a survey. The other method involves the consideration of a variety of factors linked to the establishment of a reputation (secondary meaning) for a mark or trade dress. These factors include (but are not limited to) first use, exclusive use, sales, marketing expenditures and market position. Experts use both methods. Often, either method may be used.

**3.  Summary of main opinions**

My main opinions are:

 A.    The Sanho copyright registration is very different from the KaiJet packaging.

 B.    The claimed Sanho trade dress is very different from the KaiJet packaging.

 C.    Sanho has not achieved secondary meaning for "hyper" and "hyperdrive" because it is neither the exclusive user, nor the first user.

7

D.    Trademark registrations with "ultra" and "hyper" co-exist for similar products and services.

E.    Sanho's Use of "Hyper" Does Not Predate KaiJet's Use of "Ultra."

F.    Sanho's failure to have written protection of its patents, copyrights, trademarks and trade dress falls below the standard of care of consumer product companies which manufacture in China.

G.    If there are errors about returns of "HyperDrive" and "UltraDrive" products at Best Buy, they are not the result of employee confusion when the return is made.

## 4. The Sanho Copyright Registration is Very Different from the KaiJet Packaging

While paragraph 38[1] of the Third Amended Complaint lists some similarities between the Sanho's copyright registration and KaiJet's packaging, some of the claimed similarities are too vague to be helpful:

Similar expression of idea

Similar total concept and feel

Similar placement of components

---

[1] The Copyright infringement claim, which begins at ¶82 of the Third Amended Complaint, incorporates ¶38.

8

Text and placement of the text on packaging

One is left guessing what these points mean. Sanho does list 9 more specific similarities.

Attached as Exhibit D is a list of differences between the Sanho Copyright registration and the KaiJet packaging. There are over 180 differences which include color, shape, location, lettering and numbering. Attached as Exhibits E1 through E9 are graphics which show the location of most differences on the panels which comprise the Sanho copyright registration, on one hand, and the KaiJet packaging on the other. The differences are substantial and numerous.

**5. The Claimed Sanho Trade Dress is Very Different from the KaiJet Packaging**

Trade dress allegations are in counts III, V and VII[2] of the Third Amended Complaint. Each of these claims also incorporates ¶38.[3] The same point about the vagueness of some of the specified features applies to these counts and the trade dress claims. To remedy this, KaiJet propounded Interrogatory number 10 (in the Third Set to Sanho) which requested that Sanho "define with particularity the precise trade dress."

---

[2] ¶¶ 77, 96 and 112 of the Third Amended Complaint respectively.

[3] ¶¶ 75, 94 and 111 of the Third Amended Complaint respectively.

Sanho never made a detailed substantive response, it only objected.[4] That leaves just the nine specific similarities in paragraph 38 of the Third Amended Claim.

Attached as Exhibit F is a list of differences between the claimed Sanho trade dress and the KaiJet packaging. There are over 250 differences which include color, shape, location, sound, meaning, lettering and numbering. Attached as Exhibits G1 through G11 are graphics which indicate the location of most differences on the panels which comprise the claimed Sanho trade dress, on one hand, and the KaiJet packaging on the other. The differences are substantial and numerous.

## 6.    Sanho Has Not Achieved Secondary Meaning for "Hyper" and "Hyperdrive" Because it is Neither the Exclusive User, nor the First User

In the Third Amended Complaint, Sanho claims it has obtained secondary meaning for two marks: "Hyper" and "Hyperdrive".[5] Sanho has trademark registration # 5,442,707 for "Hyperdrive," and its registration # 5,442,706 for "Hyper." Both marks are registered in class 9. Sanho has about eight trademarks which include "Hyper". A claim of secondary meaning is a claim that the consuming public recognizes a product with the mark "Hyper" or "HyperDrive" as being made by Sanho.

---

[4] Sanho Response to Interrogatory no. 10 from the Third Set.

[5] Paragraph 36.

10

Marks gain acquired distinctiveness or secondary meaning when the consumer associates a particular mark with one owner. Two requirements for establishing secondary meaning are exclusive use of a mark and first use of the mark. If these requirements cannot be met, a mark has not achieved secondary meaning.

Turning first to "Hyper," there are nine other phonetically identical and visually similar trademark registrations for computer-related products or batteries. Exhibit H. The registration for "Hiper" (no. 2,757,019), for batteries and computer software, has a first use over 10 years before the first use of Sanho's "Hyper". "Hiper" batteries are still sold. Exhibit I ("Hiper" battery for sale on Amazon). These registrations establish that Sanho has not acquired secondary meaning as to "Hyper" for two reasons. First, Sanho was not the first user of the "Hyper" mark. Second, Sanho is not, and never has been, the exclusive user of the mark for batteries or computer-related products and services.

Sanho's "Hyperdrive" is in class 9. Sanho's registration specifies components for personal computers, tablet computers, MP3 players, cell phones and smart phones, namely, electrical power cords, power adapters, and batteries; styluses and covers for tablet computers. The first use date is 8/1/12. Exhibit J shows six other trademark registrations for marks phonetically identical to and visually similar to "Hyperdrive." These registrations are in class 9. Four registrations specify either software or computer hardware in their descriptions. Generally, online and retail stores which offer computer parts also sell software. Neither the Sanho registration for "Hyperdrive" nor any of the

11

other registrations have limitations as to the type of stores at which the products can be purchased. This means that consumers are likely to encounter their products at the same retail and online stores as Sanho's "Hyperdrive". Sanho does not have the exclusive right to the mark "Hyperdrive."

Sanho's registration claims a first use in 2012. The four registrations which specify either software or computer hardware were filed after this first use date. Sanho, because it was already using its "HyperDrive" trademark, could have opposed each of these other 4 applications. The U.S. Patent and Trademark Office records for each of these marks indicate Sanho failed to oppose any of them. Records at the Trademark Trial and Appeal Board Inquiry System confirm that Sanho did not oppose any of these marks. Patent and Trademark Office records are public and easy to check and monitor for possibly conflicting marks. Failure to oppose similar marks for similar goods in the same class contradicts a claim of exclusive use, part of secondary meaning. Sanho allowed other users of the same mark to not only enter the market, but to get the significant protection of a federal trademark registration.

The next issue is whether Sanho was the first user of the mark. "Hiperdrive" (registration no. 2769024, the last on the list), was registered in 2003, nine years before Sanho's date of first use in 2012. This registration is for goods in classes 7 and 9. The goods in the "Hiperdrive" registration include electric engines and electrical position drives. An electric drive (often referred to as an electric controller) is a device

used to control the output of a motor. Online vendors such as Mouser sell both the power cords listed in Sanho's registration and the electric drives listed in the "Hiperdrive" registration. Exhibit K. Products under the "Hiperdrive" and "Hyperdrive" marks are sold at the same places. Consumers may encounter their products at the same retail and online stores. "Hiperdrive" products entered this market much earlier than "Hyperdrive" products. "Hiperdrive" products continue to be sold in the U.S. Exhibit L. Sanho was not the first user.

Sanho's claim of secondary meaning for its marks "Hyper" and "Hyperdrive" fails because it is neither the exclusive user nor the first user of either mark.

## 7. Trademark Registrations with "Ultra" and "Hyper" Co-exist for Similar Products and Services

Sanho alleges that the use of "Ultradrive" is an infringement of its trademark registration for "Hyperdrive." [6] According to Sanho, this use also constitutes misappropriation of style of doing business and unfair competition.[7] While both marks include "drive", one mark has "hyper" and the other "ultra." Sanho's position rests on its belief that "hyper" and "ultra" are very similar which will lead to consumer confusion. Since the letters and sound of "hyper" and "ultra" are different, this position must be

_____

[6] ¶¶ 72, 77, Third Amended Complaint.

[7] ¶¶ 37, 112, Third Amended Complaint.

grounded in a belief that they have a very similar meaning in the context of trademarks. One way to examine whether "ultra" and "hyper" trademarks are similar is look at trademark registrations issued by the Patent and Trademark Office. The Patent and Trademark Office is the government agency with trademark expertise. The Patent and Trademark Office usually rejects new applications which are confusingly similar to existing registrations. The Patent and Trademark Office categorizes goods and services by class. So, for example, bread is one class and clothing is another. While it would be possible to search across all classes to see if "hyper" and "ultra" coexist, because the products and services are so different, that might not give meaningful results. This report focused on class 9 which covers computer software and hardware. These classes also include other goods and services.

Sanho's registration for "Hyperdrive" is in trademark class 9. Attached as Exhibit M are six groups of trademark registrations, all in class 9. Each group has one mark with the prefix "ultra" and another mark with the prefix "hyper".  With the exception of the first group with "drive" marks, the suffix of each mark in a group is either identical or very similar. The marks in some groups are for similar goods.

Sanho's mark "Hyperdrive" is grouped with three registrations which include "Ultradrive." The registration for "HyperDrive" covers MP3 players. MP3 players are electric and play digital music. The registration for "Ultradrive" includes "electric and

digital sound equipment." This is a major overlap of covered goods. An MP3 player is "electric and digital sound equipment."

The other marks in this group are KaiJet's registrations for "UltaDriveKit", with logo, and "UltaDriveMiniDock", with logo. Both of these registrations specify "computer monitors" and "computer hardware and peripheral devices." Sanho's "Hyperdrive" specifies "components for personal computers, tablet computers." This is another major overlap of covered goods.

"Hyperhybrid" covers apparatus for controlling electricity and chargers for electric batteries. "Ultra Hybrid" includes computer hardware and power adapters. Power adaptors control electricity, so there is direct overlap. In addition, chargers for electric batteries ("HyperHybrid") and computer hardware are sold at the same stores (including online) such as Best Buy. It is common for hardware stores to carry charger for batteries and power adapters. "Hyperhybrid" and "Ultra Hybrid" products may be sold at the same online and brick and mortar stores.

The registrations for "Hyperflow" and "Ultraflow" both include software for the control of other electrical devices. These are very similar goods.

These registrations show that the U.S. Patent and Trademark Office allows registrations with the prefixes "hyper" and "ultra" to exist, not only in the same trademark class, but with similar goods that may be sold at the same places. The Patent and Trademark Office is correct in its analysis. "Ultra" and "hyper" have different

15

meanings. "Ultra" means beyond. "Hyper" is short for hyperactive. The two prefixes are different in appearance, they have different letters. The two prefixes are different in sound. As a result, marks which have a prefix of "hyper" and "ultra" may coexist in classes which contain computer related goods and services without creating confusion.

## 8. Sanho's Use of "Hyper" Does Not Predate KaiJet's Use of "Ultra"

Priority of trademark rights refers to which party has superior rights. Priority in trademarks can be obtained a number of ways. One way is first use. KaiJet first began using the trademark "Ultra" on electronic products in mid-2012 on a product known as an "ultra station" (JUD500). A few years later KaiJet launched its "HyperDrive." Sanho began using the mark "Hyper" on electronic products in August 2012. [8] About the same time, it began using "HyperDrive." This means that even if one assumes "hyper" and "ultra" are similar, Sanho does not have priority over KaiJet based on use.

## 9. Sanho's Failure to Have Written Protection of Its Patents, Copyrights, Trademarks and Trade Dress Falls Below the Standard of Care of Consumer Product Companies which Manufacture in China

Sanho manufactured its HyperDrive docks in China. Exhibit N is two invoices for the manufacture of the docks from a Chinese company. The docks are consumer

---

[8] See US Patent and Trademark Office records for trademark registration no. 5442706, for "Hyper" class 9 and registration no. 5,442,707 for "Hyperdrive," class 9.

products. When consumer products are manufactured in China, there are substantial risks to any intellectual property involved with those products. This includes patents, trademarks and copyrights. There are three kinds of risks. First, that the Chinese manufacturer, or any company involved in the manufacture, such as a subcontractor, will take the intellectual property and use that on its own products. For example, a Chinese company might use the trademark "HyperDrive" on something it makes.

A second risk is that a Chinese company might manufacture extra products – more than ordered – and sell them for its own profit, even into the United States. For example, if Sanho ordered 1,000 HyperDrives, the manufacturer could make 1,300. It would sell 1,000 to Sanho and sell the rest itself – even though the HyperDrives might have Sanho's trademark, copyright and patents.

A third risk has to do with the nature of consumer product manufacturing. If Sanho orders 1,000 docks from a factory, the factory will produce a higher number, for example 1,060. Factories must do this because some products will be defective or damaged in the production process. The factory would deliver 1,000 docks to Sanho. Of the remaining 60, some of them will be unusable (too severely damaged to use), some will have small defects (the "seconds") and some will have no defects ("overruns"). All consumer product factories have "seconds" and "overruns."

The standard of care for companies which manufacture consumer products in China is to have written contract terms which identify and restrict the use of that

17

intellectual property. As to seconds and overruns, the standard of care is to take one of several steps: require the destruction of these goods, purchase them, require that they be held for a period or have an authorized outlet to which they must be sold. The steps would be in writing in the manufacturing contract.

Sanho failed to include any terms in its manufacturing contracts which would protect its intellectual property from these three risks. Exhibit N, the commercial invoices for the manufacture of HyperDrive products, were produced by Sanho in response to a request for production of all documents used in the manufacture of HyperDrive. [9] These documents have no terms to protect the patents, trademarks, trade dress or copyrights of Sanho. No documents with such terms were produced. This is consistent with the testimony of Zhuowen Liao, the president of Gopod, the manufacturer for Sanho:

Q. Are there any contracts between Gopod and Sanho?

A. No. [10]

_____

[9] KaiJet Request for Production, Set One, No. 6 asked Sanho to produce "[a]ll documents and communications sufficient to show the nature and extent of Your relationship with Gopod Group Ltd." Exhibit N and similar documents were produced in response.

[10] Zhuowen Liao Dep. 22: 12 – 14.

Q.· Are there any documents that outline the responsibilities and relationship between Gopod and Sanho?

A.  No.[11]

Sanho's failure to have written contract terms protecting its patents, copyrights, trademarks and trade dress falls below the standard of care of consumer product companies which manufacture in China. This behavior contradicts concern for its patents, copyrights, trademarks and trade dress.

## 10.  Best Buy Product Return Mistakes are not the Result of Employee Confusion Between "HyperDrive" and "UltraDrive"

Best Buy sells both HyperDrive and UltraDrive products. It processes returns of both products and, of course, tens of thousands of other products. On rare occasions, a HyperDrive or UltraDrive product was mistakenly labeled at Best Buy as the other. Best Buy often returned the wrong products to Sanho. Those many returns were not primarily products made by KaiJet. [12]

---

[11] Zhuowen Liao Dep. 22: 18 − 21.

[12] Mr. Chin, CEO of Sanho, testified that his warehouse had so many incorrect (products from companies other than Sanho) returns from Best Buy that he could not remember the manufacturers of those products. Chin 30(b)(6) Dep. 122: 8 − 18.

Despite the large number of Best Buy returns of products made by a variety of other companies, Mr. Chin, CEO of Sanho, testified that KaiJet, in particular, had responsibility because of its UltraDrive product:

> Each Best Buy store handled their own returns . . . in each and every store, there are Best Buy employees who are confused by the UltraDrive, thinking that it's HyperDrive and mislabeling them.[13]

Tor test this theory, on September 8, 2022, I returned an UltraDrive mini Dock J5 Create to the Best Buy at 3675 E Pacific Coast Highway, Torrance, CA 90505. I handed the person at the register my transaction receipt and the boxed product and explained that I wanted to return the product. I saw him scan the barcodes on first, the transaction receipt and, then, the product box. I asked him how he knew what was being returned. He said when they scan the transaction receipt it lists every item bought on that transaction. The second scan of the product identifies the item from the transaction which is being returned. I asked if any of the return information was based on his recognition of a product. He said it was not. This meshes with common sense. Because Best Buy has thousands of skus, employees cannot be expected to recognize each product. If there are errors about returns of "HyperDrive" and "UltraDrive" products

---

[13] Chin 30(b)(6) Dep. 86: 7- 8, 14-16.

at Best Buy, they are not the result of employee confusion when the return is made.

## 11.    Business Bases of Opinions

My analysis and opinions about the development and use of trade dress, trademarks and distinctiveness in the consumer product business are based upon my knowledge of the generally accepted standards about trade dress, trademarks and distinctiveness in the consumer product business. I know these standards and that these standards are generally accepted in the consumer product business because of my extensive work with consumer products, brands, trade dress, trademarks and the companies that own them during the last 35 years.

My analysis and opinions about copyright infringement and resolution of copyright infringement claims are based upon my knowledge of the generally accepted standards in the copyright enforcement and protection business. I know these standards and that these standards are generally accepted in the copyright enforcement and protection business because of my extensive work in infringement matters and with copyright owners during the last 35 years.

My analysis and opinions about protecting intellectual property in contracts for consumer products manufactured in China are based upon my knowledge of the generally accepted standards about contracts for manufacturing consumer products in China. I know these standards and that these standards are generally accepted in the

consumer product business because of my extensive work with consumer products and intellectual property in China and the Far East during the last 35 years.

My analysis, opinions and conduct during the purchase and return of the mini Dock to Best Buy were done in accordance with the generally accepted standards and practices of intellectual property investigators. I know these standards and that these standards are generally accepted in the intellectual property investigation business because of my over 25 years as a licensed private investigator (through my company) and my over 35 years as an attorney who has participated in and supervised intellectual property investigations.

My opinions are not based on the outcome of the underlying litigation.

/Antonio R. Sarabia II /     September 26, 2022
(electronic signature)
Antonio R. Sarabia II

# Exhibit A

**Exhibit A**

**ANTONIO R. SARABIA II**

320 via Pasqual

Redondo Beach, CA 90277

Phone: (310) 377 5171

asarabia2@gmail.com

**R E S U M E**

EXPERIENCE

1994 - Present   **Expert Witness, Consultant and Law Practice**

Emphasis on: international intellectual property, including trademarks, trade dress, service marks, copyrights and infringements in consumer products and consumer services.  Plan intellectual property protection using civil, criminal and administrative remedies. Preparation of license, distribution  and import agreements.

1984 - 1993

Executive with Guess?, Inc., a major international fashion company with annual revenue of over $450 million, in positions including Licensing and Trademark Counsel, Vice President of Licensing and General Counsel.

Plan and establish company policies in numerous areas including trademarks, copyrights, trade secret protection, personnel, business contracts and litigation.  Confer with and advise the Board of Directors on a wide range of matters.

Creation of an international program to control counterfeiting, diversion and unauthorized sales of garments: a variety of remedies were used, such as civil seizure orders and felony and misdemeanor arrests of counterfeiters in many jurisdictions.  An extensive network of personal contacts was established including governmental authorities, prosecutors, police and investigators in many countries.

23

The trademark and copyright work involved reviewing the business and licensing objectives of the company and tailoring a plan of worldwide trademark and copyright applications and registrations to the needs of the company. This included: filing over 2,400 trademark applications and numerous oppositions in a variety of classes in over 100 countries; selection and control of foreign associates; monitoring trademark watch services; and directing related national and international investigations and litigation. Significant victories were achieved in trademark issues in a variety of courts including the Korean Supreme Court and the Indonesian Supreme Court.

Nine years of experience in negotiating and writing international distribution agreements and trademark licenses with a variety of countries worldwide such as Argentina, Australia, Brazil, Canada, Chile, Canada, Hong Kong, Japan, Korea and Mexico; monitoring and coordinating compliance with the licenses and agreements.

Counsel management in legal and administrative compliance in United States and overseas, including laws applicable to the garment industry, labor laws, U.S. customs requirements and antitrust.  Work closely with senior managers in all departments including sales, production, import, export, trim, and piece goods.  Recommend, plan and supervise business litigation; determine appropriate remedies and review of all pleadings, correspondence and settlement agreements.

Negotiate, prepare and review contracts for all phases of the apparel business, including foreign manufacturing, purchasing agents, sewing and cutting, fabric purchase, distribution agreements, buy/sell agreements, employment agreements, secured loan agreements and guarantees.

Perform general corporate work (e.g., preparation of minutes, presentations to board of directors).

1980 - 1984  **Associate**

   Ball, Hunt, Hart, Brown and Baerwitz

At this major Los Angeles law firm responsibilities included working with clients and addressing their various legal problems. Diversified experience in civil and business litigation, including trials by judge, discovery, writs, appearances before regulatory agencies; commercial and real estate transactions.

1979 - 1980  **Associate**

   Jack Heller and Associates, Realtors

24

A commercial real estate company.


1978 - 1979  **Clerk**

Forster, Gemmill & Farmer, a law firm.


EDUCATION

University of Chicago Law School, J.D. June 1978

Occidental College, Los Angeles, A.B. 1974 (magna cum laude),

   Philosophy; Phi Beta Kappa

New Trier East High School, Winnetka, Illinois, 1970


BAR MEMBERSHIPS

Supreme Court of California

United States Court of Appeals for the Ninth Circuit

United States Federal District Court for the Central, Eastern,

Northern and Southern Districts of California

United States Tax Court


OTHER ACTIVITIES

Participant in drafting revisions to California criminal trademark anti-counterfeiting statute.

Founding Member of the Western Anti-counterfeiting Coalition, which is a group of over 20 major companies which coordinate their anti-counterfeiting actions.

Testimony in civil and criminal, state and federal cases on legal and factual issues related to trademark infringement.

25

# Exhibit B

**Exhibit B**

## 1.    Publications

"Victim Restitution," in <u>California Criminal Law Procedure and Practice</u>, (1998 edition through current edition).

"Judgment and Sentencing," in <u>California Criminal Law Forms Manual</u>, contributor of forms on victim restitution (2006 edition through current edition).

"Restitution," in <u>California Judges Benchguides, Benchguide 83</u>, consultant (2005 edition through current edition).

"Towards a Tougher State Bar Audit," <u>Los Angeles Daily Journal</u>, April 27, 2022.

"State Bar of California is Not Protecting Half a Million Victims," <u>Los Angeles Daily Journal</u>, February 25, 2022.

"Public Protection and The State Bar of California," <u>Los Angeles Daily Journal</u>, February 9, 2022.

"Criminal Courts Must Address Restitution in Mass Victim Crimes," <u>Los Angeles Daily Journal</u>, January 31, 2022.

"State Bar Whitewash," <u>Los Angeles Daily Journal</u>, June 24, 2021.

"Did the State Bar Fail Professional Responsibility in Girardi Case?," <u>Los Angeles Daily Journal</u>, May 24, 2021.

"Crime Victims Are Being Denied Due Process," <u>Los Angeles Daily Journal</u>, May 6, 2021.

"White Collar Crime Tax Deduction Affects Victims and Prosecutors," <u>Los Angeles Daily Journal</u>, November 25, 2020 (co-author with John Palermo).

"Chapter 14 - Restitution," in <u>California Drunk Driving Law</u>, 2020.

"Prison, probation and victim restitution," <u>Los Angeles Daily Journal</u>, December 17, 2019.

"Survey Says - Not so Fast in Secondary Meaning Cases," <u>Los Angeles Daily Journal</u>, September 26, 2019.

"Blasting Unfair Conduct in Family Law Cases," <u>Los Angeles Daily Journal</u>, February 21, 2019.

"Ex Parte - Not So Fast," Los Angeles Daily Journal, February 15, 2019.

"The Genus and Species of Copyright," Los Angeles Daily Journal, October 12, 2017.

"When the FTC Botches A Deal Review," Los Angeles Daily Journal, November 16, 2015.

"Protecting A Victim's Right to Counsel," Los Angeles Daily Journal, November 28, 2014.

"Cheerleading Uniforms and Copyright Separability" in New Matter Fall 2014 (co-author with Steven Crosby).

"Victim Restitution," California Lawyer July 2014.

"California Victim Restitution Law," National Crime Victim Bar Association 2013 National Conference, September 2013.

"Victims Not Being Told of Their Constitutional Right to Counsel," Los Angeles Daily Journal

January 31, 2013.

"Judicial Notice, A Misunderstood Tool," Los Angeles Daily Journal January 3, 2013.

"Naked licensing: Not as rare as one may think," Los Angeles Daily Journal, October 18, 2011.

"New Decision puts Teeth in the Victims' Right to Counsel," Los Angeles Daily Journal, September 26, 2011.

"Paying for the Costs of Crime: Criminal Defendants, Insurance and Restitution," Los Angeles Daily Journal, June 20, 2011.

"Restitution and Personal Injuries - Clients Might be Leaving Money on the Table," Los Angeles Daily Journal, May 3, 2011.

"How Much Do You Know about Victims' Rights?,"  Los Angeles Daily Journal, October 20, 2010.

"Restitution is Often Overlooked as a Punishment for Criminals," Los Angeles Daily Journal, September 2, 2009.

"The Power of Victim Restitution in Civil Cases," in Advocate Magazine, July 2009.

"Rehashing Old Laws Won't Do More to Protect Crime Victims," in Los Angeles Daily Journal, January 13, 2009.

"Investigative Peril," in Los Angeles Daily Journal, June 27, 2007.

"Keeping An Eye on HP," in Los Angeles Daily Journal, December 28, 2006.

27

"Follow 'Falkowski' and 'Lucian' to Control Annual Bonus Programs," in <u>Los Angeles Daily Journal</u>, August 17, 2006.

"Plaintiffs Counsel as Escrow in Class Actions - It's Plain Wrong" in <u>Los Angeles Daily Journal</u>, December 16, 2005.

"Marked Recovery," in Los Angeles Lawyer, April 2005.

"Google Blithely Ignores Legal Rights of Trademark Holders," in Los Angeles Daily Journal, November 25, 2004.

"Shared Weight," in <u>Los Angeles Daily Journal</u>, September 25, 2003.

"Do Not Confuse Criminal and Civil Subpoeanas Duces Tecum," in <u>Los Angeles Daily Journal</u>, October 16, 2002 (co-author with William Kopesky).

"Restitution Bind - The Harvest Court Performed Legal Gymnastics and Ignored Precedent," in  <u>Los Angeles Daily Journal</u>, September 5, 2001.

"Forgotten Citizens - Too Often Victims of Criminal Acts are Kept in the Dark about Their Legal Rights," in  <u>Los Angeles Daily Journal</u>, April 28, 2000.

"Civil Litigators Should Consider Action for Criminal Restitution," in <u>Los Angeles Lawyer</u>, March 1999.

"Pay Back, California's Restitution Statute," in <u>Los Angeles Daily Journal</u>, August 26, 1996.


**3.     Compensation**: $620 an hour.


**4.     Deposition and trial testimony within the last four years:**

<u>Orgain v.  Iovate</u>, 8:18-cv-01253 CD CA, 2020.

<u>Green Crush, LLC v. Paradise I, Inc</u>. 8:17-cv-01856, C.D. CA, 2019.

<u>Ironhawk Technologies, Inc., v. Dropbox, Inc</u>. 2:18-cv-01481, C.D. CA, 2019.

<u>American Airlines v. Kaufman Franco</u>, Cause No. 236-279297-15, Tarrant County, TX, 2018.

<u>Celeste Stein Designs, Inc. v. Scrubsco, LTD. et al</u>, 3:16−cv−00297, S.D. Tx., 2018.

<u>Master Strategies, LLC. et al. v. RJ Worldwide, LLC et. al.</u>, JAMS #1100084132 (San Diego) 2018 (arbitration and deposition).

State v. Halvorson, Circuit Court of Multnomah County (Oregon), #16CR 27788, 2017 (restitution hearing).

Gaylia Pickles, et al v. Kate Spade and Company, 3:15-cv-05329, N.D. Cal. 2017.

Embassy Apparel, Inc. v. Pixior, LLC, BC512516, Los Angeles County Superior Court, 2016 (jury trial).

Disorderly Kids v. Family Dollar, CV12-05073, C. D. Cal. 2016 (jury trial).

Urban Textile, Inc. v. the Cato Corporation, #14-cv-6967, C. D. Cal. 2015.

Unicolors, Inc. v. Macy's Inc., 2:15-cv-00661, C. D. Cal. 2015.

Walrus Brands, L.L.C. v. Peaches Uniforms, Inc., No. 1:12-cv-04892, N.D. Ill, 2015, 2016.

OTR Wheel Engineering, Inc. v. West Worldwide Services, Inc., No. 2:14-cv-00085, E.D. WA, 2015, 2016 (jury trial).

**Some Prior Cases**

Indigo Group v. Polo Ralph Lauren, # 11 CV 5883, C.D. Cal. 2013.

Ingroup v. True Religion, AAA Ref. No. 72 130 00188 12 S1M, 2013.

Varsity v. Star Athletica, W.D. Tenn. 2:10-cv-02508, 2012.

MGA Entertainment v. National Products, Ltd., C.D. Ca. CV10-7083, 2012.

Farah v. Forever 21, #BC43990, Los Angeles County Superior Court, 2012 (jury trial).

Cassel v. Wasserman, #LC070478, Los Angeles County Superior Court, 2011 (jury trial).

Cassidy v. Reebok, C.D. Ca. 2:10cv09966, 2011. Jivago v. Kleinberg, SC099941, Los Angeles County Superior Court, 2010.

Callan v. Christian Audigier, Inc., C.D. Ca. CV 08-8072, 2009.

Rosmarin v. Buchalter, Jams Arbitration, Orange County No. 1200040434, 2009.

Citizens of Humanity v. Caitac, #38090, Los Angeles County Superior Court, 2008.

Cassel v. Wasserman, #LC070478, Los Angeles County Superior Court, 2008 (deposition).

Bayer Clothing Group v. Sears, N.D. Il. #07CV2395, 2008.

29

SPI Manufacturing v. Pacific Sunwear, #06CC04289, Orange County Superior Court, 2008.

Mourad v.  Lada Jeans, C.D. Ca. Case# CV06-2649, 2007.

One Industries v.  O'Neal Distributing, S.D. Ca. Case# 06 CV 1133, 2007.

# Exhibit C

Exhibit C – Sources

Third Amended Complaint

"Do Those Plans Infringe on My Plans? Depends Where You Are."

https://m.grsm.com/publications/2020/do-those-plans-infringe-on-my-plans-depends-where-you-are- March 28, 2022

Federal Court Docket March 28, 2022

PTAB docket, Kaijet v. Sanho, IPR2021-00886, March 31, 2022

Declarations of Charles Akins (11/29/19), Steven Lu (8/8/8), Andrew Miller (12/3/19)

Walt Disney World Co., 475 F.3d 1239, 1251 (11th Cir. 2007)

Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1247 (11th Cir.1999)

U.S. Patent and Trademark Office website

U.S. Patent and Trademark Office files registration no. 87568782 ("Hyperdrive") and 85558805 ("Hyperdrive")

UltraDrive product in packaging

HyperDrive product in packaging

www.rdoequipment.com

Saegis

Westlaw

McCarthy on Trademarks

www.bestbuy.com

www.mouser.com

Compendium Of U.S. Copyright Office Practices, Third Edition

John H. Harland Co. v. Clarke Checks, Inc., 711 F. 2d 966 (11th Circuit 1983)

Lee Hayes notes on 11th Circuit trade dress standards

J-B Weld Co. v. Gorilla Glue Co., 978 F.3d 778, (11th Cir. 2020)

Written and oral communications with R. Gentes, J. Tomlinson and B. Carlson

Answer to Third Amended Complaint and Counterclaim

Answer to Counterclaim

7/29/20 Order on Motion to Dismiss Third Amended Complaint

Motion for Preliminary Injunction and Opposition, supporting declarations (some were redacted) and Order

11/25/17 R. Barney letter to A. Aalaei

11/20/17 A. Aalaei letter to KaiJet

Subpoena to Yi-Ching, documents produced and deposition of her (3/30/22)

Sanho Packaging Documents

https://appleinsider.com/articles/11/05/20/thunderbolt_trademark_rights_will_be_transferred_from_apple_to_intel  May 19, 2022

TTABVue

Rule 26 disclosures

Purchase Orders/Invoices between Sanho and Manufacturer (Gopod)

Best Buy Sales

Purchase from Best Buy (UltraDrive minidock) and interaction at Best Buy store to make return

Sanho Sales Invoices and Customer Lists

Sanho Media coverage

Written discovery responses

Dun & Bradstreet Reports on Sanho and KaiJet

KaiJet e-mails on marks for its product

Information on earlier KaiJet Ultra line

Deposition transcripts of Akins, Liu, Chen, Chong, Liao, Lyu, Miller (one depositions as both individual and (30(b)(6) for Select Sales) , Daniel Chin (two depositions, individual deposition and (30(b)(6) for Sanho)

J5Create Ultra Station Window packaging

Sanho Marketing Reports

KaiJet Sales Information

<u>Baby Buddies, Inc. v. Toys "R" Us, Inc</u>.(11th Cir. 2010)611 F.3d 1308