UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SANHO CORPORATION, | Case No. 1:18-cv-05385-SDG |
| Plaintiff, | |
| v. | |
| KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC., dba "j5create;" and DOES 1-100, | |
| Defendants, | |
| SANHO CORPORATION, | Consolidated with Case No. 1:20-cv-02150-TCB |
| Plaintiff, | |
| v. | |
| KAIJET TECHNOLOGY INTERNATIONAL LIMITED, INC.; KAIJET TECHNOLOGY INTERNATIONAL CORPORATION; MAGIC CONTROL TECHNOLOGY; STARVIEW GLOBAL LIMITED, each doing business as "J5Create;" and DOES 1-10, | **PUBLIC – REDACTED VERSION** |
| Defendants. | |

**DEFENDANT KAIJET TECHNOLOGY INTERNATIONAL
LIMITED, INC.'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................ 1

II.   FACTUAL BACKGROUND................................................................ 2

      A. KaiJet US ULTRA Products ............................................................ 2

      B. JCD382 ............................................................................................ 3

III.  ARGUMENT..................................................................................... 3

      A. Summary Judgment in Defendants' Favor is Appropriate as to
         Sanho's Design Patent Infringement Claims ................................... 5

         1. It is appropriate for the Court to determine design patent non-
            infringement at summary judgment. ........................................... 7

         2. No reasonable jury could find the JCD382 infringes the '875 or
            '616 Patents (First Action, Count I)............................................ 9

         3. No reasonable jury could find either the JCD382 or the JCD389
            infringe the '618 Patent (Second Action, Count II). .................... 10

         4. No reasonable jury could find the JCD382 infringes the '290
            Patent. ......................................................................................... 12

      B. Summary Judgment in Kaijet US's Favor is Appropriate as to Sanho's
         Trademark Infringement Claim (First Action, Count II) ................. 13

         1. Sanho's 707 Mark for HYPERDRIVE is void ab initio. ............. 13

         2. There is no likelihood of confusion as a matter of law. .............. 15

      C. Summary Judgment in Defendants' Favor is Appropriate as to
         Sanho's Federal Unfair Competition Claim  (First Action, Count III)
         28

         1. There is no unfair competition based on trade dress infringement.
            ..................................................................................... 30

2.  Sanho failed to produce evidence showing its product packaging is inherently distinctive. ................................................................... 31

3.  Sanho cannot show that its packaging has acquired secondary meaning. ....................................................................................... 33

IV.   CONCLUSION.......................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaven Consumer Healthcare, Inc. v. DrFloras, LLC*,
No. 1:09-CV-705-TWT, 2010 U.S. Dist. LEXIS 9366 (N.D. Ga.
Feb. 4, 2010) ..............................................................................20, 21, 28

*Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television,
Inc.*,
810 F.2d 1546 (11th Cir. 1987) ..........................................................34

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................4

*Armstrong Cork Co. v. World Carpets, Inc.*,
597 F.2d 496 (5th Cir. 1979) ..............................................................20

*Avenue CLO Fund, Ltd. v. Bank of Am., N.A.*,
723 F.3d 1287 (11th Cir. 2013) ..........................................................23

*Aycock Eng'g, Inc. v. Airflite, Inc.*,
560 F.3d 1350 (Fed. Cir. 2009) .....................................................14, 15

*Boost Beauty, LLC v. Woo Signatures, LLC*,
No. 2:18-cv-02960-CAS-Ex, 2022 U.S. Dist. LEXIS 24515 (C.D.
Cal. Feb. 7, 2022)............................................................................17, 20

*Braun Inc. v. Dynamics Corp. of Am.*,
975 F.2d 815 (Fed. Cir. 1992) ............................................................34

*Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*,
716 F.2d 854 (11th Cir. 1983) ............................................................32

*Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge,
LLC*,
605 F.3d 931 (11th Cir. 2010) ............................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..............................................................................4

*Chrysler Corp. v. Silva,*
118 F.3d 56 (1st Cir. 1997) .................................................................23

*Claremont Polychemical Corp. v. Atl. Powdered Metals, Inc.,*
470 F.2d 636 (C.C.P.A. 1972) .............................................................21

*Conagra, Inc. v. Singleton,*
743 F.2d 1508 (11th Cir. 1984) .....................................................19, 33

*Corbitt Mfg. Co. v. GSO Am., Inc.,*
197 F. Supp. 2d 1368 (S.D. Ga. 2002) ...............................................21

*Crocs, Inc. v. ITC,*
598 F.3d 1294 (Fed. Cir. 2010) .............................................................6

*Custom Mfg. & Eng'g, Inc. v. Midway Servs.,*
508 F.3d 641 (11th Cir. 2007) .......................................................21, 24

*Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC,*
369 F.3d 1197 (Fed. Cir. 2004) ...........................................................30

*Door-Master Corp. v. Yorktowne, Inc.,*
256 F.3d 1308 (Fed. Cir. 2001) .............................................................7

*Echo Travel, Inc. v. Travel Assocs., Inc.,*
870 F.2d 1264 (7th Cir. 1989) .............................................................33

*Egyptian Goddess, Inc. v. Swisa, Inc.,*
543 F.3d 665 (Fed. Cir. 2008) ......................................................6, 7, 11

*Epic Metals Corp. v. Souliere,*
99 F.3d 1034 (11th Cir. 1996) .............................................................30

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.,*
796 F.3d 1312 (Fed. Cir. 2015) ....................................................*passim*

*Exxon Corp. v. Texas Motor Exch., Inc.,*
628 F.2d 500 (5th Cir. 1980) ...............................................................17

*First Brands Corp. v. Fred Meyer, Inc.,*
809 F.2d 1378 (9th Cir. 1987) .............................................................34

*Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*,
    830 F.3d 1242 (11th Cir. 2016) .......................................................................17

*Frehling Enters., Inc. v. Int'l Select Grp., Inc.*,
    192 F.3d 1330 (11th Cir. 1999) .......................................................................20

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*,
    921 F.3d 1343 (11th Cir. 2019) .......................................................................25

*HBP, Inc. v. Am. Marine Holdings, Inc.*,
    290 F. Supp. 2d 1320 (M.D. Fla. 2003).........................................................21

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
    589 F.3d 1233 (Fed. Cir. 2009) .........................................................................7

*Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*,
    722 F. Supp. 719 (S.D. Fla. 1989), *aff'd*, 931 F.2d 1519 (11th Cir.
    1991) ................................................................................................................34

*Jack Wolfskin Ausrüstung Für Draussen GmbH & Co. KGaA v. New
    Millennium Sports, S.L.U.*,
    797 F.3d 1363 (Fed. Cir. 2015) .......................................................................17

*John H. Harland Co. v. Clarke Checks, Inc.*,
    711 F.2d 966 (11th Cir. 1983) .........................................................................17

*Lanard Toys, Ltd. v. Dolgencorp LLC*,
    958 F.3d 1337 (Fed. Cir. 2020) ....................................................................7, 11

*In re Mann*,
    861 F.2d 1581 (Fed. Cir. 1988) .........................................................................6

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)...................5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).........................................................................................4

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,
    702 F.3d 1312 (11th Cir. 2012) ....................................................30, 31, 32, 33

*Nabisco, Inc. v. PF Brands, Inc.*,
    191 F.3d 208 (2d Cir. 1999) ...........................................................................25

*Nat'l Nonwovens, Inc. v. Consumer Prods. Enters., Inc.*,
  397 F. Supp. 2d 245 (D. Mass. 2005) .................................................15

*OddzOn Prods. Inc. v. Just Toys, Inc.*,
  122 F.3d 1396 (Fed. Cir. 1997) .........................................5, 6, 7, 11

*Olay Co. v. Cococare Prods., Inc.*,
  No. 81 Civ. 4102, 1983 U.S. Dist. LEXIS 17613 (S.D.N.Y. Apr.
  19, 1983) .....................................................................................24, 27

*Peters v. Active Mfg. Co.*,
  129 U.S. 530 (1889)..........................................................................7

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
  261 F.3d 1188 (11th Cir. 2001) .......................................................16

*PlayNation Play Sys., Inc. v. Velex Corp.*,
  924 F.3d 1159 (11th Cir. 2019) .......................................................23

*Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*,
  675 F.2d 1160 (11th Cir. 1982) .......................................................24

*Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*,
  568 F.2d 1342 (C.C.P.A. 1977) .......................................................32

*Spireon, Inc. v. Flex Ltd.*,
  71 F.4th 1355 (Fed. Cir. 2023) ........................................................17

*Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.*,
  836 F. App'x 895 (Fed. Cir. 2020)........................................8, 9, 11

*Superior Consulting Servs., Inc. v. Shaklee Corp.*,
  No. 19-10771, 2021 U.S. App. LEXIS 29284 (11th Cir. 2021)........16

*Swint v. City of Carrollton*,
  859 F. App'x 395 (11th Cir. 2021) ..................................................29

*T.G.I. Friday's, Inc. v. Int'l Rest. Grp., Inc.*,
  405 F. Supp. 698 (M.D. La. 1975).................................................27

*Tana v. Dantanna's*,
  611 F.3d 767 (11th Cir. 2010) ..................................................16, 24

*Tarsus Connect, LLC v. Cvent, Inc.*,
   452 F. Supp. 3d 1334 (N.D. Ga. 2020)........................................................20, 28

*Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing*,
   No. 1:00-cv-1934-BBM, 2003 U.S. Dist. LEXIS 8788 (N.D. Ga.
   May 9, 2003) ................................................................................................21

*Trilink Saw Chain, LLC v. Blount, Inc.*,
   583 F. Supp. 2d 1293 (N.D. Ga. 2008)..................................................21, 22, 28

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992)......................................................................................31

*United States v. Torkington*,
   812 F.2d 1347 (11th Cir. 1987) .......................................................................24

*Vitarroz Corp. v. Borden, Inc.*,
   644 F.2d 960 (2d Cir. 1981) ...........................................................................22

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
   529 U.S. 205 (2000).................................................................................30, 31

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*,
   898 F.3d 1279 (11th Cir. 2018) .......................................................................23

## Statutes

15 U.S.C. § 1114(a) ......................................................................................13, 15

35 U.S.C. § 171 ...............................................................................................5

15 U.S.C. § 1119 .............................................................................................14

15 U.S.C. § 1125(a) ......................................................................................28, 30

## Other Authorities

Fed. R. Civ. P. 56 ...........................................................................................3, 4

1 Gilson on Trademarks § 2.06 (2023) ...................................................................19

1A Gilson on Trademarks § 5.04 (2023) ................................................................24

1A Gilson on Trademarks § 5.10 (2023) ................................................................19

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 8:13 (4th ed. 2010) ....................................................... 33

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:90 .......................................................................... 17

TMEP § 1402.01 .................................................................................... 15

## TABLE OF ABBREVIATIONS

| Full Name | Abbreviations |
|---|---|
| U.S. Design Patent No. D807,290 | '290 Patent |
| U.S. [Utility] Patent No. 10,572,429 | '429 Patent |
| U.S. Design Patent No. D844,618 | '618 Patent |
| Original Packaging for JCD382 Product | Accused Packaging |
| Copyright Reg. No. VA 2-103-336 | Copyrighted Registration or Copyrighted Packaging |
| Data Transmission Control Module | DTCM |
| *Sanho Corp. v. KaiJet Technology Int'l Ltd.*, No. 1:18-cv-05385 (N.D. Ga.) | First Action |
| Defendants KaiJet Technology International Corporation and KaiJet Technology International Limited, Inc, collectively | KaiJet or Defendants |
| Defendant KaiJet Technology International Limited, Inc. | KaiJet US |
| Transcript and exhibits to the July 14, 2022 deposition of KaiJet Technology International Limited, Inc. | KaiJet US 30(b)(6) |
| Transcript and exhibits to the June 30, 2022 deposition of KaiJet Technology International Corporation | KTIC 30(b)(6) |
| Defendant KaiJet Technology International Corporation | KTIC or KaiJet Taiwan |
| Main Port Module | main port module |
| Plaintiff Sanho Corporation | Sanho |
| *Sanho Corp. v. KaiJet Technology Int'l Ltd.*, No. 1:20-cv-02150 (N.D. Ga.) | Second Action |
| Complaint, D.E. 204, filed May 19, 2020 | Second Action Complaint |

| Full Name | Abbreviations |
|---|---|
| First Amended Complaint, D.E. 418, filed Dec. 19, 2023 | Second Action FAC |
| Third Amended Complaint, D.E. 89, filed Nov. 14, 2019 | TAC |
| Trademark Manual of Examining Procedure | TMEP |
| Trademark Reg. No. 5,442,707 | "707 Mark" or "Asserted Trademark" |

## I.    INTRODUCTION

Plaintiff Sanho Corporation ("Sanho") has sued Defendant Kaijet Technology International Limited, Inc. ("KaiJet US") regarding its line of Ultradrive USB-C dock devices.[1] Sanho alleges eleven different counts including infringement of four design patents, copyright infringement, and trademark infringement, as well as other Lanham Act and state law claims.[2] But Sanho vastly overreaches the scope of its intellectual property rights.

Sanho seeks to use its intellectual property registrations to assert dominion over all rectangularly shaped USB-C hubs, product packaging with a window or the color orange, and any product name it contends is a synonym for "Hyper."[3] But neither the Asserted Patents, Copyright Registration, nor the Asserted Trademark give Sanho such sweeping authority. The plethora of competing products available on the market is evidence of the frivolousness of Sanho's claims.[4] Given the undisputed facts, Sanho's allegations are insupportable and summary judgment should be granted in favor of Defendants in the First Action on Counts I-III and on the Second Action on Count II and Count III (with respect to the JCD382 product).

---

[1] Statement of Undisputed Facts ("SUF"), ¶ 1.
[2] *Id*.
[3] *See id*.
[4] SUF, ¶ 5.

## II.    FACTUAL BACKGROUND

Sanho has accused Defendants of infringing four different design patents - U.S. Design Patent Nos. D813,875 ("the '875 Patent"), D855,616 ("the '616 Patent"), D844,618 ("the '618 Patent") and D807,290 ("the '290 Patent").[5] Except for the '616 Patent, these patents were applied for and issued to Sanho's supplier: GoPod Group.[6] GoPod Group transferred the patents to Sanho for this litigation.[7]

Sanho has also accused Defendants of infringing Trademark Registration Number 5,442,707 ("the 707 Mark") for HYPERDRIVE.[8] In 2017, Sanho obtained the 707 Mark registration for these exact goods: "electrical power cords, power adapters, and batteries; styluses; and covers for tablet computers."[9] While Sanho contends that (1) its Hyperdrive products are such goods and (2) that "Ultradrive" is confusingly similar to "Hyperdrive,"[10] it lacks evidence to prove either contention.

### A. KaiJet US ULTRA Products

KaiJet US has been selling products with the prefix "ULTRA" since as early as mid-2012.[11] The "ULTRA" line of products includes computer peripherals like

---

[5] SUF, ¶ 1.
[6] SUF, ¶ 2.
[7] *Id*.
[8] SUF, ¶¶ 3-4.
[9] SUF, ¶ 3.
[10] SUF, ¶ 4.
[11] SUF, ¶ 6.

the UltraStation (JUD500) product.[12]

## B. JCD382

In June 2017, KaiJet US first became aware of Sanho and the Hyperdrive product.[13] Like the many other companies in this space, KaiJet US wanted to sell a product that competed with the Hyperdrive.[14] KaiJet US inquired with its Taiwanese supplier, KaiJet Technology International Corporation ("KTIC"), about products with similar functions.[15] KTIC had a product available—the JCD382.[16] KTIC packaged the product using its typical packaging scheme and named the product using the preexisting "ULTRA" tradename.[17] KaiJet US purchased the j5create Ultradrive (JCD382) from KTIC, imported it into the United States, and ultimately sold it to Best Buy.[18]

## III.   ARGUMENT

Summary Judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] Not all "disputed facts" are material or genuine. A fact is "material"

---

[12] *Id.*
[13] SUF, ¶ 7.
[14] SUF, ¶¶ 8-9.
[15] SUF, ¶ 10.
[16] SUF, ¶ 11.
[17] SUF, ¶ 12.
[18] SUF, ¶ 13.
[19] Fed. R. Civ. P. 56(a).

only if it can affect the outcome of the lawsuit under the governing legal principles.[20]

"Factual disputes that are irrelevant or unnecessary" are not material.[21] A factual

dispute is "genuine … if the evidence is such that a reasonable jury could return a

verdict for the non-moving party."[22]

"A party seeking summary judgment" has the burden of "informing the

district court of the basis for its motion, and identifying those portions of [the record

that] demonstrate the absence of a genuine issue of material fact."[23] The party

opposing summary judgment must then present evidence showing either (1) a

genuine issue of material fact or (2) that the movant is not entitled to judgment as a

matter of law.[24] The non-movant "may not rest upon the mere allegations or denials

of his pleading, but … must set forth specific facts showing that there is genuine

issue for trial."[25] If the evidence relied on by the non-movant is "merely colorable,

or is not significantly probative, summary judgment may be granted."[26] Summary

judgment for the moving party is proper "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party."[27]

---

[20] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[21] *Id.*

[22] *Id.*

[23] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[24] *Id.* at 324.

[25] *Anderson*, 477 U.S. at 248 (citing Fed. R. Civ. P. 56(e)).

[26] *Id.* at 249.

[27] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Anderson,* 477 U.S. at 250.

**A. Summary Judgment in Defendants' Favor is Appropriate as to Sanho's Design Patent Infringement Claims**

Sanho has accused 5 different products of infringing at least one of the four asserted design patents.[28] Below is a chart of which products Sanho accuses of infringing each patent:

| Patent No. | Accused Product |
|---|---|
| '875 Patent | JCD382 |
| '616 Patent | JCD382 |
| '618 Patent | JCD382, JCD389 |
| '290 Patent | JCD382, *JCD324, JCD386, JCD388* [29] |

KaiJet US moves for summary judgment for the claims against the JCD382 and JCD389.

Design patents only cover the "ornamental design for an article of manufacture."[30] In other words, a design patent only protects the specific way a product looks and not its function. Design patent infringement is a two part inquiry: 1) construing the design and 2) comparing it to the accused product.[31]

**Construction**. Functional considerations are not subject to patent protection.[32] Where a design contains both functional and non-functional elements,

---

[28] SUF, ¶ 1.

[29] KaiJet US has not moved for summary judgment with respect to the JCD324, JCD386, and JCD388 products.

[30] 35 U.S.C. § 171.

[31] *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

[32] *OddzOn Prods. Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997).

the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent.[33] The scope of protection is limited to the ornamental aspects of the design.[34] Therefore, "[d]esign patents have almost no scope" as they only protect the specific ornamental features of the object as depicted in the patent's drawings.[35]

**Comparison.** The test for design patent infringement is whether "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design."[36] Where the claimed and accused designs are "sufficiently distinct" and "plainly dissimilar," the patentee fails to meet its burden of proving infringement as a matter of law.[37] *Only* if the claimed and the accused designs are not plainly dissimilar will the infringement analysis then benefit from applying the ordinary observer test.[38]

**Relationship between infringement and invalidity**. Sanho's design patent expert, Mr. Bressler, did not opine on whether three of the four design patents were infringed.[39] However, he did opine on their scope for the purposes of determining

---

[33] *Id.*

[34] *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015).

[35] *In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988).

[36] *Crocs, Inc. v. ITC*, 598 F.3d 1294, 1303 (Fed. Cir. 2010).

[37] *Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665, 678 (Fed. Cir. 2008).

[38] *Id.*

[39] SUF, ¶ 24.

whether they were valid in view of prior art.[40] This is significant because the tests for infringement and invalidity are *exactly the same*.[41] As illustrated below, when the opinions of both Sanho and KaiJet Defendants' experts are applied to the Asserted Patents, they demonstrate that the Accused Products do not infringe.

### 1. It is appropriate for the Court to determine design patent non-infringement at summary judgment.

Though design patent infringement is a question of fact, a district court may grant summary judgment as to noninfringement if "the accused design could not reasonably be viewed as so similar to the claimed design that a purchaser familiar with the prior art would be deceived by the similarity between the claimed and accused designs 'inducing him to purchase one supposing it to be the other.'"[42] The Federal Circuit has often affirmed such orders.[43]

For example, in *Ethicon*, a district court found, and the Federal Circuit agreed, that even though two surgical instruments both had "an open trigger, a small

---

[40] SUF, ¶ 23.

[41] *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1312 (Fed. Cir. 2001) ("that which infringes, if later, would anticipate, if earlier") (quoting *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889)); *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009) ("the ordinary observer test is the sole test" for both infringement and anticipation).

[42] *Egyptian Goddess*, 543 F.3d at 683.

[43] *See, e.g., Lanard Toys, Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1347 (Fed. Cir. 2020); *Ethicon Endo-Surgery*, 796 F.3d at 1315; *Egyptian Goddess*, 543 F.3d at 683; *OddzOn*, 122 F.3d at 1407.



D'804 patent, Fig. 1



Covidien's accused product

activation button, and a fluted torque knob in relatively similar positions" they were plainly dissimilar and summary judgment of noninfringement was appropriate.[44] There, the "[s]imilarity at the conceptual level" was insufficient to demonstrate infringement.[45] Differences in the overall linear shape, ornamentation of the trigger, torque knob, and button elements were "plain dissimilarities," such that summary judgment of noninfringement was appropriate.[46]

In *Super-Sparkly*, the Federal Circuit affirmed summary judgment of noninfringement of a pepper-spray canister design patent because the design patent had rhinestones on the sides and bottom of the canister, whereas the accused product only had rhinestones on the sides.[47] Even though the presence of rhinestones on the bottom of the canister was the only difference identified between the patented design and the accused product, the Federal Circuit agreed it was a distinguishing feature on a "very simple design."[48]

---

[44] *Ethicon Endo-Surgery*, 796 F.3d at 1336.
[45] *Id.*
[46] *Id.*
[47] *Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.*, 836 F. App'x 895, 898 (Fed. Cir. 2020).
[48] *Id.*

8

As in *Super-Sparkly*, Sanho's Asserted Patents are very simple designs – rectangular devices with male port(s) on one side and female ports on the other. And, as shown below, each Asserted Patent/Accused Product pair has differences at least as significant as the rhinestone placement in *Super-Sparkly*. This Court has the authority to find the Asserted Patents not infringed at summary judgment, and doing so would follow Federal Circuit precedent.

**2. No reasonable jury could find the JCD382 infringes the '875 or '616 Patents (First Action, Count I).**

Sanho accuses the JCD382 of infringing both the '875 and '616 Patents.[49] Sanho has not provided expert support or consumer evidence to support its claim.[50] But experts for both Sanho and KaiJet US agree a difference in overall shape, like the difference in the JCD382 and '875/'616 Patent design, would be immediately noticeable to an ordinary observer such that they would be plainly dissimilar and



there would be no infringement.[51] The '875 and '616 Patents, having nearly identical shapes,[52] claim a device with a flat top and bottom, resulting in squared-off end faces making a 90° angle at each

---

[49] SUF, ¶ 1.
[50] SUF, ¶ 19.
[51] SUF, ¶ 18.
[52] SUF, ¶ 15.

end.[53] The JCD382 has a different, plainly dissimilar shape with its tapered ends and faces.[54] Sanho advances the same arguments that failed (as a matter of law) for the patent owner in *Ethicon* – it seeks infringement based on the two designs having the same general concept, not based on their ornamental features. Therefore, like in *Ethicon*, summary judgment of noninfringement is warranted.[55]

### 3. No reasonable jury could find either the JCD382 or the JCD389 infringe the '618 Patent (Second Action, Count II).



**JCD389.** Like above, the JCD389 has a distinctly different shape than the '618 Patent design.[56] As with the '875 and '616 Patents, both experts and Federal Circuit precedent agree that distinct differences in shape would be noticeable to an ordinary observer.[57] Thus, no reasonable jury could find that the JCD389 infringes the '618 Patent.

---

[53] SUF, ¶ 16.
[54] SUF, ¶ 17.
[55] SUF, ¶ 14.
[56] SUF, ¶ 20.
[57] SUF, ¶ 21; *Ethicon Endo-Surgery*, 796 F.3d at 1336.

**JCD382**. Unlike the two combinations above, the JCD382 is at least a similar general shape as the '618 Patent. But simply having a similar shape is insufficient to satisfy the ordinary observer test.[58] Sanho's expert opined that the '618 Patent was not confusingly similar to the CN728 prior art patent under the ordinary observer test. In other words, Sanho's expert opined that a product resembling the CN728 Patent design would not infringe the '618 patent. Despite the similar designs, Sanho considers the CN728 distinct from the '618 Patent because its approximately 20% longer than the CN728, proportional to its height, and the number of ports do not match.[59] This is like the rhinestone placement in *Super-Sparkly*.



But if the CN728 is not confusingly similar to the '618 Patent, then neither is the accused JCD382. The differences between the '618 Patent and the JCD382 greatly outnumber the differences between the CN728 and the JCD382. The '618 Patent's difference in proportional length is even greater for the JCD382 than the CN728 – a 27% difference versus a 20% difference.[60] The ports of the JCD382 are

---

[58] *See, e.g.*, *Lanard*, 958 F.3d at 1347; *Ethicon Endo-Surgery*, 796 F.3d at 1315; *Egyptian Goddess*, 543 F.3d at 683, *OddzOn*, 122 F.3d at 1407.
[59] SUF, ¶¶ 22-23.
[60] SUF, ¶ 25.

also oriented differently than the ports of the '618 Patent design.[61] And the JCD382 has additional distinctive features including the symmetrical material transitions not present on the '618 Patent design and the absence of the asymmetrical feature line containing concentric circles of the '618 Patent.[62]

Sanho cannot argue that the '618 Patent has a narrow scope for the purposes of validity and a broad scope for the purposes of infringement. Put another way, if the scope of the '618 Patent was broad enough to encompass the JCD382, it would also be anticipated by the CN728 and, therefore, be invalid. The JCD382 is plainly dissimilar from the '618 Patent and summary judgment of noninfringement is appropriate.

### 4. No reasonable jury could find the JCD382 infringes the '290 Patent.

Originally, Sanho accused three products sold by KaiJet US of infringing the '290 Patent.[63] In 2022, Sanho filed supplemental infringement contentions which, for the first time, accused the JCD382 of infringing the '290 Patent.[64] But no reasonable jury could find the JCD382 and '290 Patent designs confusingly similar.

The differences between the JCD382 and the '290 Patent are similar to those that Sanho's expert opined made the CN728 and '618 Patent plainly dissimilar. The

---

[61] SUF, ¶ 26.
[62] SUF, ¶ 27.
[63] SUF, ¶ 28.
[64] SUF, ¶ 29.

JCD382 is both longer and skinnier proportional to its height than the device claimed in the '290 Patent.[65] The number of ports, which Sanho's expert agrees is significant, are wildly different between the JCD382 and the '290 Patent.[66] The JCD382 includes twice the male ports and nearly twice the female ports claimed in the '290 Patent design.[67] The additional differences in ornamental features are similar to the differences between the '618 Patent and the JCD382 outlined above.[68] The JCD382 is plainly dissimilar from the '290 Patent and no reasonable jury could find infringement.

## B. Summary Judgment in Kaijet US's Favor is Appropriate as to Sanho's Trademark Infringement Claim (First Action, Count II)

Sanho alleges that Kaijet US's use of "Ultradrive" infringes Sanho's 707 Mark for HYPERDRIVE.[69] But as discussed in this section, Sanho's 707 Mark is invalid, and Sanho cannot show a likelihood of confusion between the 707 Mark and Kaijet US's use of "Ultradrive" as a matter of law.

### 1. Sanho's 707 Mark for HYPERDRIVE is void ab initio.

To prevail on a claim of infringement of a registered trademark under § 1114(a), Sanho must show: (1) its 707 Mark's registration is valid, and (2) Kaijet

---

[65] SUF, ¶ 30.
[66] SUF, ¶ 31.
[67] *Id.*
[68] *See supra* III.A.3.
[69] SUF, ¶ 4.

US's use of its "Ultradrive" mark is likely to cause confusion.[70] Sanho cannot prevail on either prong.

It is appropriate for the Court to address validity of the 707 Mark in this action. The relevant Lanham Act section, 15 U.S.C. § 1119, provides that "[i]n any action involving a registered mark the court may determine the right to registration, … and otherwise rectify the register with respect to the registrations of any party to the action." Trademark registration requires use of the mark in U.S. commerce with the goods applied for, and "[t]he registration of a mark that does not meet the use requirement is void ab initio."[71] Sanho did not use HYPERDRIVE with any of the goods in its application for registration, and therefore its registration is void.

Sanho's application to register its 707 Mark was granted on April 10, 2018 based on Sanho's claim of use of the mark with this exact list of goods: "components for personal computers, tablet computers, MP3 players, cell phones and smart phones, *namely, electrical power cords, power adapters, and batteries; styluses and covers for tablet computers.*"[72] Sanho submitted to the Trademark Examiner a use specimen which is a screenshot of a Kickstarter campaign with images of its Thunderbolt 3 USB-C Hub for MacBook Pro (the "Specimen").[73] Sanho agrees that its Specimen is not an electrical power cord, a battery, a stylus, or a cover for a tablet

---

[71] *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009).
[72] SUF, ¶ 33.
[73] SUF, ¶ 34.

computer.[74] Sanho suggests it is a "power adapter," but the product does not meet the commonly-understood meaning of that term.[75] Thus, Sanho's Specimen does not show use of the mark with any of the five specific goods in its application.

What is more, Sanho has zero evidence it was using HYPERDRIVE in association with those five goods before it filed its trademark application on August 15, 2017.[76] Since 2017, Sanho has only used HYPERDRIVE on its line of USB Hubs, which are none of the goods listed on the 707 Mark.[77] Because it is undisputed Sanho did not use the mark for the goods it claimed when it registered the mark or since, Sanho did not meet the use requirement, and the 707 Mark is void ab initio.[78] Ergo, Sanho cannot show that it owns a valid trademark registration, a required element of a cause of action under 15 U.S.C. § 1114(a). Summary judgment on Count II is warranted.

**2. There is no likelihood of confusion as a matter of law.**

As a matter of law, there is also no likelihood of consumer confusion between

---

[74] SUF, ¶¶ 35, 39-40.

[75] SUF, ¶ 36; *see also* TMEP § 1402.01 ("The language used to describe goods and/or services should be understandable to the average person and should not require an in-depth knowledge of the relevant field."); *Nat'l Nonwovens, Inc. v. Consumer Prods. Enters., Inc.*, 397 F. Supp. 2d 245, 253 n.9 (D. Mass. 2005) ("[A]n applicant's 'identification of goods or services should set forth *common names*, using terminology that is generally understood.'") (citing TMEP § 1402.01).

[76] SUF, ¶ 37.

[77] SUF, ¶ 38.

[78] *See Aycock*, 560 F.3d at 1357.

the 707 Mark for HYPERDRIVE and Kaijet US's use of "Ultradrive" in association

with the parties' products. The Eleventh Circuit has established a multi-factor test to

evaluate the likelihood of confusion between two marks:

> (1) strength of the mark alleged to have been infringed; (2) similarity
> of the infringed and infringing marks; (3) similarity between the goods
> and services offered under the two marks; (4) similarity of the actual
> sales methods used by the holders of the marks, such as their sales
> outlets and customer base; (5) similarity of advertising methods; (6)
> intent of the alleged infringer to misappropriate the proprietor's good
> will; and (7) the existence and extent of actual confusion in the
> consuming public.[79]

"After making subsidiary findings as to each factor, a court must also make

an ultimate finding as to the likelihood of confusion based on the 'overall balance'

of the factors."[80] Among the seven factors, "the type of mark and the evidence of

actual confusion are the most important," both of which weigh (in this case) *against*

a likelihood of confusion.[81]

**Strength of the Mark.** HYPERDRIVE is a conceptually weak mark because

there are several third-party users of "Hyperdrive" and many more users of "Hyper"

and "Drive" formatives in their trademarks. The Eleventh Circuit has determined

that "a strong trademark is one that is rarely used by parties other than the owner of

---

[79] *Tana v. Dantanna's*, 611 F.3d 767, 774-75 (11th Cir. 2010).
[80] *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 19-10771, 2021 U.S. App. LEXIS 29284, at *16 (11th Cir. 2021).
[81] *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1200 n.22 (11th Cir. 2001).

16

the trademark, while a weak trademark is one that is often used by other parties."[82]

> The existence of third-party registrations on similar goods and services can bear on a mark's conceptual strength. Specifically, third-party registrations containing an element that is common to both the [plaintiff's] and the [defendant's] marks can show that that element has "a normally understood and well-recognized descriptive or suggestive meaning," … "leading to the conclusion that that segment is relatively weak."[83]

Several other companies use "Hyperdrive" in association with similar goods and services. Kaijet US's trademark and copyright expert, Antonio ("Tony") Sarabia, identified at least six other trademark registrations for marks phonetically identical and visually similar to "Hyperdrive" for high-tech goods that constitute or relate to components for personal computers, tablet computers, MP3 players, cell phones, and smart phones—the goods specifically described in Sanho's 707 Mark.[84]

Additionally, Mr. Sarabia identified nine other phonetically identical and

---

[82] *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973-75 (11th Cir. 1983) (quoting *Exxon Corp. v. Texas Motor Exch., Inc*., 628 F.2d 500, 504 (5th Cir. 1980)); *see also Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1257 (11th Cir. 2016) (finding defendant successfully "rebutted the presumption of strength by showing extensive third-party use of the mark"); *Boost Beauty, LLC v. Woo Signatures, LLC*, No. 2:18-cv-02960-CAS-Ex, 2022 U.S. Dist. LEXIS 24515, at *28 (C.D. Cal. Feb. 7, 2022) (BOOSTLASH mark was not strong where there were "47 live trademarks using 'Boost' in cosmetics [and] 730 registered trademarks using 'Lash.'").

[83] *Spireon, Inc. v. Flex Ltd.*, 71 F.4th 1355, 1363-64 (Fed. Cir. 2023) (quoting *Jack Wolfskin Ausrüstung Für Draussen GmbH & Co. KGaA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 1373-74 (Fed. Cir. 2015), and then 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:90) (internal citations omitted).

[84] SUF, ¶ 41.

visually similar trademark registrations for computer-related products or batteries utilizing the term "Hyper" by itself.[85] Mr. Sarabia's findings are unrebutted by Sanho.

In fact, there are well over one hundred valid trademark registrations utilizing the segment "Hyper," with goods related to Sanho's 707 Mark, such as computer software, computer hardware, computer operating systems, computer games, computer monitors, battery chargers, and tablet computers, to name a few.[86] The number is even more staggering when viewed in conjunction with the number of registered trademark registrations utilizing the term "drive" in association with such goods.[87] Trademark owners frequently disclaim the segment "drive" as being merely descriptive of the computer-related goods and services described.[88] This makes sense, as a "drive" is a readily defined term in the computer and technology industry.[89] Thus, undisputed evidence demonstrates Sanho's 707 Mark is conceptually weak.

Moreover, Sanho's 707 Mark is commercially weak; Sanho cannot provide any evidence that the mark has secondary meaning among consumers. Because strong secondary meaning would also show the commercial strength of a trademark,

---

[85] SUF, ¶ 42.
[86] SUF, ¶ 43.
[87] SUF, ¶ 44.
[88] *Id.*
[89] SUF, ¶ 45.

absence of that evidence results in a commercially weak mark.[90] The Eleventh Circuit examines four factors for commercial strength: "(1) the length and nature of the name's use, (2) the nature and extent of advertising and promotion of the name, (3) the efforts of the proprietor to promote a conscious connection between the name and the business, and (4) the degree of actual recognition by the public that the name designates the proprietor's product or service."[91]

Sanho may contend that it has advertised the 707 Mark, but in order for advertising to be relevant to secondary meaning, the owner must "explain the 'reach, frequency and duration' of the advertising material, such as circulation numbers and how often the ad ran."[92] Advertising must use the material as a source indicator and not in an ornamental or descriptive manner.[93] Mere evidence of advertising, without more, does not establish a mark's strength, only efforts to achieve strength.[94] Here, the only evidence Sanho could rely on to demonstrate commercial strength is advertising dollars; there is no evidence Sanho's advertising or promotional materials call attention to the 707 Mark. There is also no evidence demonstrating the reach, frequency, or duration of the advertising material. Thus, Sanho's 707 Mark is commercially weak.

---

[90] 1A Gilson on Trademarks § 5.10 (2023).

[91] *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512-13 (11th Cir. 1984).

[92] 1 Gilson on Trademarks § 2.06 (2023).

[93] *Id.*

[94] *Id.*

**The two marks are not similar.** To evaluate the similarity of two marks, a court "compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used."[95] "The mere fact that two marks contain the same word does not, in itself, make the marks 'substantially similar.'"[96] And as discussed above in regard to the lack of conceptual strength, the sharing of the common, generic term "drive" does not create a conceptual impression of similarity.

Absent the shared term "drive," a term that is weak in the relevant industry,[97] the remaining portions of the parties' marks are linguistically distinct. "ULTRA" and "HYPER" are objectively dissimilar in both sight and sound. Sanho may argue a definitional similarity between those terms, but long-standing precedent holds that word marks are not confusingly similar simply because convey the same or a similar

---

[95] *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1337 (11th Cir. 1999).

[96] *Tarsus Connect, LLC v. Cvent, Inc.*, 452 F. Supp. 3d 1334, 1351 (N.D. Ga. 2020) (quoting *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979)); *see also Boost Beauty*, 2022 U.S. Dist. LEXIS 24515, at *29 (when comparing BOOSTLASH and WOOLASH, court concluded, absent the shared term LASH, no reasonable consumer would mistake "woo" and "boost").

[97] *Alaven Consumer Healthcare, Inc. v. DrFloras, LLC*, No. 1:09-CV-705-TWT, 2010 U.S. Dist. LEXIS 9366, at *4 (N.D. Ga. Feb. 4, 2010) ("The strength of a trademark depends on … the degree to which third parties use the mark or components thereof." Holding that DrNatura was weak due to third party use of prefix "Dr.," and granting summary judgment as to no likelihood of confusion).

meaning.[98]

Finally, the way the marks are actually presented to customers in the marketplace is distinct and dissimilar. The question of whether consumers would be confused is not based on whether the two marks (when typed out in a legal brief) look similar, but instead properly based on how the marks are presented to consumers *in the real world*.[99] Even when two marks are "confusingly similar in the abstract," courts in this circuit have repeatedly found that those marks to be "rendered distinct by their presentation."[100] This is particularly true where one of the noticeably different marks is always or almost always presented in association with

---

[98] *See Claremont Polychemical Corp. v. Atl. Powdered Metals, Inc.*, 470 F.2d 636, 637 (C.C.P.A. 1972) (Evergold for metal powder and Duragold for bronze pigment not similar in appearance); *Alaven Consumer Healthcare,* 2010 U.S. Dist. LEXIS 9366, at *8 (reasoning that while "Natura" and "Flora" both connoted the same thing, the plaintiff could not claim a monopoly on all phrases connoting the same concept).

[99] *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, 508 F.3d 641, 652 (11th Cir. 2007) ("[L]iability under the Lanham Act is properly tied to the *real-world context* in which the alleged trademark use occurs.") (emphasis added).

[100] *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1315 (N.D. Ga. 2008) (holding that PROLINE and PRO-LITE were markedly different "when compared as they appear in the marketplace."); *see also HBP, Inc. v. Am. Marine Holdings, Inc.*, 290 F. Supp. 2d 1320, 1332-33 (M.D. Fla. 2003) (finding that marks encompassing the term "Daytona" were not similar in light of their presentation); *Corbitt Mfg. Co. v. GSO Am., Inc.*, 197 F. Supp. 2d 1368, 1377 (S.D. Ga. 2002) (finding that a party failed to show likelihood of confusion, in part, because the "marked differences in the parties' packaging … create an overall impression of distinct manufacturers."); *Tommy Hilfiger Licensing, Inc. v. Goody's Family Clothing*, No. 1:00-cv-1934-BBM, 2003 U.S. Dist. LEXIS 8788, at *87 (N.D. Ga. May 9, 2003) (finding that the dissimilarities between packaging affected the similarity of the parties' marks).

its company name.[101]



Undisputed evidence demonstrates Kaijet US's ULTRADRIVE Mark is always displayed with the j5create Mark on every side of its packaging and in advertisements.[102] Additionally, Sanho's HYPERDRIVE Mark is displayed on Sanho's products in stylized font with the "++" design between the words HYPER and DRIVE.[103]

Therefore, the marks are dissimilar in terms of sight, sound, and commercial impression.

**No intent to misappropriate goodwill**. The undisputed evidence in this action demonstrates KaiJet US was already using the dominant segment ULTRA as a trademark, as early as mid-2012, for the UltraStation product.[104] That date is six years before Sanho filed its application for its trademark registration for

---

[101] *Trilink Saw Chain*, 583 F. Supp. 2d at 1315 (holding that the marks were not confusingly similar because the "PRO-LITE mark is consistently depicted along with the Oregon mark, making confusion between [the two marks] less likely."); *see also Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 969 (2d Cir. 1981) ("When similar marks are always presented in association with company names, the likelihood of confusion is reduced.").

[102] SUF, ¶ 46.

[103] SUF, ¶ 47.

[104] SUF, ¶ 6.

HYPERDRIVE,[105] and five years before KaiJet US even heard of Sanho in 2017.[106]

Furthermore, the mere fact that Kaijet US mentioned Sanho in e-mails involving its ULTRADRIVE name and product packaging does not equate to a finding of an intent to copy, and any such argument it does is speculative.[107] However, even if copying could be inferred, intentional copying, without more, does not support a finding of likelihood of confusion – an "intent to cause confusion" is necessary.[108] With no evidence of any intent to confuse, this factor weighs in KaiJet's favor.

**No evidence of actual confusion**. The only evidence Sanho contends to show actual confusion is two instances of mis-labeling of a product return by an employee of Best Buy, which is irrelevant. The existence of actual confusion "turns on both the number of instances of confusion *and the type of person confused.*"[109] Specifically, trademark infringement depends on whether there is a likelihood of

---

[105] SUF, ¶¶ 3, 6, 33.

[106] SUF, ¶ 7.

[107] *Avenue CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (Inferences "based on speculation and conjecture" cannot defeat a motion for summary judgment).

[108] *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1293 (11th Cir. 2018) ("There is a difference between intentional copying and intentional copying *with intent to cause confusion* … 'Strictly, intent, or lack thereof, does not affect the eyes of the viewer.'") (quoting *Chrysler Corp. v. Silva*, 118 F.3d 56, 59 n.3 (1st Cir. 1997)).

[109] *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1167 (11th Cir. 2019) (emphasis added).

confusion of *consumers*.[110] The Eleventh Circuit's "caselaw makes plain that" evidence of actual confusion by "*consumers* of the relevant product…turn the key."[111] This is because "[a] product is viewed differently by a purchaser with money in hand than it is by a store employee."[112]

Additionally, "[s]hort-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, … while confusion of actual customers of a business is worthy of substantial weight."[113] If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, this is a powerful indication that there is no

---

[110] *Custom Mfg. & Eng'g*, 508 F.3d at 650 ("the relevant audience [for trademark infringement] is the 'purchasing public.'") (quoting *United States v. Torkington*, 812 F.2d 1347, 1352 (11th Cir. 1987)).

[111] *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 936-937 (11th Cir. 2010) (emphasis added); *see also Custom Mfg. & Eng'g*, 508 F.3d at 648 (the actual confusion factor asks "whether there is evidence that *consumers* were actually confused") (emphasis added); *Tana*, 611 F.3d at 779 ("the last factor, *actual confusion in the consuming public*, is the most persuasive evidence in assessing likelihood of confusion.") (emphasis added); 1A Gilson on Trademarks § 5.04 ("Actual confusion has occurred when one or more members of the *purchasing public* has seen or heard the defendant's mark and believed the defendant's product was made or sponsored by the plaintiff.") (emphasis added).

[112] *Olay Co. v. Cococare Prods., Inc.*, No. 81 Civ. 4102, 1983 U.S. Dist. LEXIS 17613, at *37 (S.D.N.Y. Apr. 19, 1983).

[113] *Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982).

likelihood of confusion.[114]

The evidence in this action establishes that, during the relevant period, Sanho sold over ███ units of its HYPERDRIVE hubs;[115] meanwhile, KaiJet US sold over ███ units of the Ultradrive hubs.[116] In light of these figures, Sanho's misplaced reliance on only two instances of purported actual confusion (which are inadmissible hearsay and do not show consumer confusion at all) involving Kaijet US's "Ultradrive" branded product does not establish likelihood of confusion, rather the opposite.

Sanho's alleged evidence of Best Buy actual confusion amounts to nothing more than errors in Best Buy's computer system for processing consumer product returns. Over the years, Sanho's and KaiJet US's mutual customer Best Buy apparently returned to Sanho only two of KaiJet US's "Ultradrive" units. To be sure, Sanho produced 30 photos of KaiJet US's other products returned to Sanho, but aside from the two, the other mis-returned products do not even feature the "Ultradrive"

---

[114] *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019) ("If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion."), quoting *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999)).
[115] SUF, ¶ 48.
[116] SUF, ¶ 49.

mark.[117] Sanho CEO Daniel Chin testified Sanho received "50 to hundred products" from Best Buy of products from other manufacturers, not including KaiJet US.[118] Mr. Chin also testified that based on his personal experience with Best Buy returns, "[i]f you have a receipt, they will scan the receipt to process the return. If you don't have the receipt, they will scan your credit card; they scan the bar code of the return product packaging to process the return."[119] Thus, Sanho's own evidence shows the mistaken returns are not due to confusion of the parties' marks, rather they are due to erroneous product information paired with the scanned receipt code.

Kaijet US's trademark expert, Tony Sarabia, confirmed that the mistaken returns do not evidence actual confusion. Mr. Sarabia returned a j5create Ultradrive Minidock to Best Buy to determine whether Best Buy employees process customer returns based on brand recognition of a product.[120] They do not.[121] Instead, Best Buy employees scan the barcode on transaction receipt, print a return barcode sticker for the product, places the barcode sticker on the product box, and then, scans the new return barcode.[122] The transaction receipt lists every item bought on the transaction, and the product scan identifies the item from the transaction receipt which is being

---

[117] SUF, ¶ 50.
[118] SUF, ¶ 51.
[119] SUF, ¶ 52.
[120] SUF, ¶ 53.
[121] *Id.*
[122] *Id.*

returned.[123] The employee does not determine whether the returned product is an UltraDrive or a HyperDrive – the computer system does. Sanho failed to rebut Mr. Sarabia's findings. No reasonable jury would find that Best Buy employees, who process returns for hundreds, if not thousands of different products, process returns based on their recognition of product brand identity.

Moreover, Best Buy employees are not actual or potential consumers of the products at issue in this case. Instead, Best Buy employees are merely tasked with the job of putting barcodes on the products. Best Buy employees have no skin in the game like a consumer does – employees are not spending money on a product to use for years to come.[124] The carelessness of an inattentive retail employee does not inform the experience of a reasonably prudent consumer. Sanho's contention of alleged confusion by irrelevant non-consumers should be given no weight.

No evidence supports Sanho's Best Buy return theory of actual confusion, nor does common sense. Instead, the fact that ULTRADRIVE and HYPERDRIVE have coexisted in the marketplace for a substantial period of time with little evidence of *consumer* confusion cuts heavily in Kaijet US's favor.

---

[123] *Id.*

[124] *See Olay*, 1983 U.S. Dist. LEXIS 17613, at *37; *see also T.G.I. Friday's, Inc. v. Int'l Rest. Grp., Inc.*, 405 F. Supp. 698, 707 (M.D. La. 1975) (Evidence of actual confusion among restaurant suppliers misdirecting some billings is de minimis and not material to basic findings that T.G.I. FRIDAY'S is not likely to be confused with E.L. SATURDAY'S or EVER LOVIN' SATURDAY'S for restaurant services.).

**As a matter of law, absence of likelihood of confusion justifies summary judgment for Defendants**. Assuming, for purposes of this motion, the similarity of the products, retail outlets, and advertising methods favor Sanho, courts in this circuit analyze that when balancing the factors, the weakness of the asserted marks, differences in the marks, lack of actual confusion, and lack of bad faith intent carry more weight than the three factors favoring Sanho.[125] In fact, district courts have "routinely afforded the similarity factor [dissimilarity of the trademarks] more weight than the three factors favoring [Sanho.]"[126] As detailed above, the relevant likelihood of confusion factors weigh in favor of KaiJet US.[127] Therefore, it is proper for this Court to grant summary judgment in this case.[128]

## C. Summary Judgment in Defendants' Favor is Appropriate as to Sanho's Federal Unfair Competition Claim  (First Action, Count III)

Sanho alleges unfair competition in violation of Lanham Act § 43(a), 15 U.S.C. § 1125(a)[129]. The test for unfair competition is the same as that of trademark

---

[125] *Alaven Consumer Healthcare*, 2010 U.S. Dist. LEXIS 9366, at *12.

[126] *Id.* at *12-13.

[127] *See id.*

[128] *Trilink Saw Chain*, 583 F. Supp. 2d at 1318 (district court granted summary judgment in favor of defendant on no likelihood of confusion where there was no evidence anyone had actually been confused by the two marks, defendant did not engage in bad faith when picking the mark, and the marks were strikingly dissimilar when they appear in the manner in which they were marketed); *see also Tarsus Connect*, 452 F. Supp. 3d at 1356 (granting summary judgment in favor of defendant on no likelihood of confusion).

[129] SUF, ¶ 58.

infringement. Yet again, Sanho fails both prongs. There is no unfair competition based on trademark infringement of Sanho's word mark, HYPERDRIVE.

Sanho's first alleged ground for unfair competition is that "Ultradrive" infringes its "707 Mark," *i.e.*, the trademark registration addressed in the preceding section.[130] Sanho's contentions of infringement of the 707 Mark in Count III fail for the reasons outlined above as to Count II.[131]

Although an unfair competition claim can be based on the infringement of a common law wordmark, Sanho never pleaded any such infringement. Sanho only pleaded infringement of a registered trademark in each of its multiple amended complaints.[132] Sanho's Count III alleging unfair competition states only that Kaijet US's "use of the ULTRADRIVE name is a deliberate and willful effort to … trade off of Plaintiff's reputation and goodwill in the HYPERDRIVE by infringing on the 707 mark and trade dress."[133] Sanho might argue that the Court should nevertheless allow Sanho to assert common law rights it did not plead, but Eleventh Circuit precedent provides otherwise.[134] Thus, as a matter of law, Sanho does not plead infringement of a common law wordmark.

---

[130] SUF, ¶ 59.
[131] *See supra* III.B
[132] SUF, ¶ 32.
[133] SUF, ¶ 58.
[134] *Swint v. City of Carrollton*, 859 F. App'x 395, 399 (11th Cir. 2021) (passing reference to freedom of speech did not put plaintiff's adversaries on notice she was alleging a violation of her freedom of speech at summary judgment stage.)

**1. There is no unfair competition based on trade dress infringement.**

Sanho also asserts infringement of "trade dress," in Sanho's packaging; Sanho contends these actions constitute unfair competition.

> To bring a successful trade dress infringement claim under the Lanham Act, a *plaintiff* must prove that (1) the defendant's product [or in this case packaging] is confusingly similar to its product [or packaging]; (2) the similar features of the two products [or packaging] are primarily non-functional; and (3) the plaintiff's product [package] is distinctive.[135]

"[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold."[136] Sanho's trade dress claim fails because, at a minimum, Sanho failed to produce any evidence demonstrating its packaging is distinctive.

Although the text of Section 43(a) does not "explicitly require[] a producer to show that its trade dress is distinctive, … courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion … as to the origin, sponsorship, or approval of the goods.'"[137] Because Sanho has no trademark registration for its product packaging, Sanho bears the burden of producing evidence demonstrating its product packaging is either

---

[135] *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1322 (11th Cir. 2012) (emphasis added).
[136] *Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1202 (Fed. Cir. 2004) (quoting *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996)).
[137] *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000) (quoting 15 U.S.C. § 1125(a)).

inherently distinctive, or that it acquired distinctiveness through secondary meaning.[138] Sanho failed to do so.

"Trade dress may become distinctive in two ways."[139] In rare circumstances, trade dress, "because its intrinsic nature serves to identify a particular source of a product, is deemed inherently distinctive."[140] "Other trade dress, though not inherently distinctive, can become distinctive if it acquires 'secondary meaning, which occurs when, in the minds of the public, the primary significance of [trade dress] is to identify the source of the product rather than the product itself.'"[141]

### 2. Sanho failed to produce evidence showing its product packaging is inherently distinctive.

Sanho has not produced any evidence that its packaging is so unique, unusual, or unexpected such that it will be perceived by consumers to indicate the origin of its goods.[142] Undisputed evidence establishes it is not. Sanho's packaging is a common rectangular shape with unexceptional dimensions, and a commonly-used hangtag arrangement. Sanho uses a conventional typeface, basic colors and symbols, and no text other than basic factual information providing the product specifications.[143]

---

[138] *Miller's Ale House*, 702 F.3d at 1322.
[139] *Id.*
[140] *Id.* (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992))
[141] *Miller's Ale House*, 702 F.3d at 1322 (quoting *Wal-Mart*, 529 U.S. at 211).
[142] SUF, ¶ 54.
[143] SUF, ¶ 55.





Undisputed evidence demonstrates Sanho's packaging is common in the industry.[144] As a matter of law, Sanho's commonplace, unremarkable package is not inherently distinctive.

The Eleventh Circuit uses the test enumerated in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.* to determine whether trade dress in inherently distinctive.[145] In that test, the court considers "whether it is a 'common' basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods."[146] In other words, trade dress can be inherently distinctive only if "the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of

---

[144] SUF, ¶ 56.

[145] *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 1344-45 (C.C.P.A. 1977).

[146] *Miller's Ale House*, 702 F.3d at 1323 (quoting *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854, 858 (11th Cir. 1983)).

origin."[147] There is nothing unique, unusual, or unexpected about Sanho's packaging. Instead, undisputed evidence establishes Sanho's packaging is just one more example of a commonly-adopted and well-known form of ornamentation in the industry: a rectangular box with a window showing the product within. It is not inherently distinctive.

### 3. Sanho cannot show that its packaging has acquired secondary meaning.

Secondary meaning exists where there is a mental association in buyers' minds between a product's trademark and its source.[148] The plaintiff must prove that such an association exists by a preponderance of the evidence. In so doing, the following factors may be relevant:

> (a) direct consumer testimony; (b) consumer surveys; … (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying.[149]

"In evaluating a claim of secondary meaning, consumer surveys are recognized as the most direct and persuasive evidence of secondary meaning" and courts in this circuit have declined to find secondary meaning where a plaintiff

---

[147] 1 McCarthy § 8:13.

[148] *See Miller's Ale House*, 702 F.3d at 1322.

[149] *Echo Travel, Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989); *see also Conagra,* 743 F.2d at 1513.

cannot provide consumer surveys or other direct evidence.[150]

Here, Sanho provides neither direct consumer testimony nor any consumer surveys demonstrating consumer association between Sanho and the packaging used for Sanho's hub.[151] As illustrated above, this Court may decline to find Sanho's trade dress achieved acquired distinctiveness, solely based on Sanho's failure to provide this Court with any surveys, quantitative evidence, or testimony.

Sanho cannot contend that mere sales and advertising evidence supports a claim of secondary meaning. Bare advertising and sales numbers have limited probative value where there is no evidence connecting the advertising and sales dollars to the specific trade dress.[152]

---

[150] *See Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 722 F. Supp. 719, 723-24 (S.D. Fla. 1989), *aff'd*, 931 F.2d 1519 (11th Cir. 1991) (plaintiff's failure to provide survey evidence is compelling evidence of no secondary meaning); *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987) (plaintiff's failure to submit survey evidence of secondary meaning supported finding that none existed); *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 827 (Fed. Cir. 1992) (concluding that the plaintiff failed to prove secondary meaning by failing to present surveys, quantitative evidence, or testimony suggesting the existence of secondary meaning with regard to the blender's design and finding that large consumer demand for the blender did not equate to the public's association of the blender design with Braun).
[151] SUF, ¶ 57.
[152] *Braun*, 975 F.2d at 826-27 ("Braun did not proffer evidence establishing that the advertising effectively created secondary meaning as to the blender"); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) ("a large expenditure of money does not in itself create legally protectable rights. The test of secondary meaning is the effectiveness of the efforts to create it"); *Investacorp*, 722 F. Supp. at 724 ("More is needed to establish the necessary consumer association than the mere proof of sales and growth under the mark…because such proof only measures

Analysis of all the relevant factors lead to the conclusion that Sanho cannot demonstrate its packaging acquired secondary meaning, i.e. that the packaging served to identify a single source of the goods it contained. Because Sanho cannot demonstrate its packaging is distinctive, either inherently or through acquired distinctiveness, Sanho's trade dress infringement claim fails as a matter of law.

## IV.    CONCLUSION

Sanho's claims seek to enforce its intellectual property well beyond any reasonable definition of its scope. No reasonable jury could find that Defendants infringe Sanho's trade dress, trademark, or design patents for the products discussed above. Therefore, KaiJet US submits that summary judgment in favor of Defendants is warranted on the issues presented.

Respectfully submitted, this 31st day of January, 2024.

/s/ *Ryan P. Gentes*
Ryan P. Gentes
GA Bar No. 421695
Robert A. Madayag, III
GA Bar No. 123699
William B. Dyer III
GA Bar No. 236915
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: ryan.gentes@leehayes.com
Email: robm@leehayes.com

---

plaintiff's effort to establish secondary meaning – it does not determine its success.").

Email: bill.dyer@leehayes.com

Robert J. Carlson
WSBA Number 18455
*Admitted Pro Hac Vice*
LEE & HAYES, P.C.
701 Pike Street, Ste. 1600
Seattle, WA 98101
Telephone: (206) 315-4001
Email: carlson@leehayes.com

Rhett V. Barney
WSBA Number 44764
*Admitted Pro Hac Vice*
Johanna Tomlinson
WSBA Number 57582
*Admitted Pro Hac Vice*
LEE & HAYES, P.C.
601 W. Riverside Ave., Ste. 1400
Spokane, WA 99201
Telephone: (509) 324-9256
Email: rhettb@leehayes.com
johanna.tomlinson@leehayes.com

*Attorneys for Defendants KaiJet Technology International Limited, Inc. and KaiJet Technology International Corporation*

36

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2024, I filed a true and correct copy of the foregoing document with the CM/ECF filing system of this Court, which will serve an electronic copy to all attorneys of record.

/s/ *Ryan P. Gentes*

Ryan P. Gentes (GA Bar No. 421695)
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: ryan.gentes@leehayes.com

*Attorney for Defendants KaiJet Technology*
*International Limited, Inc. and KaiJet*
*Technology International Corporation*

37

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document is written in 14 point Times New Roman font in accordance with Local Rule 5.1.

/s/ *Ryan P. Gentes*
Ryan P. Gentes (GA Bar No. 421695)
LEE & HAYES, P.C.
75 14th Street NE, Suite 2500
Atlanta, GA 30309
Telephone: (404) 815-1900
Email: ryan.gentes@leehayes.com

*Attorney for Defendants KaiJet Technology International Limited, Inc. and KaiJet Technology International Corporation*