## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SANHO CORPORATION,

    Plaintiff,

                v.

KAIJET TECHNOLOGY INTERNATIONAL
LIMITED, INC., *et al.*,

    Defendants.

Civil Action No.
1:18-cv-05385-SDG

### OPINION AND ORDER

This matter is before the Court on the parties' various dispositive motions, including cross-motions for summary judgment in whole and in part and a motion for judgment on the pleadings. With the benefit of oral argument and for the reasons set forth below, the Court holds as follows:

- Plaintiff Sanho Corporation's motion for partial summary judgment [ECF 439] is **GRANTED**;

- Defendant Kaijet Technology International Corporation, Inc.'s (Kaijet Taiwan) motion for summary judgment [ECF 446] is **GRANTED** as to Sanho's false advertising claim and **DENIED** as to all others;

- Defendant Kaijet Technology International Limited, Inc.'s (Kaijet US) motion for partial summary judgment [ECF 450] is **GRANTED** as to Sanho's false advertising claim and **DENIED** as to all others;

- Defendant Starview Global Limited's motion for summary judgment [ECF 456] is **GRANTED** as to Sanho's false advertising claim and **DENIED** as to all others; and

- Kaijet US and Kaijet Taiwan's motion for judgment on the pleadings [ECF 494] is **DENIED**.

1

# TABLE OF CONTENTS

I.   BACKGROUND ......................................................................... 4

II.  DISCUSSION............................................................................. 9

     A.   Kaijet US's Motion for Summary Judgment Is Granted
          as to False Advertising and Denied as to All Other
          Claims......................................................................... 10

          1.   Factual Disputes Remain as to the Merits of
               Sanho's Design Patent Infringement Claims............................ 11

               i.    The '875 Patent................................................. 14

               ii.   The '616 Patent................................................ 20

               iii.  The '618 Patent................................................ 20

                     a.   The JCD382.............................................. 21

                     b.   The JCD389.............................................. 23

          2.   Factual Disputes Remain as to the Merits of
               Sanho's Lanham Act Claims for Trademark
               Infringement and Unfair Competition, but not
               Sanho's False Advertising Claim. ............................... 24

               i.    Section 32, Infringement of the '707 Mark..................... 25

                     a.   Void *Ab Initio* ........................................ 25

                     b.   Consumer Confusion.................................. 27

               ii.   Section 43(a), Unfair Competition ................................ 36

               iii.  Section 43(a), False Advertising ....................... 37

          3.   Factual Disputes Remain as to the Merits of
               Sanho's Copyright Infringement Claim..................... 39

     B.   Kaijet Taiwan's Motion for Summary Judgment Is
          Granted as to False Advertising and Denied as to All
          Other Claims. ...................................................... 47

1.      Kaijet Taiwan Has Engaged in Commerce in the
        United States. ............................................................... 47

        i.      Patent Law .......................................................... 50

        ii.     Lanham Act ......................................................... 53

        iii.    Copyright law ..................................................... 54

2.      The Court Declines to Address Sanho's Theory
        That Kaijet Taiwan and Kaijet US Are Alter Egos. ................... 55

C.      Starview's Motion for Summary Judgment Is Granted
        as to False Advertising and Denied as to All Other
        Claims.......................................................................... 57

D.      Sanho's Motion for Summary Judgment Is Granted. ........................ 59

        1.      No Reasonable Jury Could Find Sanho Liable for
                False Advertising......................................................... 59

        2.      No Reasonable Jury Could Find Sanho Liable for
                False Patent Marking. .................................................. 62

E.      Defendants' Motion for Judgment on the Pleadings Is
        Denied. ........................................................................ 64

III.    CONCLUSION ................................................................. 65

## I.    BACKGROUND[1]

This procedurally complicated case arises out of an intellectual property dispute between competitors in the MacBook dongle[2] market.[3] Plaintiff Sanho is a tech company headquartered in Fremont, California,[4] that "makes and sells accessories" for electronic devices like laptop computers and mobile phones.[5] Sanho has been selling a series of electronic accessories under the "HyperDrive" name since 2005,[6] including MacBook dongles since 2015.[7]

Defendant Kaijet US, a tech company headquartered in Kennesaw, Georgia,[8] sells a line of competing "UltraDrive" MacBook dongles under the

---

[1]    Many documents in this case have been filed under provisional seal. The Court will place those documents under permanent seal. Nevertheless, the Court has determined that those portions of the record cited in this Order do not require the protection of a seal.

[2]    "A dongle is a small piece of computer hardware that connects to a port on another device to provide it with additional functionality." *Dongle*, WIKIPEDIA, https://en.wikipedia.org/wiki/Dongle (last visited May 16, 2024) (emphasis omitted). Common varieties include port adapters (e.g., HDMI to USB-C), data storage devices (i.e., USB drives), and plug-ins that provide wireless connectivity over Wi-Fi or Bluetooth. *Id.*

[3]    ECF 483-2, at 2, ¶¶ 1, 6.

[4]    ECF 442, at 24.

[5]    *Id.* at 20.

[6]    *Id.* at 29.

[7]    *Id.* at 31.

[8]    ECF 502-25, at 3.

"j5create" brand name.[9] Defendants Kaijet Taiwan and Starview—both of which are headquartered in Taiwan[10]—are Kaijet US's suppliers of j5create products.[11] The three Defendants are rather intimately connected. The sole owner of Starview (as of 2021),[12] Yuki Tai, is also a co-founder of Kaijet Taiwan[13] and owns a majority of its stock (as of 2022).[14] Kaijet US was founded in 2011 by Yu-chia Jessica Liu, who was at the time the sole owner of Kaijet Taiwan,[15] and the entities through 2017 had nearly identical names: "Kaijet Technology International Limited" (Kaijet Taiwan) v. "Kaijet Technology International Limited, Inc." (Kaijet US).[16] Kaijet US sells "j5create" products under an oral license from Kaijet Taiwan,[17] for which Kaijet US is an "exclusive distributorship."[18] Starview likewise sells products

---

[9]   ECF 483-2, ¶ 1; ECF 453-2, ¶¶ 9–13.

[10]   ECF 502-2, ¶ 9 (Kaijet Taiwan); ECF 479-3, at 23 (Starview).

[11]   ECF 453-2, ¶ 10 (Kaijet Taiwan); ECF 456-2, ¶ 9 (Starview). For example, Kaijet Taiwan and Starview sell (or previously sold) a j5create product called the JCD382 to Kaijet US [ECF 463-1, at 80, 87], which in turn sells the product in the United States [ECF 453-2, ¶ 13].

[12]   ECF 463-1, at 77.

[13]   ECF 448-2, at 4.

[14]   ECF 479-5, at 7.

[15]   ECF 466-2, at 14.

[16]   ECF 488-2, ¶¶ 1–2.

[17]   ECF 453-4, at 5.

[18]   ECF 488-2, ¶ 29.

exclusively to Kaijet US (as of 2021), and its owner (Yuki Tai) could not recall Starview selling products to anyone else.[19]

Sanho brings this suit against the entities it believes are responsible for j5create's dongles—more specifically, the MacBook-compatible USB-C hubs[20]—that were sold between 2017 and 2022.[21] Sanho began selling its own HyperDrive hub in late 2016 or early 2017:[22]



[23]

---

19  ECF 463-1, at 81. Unless otherwise specified, "Defendants" refers collectively to Kaijet US, Kaijet Taiwan, and Starview; "Kaijet Defendants" refers to Kaijet US and Kaijet Taiwan; and "j5create" refers strictly to the brand and not to any party.

20  "A USB hub is a device that expands a single Universal Serial Bus (USB) port into several so that there are more ports available to connect devices to a host system. … [A]n external USB hub can consolidate several everyday devices (like a mouse, keyboard or printer) into a single hub to enable one-step attachment and removal of all the devices." *USB Hub*, WIKIPEDIA, https://en.wikipedia.org/wiki/USB_hub (last visited May 16, 2024) (emphasis omitted).

21  ECF 483-2, ¶¶ 5–6.

22  *Id.* ¶ 2.

23  ECF 491-2, ¶ 110.

Kaijet US began selling the first j5create UltraDrive hub sometime around October 2017:[24]



[25]

Both parties sold their hubs through the big-box electronics retailer Best Buy, in brick-and-mortar stores and online.[26]

Sanho sued Kaijet US in 2018, alleging that j5create had copied various features of its HyperDrive in violation of federal and state intellectual property laws.[27] That case (the First Action), which was initially filed in California, was transferred to this district,[28] and the complaint was twice amended: to substitute Georgia state law claims for California state law claims[29] and then to add Kaijet Taiwan as a party defendant.[30] Sanho then filed a second suit (the Second Action) in this district, arising out of the same facts but asserting novel claims against a

---

[24] *Id.* ¶ 53.

[25] *Id.* ¶ 110.

[26] *Id.* ¶ 107.

[27] ECF 1.

[28] ECF 24.

[29] ECF 39.

[30] ECF 89.

larger group of defendants: Kaijet US, Kaijet Taiwan, Starview, and former Defendant Magic Control Technology.[31] Counterclaims were asserted in both cases.[32] The two cases were subsequently consolidated into one docket; however, they remain separate cases, each with its own operative complaint.[33]

Magic Control was subsequently dismissed under Rule 12(b)(6),[34] and all claims and counterclaims concerning one of Sanho's patents—U.S. Patent No. 10,572,429—were voluntarily dismissed,[35] leaving the following:

- *Under patent law*: Sanho's patent infringement claims, and Defendants' patent noninfringement, patent invalidity, and false patent marking counterclaims, involving the '875,[36] '616,[37] '618,[38] and '290[39] Patents;[40]

---

[31] ECF 418, ¶¶ 8–10; *Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc.*, No. 1:20-cv-02150-TCB (N.D. Ga. May 19, 2020) (the 2150 Case), ECF 1.

[32] ECF 115; 2150 Case, ECF 24.

[33] ECF 196.

[34] ECF 267, at 2.

[35] ECF 425, at 2.

[36] The '875 Patent refers to U.S. Design Patent No. D813,875.

[37] The '616 Patent refers to U.S. Design Patent No. D855,616.

[38] The '618 Patent refers to U.S. Design Patent No. D644,618.

[39] The '290 Patent refers to U.S. Design Patent No. D807,290.

[40] Technically, Kaijet Taiwan has asserted patent law counterclaims only for '875 and '616 Patent noninfringement and invalidity. In addition, Starview is only a party to claims and counterclaims asserted in the Second Action. Thus, under patent law, Starview is a Defendant only for purposes of Sanho's '618 and '290 Patent infringement claims, and has asserted counterclaims only for '618 and '290 Patent invalidity and for false patent marking.

- *Under the Lanham Act* (the federal trademark statute): Sanho's trademark infringement claim and Defendants' trademark noninfringement counter-claim, both involving the '707 Mark, as well as Sanho's unfair competition and false advertising claims and Defendants' false advertising counter-claims;[41]

- *Under the Copyright Act*: Sanho's copyright infringement claim and Defendants' copyright noninfringement counterclaim, both involving the '336 Copyright;[42] and

- Sanho's Georgia law claims.[43]

Pending before the Court are five dispositive motions—four for summary judgment, and one for judgment on the pleadings—addressing many, but not all, of these claims and counterclaims.

## II.   DISCUSSION

Defendants move for summary judgment on all of Sanho's federal claims save one (infringement of the '290 Patent), and the Kaijet Defendants additionally move for judgment on the pleadings on all of Sanho's state law claims. Sanho in

---

[41]   The '707 Mark refers to U.S. Trademark Registration No. 5,442,707. Technically, under the Lanham Act, Starview is a party only for purposes of Sanho's false advertising claim.

[42]   The '336 Copyright refers to U.S. Copyright Registration No. VA 2-103-336. Technically, Starview is not a party to any claims or counterclaims arising under the Copyright Act.

[43]   Starview is not a party to any of Sanho's state law claims.

turn moves for summary judgment on Defendants' false patent marking and false advertising counterclaims. Each will be addressed in turn.[44]

### A.    Kaijet US's Motion for Summary Judgment Is Granted as to False Advertising and Denied as to All Other Claims.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a). A fact is "material" if it could change the outcome of the case, and a dispute is "genuine" if a reasonable jury could resolve it in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The purpose of summary judgment is to test "the need for a trial"—to look for "factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Thus, at summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Judges are not to weigh evidence, determine credibility, or draw their own inferences from the facts, these being the proper functions of the jury. *Id.*

---

[44]    The Court notes that the parties have mixed and matched arguments and briefs in what can only be explained as a poor end-run around the Court's page limits, which the Court has already enlarged. ECF 430. Thus, Kaijet US has, technically, neither moved for nor argued for summary judgment on Sanho's false advertising and copyright infringement claims, that task having apparently been delegated to Kaijet Taiwan. ECF 502, at 2. Likewise, Sanho addresses the merits of its false advertising claim in its response to Starview's motion, even though Starview does not contest that claim on its merits. ECF 456-1, at 2.

### 1.     Factual Disputes Remain as to the Merits of Sanho's Design Patent Infringement Claims.

Sanho claims that certain models of j5create's UltraDrive hubs infringe its design patents, as follows:

- '875 Patent: Allegedly infringed by j5create model JCD382;

- '616 Patent: Allegedly infringed by the JCD382;

- '618 Patent: Allegedly infringed by the JCD382 and JCD389; and

- '290 Patent: Allegedly infringed by the JCD348,[45] JCD386, and JCD388.[46]

Kaijet US moves for summary judgment with respect to the JCD382 and JCD389 products—in other words, on Sanho's design patent infringement claims as to the '875, '616, and '618 (but not '290) Patents.[47]

The gist of a design patent infringement claim is that two things look the same: that the defendant's product design (the "accused design") produces the same "effect upon the eye" as the plaintiff's patent-protected product design

---

[45]    The parties at times refer, in the context of Sanho's '290 Patent infringement claim, to "JCD324" instead of "JCD348." E.g., ECF 453-1, at 16. But there is no other indication that "JCD324" is a product accused of infringement in this case. The Court thus construes "JCD324" as a typo for "JCD348."

[46]    ECF 418, ¶ 16; ECF 453-2, ¶ 1.

[47]    ECF 504, at 2. Kaijet US purports to move for summary judgment on Sanho's '290 Patent infringement claim as to the JCD382. *Id.* However, the operative complaint does not allege infringement of the '290 Patent by the JCD382. ECF 418, at 9. The Court accordingly treats that claim as withdrawn.

(the "claimed design"). *Gorham Mfg. Co. v. White*, 81 U.S. 511, 526 (1871). The well-established legal standard for design patent infringement, as recently re-articulated by an *en banc* Federal Circuit,[48] is the so-called "ordinary observer" test. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008) (*en banc*). That test asks whether "a purchaser familiar with the prior art" — that is, a purchaser reasonably familiar with the kind of products at issue, *id.* at 675 — would be so "deceived by the similarity between the claimed and accused designs" as to "purchase one supposing it to be the other," *id.* at 683. Under the ordinary observer test, even if the accused and claimed designs differ "in details of ornament," the one infringes the other if "they are still the same in general appearance and effect, so much alike that in the market and with purchasers they would pass for the same

---

[48] Because the Federal Circuit has near-exclusive jurisdiction over appeals from district court cases arising "in whole or in part" under federal patent law, *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 829 (2002) (quoting 28 U.S.C. § 1295(a)(1)), the Court will apply Federal Circuit law to this case. In accordance with that law, the Court will apply Federal Circuit precedent to federal patent law claims and to federal patent law preemption issues. *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004) ("We apply Federal Circuit law not only to the patent issues but also in deciding whether the patent laws preempt a state-law tort claim."). The Court will apply Eleventh Circuit precedent to all other issues. *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348 (Fed. Cir. 2003) (applying the law of the regional circuit for claims that "do not present questions that are intimately involved with the substance of the patent laws.").

thing—so much alike that even persons in the trade would be in danger of being deceived." *Id.* at 670 (quoting *Gorham*, 81 U.S. at 531).

In some instances, the difference between the claimed and accused designs will be obvious: They will, in the words of *Egyptian Goddess*, be "plainly dissimilar," or "sufficiently distinct." *Id.* at 678. That is, the two designs will be so different that no observer—no matter how unfamiliar with the products at issue—could confuse one for the other. In those instances, there will be no infringement. *Id.* However, "[i]n other instances, when the claimed and accused designs are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art." *Id.* As the Federal Circuit explained, establishing a "frame of reference consist[ing] of numerous similar prior art designs … can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer." *Id.* at 677. An observer who has seen enough "closely similar prior art designs" may find significant design differences between two products that, to the unaccustomed eye, look the same. *Id.* at 676.

Significantly, *Egyptian Goddess* put the burden of *producing* relevant prior art on the *defendant*, reasoning that the defendant would be incentivized to produce prior art that most effectively highlights the differences between the claimed and

accused designs. *Id.* at 678–79. Thus, *Egyptian Goddess* suggests that, where the claimed and accused designs are not plainly dissimilar, and where the defendant has not met its burden of providing the necessary context to distinguish between them, the defendant is not entitled to summary judgment. Under that principle, Kaijet US is not entitled to summary judgment on any of Sanho's design patent infringement claims.

### i.    The '875 Patent

Sanho claims that its '875 Patent (left) is infringed by the j5Create JCD382 (right):



FIG. 7
49                                        50

The '875 Patent, like all design patents, protects only the "ornamental features" of Sanho's product design, and not its "broader general design concept." *OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). The '875 patent, in other words, does not protect the abstract, high-level concept of a cordless MacBook hub. Nor does a design patent encompass a product's *functional* aspects.

---

49   ECF 504-19, at 113.

50   *Id.* at 19.

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015). For example, the flat head of a hammer, designed to allow the hammer to "deliver force to a struck object," is functional and outside of a design patent's scope. *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010).

Here the '875 Patent's two male ports (depicted above as protruding from the hub on the far side), which connect the hub to the MacBook, are functional—but the placement of the male ports relative to the body of the hub is ornamental. Likewise, the inclusion of particular female ports (e.g., USB or USB-C) is integral to the hub's port-adapting function—but the female ports' placement and distribution on the body of the hub is ornamental. And though functional concerns set certain parameters on the '875 Patent's physical shape (the side with the male ports must be straight, so as to lie flush against the side of the MacBook when the hub is plugged in; the bottom of the hub must not extend out too far, lest it destabilize the MacBook when it is placed on a desk or table), the '875 Patent's sleek and narrow build is primarily an ornamental feature.

Focusing solely on the '875 Patent's ornamental features does not eliminate the resemblance between it and the JCD382. From undersigned's untrained perspective, the two designs look alike: they are both flat, thin, and rectangular, much longer than they are wide, with rounded corners and squared-off sides. On both, the male ports are positioned about a quarter of the way along one of the

long sides; and the female ports are similarly positioned either along the other long side or at the end.

Kaijet nevertheless moves for summary judgment on the grounds that the JCD382's tapered ends (top) give it a "plainly dissimilar shape" from the '875 Patent (bottom):[51]



The Court does not agree. Surely, an ordinary observer could reasonably find that the designs are at least *similar*. The ordinary observer is defined, not as an expert, but as the "principle purchaser[ ]" of the products in questions. *Gorham*, 81 U.S. at 528. Here, that means the typical MacBook owner: a large and varied class to which the Court is hesitant to ascribe any special eye for product design. And to the ordinary eye, Sanho's and j5create's designs look alike, with similar proportions, similar profiles, and similar distributions of ports. It is possible to imagine going to the store to buy one and accidentally coming home with the other. The JCD382's tapering is certainly a point of distinction, and not the only one; nevertheless, it is

---

[51]   ECF 453-1, at 21.

[52]   ECF 504-19, at 112.

[53]   *Id.*

an insufficient basis for the Court to declare the two designs plainly dissimilar to the ordinary observer as a matter of law.

The Federal Circuit case law that Kaijet US cites on this point is not dispositive. Kaijet US argues that the Federal Circuit's decisions in *Ethicon* and *Super-Sparkly Safety Stuff, LLC v. Skyline USA, Inc.*, 836 F. App'x 895 (Fed. Cir. 2020), require a ruling of plain dissimilarity.[54] In *Ethicon*, the Federal Circuit affirmed a lower court's determination that the surgical devices pictured below were "plainly dissimilar" as a matter of law:



D'804 patent, Fig. 1          Covidien's accused product [55]

796 F.3d at 1335. The appellate court explained that the two designs *were* similar at the functional and conceptual levels: as surgical devices having handles, triggers, buttons, and torque knobs. *Id.* at 1336. But that was where the similarity ended: at the *ornamental* level, the devices differed at virtually every point, beginning with the contrast between the "overall contoured shape" of the claimed

---

54   ECF 453-1, at 18–21.

55   *Id.* at 11.

design (left) and the "overall linear shape" of the accused design (right). *Id.* The *Ethicon* court also identified plainly visible differences between the curvature of the two designs' handles and triggers, the shape of their buttons, and the molding of their torque knobs. *Id.* at 1336–37. These differences were amplified by the fact that the ordinary purchasers of the surgical products at issue were either hospital administrators or surgeons: in either case, people "who are more sophisticated than the general public." *Id.* at 1337. Here, by contrast, the '875 Patent and the JCD382 are similar not only in function and conception but in particular ornamentation, and their ordinary purchasers are the general public. *Ethicon* does not control the outcome here.

Neither does *Super-Sparkly*, in which the Federal Circuit distinguished between two rhinestone-encrusted pepper-spray canisters. 836 F. App'x at 898. The claimed design in *Super-Sparkly* was "very simple": a cylinder covered with rhinestones both on the sides and on the bottom. *Id.* In light of that simplicity, the appellate court ruled that the accused design, which featured a cylinder covered with rhinestones on the sides but not the bottom, was "plainly dissimilar." As the appellate court reasoned, where the claimed design has two ornamental features, and the accused design changes one of them, the latter does not infringe the design patent protecting the former as a matter of law. *Id.* That reasoning does not necessitate a particular result here, where the similarities between the '875 Patent

and the JCD382 both qualitatively and quantitatively exceed the differences. In addition, *Super-Sparkly* buttressed its determination of plain dissimilarity by comparing both the claimed and accused designs with closely similar prior art. *Id.* at 898–99. Here, where Kaijet US has not met its burden under *Egyptian Goddess* to produce prior art that highlights the distinctiveness of the JCD382, no such comparison can be made. Because a jury question remains as to whether a purchaser familiar with the prior art would be deceived by the similarity between the '875 Patent and the JCD382s, summary judgment as to Sanho's '875 Patent infringement claim is denied.

### ii. The '616 Patent

Sanho claims that its '616 Patent (left) is infringed by the JCD382 (right).



FIG. 1

The '616 Patent is similar to the '875 Patent: so similar that Kaijet US's brief treats them interchangeably for purposes of the JCD382 infringement analysis.[58] Thus, having found that a jury question as to infringement exists for purposes of the JCD382 and the '875 Patent, the Court concludes for the same reasons that a jury question as to infringement exists for purposes of the JCD382 and the '616 Patent.

### iii. The '618 Patent

Sanho claims that its '618 Patent is infringed by the j5Create JCD382 and JCD389. The Court denies summary judgment as to both models.

---

[56]   ECF 504-19, at 102.

[57]   *Id.* at 19 (rotated 180°).

[58]   ECF 453-1, at 20–21.

### a.   The JCD382

Sanho's '618 Patent is similar to the '875 and '616 Patents discussed above, but features tapering on the ends: it looks, in other words, something like the JCD382:



Fig. 7                                        59                                        60

Kaijet US agrees that the '618 Patent (left) and the JCD382 (right) are similar in "general shape."[61] Nevertheless, it identifies various differences between the two designs—relative length, arrangement of ports, material composition—that, in its view, make the JCD382 "plainly dissimilar."[62] Kaijet also argues that the JCD382 does not infringe the '618 Patent because the '618 Patent is more similar to prior art—specifically, the CN728 Patent—than to the JCD382.[63] This argument is, in effect, one under *Egyptian Goddess*: that, in light of the similarities between various products in the MacBook-hub market, the otherwise subtle design differences

---

[59]   ECF 504-19, at 120.

[60]   *Id.* at 19.

[61]   ECF 453-1, at 22.

[62]   *Id.* at 23.

[63]   *Id.*

between the '618 Patent and the JCD382 are significant in the eyes of the hypothetical purchaser. Sanho, in response, asserts that the CN728 Patent is not prior art because it and the '618 Patent share an inventor.[64] Kaijet did not address this assertion in its reply brief, nor has it asserted the absence of a factual dispute on the issue of whether the CN728 Patent is prior art to the '618 Patent.[65] Thus, Kaijet has not met its burden of production under *Egyptian Goddess* to identify relevant prior art. Nor does the Court find as a matter of law that the '618 Patent and the JCD382 are plainly dissimilar. The Court accordingly declines to grant summary judgment on Sanho's '618 Patent infringement claim as to the JCD382.

---

[64]   ECF 470-1, at 25 n.17 (citing 35 U.S.C. § 102(b)).

[65]   *See* ECF 491-1.

### b.     The JCD389

Sanho also claims that the '618 Patent (left) is infringed by the JCD389 (right):



Fig. 7                                      66                                                   67

The asserted difference between the two designs is, again, tapering: the '618 Patent (top) is tapered on the ends, while the JCD389 (bottom) is tapered on the sides.



68

69

Kaijet US argues that this difference in tapering gives the JCD389 a "distinctly different shape" than the '618 Patent.[70] But for the same reasons given in this Order's discussion of the '875 Patent and the JCD382,[71] the Court declines to rule

---

[66]   ECF 504-19, at 120.

[67]   *Id.* at 26.

[68]   *Id.* at 132.

[69]   *Id.*

[70]   ECF 453-1, at 21.

[71]   *See supra* subsection II.A.1.i.

that the two designs are plainly dissimilar as a matter of law, and thus declines to grant summary judgment on Sanho's '618 Patent infringement claim.

In other words, all of Sanho's patent infringement claims will proceed to trial. The Court notes that some arguments that Kaijet US has raised to contest Sanho's patent infringement claims are better considered in the patent validity context. For example, Kaijet US's point is well taken that Sanho's design patents seem more similar to each other than to Kaijet US's allegedly infringing products.[72] The Court also questions how a single product—the j5create JCD382—could realistically infringe on three of Sanho's design patents at the same time.[73] These arguments do not impact the Court's infringement analysis, and are not taken up in this Order because neither party has moved for summary judgment on Kaijet US's invalidity counterclaims. They may, of course, be relevant when all of the claims and all of the evidence are before the jury come trial.

### 2. Factual Disputes Remain as to the Merits of Sanho's Lanham Act Claims for Trademark Infringement and Unfair Competition, but not Sanho's False Advertising Claim.

Kaijet US moves for summary judgment on Sanho's three Lanham Act claims: infringement of the '707 Mark, unfair competition, and false advertising. The Court grants summary judgment only on the false advertising claim.

---

[72]   ECF 491-1, at 11.

[73]   *Id.*

### i.  Section 32, Infringement of the '707 Mark

Sanho claims that its '707 Mark in "HyperDrive" has been infringed by j5create's use of "UltraDrive" in violation of § 32 of the Lanham Act (codified at 15 U.S.C. § 1114). To prevail under § 32, "the plaintiff must show, first, that its mark is valid and, second, that the defendant's use of the contested mark is likely to cause confusion." *Dieter v. B & H Indus. of Sw. Fla., Inc.*, 880 F.2d 322, 326 (11th Cir. 1989). Kaijet argues that Sanho's trademark infringement claim fails as a matter of law because (a) the '707 Mark is void *ab initio* after Sanho failed to use it in interstate commerce, and (b) no jury could reasonably find a likelihood of consumer confusion between "HyperDrive" and "UltraDrive." These arguments are rejected.

### a.  Void *Ab Initio*

The Lanham Act "permits registration of a trademark 'used in commerce.'" *Gay Toys, Inc. v. McDonald's Corp.*, 585 F.2d 1067, 1068 (C.C.P.A. 1978) (quoting 15 U.S.C. § 1051(a)(1)). "The registration of a mark that does not meet the use requirement is void *ab initio*." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009). Here, Sanho's registration of the '707 Mark was predicated on its use of the mark in commerce in connection with the following goods:

> [C]omponents for personal computers, tablet computers, MP3 players, cell phones and smart phones, namely,

> electrical power cords, *power adapters*, and batteries;
> styluses and covers for tablet computers.[74]

Kaijet US argues that the products in connection with which Sanho used the '707 Mark—the HyperDrive hubs[75]—are not power cords, power adapters, batteries, styluses, or tablet computer covers, and that the '707 Mark was therefore never used in commerce and was never valid.[76] Sanho responds that its hubs are, in fact, "power adapters," and that its use of "HyperDrive" in connection with its hubs satisfies the Lanham Act's use requirement.[77] In short, the validity of Sanho's '707 Mark depends on whether HyperDrive hubs are "power adapters."

The Court, at this stage, declines to rule as a matter of law that they are not. As Sanho points out, its hubs can be used "to transmit[ ] power from a 'source' (MacBook Pro) to a 'sink' (a cell phone being charged)."[78] Sanho has provided both evidence showing that similar products are marketed as power adapters, and expert testimony that devices facilitating the transmission of power from laptops

---

[74] ECF 471-1, ¶ 34 (emphasis added).

[75] *Id.* ¶ 37.

[76] ECF 453-1, at 25–26.

[77] Sanho also argues that it satisfied the Lanham Act's use requirement by selling "computing components *having* power delivery, batteries, and power cords." ECF 470-1, at 27 (emphasis added). The Court rejects that argument: selling a product *incorporating x* is not equivalent to selling *x*. A dealership selling white-painted cars cannot reasonably be characterized as selling white paint.

[78] ECF 470-1, at 27.

to "connected downstream ports" can properly be classified as power adapters.[79] This evidence creates a jury question on whether Sanho's hubs are power adapters, and thus on whether Sanho's mark is void *ab initio*.

### b. Consumer Confusion

Kaijet US argues that, even if the '707 Mark is valid, it still cannot be liable for trademark infringement because no jury could reasonably find that "UltraDrive" is similar enough to "HyperDrive" to cause consumer confusion.[80] To analyze the likelihood of consumer confusion, the Eleventh Circuit looks to the following factors:

1. Strength of the mark;

2. Similarity of the mark;

3. Similarity of the products;

4. Similarities of retail outlets and customers;

5. Similarity of advertising media;

6. Defendant's intent; and

7. Actual confusion.

*Tana v. Dantanna's*, 611 F.3d 767, 779 (11th Cir. 2010). Of these, the first (strength of the mark) and seventh (actual confusion) are the most important, but the Court must "[e]valuat[e] the overall balance" of all seven. *Frehling Enters., Inc. v. Int'l*

---

[79]   ECF 512-4, ¶ 33.

[80]   ECF 453-1, at 26.

*Select Grp., Inc.*, 192 F.3d 1330, 1335, 1342 (11th Cir. 1999). Here, a reasonable jury could find that the balance of the factors supports a finding in Sanho's favor on the likelihood of consumer confusion.

*First*, strength of the mark: Marks are categorized as "strong" or "weak" depending on their distinctiveness. *Tana*, 611 F.3d at 774. The Eleventh Circuit recognizes the following four categories of marks, from weakest to strongest:

- Generic: marks that "refer to a class of which an individual [article or] service is a member (e.g., 'liquor store' used in connection with the sale of liquor)." *Frehling*, 192 F.3d at 1335.

- Descriptive: marks that "describe a characteristic or quality of an article or service (e.g., 'vision center' denoting a place where glasses are sold)." *Id.*

- Suggestive: marks that "require an effort of the imagination by the consumer in order to be understood as descriptive" (e.g., "penguin" in connection with refrigerators). *Id.*

- Arbitrary: marks that "bear[ ] no relationship to the product (e.g., 'Sun Bank' is arbitrary when applied to banking services)." *Id.*

In addition, a mark is stronger the less that third parties use it. *Id.* at 1336.

Here, a jury could reasonably find that the '707 Mark is strong. "HyperDrive" is not generic, as it is not a class of products. Nor is it descriptive, because a hub is not a "drive" in the common computing sense: it is neither "[a]n apparatus for reading and writing data to or from a mass storage device," nor the

mass storage device itself.[81] "HyperDrive" is, rather, either suggestive or arbitrary. It could be suggestive, if consumers understand "drive" as connoting a portable piece of computer hardware and "hyper" as connoting something that is modern, advanced, or fast. Or it could be arbitrary, if consumers make the connection between "HyperDrive" and the Star Wars franchise and understand the word as invoking intergalactic adventure.[82] The suggestive or arbitrary nature of the '707 Mark gives it inherent distinctiveness and, accordingly, inherent strength. *Tana*, 611 F.3d at 774.

Moreover, the strength of the '707 Mark is not significantly reduced by third party use, for two reasons. First, third-party use of the '707 Mark's component words "hyper" and "drive" (or of their homophones) is not probative of strength. As the Eleventh Circuit has explained: "[T]he significance of third-party use depends on the *entire* name a third party uses." *Sovereign Mil. Hospitaller Ord. of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, The Ecumenical Ord.*, 809 F.3d 1171, 1186 (11th Cir. 2015) (emphasis in original). Thus, other trademark registrations that "use *parts* of [Sanho]'s word," *id.* (emphasis in original)—those

---

81 *Drive*, WIKTIONARY https://en.wiktionary.org/wiki/drive (last visited May 16, 2024) (noun entries 12–13).

82 ECF 512-1, ¶¶ 6–7.

"utilizing the segment 'Hyper,'" or "utilizing the term 'drive,'"[83]—are "not persuasive evidence of third-party use," *id.* Second, third-party use of "HyperDrive" in connection with *unrelated* products is not probative of the '707 Mark's strength. Kaijet US points out that homophonic trademark registrations exist for the following products: (1) a mobile app for "analyzing, optimizing, and gamifying the operation of motor vehicles";[84] (2) a different mark for the same product;[85] (3) a software license that "allows users to manage large volumes of geospatial data";[86] (4) "servers for delivery of data to networked consumers";[87] (5) "centrifuges for laboratory use";[88] and (6) electrical controls for use "in power engine systems."[89] But because "[n]one of these instances … occupies the same commercial field" as the HyperDrive, none of them "weaken the distinctiveness of [Sanho]'s mark." *Superior Consulting Servs., Inc. v. Shaklee Corp.*, 710 F. App'x 850, 855 (11th Cir. 2017). The first factor thus weighs in Sanho's favor.

---

[83]   ECF 453-1, at 29.

[84]   ECF 504-12, at 4.

[85]   *Id.* at 5.

[86]   *Id.* at 8.

[87]   *Id.* at 10.

[88]   *Id.* at 12.

[89]   *Id.* at 15.

*Second*, similarity of the marks: Similarity is determined by comparing the marks' appearances, sounds, meanings, and manners of use. *Sovereign Mil.*, 809 F.3d at 1186. In assessing similarity, the factfinder must consider the "overall impression created by the mark as a whole," and refrain from "simply comparing individual features." *Id.* Here, this factor is not decisive. The marks are dissimilar in appearance:

 [90]  [91]

They are, however, similar in sound, meaning, and usage. The words have a similar structure—a two-syllable prefix followed by the word "drive"—and produce a similar effect on the ear. The words have a similar meaning, "hyper" and "ultra" being roughly synonymous.[92] And the words are used in the same way: as product names for similar-looking MacBook hubs presumably sold side-by-side in the same stores. How the dissimilarity in appearance weighs against the similarity in sound, meaning, and usage is an appropriate question for the jury.

---

[90]   ECF 461-1, at 23 (cropped).

[91]   *Id.* at 19 (cropped).

[92]   *Compare hyper-*, Oxford Eng. Dictionary, https://www.oed.com/dictionary/hyper_prefix (last visited May 16, 2024) ("over, beyond, or above"), *with ultra-*, Oxford Eng. Dictionary, https://www.oed.com/dictionary/ultra_prefix (last visited May 16, 2024) ("going beyond, surpassing, or transcending the limits of").

*Third*, similarity of the products: Products are similar if they "are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *Frehling* 192 F.3d at 1338. The question is not whether the products themselves are "readily distinguish[able]," but whether the products could "emanate from the same source." *Id.* Thus, the Eleventh Circuit has found that wine and brandy were similar when "it was not unreasonable to conclude that a maker of wine could also produce brandy." *Id.* (citing *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985)). By that metric, the "HyperDrive" and "UltraDrive" products are indisputably similar. The third factor accordingly weighs in Sanho's favor.

*Fourth*, similarity of retail outlets and customers: This factor focuses on "where, how, and to whom the parties' products are sold." *Id.* at 1339. That the products are sold in the same stores is strong evidence of likelihood of confusion. *Id.* Here, where the "HyperDrive" and "UltraDrive" products are sold in the same stores (Best Buy), in the same way (physically and online), and to the same customers, this factor weighs in Sanho's favor.

*Fifth*, similarity of advertising media: The test is "whether there is likely to be significant enough *overlap in the readership* of the publications in which the parties advertise that a possibility of confusion could result." *Id.* at 1340 (emphasis added). Thus, Sanho's evidence that it and j5create both advertise "online via web

sites and social media" is not dispositive without a reasonable inference of readership overlap.[93] However, as the party moving for summary judgment, it is Kaijet US's burden to assert that the undisputed evidence compels a finding in its favor on this factor, which it has failed to do. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This factor accordingly weighs against the grant of summary judgment.

*Sixth*, Kaijet US's intent: The relevant intent is the defendant's "intent of deriving benefit from the reputation of the plaintiff" in adopting its mark, which can be inferred from direct or circumstantial evidence. *Sovereign Mil.*, 809 F.3d at 1188. Helpful here is the Eleventh Circuit's discussion of intent in *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778 (11th Cir. 2020). There, the Eleventh Circuit clarified the distinction between "[i]ntent to benefit from a competitor's goodwill" and "intent to copy." *Id.* at 790. On one hand, the two intents are different, and only the *former* is probative of the dispositive question of consumer confusion. *Id.* (quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1293 (11th Cir. 2018)). On the other hand, the *same* evidence may be, and often is, probative of both. *Id.* As the appellate court explained: "[A] finder of fact may ... infer intent to benefit from a competitor's goodwill ... from evidence of intent to copy." *Id.* In *J-B Weld*, the defendant had, in internal emails, "repeatedly

---

[93]   ECF 470-1, at 36.

referenced" the plaintiff's design and "expressed a desire to use similar elements" in its own product, and had designed its own product "with the knowledge that it would be sold on shelves near [the plaintiff's product] in retail stores." *Id.* at 790, 792. *J-B Weld* held that "[t]his evidence of [the defendant]'s intent to copy creates an inference that [the defendant] intended to capitalize on [the plaintiff]'s goodwill, and that evidence is probative of the likelihood of confusion issue." *Id.* at 792.

The Court here follows the Eleventh Circuit's *J-B Weld* analysis in ruling that the sixth factor favors Sanho. Sanho has presented similar circumstantial evidence of Kaijet US's intent to copy as did the plaintiff in *J-B Weld*: email communications repeatedly referencing Sanho's design, and expressing a desire to use similar elements in its own product.[94] Sanho, moreover, has compelling evidence of Kaijet US's intent to copy that the *J-B Weld* plaintiff did not: evidence that Kaijet US changed its existing product name from "ultrastation" to "UltraDrive"—in effect conforming it more closely to the trademark-protected "HyperDrive"—*after* Sanho began selling its hubs, and as Kaijet US was preparing to introduce a competing product into the same market.[95] As in *J-B Weld*, this evidence of Kaijet US's intent

---

[94]   ECF 491-2, ¶¶ 40–47.

[95]   *Id.* ¶¶ 51–59.

to copy supports the reasonable inference that Kaijet US intended to capitalize on Sanho's goodwill, and is probative of the likelihood of consumer confusion.

*Seventh*, consumer confusion: "Evidence of actual confusion is the best evidence of a likelihood of confusion." *Frehling*, 192 F.3d at 1340. This factor tends to work in the plaintiff's favor: lack of actual confusion does not doom his case, "but even a very little amount of it is highly probative" of the likelihood of consumer confusion. *Sovereign Mil.*, 809 F.3d at 1189. The Eleventh Circuit affords courts significant discretion in analyzing this factor "in light of the particular facts of each case." *Frehling*, 192 F.3d at 1340. Here, the relevant evidence is limited and hotly contested. Sanho asserts that the evidence shows customer emails and product returns consistent with actual confusion.[96] Kaijet US asserts that Sanho's evidence boils down to a handful of "misdirected" consumer complaints and computer-system glitches that cannot support the inference of actual confusion.[97]

The Court need not weigh evidence under the seventh factor now, however, because the likelihood of consumer confusion will be decided by a jury. The first (strength of the mark), third (similarity of products), fourth (similarity of outlets and consumers), and sixth (defendant's intent) factors weigh in varying degrees in Sanho's favor, while the second factor (similarity of the marks) is best decided

---

[96] ECF 470-1, at 38.

[97] ECF 491-1, at 18; *see* also ECF 453-1, at 36–37.

by a jury and the fifth (similarity of advertising media) is not contested by Kaijet US at summary judgment. Even without strong evidence of actual confusion under the seventh factor, the balance of the other six clearly precludes the grant of summary judgment in Kaijet US's favor. Because factual disputes remain both as to (a) the validity of Sanho's trademark and (b) the likelihood of consumer confusion between "HyperDrive" and "UltraDrive," Sanho's trademark infringement claim will proceed to trial.

### ii.   Section 43(a), Unfair Competition

In addition to its § 32 trademark infringement claim, Sanho brings a claim under § 43(a) of the Lanham Act for unfair competition (codified at 15 U.S.C. § 1125(a)), which, as the parties seem to agree, can be premised on federal trademark infringement.[98] *See Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 858 (1982) ("[Section] 43(a) prohibits a broader range of practices than does § 32."). Thus, Sanho's § 32 trademark infringement and § 43(a) unfair competition claims will proceed to trial together.[99]

---

[98]   ECF 453-1, at 39–40 ("The test for unfair competition is the same as that of trademark infringement."); ECF 89, ¶ 77 (bringing § 43(a) unfair competition claims based on "infringe[ment] on the 707 Mark").

[99]   Sanho argues three alternative theories of liability for its § 43(a) unfair competition claim: (1) liability based on federal trademark infringement, (2) liability based on trade dress infringement, and (3) liability based on common law trademark infringement. ECF 470-1, at 43–45. Because the Court rules that summary judgment is inappropriate as to (1), it declines to address the merits of (2) and (3). The Court notes, however, that it does not identify

36

### iii.    Section 43(a), False Advertising

Sanho's third and final Lanham Act claim asserts that j5create falsely advertised the JCD382 as an "8-in-1" product, when it contains only seven ports.[100] False advertising is actionable under § 43(a) of the Lanham Act for statements that are either (1) "literally false" or (2) "literally true, but misleading." *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010). This distinction is legally significant because it impacts the plaintiff's burden of production: for literally false advertisements, no evidence of consumer deception is required; but for literally true but misleading advertisements, the plaintiff *must* "present evidence of deception," often "in the form of consumer surveys, market research, [or] expert testimony." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1261 (11th Cir. 2004). To evaluate literal falsity, courts must "analyze the message conveyed [by the advertisement] in full context, and … view the face of the statement in its entirety." *Osmose*, at 1308. The line between literally false and simply misleading statements

---

allegations in either of Sanho's operative complaints that would put Kaijet US on notice that a common law trademark infringement claim is being asserted against it. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

[100]   ECF 479-1, at 22. As noted above, Sanho argues the merits of its false advertising claim in its brief opposing Starview's motion for summary judgment. *Supra* note 44.

can be thin, but, as a general rule, the more ambiguous a statement is, the less likely it is to be literally false.

Here, the Kaijet Defendants[101] move for summary judgment on the grounds that (1) "8-in-1" is not literally false because the JCD382 has eight *functions* (if only seven ports), and (2) Sanho cannot prevail on a "literally true but misleading" theory because it has produced no evidence of consumer confusion.[102] The Court agrees. First, "8-in-1" is too ambiguous—too "susceptible to multiple meanings," *id.* at 1309—for the Court to declare it literally false. At issue are the eight numbered labels pictured below:



103

The numbers might be read as counting ports—in which case "8-in-1" would be literally false. But the Court agrees with the Kaijet Defendants that the numbers

---

[101] As noted above, Kaijet Taiwan is the only party that has moved for and argued for summary judgment on Sanho's false advertising claim. *Supra* note 44. The Court nevertheless takes up the merits of that claim here, in the context of Kaijet US's motion for summary judgment, so that the merits of Sanho's claims might be analyzed together. For purposes of this claim, the moving parties are the "Kaijet Defendants."

[102] ECF 502-1, at 33–35.

[103] ECF 461-1, at 30 (cropped).

may also be read as "count[ing] out the eight functions" of the JCD382.[104] And the labels do, in fact, count out eight functions. Several of those functions do seem duplicative—(5) and (6) are both labeled "USB 3.0.," (7) and (8) are both labeled "Memory Card"—but that suggests the labels are misleading, not literally false. More to the point, because "8-in-1" can be reasonably construed as referring either to ports or to functions, the statement is ambiguous—and thus not literally false, but at best misleading.

Moreover, Sanho has failed to present evidence of customer confusion, which it needs to prevail on a false advertising claim premised on a misleading statement. The Court accordingly grants summary judgment to the Kaijet Defendants on Sanho's false advertising claim.

### 3. Factual Disputes Remain as to the Merits of Sanho's Copyright Infringement Claim.

Sanho claims that the Kaijet Defendants[105] infringed its '336 Copyright by misappropriating protected elements of its product packaging.[106] Copyright infringement has two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc.*

---

[104]  ECF 502-1, at 34.

[105]  Here again, Kaijet Taiwan is the only party that has moved for and argued for summary judgment. *See supra* note 101.

[106]  ECF 460-1, at 29.

*v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). The Kaijet Defendants move for summary judgment on the second element, asserting that it did not copy "any *protectable* elements of Sanho's copyrighted work."[107]

In analyzing copying, the Eleventh Circuit begins with the threshold issue of whether the defendant has access to the plaintiff's work. With access, the plaintiff can prove copying by showing that the defendant's work is "substantially similar" to his own. *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1315 (11th Cir. 2010). Lacking access, the plaintiff must meet the higher burden of proving that the defendant's work is "strikingly similar" to his own. *Id.* In the Eleventh Circuit, a "reasonable opportunity to view" the copyrighted work constitutes access. *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1249 (11th Cir. 1999) (per curiam).

Here, a factual dispute exists as to whether the Kaijet Defendants had a reasonable opportunity to view Sanho's product packaging. According to the Kaijet Defendants, their allegedly infringing packaging design was finalized on September 18, 2017.[108] Sanho president Kien Hoe Daniel Chin submitted testimony that the copyrighted packaging design was physically offered for sale at brick and

---

[107]  ECF 502-1, at 29 (emphasis in original).

[108]  ECF 502-2, ¶ 35.

mortar Best Buy stores between April and September 2017.[109] This testimony is corroborated by Best Buy's records, which shows that Best Buy had HyperDrive products on hand no later than May 2017.[110] Chin's testimony is also corroborated by a September 13, 2017 email from Kaijet US CEO Jessica Liu,[111] which seems to reference a "HyperDrive" product that she "saw once at BBY store."[112] From this evidence, a jury could find that the Kaijet Defendants had a reasonable opportunity to view (if not actual access to) the copyrighted packaging.

With access, Sanho must show that its and j5create's packaging designs are "substantially similar" *in protected expression*. This qualifier is important: Not all

---

[109]  ECF 511-8, ¶¶ 24, 26.

[110]  The Kaijet Defendants cite to Best Buy's point of sale records for the factual proposition that Best Buy did not begin selling HyperDrive products in its brick-and-mortar stores until late October 2017. ECF 488-1, at 13. Best Buy's records do not support that inference. The records show that Best Buy began increasing its on-hand and on-order stock of HyperDrive products in May 2017, with big orders at the beginning of August, the middle of August, and the end of September; and with on-hand stock increasing steadily from late September through late November. *See* ECF 488-9. The Kaijet Defendants' assertion that Best Buy's records show a "drastic increase in the number of units on-hand ('OH') and on order ('OO') in late October 2017" thus mischaracterizes the evidence. ECF 488-2, ¶ 54. Nor do the Kaijet Defendants explain how it inferred facts about *where* products were sold from data that only indicates *how many* products Best Buy held in inventory. As far as the Court can tell, the only probative evidence in the record on the factual issue of when Best Buy began selling HyperDrive products in brick-and-mortar stores is Chin's testimony.

[111]  ECF 502-2, ¶ 15.

[112]  ECF 488-2, ¶ 63. The parties do not dispute that "BBY" refers to Best Buy. *Id.*

elements of a copyrighted work are necessarily protected, because copyright only protects a work to the extent that it is original. *Baby Buddies*, 611 F.3d at 1316. Thus, the first step in assessing substantial similarity is distinguishing between a work's protectable and non-protectable elements. The distinction can be a subtle one. *Intervest Const., Inc. v. Canterbury Est. Homes, Inc.*, 554 F.3d 914, 920 (11th Cir. 2008). Under the doctrine of "idea/expression dichotomy," *id*, copyright law protects the particular expression of an idea (*e.g.*, a Barbie), but not the idea itself (*e.g.*, a human-figure doll with "youthful female facial features"), *Baby Buddies*, 611 F.3d at 1318 (citing *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983)). In addition, copyright law distinguishes between an object's "artistic design," which is protectible, and its "utilitarian function," which is not. 17 U.S.C. § 101. Thus, copyright protection extends only to elements that are physically or conceptually separable from a product's usefulness. *Home Legend, LLC v. Mannington Mills, Inc.*, 784 F.3d 1404, 1413 (11th Cir. 2015). Finally, where a work's originality lies in its "arrangement and coordination" of common elements, the Court must distinguish between the copyrighted work's particular arrangement of elements, which is protectible, and the underlying elements themselves, which often are not. *Intervest*, 554 F.3d at 919.

Here, Sanho's copyrighted packaging (left) contains both protectable and non-protectable elements:



Non-protectable are Sanho's product name and description, the packaging's selection of typographies and colors, and familiar images such as MacBooks and laptop ports. *See* 37 C.F.R. § 202.1(a). Also non-protectible are functional elements like the listing of product information and specifications. The way in which the product-shaped cutout or window on the front of the packaging allows consumers to view the product without opening the packaging is likewise functional and therefore non-protectable.

Sanho's packaging does have original elements. As the Eleventh Circuit has explained, originality in the copyright context is a "low bar." *Home Legend*, 784

---

113 ECF 461-1, ¶ 38.

114 *Id.* ¶ 33.

F.3d at 1409. To be deemed original, a work need only "possess some creative spark, no matter how crude, humble, or obvious," *id.*, and the Court catches a spark of creativity here in Sanho's arrangement and coordination of the packaging's otherwise unprotectible constituent elements—most notably in the alignment of the right side of the product-shaped cutout with the left edge of a depiction of a MacBook to suggest the physical docking of the hub to the laptop. The originality of Sanho's design is underscored by examples that Kaijet US has submitted of packaging for similar products: they contain more or less the same elements—product name and description, specifications and features, cutouts or windows—but in a variety of arrangements, none of them resembling Sanho's in overall layout, and none of them suggesting its product's physical compatibility with another device in the way that Sanho's does.[115]

---

[115]  ECF 506-10, at 2, 5, 8, 16.

Here, at the level of protected expression—Sanho's arrangement and coordination of elements in its packaging—a jury question exists as to the substantial similarity between Sanho's (left) and j5create's (right) designs:

 

116

117

Significantly, j5create has appropriated the most original element of Sanho's design: the cutout in the center showing the product hub physically interfacing with a depiction of a MacBook to the right. In addition, the front of j5create's packaging presents mostly the same information as Sanho's, and in the same layout: product name at top, product description at bottom, "4K" and "50 Gbps" callouts at bottom right. The back of j5create's packaging, like Sanho's, depicts a MacBook, open at a similar angle and viewed from a similar perspective, with the

---

116   ECF 89-4, at 2.

117   *Id.* at 3.

product hub attached and its ports labeled, followed by a bulleted list detailing the ports' capabilities. The left side panel of j5create's packaging, like Sanho's, depicts and labels the hub's ports. These are significant similarities in the packagings' arrangement and coordination of dominant design features.

The packagings are of course far from identical. Unlike Sanho's, the front of j5create's packaging features its brand name at top left, and both the product's model name and its 2016 MacBook compatibility on a banner at bottom. Unlike Sanho's, the back of j5create's packaging lists product specifications in four languages. Unlike Sanho's, the side panels of j5create's packaging depicts the product's side profile. The packaging designs differ in color scheme and in font. There are various other small differences which, according to the Kaijet Defendants' expert witness, total over 180.[118]

Nevertheless, substantial similarity is a qualitative, as opposed to a quantitative, question. It is determined, not by tallying up and comparing the raw "number of similarities and differences," but by looking at the copyrighted work's protected expression as a whole. *Baby Buddies*, 611 F.3d at 1316. Here, the question is whether a large number of minor differences outweighs a smaller number of similarities in dominant design features. Because that question is best decided by

---

[118] ECF 461-1, ¶ 48.

a jury, Sanho's copyright infringement claim against the Kaijet Defendants will proceed to trial. Kaijet US's motion for summary judgment is therefore granted as to Sanho's Lanham Act false advertising claim, but denied as to all others.

**B.      Kaijet Taiwan's Motion for Summary Judgment Is Granted as to False Advertising and Denied as to All Other Claims.**

Kaijet Taiwan moves for summary judgment on the same claims for which Kaijet US moved for summary judgment, contesting both the merits of Sanho's claims and the extraterritorial application of U.S. intellectual property law. Because the merits of Sanho's claims have already been discussed in the context of Kaijet US's motion for summary judgment, the Court turns to the issue of extraterritoriality. Sanho's position is that Kaijet Taiwan, though a foreign corporation, is subject to U.S. intellectual property law because (1) it has engaged in activity in the United States through its dealings with Kaijet US, and (2) it is an alter ego of Kaijet US. Because the Court finds that Kaijet Taiwan's activity in the United States subjects it to U.S. intellectual property law, it declines to rule on Sanho's alter ego theory.

**1.      Kaijet Taiwan Has Engaged in Commerce in the United States.**

Sanho presented substantial evidence of Kaijet Taiwan's activity in the United States, beginning with evidence that Kaijet Taiwan sold and shipped the allegedly infringing j5create products to the United States. Kaijet Taiwan admits

that it supplies Kaijet US with lists of "products that will soon be available," and that Kaijet US selects which of those products will be marketed and sold in the United States.[119] Kaijet Taiwan admits that its address is listed as the "container stuffing location" for shipments to Kaijet US of the allegedly infringing j5create products;[120] that waybills designate Kaijet Taiwan as the "shipper" for those products;[121] and that Kaijet US paid Kaijet Taiwan directly for the delivery of those products.[122] Nor is Kaijet Taiwan under any illusion as to its products' ultimate destination: as part of filing for trademark protection of the "j5create" brand name with the U.S. Patent and Trademark Office (USPTO), Kaijet Taiwan declared under penalty of perjury that the "j5create" mark was "in use in commerce" in the United States in connection with its allegedly infringing products.[123]

There is also evidence that Kaijet Taiwan coordinated with Kaijet US to import its goods into the United States. Kaijet Taiwan admits that it has been filing documents and applications—at least 46 applications, and allegedly hundreds of

---

[119]  ECF 488-2, ¶ 28.

[120]  *Id.* ¶ 52.

[121]  *Id.* ¶ 50.

[122]  *Id.* ¶ 49.

[123]  *Id.* ¶ 10. The evidence further suggests that Kaijet Taiwan filed trademark applications in the United States at the direction of Kaijet US CEO Jessica Liu. ECF 464-2, at 2.

documents—with the Federal Communications Commission (FCC) since 2015.[124] Kaijet Taiwan admits that some of those FCC communications were made in pursuit of the certificates of conformity needed to import j5create products into the United States.[125] Kaijet Taiwan admits that its designated contact person with the FCC was Kaijet US CEO Jessica Liu.[126] And Kaijet Taiwan admits that its former invoicing agent Melody Kuo coordinated with Kaijet US's shipper to "facilitate the shipment" of j5create products to the United States.[127]

There is also evidence that Kaijet Taiwan coordinates with Kaijet US to market j5create products in the United States. The parties agree that in October of 2017, as Kaijet US was rolling out its first UltraDrive hub for sale at Best Buy in the United States, Kaijet Taiwan employee Cindy Lin emailed a "product roadmap" including "product launch date, sample date, quantity of pilot run, quantity of sample, and packaging" to Kaijet US personnel.[128] Kaijet Taiwan owns j5create's website, www.j5create.com,[129] which boasts of "4 corporate offices around the world"—and Kaijet Taiwan does not deny that, at the inception of this lawsuit, its

---

[124]  ECF 488-2, ¶ 6.

[125]  *Id.* ¶ 7.

[126]  *Id.* ¶ 5.

[127]  *Id.* ¶ 18.

[128]  *Id.* ¶ 47.

[129]  *Id.* ¶ 14.

website indicated that one of those offices was located in Kennesaw, Georgia.[130] In addition, Kaijet Taiwan admits that visitors to www.j5create.com can navigate, via its "Where to Buy" section, to another Kaijet Taiwan-hosted website where j5create products are sold.[131] Together, this is more than enough evidence from which a jury could find Kaijet Taiwan liable under U.S. patent law, the Lanham Act, and the Copyright Act.

### i.  Patent Law

Kaijet Taiwan cannot assert extraterritoriality as a defense against Sanho's (1) direct or (2) indirect patent infringement claims. First, Sanho brings *direct* patent infringement claims under 35 U.S.C. § 271(a), which creates liability for "whoever … offers to sell, or sells any patented invention, within the United States." Thus, if the Court is to hold Kaijet Taiwan liable for patent infringement under § 271(a), Sanho must prove that Kaijet Taiwan committed infringing acts *inside* the United States. *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375–76 (Fed. Cir. 2005). The location of an infringing act is determined through traditional contract principles, by looking to the "places of contracting and performance." *MEMC*, 420 F.3d at 1376–77.

---

[130]  *Id.* ¶ 15.

[131]  *Id.* ¶ 17.

Here, the record evidence supports the reasonable inference that Kaijet Taiwan both *sold* and *offered for sale* infringing products in the United States. Kaijet Taiwan's liability for the *actual sale* of products is controlled by *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576 (Fed. Cir. 1994). At issue in *North American Phillips* was the "situs of the infringement" under patent law when allegedly infringing goods were delivered to Illinois by defendants located in Texas and California under "free on board" (FOB) shipping contracts. *Id.* at 1579. Other than those contracts, the only two connections that the defendants had to Illinois were (1) visits to Illinois by the defendants' officers to promote sales, and (2) the defendants' participation in trade shows in Illinois. *Id.* at 1577–78. *North American Phillips* nevertheless held that "to sell an infringing article to a buyer in Illinois is to commit [the tort of infringement-by-sale] there." *Id.* at 1579.

Similarly, here, evidence that Kaijet Taiwan sold, shipped, and facilitated the importation of j5create products to the United States supports the inference that it committed the alleged tort of infringement-by-sale in the United States. Nor can the fact that Kaijet Taiwan shipped the allegedly infringing products "FOB Taiwan"[132] be a defense, when it was not a valid defense in *North American Phillips*—especially since Kaijet Taiwan's commercial ties with the United States

---

[132]  ECF 502-1, at 13.

vis-à-vis the infringing products are orders of magnitude stronger than were the *North American Phillips* defendants' with Illinois.

The record also supports the inference that Kaijet Taiwan *offered for sale* its products in the United States. The Federal Circuit has explained that § 271(a)'s "offer for sale" language was added to the statute to prevent a party from "generating interest in a potential infringing product to the commercial detriment of the rightful patentee." *MEMC*, 430 F.3d at 1376. A defendant can accordingly be liable under § 271(a) for conveying to potential purchasers "the description of the allegedly infringing merchandise and the price at which it can be purchased." *3D Sys., Inc. v. Aarotech Lab'ys, Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998). Here, a jury could find that Kaijet Taiwan generated interest in potentially infringing products through its product "roadmaps," from which Kaijet US selected the merchandise it would market and sell in the United States.

Second, Sanho brings *indirect* patent infringement claims under 35 U.S.C. § 271(b), which creates liability for a party that "actively induces infringement." To prevail under § 271(b), "the patentee must show, first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *MEMC*, 420 F.3d at 1378. Kaijet Taiwan argues that Sanho should be barred from proceeding under a theory of indirect infringement because of defects in the

pleadings,[133] even though both of Sanho's operative complaints clearly indicate that Sanho is pursuing both direct and indirect theories of patent infringement.[134] Kaijet Taiwan is effectively arguing for dismissal, under Fed. R. Civ. P. 12(b)(6), in a nearly six-year-old case, of claims that it has already answered. Such an argument has long been waived. All of Sanho's patent infringement claims will accordingly proceed to trial against Kaijet Taiwan: under § 271(a) for selling or offering for sale infringing products, and under § 271(b) for inducing the infringement of others.

### ii.    Lanham Act

Kaijet Taiwan also cannot assert extraterritoriality as a defense against Sanho's Lanham Act claims. The controlling case here is the recent Supreme Court decision in *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, which delineated "the dividing line between foreign and domestic applications" of Lanham Act claims under both § 32 and § 43(a). 600 U.S. 412, 428 (2023). According to *Abitron*, that dividing line is the defendant's "use in commerce" in the United States of the mark (or trade dress) at issue. *Id.* at 423. And "use in commerce," *Abitron* held, means "'the bona fide use of a mark in the ordinary course of trade,' where the mark

---

[133] ECF 502-1, at 39.

[134] ECF 89, ¶ 58 ("Defendant's actions constitute direct and indirect infringement of the … 875 patent and 616 Patent"); ECF 418, ¶¶ 27, 36 (alleging "direct and indirect infringement" of the '618 and '290 Patents).

serves to 'identify and distinguish [the mark user's] goods ... and to indicate the source of the goods.'" *Id.* (quoting 15 U.S.C. § 1127). Or as Justice Jackson put it in her concurrence: the Lanham Act permits liability for a foreign defendant's use of its mark "wherever the mark serves its source-identifying function." *Id.* at 430. Here, where Sanho has presented evidence that j5create's products are displayed for sale in Best Buy stores across the United States and that Kaijet Taiwan declared under oath to the USPTO that its allegedly infringing products are "in use in commerce" in the United States, there is a jury question as to Kaijet Taiwan's liability on Sanho's Lanham Act claims for trademark infringement and unfair competition.

### iii.    Copyright law

Finally, Kaijet Taiwan cannot assert extraterritoriality as a defense against Sanho's copyright infringement claims. As the Eleventh Circuit explained in *Palmer v. Braun*, "[w]here a person imports an infringing work into the United States, the federal courts have jurisdiction over the action for infringement." 376 F.3d 1254, 1258 (11th Cir. 2004). For example, where a foreign water bottler labeled its products "for marketing in the United States, the bottles were packaged for shipment to the United States, and the bottler sold them to a company which imported them to the United States," that bottler was subject to U.S. copyright law. *Id.* (citing *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp.

763, 772–73 (W.D.N.Y. 1991)). Here, where Sanho has presented evidence that Kaijet Taiwan marketed its products in, packaged its products for, and shipped its products to the United States, a jury question exists as to Kaijet Taiwan's Copyright Act liability. Kaijet Taiwan's motion for summary judgment is therefore granted as to Sanho's false advertising claim[135] and denied as to all others.

### 2. The Court Declines to Address Sanho's Theory That Kaijet Taiwan and Kaijet US Are Alter Egos.

Sanho opposes Kaijet Taiwan's extraterritoriality defense, not only on the basis of Kaijet Taiwan's actions in the United States, but also under the theory that Kaijet Taiwan and Kaijet US "are the same company" and are therefore liable for each other's conduct.[136] However, because the Court has ruled that Kaijet Taiwan's actions in the United States give rise to liability under U.S. intellectual property law independent of any actions taken by Kaijet U.S., the Court declines to address Sanho's alter ego theory at this time.

This is not just a function of procedural expediency. The Court is hesitant to rule on Sanho's alter ego theory because it raises a thorny choice-of-law problem that the parties' briefing failed to address. The choice-of-law problem here is

---

[135] Because the Court grants summary judgment on Sanho's false advertising claim on the merits, *see supra* subsection II.A.2.iii, it does not consider the extraterritorial applicability of that claim as to Kaijet Taiwan.

[136] ECF 460-1, at 30.

twofold. First, what law governs the alter ego analysis? Kaijet Taiwan is incorporated and has its principal place of business in Taiwan.[137] Kaijet US is incorporated in Delaware and has its principal place of business in Georgia.[138] Sanho's brief in support of its alter ego theory relies on Georgia law governing corporate veil-piercing[139]—but it does not explain why Georgia law should apply when neither of the entities in question is incorporated in Georgia. Kaijet Taiwan, for its part, cites to *both* Georgia law and federal common law without explanation.[140] But surely, both cannot govern at the same time. It is possible that neither are relevant. Might not the issue be governed by Delaware law? Or, perhaps, Taiwanese law?

There is a second problem: under any law, analysis of Sanho's alter ego theory would likely involve an inquiry into whether corporate formalities are being observed. Presumably, the requisite corporate formalities depend on the law of the places of incorporation: here Delaware and Taiwan. Yet neither party cites to either Delaware or Taiwanese law in arguing whether the entities in question

---

[137]  ECF 502-2, ¶ 9.

[138]  ECF 115, ¶ 7, at 4.

[139]  ECF 460-1, at 36–37.

[140]  *Compare* ECF 502-1, at 42 n.165 (Georgia law), *with id.* at 43 n.170 (federal common law).

abused the corporate form. These problems must be resolved before there can be a ruling on Sanho's alter ego theory.

### C. Starview's Motion for Summary Judgment Is Granted as to False Advertising and Denied as to All Other Claims.

Starview moves for summary judgment on the two patent infringement ('618 and '290 Patents) and one Lanham Act (false advertising) claims that Sanho has asserted against it, raising only the defense of extraterritoriality. The analysis here mirrors the analysis for Kaijet Taiwan's motion for summary judgment above. Like Kaijet Taiwan, Starview asserts that it has committed no acts in the United States that would trigger liability under U.S. intellectual property law.[141] The record suggests otherwise.

There is evidence that Starview sells j5create products to Kaijet US, most directly through the deposition testimony of Starview's owner, CEO, and 30(b)(6) witness Yuki Tai that "Starview has sold [JCD382] to the United States,"[142] and in the form of a "Supply Contract" between Starview and Kaijet US.[143] The record also contains purchase orders from Kaijet US to Starview for j5create products;[144] commercial invoices from Starview to Kaijet US for those same j5create

---

141  ECF 456-1, at 1.

142  ECF 493, ¶¶ 11–12.

143  ECF 479-6, at 3.

144  ECF 493, ¶ 19.

products;[145] periodic wire payments from Kaijet US to Starview;[146] and an email that could be read as a Starview employee's request for the countersignature and delivery of purchase orders and invoices from Kaijet US.[147]

There is also evidence that Starview ships j5create products to Kaijet US: The record contains packing and weight lists for shipments from Starview to Kaijet US;[148] bills of lading and air waybills that designate Starview as the "shipper,"[149] and emails to and from "starview.shipping@gmail.com" that appear to discuss the logistics of shipments from Taiwan to Atlanta.[150] Finally, under the terms of Starview's "Supply Contract" with Kaijet US, Starview is responsible for "effectively manag[ing] the quality of the products and immediately provid[ing] the necessary after-sales service for the products."[151]

This evidence is sufficient to defeat Starview's extraterritoriality defense. Thus, Starview may be liable, under 35 U.S.C. § 271(a) and *North American Phillips*, for selling infringing products to Kaijet US in the United States. And it may be

---

[145] *Id.* ¶ 20.

[146] *Id.* ¶ 22.

[147] *Id.* ¶ 21.

[148] *Id.* ¶ 24.

[149] *Id.* ¶¶ 29–30.

[150] *Id.*

[151] ECF 479-6, at 3.

liable, under 35 U.S.C. § 271(b) and *MEMC*, for inducing Kaijet US to sell or offer for sale infringing products in the United States. Starview's extraterritoriality defense is accordingly rejected, and its motion for summary judgment is granted as to Sanho's false advertising claim[152] but denied as to all others. The Court declines to address Sanho's alternative alter ego theory as to Starview, which is incorporated in Anguilla[153] with its principal place of business in Taiwan,[154] for the same reasons it declined to do so as to Kaijet Taiwan.

### D.   Sanho's Motion for Summary Judgment Is Granted.

Sanho moves for summary judgment on Defendants' false advertising and false patent marking counterclaims. Sanho's motion is granted as to both.

#### 1.   No Reasonable Jury Could Find Sanho Liable for False Advertising.

The Kaijet Defendants' § 43(a) false advertising counterclaim asserts that Sanho engaged in a "fake review campaign" by manufacturing positive product reviews of its GN28 line of products on e-commerce retailer Amazon's online marketplace.[155] To prevail on a false advertising claim, a claimant must

---

[152] Because the Court grants summary judgment on Sanho's false advertising claim on the merits, *see supra* subsection II.A.2.iii, it does not consider the extraterritorial applicability of that claim as to Starview.

[153] ECF 456-2, ¶ 1.

[154] *See* ECF 479-3, at 23.

[155] ECF 483-1, at 10.

demonstrate, not only that the defendant made a statement that is false or misleading,[156] but that the false or misleading statement was *material*. *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010). A statement is material if it "is likely to influence the purchasing decision." *Id.* Here, therefore, the Kaijet Defendants must demonstrate that Sanho's alleged fake review campaign was likely to influence a consumer's decision to purchase the GN28 over competing j5create products. Sanho contends that it cannot be liable for false advertising because no reasonable jury would find its allegedly fake review campaign material,[157] and the Court agrees.

The Kaijet Defendants point to the following evidence linking Sanho's alleged fake review campaign to GN28 purchases:

1. A study showing that 74% of respondents "read online reviews" from online stores like Amazon and BestBuy;[158]

2. A study showing that 32.7% of respondents cited "[p]roduct reviews and recommendations as a "[m]ain reason for shopping at Amazon";[159] and

3. Sanho CEO Daniel Chin's declaration testimony that "The UltraDrive is an inferior and lower quality version of the HyperDrive. It receives less favorable

---

[156]   *See supra* subsection II.A.2.iii.

[157]   ECF 439-1, at 13.

[158]   ECF 439-27, at 3.

[159]   *Id.* at 4.

> customer rating reviews on Best Buy's website and has many complaints."[160]

That is not enough. Evidence about *where* consumers read online reviews is not probative of what they do with the information in those reviews. Likewise, evidence about why consumers choose to shop at *Amazon* is not probative of why they would choose the HyperDrive over the UltraDrive, when the latter was sold exclusively through Best Buy.[161] And whether a CEO believes his product is better than a competitor's is not probative of whether a consumer would choose to buy the one product instead of the other. What the Kaijet Defendants need is evidence that goes to the *consumer's purchasing decision*: evidence tending to prove that Sanho's alleged fake reviews caused consumers to buy Sanho's products instead of j5create's. No such evidence has been produced. Furthermore, the Kaijet Defendants have failed to meaningfully rebut Sanho's evidence of *immateriality*: Akins' deposition testimony that the GN28 has (as of "late 2022") a better aggregate rating on Best Buy (where it is actually sold) than it does on Amazon,[162] and Sanho's expert's testimony that the sales metrics of the GN28, both of themselves and relative to the sales metrics of its j5create competitor, are

---

[160]  ECF 93-2, ¶ 22.

[161]  ECF 453-4, at 13.

[162]  ECF 483-2, ¶ 18.

uncorrelated with the timing of Sanho's alleged fake review campaign.[163] No reasonable jury could find, on this record, that Sanho's fake review campaign was material, and thus Sanho is entitled to summary judgment on the Kaijet Defendants' false advertising claim.

### 2. No Reasonable Jury Could Find Sanho Liable for False Patent Marking.

Defendants' second counterclaim asserts that Sanho falsely marked one of its products—the HyperDrive DUO—with its '875, '616, and '618 Patents despite the DUO being outside those patents' scopes.[164] To prove false marking, a party must, under 35 U.S.C. § 292, (1) mark an unpatented article with "any word or number importing that the same is patented," (2) "for the purpose of deceiving the public," and (3) cause a "competitive injury." *Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1399 (Fed. Cir. 2015). Sanho does not appear to contest that (1) the DUO was falsely marked,[165] but argues that it cannot be liable for false patent marking because (3) Defendants did not suffer a competitive injury. The Court agrees.

The Federal Circuit defines "competitive injury" as a "wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair

---

[163]  ECF 441-1, at 54–63.

[164]  ECF 483-1, at 30; ECF 439-1, at 20.

[165]  Sanho speculates that the DUO was marked as a result of employee negligence [ECF 439-1, at 22], and represents that it has removed the allegedly false markings from its website "out of an abundance of caution" [*id.* at 23].

competition; a disadvantage in a plaintiff's ability to compete with a defendant, caused by the defendant's unfair competition." *Sukumar*, 785 F.3d at 1396 (quoting BLACK'S LAW DICTIONARY (9th ed. 2009)). A false marking plaintiff must show a causal relationship between the competitive injury and the false marking. *Gravelle v. Kaba Ilco Corp.*, 684 F. App'x 974, 979 (Fed. Cir. 2017) (rejecting false patent marking claim because "no reasonable jury could infer from [the plaintiff]'s decline in [product] sales around the time of [the defendant]'s false marking that the decline was an injury *caused* by the false marking) (emphasis added).

Defendants have presented the following evidence of causation:[166]

1. The fact that Sanho's claims for damages in this litigation are premised on competition between the parties;

2. Four twitter posts in which Sanho mocks j5create for copying the HyperDrive;[167] and

3. A blog post in which Sanho mocks j5create for copying the HyperDrive.[168]

That is not enough. Defendants' evidence fails to provide a basis to reasonably infer that it suffered a competitive injury at all, much less that its competitive

---

[166] ECF 483-1, at 39. Defendants also proffer that Sanho has created a "false impression of a robust patent portfolio," and that Defendants have "suffered injury to its goodwill and reputation as a result." *Id.* at 39–40. However, Defendants do not substantiate these allegations with any evidence.

[167] ECF 507-38, at 2, 4–6.

[168] ECF 507-39, at 2–8.

injury was caused by Sanho's false patent marking. Nor do Defendants attempt to rebut the sworn testimony of Kaijet US's own officer and shareholder that Kaijet US has not been economically disadvantaged by Sanho's patent marking.[169] No reasonable jury could find, on this record, that Sanho's patent marking caused a competitive injury to Defendants. Therefore, Sanho is granted summary judgment on Defendants' false advertising and false patent marking claims.

### E.    Defendants' Motion for Judgment on the Pleadings Is Denied.

Finally, Defendants move for judgment on the pleadings as to Sanho's state law claims. Under Fed. R. Civ. P. 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." In addition, according to the Court's Local Rules, motions for judgment on the pleadings "must be filed WITHIN THIRTY (30) DAYS after the beginning of discovery unless the filing party has obtained prior permission of the Court to file later." LR 7.1(A)(1), NDGa (emphasis in original).

Defendants admit that their motion does not comply with Local Rule 7.1(A)(1).[170] Nor do Defendants attempt to explain how their motion complies with Rule 12(c). Defendants are moving for judgment on the pleadings only on claims asserted in the Third Amended Complaint, meaning the pleadings closed when

---

[169]   ECF 483-2, ¶ 41.

[170]   ECF 499, at 7.

Defendants answered that complaint on January 3, 2020. Defendants' motion for judgment on the pleadings was filed *over four years later*, on March 26, 2024. At that point, the Court's January 31, 2024 summary judgment motions deadline had passed,[171] and a jury trial beginning on July 9, 2024 had already been scheduled.[172] Defendants do not explain why the instant motion could not have been filed months, if not years, earlier. Nor do they explain why they did not seek the Court's leave before filing it in accordance with the Local Rules. In addition, as Defendants point out, they will not be prejudiced by a denial of the instant motion because the issues it raises can be addressed at trial.[173] So as not to delay said trial, and due to counsel's once-again disregard of the applicable procedural rules, the motion for judgment on the pleadings is denied.

## III.    CONCLUSION

The Court holds as follows:

- Sanho motion for partial summary judgment [ECF 439] is **GRANTED**;

- Kaijet Taiwan's motion for summary judgment [ECF 446] is **GRANTED** as to Sanho's false advertising claim and **DENIED** as to all others;

---

[171]  ECF 429.

[172]  ECF 438.

[173]  ECF 499, at 7.

- Kaijet US's motion for partial summary judgment [ECF 450] is **GRANTED** as to Sanho's false advertising claim and **DENIED** as to all others;

- Starview's motion for partial summary judgment [ECF 456] is **GRANTED** as to Sanho's Lanham Act false advertising claim and **DENIED** as to all others; and

- Kaijet Taiwan and Kaijet US's motion for judgment on the pleadings [ECF 494] is **DENIED**.

The Clerk is DIRECTED to permanently seal the documents filed under provisional seal at ECFs 440, 441, 442, 443, 444, 445, 448, 449, 453, 454, 455, 460, 461, 462, 463, 464, 465, 466, 470, 471, 472, 473, 474, 475, 479, 480, 481, 483, 486, 488, 491, and 495.[174]

**SO ORDERED** this 20th day of May, 2024.

Steven D. Grimberg
United States District Judge

---

[174] *See supra* note 1.