## EXHIBIT D-1:  PLAINTIFF'S WITNESS LIST

| Witness name and address | Will call | May Call |
|---|---|---|
| Daniel Chin<br>c/o plaintiff counsel | X | |
| Valerie Chong<br>c/o plaintiff counsel | | X |
| Yuwen Chen<br>c/o plaintiff counsel | | X |
| Lisa Nguyen<br>c/o plaintiff counsel | | |
| Peter Bressler<br>c/o plaintiff counsel | | X |
| Jacob Baker, Ph.D.<br>c/o plaintiff counsel | | X |
| Daniel J. Cenatempo<br>c/o plaintiff counsel | X | |
| Jessica Liu<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Cindy Lin<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Melodie Kuo<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Chuck Akins<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Steven Lyu<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Yuki Tai | | X |

| | | |
|---|---|---|
| c/o Defendant Kaijet US and Kaijet Taiwan counsel | | |
| Keith Reagin<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Vicky Lin<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Candy Li<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| Alina Lin<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| The corporate representative of Kaijet U.S. at trial<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| The corporate representative of Kaijet Taiwan at trial<br>c/o Defendant Kaijet US and Kaijet Taiwan counsel | | X |
| The corporate representative of Starview<br>c/o Defendant Starview counsel | | X |
| Zhuowen Liao<br>7F, Building C, Lian Jian Industrial Park | | X |

| | | |
|---|---|---|
| Huarong Road, Dalang, Longhua, Shenzhen, China. | | |
| Andy Miller Select Sales 952-941-9388 7750 West 78th Street Bloomington, MN 55439 | | X |
| A corporate representative of Buy Buy Inc. (866) 758-1457 7601 Penn Ave S. Richfield, MN 55423 | | X |
| A corporate representative/recods custodian of DLS LOGISTICS SERVICE, LLC 1719 N. Douglas St. El Segundo, CA 90245 | | X |
| A corporate representative/records custodian of EWI, INC., 12030 Alondra Blvd. Ste. 102, Cerritos, CA 90703 | | X |
| A corporate representative of Select Sales, Inc. 952-941-9388 7750 West 78th Street Bloomington, MN 55439 | | X |
| Any person on any of Defendants' witness lists | | X |
| Any person needed for impeachment or rebuttal whose testimony is could not have been reasonably anticipated | | X |

## SUMMARY OF ANTICIPATED EXPERT TESTIMONY

**Daniel J. Cenatempo** is expected to testify to Sanho's damages for trademark infringement, unfair competition, copyright infringement, and design patent infringement. Based on his review of evidence, research, and analysis, he is expected to testify to:

1. Damages for the preceding causes of action in the form of recovery of each infringer-Defendants' profits. *See* Tables 1 and 2 for his opinions on total sales and total profits by count (Cenatempo Report, 8/29/2022 pp. 54-71 and 134-161; and Cenatempo Report dated 10/10/2022, pp. 73-75). To arrive at each infringer-Defendant's profits, Mr. Cenatempo is expected to describe how he calculated each Defendant's sales, including a discussion of each Defendant's sales-related documents and sales within the relevant time periods before and after the issuance of the registered HyperDrive trademark, the copyright registration and the design patents at issue. He will also discuss each Defendant's recognizable costs and expenses, as discussed further below.







3. Deductible expenses from each Defendant's gross profits when calculating the amount of profits to be recovered. Mr. Cenatempo is expected to testify to the lack of documentation or details for each Defendant's additional expense deductions. He will describe methodologies and analysis he used to determine which of each Defendant's expenses were appropriate to deduct from gross profits and his deduction of Kaijet Technology International Limited's (Kaijet U.S.'s) sales commission expense. Mr. Cenatempo will also testify to problems that the Defendant's percentage of sales expense allocation (Cenatempo report dated 8/29/2022 pp. 36-53; and Cenatempo Report dated 10/10/2022 pp. 7-28). Mr. Cenatempo is expected to testify that this allocation method was problematic for Kaijet Technology International Limited's (Kaijet U.S.'s) because:

   (a) It inherently assumes that 100% of these expenses varied / were incremental to sales;

   (b) 100% of these expenses did not vary / were not incremental to sales; and

   (c) The allocated expenses did not demonstrate a steady or predictable relationship to sale.

4. Adding the profits of each Defendant together when determining the amount of damages is not a duplicative recovery from a financial and economic

perspective (Cenatempo Report Cenatempo Report 8/29/2022 pp. 157-161; and Cenatempo Report dated 10/10/2022 pp. 35-40).

5. Sensitivities to the Defendants' sales, unit sales, and profits by product and in total under alternative liability and damages period assumptions such as later starts to the recovery period for the counts (Cenatempo Report dated 10/29/2022 pp.63-64 and 10/10/2022 pp. 43-56)

6. Evidence on Sanho's and the Defendants' products and financial and market performance of each product that support his damages assumptions. This includes his discussion of the sales, cost, expenses, and profit data produced by the parties in this case, the contents of which have been designated as attorney's eyes only confidential by the parties (Cenatempo Report, 8/29/2022, pp. 9-11, 16-35, 52-56; and 134-181).

7. Significant industry praise for, and copying and commercial success of, Sanho's HyperDrive (Cenatempo Report, 8/29/2022, pp. 16-35, 88-92, 133 at no. 114, 134-181 and fn. 143 and 155 on pp. 88 and 92, respectively ). The basis for these opinions is discussed extensively in the declaration of Daniel J. Cenatempo dated December 18, 2022 and cited to in the Cenatempo Report dated 8/29/22, including:

    (a) Significant praise for the HyperDrive in online technology press such as from CNET, Digital Trends, Tech Times, TechRadar, Extreme Tech,

Techaeris, The Daily Dot, BGR, Fact, MKBHD, and 9to5 Mac. This press praised the HyperDrive for: solving the dongle problem and port problems of the 2016 MacBook Pro; adding back the ports Apple removed from the 2016 Gen MacBook Pro; adding a variety of full speed ports; being small, neat, sits flush against the MacBook Pro, and it fit's the laptop's design / aesthetic; supporting connecting dual monitors; cost effectiveness; and eliminating the cost, mess, and inconvenience of multiple dongles;

(b) Significant copying of the HyperDrive by products that were first offered for sale after the HyperDrive, that were for use with the Thunderbolt 3 USB-C ports on the 2016 Gen MacBook Pro and / or 2018 Gen MacBook Air, and similar to the HyperDrive in terms of: the arrangement of the twin USB-C input connectors; the number and / or type of output ports; and form factor. HyperDrive copies were offered by at least 18 other brands including Raycue, MOkin, LIONEWEI, Selore&S-Global, ZMUIPNG, nov8tech, UGREEN, INTPW, Aoslen, TECHDOTY, HUOONE, UtechSmart, HOdo, LENTION, Upgrow, TOTU, N/C and LIFUN; and

(c) HyperDrive's commercial success within the context of the broader market as measured by both its sales and initial funding campaign.

During the period from January 1, 2017 through December 31, 2021, Sanho sold 1,027,685 units of, and generated $54.8 million in revenue from the HyperDrive worldwide. Its sales dollars, growth, and share of company sales from the HyperDrive were significantly greater than its predecessor hubs. Sanho's revenue growth attributable to HyperDrive sales was significantly higher than industry growth rates during this period. The KickStarter Campaign to fund the HyperDrive was highly successful as measured by it successfully raising $1.84 million which was 62.5 times the average successful product; the small percentage of projects that raised $1 million or more; and the high ranking of the HyperDrive campaign among projects that included "USB" (#3 of 1,138) or "USB-C" ($3 of 220) in the description or for a USB hub, adapter, or docking station (most funded).

Copies of Mr. Cenatempo's expert reports dated August 29, 2022 and October 10, 2022 have already been served, and the contents of these reports are incorporated herein by reference.

**Jacob Baker, Ph.D.** is expected to testify that the HyperDrive is a power adapter for the reasons provided in paragraphs 28-35 of his Expert Report dated September 28, 2022 and in paragraphs 44-50 of his Expert Report dated August 29, 2022 in this case.

According to Dr. Baker, when delivering power to a USB peripheral (sink), the USB hub includes a regulator/converter that converts the downstream power from the USB host (source) to specific voltage requirements at each of its downstream-facing ports to be delivered to the peripheral(s). For instance, a standard computer using an AC power supply will have power that can be supplied downstream. One of the features of a USB hub is to convert power from an AC supply to a specified downstream port at 5V@2A (10W) in order to send an appropriate charge downstream to charge a mobile phone. This is illustrated by the following diagram.

B.3     Giving back power

**Figure B-3 Giving Back Power**



Configuration:
1. Laptop with an AC supply.  AC supply provides sufficient power to charge the laptop and, in addition, to provide up to 60W PD Power downstream.
2. A Hub with 4 downstream ports which initially provides 1 unit load (150mA) per Port plus 1 unit load for its internal functions.
3. Two Hard Disk Drives both of which require 5V@2A (10W) to spin up and 5V@1A (5W) while being accessed.
4. A phone which uses 5V@2A (10W) to charge and can give back all of this power when requested.

USB Power Delivery Specification Revision 3.0, Version 1.1, p. 549.

The USB Power Delivery specification ("USB PD Spec") was introduced in 2012. It offered an interoperable charging standard that would allow manufacturers to offer one charger capable of powering a suite of portable devices.

In general, the USB PD Spec facilitates a USB peripheral and host to work out the appropriate voltage and current levels using $V_{BUS}$ pins to deliver power bidirectionally without recourse to connector switching. This capability allows, for example, a display connected to main power to be used to charge a laptop while

simultaneously presenting information from the portable computer. It also allows devices to negotiate the exact amount of power they need at any time.

USB PD Spec specifies a maximum 20 volts at 5 amps (100 W) and compatibility with the then-existing USB 2.0 and USB 3.0 compatible cables and connectors up to 7.5 watts.

Consequently, USB 2.0 introduced a maximum current of 500 mA (increasing the power to 2.5 W) while USB 3.0 pushed the current up to 900 mA (4.5 W).

The USB-C standard (2.0) states that "[u]sing the Configuration Channel, the USB-C interconnect defines a simplified 5 volt $V_{BUS}$-based power delivery and charging solution that supplements what is already defined in the USB 3.2 Specification." USB-C standard (2.0), p. 30. USB-C compatible devices without USB PD support up to 5 volts at 3 amps (15 W), which can charge the battery of a smartphone or similar peripheral. USB-C devices with USB PD permit power up to 20 volts at 5 amps (100 W), but with added complexity.

In USB, the downstream-facing port (the port at the host or at a hub facing a peripheral) can source $V_{BUS}$ power. The upstream-facing port acts as a power sink. If the port is a dual port, it may act as a source or a sink of power. Its role is determined by whether it acts as a source or sink at start-up.

According to Dr. Baker, the HyperDrive is a power adapter at least because it can (1) adapt a single power source (a MacBook Pro USB-C) to multiple power sinks (e.g., two USB Type-A ports, each connected to mobile phones, external hard drives, etc.), and (2) transmit the correct amount of power to each of the multiple connected USB devices simultaneously. The HyperDrive also permits a single MacBook Pro port to transmit or receive power while simultaneously interacting with additional peripheral devices. These functions are each sufficient for the HyperDrive to qualify as a "power adapter" under any reasonable interpretation of the term.

According to Dr. Baker, the USB compliant hubs facilitate a USB peripheral and host to work out the appropriate current levels for a connected downstream port. This capability allows, for example, a main power source from the AC mains (e.g., a wall outlet) to charge a laptop while the laptop's USB-compliant charging port simultaneously provides power to connected downstream ports. It also allows multiple peripheral devices to negotiate the exact amount of power they need at any time. USB compliant hubs like the HyperDrive thus do not merely "pass-through" power as Dr. Franzon argues; the USB compliant hub (HyperDrive) actively manages power distribution functionality.

Dr. Baker is also expected to testify that while Dr. Franzon is correct that such AC to DC power supplies are a type of power adapter, he is incorrect that this

is the only type of power adapter, and the evidence he cites in support is inadequate to prove the truth of his opinion. Rather, some power adapters, like the HyperDrive, transmit DC current from one device to others.    Amazon and other sources describe the devices as "power adapters" despite the fact that they do not alter the current.

According to Dr. Baker, not all power adapters connect to wall electrical outlets. Various sources describe their products for transmitting power between USB devices (e.g., between a computer and a connected mobile phone) as "USB power delivery management adapters" or other similar terms.

Dr. Baker is expected to testify that the Battery Charging Specification released by the USB Implementers Forum refers to simple USB car chargers as "power adapter[s]." The HyperDrive is similar to the Accessory Charger Adapter described in his report in that it permits a MacBook Pro to charge while preserving—and even expanding—the MacBook Pro's port functionality. See, e.g., HyperDrive Website ("HyperDrive is the only MacBook Pro/Air hub with two USB-C ports that support Power Delivery (PD) & Data (40Gbps/100W + 5Gbps/60W)."). Indeed, the HyperDrive adapts power transmission in more ways than the Accessory Charger Adapter depicted in Dr. Baker's report.

**Peter Bressler** is expected to testify to the infringement of the '290 Design Patent by UltraDrive models JCD348, JCD 382, JCD386, and JCD388 infringe U.S. Patent No. D807,290. The following is a summary of the anticipated Bressler testimony taken from his opening report dated August 29, 2022 and his report dated October 12, 2022 replying to issues raised in the Shankwiler September 28, 2022 rebuttal report regarding patent infringement.

Legal Standards

Regarding the contention that the JCD348, JCD 382, JCD386, and JCD388 infringe the '290 patent, Bressler is expected to testify to his understanding that:

- The grant by the USPTO of a patent entitles the inventor to protection against infringement of the manufactured invention claimed in the granted patent. A utility patent protects how the invention works and a design patent protects the appearance or ornamental nature of a product that is manufactured.

- Design patents are only issued to ornamental designs and are only issued to "articles of manufacture" which presumably have some function or they would not be manufactured. Having some function is quite different from being dictated by function. If a design is dictated by function, there can be no alternate visual/ornamental designs for the product.

- If, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

- In some instances, the claimed design and the accused design will be sufficiently distinct that it will be clear without more that the patentee has not met its burden of proving the two designs would appear "substantially the same" to the ordinary observer.

- In other instances, when the claimed and accused designs are not plainly dissimilar, resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claimed and accused designs with the prior art. Where there are many examples of similar prior art designs, differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art.

- The mandated overall comparison is a comparison taking into account significant differences between the two designs, not minor or trivial

differences that necessarily exist between any two designs that are not exact copies of one another.

- The infringement analysis focuses on the design as a whole rather than particular features of the design.  Minor variations do not prevent a finding of infringement and thus an infringing product need not be an exact copy of the patented design.

- If the accused design is visually closer to the patented design than any prior art design, this supports a conclusion that the overall appearance of the accused design is substantially the same as the overall appearance of the patented design, such that there is design patent infringement. This analysis has been referred to as the "Three-Way Test."

- In a design patent, the solid lines show the claimed design, whereas the broken lines show structure that is not part of the claimed design.

- Broken lines may be used to show visible environmental structure.

- Shading is used to indicate the surface or shape of spherical, cylindrical, and conical elements of an object. Flat parts may also be lightly shaded. As a substitute for shading, heavy lines on the shade side of objects can be used except where they superimpose on each other or obscure reference characters.

- The "ordinary observer" is a person possessing ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which (persons) of ordinary intelligence give. For purposes of determining infringement, the ordinary observer is the ordinary purchaser of the article charged to be an infringement. The ordinary observer is deemed to be familiar with the state of the art of the products in question.

- The ordinary observer gives such attention to the design of a product as a purchaser usually gives. The mandated overall comparison is a comparison taking into account significant differences between the two designs, not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another.

Visual Impressions

Bressler is expected to testify that there are several ways to communicate the visual impression provided by the illustrations at multiple levels of visual comprehension. In order to analyze the visual aspects of any design properly, one must understand the principles of the psychological science of how people see things. In design education, this analysis of visual impressions during the design process is defined frequently as prioritization of visual stimuli. In layman's terms, this means what shapes or visual forms are seen and recognized and in what order

and to what effect on the user's understanding of what they are seeing. We categorize these visual elements as primary, secondary and in some cases tertiary forms or visual elements.

An example would be recognition of another person. The initial judgement of whether you recognize them is based upon their profile, perhaps as seen at a distance, the proportion of their height vs. width, ratio of leg vs. torso length, etc. (primary visual elements). Then eye tracking tests have shown that we look to the eyes and nose and mouth (secondary visual elements) within the field defined by the edges, to confirm our identification of someone we know. Further (tertiary visual elements) details may then be noticed, such as the shape of eyebrows or color of eyes or minor scars that are evident.

People recognize and remember objects of manufacture similarly. The most simply shaped products are frequently the most easily recognized and remembered. According to general teachings of design education and design industry, being recognizable and memorable are the primary criteria for creating a strong/memorable visual image or design. Primary visual features include outline/profile, secondary visual features include internal or surface features, and tertiary design features include the smallest details.

The '290 Patent

Bressler is expected to provide the following testimony describing the '290

Patent:

The '290 Patent claims a design entitled MULTI-FUNCTION

CONNECTOR. The patent includes five figures that define the design claimed in

this patent:



Fig. 1



Fig. 2

Fig. 3

22



Fig. 4



Fig. 5

The appearance of the '290 patented connector is that of a thin generally rectangular solid whose length and width are substantially greater than its height or thickness.

The vertical corners where the narrow sides and ends meet are radiused.

The proportions of the rectangular solid are approximately 1H x 2.8W x 9.1L. The top and bottom broad rectangular surfaces are flat and devoid of features.

At both ends these surfaces they curve very slightly toward the centerline

reducing the height of the adjacent shorter narrow end walls.

The foregoing would be considered the primary visual elements of this design claimed in the '290 Patent.

The design also claims a male protrusion on the longer thin side of the rectangular solid. The protrusion is a lozenge shape whose major axis is parallel to the length of the connector and near one end of the narrow side.

On the narrow side opposite the protrusion, there are four negative rectangular shapes of various proportions. To the left, a small narrow rectangular slot sits above a wider slot. These openings are the kind of openings used to accommodate memory cards and mini-cards. To the right, there are side-by-side rectangular openings. These openings are akin to traditional USB ports. The interiors of these shapes are not claimed.

The foregoing features (¶¶ 58-59) would be considered the secondary visual elements of this design.

The tertiary design elements of the '290 Patent comprise a small circular feature on the short end adjacent to and at right angles to the protrusion, and lines indicating a surface change from top to bottom and from end to end. There are no other visual features on the short sides.

The Accused UltraDrive Devices

Bressler is expected to provide the following testimony describing the

24

UltraDrive device models JCD 348, JCD 382, JCD 386 and JCD 388:

The **JCD 348** is a multi-function connector and appears as follows:



The JCD 348 is a thin rectangular solid whose length and width are substantially greater than its height or thickness. The vertical corners where the narrow sides and ends meet are radiused. The proportions of the rectangular solid are roughly 1H x 2.8W x 9L. These proportions are extremely similar to those of the '290 Patent.

The top and bottom broad rectangular surfaces are flat and devoid of apparent features. At both ends these broad surfaces curve, with a full blend and no interruption of the surfaces, very slightly toward the mid-line of the product reducing the height of the adjacent short narrow end walls. Similar to the '290 Patent, these are the primary visual elements of this design.

The JCD 348 product has a male protrusion on the long thin side of the rectangular solid. The protrusion is a lozenge shape whose major axis is parallel to the length of the product and near one end of the narrow side.

On the narrow side opposite the protrusion, there are five negative rectangular shapes of various proportions. To the right, the narrow slot-like opening for a memory mini-card sits atop the wider opening for a memory card. To the left, there are three side-by-side rectangular traditional USB port openings. Similar to the '290 Patent, these are secondary visual elements of this design.

There are minor differences between the design claimed in the '290 Patent and the design of the UltraDrive JCD 348. The height-width-length ratio is slightly different.  The accused design has five rectangular openings instead of four (with the stacked memory card slots aligned to the right and three USB ports to the left) and does not have a circular feature on the end near the protrusion.

Given the significant similarities of primary and secondary features, an ordinary observer would conclude that the design of the JCD 348 is not plainly dissimilar from the '290 Patent design.

The **JCD 382** is a multi-function connector and appears as follows:



The JCD 382 is a thin rectangular solid whose length and width are substantially greater than its height or thickness. The vertical corners where the narrow sides and ends meet are radiused.

The proportions of the rectangular solid are approximately 1H x 2.7W x 10L. These proportions, though approximately 10% longer than the '290 Patent design, are nevertheless visually similar to those of the '290 Patent.

The top and bottom broad rectangular surfaces are flat and apparently devoid of features. At both ends these broad surfaces curve, with a full blend and no interruption of the surfaces, very slightly toward the mid-line of the product reducing the height of the adjacent shorter narrow end walls.

The foregoing are the primary visual elements of the JCD 382 design.

The JCD 382 product has two male protrusions on one of the long thin sides of the rectangular solid. The protrusions are lozenge-shaped and the major axis is parallel to the length of the product and near one end of the narrow side.

On the narrow side opposite the protrusions, there are six negative shapes of various proportions.  Starting from the left, there are side-by-side openings that Bressler understands to be similar to USB-Type C ports.  To the immediate right, there are side-by-side rectangular traditional USB ports.  To the far right, there is a narrow slot-like opening for a memory mini-card sitting atop a wider opening for a memory card. One end of the JCD 382 contains an HDMI port. Similar to the '290

Patent, these are secondary visual elements of this design.

There are minor differences between the design claimed in the '290 Patent and the design of the UltraDrive JCD 382. The height-width-length ratio is slightly different.  The accused design has six rectangular openings instead of four, with the USB-C ports to the left, traditional USB ports in the middle and the stacked memory card slots to the right, an HDMI port on one end, and does not have a circular feature on the end near the protrusion.

Given the significant similarities of primary and secondary features, an ordinary observer would conclude that the design of the JCD 382 is not plainly dissimilar from the '290 Patent design.

The **JCD 386** is a multi-function connector and appears as follows:



The UltraDrive JCD 386 is a multi-function connector made by the Defendant, KaiJet. The JCD 386 is a thin rectangular solid whose length and width

are substantially greater than its height or thickness. The vertical corners where the narrow sides and ends meet are radiused.

The proportions of the rectangular solid are approximately 1H x 2.9W x 9.6L. These proportions are similar to those of the '290 Patent, the JCD 348 and are identical to the JCD 388.

The top and bottom broad rectangular surfaces are flat and devoid of apparent features. At both ends these broad surfaces curve, with a full blend and no interruption of the surfaces, very slightly toward the mid-line of the product reducing the height of the adjacent shorter narrow end walls.

The JCD 386 has a male protrusion on the long thin side of the rectangular solid. The protrusion is a lozenge shape whose major axis is parallel to the length of the product and near one end of the narrow side.

On the narrow side opposite the protrusion, there are five negative rectangular shapes of various proportions. Starting from the left, there is one USB-Type C port opening.  To the immediate right of that, there are side-by-side rectangular traditional USB ports.  To the far right, there is a narrow slot-like opening for a memory mini-card sitting atop a wider opening for a memory card. There is an HDMI port on one end of the device.  Similar to the '290 Patent, these are secondary visual elements of this design.

There are minor differences between the design claimed in the '290 Patent

and the design of the UltraDrive JCD 386. The height-width-length ratio is slightly different.  The accused design has five rectangular openings instead of four, with the USB ports to the left and the stacked memory card slots to the right, an HDMI port on one end, and it does not have a circular feature on the end near the protrusion.

Given the significant similarities of primary and secondary features, an ordinary observer would conclude that the design of the JCD 386 is not plainly dissimilar from the '290 Patent design.

The **JCD 388** is a multi-function connector and appears as follows:



The JCD 388 is a thin rectangular solid whose length and width are substantially greater than its height or thickness. The vertical corners where the narrow sides and ends meet are radiused.

The proportions of the rectangular solid are approximately 1H x 2.9W x

9.7L. These proportions are similar to those of the '290 Patent, the JCD 348 and are identical to the JCD 386.

The top and bottom broad rectangular surfaces are flat and devoid of apparent features. At both ends these broad surfaces curve, with a full blend and no interruption of the surfaces, very slightly toward the mid-line of the product reducing the height of the adjacent shorter narrow end walls.

The JCD 388 product has a male protrusion on the long thin side of the rectangular solid. The protrusion is a lozenge shape whose major axis is parallel to the length of the product and near one end of the narrow side.

On the narrow side opposite the protrusion, there are five negative rectangular shapes of various proportions. Starting from the left, there is one USB-Type C port opening.  To the immediate right of that, there are side-by-side rectangular traditional USB ports.  To the far right, there is a narrow slot-like opening for a memory mini-card sitting atop a wider opening for a memory card. Similar to the '290 Patent, these are secondary visual elements of this design.

There are minor differences between the design claimed in the '290 Patent and the design of the UltraDrive JCD 388. The height-width-length ratio is slightly different.  The accused design has five rectangular openings instead of four, with the USB ports to the left and the stacked memory card slots to the right, and this design does not have a circular feature on the end near the protrusion.

Given the significant similarities of primary and secondary features, an ordinary observer would conclude that the design of the JCD 388 is not plainly dissimilar from the '290 Patent design.

Because the '290 Patent design is not plainly dissimilar from the designs of the accused JCD devices, as noted above, Bressler is expected to proceed to investigate the contents of the prior art, as an ordinary observer with knowledge of the prior art would do.

The Alleged Prior Art and 3-Way Test

Bressler is expected to testify that he understands that the Defendants have the burden to produce the prior art for consideration in this case. Bressler has reviewed the record in this case to determine the prior art produced relating to the '290 Patent by the Defendants. The following prior art references were taken from the KaiJet Defendants' Invalidity Contentions, and, to Bressler's knowledge, represent the closest prior art known to the '290 Patent.

Bressler also reviewed and is expected to testify to the prior art identified during the prosecution history leading to the issuance of the '290 Patent. His expected observations about these references follow as well.

For the '290 Patent and each of the JCD 348, JCD 382, JCD 386 and JCD 388 devices accused of infringement, Bressler has created a 3-way chart comparing them with each of the prior art references discussed below. The 3-way charts

demonstrate that each of the JCD 348, JCD 382, JCD 386 and JCD 388 devices infringes the '290 Patent, in that the product designs of the accused devices appear closer, in the eye of the ordinary observer, to the '290 Patent design than to any of the prior art.  Bressler is expected to walk the jury through each of the 3-way charts to explain the visual comparison of the '290 Patent, the accused devices and the prior art.  The following paragraphs include certain specific conclusions drawn from the visual comparisons in the 3-way charts that Bressler expects to testify to.

Bressler is expected to testify that in his opinion, the 3-way charts help to demonstrate that the JCD 348, JCD 382, JCD 386 and JCD 388 infringe the '290 Patent.  Specifically, the prior art reinforces the fact that the primary design feature similarities shared by the '290 Patent design and the accused JCD devices that are not features found in the prior art.

### A.    U.S. Design Pat. No. D647,908 to Chen et al. ("Chen")

Bressler has considered all figures of the design of Chen:



33

Bresser is expected to testify that Chen is not substantially similar to the '290 Patent in that it has different height-width-length proportions (approximately 1H x 2.7W x 7.2L). Also, it is a trapezoidal, not a rectangular shape in plan and has a recessed feature in the top surface. It has radii on all eight edges and claims none of the protrusions or openings present in both the '290 Patent and the contested designs of the accused products.

Bresser is further expected to testify that the JCD 348, 382, 386 and 388 look substantially more like the '290 Patent design than Chen judged from the perspective of an ordinary observer:





| '290 Patent | UltraDrive JCD 382 | U.S. Design Pat. No. D647,908 to Chen et al. ("Chen") |
|---|---|---|
| | | |

| '290 Patent | UltraDrive JCD 386 | U.S. Design Pat. No. D647,908 to Chen et al. ("Chen") |
|---|---|---|
| | | |



| '290 Patent | UltraDrive JCD 388 | U.S. Design Pat. No. D647,908 to Chen et al. ("Chen") |
|---|---|---|

## B.    U.S. Design Pat. No. D750,083 to Chow et al. ("Chow")

Bressler has reviewed all figures of Chow:



Bresser is expected to testify that Chow has a protrusion on one narrow side and multiple openings on the opposite side but shows a dramatically stepped top surface with angled transitions to the lower portion and the ends of the lower surface are not perpendicular to the primary horizontal surfaces. The Chow design

36

at approximately 1L x 3.0W x 13.3L does not have the approximately 1H x 2.8W x 9.1L proportions of the '290 Patent, nor the proportions of the JCD 348 (approximately 1H x 2.8W x 9L), the JCD 382 (approximately 1H x 2.7W x 10L), the JCD 386 (approximately 1H x 2.9W x 9.6L), or the JCD 388 (approximately 1H x 2.9W x 9.7L). Furthermore, Chow does not provide openings in the side opposite the protrusion. The openings are in an extended portion of the top surface. Chow also lacks a flat top and bottom surface. Chow has noticeable tertiary details including a claimed stippled or perforated top surface that is absent in the designs in question.

Bresser is further expected to testify that Chow does not support a claim of non-infringement and make it clear that the JCD 348, JCD 382, JCD 386 and JCD 388 look substantially more like the '290 Patent design than Chow judged from the perspective of an ordinary observer.





| '290 Patent | UltraDrive JCD 382 | U.S. Design Pat. No. D750,083 to Chow et al. ("Chow") |
| --- | --- | --- |
| Fig. 1 | | |

| '290 Patent | UltraDrive JCD 386 | U.S. Design Pat. No. D750,083 to Chow et al. ("Chow") |
| --- | --- | --- |
| Fig. 1 | | |

| '290 Patent | UltraDrive JCD 388 | U.S. Design Pat. No. D750,083 to Chow et al. ("Chow") |
| --- | --- | --- |
| Fig. 1 | | |

## C.     U.S. Design Patent No. D692,024 to Seong et al. ("Seong")

Bressler has reviewed all figures of Seong:



Bresser is expected to testify that **Seong** possesses linear features that complicate the top surface, and the height-width-length proportions appear to be very different than the '290 Patent. It is approximately 1H x 3.6W x 15.2L compared to the 290 Patent's approximately 1H x 2.8W x 9.1L.  Seong also has a fully radiused long side opposite the side with the features that is not present in any of the contested designs.  Seong provides multiple openings and protrusions. They are, however, on the same rather than opposite sides of the design.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD

386 and JCD 388, Seong is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Seong.





**D.    U.S. Pat. App. No. 2006/0085584 to Chen et al. ("Chen '584")**

Bressler has reviewed all figures of Chen '584:



Bresser is expected to testify that although Chen '584 is rectangular in shape, its approximate proportions are approximately 1H x 2.1W x 11.7L. (Chen '584 appears to be 40% longer than either the '290 Patent design, or the JCD 348.) Chen '584 does not teach the radii on the vertical corners, nor does it have top and bottom surfaces that curve very slightly toward the center reducing the height of the adjacent shorter narrow end walls.  Chen '584 provides a single protrusion that is centered on one narrow side and six openings on the opposite narrow side, including a traditional USB port towards the left of one narrow side, and three identically-shaped rectangles to the far right hand of the same side.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Chen '584 is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Chen '584.



| '290 Patent | UltraDrive JCD 348 | U.S. Pat. App. No. 2006/0085584 to Chen et al. ("Chen '584") |
|---|---|---|

| '290 Patent | UltraDrive JCD 382 | U.S. Pat. App. No. 2006/0085584 to Chen et al. ("Chen '584") |
|---|---|---|

| '290 Patent | UltraDrive JCD 386 | U.S. Pat. App. No. 2006/0085584 to Chen et al. ("Chen '584") |
|---|---|---|

43



## E.    U.S. Design Pat. No. D709,892 to Lui ("Lui")

Bressler has reviewed all figures of Lui:



Bresser is expected to testify that Lui is not generally rectangular in that it has two differently dimensioned sections, which contrasts with the design of the '290 Patent and the accused products.  Lui also has a dramatically smaller lower section from which there is a lozenge shaped protrusion.  Neither the '290 Patent nor the accused devices have two sections, one of which is smaller than the other.

Lui also has different proportions from the designs of the '290 Patent and the accused products.  The proportions of Lui are approximately 1H x 1.9W x 7.9L. Lui does have a protrusion on one side and four openings on the opposite side. However, taken as a whole, its overall shape does not resemble the '290 Patent or the accused devices. It provides a wider top portion that houses the openings/connectors and a narrower and shorter lower section that has a protrusion. The transition from the top portion to the lower is a significant step, a feature not present in the '290 Patent or the accused products.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Lui is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Lui.



| '290 Patent | UltraDrive JCD 348 | U.S. Design Pat. No. D709,892 to Lui ("Lui") |
| --- | --- | --- |

| '290 Patent | UltraDrive JCD 382 | U.S. Design Pat. No. D709,892 to Lui ("Lui") |
|---|---|---|
|  | | |

| '290 Patent | UltraDrive JCD 386 | U.S. Design Pat. No. D709,892 to Lui ("Lui") |
|---|---|---|
|  | | |

| '290 Patent | UltraDrive JCD 388 | U.S. Design Pat. No. D709,892 to Lui ("Lui") |
|---|---|---|
|  | | |

**F.    Taiwanese Patent No. 201330499889 to Samya Technologies**

("Power Bank")

Bressler has reviewed all figures of Power Bank:



Bresser is expected to testify that Power Bank has broad flat surfaces that curve toward the centerline. However, the overall scale and proportions of the product are very different from the designs of the '290 Patent and the accused products, undermining any perception of visual similarity when compared to them. Power Bank's proportions are approximately 1H x 3.5W x 3L, and are a far cry from the proportions of the '290 Patent. The isometric view of FIG. 1 does not entirely reflect the almost square plan view proportions of Power Bank. Power Bank claims a few irregular openings in one of its two flat sides and no protrusions.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD

386 and JCD 388, Power Bank is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Power Bank.





## G.     U.S. Design Pat. No. D772,878 ("Chiang")

Bressler has reviewed all figures of Chiang:



Bresser is expected to testify that Chiang is generally rectangular, an almost square profile in the plan view. A significant difference from the '290 Patent and accused products, aside from being almost square in profile, is that the thickness of Chang is much greater than the '290 Patent and the accused devices, and it has full radii on each end. Chiang also has proportions (approximately 1H x 2.7W x 2.8L) that are quite different than the '290 Patent. Chiang also claims a few irregular features on one of its two flat sides and a single protrusion on an opposite side. This design, in the eyes/mind of the ordinary observer, would not teach a similar impression as that of the '290 Patent nor the accused devices.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Chiang is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Chiang.



| '290 Patent | UltraDrive JCD 348 | U.S. Design Pat. No. D772,878 ("Chiang") |
|---|---|---|

| '290 Patent | UltraDrive JCD 382 | U.S. Design Pat. No. D772,878 ("Chiang") |
|---|---|---|

| '290 Patent | UltraDrive JCD 386 | U.S. Design Pat. No. D772,878 ("Chiang") |
|---|---|---|



| '290 Patent | UltraDrive JCD 388 | U.S. Design Pat. No. D772,878 ("Chiang") |
|---|---|---|

## H.     U.S. Design Pat. No. D484,853 ("Alviar")

Bressler has reviewed all figures of Alviar:



Bresser is expected to testify that 214. Alviar provides a visual image in the eyes of the ordinary observer that is strikingly unlike the '290 patented design. It is a roughly rectangular solid, but its proportions are strikingly different at approximately 1H x 1.5W x 2.7L compared to the 290's Patent's approximately 1H x 2.8W x 9.1L. Its top and bottom are not unadorned, and it lacks a protrusion that is on a side opposite several openings.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD

386 and JCD 388, Alviar is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Alviar.





## I.    U.S. Design Pat. No. D496,629 ("Hriscu")

Bressler has reviewed all figures of Hriscu:



Bresser is expected to testify that Hriscu provides a visual image in the eyes of the ordinary observer that is strikingly unlike the '290 patented design. It is a roughly rectangular solid, but its proportions are strikingly different at approximately 1H x 1.9W x 2.9L compared to the 290 Patent's approximately 1H x 2.8W x 9.1L. Its top and bottom are not unadorned. It is not a true rectangle in that all of its sides, save the connector end have a gradual curvature. It lacks a protrusion that is on a side opposite several openings.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Hriscu is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Hriscu.

（画像内）



| '290 Patent | UltraDrive JCD 348 | U.S. Design Pat. No. D496,629 to Hriscu ("Hriscu") |
| --- | --- | --- |
| | | |
| '290 Patent | UltraDrive JCD 382 | U.S. Design Pat. No. D496,629 to Hriscu ("Hriscu") |
| | | |
| '290 Patent | UltraDrive JCD 386 | U.S. Design Pat. No. D496,629 to Hriscu ("Hriscu") |
| | | |



| '290 Patent | UltraDrive JCD 388 | U.S. Design Pat. No. D496,629 to Hriscu ("Hriscu") |
|---|---|---|
| | | |

## J.    U.S. Design Pat. No. D538,222 ("Curello")

Bressler has reviewed all figures of Curello:



Bresser is expected to testify that Curello provides a visual image in the eyes of the ordinary observer that is strikingly unlike the '290 patented design. It is a roughly rectangular solid, but its proportions are strikingly different at approximately 1H x 1.9W x 5.1L compared to the '290 Patent's approximately 1H

x 2.8W x 9.1L. Its top and bottom are unadorned. It is not a true rectangle in that it tapers over its full length from a larger to a smaller end and it has a full radius along one long side. It lacks a protrusion that is on a side opposite several openings.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Curello is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Curello.





**K.     U.S. Design Pat. No. D654,867 ("Huppe")**

Bressler has reviewed all figures of Huppe:



Bresser is expected to testify that Huppe provides a visual image in the eyes of the ordinary observer that is strikingly unlike the '290 patented design. It is a roughly elliptical extruded form with two prominent ribs that that circle the extruded shape and separate it from the stepped ends that include cord strain reliefs. Its proportions are strikingly different at approximately 1H x 1.6W x 3.1L compared to the '290 Patent's approximately 1H x 2.8W x 9.1L.  In addition to these primary elements, there are various curved scalloped shapes on the top and sides and it lacks a lozenge shaped protrusion that is on a side opposite several openings.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Huppe is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than Huppe.





**L.    U.S. Design Pat. No. D684,976 ("Akana")**

Bressler has reviewed all figures of Akana:



Bresser is expected to testify that Akana provides a visual image in the eyes of the ordinary observer that is strikingly unlike the '290 patented design. It is a lozenge shaped extruded form with radii on both narrow sides perpendicular to the two flat ends that include a protruding connector and a rectangular port on opposite ends.  Its proportions are strikingly different at approximately 1H x 4.4W x 3.5L compared to the '290 Patent's approximately 1H x 2.8W x 9.1L.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Akana is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than to Akana.





| '290 Patent | UltraDrive JCD 388 | U.S. Design Pat. No. D684,976 to Akana ("Akana") |
|---|---|---|

## M.    U.S. Design Pat. No. D714,731 ("Lee")

Bressler has reviewed all figures of Lee:



Bresser is expected to testify that Lee provides a visual image in the eyes of the ordinary observer that is unlike the '290 patented design. This design includes two solid rectangles connected by a cable it has a single, apparently USB

64

connector and an unclaimed HDMI port in the top of the upper unit. Its proportions are strikingly different at approximately 1H x 3.5W x 4.8L for the larger portion, compared to the '290 Patent's approximately 1H x 2.8W x 9.1L.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Lee is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than to Lee.







## N.    U.S. Design Pat. No. D722,952 ("Hu")

Bressler has reviewed all figures of Hu:



Bresser is expected to testify that Hu is an ultrathin, generally rectangular-shaped detachable smartphone protective device with backup power unit. Hu provides a visual image in the eyes of the ordinary observer that is unlike the '290 patented design. It is an ultra-thin rectangular form with radii on four corners. It has an oval-shaped through hole in its top right corner and a "u" shaped cord extending from the lower left corner. Its proportions are strikingly different at approximately 1H x 6.9W x 15.1L compared to the '290 Patent's approximately 1H x 2.8W x 9.1L. It is a very thin unit with a top surface that has a gentle curvature over its full length.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Hu is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than to Hu.



| '290 Patent | UltraDrive JCD 348 | U.S. Design Pat. No. D722,952 to Hu ("Hu") |
|---|---|---|







## O.    U.S. Pat. App. No. 2010/0151723 ("Su")

Bressler has reviewed all figures of Su:



Bresser is expected to testify that Su provides a visual image in the eyes of the ordinary observer that is unlike the '290 patented design. This design is rectangular solid that has full radii on all sides except for the flat end that has a multipin connector. Its proportions are strikingly different at approximately 1H x 3.4W x 5.8L compared to the '290 Patent's approximately 1H x 2.8W x 9.1L.  In addition to these primary visual elements, secondary elements would include two cables prodding from the opposite end and several radiused rectangular forms in the top surface. Except for these secondary elements, the design includes a flat top and bottom.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Su is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than to Su.

| '290 Patent | UltraDrive JCD 348 | U.S. Pat. App. No. 2010/0151723 to Su ("Su") |
|---|---|---|
|  | | |

| '290 Patent | UltraDrive JCD 382 | U.S. Pat. App. No. 2010/0151723 to Su ("Su") |
|---|---|---|
|  | | |

| '290 Patent | UltraDrive JCD 386 | U.S. Pat. App. No. 2010/0151723 to Su ("Su") |
|---|---|---|
|  | | |

70



| '290 Patent | UltraDrive JCD 388 | U.S. Pat. App. No. 2010/0151723 to Su ("Su") |
|---|---|---|

## P.     U.S. Pat. App. No. 2015/0155726 ("Duan")

Bressler has reviewed all figures of Duan:



Bresser is expected to testify that Duan's mobile power pack provides a visual image in the eyes of the ordinary observer that is unlike the '290 patented design. This design is based upon an extruded form with vertically curved sides and a flat top and bottom. Its proportions are strikingly different at approximately 1H x 1.7W x 3.6L, compared to the '290 Patent's approximately 1H x 2.8W x 9.1L.  In addition to these primary visual elements, a secondary element would be

71

the four holes in the lower right corner of the flat top.

Bresser is further expected to testify that unlike the JCD 348, JCD 382, JCD 386 and JCD 388, Duan is not substantially similar to the '290 Patent. To the ordinary observer, each of the JCD 348, JCD 382, JCD 386 and JCD 388 appears more similar to the '290 Patent than to Duan.





Responses to Defendants' Non-Infringement Arguments

Bressler is also expected to respond to Defendants' and Mr. Shankwiler's noninfringement positions.

For example, Bressler is expected to testify regarding the location of the male protrusions in the accused JCD devices and the '290 Patent:



Bressler is expected to testify that the difference in port location is is not a "distinct difference" to an ordinary observer. This characteristic of this detail of the design is a secondary design factor. The substantial similarities previously noted with respect to the overall design shape and proportion would weigh more heavily in the mind of an ordinary observer than these relatively minor differences. To confirm this, Bressler is expected to present the 3-Way charts he has prepared with emphasis on the rows tied to FIGURES 3 and 4 of the '290 Patent (showing the relevant side and top views) and compared the similarities between the '290 Patent figures, the accused JCD devices and the prior art. The following diagram, for example, shows the location of the male protrusions in the '290 Patent, the accused JCD devices and Chow:



Bressler is expected to testify that as a whole, to the ordinary observer, due to its strikingly dissimilar shape and proportions, as well as the lack of radii on vertical corners of the top and bottom surface lines, and the fact that Chow has an upper section that is wider than its lower section, with both upper and lower sections featuring slanted end lines, as well as the other differences noted previously, Chow is considerably more dissimilar to '290 Patent than to any of the accused JCD devices.  Bressler will also testify that he also confirmed that this is true with respect to a 3-way comparison of Chow to FIGURE 4 of the '290 Patent,

versus a comparison of FIGURE 4 of the '290 Patent to each of the accused devices.

**3-Way: '290 Patent, FIGURE 4 – JCD 348 – Chow**



### 3-Way: '290 Patent, FIGURE 4 – JCD 382 – Chow



### 3-Way: '290 Patent, FIGURE 4 – JCD 386 – Chow



**3-Way: '290 Patent, FIGURE 4 – JCD 388 -- Chow**



Using the 3-Way comparison as a filter, Bressler is expected to conclude that an ordinary observer with knowledge of the prior art would assess that the differences in placement of the male protrusions in the accused JCD devices are outweighed by the substantial design similarities when judged from the perspective of FIGURES 3 and 4 of the '290 Patent.  Consideration of these issues and placed in the broader context of the overall impression of the '290 Patent design judged from the perspective of an ordinary observer and considering the figures of the '290 Patent as a whole, the overall designs of the accused JCD products, and the overall designs of the prior art, Bressler's opinion is expected to be that the asserted locational differences in placement of male protrusions do not warrant a determination of non-infringement.

Bressler is also expected to respond to Defendant's argument that the port layouts on the front of the JCD348, JCD386, and JCD388 products are plainly

dissimilar from those claimed in the '290 Patent claim.



Bressler is expected to testify that this is not plainly dissimilar to an ordinary observer, considering all patent views, and even if only FIGURE 2 of the '290 Patent were to be taken into consideration. This characteristic of the design is a secondary design factor, which would have less importance than the primary design factors Bressler has noted above (¶¶ 51-57). The substantial similarities Bressler has previously noted with respect to the overall design shape and proportion would weigh more heavily in the mind of an ordinary observer than the difference in ports and port alignments. And within the context of consideration of this secondary element, this is, at best, a minor difference when compared with the overall impression caused by the shape and proportionality of the design of the

device.

Bressler is also expected to testify that there are also similarities with respect to the placement of two traditional USB ports side-by-side in the accused JCD devices. Like FIGURE 2 of the '290 Patent, each of the accused JCD devices shows a mini-card slot stacked atop a memory card slot. Like FIGURE 2, the JCD 382, 386 and 388 devices each have two traditional USB ports side-by-side. Again, these are secondary design considerations. Bressler is expected to testify that they do not weigh as heavily as the primary design considerations noted above.

To confirm the correctness of his analysis, Bressler is expected to present his 3-Way charts with emphasis on the rows tied to FIGURE 2 of the '290 Patent, comparing FIGURE 2 of the '290 Patent, the accused JCD devices and the prior art. He is expected to find that, judged from the perspective of an ordinary observer with knowledge of the prior art, the closest ports and port alignment in the prior art to the alignment depicted in FIGURE 2 of the '290 Patent is either Chen '584 or Lui, illustrated below:



He is expected to testify that unlike the '290 Patent and the accused JCD devices, neither Chen '584 nor Lui show mini-card slots or memory card slots, much less stacked memory slots. These are secondary design considerations. Chen '584 and Lui also each show 4 traditional USB ports, which is more than either the '290 Patent or any of the accused JCD devices shows. Again, these are secondary design considerations. Bressler is also expected to testify that Chen

'584 has two circular openings that are not present in either the '290 Patent or the accused JCD devices.

Bressler is further expected to testify that to an ordinary observer with knowledge of the prior art, the shape and proportion of the sides of each of the accused JCD devices is closer to the design of the device depicted in FIGURE 2 of the '290 Patent than either Chen '584 or Lui.

### 3-Way: '290 Patent, FIGURE 2 – JCD 348 – Chen '584



**3-Way: '290 Patent, FIGURE 2 – JCD 348 – Lui**



**3-Way: '290 Patent, FIGURE 2 – JCD 382 – Chen '584**



### 3-Way: '290 Patent, FIGURE 2 – JCD 382 – Lui



### 3-Way: '290 Patent, FIGURE 2 – JCD 386 – Chen '584



**3-Way: '290 Patent, FIGURE 2 – JCD 386 – Lui**



**3-Way: '290 Patent, FIGURE 2 – JCD 388 – Chen '584**



**3-Way: '290 Patent, FIGURE 2 – JCD 388 – Lui**



Bressler is also expected to respond to Defendants' argument that differences exist between the appearance of the "material transition" in each of the accused JCD devices and the '290 Patent, the presence of a "decorative screw" in FIGURE 5 of the '290 Patent, and an HDMI port on the end of each of the JCD 386 and 382 devices. He is expected to testify that these are not significant differences between designs to an ordinary observer, for the following reasons.

- Judged from the perspective of an ordinary observer, the overall design, shape and proportion of the end of the device depicted in the '290 Patent is substantially similar to that of each of the accused JCD devices.

- This appearance of the HDMI port in the design of an end of each of the JCD 382 and JCD 386 devices represents a secondary design factor. The substantial similarities previously noted with respect to

the overall design shape and proportion would weigh more heavily in the mind of an ordinary observer than this smaller difference.

- Within the broader context of primary and secondary design factors, the more significant design similarities to an ordinary observer pertain to the similarities in overall impression caused by the overall similarity in appearance, proportion and shape of the end view. Thus, to an ordinary observer, these similarities would outweigh the presence of an HDMI port on one of the device ends.

- The absence of a decorative screw from each of the accused JCD devices represents a tertiary design factor of even less importance than the primary and secondary design considerations noted above. Judged from the perspective of an ordinary observer, the overall impression caused by the design, shape and proportion of the end of the device depicted in the '290 Patent is substantially similar to that of each of the accused JCD devices.

Bressler is expected to conclude that any differences in the so-called "material transition" are no more than tertiary design factors and are of little, if any, consequence. To confirm this reasoning opinions, Bressler is expected to present the reviewed the 3-Way charts with emphasis on the rows tied to FIGURE 5 of the '290 Patent (showing the view of one of the ends) and compared the

similarities between the '290 Patent figures, the accused JCD devices and the prior art, to see if any prior art looked more confusingly similar to the '290 Patent than the accused JCD devices. His analysis will confirm the infringement, because none of the prior art appears as similar to the '290 Patent as the accused JCD devices.

Bressler is expected to present the following images, which show exemplary ends in FIGURE 5 of the '290 Patent, the accused JCD devices, the closest prior art on this issue, Lui and Chiang:



### 3-Way: '290 Patent, FIGURE 5 – JCD 348 – Lui



### 3-Way: '290 Patent, FIGURE 5 – JCD 348 – Chiang



### 3-Way: '290 Patent, FIGURE 5 – JCD 382 – Lui



### 3-Way: '290 Patent, FIGURE 5 – JCD 382 – Chiang



### 3-Way: '290 Patent, FIGURE 5 – JCD 386 – Lui



**3-Way: '290 Patent, FIGURE 5 – JCD 386 – Chiang**



**3-Way: '290 Patent, FIGURE 5 – JCD 388 – Lui**



**3-Way: '290 Patent, FIGURE 5 – JCD 388 – Chiang**



Bressler is expected to conclude that to an ordinary observer with knowledge of the prior art, the shape and proportion of the ends of the accused JCD devices are closer to the design of the device depicted in the '290 Patent than either Lui or Chiang.

<u>Article of Manufacture</u>

Bressler is also expected to testify as to his understanding that 35 U.S.C. § 289 states:

Whoever during the term of a patent for a design, without license of

the owner, (1) applies the patented design, or any colorable imitation thereof, to any <u>article of manufacture</u> for the purpose of sale, or (2) sells or exposes for sale any <u>article of manufacture</u> to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250, recoverable in any United States district court having jurisdiction of the parties.

Nothing in this section shall prevent, lessen, or impeach any other remedy which an owner of an infringed patent has under the provisions of this title, but he shall not twice recover the profit made from the infringement.

In order to apply Section 289, he will explain that he has been advised that Section 289 requires a determination of the "article of manufacture" ("AOM"). He will further explain that counsel has advised him that various courts have approved of the following four-part test to determine what the AOM is in design patent infringement litigation:

1. "the scope of the design claimed in the plaintiff's patent, including the drawing and written description, provides insight into which portions of the underlying product the design is intended to cover, and how the design relates to the product as a whole" ("Factor 1");

2. "the relative prominence of the design within the product as a whole" ("Factor 2");

3. "whether the design is conceptually distinct from the product as a whole" ("Factor 3"); and

4. "the physical relationship between the patented design and the rest of

the product may reveal that the design adheres only to a component of the product." ("Factor 4")

Regarding Factor 1, Bressler is expected to testify that the scope of the claimed design provides insight into how the design relates to each of the accused JCD devices as a whole. The '290 Patent is titled "Multifunction- Connector," thereby referring to the product as a whole. With the exception of the broken lines indicating that the interior of the ports are unclaimed, the '290 Patent figures are each defining the design to be applied to a multi-function connector as a whole.

Regarding Factor 2, Bressler is expected to testify that he has been advised by counsel that if the design is a minor component of the product, like a latch on a refrigerator, or if the product has many other components unaffected by the design, that fact suggests that the AOM should be the component embodying the design. Conversely, if the design is a significant attribute of the entire product, affecting the appearance of the product as a whole, that fact might suggest that the 'article' should be the product. The '290 Patent design includes the overall shape of the entire top and bottom face of the connector, including the relative proportions, straight edges and radiused corners, as well as the relative proportions, straight edges and radiused corners of the sides of the connector, and the shape of the ends of the connector. These design features stand out in prominence in each of the accused JCD devices, contributing considerably to their overall appearance. These

design features include the primary design features that are noticed quickly when looking at the products and contribute significantly to the look of the infringing JCD devices as a whole.

Further regarding Factor 2, Bressler is expected to testify that the claimed design influences the shape and size of each of the accused JCD devices, for example by defining the general shape of the device. The claimed design also serves to differentiate the accused JCD devices as a product line from other connector designs by third party companies.

**Belkin**



**Aluratek**



**UtechSmart**



Bressler is thus expected to conclude that Factor 2 supports the conclusion that the article of manufacture is each of the entire accused JCD devices.

Regarding Factor 3, Bressler is expected to testify that he applied his expertise as an industrial designer to evaluate whether the '290 Patent design is conceptually distinct from each or any of the accused JCD devices as a whole. The '290 Patent design corresponds to various portions of each of the accused JCD

devices that a user must touch in order to use the device as a whole. For example, the user is expected to touch the design components in order to affix the multifunction connector to a computer, as shown on the product packaging of the JCD 382 device:



Bressler is expected to testify that because the user's primary interaction when operating each of the accused JCD devices is by touching the design portion of the '290 Patent design, the design has no value apart from the accused JCD devices as a whole. In fact, a user could not operate each of the accused JCD devices without interfacing with the '290 Patent design as claimed. For the foregoing reasons, in his opinion as an industrial designer, Bressler is expected to conclude that the '290 Patent design is not conceptually distinct from each or any of the accused JCD devices as a whole.

Regarding Factor 4, Bressler is expected to testify that he has considered the physical relationship between the '290 Patent design and the rest of the accused JCD devices to assess whether the design adheres only to a component of the product.   In his opinion as an industrial designer, the design at issue does not adhere only to a component of the product.  Rather, it adheres to the product as a whole.  The design at issue applies to each of the accused JCD devices as sold and as used:



The '290 Patent design does not pertain to an internal component of a connector device that a user, in normal use of the connector, would physically separate from the connector as a whole. Furthermore, Bressler recognizes that there is an embedded circuit board within each of the accused JCD devices.  However, in examining the accused JCD devices, the user cannot in normal use, access the circuit board, or separate it from the accused device as a whole.  Moreover, a normal user would not be expected to access the circuit board.  In short, the

claimed design is integral to the accused JCD products and includes the protruding connector and negative ports of various shapes which are integral to its use. As stated above, the '290 Patent design does not adhere merely to a component of the product, but to the multi-function connector as a whole.

Bressler is expected to conclude that on balance, the four factors identified above indicate that: (a) the entire JCD 348 is the AOM; (b) the entire JCD 382 is the AOM; (c) the entire JCD 386 is the AOM; (d) the entire JCD 388 is the AOM.

Replying to Shankwiler September 28, 2022 Report

Bressler is also expected to respond to and rebut the arguments presented in Mr. Shankwiler's September 28, 2022 Report.

First, Bressler is expected to testify that Shankwiler has not applied the "ordinary" observer test as required by law, but rather has improperly applied an "extraordinary" observer test, replacing the ordinary observer with an observer who would apply an exacting analysis of each and every detail. For example, Shankwiler opines that the ordinary observer in this case is limited to the purchaser of accessories for a MacBook computer. In Bressler's opinion, this is incorrect, as it is too narrow, and merely represents an attempt by Shankwiler to replace an ordinary observer with an observer that supports his own granular approach to evaluating the designs in question. The '290 Patent is for a "Multi-Function Connector." The design is not limited to a connector suitable for use only with

Apple computers, such as a MacBook Pro.  An ordinary observer viewing the design of the '290 Patent would understand that it is a connector that can be used with any device having a female USB-Type C (henceforth "USB-C") port. Bressler is thus expected to conclude that such devices are not limited to MacBook laptops.

Responding to Shankwiler's argument that an ordinary observer would scrutinize the relevant products in greater detail because they are expensive, Bresser is expected to testify and present evidence that USB adapter are sold for as little as $5-6, laptop computers are sold for as little as $50-$55, and the accused products are each between $44 and $90, none of which is particularly expensive. Bressler is also expected to testify that most adult consumers have purchased some type of electronic connector or adapter, and thus that the market for these products is not limited to persons of above average income and/or education level, and not limited to persons well-versed in high-end electronic products and accessories.

Bressler is also expected to opine that Shankwiler's expertise does not extend to an understanding of the ordinary Mac user.  Other than offering evidence to support the price of a Mac laptop, the Shankwiler report offers no data in support of his opinions that Mac users are more educated, more technical, and more discriminating than ordinary consumers.  From Bressler's professional experience working with others who are Mac users, he is aware that Mac users are

diverse in age, work experience, education level, and technical savvy.

Bressler is also expected to rebut Shankwiler's argument that the size of the pill-shaped protrusion (i.e., USB-C male port) relative to the overall size of the device and its different features is an aesthetic, ornamental design choice. Because the size of the USB-C male port is functional, it is discounted in the infringement analysis.

Bressler is also expected to rebut Shankwiler's argument that the location of the USB-C port in the '290 Patent is functional because it is specific to use with ports on the left side of a laptop computer. USB-C ports are reversible (i.e., usable face up or face down), and thus such USB-C devices could be used on either side of a laptop, or potentially even on the front or back of a laptop (wherever there is a female USB-C port). The USC-B male connector could even be connected to another adapter rather than directly into a computer, further increasing its versatility. Especially because the '290 Patent device is not limited to any particular kind of computer, none of Shankwiler's arguments alleging functionality of the port location are correct. Thus, Bressler will testify that the location of the USB-C port in the '290 Patent is ornamental.

Bressler is also expected to testify that Shankwiler's suggestion that the shape and size of the female ports of the '290 Patent device are functional serves to bolster his infringement opinion. This is because the shape and size of the ports

cannot distinguish the '290 Patent from the accused products.

Regarding Shankwiler's argument that the JCD 382 does not infringe because it has a second male USB-C port, whereas the '290 Patent depicts only one male USB-C port, Bressler is expected to testify that the difference is relatively minor and is outweighed by the substantial similarities in the designs.

Bressler is also expected to testify that Shankwiler's comparison of the accused products to commercial products rather than the '290 Patent is an incorrect methodology for determination of infringement.

Bressler is also expected to testify that Shankwiler's argument that "there is no indication in the '290 patent that [the] curved line [contour caused by at the ends of the connector tapering, as shown in Figure 5] represents anything other than a physical seam between like parts" and "[t]here is no indication of a transition from one material to another as there exists on JCD382" is improper because design patents cover designs, including shapes and configurations, irrespective of the use of different colors and materials.  Also, the '290 Patent does not specify any material(s) or any color.  Design patent drawings further do not reveal heft or weight, as Shankwiler suggests, nor are they limited by the fact that they fail to do so.

Bressler is also expected to rebut Shankwiler's argument that the HDMI port of the JCD 382 "dominates" the surface of the JCD 382.  Shankwiler should not

have taken the size and shape of the HDMI port into consideration in performing his analysis because these features are functional.  The same is true for the size and shape of the other ports on the accused devices.

Bressler is also expected to rebut Shankwiler's argument that "[t]he taper on the sides of the '290 patent is more pronounced than the taper of the JCD382. (Similar arguments are presented as to the JCD 348, JCD 386 and JCD 388.)"  The difference in taper, according to Bressler's expected testimony, is visually insignificant.

Bressler is further expected to testify that his interpretation and application of the 3-way test, which compares the asserted patent and accused product to a single prior art reference, is correct, and that Shankwiler's interpretation of the test as considering the prior art collectively is incorrect.

Bressler is also expected to distinguish the prior art that Shankwiler relies upon.  With respect to the use of tapered ends, Bressler will point out that 4 of these 6 designs (images depicted below) identified by Shankwiler show fully-radiused ends, not tapered ends such as those used in the '290 Patent and the Accused Products:



**FIG. 1**

D693768

FIG. 1

D622213

FIG. 2

D720755

FIG. 1

D714728

Another set of references (see image below) relied upon does not begin tapering near the upper and lower ends of the devices.  Instead, they taper starting from the device midpoint, which is nothing like the '290 Patent design or the design of the Accused Products.



Chinese Patent Application No.
CN200830039913

FIG. 3

D488,464

The only other identified prior art with tapered ends is the Power Bank, which Bressler will have already distinguished.

Bressler is further expected to testify that much of the prior art considered in by Shankwiler would not likely be considered by the ordinary observer because the visual impression caused by the reference is not anywhere near to the visual impression created by the '290 Patent or the design of the Accused Products. He notes, for example, that much of the prior art relied upon by Shankwiler is not even in the field of connectors, and is therefore of minimal assistance, if any, in determining how prior art will impact the ordinary observer's perception of the accused and patented designs for multi-function connectors. For example, Shankwiler relies on: USD650,737 for a "portable battery pack"; USD711,389 for a "dual interface usb flash drive"; USD715,219 for a "portable charger"; USD745,523 for a "wireless adapter"; USD431,808 for a "battery"; USD488,464 for a "wireless LAN card"; USD711,389 for a "dual interface USB flash drive;" USD531,991 for a "Wireless stereo audio adapter for digital media player;" USD728,467 for a "Mobile battery charger;" and USD522531 for a "digital video tuner." These references should be discounted in the analysis because they are outside the scope of the field of connectors, and thus not likely to be drawn upon by an ordinary observer.

Bressler is further expected to testify that several prior art references identified by Shankwiler are of limited value because they lack a smooth, uninterrupted top surface.  These include USD647,908, USD488,464, USD 522,531, USD650,737, US D711,389, USD431,808, USD750,083, USD693,768, USD622,213, USD714728 and USD688,255.  Other prior art references identified by Shankwiler are of limited value because they are not in the shape of a generally rectangular device having elongated, straight sides.  These include D684,976 (square-shaped with radiused sides), USD709,892 (complex, multi-tiered shape), (complex shape), Hootoo HT-UD01 Universal Docking Station (two radiused corners and two sharp corners), and Juiced Systems 4-in-1 Adapter (trapezoidal; two radiused corners and two sharp corners, top side slimmer than rear side).

Bressler is expected to testify that of all the prior art Shankwiler identifies, he sees only one prior art design that the ordinary observer could conceivably draw upon as a starting point for a *bona fide* comparison of shape, proportion and texture of the '290 Patent, the Accused Products and the prior art:

**US Design Patent No. D689,858**

73.     US Design Patent No. D689,858 for a "converter" has proportions of 1H x 10.5L x 3.3W:



FIG. 1

In Bressler's opinion, on the whole, USD689,858 is the closest prior art design that the ordinary observer would draw upon in which to perform the 3-way comparison. This is because USD689,858 is a rectangular-shaped connector with a flat (yet slightly angled) and smooth, uninterrupted top side, having two elongated straight sides, each ending at radiused vertical corners.  Therefore, Bressler is expected to proceed to compare this design to the '290 Patent and the design of the Accused Products, as an ordinary observer would.

Bressler is expected to testify that performing the 3-way comparison of the '290 Patent design, the design of the Accused Products and USD689,858 reinforces his opinion of infringement at least because both the '290 Patent and the Accused Products conspicuously depart from the prior art design by incorporating the tapering at the ends of the top and bottom sides of the device:

**3-Way Comparison Using JCD 382 and D689,858**

| '290 Patent | UltraDrive JCD 382 | US D689,858 (Lo) Converter |
|---|---|---|



Bressler is expected to testify that the overall design of US Design Patent No. D715,219 would be a second conceivable prior art design if it was for a connector, but it is not. It is for a portable battery charger. (The September Shankwiler Report stated that the charger's proportions were 1H x 9.5L x 4.7W, which is also considerably wider than the proportions of the '290 Patent and the Accused Products in any event). Even if Bressler had considered USD715,219 as a bona fide design to the ordinary observer, the ordinary observer considering this design would be drawn to the conspicuous absence of the kind of tapering at the top and bottom ends of USD 715,219 that appears in both the '290 Patent and the Accused Devices.

**3-Way Comparison Using JCD 382 and USD715,219**

| '290 Patent | UltraDrive JCD 382 | USD715219 (Cepress) Portable Charger |
|---|---|---|
|  Fig. 3 |  |  FIG. 4 |

Bressler is expected to testify that the overall design of US Design Patent No. D715,797 would be a third conceivable prior art design – it is rectangular and has a smooth, uninterrupted top surface and 4 radiused vertical corners – if it was for a connector, and if its proportions were closer to those of the '290 Patent and the Accused Products. The proportions of USD715,797 are 1H x 2.19W X 7.58L. It is considerably shorter than the length of the design of the '290 Patent and the Accused Devices. Even if Bressler had considered USD715,797 as a bona fide design to the ordinary observer, he is expected to testify that the ordinary observer considering this design would again be drawn to the conspicuous absence of

tapering at the top and bottom ends of USD715,797 when compared to the design

of the '290 Patent and the Accused Devices.

**3-Way Comparison Using JCD 382 and USD715,797**

| '290 Patent | UltraDrive JCD 382 | US D715,797(Hiraga) Information Communication Terminal |
|---|---|---|



Bressler is further expected to testify that had he used another smooth-

topped connector design of Shankwiler's cited prior art as the closest prior art

design that an ordinary observer would use for the sake of comparison – such as

US 2006/0085584, or possibly the Hootoo HT-UD01 Universal Docking Station

(the quality of the images makes it difficult to state whether it is smooth-topped),

or the Juiced Systems 4-in-1 Adapter – the ordinary observer considering any of

these prior art designs would again be drawn to the conspicuous absence of

tapering at the top and bottom ends of the prior art design when compared to the design of the '290 Patent and the Accused Devices.

Bressler is further expected to rebut Shankwiler's contentions that isolated individual design elements (such as "radiused corners") were "well known in the prior art." He is further expected to testify that Shankwiler refuses to consider each isolated design element as part of the consideration of each prior art design as a whole. Just as the comparison of the accused product design to the patented design is a consideration based on the design as a whole, so too must this examination of prior art be contextualized to the closest overall designs reflected in the prior art, not merely a discussion of an isolated feature in the prior art.

With respect to Shankwiler's contention that "[a]any computer peripheral devices that predate the '290 patent had some combinations of a) a generally rectangular shape with ports on the front and/or rear face, b) proportions similar to the '290 patent, c) radiused corners, and d) tapered sides," Bressler is expected to testify that Shankwiler apparently developed a checklist of individual features, and then went in search of each individual feature in the prior art, regardless of the overall design of which it is a part. Bressler will explain that such a process is in in direct contrast with the goal of determining whether the design of the accused product conspicuously incorporates a key element of the '290 Patent design which is missing from the overall closest prior art designs.

Bressler is further expected to present 3-way charts for other prior art identified by Shankwiler, for the purpose of determining whether the accused products infringe the '290 patent.

Bressler is also expected to testify to the validity of the '290 Patent, the '875 Patent, the '616 Patent and the '618 Patent.  The following is a summary of the anticipated Bressler testimony taken from his report dated Sept. 29, 2022 regarding rebuttal (patent invalidity) issues raised in the Shankwiler Aug. 29, 2022 report).

Invalidity of Design Patents (Rebuttal)

Regarding the contention that the Sanho design patents are invalid, Bressler is expected to testify that patent invalidity must be proven by clear and convincing evidence.

875 Patent – Alleged Indefiniteness

Regarding the contention that the 875 Patent is indefinite under Section 112, Bressler is expected to testify to his understanding that:

- a design patent is indefinite if one skilled in the art, viewing the design as would an ordinary observer, would not understand the scope of the design with reasonable certainty based on the claim and visual disclosure.

- so long as the scope of the invention is clear with reasonable certainty to an ordinary observer, a design patent can disclose multiple embodiments within its single claim and can use multiple drawings to do so.

- a design patent is invalid for indefiniteness if there are errors and inconsistencies in the patent drawings that are of such a magnitude that the drawings, taken as a whole, fail to inform, with reasonable certainty, those skilled in the art about the overall appearance of the design.

Further, Bressler is expected to testify that the Shankwiler Report states, quite incorrectly, that FIGURES 6 and 7 "depict two different products." They are not products at all, but design embodiments.  Whereas Shankwiler states that "it would be impossible for an ordinary observer to understand which port configuration constituted the scope of the design claimed in the '875 Patent," Bressler disagrees.  Having reviewed the '875 Patent, including all of its figures, Bressler is expected to testify that the focus of whether the patent claim is definite or not is on the overall appearance of the design.  Here, the '875 Patent claims the ornamental design for a multi - function docking station, as shown and described further in FIGURES 1-8.  The overall design as perceived by the ordinary observer, considering the patent and figures as a whole, is that of a thin generally rectangular solid whose length and width are substantially greater than its height or thickness. The vertical corners where the narrow sides and ends meet are radiused. The

111

proportions of the rectangular solid are approximately 1H x 2.9W x12L. The top

and bottom broad rectangular surfaces are flat and devoid of features. The

foregoing would be the primary visual elements of the design.  The overall

appearance of the design as described above is consistent and reinforced by the

various figures of the '875 Patent.

Bressler is also expected to testify that the design as shown in FIGURES 1-5

and FIGURE 8 also claims two male protrusions on the longer thin side of the

rectangular solid. The protrusions are each of a lozenge shape whose major axis is

parallel to the length of the connector and near one end of the narrow side.  The

appearance of these protrusions is consistent and reinforced by each of the

FIGURES 1-5 and 8 of the '875 Patent.

Bressler is expected to testify that on the narrow side opposite the

protrusion, as shown in FIGURES 6 and 7, there is a small narrow rectangular slot

which sits above a wider slot. I recognize these openings as the kind of openings

used to accommodate memory cards and mini-cards. On either side of these two

slots, there are additional side-by-side openings which I recognize as akin to USB

ports.  In FIGURE 6, Bressler is expected to testify that the side-by-side USB ports

to the left of the memory card slots are traditional USB-A ports, and the side-by-

side USB ports to the right of the memory card slots are USB-C ports.  In FIGURE

7, the side-by-side USB ports to the left of the memory card slots are USB-C ports,

and the side-by-side USB ports to the right of the memory card slots are traditional USB-A ports.

FIGURES 6 and 7 do not represent "products." They each represent left side views of the claimed design, which are not primary visual elements of the overall design of the '875 Patent, when judged from the perspective of an ordinary observer having formed an overall visual impression of the design based upon all of the figures. In Bressler opinion, an ordinary observer and ordinary designer viewing FIGURES 6 and 7 would conclude that the inventor is indicating that it does not matter whether the USB ports on the left and right side of the memory card slots are USB-A ports or USB-C ports.

Alleged anticipation of the 875 Patent based on the 616 Patent

Regarding the Shankwiler Report's contention that the 875 Patent (filed Jan. 12, 2017, claiming priority to CN application dated Dec. 13, 2016) is anticipated by the 616 Patent (filed Nov. 24, 2016), Bressler is expected to testify to his understanding that:

- the sole test for anticipation in design patents is the "ordinary observer test." According to this test, two designs are substantially the same if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, the resemblance is such as to deceive such an observer,

inducing him to purchase one supposing it to be the other. The publication must show the same subject matter as that of the patent and must be identical in all material respects.

- a disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention if:

  o (A)     the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

  o (B)     the subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor. See 35 U.S.C. § 102(b)(1).

  o In the fall of 2016, Mr. Chin expressed interest in working with GoPod (owned by Zhuowen Liao) to purchase and then market and sell the N28 product. In November of 2016, Mr. Chin was working on exterior designs for the N28 product along with Zhuowen Liao, the head of GoPod. Mr. Chin and Mr. Liao were in communications with each other throughout the fall of 2016 as they worked on the design and product release.

- o The '875 Patent is based on a U.S. patent application filed on January 12, 2017, naming Zhuowen Liao as inventor. The patent claims priority to a Chinese counterpart application which was filed December 13, 2016.

- o On May 5, 2020, a Petition to Correct Inventorship of the '875 Patent was filed seeking to add Daniel Chin as a co-inventor. It includes statements under oath by Mr. Chin and Mr. Liao.

- o The '616 Patent is based on a U.S. patent application filed on Nov. 24, 2016, naming Daniel Chin as inventor.

- o On May 5, 2020, a Petition to Correct Inventorship of the '616 Patent was filed seeking to add Zhuowen Liao as a co-inventor. It includes statements under oath by Mr. Chin and Mr. Liao.

- o Sanho is the owner of both the '875 Patent and the '616 Patent.

Therefore, Mr. Bressler is expected to testify that the '616 Patent is not prior art to the '875 Patent because the '616 Patent is a disclosure made November 24, 2016, which is 1 year or less before the December 2016 effective filing date of the '875 Patent, and the '616 Patent was made by the inventor or joint inventor (Mr. Chin) or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor (Mr. Liao).

Alleged Obviousness of the 875 Patent

115

Bressler is expected to testify to the following understandings:

- that the obviousness inquiry for design patents asks whether, based on the content and scope of the prior art, the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved. More specifically, the inquiry is whether a designer of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design.

- before one can begin to combine prior art designs, one must identify a prior art design, the design characteristics of which are basically the same as the claimed design. Once this reference is identified, other references, from the prior art, may be used to modify that primary reference to create a design that has the same overall visual appearance as the claimed design.

- Additional references may only be used to modify the primary reference if they are so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other.  In other words, there must be a teaching or rationale in the prior art that would lead an ordinary designer to combine references.

Bressler is expected to testify that the Shankwiler Report, Paragraph 40, shows various prior art references teaching generally rectangular shapes with radiused corners.   Bressler examined these references and found, as set forth below, that they lack the design proportions of the '875 Patent design.  They are not, therefore, showing a body design that is basically the same as the body design of the '875 Patent, as Shankwiler has suggested.

<u>Comparing Body Design Proportions</u>

| Reference | Height | Width | Length |
| --- | --- | --- | --- |
| '875 Patent | 1.0 | 2.9 | 12.0 |
| D522531 | 1.0 | 3.5 | 5.4 |
| D750083 | 1.0 | 3.0 | 13.3 |
| D728467 | 1.0 | 2.7 | 5.0 |
| D715797 | 1.0 | 2.2 | 7.6 |

Of these references, the Shankwiler Report states: "In my opinion, U.S. Patent No. D715,797 (the '797 Patent) is a primary reference that discloses almost every element of the claimed design. The article depicted in the '797 Patent has the same rectangular shape with flat top and bottom surfaces that result in squared-off ends."

Bressler is expected to testify that the '797 Patent shows the ornamental design for an information communication terminal, including:

**Front View**



(Emphasis added).

Bressler is expected to testify that the '797 Patent claims four circular protrusions (in red above) and three different generally rectangular features on the rear side of the design. The '875 Patent has no such protrusions or generally rectangular features on its rear side.

**Left Side View**



Bressler is also expected to testify that the proportions of the '797 Patent are 1.0H x 2.2W x 7.6L. These are not the substantially same (or even basically the same) as the proportions of the design of the '875 Patent. There are also multiple detailed features on the "back" of the '797 Patent design that are absent from the '875 Patent and which further create a different overall impression from the '797 Patent and therefore the '797 Patent does not qualify as a primary reference. The height/thickness of the '797 Patent design is obviously much larger than that of the claimed designs. Therefore, Bressler is expected to testify that the Shankwiler Report <u>falsely</u> claims that the '797 Patent "discloses almost every element of the claimed design" of the '875 Patent.

Bressler is also expected to testify that the Shankwiler Report states in a most conclusory and unsupported manner that "an ordinary designer of a multi-port docking station would draw design inspiration from an information communication terminal like the one depicted in the '797 Patent as they are closely related technology." Setting aside what "design inspiration" is and whether it is related to the determination of obviousness, Bressler is expected to testify that the

Shankwiler Report offers no reasons in support of this conclusion.  It is instead merely an unsupported assertion.  According to Bressler, an ordinary designer would not likely be motivated to arbitrarily combine disparate elements of docking stations or connectors with unrelated terminals that are not used to dock peripheral devices with computers.  According to Bressler, the design characteristics of the '797 Patent are not "basically the same" as the claimed design of the '875 Patent. There are notable differences in proportionality and features.

The Bressler is also expected to testify that the Shankwiler Report's attempt to analyze the male protrusions is flawed.  Whereas the Shankwiler Report notes that the '797 Patent "does not include solid pill-shape protrusions extending from its rear face. The '875 Patent includes two pill-shaped protrusions extending from one face,"  Bressler is expected to testify that one cannot parse, much less entirely eliminate a structural element from the claimed ornamental design, for design patents protect the overall ornamentation of a design, not an aggregation of separable elements.  Here, per Bressler, the overall appearance of the design is an aesthetically pleasing appearance that is not dictated by function alone, so there is no functionality issue.  Moreover, per Bressler, the decision where to place the male protrusions along the side of the docking station is a design decision, one that is not dictated by function.  Elsewhere, in describing the male protrusion of the '290 Patent, the Shankwiler Report essentially agrees with this point, for it states

that "[o]nly the position of the element relative to the overall body may be claimed, not the element itself."

In response to the Shankwiler Report statement that "[i]t would have been obvious to an ordinary designer of products of this kind to modify the design depicted in the '797 Patent to include protrusions that align with the ports of the device the article interacts with, as shown in D750,083, D830,366 and CN728 Patents," Bressler is expect to testify that the '797 Patent is not a docking station, and in his opinion does not qualify as a primary reference, the secondary references relied upon – D750,083 (titled "Docking device"), D830,366 (titled "Multiport USB hub for computer") and CN728 Patents – cannot be relied upon to modify the '797 Patent design because they are not so related to the '797 Patent that the appearance and location of male protrusions in any secondary reference would suggest the application of those features to the '797 Patent design.

Moreover, per Bressler, even if the '797 Patent was combined with male protrusion(s) from one of the secondary references relied upon by the Shankwiler Report, the resulting design would not have the same height-width-length proportions as the '875 Patent design.   Bressler is expected to testify that the Shankwiler Report fails to demonstrate by clear and convincing evidence that the claim of the '875 Patent is obvious.  And, for the reasons mentioned above, the CN '728 reference is not prior art.

Alleged obviousness of the 616 Patent

In addition to the understandings described above relating to obviousness, Bressler is expected to testify that the '616 Patent claims the ornamental design for a Thunderbolt 3.0 USB-C Connector, as shown and described further in FIGURES 1-7.  The overall design as perceived by the ordinary observer considering the patent and figures as a whole is that of a thin generally rectangular solid whose length and width are substantially greater than its height or thickness. The vertical corners where the narrow sides and ends meet are radiused. The proportions of the rectangular design are approximately 1H x 2.9W x 11.3L. The top and bottom broad rectangular surfaces are flat and devoid of features. The foregoing would be the primary visual elements of the design.

Whereas the Shankwiler Report shows various prior art references teaching generally rectangular shapes with radiused corners.  Bressler has examined these references and, as reflected in the below chart, shows that they lack the design proportions of the '616 Patent design.  According to Bressler, therefore, they are not showing a body design that is substantially the same as the body design of the '616 Patent.

**Comparing Body Design Proportions**

| Reference | Height | Width | Length |
|-----------|--------|-------|--------|
| '616 Patent | 1.0 | 2.9 | 11.3 |
| D522531 | 1.0 | 3.5 | 5.4 |

| | | | |
|---|---|---|---|
| D750083 | 1.0 | 3.0 | 13.3 |
| D728467 | 1.0 | 2.7 | 5.0 |
| D715797 | 1.0 | 2.2 | 7.6 |

Bressler is expected to testify that the '797 Patent is a weak primary reference because its proportions and features are not basically the same as those of the '616 Patent. Additionally, the '797 Patent has additional features that prevent it from being perceived as basically the same. As noted above, the '797 Patent shows the ornamental design for an information communication terminal. As noted above, the '797 Patent claims four circular protrusions and three different generally rectangular features on the rear side of the design. The '616 Patent has no such protrusions or generally rectangular features on its rear side.

According to Bressler, the proportions of the '797 Patent are 1.0H x 2.2W x 7.6L. These are not the substantially same (or basically the same) as the proportions of the design of the '616 Patent. There are also multiple detailed features on the "back" of the '797 Patent design that are absent from the '616 Patent and which further create a different overall impression from the '797 Patent. The height/thickness of the '797 Patent design is much larger than that of the claimed design of the '616 Patent. Therefore, according to Bressler, the Shankwiler Report falsely claims that the '797 Patent "discloses almost every element of the claimed design" of the '616 Patent.

Per Bressler, the Shankwiler Report states in a most conclusory manner that "an ordinary designer of a Thunderbolt 3.0 USB-C Connector would draw design inspiration from an information communication terminal like the one depicted in the '797 Patent as they are closely related technology." Bressler is expected to testify that, setting aside what "design inspiration" is and whether it is related to the determination of obviousness, the Shankwiler Report offers no reasons in support of this conclusion. For the reasons shown above, the design characteristics of the '797 Patent are not basically the same as the claimed design of the '616 Patent. Per Bressler, there are notable differences in proportionality and visual features that are not present in the '616 Patent design.

Bressler is also expected to testify that Shankwiler's analysis of the male protrusions is flawed for the same reasons as his analysis of the '875 Patent above.

Bressler is expected to testify that because the '797 Patent is not a connector, the secondary references relied upon in the Shankwiler Report – D750,083 (titled "Docking device"), D830,366 (titled "Multiport USB hub for computer") and CN728 Patent (which is not prior art) – would not be relied upon by an ordinary designer to modify the '797 Patent design, because they are not so related to the '797 Patent that the appearance and location of male protrusions in any of these secondary references would suggest the application of those features to the '797 Patent design.

Bressler is also expected to testify that even if the '797 Patent was combined with male protrusion(s) from any of the secondary references relied upon by the Shankwiler Report, the resulting design would not have the same height-width-length proportions as the '616 Patent design. Thus, the prior art relied upon does not result in a design that is substantially the same as the design of the '616 Patent.

Alleged obviousness of the 618 Patent

In addition to the understandings above relating to obviousness generally, Bressler is expected to testify that the '618 Patent claims the ornamental design for a multi-function docking station, as shown and described further in FIGURES 1-8. The overall design as perceived by the ordinary observer considering the patent and figures as a whole is that of a thin generally rectangular solid whose length and width are substantially greater than its height or thickness. Per Bressler, the vertical corners where the narrow sides and ends meet are radiused. The proportions of the rectangular solid are approximately 1H x 2.7W x 11.7L. The top and bottom broad rectangular surfaces are flat and devoid of features.

Per FIGURE 4, the '618 Patent design also includes, as secondary visual design factors, female ports on one side of the device, arranged as what appears to be side-by-side USB-C ports positioned to the immediate left of two stacked slots comprising a memory card slot beneath a micro-card slot, positioned to the

immediate left of side-by-side traditional USB ports.  The micro-card slot is

centered atop the memory card slot.

### '618 Patent – Female Ports



Per Bressler, FIGURE 5 shows that the '618 Patent design also includes, as

secondary design factors, two male connectors on the opposite side of the device

from the female ports.   Per FIGURES 1 and 2, the '618 Patent design also includes,

as tertiary design factors, a decorative screw at each end of the device.

According to Bressler, the CN728 Patent shows an ornamental design for a

multi-function connector.  The overall design as perceived by the ordinary observer

considering the patent and figures as a whole is that of a thin generally rectangular

solid whose length and width are substantially greater than its height or thickness.

The vertical corners where the narrow sides and ends meet are radiused. The

proportions of the rectangular solid are approximately 1H x 2.5W x 9.4L. The top

and bottom broad rectangular surfaces are flat and devoid of features.

Bressler is expected to testify that the CN728 Patent design also includes, as

secondary visual design factors, female ports on one side of the device, arranged as

what appears to be a single USB-C port positioned to the immediate left of two

stacked slots comprising a memory card slot beneath a micro-card slot, positioned

to the immediate left of side-by-side traditional USB ports.  The micro-card slot lines up with the far-right edge of the memory card slot and is not centered.

## CN728 Patent – Female Ports



仰视图

According to Bressler, he CN728 Patent design also includes, as a secondary design factor, one male connector on the opposite side of the device from the female ports.  The location of the port is a non-functional design feature.

Per Bressler, an ordinary observer comparing the primary visual elements of the '618 Patent design to the CN728 Patent design would recognize that the proportions of the designs differ, due primarily to the fact that the body of the '618 Patent design is noticeably longer (approximately 20% longer) than that of the CN728 Patent:

| '618 Patent | CN728 Patent |
|---|---|
| Fig. 6 | 立体图 |

Per Bressler, an ordinary observer comparing the secondary visual elements of the '618 Patent design to the CN728 Patent design would recognize that the '618 Patent has 6 female ports while the CN728 Patent has 5 female ports, and the alignment of the micro-card slot different between the two designs.

| '618 Patent | CN728 Patent |
|---|---|
|  | |

Bressler is also expected to testify that while acknowledging the differences in the number of male connectors and female ports between these two references, the Shankwiler Report attempts to downplay the significant difference in length between the two by calling the '618 Patent design "slightly" longer. In actuality, the '618 Patent length is 11.7 versus the CN728 Patent design length of 9.4. The 2.3 difference represents approximately a 20% difference in length between the designs.

Bressler disagrees with the Shankwiler Report's conclusion that the '618 Patent design is longer than the CN728 Patent design in order "to accommodate additional female ports on its rear face." Per Bressler, the Shankwiler Report offers no analysis or reasoning to back up this assertion. Per Bressler, it is not

necessary to have a length that is approximately twenty percent longer to accommodate four side-by-side USB ports and stacked memory card slots. Bressler is expected to testify that the JCD 382 design has design proportions of 1.0H x 2.7W x 10.0L, and also has four side-by-side USB female ports beside stacked memory card slots.

**JCD 382 – Female Ports**



Bressler is expected to testify that even if the CN728 Patent was combined with additional male protrusion(s) from any of the secondary references relied upon by the Shankwiler Report, the resulting design would not have the same height-width-length proportions as the '618 Patent design.  Thus, per Bressler, the prior art relied upon does not result in a design that is substantially the same as the design of the '618 Patent.

The HyperDrive Embodies the Design of the '618 Patent (Rebuttal)

The Shankwiler Report concludes that "due to the numerous differences between the Hyperdrive and the '618 Patent, the designs are not substantially similar and the Hyperdrive does not embody the '618 Patent."   In rebuttal,

129

Bressler is expected to testify that the Shankwiler Report has not followed the proper methodology for determining whether HyperDrive practices (*i.e.*, would infringe) the '618 Patent design.

Bressler laid out the test for design patent infringement in his first report. Specifically, the first inquiry is whether the designs are "plainly dissimilar." If the design in question is not plainly dissimilar from the design of the '618 Patent, then the three-way test of *Egyptian Goddess* (comparing the design patent, the accused product in question and the prior art) must be used.

The Shankwiler Report offers the opinion that the HyperDrive design is not "substantially similar" to the '618 Patent's design, but, per Bressler, it does not offer any opinion that the HyperDrive design is "plainly dissimilar" from the '618 Patent's design.

Moreover, Bressler is expected to point out that the Shankwiler Report is silent as to the similarities between the designs of the '618 Patent and the HyperDrive.  Bressler notes that an ordinary observer would not likely conclude that the HyperDrive design is plainly dissimilar from the design of the '618 Patent. The overall design of the '618 Patent as perceived by the ordinary observer considering the patent and figures as a whole is that of a thin generally rectangular solid whose length and width are substantially greater than its height or thickness. The vertical corners where the narrow sides and ends meet are radiused. The

proportions of the rectangular solid are approximately 1H x 2.7W x 11.7L. The top

and bottom broad rectangular surfaces are flat and devoid of features.

Bressler is expected to testify that,like the '618 Patent, the overall design of

the HyperDrive as perceived by the ordinary observer considering the product

design as a whole is that of a thin generally rectangular solid whose length and

width are substantially greater than its height or thickness. Two of the vertical

corners where the narrow sides and ends meet are radiused. The proportions of the

rectangular solid are approximately 1H x 3.6W x 12.7L. Like the '618 Patent, the

top and bottom broad rectangular surfaces are flat and devoid of features.

Bressler may rely on the following side-by-side comparison:

### Side-by-Side Comparison

| | '618 Patent | Hyperdrive device |
|---|---|---|
| "top, front, left perspective" |  Fig. 6 |  |
| "bottom, rear, left side perspective" |  Fig. 7 |  |

Bressler is expected to explain that, per FIGURE 4, the '618 Patent design also includes, as secondary visual design factors, female ports on one side of the device, arranged as what appears to be side-by-side USB-C ports positioned to the immediate left of two stacked slots comprising a memory card slot beneath a micro-card slot, positioned to the immediate left of side-by-side traditional USB ports.  The micro-card slot is centered atop the memory card slot.  Like the '618 Patent, Bressler is expected to testify that the HyperDrive product design also includes, as secondary visual design factors, female ports on one side of the device, arranged as what appears to be side-by-side USB-C ports positioned to the immediate left of two stacked slots comprising a memory card slot beneath a micro-card slot, positioned to the immediate left of side-by-side traditional USB ports.  Unlike the '618 Patent design, the HyperDrive product design's micro-card slot is left-aligned as opposed to centered atop the memory card slot.  Per Bressler, FIGURE 5 of the '618 Patent design also includes, as secondary visual design factors, two male protrusions extending from one of the sides of the docking station.  Each of the protrusions is lozenge-shaped.



Fig. 5

Bressler is expected to testify that the design of the HyperDrive also includes, as secondary visual design factors, two male protrusions extending from one of the sides of the docking station. Each of the protrusions is lozenge-shaped. Bressler may rely on the following visual comparison:

**Side-by-Side Comparison**

| '618 Patent | Hyperdrive device |
|---|---|
| "side view"  Fig. 5 |  |

According to Bressler, the failure of the Shankwiler Report to consider any of the design similarities between the design of the '618 Patent and the HyperDrive precludes any ability to render a meaningful opinion on the degree of similarity or dissimilarity of the designs taken as a whole.

Moreover, in Bressler's opinion, taken as a whole, the designs of the '618 Patent and the HyperDrive are not "plainly dissimilar" due to the similarities in primary and secondary visual factors described above. Because the design of the HyperDrive is not plainly dissimilar from the design of the '618 Patent, a proper

analysis of whether the HyperDrive practices the design of the '618 Patent

necessitates the usage of the three-way test of *Egyptian Goddess*.

Therefore, according to Bressler, Shankwiler utilized an unreliable

methodology for evaluating the design of the HyperDrive product in comparison to

the design of the '618 Patent. In addition to failing to account for the similarities

in the respective designs, the Shankwiler Report did not employ the three-way test

of *Egyptian Goddess*. Therefore, in Bressler's opinion, the opinion expressed in

the Shankwiler Report that the HyperDrive does not practice the design of the '618

Patent is not credible or reliable.