1

1        The following is the PDF of an official transcript.

2   Official transcripts may be filed in CM/ECF only by the

3   Official Court Reporter and will be restricted in CM/ECF for a

4   period of 90 days.

5        You may cite to a portion of the attached transcript

6   by the docket entry number, referencing page and line number,

7   only after the Court Reporter has filed the official

8   transcript; however, you are prohibited from attaching a full

9   or partial transcript to any document filed with the Court.

10

11                          - - -

12        Stenographic Court Reporter Note:

13   No AI technology was used in the preparation of this

14   Official Certified U.S. District Court transcript.

15                          - - -

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3

4   SANHO CORPORATION,            )
                                  )
5              Plaintiff,         )
           v.                     )   CIVIL ACTION
6                                 )   FILE NO. 1:18-CV-05385-SDG
                                  )
7   KAIJET TECHNOLOGY             )
    INTERNATIONAL LIMITED, INC.,  )
8   ET AL.,                       )
                                  )
9              Defendants.        )
    _____)
10

11

12  ---------------------------------------------------------

13      BEFORE THE HONORABLE STEVEN D. GRIMBERG
              TRANSCRIPT OF PROCEEDINGS
14                 JULY 2, 2024

15  ---------------------------------------------------------

16

17      Proceedings recorded by mechanical stenography
         and computer-aided transcript produced by
18

19       JANA B. COLTER, FAPR, RDR, CRR, CRC
            Realtime Systems Administrator
20             Official Court Reporter
               1949 U.S. Courthouse
21             75 Ted Turner Drive, SW
               Atlanta, Georgia  30303
22                (404) 215-1456

23

24

25
```

```
1    APPEARANCES:

2    For the Plaintiff:              ALI AALAEI
                                     STEVEN HILL
3                                    DAVID LUDWIG
                                     JOHN NIXON MAHAFFEY
4                                    Attorneys at Law

5    For KaiJet Technology:          ROBERT CARLSON
                                     RYAN GENTES
6                                    STEVEN MATTHEW PHILBIN
                                     JOHANNA TOMLINSON
7                                    Attorneys at Law

8    For Magic Control Technology    YITAI HU
     & Starview Global Limited:      CHARLENA THORPE
9                                    Attorneys at Law

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

```
1
2                         _  _  _
3                    P R O C E E D I N G S
4       (Atlanta, Fulton County, Georgia, July 2, 2024, in open
5   court.)
6
7            THE COURT:  Good morning.  You may be seated.
8            All right.  Well, let me call the case.
9            This is Sanho Corporation v. KaiJet Technology
10  International Limited, et al., Case Number 18-cv-5385.
11           Let's have appearances of counsel beginning with the
12  plaintiff.
13           MR. HILL:  Good morning, Your Honor.
14           For the plaintiff, I'm Steve Hill from
15  Hill, Kertscher & Wharton.
16           With me is my partner, David Ludwig and Ali Aalaei,
17  and also one of my associates, John Mahaffey, is seated at
18  counsel table as well.
19           THE COURT:  All right.  Good morning.
20           MR. CARLSON:  Good morning, Your Honor.
21           I'm Bob Carlson of Lee & Hayes, for the defendants.
22  We'll use as shorthand KaiJet U.S. and KaiJet Taiwan.  And
23  with me at counsel table are Ryan Gentes and Steven Philbin.
24           THE COURT:  All right.  Good morning.
25           MR. HU:  Good morning, Your Honor.  I'm Yitai Hu for
```

1  defendants, KaiJet Taiwan and Starview Global.

2          MS. THORPE:  Good morning, Your Honor.

3          Charlotte Thorpe for Defendants Starview Global and

4  KaiJet Taiwan.

5          THE COURT:  Okay.

6          MS. TOMLINSON:  Good morning.

7          I'm Johanna Tomlinson, also with KaiJet U.S. and

8  KaiJet Taiwan.

9          THE COURT:  Okay.  Excellent.

10          MS. THORPE:  Thank you.

11          THE COURT:  Well, good to see you-all.

12          We're here in the pretrial conference for the trial

13  that is scheduled to begin a week from today, on July 9th.  I

14  know we have a number of issues to get through today, so I

15  appreciate counsel accommodating the change in time to this

16  morning so that we make sure that we have enough time to get

17  through it all.

18          In looking through everything, my thought, unless

19  you-all have discussed it differently, is that we tackle the

20  motions to exclude the expert witnesses first because that is

21  probably the most substantive issue we need to address and

22  seems to affect some of the motions in limine issues as well.

23          So if that's okay, let's proceed with that.  I have

24  reviewed the briefings, but I'd like to hear argument on them

25  as well because I have some questions.

```
 1              So let's start with Sanho's motion to exclude Witness
 2    Sarabia, which is ECF 521.
 3              Who wishes to take that on behalf of Sanho?
 4              Mr. Hill?
 5              MR. HILL:  It's probably been about 15 years since
 6    I've seen somebody try to do what the defendants want to do
 7    here, which is to put a lawyer in the box as a likelihood of
 8    confusion and copyright infringement expert to opine on the
 9    trademark infringement copyright infringement ultimate issues
10    in the case, as well as some collateral secondary issues that
11    relate to some of the likelihood of confusion factors.
12              We used to -- we used to shy away from that because
13    it was too much of a -- it was too much of a concern that the
14    lawyer was just a mouthpiece and that anything that the lawyer
15    said regarding the law might be taken as gospel by the jurors
16    and therefore, confused.  But here, this is all of the
17    concerns that we used to have about this type of practice on
18    steroids.
19              Because what Mr. Sarabia has done is he has attempted
20    to redefine central tenants of trademark law and then argue
21    facts that meet his redefined standards, starting at Pages 10
22    through 13 of his report, where he -- where he says that for
23    copyright infringement and trade dress infringement, he's
24    counted up hundreds of differences, based on nothing more than
25    visual observation, and therefore, concludes that because
```

1    there are so many differences, there can't be infringement.

2          His report does not set forth a test for how

3    infringement is determined.  So there is no prerequisite

4    methodology that he has set forth that he is attempting to put

5    his facts into in order to generate an ultimate opinion.  The

6    opinion is, if there's differences, there must not be

7    infringement.

8          The second core problem that we have with the

9    opinions at Pages 10 through 13 regarding the counting up and

10   summing up of differences is that this is not expert work.

11   The law is clear that for an expert to be helpful to the jury,

12   the expert must be something more than just a percipient

13   witness.

14          So we wouldn't call an expert to count two plus two

15   equals four, and here we wouldn't call an expert to do the

16   same thing that jurors can do themselves, which is to make

17   visual observations about product packaging, count differences

18   and similarities, if they wish to count them.  The only thing

19   he's doing is he's putting an exclamation point at the end of

20   the counting exercise by saying, and therefore, because there

21   are these differences, there's no infringement.

22          Well, as Your Honor pointed out in the summary

23   judgment order, that's not actually what the test of

24   infringement is.  It's not a mathematical exercise.  It's not

25   a summation.  It's not counting similarities, counting

1    differences and seeing which is greater than what.

2         There's a -- there's an exercise in qualitative

3    assessment that has to go on there, that Mr. Sarabia has not

4    accounted for in his analysis, either methodologically or in

5    terms of the facts that he is marshaling in support of his

6    opinion.

7         THE COURT:  Why can't you cross-examine him on that

8    point?

9         MR. HILL:  Of course we can, and we will, if he

10   testifies.  But the -- but the prerequisite issue under --

11   under Rule 703 is is the testimony helpful to the jury, as an

12   expert testimony should be.  And if all the expert is doing is

13   doing the same thing that an advocate does when he points out

14   to the jury the similarities and the differences and then

15   makes the argument, he's nothing more than another -- than

16   another advocate attorney, this one appearing in the box under

17   the guise of an expert witness making the same arguments that

18   the counsel for the parties can make, and doing it under

19   the -- but under the guise of being an expert.  And that's

20   unfair.  So that's -- that's the sum total of the argument on

21   Pages 10 through 13.

22        Also, now I'm turning to his arguments relating to

23   the weakness of the HyperDrive mark.  And I apologize because

24   I think -- I think this bleeds over some into Pages 10 through

25   13 as well, because here is where he is coming up with his --

1    a well-defined trademark concept, secondary meaning.

2    Secondary meaning, there's pattern Eleventh Circuit jury

3    instruction, lays out the four-part test for how the jury is

4    supposed to determine secondary meaning.

5          Secondary meaning is, in short, the concept of

6    whether or not -- notwithstanding whether the mark is

7    descriptive of the goods, has the owner of the mark done

8    enough in the way that he has used it, in the way that he has

9    advertised it, and in the way that he has sold his goods

10   bearing the mark that he has created a linkage in the mind of

11   the consuming public between the mark and his company.

12         Sarabia does not analyze any facts relating to how

13   Sanho has used the mark, the extent to which Sanho has

14   advertised, the extent to which it has sold, the extent to

15   which its products have been visible in retail chains like

16   Best Buy.  You don't find any analysis that relates to the

17   actual secondary factors analysis the way it's supposed to be

18   carried out under Eleventh Circuit law.

19         THE WITNESS:  Instead, what Sarabia does is he seeks

20   to redefine the concept of secondary meaning because he argues

21   that we're not entitled to secondary meaning for HyperDrive

22   for two reasons:  First of all, because Sanho was not the

23   first company to use hyper, and it was not the first company

24   to use HyperDrive on any good anywhere in the world.  That's

25   the first argument that he makes.  That has nothing to do,

1  given the -- given the Eleventh Circuit's decision in the

2  *Tally-Ho* case, priority of use, being the first to use is

3  utterly irrelevant to secondary meaning, because secondary

4  meaning is about penetrating the market.  It's not about

5  whether you were first.

6        Now, there's a collateral problem with his first-use

7  factor as he has coined it for this particular analysis.  And

8  that is that the first usage that he is pointing to of

9  HyperDrive is on product -- is on a product that is utterly

10  irrelevant to the market in which Sanho competes.  It has

11  nothing to do with computers or computer accessories.  It's --

12  it's a sound amplifier.

13        And as to the earlier usages of hyper, this Court

14  already found in the summary judgment order that the usage of

15  a subpart of the mark is not -- is not how trademark analysis

16  should be carried out.

17        We're not looking at whether or not Sanho was -- even

18  under his first use of the mark criterion, we wouldn't look at

19  whether Sanho was the first to use drive or the first to use

20  hyper; we would look to see whether Sanho was the first to use

21  HyperDrive.

22        But that's secondary because the real problem here is

23  that he wants to tell the jury that if Sanho wasn't the first

24  company to ever use HyperDrive on any product anywhere in the

25  world, then it can't have secondary meaning.  And that's not

1  the law.

2        So he wants to sit in the box as a lawyer, a supposed

3  lawyer with expertise in trademark and copyright and tell the

4  jury something that's not true when it boils down to how the

5  law is supposed to be applied.  That risks juror confusion,

6  and it also risks the jurors coming to some decisions

7  regarding to important legal terms before they've actually

8  received Your Honor's instructions.

9        Second Sarabia factor in his definition of secondary

10  meaning, the way he sees it is that Sanho supposedly had a

11  duty to police the marketplace against any kind of use of

12  hyper or HyperDrive, no matter what product it was actually

13  used on.  So this is -- really boils down to sort of a we're

14  not the exclusive user of the mark and therefore, we can't

15  have secondary meaning.

16        Again, exclusivity is not one of the secondary

17  meaning factors under the established Eleventh Circuit test,

18  so this is no -- in no way is no better than the -- than the

19  first user criterion that he has also established.

20        Under this exclusivity factor, he has given no

21  consideration to the relatedness of the goods that are being

22  used.  The examples that he pulls out of hyper and HyperDrive

23  that are being used are the same examples that Your Honor in

24  the summary judgment order denying their motion for summary

25  judgment said are irrelevant because they don't relate to

1    goods that are anything like what the HyperDrive is used on.

2         They're not for computer accessories.  They're

3    pointing to software and electrical engines and positional

4    drives, heavy machinery, centrifuges.  These are -- these are

5    things that -- Sarabia hasn't engaged in any probing analysis

6    to show why there's a relatedness between the goods associated

7    with the marks that he wishes to tell the jury about to be

8    able to defend the proposition that this somehow has had a

9    dilutive effect in Sanho's market that is preclusive of Sanho

10   being able to show that it has established secondary meaning.

11        So that, in a nutshell, is why we are opposed to his

12   testimony regarding secondary meaning regarding the first use

13   of the mark and regarding this so-called duty of -- duty to

14   police the market against any goods anywhere in the world that

15   bear the mark, regardless of whether the goods are actually

16   shown to be related or not.  He has not shown that any of

17   these goods are, in fact, related.

18        Third set of opinions.  This is Sarabia's reliance on

19   the word hyper --

20        THE COURT:  Before we go there --

21        MR. HILL:  Sure.

22        THE COURT:  -- just so that I can track with the

23   report, does that second bucket first use, secondary mark,

24   duty to police, what are the page numbers that are impacted?

25        MR. HILL:  Yes.  So it starts -- it's Section 6 of

1   his report, starting at Page 10 and going to Page 13.  In

2   Pages 10 through 13, he interweaves the -- I believe he

3   interweaves the -- no, that -- that's right.  The counting of

4   the differences is also on Page 10, but it starts at

5   Section 5.

6            THE COURT:  So the --

7            MR. HILL:  The counting of differences actually

8   starts on Page 8 and goes to Page 10.  I misspoke.  I

9   apologize.

10           THE COURT:  So the first bucket is Section 5, Pages 8

11  to 10?

12           MR. HILL:  Sections 4 and 5, Pages 8 to 10.  One is

13  copyright.  The other is trade dress.  But the analysis is the

14  same.

15           THE COURT:  Got it.  And then the second bucket is

16  Section 6, Pages 7 to 13?

17           MR. HILL:  Correct.

18           So now I'm going to pick up with Section 7 on Page 13

19  and going through approximately Page -- Page 16.

20           And this is where he argues that all -- well, the

21  first thing that he -- he does several things in this section.

22  The first thing that he wants to do is he wants to rely on the

23  use of hyper by itself.  He wants to talk to the jury about

24  nine other registered trademarks where the word hyper or its

25  phonetic equivalent is used on some other type of product, and

1  he wants to -- his ultimate conclusion is that this level of

2  third-party usage shows that the HyperDrive mark is a

3  commercially weak mark.

4       But again, no analysis in the report that explains

5  relatedness of goods, why we have relatedness of goods as a

6  criterion before we make the determination of commercial

7  weakness, and there's no analysis in the report of why any of

8  these hyper trademarks are, in fact, related.

9       Now, if I'm understanding the argument that they

10 intend to make with him, the argument seems to be that

11 anything in International Class 9 must be related.  So let me

12 give you two examples of marks that I've been associated with

13 that are International Class 9. One was for a DVD, you know,

14 just a -- just a video diskette that you would play.  A DVD is

15 an International Class 9.

16      Also a sonogram, a sonogram is an International

17 Class 9.  International Class 9 -- if it has anything to do

18 with an electronic component, it arguably fits into

19 International Class 9.

20      And so that's -- that's a delimiting -- to say that

21 if they're in International Class 9, they must be related is

22 so delimiting that ever -- I mean, it's almost impossible to

23 believe that you could find -- I would -- I would venture to

24 say that 99 percent of marks would be commercially weak under

25 the type of analysis that Sarabia is pointing out because

1  there is no relatedness limitation.

2         They cite the *Remy Martin* -- the *Remy Martin* case,

3  which is a great case, but that -- that's the case that we

4  should be looking at, right?  Because in that case, you're

5  talking about cognac made from -- made from wine, and wine,

6  right?  Obviously two related goods.  Not a difficult call,

7  right?

8         But where's the analysis in Sarabia's opinion that

9  shows that -- that hyper is used on marks that are actually

10  related to computer accessories?

11         The second point is, as -- as Your Honor pointed out

12  in the summary judgment order, it's not appropriate to be

13  parsing the mark like this.  You know, it's -- this is not a

14  case about hyper and it's not a case about drive.  If you want

15  to argue commercial weakness of HyperDrive, you would do it

16  based on other HyperDrive marks that are on related goods.

17         Don't -- don't try to confuse the jury into believing

18  that if -- that if any syllable of the mark is being used by a

19  third party, that somehow demonstrates that it's commercially

20  weak, when that's not what the Eleventh Circuit test is for

21  commercial weakness.

22         THE COURT:  Isn't there some authority for the idea

23  that at least the first part of the term could be -- could

24  carry some weight, the sort of hyper --

25         MR. HILL:  I've seen -- I've seen some cases that do

1    talk about the dominance of a -- of a -- of a primary

2    indicator.

3            THE COURT:  Right.

4            MR. HILL:  But those -- those cases tend to be in

5    situations where the second -- the second word, if you will,

6    here, which in our case would be drive, is merely descriptive

7    of the product or service at issue.  And here, as Your Honor

8    indicated in the summary judgment order, drive is just as

9    arbitrary as hyper.

10            And so there is no dominant mark.  There is no

11   dominant component when that happens.  And for that reason,

12   it's inappropriate to parse the mark into hyper or drive, and

13   analyze whether or not there are multiple uses of subparts,

14   and then say, if there are, that proves commercial weakness.

15            That's exactly what they tried to do in the summary

16   judgment order, and that's exactly what Your Honor said in the

17   summary judgment order at Page 29 was irrelevant.

18            So moving forward to the next -- the next argument

19   that Sarabia advances in this section of his report, he points

20   to six noncompetitive HyperDrive trademarks in -- and these

21   are -- these are like HyperDrive being used on software for

22   driving an automobile, right?

23            That's -- again, as the Court pointed out in the

24   summary judgment order at Page 30, these six marks are no

25   different than somebody coming into this Court and saying that

1  Delta is not a strong mark on airlines because you have Delta

2  faucets.  They're not on related goods, and therefore, it

3  doesn't bear on the question of the strength of the -- of the

4  commercial strength of the mark when it is used on a given

5  product, because they're not in the same commercial field.

6       I'm going to move to pages -- also in Pages 13

7  through 16, he advances the argument that there are coexisting

8  hyper and ultra trademarks within International Class 09.  And

9  so what this -- what this is is this is his attempt to tell

10 the jury that they should defer to the decisions that have

11 been made by examiners inside the trademark office about

12 whether or not a given hyper-related registration infringes a

13 given ultra-related registration, or vice versa.

14      A few problems with this.  First of all, if you look

15 at the goods on the -- if he says ultrasonic and then he shows

16 hypersonic, the goods -- the goods between the two marks,

17 again, no relationship.

18      And he doesn't analyze the relatedness of the goods.

19 He jumps to the conclusion that since there's both in

20 International Class 9, this must -- they must be related.

21 That's not -- that's not actually true, and he hasn't actually

22 demonstrated that.

23      Secondly, because they're not related goods, that --

24 that may very well explain why the trademark office did what

25 it did.  But the trademark office doesn't have to account for

1  the logic of their decisions in registering any marks.

2          So what he's really trying to do is infer something

3  important about no likelihood of confusion because of the lack

4  of an objection that a trademark examiner failed to object.

5  And this is not an inter partes proceeding; this is an

6  ex parte proceeding, as Judge Batten noted in the case that we

7  cited, Hi-Tech Pharmacies earlier this year.  Judge Batten

8  noted these trademark proceedings are not inter partes

9  proceedings.

10          Ex parte proceeding, where you have one party

11  advocating for its ownership of the trademark, they're not

12  explaining the facts of the marketplace to these examining

13  attorneys.  And the examining attorneys' decisions, therefore,

14  are entitled to little, if any, weight.  I believe

15  Judge Batten said no weight.  There are some decisions out

16  there, admittedly, that have said little weight.

17          But even in those cases, motions in limine have been

18  granted excluding them where they attempt to subvert the

19  jurors' use of the likelihood of confusion test and the

20  appropriate seven-factor test that the Eleventh Circuit has

21  established for providing the framework for likelihood of

22  confusion using the facts of HyperDrive and UltraDrive in this

23  case.

24          THE COURT:  So is that a -- what is the ground, then,

25  for excluding it if it is a -- if it does -- if it is afforded

1  some weight, little or however you want to characterize it,

2  but it is more than zero, then is it really a 403 analysis?

3          MR. HILL:  It is a 403 analysis if it's entitled to

4  some weight.  Some weight presumes that there is a relatedness

5  of goods.  So if I could -- if I could go back to my analogy

6  before.

7          If Sarabia is comparing hypersonic to ultrasonic and

8  there's no relatedness of goods, then it's irrelevant whether

9  or not they both coexist in International Class 09 because the

10 decision to register both is not probative of any particular

11 confusion.  If the goods aren't related, they're not going to

12 be probative of confusion in the marketplace.

13         So he hasn't crossed that critical threshold on any

14 of the comparators that he's trying to use, so that even if

15 they were UltraDrive and HyperDrive, they wouldn't be -- they

16 wouldn't be relevant.

17         In fact, the one example of HyperDrive and UltraDrive

18 that is not at issue in this case is the example that he gives

19 of the HyperDrive registration for, you know, sound

20 amplification equipment, and then he points to UltraDrive

21 being registered on goods that have absolutely nothing to do

22 with sound amplification equipment.

23         How is that relevant?  What does that prove?  That

24 it's too far removed from the facts of the dispute at hand to

25 justify spending time trying to convince the jury to defer

1    that somehow the institution of government that oversees

2    trademarks has already made a decision that ultra and hyper

3    marks cannot be confused with one another.

4         That's ultimately what he's trying to do from the

5    box, and -- from the witness box.  And that's basically

6    tantamount to trying to confuse the jury into not applying the

7    established seven-part likelihood of confusion test.

8         Now, there are two -- I'm going to carve this out

9    separate from the rest of his HyperDrive/UltraDrive or hyper

10   and ultra marks comparisons because he does compare HyperDrive

11   to ULTRADRIVEMINIDOCK and Ultradrive Kit.  These are

12   registrations that KaiJet sought to obtain after this lawsuit

13   was filed, and were able to obtain.  We have a

14   motion in limine to preclude those.

15        And the argument for not presenting those, I think,

16   is even more forceful on the point of juror confusion here,

17   because in this case, going back to Judge Batten's observation

18   that -- that these -- these decisions, because they are

19   ex-parte proceedings.

20        And as we pointed out, these decisions by trademark

21   examining attorneys in the trademark office are entitled to no

22   weight because they are -- because they are -- they are

23   ex parte proceedings.

24        And as we pointed out in our motion, Sarabia doesn't

25   account for the fact that in prosecuting these post hoc

1   registrations for UltraDrive plus additional words, KaiJet

2   didn't tell the trademark office anything about the existence

3   of this lawsuit, anything about the contentions that were

4   being made in this lawsuit, which only highlights that, you

5   know, the trademark office examiners' decisions are -- they're

6   garbage in, garbage out.  If you don't give them the facts,

7   you can't expect them to apply the facts and reach a rational

8   conclusion.

9        But what they want to do is they want to jump to the

10  conclusion of they must not have found that -- that there is

11  confusion with the HyperDrive because they manipulated the

12  process so that the examining attorney didn't have access to

13  any of the facts to be able to make an intelligent decision as

14  to whether or not there was confusion.  And that is -- that

15  renders the -- those trademarks of no weight.

16       And that -- on that point, I will conclude that part

17  of our argument.

18       THE COURT:  And then again, that's encompassed all by

19  Section 7, Page 13 to 16; correct?

20       MR. HILL:  Correct.

21       THE COURT:  Okay.

22       MR. HILL:  So now we're going to Section 8.  And this

23  issue overlaps with one of our motions in limine, which has to

24  do with priority of use.

25       I'm sure Your Honor is aware that it is -- the

1 | concept of being a senior user is important in a trademark
2 | dispute because if a defendant can argue that they are the
3 | senior user of the mark, they -- there can be no infringement
4 | by -- a senior user cannot infringe a junior user's trademark,
5 | right?
6 | Because trademark usage is established through use in
7 | commerce; it's not established by registration.  The right --
8 | the underlying right comes from use in commerce.
9 | So we're walking a very fine line in this case
10 | because the mark at issue -- and I'm talking about what's in
11 | the counts, what's in the cause of action here, what was in
12 | the summary judgment order, what's in the pretrial order is
13 | that we are arguing that HyperDrive is being infringed by
14 | UltraDrive, right?
15 | Having said that, what Mr. Sarabia wants to tell the
16 | jury is that KaiJet is the senior user of ultra because they
17 | used ultra on a product called the UltraStation as early as
18 | mid-2012.  The question of who is the senior user of ultra or
19 | hyper is not before of the jury.  But it is -- but it could be
20 | damaging in a very confusing way if the jury comes away with
21 | the impression that KaiJet has some type of
22 | priority-of-use-based defense.
23 | The Eleventh Circuit is clear in the *Tally-Ho*
24 | decision.  The use to establish priority has to be the use of
25 | the trademark itself.  They're not the senior user of

1    HyperDrive.  They are not the -- you know, their usage of

2    UltraDrive postdates the using of HyperDrive by Sanho.  That

3    is not in dispute.

4         THE COURT:  Well, what would he say in response to

5    that question if you asked him who was the senior user of

6    the -- not UltraDrive but the -- the HyperDrive?  What would

7    he say in response to that question?

8         MR. HILL:  I can only presume that he will answer the

9    question truthfully, but he may indicate that it doesn't

10   matter, trying to argue -- I mean, that's not -- I'm not eager

11   to try to argue with a trademark lawyer in the witness box in

12   front of the jury over what the law is regarding priority of

13   usage and how it applies to this case.

14        That's really for the Judge to -- it's really for

15   Your Honor to instruct the jurors, giving them the proper test

16   of priority as it relates to these trademarks and to allow a

17   witness to use the word priority.  And this is really where it

18   comes in, because I don't have a problem with them putting in

19   their evidence of their use of UltraStation, and I even have

20   them putting in evidence saying that they used it as early as

21   2012.

22        What I have a problem with is lawyers arguing to a

23   point of confusion by using terms like priority, first user.

24   Those are loaded terms, and those shouldn't be argued to the

25   jury because they have no place in this case.

1          And I'm just going to -- I'm just looking at what he

2    says on Page 16:  Priority of trademark rights refers to which

3    party has superior rights.

4          He's saying this means that, even if one assumes that

5    hyper and ultra are similar, Sanho does not have priority over

6    KaiJet based on use.  How can we let lawyers sit as expert

7    witnesses and feed propositions, conclusions of law to the

8    jurors that we know are antithetical to what the real -- what

9    the real outcome of that issue is.

10         That's my only -- that's my only point.  If I have to

11   cross-examine him, I'll cross-examine him.  But I don't think

12   it's appropriate for him to sit in the box and feed the jury a

13   line about priority of use and somehow having superior rights,

14   when it's just a distraction from what the real issue is in

15   the case.  And it could confuse the jury into believing that

16   they somehow have a better case than what they really have.

17         So I'll move on to Section 9.

18         THE COURT:  Do you have the pages handy for

19   Section 8?

20         MR. HILL:  Yes.  That's Page 16.

21         Section 9.  I've read their brief about why falling

22   below the standard of care of consumer product companies which

23   manufacture in China.  You know, I tried to figure it out when

24   I wrote this brief.  I thought it was some kind of an

25   acquiescence-based defense that they were coming up with.

1          I really don't even understand why any of this

2    matters.  I mean, you know, they don't have a defense in the

3    case that relates to any conduct between Sanho and its

4    manufacturer in China.  They haven't shown that there is any

5    obligation for us to do anything in China with regard to a

6    registered mark in the United States, or that we somehow hurt

7    ourselves.

8          I'm just going to -- I mean, I'm going to stand on

9    our brief on this because I really don't have anything more to

10   say.  I read their -- I read their brief in opposition.  I

11   still don't understand why he needs to -- why he needs to

12   characterize anything regarding our relationship with our

13   manufacturer in China, as if we have somehow waived our right

14   to enforce our trademark rights in the United States by not

15   being diligent enough in the way that we contract with our

16   manufacturer in China.  If -- you know, I'm just -- I'm

17   flabbergasted by that point.  I don't understand it.  That's

18   Pages 16 through 19.

19         Finally, on Section 10, Best Buy, you know, this

20   is -- this is where he wants to tell the jury about his

21   experience going into a Best Buy and what he was told when he

22   tried to do a product return in Best Buy.  And he's attempting

23   to defend it based on the fact that he's a licensed

24   investigator or, you know, he -- whether he's a licensed

25   investigator or not doesn't -- doesn't -- he's not testifying

1    to any -- what he really wants to do is he wants to testify

2    what he was told by Best Buy.  And that's inappropriate.

3    That's -- that's when an expert crosses the line when they

4    become a mouthpiece for hearsay.  And that's all we have to

5    say about that.

6                THE COURT:  All right.  Thank you.

7                MR. HILL:  Thank you.

8                THE COURT:  Who would like to take this one?

9                MR. CARLSON:  I'll take it.

10               MS. GENTES:  Mr. Carlson.

11               Is it possible for us to get our presentation on the

12   screens?

13               THE COURT:  Yes.

14               MS. GENTES:  We also have hard copies if Your Honor

15   would like a hard copy.

16               THE COURT:  As long as this works, it's fine with me.

17               MS. GENTES:  Okay.

18               MR. CARLSON:  We'll have one to leave with you.

19               THE COURT:  Okay.

20               MR. CARLSON:  If you'd like to refer to it again.

21               THE COURT:  Okay.

22               COURTROOM DEPUTY:  Are you connected?

23               MS. GENTES:  Yes, I am connected.

24               THE COURT:  We just got the technology upgraded in

25   the courtroom, and this will be the first trial with this new

1  technology, so everybody should have fingers crossed.

2          MR. CARLSON:  That gives us a lot of confidence.

3          Thank you.

4          There are really only a couple of slides that we

5  might want to be --

6          THE COURT:  I'll take a hard copy while we're working

7  on that.

8          MS. GENTES:  Okay.

9          MR. CARLSON:  At least for my portion, Your Honor,

10  let's not worry about getting the slides up, but there are a

11  couple of slides that I would refer to you in a moment.

12          THE COURT:  Go ahead.

13          MR. CARLSON:  It doesn't surprise me that Mr. Hill

14  started out of the box with, well, this man is a lawyer and

15  you want to put him in the box.

16          Mr. Sarabia faces this every time he's -- he's

17  offered as an expert.  And very frequently he testifies as an

18  expert and he testifies as a business expert.

19          He does not intend to offer, and we don't intend to

20  ask him to offer, any legal opinions.  He's not here as a

21  legal expert.  But he has a substantial and lengthy pedigree

22  in trademark experience based on his business experience while

23  he was with Guess? and his later experience as a consultant

24  for many, many companies on their trademark and copyright

25  matters, and as a private investigator who has investigated

1  many thousands of trademark infringement complaints.  So we

2  don't intend to ask him, what's your opinion on this legal

3  matter.

4          THE COURT:  But are you going to tell -- you are

5  going to elicit, I presume, that he is an attorney.

6          MR. CARLSON:  If Your Honor wants to restrict us from

7  doing that, I'm happy to restrict ourselves from doing that

8  because, frankly, it's his experience in business as -- as a

9  trademark expert that is significant and that we want the jury

10  to know about.

11          Yes, he does have legal training.  He does have a law

12  degree.  But that's not significant to the opinions that he

13  offers or to the analysis that he performed.

14          Let me try to move in the same direction that

15  Mr. Hill went through, starting with his concerns about

16  Mr. Sarabia's opinions over the differences perceived by

17  Sarabia as an expert who has considerable experience in

18  investigation of packaging and in creation and approval and

19  analysis of retail packaging, the differences between the two

20  boxes.  And between the accused KaiJet box and the copyright

21  registration that Sanho obtained on its first product box.

22          Critically, we don't intend to ask, and you'll not

23  find in his report, an opinion that because of these

24  differences, therefore, there is no infringement.  He does not

25  make that opinion and he will not try to offer that opinion.

1            The significance of what we asked for him to analyze

2    in this is observe the substantial number of differences that

3    there are in these packagings from -- through the eyes of

4    someone who is trained in retail packaging and the

5    significance of retail packaging and the presentation of

6    facts.

7            The issue that came up in the briefing that wasn't

8    apparently addressed by Mr. Hill is the question of, well,

9    it's Sanho's burden, remember, to show that what they have in

10   their copyright registration is protectable expression,

11   because a great deal of what is on a product box and what is

12   in the shape of a product box and everything else simply does

13   not have copyright protection.

14           There's nothing creative about it, and there's

15   nothing about it that is -- that is entitled to enforcement by

16   copyright.  So again, because that's a question of law that

17   Sanho bears the burden on, Mr. Sarabia didn't try to opine on

18   here are the areas of protected expression and this is why

19   there's a difference there.

20           But the differences are significant, whether or not

21   they are protected expression in the overall substantial

22   similarity of the box.  So the question of Mr. Sarabia didn't

23   opine on what is protected expression is a bit of a red

24   herring.  And again --

25           THE COURT:  What about his expertise assists with

1  counting or identifying the differences between packages?

2      MR. CARLSON:  Well, yeah.  And they're talking about

3  counting as if, you know, everybody can count.  What he's done

4  is analyze the boxes through the eyes of someone who has

5  expertise in retail packaging and in analyzing counterfeiting

6  claims made against retail packaging, and identifying the

7  differences that strike a person who has expertise in that

8  field so that these can be -- yes, and certainly these can

9  also be perceived by the jurors.

10      But his analysis and his background gives him the

11  opportunity to point out to the jurors why there are so many

12  significant differences and why this is important.  And it is

13  helpful to them to understand the evidence that is being

14  presented.  So that's the reason.

15      Certainly, he can be cross-examined on all of these

16  issues.  But his opinion as to that should not be -- should

17  not be excluded.

18      Let me move on to the question of weakness of mark.

19  And again, you know, a lot of it's briefing, and in a lot of

20  the argument that Mr. Hill offered there is some conflation of

21  the relevant issues.

22      It's true that Mr. Sarabia analyzed secondary

23  meaning.  As we pointed out in our briefing, he's certainly

24  aware of the factors that go into secondary meaning.  He felt

25  that two factors, in particular, were significant in his

1  analysis, and that relates to exclusiveness of use and first

2  use.  So that weighs into secondary meaning.

3        But these concepts also weigh into the question of

4  what is the strength of the mark that Sanho is trying to

5  assert and doesn't have strength.

6        One of the factors for secondary meaning is length

7  and nature of trademark use.  And the nature of trademark use

8  in the marketplace in comparison to other similar marks is how

9  that factor is evaluated.  That's what Mr. Sarabia has

10 analyzed here in his analysis of some of the other usages that

11 other folks have made.

12       One of the things that Mr. Hill spent a lot of time

13 on, and a lot of time saying, is, well, Sarabia just looked at

14 all of the goods that are in International Class 9 and said

15 that's the only relationship.  Well, that -- that's really a

16 false statement.  If you look --

17       THE COURT:  Mr. Hill, have you moved over to -- I'm

18 trying to track the various points here.

19       Are you still addressing Section 6 or have you moved

20 on to Section 7?

21       MR. CARLSON:  I guess I'm kind of addressing

22 Sections 6 and 7 in the way that, at least in my perception,

23 Mr. Hill did.

24       THE COURT:  Okay.

25       MR. CARLSON:  So moving past secondary meaning and

1  first use and exclusive use, then he went into the question

2  of, well, the only relatedness that Mr. Sarabia expressed was

3  that these are all goods in Class 9, and that's simply not

4  true.

5         If we look, for example, on Page 15 of his report,

6  starting actually at the page -- at the bottom of the page

7  before, he refers to a HyperDrive mark, a HyperDrive

8  registration of a third party for sound amplification

9  equipment and then points out that Sanho's HyperDrive

10  registration includes components for MP3 players, which is a

11  digital music player, and that's an overlap in relatedness of

12  goods.

13         He says again on Page 15 that with respect to

14  KaiJet's registrations of ULTRADRIVEMINIDOCK and

15  Ultradrive Kit for computer accessories and computer

16  peripherals, even though that's not what Sanho's statement of

17  goods are, it's the products that Sanho is trying to assert

18  this mark against, and that's again a major overlap.

19         He talks about hyper hybrid and ultra hybrid

20  regarding computer hardware and electrical controls,

21  identifying the major overlap there.

22         He talks about hyperflow and ultraflow having

23  software for the control of electrical devices, and there's

24  overlap there.

25         So he was careful to identify close relationships

1  between these marks, not just simply say, well, they're all in

2  Class 9, contrary to what Mr. Hill just tried to tell you.

3        And again, all of these issues are issues that go to

4  the weight of his opinion and not to its admissibility.

5        Now, we certainly expect, and would be surprised if

6  Mr. Hill did not cross-examine on these issues, and he can

7  certainly point those things out to the jury.  But this is not

8  a justification for excluding Mr. Sarabia's opinions in these

9  areas.

10        Going on to Section 7, more explicitly in the

11  coexistence of the marks, you know, I think we already talked

12  about the relatedness of goods and pointed out where in his

13  report he talks about close relationships with these goods in

14  his analysis.

15        Again, Mr. Hill may not be satisfied, but that's a

16  matter for cross-examination rather than a matter for you as

17  the Judge to say, as the gatekeeper, I can't allow this to

18  come in.  He's a qualified expert.  It's a reliable analysis.

19  And it's helpful to the jury.  And that's really what the

20  *Daubert* and *Kumho Tire* standard asks.

21        We talked about *Remy Martin*, and Mr. Hill talked

22  about the *Remy Martin* case, says that's truly where

23  relatedness is because cognac is made from wine.

24        And in their briefing, there's a reference to an

25  implicit standard that *Remy Martin* says.  Well, there's an

1    explicit standard in *Remy Martin*, and the explicit standard

2    is, could these goods emanate from the same source?

3        And that's what Mr. Sarabia's opinions are based

4    upon.  These are sufficiently related goods in these marks

5    that they could, in the mind of the consuming public, emanate

6    from the same source.  And that is the significance there.

7        THE WITNESS:  The very narrow relatedness that

8    Mr. Hill is urging to convince you to exclude Sarabia's

9    opinion simply doesn't exist in the case law, and certainly

10   not in *Remy Martin* because it is the explicit standard that is

11   stated.

12       I'm going to grab a drink of water, if I may.

13       THE COURT:  Sure.

14       MR. CARLSON:  Also in the course of that analysis,

15   Your Honor, you pointed out, isn't there authority that talks

16   about what is the dominant portion of the mark.

17       And certainly there is.  And certainly, business

18   people who are analyzing trademarks focus on and look to the

19   dominant portion of the mark.  And in our briefing we cited to

20   some case law that is, I think, quite significant and helpful

21   to the Court, not only out of the Eleventh Circuit, but out of

22   the Federal Circuit.

23       And in particular, to the *National Data* case that we

24   cite on Page 17 of our brief at Footnote 55 of our response,

25   saying:  It's entirely appropriate.  There is nothing wrong

1  with focusing on more weight to a particular feature because

2  as long as the ultimate conclusion considers the marks in

3  their entirety -- the Court even says -- this type of analysis

4  appears unavoidable.  And indeed it does.

5       The next comment that I would like to make that kind

6  of feeds into that is then Mr. Hill went on to say in citing

7  to their briefing saying drive, in this context, is just as

8  arbitrary as hyper.

9       Well, I think it was not necessarily the Court's

10  intention to make that finding as a matter of law when the

11  Court issued its order on our summary judgment motion.  And

12  indeed, I recognize where in the summary judgment order there

13  is some discussion of that.

14       But I would like to refer the Court back to that

15  order itself and to the citation that was made to -- it's a

16  Wiktionary entry about drive in the computer sense.  The Court

17  says HyperDrive is not generic because it's not a class

18  product, no -- no argument there.

19       It goes on to say, nor is it descriptive because a

20  hub is not a drive in the common computing sense.  It is

21  neither an apparatus for reading and writing data to or from a

22  mass storage device, nor a mass storage device itself.

23       I think the evidence in the case will suggest that

24  drive is indeed descriptive in this usage.  And I would direct

25  the Court, if I may, to -- it's slide 71 in our presentation.

1  There will be some evidence where we expect there to be

2  evidence in the case that drive is a, in this sense,

3  descriptive term of an apparatus for reading and writing data

4  to or from a mass storage device, quoting from the Court's

5  order.

6          Our client, KaiJet, had a product several years

7  before, and the product is identified here.  It's just a --

8  it's a little doodad with a lightning connector that plugs

9  into the bottom of an iPhone, and then it accepts a mini SD

10 card.  Mac users, in particular, are very cognizant of the --

11 they work a lot with media.  A lot of photographers have Macs.

12 A lot of people who are doing video editing do it on a

13 MacBook.

14         And the notion in the mind of the consuming public

15 that a piece of apparatus like this can be a drive, is

16 descriptive of a drive, is sort of fitted into here, that our

17 client had a creative drive app to be used with this product,

18 creative drive and drive in the sense of like a thumb drive

19 is.

20         Here is a doodad that -- okay, the hardware itself

21 didn't have the mini SD card.  But when you plug in a mini SD

22 card and you carry it around in your pocket, then you've got a

23 drive.  You've got a creative drive that you can plug into

24 your phone, take pictures off your phone, plug it into your

25 laptop, move them to your laptop.  Drive can be descriptive.

1          So this is an issue of fact for the jury to decide.

2     And the focus on drive as entirely arbitrary, just as

3     arbitrary as hyper, I think it's nonsense.

4          So what I would suggest is it's entirely appropriate,

5     as the case law suggests, that, particularly here where

6     there's a descriptive portion of a mark and a dominant

7     portion, in this case hyper and ultra, that we analyze marks

8     in the area of hyper and ultra.

9          And that's really all that Mr. Sarabia is going to

10    do.  It will be helpful to the jury to understand the marks at

11    issue and to understand the issues by doing so.  Again, he can

12    be cross-examined on it.

13         That also kind of feeds into the argument about

14    coexistence of the mark across registrations, ultrasonic

15    versus hypersonic and so forth.

16         If Mr. Hill feels that these are of little weight,

17    he's entitled to cross-examine Mr. Sarabia on the type of

18    goods that these marks were used with and why they are not

19    significant and why they shouldn't have significance to the

20    jury.  But it's not a justification for excluding

21    Mr. Sarabia's opinions on them.  And they have not cited any

22    evidence to say otherwise.

23         Again, Mr. Sarabia has not plucked out little pieces

24    of the mark to look at each other; he looks as these marks in

25    their entirety.  But what is done here is, we're focusing on

1    the dominant portion of the mark, not only for HyperDrive and

2    UltraDrive but in these other marks as well.

3            THE COURT:  Now, when you talk about the coexistence,

4    are you -- does that get into the trademark examiner decisions

5    in that report?

6            MR. CARLSON:  It feeds into the notion of likelihood

7    of confusion, that the trademark examiners who have examined

8    these marks together -- and again, it's true, it's not a --

9    it's a -- it's not an inter partes process, but they are

10   tasked with trying to identify is there a likelihood of

11   confusion, and if so, to deny registration.

12           And because in all of these instances, as in

13   ULTRADRIVEMINIDOCK that KaiJet was registered and Ultradrive

14   Kit that KaiJet was registered, despite the fact that

15   HyperDrive is also registered, that the trademark examiner has

16   done this analysis, certainly not conclusive, perhaps not

17   entitled to a great deal of deference, certainly subject to

18   cross-examination about, well, the trademark examiner didn't

19   have all of this information, did he?  But not excludable on

20   that basis and --

21           THE COURT:  It seems like that cross-examination is

22   difficult, though, when the trademark examiner is not here to

23   be cross-examined.

24           MR. CARLSON:  Well, that's true.  So we're not really

25   talking about what is the opinion of the trademark examiner,

1  but we're talking about what is in the public record about

2  these marks -- pardon me -- these marks were approved despite

3  the existence of another mark with the same nondominant

4  portion and ultra or hyper as the dominant portion.  And

5  that's the -- that's the significance.  And it will help the

6  jury to understand what the issues are in this case.

7         The complaint that nobody at KaiJet told the

8  trademark and patent office that we were -- about this case

9  when we were registering those marks is contrary to what the

10  statute provides, because Congress has assigned to the Court

11  and the Clerk of the Court the duty to notify the patent and

12  trademark office when there is litigation of this kind.  And

13  it was done, as we've -- I think we pointed out to the Court.

14         That's ECF 9, I think.  The clerk of the Court sent

15  the PTO the standard form that intellectual property assets

16  were going to be assessed.  So that -- that's done for the

17  PTO, and it's not the duty of KaiJet to do so.

18         The question about who's the senior user, we were not

19  trying to say that we are the priority, that we have priority

20  over HyperDrive, because we don't consider ultra and hyper to

21  be confusingly similar, and we're not going to try to make

22  that argument.  We don't say that UltraStation gives us

23  priority because ultra and hyper are not confusingly similar,

24  so we don't intend to try to do that.

25         Nevertheless, it's helpful for the jury to

1    understand.  And it goes to intent, which is one of the

2    factors that the jury has to conclude or analyze in likelihood

3    of confusion.  Did KaiJet intend to trade on any good will

4    that Sanho may have had in its mark?  Well, KaiJet used ultra

5    long before Sanho used hyper.  And that's the significance.

6         The question about did Sanho do what they should have

7    done in dealing with Chinese companies, it may not be

8    relevant, Your Honor, and we may not try to offer that

9    opinion.

10        But I'll tell you the reason why Mr. Sarabia analyzed

11   it is we don't know for sure, and we still don't know, does

12   Sanho intend to try to show actual damages.  Because one of

13   the things that they said in their complaint is they suffered

14   reputation injury by the actions of KaiJet and of Starview.

15        And if that's the case, and they're going to try to

16   say and because of that reputation injury, we have actual

17   damages, it's relevant for the causation of that reputation

18   injury to look at, well, but did you do what you should have

19   done when you were dealing with Chinese companies?  That's

20   really the focus there.

21        THE COURT:  Didn't they -- didn't Sanho in the

22   pretrial order sort of itemize its categories of damages?

23        MR. CARLSON:  I believe that's true.  But I believe

24   also in the jury instructions there's some question of whether

25   or not they're going to seek actual damages.  If they're not,

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1    I don't think -- we will not try to pursue this opinion with

2    Mr. Sarabia.

3         And finally, briefly, just to talk about the

4    experience that he had at Best Buy, Sanho puts a lot of eggs

5    in one basket, which is, we got returns of KaiJet products

6    from Best Buy, and that shows that they're confusing, that

7    they're confusing these trademarks.

8         And we have a lot of motions in limine related to

9    that, as does Sanho, so I'll defer on that until the

10   motions in limine are addressed.

11        But Mr. Sarabia went to Best Buy, essentially as a

12   trademark investigator, to determine what is the process that

13   happens at Best Buy when you return a product like that.

14        And his testimony as to that investigation, if -- if

15   the objection is, well, hearsay as to what any Best Buy

16   employee told him, perhaps that's excludable and perhaps it

17   comes under a hearsay exception.  I don't think we need to

18   decide that now.

19        But what the intent of the opinion is, and the

20   discussion from his report is, this is my observation of what

21   transpired during my return of this product at Best Buy.

22        THE COURT:  Well, do you intend to have a

23   representative from Best Buy testify as to what their process

24   is?

25        MR. CARLSON:  No.  And nor does Sanho, I believe.

```
1              THE COURT:  I mean, it strikes me as a little

2    concerning that we're going to be relying on whatever customer

3    service employee he happened to be dealing with that day as

4    speaking on behalf of the corporation.

5              MR. CARLSON:  Understood.  And I don't think that's

6    really the emphasis that we're going to try to place.  But

7    it's just a matter of here's what transpired during my

8    investigation.

9              And we also will have testimony from KaiJet witnesses

10   about their experience with Best Buy returns and their

11   understanding and knowledge of how Best Buy returns are taking

12   place.

13             Thank you, Your Honor.

14             THE COURT:  Thank you.

15             Mr. Hill, I'll let you -- if you have any final

16   comments, briefly, I'll hear you out on those.

17             MR. HILL:  Yes.  Briefly being the key part.

18             THE COURT:  Yes.

19             MR. HILL:  I understand.

20             Let me just work backwards a little bit here since

21   these points are freshest in our mind.

22             On the Best Buy testimony of Mr. Sarabia, Mr. Carlson

23   just said he wants to testify based on what his personal

24   experience at a Best Buy was with a different product.

25             He's not testifying about the Best Buy product return
```

1   center, which is what Mr. Chin's summary judgment declaration

2   was addressed to.  He's not offering anything regarding the

3   salient center that was responsible for sending the UltraDrive

4   devices to Sanho.  It's tenuous, at best, in its relevance.

5          And it's accounting for things that he was told by a

6   Best Buy employee on his visit, which we consider to be pretty

7   rank hearsay under the circumstances.  So we still maintain

8   our objection to that, to that particular testimony.

9          On the -- on the question of the Chinese manufacturer

10  and this reputational injury issue, I think we can put that to

11  bed.  The jury instructions make it clear we're seeking

12  infringer's profits.  That's what we're seeking.  That's the

13  only thing that we're seeking.

14         There's no instruction we presented regarding

15  reputational injury.  We're not seeking recovery for

16  reputational injury.  So I don't see how that has any

17  relevance.  I'm not sure it has any relevance to reputational

18  injury.  I'm not conceding that.  But I think we should be

19  able to just agree that that doesn't need to come in.

20         Now, back to the -- back to the start, he started his

21  argument by saying that Mr. Sarabia's a lawyer, but he's not

22  going to be talking to the jury about legal concepts.

23         Look at the report:  Secondary meaning, weak,

24  commercial weakness of a mark, infringement, no infringement,

25  no likelihood of confusion because the two marks coexist in

44

```
1   the trademark office database registry of trademarks, even
2   though there's no analysis of likelihood of confusion factors
3   the way the Eleventh Circuit lays them out.
4           THE COURT:  Well, the report is not going to the
5   jury.  I mean, and obviously, I will take any objections you
6   have to particular questions that seek legal conclusions.
7           MR. HILL:  Okay.
8           THE COURT:  If, as has been offered, that the fact
9   that he's a lawyer is not even elicited and if we all are
10  listening carefully for any testimony that could be perceived
11  as a legal conclusion, doesn't that resolve the issue?
12          MR. HILL:  It doesn't hurt.  That's -- that's for
13  sure.  I still don't think it justifies confusing what the --
14  what the standards are, or presenting implicit replacement
15  standards for what the proper instruction is because that's
16  pre -- that's preconditioning the jury before the jury hears
17  the appropriate charge from the Court on what a term like
18  secondary meaning actually means and what they're supposed to
19  consider.  He'll have them considering exclusivity and first
20  use for secondary meaning long before the Court gets to the
21  point where it gives a proper instruction.
22          So perhaps we could extend the I'm not going to
23  testify as a -- I'm not going to tell the jury I'm a lawyer to
24  also say that if he is -- if he is going to use a term like
25  secondary meaning, that would be an appropriate time for the
```

1  Court to give the jury the instruction, the pattern

2  instruction, because it's agreed upon by the parties as to

3  what secondary meaning is and what factors are to be

4  considered.  That may be something that can be considered.

5         But the -- the one thing that I was struck by when

6  Mr. Carlson was talking about why Mr. Sarabia's counting up of

7  the differences on the packaging is important for the jury to

8  hear is because of his expertise as a, quote, retail packager,

9  unquote.

10        But that's -- that completely distorts the issue

11 because the test of copyright infringement and trade dress

12 infringement is not based on the determination of a retail

13 packager; it's based on the determination of the -- at the

14 consumer level.

15        So it's not clear why a retail packager's helpful to

16 the jury in any way other than what the jury can observe for

17 themselves.

18        And by the way, I mean, I question whether or not we

19 need an expert in retail packaging to tell the jury that the

20 packaging is orange with gray border, or has 400 characters on

21 the back side of the packaging, or any of the other

22 differences that are actually noted in Exhibit D to the

23 Sarabia report.

24        I'm not going to go back over the issues regarding

25 the trademark examiner decisions.  I think I -- I think I hit

1    that so hard in my opening and I -- and I didn't hear anything
2    that really -- that I thought moved the needle, except that to
3    say that they're implicitly, they -- they do want to use the
4    rubber stamp of the authority of the trademark office on these
5    registrations to somehow suggest to the jury that -- that no
6    likelihood of confusion is a decision that the trademark
7    office has already come to in this case.  And that's
8    inappropriate and outside of the seven established
9    likelihood-of-confusion factors for how that decision is
10   supposed to be reached.
11        On the PTO Form 120 issue, he's right, of course.
12   There is a PTO form that goes in when we file a trademark
13   infringement suit for a registered mark on HyperDrive.
14   That -- that mark that's reflected on that form is that
15   HyperDrive is in litigation.  That's what that form says.
16        At the time that form was submitted to the PTO, there
17   was no application relating to UltraDrive.  And so there's
18   nothing in the content of that form that would in any way
19   change the analysis by somehow suggesting that the trademark
20   office actually did know that there was a debate between
21   HyperDrive and UltraDrive.
22        Finally, with regard to this creative drive argument
23   based on Slide 71, I don't remember this being in their brief
24   in opposition, but it's their argument for why drive can be
25   descriptive.  That's -- that -- it can be.  Hypotheticals are

1  not the issue here.

2          The issue is what is the HyperDrive, what it is it

3  being used on.  Is it -- is it being used on a drive.  We

4  don't have this Creative Drive app installation, that's -- and

5  I've never even -- I've never seen the product that does.

6          So it doesn't -- and the fact that hypothetically

7  drive could be descriptive, if it was used in conjunction with

8  a product that is actually a drive, I think that's axiomatic,

9  and we can all agree on that.

10          But that's not the HyperDrive.  And they didn't show,

11  and Sarabia doesn't show -- in his report, he doesn't connect

12  the dots to make that kind of association before proceeding to

13  assume that he can segment the mark and then choose to analyze

14  hyper, and hyper alone, and then stack the deck with, you

15  know, multiple, you know, examples.

16          You know, he's not -- we're not talking about a case

17  where they want to put one mark in front of the jury that's

18  a -- that's out there to make their point.

19          But -- but he's accumulating as many different

20  hypers -- hyper with a Y, hiper with an I, all these different

21  spellings on all of these different products under the sun

22  that Your Honor has already found in the summary judgment

23  order are not relevant to the determination of commercial

24  weakness or strength at the end of the day.

25          THE COURT:  Thank you.

1         Well, let's see if we can at least narrow one issue.

2   Given Mr. Hill's representation on the standard of care issue,

3   Mr. Carlson, do you agree that that is not relevant?

4         MR. CARLSON:  Given that representation, Your Honor,

5   we will not solicit this opinion from Mr. Sarabia.

6         THE COURT:  All right.  So that -- at least with

7   regard to that, Section 9, the motion is granted without

8   prejudice, obviously, if he opens the door somehow.

9         All right.  On the rest, I'm going to take it under

10  advisement for now.  I need to think about some of these

11  issues and review Mr. Sarabia's report.  We'll talk about the

12  timing of some of those decisions by the end of the day.

13        Why don't we take a 15-minute or so recess until

14  11:30.  And then we'll up KaiJet's motion.

15        All right.

16        (Whereupon, a recess was taken.)

17        THE COURT:  You may be seated.

18        All right.  Ready to proceed?

19        MS. GENTES:  So I'm going to talk about the KaiJet

20  defendants' *Daubert* motion, beginning with Baker.

21        So Sanho bears the burden of proving its experts meet

22  the *Daubert* standard of qualified, reliable methods and

23  helpfulness.  And with Baker we're specifically talking about

24  helpfulness in deciding the issue of whether or not the

25  trademark -- the '707 mark that Sanho is asserting is valid.

1    So I'll talk briefly about what is the standard,

2    where does it come from.  So 15 U.S.C. 1119 -- and I'm on

3    Slide 46 of the presentation, if Your Honor wants to follow

4    along.

5    In any action where there's a registered mark, the

6    Court may determine the right to registration or order

7    cancellation of the registration.

8    So it's this Court's function to determine whether or

9    not the '707 trademark registration is valid.  Looking at what

10   gives a trademark holder a right to a registration, it's

11   15 U.S.C. 1051, specifically talking about (a)(2).  The

12   obligations shall include a specification of goods in

13   connection with which the mark is accused.

14   And that's specifically what we're challenging is

15   whether or not the '707 mark, the goods that it listed,

16   whether Sanho was using the HyperDrive mark on those goods at

17   the time that it applied for the mark.

18   It's also, I think, worth noting 1051(a)(4)

19   specifically says:  The applicant shall comply with such rules

20   and regulations as may be prescribed by the director.

21   So there was a lot of the talk in Sanho's response

22   about the Code and the TMEP not being relevant because it

23   doesn't have the force of law.  But 1051 specifically puts a

24   hook, a legislative hook in for that the rules promulgated by

25   the director do have the force of law.

1          So that doesn't apply to the TMEP, but it does apply

2     to the Code that the director puts out, and it was

3     37 CFR 2.32, which says that the goods and services has to be

4     a particular list of goods.

5          And then we move into the TMEP, which even though it

6     doesn't have the force of law, is still persuasive and

7     illustrative of what the director meant by a list of

8     particular goods and services.

9          And I'm on Slide 48.  And to specify means named in

10    an explicit manner and identification set forth common names

11    using terminology that's generally understood.  So this

12    illustrates what the director meant by specify the goods.

13         The next Page, on Slide 49, the TMEP provides more

14    guidance that the language should be understandable to the

15    average person and should not require an in-depth knowledge in

16    the relevant field.

17         So Sanho is not the first party to have applied for a

18    certain list of goods and services and realized, down the

19    line, that they may have an issue, that the product they were

20    selling might not fit under those goods and services.  And

21    they want to try and finagle in because they can't change --

22    they can't broaden the list of goods and services after the

23    initial application.  They can narrow it, but they can't

24    broaden it.

25         So we talked about, in our briefing, the In re: *Jimmy*

1    *Moore* case, which is a precedential TTAB decision.  And this

2    was the one about they had originally applied for the services

3    entertainment in the nature of baseball games, and the service

4    they were actually providing was baseball pitching and

5    training systems.

6          And they tried to make what the TTAB called a

7    creative but unpersuasive argument that, well, it's about

8    baseball, which is about pitching, and training is

9    entertaining, and so it fits.

10          And the TTAB said, no, entertainment in the nature of

11    baseball games connotes something to the public, and it's not

12    a pitching and training system.  So they canceled the mark in

13    that case.

14          Another case -- I know that's about services, but

15    using that *Moore* decision, there was that *Fender* case that we

16    cited as well.  And in that case, the goods had been

17    registered for musical instruments, and what they were

18    actually selling was an accessory to -- to a flute.

19          And they tried to say, well, that's a musical

20    instrument.  It goes on the flute.  It helps make music.  And

21    the TTAB said, no, musical instrument means the flute; it

22    means something to the public.

23          So that's -- the operative question is whether or not

24    the goods and services -- the common names of the goods and

25    services listed on Sanho's registration matches what they were

1  selling, which is this HyperDrive product.

2       And Sanho admits that none of the other goods and

3  services, other than the power adapter, match.  So at a

4  minimum, the trademark registration should be updated to

5  cancel those other goods and services.

6       But the question before the Court here, and before

7  the jury, is whether or not the HyperDrive falls under the

8  common name of power adapter.  And Baker's testimony is not

9  helpful to that question and will confuse the jury as to what

10 the standard is.

11      Baker's ultimate conclusion on Page -- on

12 Paragraph 35 of his report talks about his reasons why he

13 determined that the HyperDrive is a power adapter.  It talks

14 about it having multiple power sinks and transmitting the

15 correct amount of power to each device connected to it.

16      It's not something that an average person is going to

17 understand about the HyperDrive.  I don't think they can even

18 show that it's something that is listed on the box that

19 anybody could look at it, that doesn't have an engineering

20 degree, and figure that out.

21      Sanho, in its response, accused KaiJet defendants of

22 trying to change the standard to the level of a simpleton.

23 And I think there's a great deal of space in between simpleton

24 and an electrical engineer, where the average person, which is

25 what the standard is, applies.

1           And nowhere in Baker's report does he attempt to come

2      up with a definition of what an average consumer, an average

3      person, would understand to be a power adapter.  All of his

4      definitions keep harkening back to this technical definition

5      of how does the HyperDrive transmit power.

6           THE COURT:  And how does that contrast with what

7      Dr. Franzon testifies to?

8           MS. GENTES:  So Dr. Franzon, in his report, I think

9      Sanho's description of what he said is misleading.  He defined

10     a power adapter as something that plugs into the wall and

11     transmits power to another device.  He said that's, you know,

12     how it's commonly understood.

13          He did go on to say, generally, it converts AC to DC

14     power.  But that wasn't required in his definition and that

15     wasn't his only basis for concluding that the HyperDrive was

16     not a power adapter.  It was that more general, you know,

17     this, in my experience designing and working on computer

18     peripheral devices, you know, I know what we classify as power

19     adapters versus what we don't, and gave this very general

20     definition that has nothing to do with power sinks or power

21     levels or anything of that sort, so...

22          Sanho tries to say that Baker is looking at both what

23     an engineer and an average person -- and he tries to say that,

24     but in every answer that he gives, he keeps coming back around

25     to, you know, I -- I have on Slide 54 the specific quote that

1    Sanho says proves that he was talking about both.

2            And when he's asked, he says: I think both.  I mean,

3    technically a power adapter, and people would think of it as a

4    power adapter.

5            And then he goes on to explain why he's saying that.

6    And he goes back to this USB standard, which is like this

7    engineering tome that engineers use to make sure all of the

8    USBs are going to be compatible.

9            So how is that relevant to what an average person

10   would understand a power adapter to be?

11           And the only thing it can serve the jury is to

12   confuse the standard from what is the common commercial

13   definition of a power adapter is versus does this thing

14   technically transmit power and change it in some way.

15           THE COURT:  Well, how can that be -- I mean, isn't

16   that accounted for with the instruction to the jury about what

17   is it that they're being asked to decide, and aren't they, as

18   jurors, best equipped to decide whether his opinion goes into

19   areas that are not for a common person to understand?

20           MS. GENTES:  So I do believe that there will be a

21   debate over the jury instructions.  We proposed a modification

22   to the Eleventh Circuit's pattern instructions because it

23   doesn't really go into what is the standard for a good, you

24   know, how -- how do you define that, what is its scope.

25           Essentially, what they're trying to do is they're

1   trying to -- and they explicitly say this in their -- their

2   briefing.  They're trying to get some latitude, some claim

3   construction to power adapter beyond its -- its common scope.

4          So, and I think the issue beyond just instructing the

5   jury is how is the fact that the HyperDrive has power sinks --

6   you know, this is not advertised this way -- how is that

7   helpful to the jury in determining whether or not the common

8   name of a HyperDrive is a power adapter?

9          So, you know, it would definitely -- if Baker is

10  allowed to testify, we would advocate for a very strong jury

11  instruction, clarifying what is meant by goods.

12         The other things in his testimony that simply are

13  confusing or not relevant is he spends a lot of time trying to

14  chop up the words power and adapter, and argue that there are

15  references that use one or both of the terms, not necessarily

16  together, in the term power adapter.  And this is exactly what

17  the TTAB rejected in *Moore*, trying to chop up entertainment

18  and baseball into its different words and then extrapolate

19  from there.

20         In his report, in Paragraphs 32 and 34, he's

21  specifically talking about an accessory charger adapter.  He's

22  talking about USB power delivery adapters and hubs.  This will

23  confuse the jury into thinking power adapter is not a term

24  that they need to define the common meaning of, that it's

25  adapters and power anywhere in -- you know, within four words

1    of each other is relevant, which it's not.  And so that

2    testimony would also be confusing to the jury.

3            So that's all that I have on Baker.  I don't know if

4    you want to have --

5            THE COURT:  Let's take them one by one, yes.

6            MS. GENTES:  Yes.

7            MR. LUDWIG:  Your Honor, Dr. Baker is a rebuttal

8    witness.  He is responding to Dr. Franzon's opinion which, in

9    Dr. Franzon's report, is only one page, three paragraphs,

10   where Dr. Franzon states that the HyperDrive is not a power

11   adapter because a power adapter, one, plugs into the wall, and

12   two, converts power from AC to DC power.

13           In Dr. Franzon's deposition, he confirmed that that

14   is his definition of the word -- of the term power adapter.

15           Question -- the question to him was:  So your

16   definition of power adapter is basically something that plugs

17   into a wall outlet and converts AC power into DC power; is

18   that right?

19           Answer:  That is my definition of power adapter.

20           THE COURT:  So is he not going to testify in your

21   case-in-chief?

22           MR. LUDWIG:  That's correct, Your Honor.

23           Dr. Baker then, in response to that opinion from

24   Dr. Franzon, presents evidence that the terms power adapter,

25   and similar terms like power delivery adapter, power delivery

1   management adapter, have been used in a wide range of products

2   that deliver power to downstream devices.

3          That includes wall outlet adapters that do not

4   convert power from AC to DC or DC to AC.  It includes USB

5   devices, such as those similar to the HyperDrive and the

6   UltraDrive.  And it includes car charging adapters that plug

7   into a cigarette lighter and convert, you know, the power to

8   USB.

9          Dr. Baker should be able to present that evidence to

10  the jury to convey that the term power adapter in its plain

11  common meaning, as well as any technical meaning, includes

12  these -- a wide range of devices.  It includes things like the

13  HyperDrive.

14         KaiJet's motion is essentially just a repeat of its

15  summary judgment motion, that this Court has already rejected.

16  The Court held in its summary judgment that, quote, Sanho has

17  provided evidence showing that similar products are marketed

18  as power adapters and expert testimony that devices

19  facilitating the transmission of power from laptops to

20  connected downstream ports can properly be classified as power

21  adapters.

22         So there, the Court has already referenced

23  Dr. Baker's testimony, and the evidence that he would be

24  presenting to the jury as contradicting the essentially legal

25  argument that KaiJet is making in its *Daubert* motion with

1   respect to Dr. Baker.

2          So just to show how KaiJet now is also moving the

3   goalposts, trying to -- trying to say that Dr. Franzon's

4   definition of power adapter is somehow consistent with these

5   other devices that Dr. Baker has presented, KaiJet is now

6   arguing that the travel delivery adapter, which is the car

7   charger that Dr. Baker identified, would fit into

8   Dr. Franzon's definition of power adapter.  And this is coming

9   from their reply brief at Pages 8 and 9.

10         Quote:  Because both plug into an electrical outlet

11  and are external powered supplies for an electronic device.

12         But in Dr. Franzon's deposition, he confirmed that a

13  car charger is not a power adapter under his definition.  So

14  KaiJet is not even being consistent with its definition of

15  what a power adapter is, and it's contradicting their own

16  expert.

17         But if we are -- as KaiJet is now arguing, if

18  we're -- if they're not even including in the definition of

19  the conversion from alternating current to direct current,

20  then there's really no distinction between what the car

21  charger is doing, which they now contend is a power adapter,

22  and what the HyperDrive does, which is similarly plugs into a

23  power source and transmits power to a downstream device that

24  then plugs into the HyperDrive.

25         Getting to KaiJet's contention that Dr. Baker's

1  definition is technical, as they point out, Dr. Baker

2  actually, in his expert report, did not provide a definition

3  of power adapter.  And he confirmed in his deposition that he

4  was using a plain meaning interpretation of the term as

5  informed by the examples that he presents in his -- in his

6  expert report.

7         And he explains that there -- he explains some of the

8  things that the HyperDrive does that constitute power adaption

9  [sic].  It receives power from a MacBook device.  It then

10  converts that power into what is necessary for the downstream

11  devices that are connected to it, and it routes that power

12  accordingly.

13         That -- that's a technical explanation of what the

14  HyperDrive is doing.  That is not a definition of power

15  adapter.  It's an explanation of why the HyperDrive is a power

16  adapter.  Other devices do different things and are also power

17  adapters.

18         So if anyone is giving a technical definition of the

19  term power adapter, it was Dr. Franzon, who insisted that it

20  must be a device that converts from alternating current to

21  direct current.

22         Dr. Baker is not contending that there is any

23  requirements of that sort to make something a power adapter;

24  rather, it just needs to adapt power.

25         Referring to the TTAB decision that -- and other TTAB

1  guidance that KaiJet has cited, it's true that the statute and

2  regulations require an applicant to list the goods that are

3  associated with that trademark in the application.

4       And there are some reference that the words used to

5  describe the goods should be common language as opposed to

6  technical jargon.  The term power adapter is a common word.

7  It's understandable by laypeople.  And therefore, it satisfied

8  that requirement.

9       There's nothing that KaiJet can point to that says

10 that a -- that putting a description on the application that's

11 not perhaps the absolute best term to be used would result in

12 invalidation.

13      Power adapter, it's a common word, and it is

14 descriptive, and it fits the power adapter HyperDrive product.

15      Thank you.

16      THE COURT:  All right.  Thank you.

17      Ms. Gentes, you can have the last word on that, and

18 then we can turn to the next motion as well.

19      MS. GENTES:  So I wrote down one of the last things

20 that Mr. Ludwig said, and it's emblematic of what they intend

21 to do with Baker.  It just needs to adapt power.

22      And I think back to Mr. Hill's argument about

23 International Class 9 for the trademark and how he was talking

24 about how it had all these computers and you could say it's

25 super broad.

1              I don't know how many things in Class 9, which covers

2    computers and electronics, don't adapt power in some way.  So

3    they're trying to use this word power adapter and through

4    Baker argue that computer is a power adapter, that anything

5    that changes -- because they talk about the HyperDrive, you

6    know, power goes through it and it changes the power level,

7    depending on what's plugged into it.  So does a laptop.

8              So they're trying to not use Baker to be helpful to

9    the jury; they're trying to use Baker to change the standard

10   into something that better fits their argument.

11             There are also, I think, two things that Baker is

12   asserting.  One is a criticism of what Franzon testifies to.

13             And the second is an opinion that HyperDrive is a

14   power adapter.

15             I think, if Baker is allowed to testify, while any

16   criticism of Franzon, if he testifies, would maybe be

17   allowable, his opinion that the HyperDrive is a power adapter

18   because it adapts power is not helpful to the jury because

19   he's not applying the standard that they're going to need to

20   apply but is trying to give an opinion to the ultimate

21   question.

22             THE COURT:  Well, I mean, that can certainly be

23   accounted for.  It sounds like they're only going to be

24   calling him for the first, which is as a rebuttal to

25   Dr. Franzon.

1              MS. GENTES:  My understanding was that it was --

2    based on what Mr. Ludwig just said, that he was going to offer

3    an ultimate opinion that the HyperDrive was a power adapter.

4              But I think, if there was a limitation on his

5    testimony that it would only be applicable to respond to

6    anything to Mr. Franzon or what Dr. Franzon tells to the jury,

7    that would --

8              THE COURT:  That's what I heard is he is a rebuttal

9    witness.

10             I mean, is that not true?  Is he a rebuttal witness?

11             MR. LUDWIG:  Yes, Your Honor.

12             THE COURT:  All right.  So is he going to be

13   rendering a standalone opinion that's -- that's separate and

14   apart from Dr. Franzon's testimony?

15             MR. LUDWIG:  It's a rebuttal to Dr. Franzon's

16   testimony that the HyperDrive is not a power adapter.  And in

17   that opinion, he's going to provide his conclusion that the

18   HyperDrive is a power adapter.

19             THE COURT:  But that's not going to be a part of your

20   case-in-chief?

21             MR. LUDWIG:  Correct, Your Honor.

22             MS. GENTES:  I guess my question is, if Dr. Franzon

23   does not testify, is Dr. Baker going to come up in rebuttal to

24   any lay facts regarding where these things are -- because we

25   intend to present evidence that, you know, these things are

1  called hubs, that on websites the HyperDrive and its related

2  products are sold under a hub heading, not a power -- and then

3  they separately have a power adapter heading that sells power

4  adapters.

5        And so my concern is that they're going to bring

6  Dr. Baker to try and counter that evidence, as well, with a

7  conclusion that the HyperDrive is a power adapter.

8        THE COURT:  Well, I mean, I think it's going to be

9  hard for them to answer that question right now because it's

10  going to depend on your case-in-chief, I imagine, unless you

11  know that now.

12        MS. GENTES:  Okay.

13        So moving to Mr. Bressler, so we are challenging

14  Mr. Bressler on all three prongs of the *Daubert* question,

15  whether or not he is qualified to give the opinion that he

16  gives, whether or not his methodology is reliable, and then

17  whether or not it's helpful because it applies the -- whether

18  it applies the proper test.

19        The proper test for design patent infringement is

20  whether or not an ordinary observer familiar with the prior

21  art would confuse the two products and purchase one instead of

22  the other.

23        And I do just want to quickly rebut to Mr. Hill about

24  whether or not an expert is helpful in explaining to a jury

25  the differences in the copyright packaging.

1          That's exactly what they're trying to do with

2    Bressler, talk about any similarities or differences.  So it

3    seems not consistent for a design patent expert to be helpful

4    and a copyright expert to not.

5          Bressler is not helpful because he's applying a test

6    that he made up.  But I'll get to that in a moment.

7          So the prior art in *Egyptian Goddess* -- and I have

8    the passage on Slide 58, is:  The prior art provides a frame

9    of reference and informs the perspective of an ordinary

10   observer and what significance they would give to different

11   elements in the two designs.

12         The reason that the Federal Circuit went with the

13   *Egyptian Goddess* test is because there was on old test called

14   the point of novelty test, and one of the things they were

15   going to avoid was -- so the point of the novelty test, you

16   put the prior art next to the claimed design and you figured

17   out what was new in the prior art and then you argued what

18   that new thing was in the accused device.

19         And one of the problems they were having is there

20   might be multiple points of novelty, and a patentee and their

21   expert would focus on just one of those points of novelty and

22   say, well, they have that one, so they infringe.

23         And the Federal Circuit said that that's not how an

24   ordinary observer sees products.  They don't look at just what

25   is the one point of novelty; they look at the products as a

1  whole.  And that's what they were trying to accomplish with
2  the ordinary observer test.
3          So looking at specifically how *Egyptian* -- what
4  *Egyptian Goddess* was looking at, because Sanho tries to
5  justify Bressler's opinion by just saying it's applying the
6  *Egyptian Goddess* three-part test.
7          They don't point to one quote in *Egyptian Goddess*
8  that talks about a three-part test.  We talk about in our
9  reply, the only time they mention three-part test was a brief
10 where one of the various parties that weighed in on this case
11 advocated for the three-part test and that they didn't adopt
12 that.
13         So *Egyptian Goddess*, I have the picture on Page 60
14 that's in that -- in that opinion, I mean, just there, they're
15 looking at four different products.  The top two are prior
16 art, and then you have the accused product and the claimed
17 design.
18         But I don't want Sanho to say, well, it's a four-part
19 test because there are four, because if you read
20 *Egyptian Goddess*, they're looking at the prior art as a whole.
21 They're looking at four-way nail buffers in the market.
22 They're looking at four-sided buffers.  They're looking at
23 catalogs.  And they're using all of that to decide how an
24 ordinary observer would perceive the two designs, not let's
25 look at the prior art one by one.

1          They specifically faulted the patentee's expert for

2    not acknowledging the differences between the prior art and

3    accounting for those in their opinion, just saying, well, the

4    shapes are the same and so an ordinary observer would be

5    confused.

6          So what is Bressler doing in his opinion?  He is

7    doing what he says is the two-part *Egyptian Goddess* test,

8    which is overcome the hurdle of them not being plainly

9    dissimilar and then move on to this one-by-one analysis of the

10   prior art, and specifically say that if there's not a piece of

11   prior art that's closer to the accused design than the claimed

12   one -- the claimed design, then that equals infringement.

13         I mean, that is what he argues in his report and that

14   is what he is intending to present to the jury, that if you

15   can go through these one by one, and it always goes over to

16   this column, then you're good; you've got infringement.

17         So talking specifically about the first prong of his

18   test, that's where you get into the lack of qualification and

19   the lack of reliability.

20         In order to say they are not plainly dissimilar, he

21   does not look at the whole design because he ranks the design

22   features into a hierarchy of primary, secondary and tertiary

23   design features and then says, well, you know, in some cases

24   the primary, in some cases the primary and secondary are

25   significantly dissimilar, and doesn't get into the

1    different -- he might list the differences in the tertiary,

2    but doesn't explain why those wouldn't be significant to an

3    ordinary observer.

4         He specifically underpins this hierarchy with

5    psychology.  And Sanho in its response harps on his 50 years,

6    40 years of design experience, and that's fine.  He is a

7    qualified expert in industrial design.

8         But he chose, in his report, to justify his opinion

9    with psychology and eye mechanics that he can't cite to any

10   reference that lays out this methodology.

11        THE COURT:  I thought he did.

12        MS. GENTES:  So he cites to the eye and the brain,

13   and we specifically included those pages, the two pages he

14   cited to in our filing.

15        It's -- it's ECF 526-2.  And so the two pages he

16   cites to in the book are 47 and 48.  47 is a discussion of --

17   at the top, seeing blindness -- and I'm not sure if I'm

18   pronouncing this right -- saccades.

19        And it talks about how when your eye moves from one

20   eye to the other, how that affects your sight.  Again, not

21   something that they've shown that Bressler has any sort of

22   expertise in.  And then it talks about fixed retinal images.

23        There's no discussion of primary, secondary,

24   hierarchy, what an ordinary observer would prioritize in

25   looking at a design.  And they have not pointed in their

1   response to anywhere else in this book that talks about that.

2            And in his deposition, you know, he says, well, it --

3   it indirectly reinforces my opinion about the psychology of

4   the eye.

5            But it's Sanho's burden to show that he's qualified

6   and that this method is reliable.  And they have not brought

7   one reference that talks about this hierarchy methodology that

8   he's applying.

9            And he's even going so far, as they talked about in

10  their response, to giving percentages.  The ordinary observer

11  would give 100 percent weight to primary and 50 percent to

12  secondary and then 20 percent to tertiary.

13           Not only is he not applying those percentages

14  anywhere in his report, but he doesn't give any basis for

15  them.  He doesn't show how they're reliable.  And so I know

16  we're moving from qualification to reliability, but he's --

17           THE COURT:  I'm not quite following the qualification

18  piece.

19           Is it because he doesn't have a background in

20  psychology?

21           MS. GENTES:  Yes.  He specifically says that in order

22  to understand his report and in order to understand the

23  analysis he's doing, you have to know about the psychology of

24  vision and the brain.  And he does not have expertise in those

25  fields, nor is he pointing to anywhere where he would have

1  gained that knowledge or that training, just these two pages

2  of a book that don't talk about the opinion that he's giving.

3  So that's the issue with qualification.

4        Reliability, you know, he's applying these

5  percentages that he doesn't have anywhere for.  We talk about

6  how he can't even really articulate -- he says there may be

7  seven or eight different psychological theories that may

8  underpin this hierarchy, but he doesn't have a specific one or

9  two.

10        And so he's not meeting the requirements of

11  reliability with this hierarchy test of testable, subject to

12  peer review, known error rate and accepted in the field.

13        Sanho tries to argue, well, he has accepted in the

14  field, and that's all he needs.

15        First, that's entirely on his word.  They haven't

16  brought out a reference that talks about this methodology.  So

17  they haven't met their burden of proving that this is accepted

18  in the field.

19        And they also point to case law that says just

20  accepted in the field is enough.  And we talk about, in our

21  reply, why those cases are not applicable.

22        And it's because those were a chemist looking at a --

23  two molecules and saying whether they were substantially the

24  same.  There's no way to test that.  There's no way to have an

25  error rate on that.  It's an expert saying these two things

1    are the same.

2            What Bressler is trying to do is say the whole of

3    ordinary observers see -- or the average ordinary observer

4    sees things in that -- in this way, without any testing or

5    error rate or any way to prove that that method is reliable.

6            So moving on to the second part of his test and

7    helpfulness, there's no legal basis, not in *Egyptian Goddess*

8    or any of its progeny, for this one-by-one treatment of prior

9    art.

10           The whole point of *Egyptian Goddess* is the prior art

11   forms a frame of reference that the jury should look at to

12   determine how they would perceive the designs.

13           And Bressler -- I have it on Page 65 -- the quote

14   from his deposition:

15                   So going piece of prior art by piece of prior

16               art and doing this three-way test, that's not how

17               humans shop for products, correct?

18                   Oh, no, that's not how humans shop for products

19               at all.

20           And so Bressler is admitting he has jumped from how

21   the prior art would affect an ordinary observer's perception

22   to this three-part structure that he has invented.

23           And the reason that this should be kept from the jury

24   is because it will create the perception that that is the test

25   for infringement, that if I can't find a piece of prior art

1 that's closer to the claimed design than the accused device,

2 I'm good to go; I can find infringement.

3          THE COURT:  Okay.  Great.  Thank you.

4          MR. LUDWIG:  As KaiJet admits, Mr. Bressler has 50

5 years of experience in industrial product design and he is

6 undoubtedly an expert in product design.

7          He also details in his report how he has in -- during

8 the course of his career, done numerous consumer studies,

9 point-of-sale observations, focus groups and the like, to get

10 an understanding of how customers, consumers will react to the

11 visual appearance of a product when they're shopping.

12          He's also an educator and has been -- has had

13 significant education in product design and testified -- or

14 he's given the opinion that his -- his hierarchy, as we'll

15 call it, of how to interpret a prior -- or a product design is

16 used consistently in the field.

17          It's referred to in education curricula.  It's widely

18 accepted methodology for how you provide a framework for

19 understanding the various visual components of a device.

20          Although he does cite in his report a couple of pages

21 from a psychology book, he states that this -- the book just

22 reinforces his views.  He considers that book to be an

23 authoritative reference that's used in design education.

24          So it's similar to, for example, an economics

25 professor who is using an equation in his curriculum to

1  explain an economic concept, even though he himself is not an

2  economist.  If it's considered and widely used, then it's --

3  it's appropriate and it's helpful.

4          Moreover, just looking at the -- you know, taking a

5  closer look at what the hierarchy framework is, all -- all

6  Dr. Bressler does is provide, essentially, a language for

7  saying that there are some product features that are more

8  prominent and more important to the eye than others.

9          THE COURT:  Where does he get that from?

10         MR. LUDWIG:  He gets that from his years of

11 experience and he also does refer to the psychology textbook

12 mentioned.  But, for example, just --

13         THE COURT:  And how does he assign -- how does he

14 assign the importance of each --

15         MR. LUDWIG:  Well, it's -- it's very basic and

16 intuitive.  So if you consider, for example -- well, he gives

17 the example of a human being walking towards you.  What's the

18 first thing that you're going to see?

19         Well, you're going to see the outline of a person and

20 that's going to tell you something.  That's going to tell you

21 that it's a person as opposed to something else.

22         Then you're going to notice that the person has eyes,

23 a nose, a mouth, and important features, not as important as

24 the outline of the person.  Now you can get a clearer picture.

25         And then, as the person gets closer still, you'll see

1　that maybe that person has blue eyes, maybe that person has a

2　scar on the face or something that is even a less important

3　detail.

4　　　　　So he's just acknowledging the fact that some very,

5　you know, gross portions of a product, or aspects of it, are

6　going to be more noticeable than others that are going to be

7　minor details.

8　　　　　In his report, he does not give numerical percentages

9　to any of these different listings.  So the 100 percent, 50 to

10　40 percent, 15 percent that KaiJet cites, that was from the

11　deposition.

12　　　　　KaiJet asked him if he could provide some numbers,

13　but that's not in his report and it's not something that Sanho

14　is going to be eliciting during his direct examination.

15　　　　　He's just -- he's just mentioning that there are

16　some -- you know, it's very common sense.  Some aspects are

17　more important than others.

18　　　　　You know, if you are comparing whether one car is

19　similar to another car, the shape of the car, whether it's a

20　SUV or a sedan is going to be more important to whether it has

21　Cooper tires or Firestone tires.  That's all he's basically

22　saying.

23　　　　　And it's helpful for the jury to have that kind of

24　linguistic framework for analyzing the prior art that's

25　presented, to be able to take the prior art images as a whole

1    and kind of think, okay, well, here is the proportions of the

2    device.  That's pretty important.

3         But maybe there's a decal or something on the device

4    that's going to be a consideration, but it's not as important

5    as some of the other features, such as the size and the shape

6    of the device.

7         And that's all, that portion of Mr. Bressler's

8    testimony, is essentially directed to.  It would be helpful to

9    the jury.  It's --

10         THE COURT:  Does he apply all factors of the *Egyptian*

11    *Goddess* test?

12         MR. LUDWIG:  Yes, Your Honor.

13         Turning to the *Egyptian Goddess* test next, the

14    *Egyptian Goddess* test is a three-way test, and it compares the

15    prior art -- the closest prior art to the patent and also to

16    the accused product.

17         He goes methodically through all of the prior art

18    that was identified.  So it's -- it's KaiJet's burden to

19    produce the relevant prior art to be analyzed.  He has

20    analyzed all of that prior art methodically.

21         He does -- he does go through them one by one and

22    compares each of them to the '290 patent and also to the

23    accused UltraDrive devices, putting the three images side by

24    side, and then provides some helpful commentary on the points

25    of similarity and difference among the three devices.

1            He then concludes, with respect to each of the prior

2    art --

3            THE COURT:  Isn't that -- I mean, that observation,

4    isn't that exactly what Mr. Hill had a problem with earlier?

5            MR. LUDWIG:  With respect to the copyright issue?

6            THE COURT:  Yes.

7            MR. LUDWIG:  Well, here, he's -- he's providing

8    his -- he's providing his expertise as a product engineer --

9    product designer to provide some -- some helpful indication to

10   the jury of how they might consider certain features to be

11   more prominent than others.

12           And then also provides the analysis to point out

13   where the primary and secondary features, perhaps where the

14   '290 patent and the accused product are aligned, whereas

15   between the '290 patent and the prior art, they're misaligned;

16   they're dissimilar.  Then, under the framework, you can

17   potentially discount similarities, potentially, of -- on the

18   tertiary level.

19           So, for example, where you have primary features that

20   are -- that are similar, that's going to discount the

21   importance of the tertiary features, where -- where the

22   primary features are -- are similar, then the tertiary

23   features might become more important as distinguishing one

24   product from another.  Dr. Bressler -- or Mr. Bressler will

25   provide testimony to the jury that will help them to

1    contextualize that analysis.

2            THE COURT:  Okay.  Thank you.

3            MS. GENTES:  Very brief rebuttal, Your Honor.

4            Again, I ask the Court to look and see where Sanho

5    quotes to *Egyptian Goddess* to talk about this three-way test,

6    that putting each piece of prior art, lined up together, and

7    he doesn't just say here's some differences and that's

8    helpful.

9            He says:  The fact that this one is not closer to

10   that one confirms the finding of infringement.

11           And so that's what's in his report in paragraph -- he

12   goes one by one in paragraphs -- I believe it's starting in

13   around the 180s, and continues to go one by one and say these

14   are confirming my finding of infringement.

15           There's nothing in *Egyptian Goddess* that says that

16   finding that the accused design looks more like one piece of

17   prior art than the claimed design has any effect whatsoever on

18   infringement.

19           And what Bressler and Sanho have done here is try to

20   create a creative way to not have to explain whether or not

21   the jury would notice a difference between these tertiary

22   features by saying primary and secondary are close enough to

23   not be plainly dissimilar.  And in doing this one-by-one test,

24   they never have to explain to the jury why these tertiary

25   features wouldn't matter to them.

1      And so it's only going to serve to be confusing to

2  the jury to think that that is the test for infringement,

3  because that's what they're saying, is that this is the

4  *Egyptian Goddess* test, and it's not.

5          THE COURT:  Okay.  All right.  Well, thank you.

6          I think that covers all of the expert-related

7  motions; is that right?

8          All right.

9          MR. CARLSON:  I would say yes, except to the extent

10  that some of the motions in limine also refer to testimony of

11  the experts.

12          THE COURT:  Right.  Right.  And that's exactly why I

13  wanted to take this up first.

14          All right.  Well, I'm trying really hard to give you

15  some guidance on these, on these issues, before the end of the

16  day because I imagine that would be helpful as you wrap up

17  your preparations.

18          And so I hate to take a longer break than usual, but

19  I feel like that might be necessary so that we can go back and

20  take these things and make some decisions by the end of the

21  day.

22          And so what I'd like to do -- it's a little past

23  12:20 now.  If we could take a lunch break until 1:30, that

24  should give us enough time to get our ducks in order on what

25  has been argued this morning.

```
 1              I'm not sure I'll have a decision for you right off
 2   the bat when we come back, but that will at least give us
 3   enough time to get started on it and be able to at least
 4   articulate a decision by the end of the day.  So let's do
 5   that.
 6              And then when we come back at 1:30, we will start out
 7   by just going through some logistical information about the
 8   trial.
 9              I'm sure you have some questions about sort of
10   mechanically how things will go, about jury selection itself
11   and the process.  And we'll take up the objections that have
12   been made to some of the voir dire questions.
13              We will take up the motions in limine as well, and
14   whatever other issues you want to be heard on.  And then we'll
15   circle back, probably at the end of the day, back to these
16   issues.
17              Okay.  All right.  Is there anything burning you want
18   to talk about before we take that break?
19              MR. CARLSON:  No.
20              THE COURT:  Okay.  Everybody is anxious to take a
21   break.
22              Okay.  All right.  All right.  So we'll be in recess
23   until 1:30 then.
24              (Whereupon, a lunch recess was taken.)
25              THE COURT:  You may be seated.
```

1          All right.  Well, I hope y'all had a good lunch.

2          MR. CARLSON:  Sure.

3          THE COURT:  Quick question before we turn to the

4     other matters.

5          I meant to ask earlier, with regard to Mr. Bressler,

6     was there a supplemental report prepared in light of the 2024

7     decision?

8          MS. GENTES:  Yes, Your Honor.  He prepared a

9     supplemental responsive report.

10         THE COURT:  He did.  Okay.  I don't know that that's

11    on the docket.  Is it?

12         MS. GENTES:  I don't believe -- I believe it was just

13    served.  I don't think it was filed.  And we're specifically

14    challenging Bressler with respect to his infringement opinion

15    not his invalidity opinion.

16         THE COURT:  Right.  But if you could provide that,

17    I'd like to have his updated report.

18         MS. GENTES:  Okay.

19         MR. HILL:  We'll make a copy available for

20    Your Honor.

21         THE COURT:  Okay.

22         MR. HILL:  Do you want us to file it or do you want

23    us just to send it to you?

24         THE COURT:  I believe the others are on the docket.

25         Are they not?

1          MR. HILL:  As part of the summary judgment process,

2    probably.

3          THE COURT:  Right.  So just for completeness, let's

4    put it on the docket as well.  Thank you.

5          MR. HILL:  Oh, Your Honor, may I ask a question

6    before we begin?

7          THE COURT:  Sure.

8          MS. GENTES:  With the --

9          THE COURT:  Go ahead.

10         MR. HILL:  We were told that there was going to be,

11   after lunch, at around 1:30, a technology -- an availability

12   for, you know, our various trial technology people to

13   interface with court staff to work with the electronics.

14         I'm taking it that, to the extent that happens, it's

15   going to happen after we're done with the entirety of the

16   pretrial conference?

17         THE COURT:  Yes.

18         MR. HILL:  And only if time is remaining; is that

19   right?

20         THE COURT:  You can take as much time as you like,

21   but yes, it will be after -- yes, it will be after the

22   hearing.

23         MR. HILL:  Do we have any sense of what time we

24   should ask those people to be here?  I don't want to hold

25   anybody up.  But at the same time, I don't want anybody -- I

```
 1   don't want people to have to sit through two or three hours of
 2   this.
 3              THE COURT:  Right.  No.  I understand.
 4              I would say 4:00 would be safe, I would think.
 5              Does that work?
 6              MR. HILL:  Yes, that's fine, Your Honor.  Thank you.
 7              THE COURT:  Thank you.  Yes.  Sorry.  I didn't
 8   realize -- I was probably being too optimistic to think that
 9   we would be done by 1:00.
10              Okay.  So okay.  For the trial itself, I just want to
11   give an opportunity for each side to introduce who is going to
12   be part of your trial team in terms of speaking roles or
13   support, so can you give us those names?
14              MR. HILL:  Yes, Your Honor.
15              It will be myself; it will be Mr. Ludwig; it will be
16   Mr. Aalaei and my associate John Mahaffey, as well as Tyra
17   Hammonds, who is our trial tech.
18              THE COURT:  Okay.  Great.
19              MR. CARLSON:  All right.  Your Honor, for the KaiJet
20   U.S. and KaiJet Taiwan, myself, Ms. Gentes, Mr. Philbin,
21   Ms. Tomlinson, and then our paralegal, Crystal Batson, and
22   Jeff --
23              MR. ROBERTS:  Roberts --
24              MR. CARLSON:  Roberts --
25              MR. ROBERTS:  Yes, sir.
```

1          MR. CARLSON:  -- Roberts, who is the hot seater, the

2   technology guy.

3          THE COURT:  Perfect.

4          MR. CARLSON:  And also a colleague, James Rollins,

5   who may be in and out.  He's a lawyer.  He probably will not

6   have a speaking role, but he will probably be doing some

7   chores for us.

8          THE COURT:  All right.

9          MR. HU:  And, Your Honor, I'm representing both

10  KaiJet Taiwan and Starview Global, and I'll be lead for

11  KaiJet Taiwan.

12         THE COURT:  Okay.

13         MS. THORPE:  And I will be the lead for

14  Starview Global.

15         THE COURT:  All right.  Okay.  Thank you.

16         All right.  Well, let's talk about the jury selection

17  process.  There was a docket entry that was filed that was

18  titled sort of an agreement to have a jury of less than six

19  jurors, but when -- the document itself was not that.  It was

20  just the proposed jury instructions, right?

21         So that was not your intent, I imagine.

22         MR. HILL:  That was a misfile.  It was mistitled.  It

23  was supposed to be a proposed form and verdict.

24         THE COURT:  Okay.  I just wanted to make sure of

25  that.

1          So in that event, we'll go with what we normally do,

2    which is to seat eight jurors with no alternates.  In other

3    words, if the eight jurors make it all the way to the end, all

4    eight jurors will deliberate.  That gives us a little bit of a

5    cushion, obviously, so that if we lose one or two, we're still

6    fine to proceed.

7          But the nice thing about civil cases is that we don't

8    have to excuse jurors at the end and tell them that everything

9    they've done is for naught, so that's what we will do.

10          Each side will have three preemptory strikes, so the

11    defendants will have to share those preemptory strikes among

12    yourselves.  That means that we will need to qualify 14

13    jurors.

14          And the process that I utilize is this:  Before the

15    jurors even come into the courtroom, in other words, while

16    they are still in the orientation room with the jury

17    coordinators, they will be asked to fill out that

18    questionnaire that you've received copies of.

19          It's nothing case specific.  It's all sort of

20    general, name, rank, serial number type of questions.  But I

21    think it's helpful to have that information in hand before we

22    even get started so that we don't waste time with that sort of

23    introductory information.

24          So while the jurors are getting oriented and

25    processed, you know, we'll ask them to fill out that

1    questionnaire first.  And then we will make every effort to

2    make copies of those questionnaires for each side and provide

3    those to you before we get started.  You're not going to have

4    a whole lot of time to review those before we get started, but

5    you'll have them and you will be able to be looking at them as

6    we are speaking to the jurors.

7            I encourage you, though, to really pay attention to

8    those questions and the answers they've provided, because I

9    have found that many times lawyers are wasting precious

10   minutes that they have during jury selection going through the

11   very same questions that the jurors have already answered in

12   those questionnaires.

13           We will have a panel -- for this case, I think I'm

14   going to try to put a panel of 20, initially, in the

15   courtroom.  And the way they will be seated, we will have 14

16   jurors in the box, and then we will utilize that very first

17   row right behind the jury box for the remaining six jurors.

18           So I'll ask your colleague there to perhaps move to

19   the other end of the table and swing around so that everybody

20   can have a line of sight to all of the jurors that are seated

21   there.

22           We will have a mobile microphone, and when any juror

23   is asked to answer a question, our court security officer will

24   hand that microphone to the juror, and we will try to be good

25   about asking that juror to, before they speak, repeat their

1  juror number and name before providing any information.

2          I will start it out by asking legal qualification

3  questions and then conflict-related questions.  Those

4  conflict-related questions will include me running down the

5  list of all of the names that you have provided on your

6  witness list.

7          I haven't looked at it that carefully to see how

8  voluminous it is, but assuming it's not tremendously

9  voluminous, I will just read them the entire list straight

10  through and just ask them sort of the singular question of

11  whether any of those names sound familiar or are known to

12  them.

13          Once I get through that, that's the end of my role in

14  asking questions.  I know that in your proposed pretrial

15  order, you have a sort of agreed-upon set of questions that

16  you wanted me to ask and then you have questions that you want

17  to ask.  That's not how I do it.  It's -- this is your show.

18  And I will let you -- I will let you primarily run jury

19  selection.

20          Each side will have a total of 60 minutes to ask the

21  panel questions.  And that will be broken down into two

22  segments, 45 minutes and 15 minutes.

23          So plaintiff's counsel will go first and the clock

24  will give you 45 minutes to utilize those -- that time as you

25  wish.  The questions that you should ask should either be ones

1    that have been stipulated to by the parties or approved as we

2    go over them today or natural follow-up to answers that have

3    been provided, either in those written questionnaires or from

4    previous questions.

5              The questions that were propounded in advance, I

6    don't view that as a script.  You know, I just ask lawyers to

7    use their common sense and ask questions that logically flow

8    from the information that's being exchanged.

9              So plaintiff's counsel will have the initial 45

10   minutes and defense counsel will have 45 minutes, and I'll let

11   you-all decide among the various parties how you want to split

12   that up.

13             Then we will turn back to the plaintiff's counsel,

14   and you will have 15 minutes for follow-up, and then defense

15   counsel will have 15 minutes as well.

16             All right?

17             I think that should -- that should be plenty if you

18   use your time wisely, which is the key, the key phrase.  I

19   mean, the only time I've ever had lawyers run out of time is

20   when they have wasted time by asking questions that are so

21   vague or so broad that it elicits so many positive responses

22   that really aren't all that helpful to determining whether a

23   juror can be fair.

24             So some of the questions in your propounded

25   questions, I think, fall into that category.  I don't have an

1  objection to you asking the question, but I suspect that if

2  you ask it, you're going to spend 20 minutes going through the

3  answers to that question.  So again, you know, use your time

4  wisely.

5          But it's not a script.  You don't have to ask every

6  question that you've propounded.  You don't have to go in the

7  same order.  You don't have to -- you can use the other

8  party's questions, if you wish.  You can do whatever you'd

9  like within the parameters that -- of what's been approved,

10 but just be cognizant of the fact that you are under a time

11 limit.

12         Okay?

13         MR. CARLSON:  Question.

14         THE COURT:  Yes.

15         MR. CARLSON:  Do you have that lawyers are to refer

16 to jurors by last name or do you prefer to have, you know,

17 Juror Number 6?

18         THE COURT:  I think, you know, for this type of case,

19 I don't have a problem utilizing their names.  It sort of

20 depends on the nature of the case.

21         MR. CARLSON:  Yeah.

22         THE COURT:  But so for a civil case and one of this

23 type, I don't think any juror will be offended by that, so

24 you're welcome to use their names.

25         MR. CARLSON:  Thank you.

```
1              THE COURT:  Once we get through and we select -- like
2    I said, we're going to try to get 20 jurors here in this
3    initial panel.  There should be additional jurors that have
4    been summoned that will be available if we need them, but I'm
5    hoping that with 20, that should be plenty because that allows
6    for up to six for-cause strikes.
7              Once we are -- the questioning has been completed by
8    counsel, at that point I will take up any for-cause
9    challenges.  To the extent that we need follow-up from any
10   individuals, all the jurors will be excused, obviously, when
11   we take up those for-cause challenges.  To the extent that we
12   have to do some individual follow-up, at that point, we will
13   bring that individual juror back in to do that and resolve
14   those challenges.
15             Once that is done, we will then proceed to the
16   strikes.  And we will do that on paper.  Ms. Brye will provide
17   you with a strike sheet that has boxes for each side to write
18   down their strikes.
19             We will alternate.  Plaintiff will strike first and
20   then alternate, one alternating until we -- each side has had
21   an opportunity to strike three.  So if everyone utilizes those
22   strikes, then the defendants will be striking last.
23             Back strikes are allowed.  In other words, you do not
24   need to go in the order of the jurors.  You could, you know,
25   choose to strike Juror 15 in your first strike and then strike
```

1  Juror Number 1 in your second strike.  It's up to you.  I know

2  that there is a very complicated chess strategy that goes on

3  there.

4        Any questions about that process?

5        Okay.  So let's discuss the voir dire questions that

6  have been proposed.  I've reviewed them.  I don't -- if I

7  recall -- and someone correct me if I'm wrong -- the only

8  objections that were raised were on cumulative grounds; is

9  that right?

10       MR. CARLSON:  Your Honor, I believe that's right.

11  Nothing that suggested prejudice or anything else.  I think

12  the goal in these objections was if the Court was going to be

13  doing the questioning primarily to try to whittle it down a

14  little bit to save time, as you suggested.

15       THE COURT:  Right.

16       MR. CARLSON:  But under the procedure that you've

17  outlined, I'm not sure that any of these objections have any

18  other function.

19       THE COURT:  Do you agree with that, Mr. Hill?  No

20  objections?

21       MR. HILL:  Yes.

22       THE COURT:  Okay.  All right.

23       So yes, so that's definitely the way that I'd ask

24  that question because, as you said, given the procedure we

25  have, and the time limits, I don't think a cumulative

1  objection is really that pertinent, so I'm going to overrule

2  all of those objections.

3        I reviewed independently all of the questions, and

4  they are deemed proper and appropriate to me, and I appreciate

5  the parties being able to narrow those issues.  So those

6  questions are all acceptable.

7        And like I said, you're free to, within your

8  professional judgment, to ask logical follow-up questions that

9  are not necessarily in that -- in those outlines as well.

10       All right.  The schedule for the trial generally,

11  will be -- at least for the jury -- will be 9:00 to 5:00.

12  I'll ask them to be here, to be ready to begin promptly at

13  9:00 a.m., meaning I'm asking them to come early enough to be

14  able to actually get started at 9:00 a.m.  And we will go

15  pretty close to 5:00.

16       I hate asking them to ever stay past 5:00, because,

17  inevitably, some of them have, you know, childcare or other

18  family obligations that they need to get to.  So depending on

19  when there's a natural break, we will usually cut out close to

20  5:00.

21       For counsel, though, that means that, as I flagged

22  for you during our hearing a couple of weeks ago, that any

23  issues that we need to resolve outside the presence of the

24  jury needs to be done when the jurors are not here, which

25  means being prepared to come earlier than 9:00, I've had

1   hearings as early as 8:00 a.m. at times, and staying past

2   5:00, sometimes very late, to resolve issues in preparation

3   for the next day.

4        I imagine that you don't have a whole lot going on

5   other than the trial once the trial starts, so -- but if there

6   are -- if anyone does have any family responsibilities on any

7   particular day, let me know and we can try to work around it.

8        But it is really important to me that we utilize the

9   jurors' time efficiently, and that tends to work the best when

10  we have been able to work out those issues either before we

11  begin or after court session is over.

12       I'll generally give two 15-minute breaks during the

13  trial day, one midmorning and one midafternoon, and then a

14  lunch break for an hour at about 12:30.

15       We are somewhat limited on when we break for lunch

16  because the cafeteria in the building closes at 1:30, and so

17  we really can't go much past 12:30 if we're giving them an

18  hour lunch break.  And they're usually getting pretty cranky

19  if I haven't let them go by 12:30, and so you can plan on that

20  as well.

21       We have sophisticated counsel on both sides, so I

22  don't think I need to tell you about that it is your

23  responsibility to use -- on the use of technology.  I welcome

24  the use of technology.  I think it's very helpful.

25       But you're responsible for bringing your own devices

1  and being able to make sure that it is compatible with our

2  courtroom technology.

3          As we saw firsthand this morning, it doesn't always

4  work out that way.  I think Ms. Brye is already working with

5  the IT folks to try to figure out what happened this morning.

6  And we may very well have some kinks because, as I said, this

7  is new.

8          But at the end of the day, again back to the theme of

9  not wasting the jurors' time, if something is not working, we

10  just need to move on, so having a Plan B is critical.

11          How much time do you anticipate needing for opening

12  statements?

13          MR. HILL:  Half an hour.

14          THE COURT:  Is that okay with you?

15          MR. CARLSON:  That will work with us, Your Honor.

16          THE COURT:  All right.  What about -- counsel, how

17  many opening statements will there be for the defendants?

18  Will there be three, or two?

19          MR. HU:  We haven't decided but, at most, two.  But

20  we will keep it to 30 minutes, Your Honor.

21          THE COURT:  Okay.  Just to be clear, are you saying

22  one opening statement of 30 minutes or two opening statements

23  of --

24          MR. CARLSON:  Probably for defendants, two opening

25  statements but we will keep the total within 30 minutes.

1          THE COURT:  Okay.  All right.

2          To the extent that you wish to show any exhibits or

3   demonstrative aids during your opening statement, please share

4   that with the other side in advance and bring it to my

5   attention before we begin so that I can resolve any objections

6   beforehand and we don't have to face having an objection

7   mid-opening.

8          It is important that you-all stay close to a

9   microphone in this courtroom.  As you see, the court reporter

10  has earplugs, earphones on, which are tied and tethered to the

11  microphone audio system.  And so, even if you are screaming

12  loudly, if you're not close to a microphone, she probably

13  can't hear you.

14         So you have a microphone on your table; you have a

15  microphone at the podium.  By the way, this big rectangular

16  podium in front of me, that one does not move; that one stays

17  where it is.

18         On the other hand, that smaller podium right now

19  that's facing the jury box, that can move.  And so -- and

20  you're welcome to move that wherever you like, whether it's

21  for your opening, closing, or witness examinations.

22         I'd encourage you, though, to do that, again, during

23  a break before we begin, so that we're not wasting time trying

24  to get that moved.  It's not terribly easy to move, but it is

25  moveable.  But to the extent that you want to have something

1  that's not facing the Court, it's that smaller podium that you

2  want to use.

3         Okay?

4         I don't have any problem with -- you know, I know

5  some judges are real particular about always staying behind a

6  podium or in a particular place.  I don't have strong feelings

7  about that other than as long as you are close to a

8  microphone.  So if you're one that likes to move out and move

9  away, away from the podium, you can do that.  Just make sure

10 that microphone is going with you and you're pointing it in

11 your direction.

12        Okay?

13        As I mentioned, there's -- courtroom timers are above

14 the jury box.  We will utilize that not only for jury

15 selection but also for the opening and closings as well.

16        For the trial exhibits, I would like a courtesy copy

17 of those exhibits, at least by the morning of trial.  Paper or

18 electronic is fine, whatever is easiest for you.  If it is

19 electronic, a thumb drive would work best for our technology.

20        At the end of each day, I'd like at least one member

21 of the team to confirm with Ms. Brye the exhibits that have

22 been admitted that day.  It's much easier to resolve any

23 discrepancies on a daily basis than after several days of

24 trial.  So please plan on doing that.

25        With regard to the witnesses, again, I can't

1  emphasize enough how important it is to make sure that you

2  have enough witnesses to complete the day.

3         As I flagged for you during our hearing, things tend

4  to go very fast in my courtroom, and many counsel have been

5  surprised and caught flat-footed when they thought they had

6  enough witnesses and it's 3:00 and they don't have any more.

7         If it's 3:00 and you don't have any more witnesses,

8  you're resting, because you're not going to waste two hours of

9  the jurors' time.  So have more than you need for witnesses

10 for the day.

11        And I know that's sometimes inconvenient for those

12 witnesses, but it's just the reality of trials and we just

13 cannot afford, especially given the limited timeframe we have

14 to get this case done, to waste one of our court days.

15        I believe you've already coordinated for the use of a

16 room, a conference room, on the floor.  And I believe each

17 side will have a room that you can make available for your

18 witnesses.

19        But having said that, those rooms are far away from

20 the courtroom, and so always make sure that you have --

21 whoever is the next witness up, make sure that witness is

22 right outside the courtroom, on the bench outside the

23 courtroom, sort of on a sort of batter's deck, because, if

24 not, it's going to be sort of this awkward five- to ten-minute

25 wait for somebody to find and retrieve the next witness.

1              In terms of your interaction with the witness while

2    he or she is on the stand, you're welcome to walk around the

3    courtroom.  You're welcome to approach the witness without

4    asking, whether it's to hand exhibits or to interact with

5    them.

6              Once an exhibit has been admitted, once I have

7    admitted the exhibit, you're welcome to publish that exhibit.

8    You don't need to ask separately for publication permission.

9              I'd encourage you to have -- think about what

10   exhibits you wish to utilize with a witness and provide all of

11   those all at once on the witness stand.  It saves time instead

12   of sort of the back-and-forth with handing individual exhibits

13   to the witness.  Witness binders tend to work well for this

14   type of case, so I encourage you to use those as well.

15             Each counsel's responsible for their own original

16   exhibits.  So just make sure that when a witness leaves the

17   stand and is walking off, they're not walking off with their

18   exhibits.

19             As I -- again, as I mentioned during our hearing, I

20   don't have any bench or sidebar conferences while the jury is

21   here.  If there's an objection, raise the objection and I'll

22   rule on it.  And if it's something that I don't feel like I

23   can rule on, we're just going to have to take a break with the

24   jurors and have that discussion in open court.  But I'm really

25   loath to do that for all of the reasons that we've discussed.

1  So the more you can anticipate in advance of a witness's

2  testimony, the better.  Because if it's something that could

3  have been anticipated and it's a close call, that's going to

4  go against your favor.

5         For the closing arguments, I saw that the parties

6  have asked for 90 minutes.  I'm not sure I can get through 90

7  minutes on each side.  That's a really long time.  So we can

8  defer that and see how this goes.  But right now, plan for the

9  possibility that you'll be limited to 60 minutes.

10         Whether it's 60 or 90, the plaintiff can reserve up

11  to 15 minutes for rebuttal.

12         Do you-all have an updated estimate of how long you

13  anticipate the trial will take?

14         MR. HILL:  We're anticipating finishing our

15  case-in-chief on Friday.

16         THE COURT:  So starting on Tuesday, ending by that --

17         MR. HILL:  Friday.

18         THE COURT:  The first Friday, right?

19         MR. HILL:  Yeah.  The first Friday.

20         THE COURT:  Okay.

21         MR. HILL:  Unless you have about five additional

22  witnesses, I'm talking about the first Friday.

23         THE COURT:  Okay.  Good.  I just wanted to make sure

24  you didn't mean November.  Okay.

25         And Mr. Carlson?

1          MR. CARLSON:  I guess depending upon what day

2    Friday -- what time Friday, I would expect that our

3    case-in-chief would be finished by midday Wednesday, and

4    sooner if we can make it happen.

5          THE COURT: All right.  Okay.  Great.

6          MR. CARLSON:  Your Honor, can I just ask one

7    question?

8          THE COURT:  Sure.

9          MR. CARLSON:  In regard to understanding those

10   sidebars and that sort of thing.  If the Court overrules -- if

11   the Court sustains an objection and the party wants to make an

12   offer of proof, do you require a statement of I request an

13   opportunity to make an offer of proof in front of the jury, or

14   is that just something that we can flag and do once the jury

15   is out of the box?

16         THE COURT:  Yes.  If I have overruled your objection,

17   I don't -- in my view, you don't need to preserve it right on

18   the spot, and you can just take it up at the next break.

19         MR. CARLSON:  Okay.  Well, I would -- would you like

20   us to say, May I make an offer of proof at the break, or is

21   that just going to be a --

22         THE COURT:  You can, but I'm not going to tell you

23   that you've waived that right if you don't say it.

24         MR. CARLSON:  Good.  Okay.

25         THE COURT:  Okay.  I don't believe the pretrial order

1  had any stipulations.  And there was some statement that the

2  parties were still working on it.

3          Is that true?

4          MR. HILL:  That is true.  I think we have made some

5  forward progress.  I think we're waiting for Your Honor's

6  determination on some of the motions in limine before we spend

7  time trying to hammer out the details, but hopefully, we will

8  have at least a set of stipulations, even if it's not the

9  largest set of stipulations I've ever seen for a jury trial.

10          THE COURT:  Okay.  Well, obviously, I would encourage

11  that.  And not only factual stipulations, but also

12  stipulations on the admissibility of exhibits as well.  To the

13  extent that you can do that, obviously, it makes everyone's

14  job easier.

15          With regard to any factual stipulations, I will leave

16  that to you on presenting that during your respective

17  case-in-chief.  I mean, in other words, if it's something that

18  you need to get into evidence, it's your responsibility to

19  read that into the record while your case-in-chief is open.

20          Okay?

21          And you can just sort of prompt me at the proper time

22  when you wish to do that, and I'll give the jurors a little

23  bit of an explanation of what's happening.

24          MR. HILL:  Okay.

25          THE COURT:  Let's talk about depositions.  Because I

1    know that there were a whole lot of designations made in the

2    pretrial order and I really didn't want to go through and

3    resolve each and every objection unless I knew that, for sure,

4    those excerpts were going to be utilized, so I'd like I get

5    some clarity on what the plan is.

6         MR. HILL:  Your Honor, speaking for the plaintiff, we

7    have -- I believe we have four of the defense witnesses under

8    either an agreement to appear live to testify or who will have

9    agreed -- who are the subject of an agreement to accept a

10   trial subpoena so that they're available during our

11   case-in-chief.  That substantially reduces the number of

12   depositions that we would expect to read.

13        I believe we are looking at two potential depositions

14   being read, the combined excerpts of which are maybe an hour

15   to an hour and a half.  We're still trying to whittle in light

16   of the -- you know, in light of the objections and everything.

17        My proposal would be, on Tuesday, if we have not been

18   able to resolve our objections regarding the first deposition,

19   which we would anticipate showing to the jury on Wednesday,

20   that we would -- we would, at a break, alert Your Honor to the

21   fact that we have gotten as far as we can on the -- on the

22   deposition and need Your Honor's assistance.

23        And we'll do that for the second deposition after

24   that.  We'll just -- we'll just work them in so that we have

25   the opportunity to bring it to your attention that we're

1  reaching a point where it would be useful to have Your Honor's

2  time so that we can discuss.

3          THE COURT:  Okay.

4          MR. HILL:  I do want to preview one issue, and it's

5  not -- it's not requesting any substantive guidance from Your

6  Honor; it's more of a heads up.

7          One of the depositions, Mr. Liao, who is an inventor

8  on some of the design patents, was taken in Mandarin Chinese

9  using a translator, and there's a check translator.

10          And because of that, what we are probably going to

11  want to do, because of how much commentary there is in that

12  deposition, making it difficult to edit, is to simply work

13  out -- try to reach an agreement with the other side about

14  what the agreed-upon answers are that can be read, to the

15  extent the check interpreter and the interpreter were not

16  100 percent aligned in their commentary, so that we can just

17  read in English the questions and the answers.

18          I don't think that should be that controversial, and

19  I don't think there's too many pivotal points in the

20  deposition where it hinges on the difference between an

21  interpreter and a check interpreter.

22          But for me, that's -- that's fairly exotic as

23  deposition issues go, so I just wanted to identify it early

24  on, because -- because to the extent that we need some help on

25  the Liao deposition, that may be the help that we need is

1  where we can't agree what to do where a translator and a check

2  translator disagree on how the witness is answering.

3        THE COURT:  Okay.  So what I'm hearing is that we

4  can, at least from your perspective, defer any rulings on

5  objections made in the designations until at least Tuesday,

6  because you're not going to -- the earliest you would call or

7  wish to present any deposition testimony would be Wednesday?

8        MR. HILL:  Yes.  And if it seems like we're moving at

9  such a -- such a fast clip that that changes for any reason,

10 I'll let Your Honor know before the -- or before or at the

11 mid-afternoon break on Tuesday, and we can start right after

12 the mid-afternoon break on Tuesday, by addressing whatever the

13 remaining issues are.

14        But I'm going to try to work that out with them,

15 because the first -- the first witness by deposition, it's not

16 a lot of clips, so it should be fairly easy for us to identify

17 whether or not we can agree or whether or not we need help.

18        THE COURT:  Okay.  Are these all video depositions?

19        MR. HILL:  Well, the two that I'm talking about are

20 both video depositions.  But like I said, for the second one,

21 where the -- there are translation issues that really slow it

22 down because of the dimension that having two interpreters

23 adds to a deposition.

24        We are probably going to just do it the old-fashioned

25 way and put Mr. Mahaffey or somebody in the box and ask them

1    the questions, have them read the answers, and do it that way,

2    and it will probably save us an hour of time.

3         THE COURT:  Okay.  To the extent that you could let

4    us know by Monday where you're at with at least that initial

5    set of depositions, that would help.

6         It's obviously -- I'm trying to balance between not

7    doing more than I need to but also not running into a

8    situation where I'm having to make decisions on a ten-minute

9    break, so...

10        MR. HILL:  Understood.  As to the first deposition, I

11   will -- I can either email or I can do a notice of filing of

12   the excerpts that we intend to introduce, and what objections,

13   notify the Court as to what objections are maintained and are

14   going to require a ruling by the Court.

15        THE COURT:  That would be great.  Email is fine for

16   that.  And emailing Ms. Brye.

17        MR. HILL:  Is it okay if I have until Tuesday to do

18   it for the second witness since there's no way we're reaching

19   that second witness on --

20        THE COURT:  Yes.

21        MR. HILL:  -- on Monday, or likely even Tuesday.

22        THE COURT:  Well, we're starting on Tuesday, but yes.

23        MR. HILL:  Yes.  I mean, if I --

24        THE COURT:  As long as I have at least one overnight,

25   that would be helpful.

1          MR. HILL:  You will have one overnight for sure.

2     I'll send you both if I can.

3          THE COURT:  Okay.

4          MS. GENTES:  Your Honor.

5          THE COURT:  What's your --

6          MS. GENTES:  No, I think that procedure works with us

7     as well.

8          We're also having the same struggle with the Liao

9     deposition due to the plaintiff's check interpreter.  One

10    question we had on that is whether or not -- if the Court had

11    a preference on whether or not we include the Chinese answer

12    before the English translation or if we are okay with the

13    video just doing the English question and the English answer.

14         THE COURT:  Unless there's an objection, I think

15    everyone would appreciate just going straight to the English.

16         MS. GENTES:  Yeah.

17         MR. HILL:  That's fine.  So my plan was in doing it

18    the old-fashioned way to have the -- to give the English

19    question and have them elicit the answer in English only.

20         I was going to incorporate their counter-designations

21    into that, in which case there would really be no reason to

22    show video, if they -- if there's something they want to show

23    by video, I suppose I could just do the direct and they can do

24    the counter-designations by showing the video.

25         THE COURT:  Okay.

```
 1              MR. HILL:  I don't have any problem with that, I
 2    mean, but it's totally up to them.
 3              MS. GENTES:  I think we were planning to use that
 4    deposition as well in our case-in-chief.
 5              MR. HILL:  Oh, in your case-in-chief, no problem.
 6              MS. GENTES:  Yes, this wasn't about the
 7    counter-designations.  But otherwise, the overarching plan --
 8    we did, you know, in the rush to get the pretrial order,
 9    probably over-designate.  And we're also working on whittling
10    that down.  And we'll work with the other side to figure out
11    which objections can be dropped and which ones need to be
12    maintained and can follow the same procedure so that we'll
13    have at least one overnight to handle any of those objections
14    before the deposition is shown.
15              THE COURT:  Great.  And the same procedure, if you
16    can email Ms. Brye with whatever is left for me to resolve.
17    That way I don't have to sort of cross-reference back to the
18    pretrial order.  If you can just sort of give me a standalone
19    on what is left, that would be helpful.
20              MS. GENTES:  Yes, absolutely, Your Honor.
21              THE COURT:  Okay.  All right.  Shall we take up the
22    motions in limine?  Unless there's something else procedurally
23    you want to discuss first?  No?
24              MR. CARLSON:  I wonder, just for logistics purposes,
25    we've gotten -- both sides have a number of different motions
```

1    and I think, at least on our side, different people are going

2    to be speaking to them.

3        THE COURT:  Yes.

4        MR. CARLSON:  Would it be acceptable to the Court if

5    we just spoke from the table here?

6        THE COURT:  Yes, that's fine.  And I was going to

7    say, I meant to mention earlier that this portion of the

8    hearing, you're welcome to remain seated because we're not

9    doing the Jack-in-the-Box thing.

10        MR. CARLSON:  Thank you.

11        THE COURT:  That's perfectly fine.

12        MR. HILL:  Your Honor, I had just two procedural

13    questions about the trial.  I was just looking -- looking

14    through my notes here before we get into the

15    motions in limine.

16        For witnesses that testify live, each -- each party,

17    I believe, has agreed to provide their own interpreter if the

18    witness speaks Mandarin Chinese rather than English as a first

19    language and wants to testify in their native language.

20        For check translators, my understanding is that the

21    check translator -- you can have a check translator, but the

22    check translator cannot speak on the record without the

23    Court's permission.  Only the official interpreter who's

24    appearing for that witness can speak in front of the jury

25    without the Court's permission; is that correct?

```
1              THE COURT:  Right.  I can't say that I've ever had
2    this situation.  But I would say that the check translator
3    would need to be called as a witness, as sort of a rebuttal
4    witness, and placed on the witness stand himself or herself if
5    we -- if it comes down to that.
6              MR. HILL:  Fair enough.
7              And my other question was:  For depositions -- and
8    now I'm talking about for having -- for use in potential
9    impeachment, we were told at the Clerk's office that you do
10   not require original manual filings of original depositions,
11   that we can bring the sealed originals and use them ourselves
12   once the trial begins.
13             Is that accurate?
14             THE COURT:  Yes.  Yes.
15             MR. HILL:  Okay.
16             THE COURT:  I mean, unless -- you know, if there's a
17   dispute about the accuracy of it, then we can take that up,
18   but I'm assuming everyone has the same copy.
19             MR. HILL:  I can't imagine that.  It's just the first
20   time that I've tried a case in this courtroom where a judge
21   said that was going to be the rule, and so I'm -- it's
22   refreshing.
23             THE COURT:  Right.
24             MR. HILL:  I think that's -- I think that's it for my
25   questions.  Thank you.
```

```
1              THE COURT:  All right.  Sure.

2              All right.  So let's take these up then.  I'm going

3    to start.  Let's start with Sanho's motion, ECF 542.

4              MR. HILL:  So much for Mr. Carlson saying we should

5    do this in our seat.  There's something about me that's --

6              THE COURT:  You just can't help yourself.

7              MR. HILL:  I can't help myself.  I move immediately

8    to the podium before I even think it through.

9              I'm going to address Motion In Limine Number 1.  Is

10   that how Your Honor prefers to handle it?

11             THE COURT:  Yes.

12             MR. HILL:  Let's just do these one at a time.

13             THE COURT:  We'll just go in order.

14             MR. HILL:  And where we see there's overlap, we can

15   identify that and argue two or more at a time.

16             THE COURT:  Sure.

17             MR. HILL:  But for Number 1, this is going to be

18   brief, because this is -- Motion Number 1 is really directed

19   to the underlying evidence that's cataloged in some of the

20   Sarabia exhibits.  And since we discussed them at length this

21   morning during the Sarabia Daubert motion, I'm not going to --

22   I'm not going to belabor the point.

23             The first -- this all has to do with the issue of the

24   strength of the mark and what evidence can and can't be used

25   in an attempt to argue whether the mark is strong or weak.
```

```
 1              The first -- the first set of evidence is the

 2    evidence relating to the commercial strength of the mark.  And

 3    this is the Sarabia exhibit that catalogs the nine hyper and

 4    hyper phonetic equivalent marks, which in the summary judgment

 5    process Your Honor -- Your Honor held in the summary judgment

 6    order that those were not probative of the commercial strength

 7    or weakness of the mark because there was no relatedness of

 8    the goods.  And for that reason, you know, we have a -- we

 9    have a Rule 402, 403 objection to the admissibility of that

10    evidence.

11              And then, secondly, there is the Exhibit J to the

12    Sarabia report, which has the six phonetically identical

13    trademark registrations not owned by Sanho.  This is, again,

14    evidence that the Court held at summary judgment.

15              THE COURT:  What number are you at?

16              MR. HILL:  I'm on Page 5 of our -- our motion, 542.

17              THE COURT:  Let's just identify it by

18    motion in limine.

19              MR. HILL:  Motion 1, still Motion 1.

20              THE COURT:  Still Motion 1.  Okay.

21              MR. HILL:  The second issue bearing on the strength

22    or weakness of the mark is the Sarabia catalog of six

23    phonetically identical trademark registrations not owned by

24    Sanho, which the Court held in its summary judgment order were

25    not relevant to commercial strength or weakness because they
```

1    cover unrelated goods.  And so we have the same objection to

2    those.

3          So this motion is really devoted to not permitting 15

4    trademark registrations that are cumulatively for goods that

5    are unrelated to the -- to the goods on which HyperDrive is

6    used by Sanho.

7          And for that reason, you know, for under FRE 402,

8    we -- you know, they're not -- they're not relevant to

9    commercial strength or weaknesses, but under FRE 403, 15 seems

10   to be unduly prejudicial and creates an undue impression that

11   this is important -- very important evidence for the jury to

12   consider.

13         THE COURT:  All right.  Please take that up.

14         MR. CARLSON:  Your Honor, let me speak to this, if I

15   may.  And if you still have our bound copy of slides that we

16   prepared --

17         THE COURT:  Yes.

18         MR. CARLSON:  -- we'll start on Slide 29.  We spoke

19   to this -- I spoke to it, to some degree, during the

20   discussion of exclusion of the testimony of Mr. Sarabia.

21         But the premise of the plaintiff's motion seems to be

22   twofold:  First, that the entire mark -- the significance of a

23   trademark goes to the entire mark.  We don't dispute that.

24         And -- but the other half of what they are arguing is

25   that the *Sovereign Military* case says that it's irrelevant to

1  focus on individual pieces of the mark.

2       *Sovereign Military* is -- does not provide a lot of

3  guidance in this case because it's really kind of confined to

4  its facts.  The mark at issue is a 14-word mark that's there

5  on our Slide 29.

6       Interesting trademark, interesting case, but the

7  third-party uses that were being -- being considered by the

8  Court plucked one or two words out of each of those,

9  Saint John, or Knights, or Hospitallers, or Knights of Malta.

10      And the Court's conclusion was, well, under those

11  circumstances and with respect to this mark, that third-party

12  use is not especially significant of strength or weakness of

13  the mark at issue, the *Sovereign Military*, you know, the

14  plaintiff's mark.

15      But that relied on, primarily, the earlier decision

16  in the Safeway Store case, where there were a number of

17  third-party uses that were submitted, but, as the Court in

18  that case determined, the third-party uses that incorporated

19  Safeway also used other distinctive additional words.

20      And in that case, the use of Safeway may not diminish

21  the strength of the plaintiff's mark, the Safeway store's

22  mark, because, for example, there was relatively precise

23  wording combined with the word Safeway -- Safeway Carpet and

24  Cleaning, Safeway Hurricane Awnings, the particular precise

25  wording that didn't diminish the strength of the Safeway mark

1 | for groceries and supermarket items, because they were -- you

2 | know, in the word mark themselves, they were considerably

3 | distant and they were distinct additional words.

4 |       So that's -- that's really what informs the

5 | discussion in *Sovereign Military* of you've got to look at the

6 | mark as a whole.

7 |       As we -- and we didn't -- I'd refer you back to --

8 | again, this is our opposition to the motion to exclude

9 | Mr. Sarabia now, which is ECF 543 at Page 17, and our footnote

10 | 55, where we cite the In re: *National Data* case out of the

11 | Federal Circuit saying:  In articulating reasons for reaching

12 | a conclusion on the issue of confusion -- and this does go to

13 | the likelihood of confusion -- there is nothing improper in

14 | stating that for rational reasons, more or less weight has

15 | been given to a particular feature of the mark.

16 |       So this focuses again on what is the dominant feature

17 | of the mark, and that's the case in which the Court said,

18 | indeed, this type of analysis appears to be unavoidable.

19 |       I will qualify that by saying that the Court also

20 | says, provided that the ultimate conclusion rests on

21 | consideration of the marks in their entireties.  So we don't

22 | dispute that that is the ultimate conclusion.

23 |       Nevertheless, the information that the jury will need

24 | to evaluate strength of the mark isn't limited strictly to

25 | entirety of marks where there is a significant dominant

1  portion, such as the hyper and ultra marks at issue here.

2        The other thing that folds into this analysis is,

3  again, as we discussed during Mr. Sarabia's exclusion motion,

4  that drive, in the sense of HyperDrive and UltraDrive, there

5  is -- and we believe there will be evidence to suggest that

6  that is actually a descriptive term for a type of a computer

7  accessory that people plug into their laptops that enables

8  them to move content on and off of some other kind of storage

9  medium.

10        So we feel that this is again something that is

11  certainly the subject of cross-examination of Mr. Sarabia, but

12  this should not be excluded on motion in limine.  It's

13  certainly relevant.

14        *Sovereign Military* doesn't say otherwise, and

15  *National Data Corp.* says this is actually inevitable, and

16  there's nothing prejudicial about it.  In the 403 analysis

17  there is nothing more prejudicial than probative because it's

18  not prejudicial at all.

19        Again, it can be cross-examined as to the closeness

20  or the ties between the marks at issue.  And certainly we

21  expect that Mr. Hill will do that.  But it doesn't meet the

22  criteria for exclusion under Rule 403.

23        THE COURT:  All right.  Thank you.

24        As we get through these, unless I have a specific

25  question, we'll just move on to the next one without rebuttal.

1    So let's move on to Number 2.

2    MR. HILL:  Motion in limine Number 2 deals with the

3 preclusion of evidence relating to the exact date of first use

4 of ultra and any argument that would ensue relating to the

5 concept of the defendants being senior users or having

6 superior trademark rights as a result of their prior use of

7 the word ultra.

8    You can see on Page 6 of plaintiff's brief, which is

9 Docket Entry 542, the quote from the Sarabia report, which

10 shows how, at least one way that the defendants have

11 contemplated they would use the exact dating information

12 relating to their prior use of the word ultra in the context

13 of UltraStation.  I want to be very clear because I know the

14 defendants have reasons for wanting to use ultra.  I am not

15 asking Your Honor to limit their ability to introduce the

16 evidence that they had a product called UltraStation.

17    What I am asking Your Honor to limit is to limit them

18 and their witnesses, just because they were using UltraStation

19 doesn't mean they are a senior user, and it doesn't mean they

20 have priority of trademark rights as between the trademarks

21 that are at issue in this case.

22    So we don't have any problem with them showing the --

23 showing the packaging for their prior UltraStation mark that

24 they had.  We don't have the -- we don't have a problem with

25 them saying that they used the -- that they used UltraStation,

1  you know, in mid-2012.

2          What we do have a problem with is taking the next

3  step and saying words along the lines of what Mr. Sarabia says

4  here, that I've put in bold type:  Priority of trademark

5  rights refers to which parties have superior rights, and

6  because --

7          THE COURT:  It's the same issue that we discussed,

8  wasn't it?

9          MR. HILL:  Yeah, it's the same issue because --

10          THE COURT:  Right.

11          MR. HILL:  -- because, you know, hyper -- because

12  they used ultra once upon a time, that means they somehow are

13  a privilege or in a privileged or advantaged litigation

14  posture in a trade secret dispute between UltraDrive and

15  HyperDrive, neither of which were -- neither of which they

16  used, you know, prior to the trademark dispute at issue in

17  this case.

18          THE COURT:  So I want to just make sure that I'm

19  tracking here then.

20          This relates to Section 8 of Sarabia's report,

21  correct?

22          MR. HILL:  That's correct.  Correct.

23          THE COURT:  Okay.

24          MR. HILL:  But in the motion in limine, it's not --

25  it's not merely Sarabia that we're concerned with.  We're also

1  concerned with arguments from counsel in either opening or

2  closing using words like senior user or priority of trademark

3  rights the way that Mr. Sarabia is throwing them around in

4  this regard because that's -- that's not -- that is misleading

5  and confusing.

6         And it's not accurate in light of the Eleventh

7  Circuit's decision in *Tally-Ho* about what you have to have.

8  It would -- in order for them to be able to have a good faith

9  basis to say they're a senior user or have priority of use,

10 they would have had to have used UltraDrive before we used

11 HyperDrive, and they're not arguing that.

12        THE COURT:  Okay.

13        MR. CARLSON:  That's correct.  We're not arguing

14 that.  The -- we don't intend to try to take a position that

15 we are a senior user based on -- and by the way, as a comment,

16 continuous use of ultra because UltraStation has been

17 continuously available since 2012, and UltraDrive was

18 introduced in 2017.

19        We don't want to take the position that ultra and

20 hyper are similar.  But it is important that the jury

21 understand that UltraStation isn't something that was plucked

22 out to try to copy HyperDrive.  It is a -- ultra is a formula

23 that was in use clear back to 2012.

24        THE COURT:  I'm not hearing any objections to that.

25 I think the objection is to the terms of art, of priority use

1    and senior use.

2           MR. CARLSON:  Yeah.  We don't intend to make the

3    claim that we are the senior user of UltraDrive because of

4    prior use of ultra.

5           THE COURT:  Okay.  Does that resolve the issue?

6           MR. HILL:  It does for -- I'm willing to take

7    Mr. Carlson at face value on that.  If either counsel or a

8    witness goes beyond his representation, I'll ask the Court to

9    make a -- to give a limiting instruction to the jury about the

10   comment or the -- or the evidence that's been -- the way it's

11   been phrased, if it crosses the line in my view.

12          THE COURT:  All right.

13          Next issue, Motion In Limine Number 3.  I think this

14   is also tied to Section 7, I believe, of Sarabia's report.

15          MR. HILL:  I think that's right.  I'm looking for my

16   copy of Mr. Sarabia's report so that I can confirm that.

17          But let me -- there is the -- this is the argument

18   about the UltraDrive trademark registrations that have -- have

19   been permitted in -- in International Class 9.  And the case

20   law is, you know, starting with the *Hi-Tech Pharmacies* case

21   from Judge Batten from earlier this year that I referenced in

22   the Sarabia argument.  The argument is exactly the same.

23          The process is an ex parte process.  There's no --

24   there's no, insight, no way for me to cross-examine the

25   examining attorney to understand what their thinking process

1   was in allowing these registrations.

2          I notice that they have a slide that cites the

3   statute about any registration being admissible in evidence,

4   and I don't believe that 15 U.S.C. 1115(a) is meant to trump

5   any of the federal rules of evidence when it comes to

6   determining issues like relevance or undue prejudice.

7          Because, if so, then they could introduce any

8   trademark registration for any trademark that they wanted in

9   this case and cause the case to drag on infinitely.  That's

10  not really -- I don't -- I don't really think that's what

11  Section 1115 of the Trademark Act envisions.

12         The issue here is that these registrations of

13  UltraDrive in Class 9 are particularly likely to be confused

14  and the -- and the thesis, whether it's Mr. Sarabia or whether

15  it's counsel arguing this point to the jury, is that the

16  trademark office has somehow given its imprimatur that there's

17  no likelihood of confusion by registering marks in Class 9

18  related to UltraDrive.  And that's an improper -- improper

19  argument to be made.

20         THE COURT:  I think Motion In Limine Number 4 is

21  related, correct?

22         MR. HILL:  So Motion Number 4 picks up on the -- on

23  the same -- Motion Number 4 picks up with the other hyper- and

24  ultra-related registrations where there's another word that's

25  in common, like hyper hybrid, hyper stack, ultra stack, hyper

1  bond, ultra bond.  So yes, the argument -- the argument winds

2  up being the same for Motion In Limine Number 4 as well.

3         THE COURT:  All right.

4         MR. CARLSON:  So, Your Honor, if you have our slide

5  packet, we're on Slide 32 when -- and Mr. Hill is correct that

6  we in that slide cited you to 15 U.S.C. Section 1115(a).

7         Here is the plain language of the statute:  Any

8  registration of a mark registered on the principal register

9  provided by this chapter, and owned by a party to an action,

10  shall be admissible in evidence.

11        Now, does it -- would it matter if that was entirely

12  irrelevant if it was a completely different mark?  Sure.  We

13  wouldn't be trying to do that.

14        But this is not an irrelevant -- this is not

15  unrelated to the issue that the jury has to determine, which

16  is, is there likelihood of confusion between HyperDrive and

17  ULTRADRIVEMINIDOCK registered by the Patent and Trademark

18  Office in May of 2019 or Ultradrive Kit registered by the

19  Patent and Trademark Office June 23rd, 2020, when trained

20  trademark examiners were aware of not only the registration of

21  HyperDrive but the actual pendency of this case, because they

22  received a copy of the complaint.

23        So it's not only not improper, it's incumbent upon a

24  lawyer who is sworn, as I am, to zealously represent the

25  client's interest to make the jury aware of this.  This is

1  certainly not excludable.

2        The statute says it's there.  It's certainly relevant

3  to intent.  And it's -- there's nothing prejudicial about the

4  fact that this application was made to the Patent and

5  Trademark Office and the trained examiners there allowed it to

6  register.  So this -- this is a particularly meritless motion.

7        THE COURT:  Now, that the covers your responses to 3

8  and 4, correct?

9        MR. CARLSON:  Well, Number 4 is these are not

10  registrations owned by a party to the case.  That's the

11  distinction as to the ones in Number 4.

12        But as we discussed in the context of the motion to

13  exclude Mr. Sarabia, what we have here are a series of

14  cases -- a series of marks.  Again, certainly we can see

15  cross-examination as to whether they are related -- related or

16  part of related -- sufficiently related goods.

17        But here are numerous instances in which there has

18  been a dominant portion of hyper and ultra and a nondominant

19  portion of a mark.  And the Patent and Trademark Office, and

20  the trained trademark examiners therein, have registered them,

21  finding an absence of likelihood of confusion.

22        So these are also relevant and helpful to the jury in

23  helping to resolve the question of likelihood of confusion

24  that's been brought by the plaintiff here.

25        THE COURT:  All right.  Thank you.

1          Let's turn to Number 5.

2          MR. LUDWIG:  Yes, Your Honor.  So Motion In Limine

3  Number 5.

4          THE COURT:  Can you bring that microphone closer to

5  you?  That would be helpful.

6          MR. LUDWIG:  In Motion In Limine Number 5, Sanho

7  requests that the defendants be barred from arguing that Sanho

8  lacks standing for any of its various claims.

9          The issue here -- there are really two discrete

10 issues.  One relates to the accusation of Sanho by Targus and

11 the subsequent exclusive license by Targus to Sanho.

12         And the other relates to a notice of correction or a

13 certificate of correction of two design patents where an

14 inventor was added to each one of those patents.  Defendants

15 have raised a standing issue, a belated standing issue related

16 to each of those issues.

17         Now, with respect to the acquisition of Sanho by

18 Targus, Sanho owned the relevant intellectual property at the

19 start of the case and had standing at the start of the case.

20 And later it is now the exclusive licensee with all

21 substantial rights in that intellectual property, thereby,

22 again, conferring standing on --

23         THE COURT:  How do I know that?  Is that undisputed?

24         MR. LUDWIG:  KaiJet has not disputed in its

25 opposition that the exclusive license is valid or that all

1  substantial rights, which it's put right in the license that

2  Sanho has all exclusive rights.

3      Sanho also submitted a declaration from Targus

4  explaining that the purpose of this license was to maintain

5  Sanho's standing in this case and so that this case would not

6  be disrupted by the acquisition.

7      THE COURT:  They submitted that declaration to who?

8      MR. LUDWIG:  That declaration has been filed on the

9  docket.

10      THE COURT:  Okay.  In what context?

11      MR. LUDWIG:  It was filed on the docket -- on the

12  docket in connection with presenting the Court with the --

13  with the exclusive license and the background for it.

14      THE COURT:  Was it in response to a motion, or what

15  was --

16      MR. LUDWIG:  It was attached as an exhibit to the

17  motion in limine, Your Honor.

18      THE COURT:  Oh, the motion in limine.  Okay.

19      MR. LUDWIG:  Yeah.  Now, notably, KaiJet did not

20  raise a standing defense in -- as an affirmative defense in

21  their pleadings, for example, in their most recent answer to

22  Sanho's amended complaint.

23      They became aware of the acquisition and the license

24  in 2023.  And then, in 2024, they did not raise a standing

25  affirmative defense in their -- in their responsive pleading.

1   Therefore, they -- they waived the defense.

2            Now, KaiJet has argued that standing is not waivable.

3   But each of the cases that they cite relates to constitutional

4   standing, which relates to subject matter jurisdiction.

5   Whereas, the standing issue -- if it can be called standing,

6   in this case -- relates to prudential standing or -- otherwise

7   known as statutory standing.

8            In the Supreme Court *Lexmark* case from 2014, the

9   Supreme Court clarified the difference between the prudential

10  and -- or statutory standing on the one hand, which is

11  waivable, and constitutional standing on the other hand, which

12  is not waivable because it implicates subject matter

13  jurisdiction.

14           Each of the cases that KaiJet cites either just

15  relate to constitutional standing or they are pre-*Lexmark*

16  cases that -- that are just using sort of the wrong language.

17           THE COURT:  I guess what I'd like to focus on for

18  this issue is -- I understand prudential versus constitutional

19  standing.

20           My question is:  Are there facts -- are there

21  disputed issues of fact that need to be resolved?

22           And if so, is that a jury question?

23           Are we asking the jury to decide standing, or is that

24  a question for the Court?

25           MR. LUDWIG:  Well, Your Honor, I agree that it should

1  not be a question for the jury.  This issue should have been

2  raised previously.

3          THE COURT:  If there's disputed issues of fact, who

4  resolves those disputed issues?

5          MR. LUDWIG:  Well, KaiJet has raised in their

6  opposition brief two alleged questions of disputed fact,

7  although they don't appear to be relevant because they don't

8  go to the question of whether the license to Sanho was an

9  exclusive license conferring all substantial rights, which is

10 all that's required for Sanho to bring the case.

11         KaiJet also admits that Targus, the licensor, is not

12 an indispensable party in this case, so if --

13         THE COURT:  They admit that?

14         MR. LUDWIG:  Yes, Your Honor.  In their opposition

15 brief, they at least did not dispute it.

16         THE COURT:  Okay.

17         MR. LUDWIG:  That's Motion In Limine Number 6, which

18 is distinct but related to this, to this motion in limine.

19         THE COURT:  Okay.

20         MR. LUDWIG:  So if Targus is not an indispensable

21 party, then how can Targus's absence in this case be required

22 for Sanho to have standing?

23         These issues are two sides of the same coin.  So as a

24 matter of -- on the merits, there should be no question that

25 Sanho has standing under the exclusive license.  And in any

1  event, Sanho had standing at the start of this case because it

2  owned the assets outright at that point.

3          Now, with respect to the patents and the change of

4  the listed inventorship on two of those patents, KaiJet has

5  been aware of that change for two and a half years, going back

6  to January of 2022, when, in the related inter partes review

7  proceedings, Sanho filed the inventor amendments on the --

8  that docket.  It's also a matter of public record that, you

9  know -- it's a matter of the file history now in those

10 patents.

11         KaiJet's had plenty of time to raise a defense based

12 on inventorship.  They could have raised it in their summary

13 judgment motion.  They could have attempted to raise it in

14 their belated Rule 12(c) motion.

15         But instead, they're raising it for the first time

16 now.  And that -- that defense is also waived.  That's, again,

17 not a Constitutional issue; that is a prudential or statutory

18 standing issue.

19         And in fact, the case that KaiJet cites in support on

20 this issue -- this is the *Intesis* case -- explicitly says:

21 Contrary to the characterizations of the issue in our

22 pre-*Lexmark* case law, the statutory requirements of

23 Section 262 are not jurisdictional in nature.

24         Section 262 is the relevant statute here on the

25 inventorship issue, and therefore, they should be barred as

1  having waived that issue by not raising it earlier, for

2  example, in their earlier pleadings.

3       THE COURT:  Okay.  Let me hear from KaiJet.

4       MS. GENTES:  Yes, Your Honor.

5       So this is a complicated issue of Sanho's making.

6  There have been -- this has been a long case, and there have

7  been a lot of facts that have changed.

8       THE COURT:  Bring the microphone closer to you as

9  well.

10      MS. GENTES:  I'm sorry.

11      There have been a lot of facts that have changed and

12  shifted throughout the years.  But at the end of the day, on

13  the MIL, whether or not they are the owner of the patent is

14  not an affirmative defense.  It's part of their prima facie

15  case that they have to show.  They can plead --

16      THE COURT:  Do they have to be the owner?

17      MS. GENTES:  They don't have to be the owner.  They

18  can be the exclusive licensee if they hold enough of the

19  rights.

20      What's in dispute in this case is whether or not the

21  exclusive license is legitimate.  This is something that was

22  given to us in December of 2023 for the first time.  And it

23  does, on its face, purport to be an exclusive license.

24      And so moving for a motion to dismiss at that point,

25  with Your Honor having to give all the facts in the light most

1  favorable to the plaintiff, it, on its face, appears to be an

2  exclusive license.

3          But when you dig into it -- and what we've discovered

4  through gathering information is that neither party is

5  operating under this agreement.  There are obligations and

6  requirements of both sides that they are not doing.  And so it

7  appears that this exclusive license was entered into for show

8  in order to preserve jurisdiction.  And those are the issues

9  that we have the right to raise.

10         THE COURT:  So what I hear you saying is that if it

11  was to be found that that exclusive license is, in fact,

12  legitimate, as you call it, then there is no standing concern?

13         MS. GENTES:  If they are the exclusive licensee, yes,

14  there is not a standing concern.

15         THE COURT:  All right.  And so is it your position

16  that the jury resolves this legitimacy question?

17         I'm not sure how this fits into the trial.

18         MS. GENTES:  I admit that this is -- yeah.  So the --

19  oh, sorry.  The -- as far as the -- is there -- are they -- do

20  they have standing if they're just the exclusive licensee?

21         I forgot there is a separate issue related to the

22  inventorship of two of the design patents.  So for all four of

23  the design patents, there's this exclusive licensee issue.

24         This is not a fact pattern that comes up often

25  because it doesn't appear that people make this big of a mess

1  of this very often.

2          There is one case in the Northern District of

3  Georgia, *GoMed Industries, Ltd. v. CR Bard*.  And it's 1995 US

4  District Lexus 22200.

5          And in that case, the judge did decide that -- did

6  review the facts and decide that the purported exclusive

7  license was a sham, as he called it.  And so they were not the

8  exclusive licensee and they did not have standing, and that

9  was the judge that made that determination.

10          That's the only comparable case that I can find to

11  this situation where the rights were signed away and then,

12  later on, in response to trying to --

13          THE COURT:  So what do you -- I'm not clear what

14  you're asking for, then, because are you -- are you seeking to

15  present this evidence during the trial in front of the jury?

16          Or are you asking for a hearing in front of me?

17          MS. GENTES:  I mean, this is a -- we -- if Your Honor

18  feels this is an issue for you to decide, we could have a

19  hearing in front of you and do that before we get to trial.

20          But there's not a whole lot of guidance on -- I mean,

21  this is a question of fact, of whether or not this license is

22  a sham.  So it's up to Your Honor's discretion if you want to

23  decide that or if you want the jury to decide that.

24          THE COURT:  Well, I guess there's the question of

25  whether the issue has been waived first.

1        Right?

2            MS. GENTES:  Yes.  Yeah, I think, for the MIL

3    standpoint, this is part of their prima facie case, that they

4    are the owner, or the case law that allows an exclusive

5    licensee to sue on their own.

6            Basically, the theory behind that is that the

7    exclusive rights give so many rights to the exclusive licensee

8    that they are, in effect, the owner of the patent.  And so

9    that's the argument that they'll try and make with respect to

10   the exclusive license.

11           THE COURT:  Okay.  Well, but to the extent that there

12   are factual disputes, do you have a position today on whether

13   this is a jury question or a question for the Court?

14           MS. GENTES:  Based on the one case, the *GoMed* case,

15   this would be a question for the Court.  The issue is that we

16   have not -- because discovery had long closed before we got

17   this license for the first time, we didn't have an opportunity

18   to raise this.

19           Your Honor, we --

20           THE COURT:  Okay.  So if your position is that it's

21   an issue for the Court, then what's your objection to a motion

22   precluding you from presenting this to the jury?

23           MS. GENTES:  So there's no -- I guess my

24   understanding of their MIL is they don't want us to argue it,

25   period.

1          THE COURT:  No.  It says that defense should be

2   barred from producing evidence or arguing at trial that Sanho

3   lacks standing to pursue any of its claims or that the Court

4   lacks subject matter jurisdiction over this matter based on

5   lack of standing.

6          I'm reading that to be they don't want the jury to

7   hear that.

8          MS. GENTES:  If that's the case, Your Honor, then we

9   don't have an issue with that.

10         Our understanding at trial meant that they didn't

11  want the issue raised, period.  They considered it waived, and

12  that they should not be subject to any argument regarding

13  this.

14         THE COURT:  All right.  Am I reading that correctly,

15  that this is a motion to preclude presentation to the jury of

16  this argument or evidence?

17         MR. LUDWIG:  You're correct, Your Honor, that it is

18  framed as a motion directed to what can be raised before the

19  jury.  But it is based on a waiver argument, and therefore, it

20  would also be applicable to any proceedings before Your Honor.

21         THE COURT:  I guess my feeling is that there is no

22  motion in front me to resolve whether something has been

23  waived.

24         KaiJet has not filed a motion to dismiss on standing

25  grounds.  I mean, I know they've raised it in their pretrial

1    order, but there's no motion.

2         So if you want me to take that up, and you believe

3    it's a question for the Court, then I need a motion.

4         MS. GENTES:  Yes, Your Honor.  The issue is, is that

5    we do need some sworn testimony to provide a record of some of

6    these facts in order to make the motion, so...

7         THE COURT:  Well, I sure wish we had queued this up

8    earlier than a week before trial.

9         MS. GENTES:  Yes, Your Honor, I understand.

10        And we have been getting facts on this contrary to

11   Sanho's counsel, as far as the inventorship issue, yes, they

12   have made us aware that they had applied to change the

13   inventorship.  They applied under the wrong procedure.

14        They never informed us that they went back and

15   applied under the correct procedure and got that correction

16   done.  And until they were able to correct the inventorship,

17   it didn't prevent the standing problem with respect to two of

18   these design patents.

19        The exclusive license, again, was given to us in

20   December.  And on its face it looked fine.  And it wasn't

21   until, you know, we submitted the summary judgment motions and

22   started digging into the actual facts of this exclusive

23   license and started to realize that it had a problem.

24        THE COURT:  Which claims does this impact?

25        MS. GENTES:  So this would impact for sure the design

1    patent claims.  And then it would impact the 1114 trademark

2    claim, because they are -- but not the 1125 trademark claim.

3        THE COURT:  All right.  Well, I guess my feeling is

4    that this is something that can be taken up separately from

5    the trial unless I -- I'm not hearing any party disagree with

6    that idea.  And so the Motion In Limine Number 5 sounds

7    unopposed, that there's no -- there's no indication that the

8    defendants wish to present this evidence or argument to the

9    jury at trial.

10        MS. GENTES:  I guess the question is if Your Honor

11    can take this issue up and take it up on the facts without,

12    you know, a 12(b)(6) deference to the plaintiff.

13        I mean, we're -- we're really at a loss.  I mean,

14    this is a prima facie case of -- a prima facie part of their

15    case, that they are the owner or, through the exclusive

16    license, effectively the owner of these patents.  And there's

17    a factual dispute to that issue.  And so we need to be able to

18    question on that and then prevent those -- present those facts

19    to someone to make a determination regarding the authenticity

20    of the exclusive license.

21        THE COURT:  Well, was it your intention to present

22    the exclusive license as part of your case-in-chief?

23        MR. LUDWIG:  Yes, Your Honor.

24        And we'd like to note that the exclusive license,

25    it's on the exhibit list and it has not been objected to.

1          MS. GENTES:  I guess the authenticity was a misnomer.

2    The -- whether or not that is actually the agreement between

3    Targus and Sanho.

4          THE COURT:  Okay.  All right.  Well, let's table that

5    and let me think about it.

6          Let's turn to the next issue.

7          Motion In Limine 6 is the same issue; correct?

8          MR. LUDWIG:  Your Honor, it's the same issue.  We've

9    already discussed that.

10         THE COURT:  All right.  Motion In Limine Number 7 is

11   unopposed.  Is that right?

12         MR. PHILBIN:  Yeah, that's correct, Your Honor,

13   except for KaiJet Taiwan wanting to -- KaiJet Taiwan just

14   wants to reserve the right to make an offer of proof at trial.

15   It would take five to ten minutes of some extra testimony,

16   just regarding the issue of extraterritoriality.

17         THE COURT:  You mean outside the presence of the

18   jury?

19         MR. PHILBIN:  Yeah, that's fine.  We just want to get

20   some testimony on the record.

21         THE COURT:  Okay.  All right.  But there's no

22   objection to the motion itself?

23         MR. PHILBIN:  Correct.

24         THE COURT:  All right.  8, no objection?

25         MR. PHILBIN:  Correct.

1          THE COURT:  Number 9, is there a contested issue

2   here?

3          MS. GENTES:  I don't -- I don't believe so,

4   Your Honor.

5          We just wanted to make a clarification.  So we have

6   no intention of presenting to the jury evidence related to

7   false marking.

8          But an issue of damages is whether or not -- for

9   patent damages -- is whether or not the plaintiff had a duty

10  to mark their products and failed to do so, and so that

11  damages don't start until actual notice.

12         So we just wanted to clarify that MIL Number 9 did

13  not prevent us from talking about marking at all, just not our

14  false marking allegations.

15         MR. HILL:  May I be heard on that?

16         THE COURT:  Yes.

17         MR. HILL:  So again, I'm going to take Ms. Gentes at

18  face value on this.  If we introduce evidence of marking on

19  the product, they are entitled to cross-examine on the marking

20  practices.  We don't have any problem with that.

21         But they lost on summary judgment on the false

22  marking, which is a different argument.  That's the argument

23  that you -- that you had used marking and don't actually

24  practice the product -- the product in question doesn't

25  actually practice the patent.  That's a different theory

1    altogether.

2          And so, you know, we're -- we're -- there -- it

3    doesn't sound like there's any opposition to Motion In Limine

4    Number 9, which is relating to the false marking issue.  And

5    it still preserves their ability -- we're not questioning

6    their ability to cross-examine on our marking practices, if

7    and to the extent we introduce testimony on our marking

8    practices.

9          THE COURT:  Okay.

10         MS. GENTES:  I just want to clarify real quick.  So

11   for our argument with respect to damages, what we have to

12   prove is that they have a product -- that they or their

13   licensees have a product that embodies the patent and that

14   they did not mark it.

15         And so that would be something that we might raise

16   without them having elicited testimony, basically, this

17   product is not marked, correct, with a patent on it.  I don't

18   think it's going to be particularly controversial, but it

19   might be something that we raise without them having talked

20   about marking first.

21         THE COURT:  Are we on the same page?

22         MR. HILL:  Well, I don't know what -- if we're not

23   saying that we mark a given product with a given patent, I

24   don't know why they need to affirmatively raise the issue of

25   marking, because, as I understand it, marking is one way that

1    the plaintiff may prove that they've put the defendants on

2    notice of a claim of infringement.  It's not the only way, but

3    it is one way to prove that.

4         So if we're not seeking affirmatively to rely on the

5    marking statute, they shouldn't be allowed to interject that

6    whatever we say about marking on the product is affirmatively

7    untrue for the following reasons, which is the gravamen of the

8    false marking counterclaim.

9         And so, you know, that's what -- that's what we're

10   concerned about.  We don't want -- we don't want them

11   suggesting to the jury that we have marked a product

12   inappropriately.

13        MS. GENTES:  Your Honor, that's not what are

14   intending to show at all.  So what is clear from Sanho's jury

15   instructions they're going to argue is that they're entitled

16   to damages from the issue date of the patent.

17        By statute, if they are selling a product that

18   embodies the patent and they do not mark it, we're not going

19   to talk about false marking or anything related to that.  We

20   just have to get in front of the jury the fact that they did

21   not mark it at all.  Then they are not entitled to damages

22   until the date that they put the defendant on notice that they

23   were infringing.  So that's all we're going to need to show.

24        I think we're more or less in agreement, but it is

25   going to -- and we just have to show the products to a witness

1  in order to elicit in front of the jury there's nothing that

2  says patent on here, correct.

3          THE COURT:  Okay.  Number 10.

4          MR. HILL:  Okay.  So here we're seeking to preclude

5  evidence or argument in front of the jury that Sanho engaged

6  in any unauthentic or fake product reviews or so-called fake

7  review campaign that was the subject of Your Honor's summary

8  judgment order dismissing their false advertising

9  counterclaim, which was premised on that notion.

10          What I read in their response brief is that it's

11  basically they're making the argument that as long as we don't

12  open the door, they won't come through with that evidence.

13          Here's my concern, and we have not -- we have not

14  reached the point of this evidence yet, but it is coming.  So

15  the only product review evidence that we intend to introduce

16  during the trial is the singular Amazon product review that is

17  Plaintiff's Trial Exhibit 78.

18          That is where a reviewer made a comment about -- a

19  complaint is probably more appropriate -- about the HyperDrive

20  and that they had been in -- and they linked it to j5, which

21  is a prominent KaiJet brand.  So that's -- that's an issue

22  that may relate to consumer confusion.

23          If we can agree that as long as -- that that evidence

24  is not going to be something that's -- that they're going to

25  in turn argue opens the door so that we can -- so that they

1  can come in with, you know, the truckload of exhibits that

2  they amassed and tried to use in summary judgment to make the

3  fake complaint argument, then we're fine.  We're okay with it.

4        If their intent is to do that in response to our

5  mention of this singular Amazon product review, then we're --

6  then we need to hash this issue out.

7        THE COURT:  And that's the subject of a motion to

8  exclude by KaiJet, correct?

9        MR. HILL:  Correct.  We actually -- we brought -- we

10  brought it affirmatively because we anticipated it would be an

11  issue.

12        THE COURT:  All right.

13        MR. PHILBIN:  Opposing counsel is correct.  If they

14  plan to rely on that review, then we believe that opens the

15  door to providing the evidence that Sanho, by its fake reviews

16  for its own products -- this is a review on their own

17  product -- that it calls into question the authenticity of

18  that review, and the jury should be able to weigh the fact

19  that Sanho fakes its own reviews to determine how much weight

20  to give to this singular piece of -- singular review, if it

21  makes it in.

22        Obviously, we've also moved to exclude it on other

23  grounds.  So if that review gets excluded and they don't plan

24  to bring up any other reviews, then we will not bring up

25  evidence of their false and unauthentic views or reviews.

1          THE COURT:  Okay.  Got it.

2          11.

3          MR. HILL:  Okay.  So our Motion In Limine 11 is

4   identical to KaiJet's motions -- I believe it's 5, 6, and 7.

5   This relates to three separate emails, or in the case of

6   the -- two emails and one Amazon product review.

7          These all are -- we contend these are all admissible.

8   The two emails are admissible under state of mind and present

9   sense impression exceptions.

10          One of the two emails they've questioned because they

11   don't consider it to be evidence of actual confusion.  It's an

12   email where someone who had subscribed to the HyperDrive

13   during the Kickstarter campaign sent an email in asking,

14   where's my UltraDrive.  That's a -- that's evidence of state

15   of mind, present sense impression as to the meaning of

16   HyperDrive.  And it -- and it does go to -- it does not go to

17   actual confusion; we will not argue that that is evidence of

18   actual confusion.

19          As to the other email in question, they have made

20   some -- that have taken some shots at it in order to try to

21   attack the weight that the finder of fact should give to the

22   email.

23          This is -- I think it's 92, Trial Exhibit 92.  It's

24   on Page 23 of our brief.  We've reproduced it in its entirety.

25          This is an email that was sent into Hyper support,

1  which is our customer support group.  The title is UltraDrive

2  for MacBook Nonfunctional, and the sender of the email says:

3  I purchased an UltraDrive for my MacBook Pro on January 7,

4  2018, from Best Buy.  Unfortunately, it's no longer working.

5        Again, we're not seeking to introduce the email for

6  its truth.  We're seeking to introduce it as evidence of state

7  of mind and present sense impression of the part of the

8  consumer.  You can read our -- you can read our brief and our

9  opposition to their Motions In Limine 5, 6, and 7.  We've

10  presented an amalgam of case law on the appropriateness of the

11  present sense impression and state of mind exceptions for this

12  kind of evidence in trademark litigation.

13        As for the customer review, the same thing.  We've

14  presented evidence -- I mean case law indicating that consumer

15  review evidence can come in when it -- when it is evidence of

16  a confused state of mind.  It doesn't have to come in for its

17  truth.  The mention of j5 in the context of a review of our

18  product that's left on Amazon is -- is indicative of a

19  confused state of mind within the meaning of those cases.

20        THE COURT:  Okay.

21        MR. PHILBIN:  So starting on Page 41 of our

22  presentation, this is the Kickstarter messages, Plaintiff's

23  Trial Exhibit 126, which in their Motion In Limine 11, they

24  did at first say that this is evidence of actual confusion.

25        Then, in their response to our own motion in limine,

1    they changed that to no, now this is just evidence of showing

2    the similarity of UltraDrive and HyperDrive, that the ultra

3    and hyper are interchangeable.

4         So for obvious reasons, this is not evidence of

5    actual confusion.  The email was sent June 14th, 2017.  KaiJet

6    didn't -- KaiJet U.S. didn't start selling the UltraDrive

7    until October of 2017.  So there could be no actual confusion

8    where this person never saw KaiJet U.S. or KaiJet Taiwan using

9    UltraDrive, much less on its products.

10         As to whether it goes to similarity, if you go to the

11   next slide, Slide 42, they offer no case law to support the

12   admission of evidence like this to show similarity of the

13   marks.  The evidence that they -- or the cases that they cite

14   go to present sense impression and state of mind exceptions

15   for actual confusion evidence.  That's not -- this is, as they

16   admit, not actual confusion evidence.

17         And it's not relevant to the question of the

18   similarity of the marks.  In order to -- similarity is one of

19   the seven factors in likelihood of confusion.  But in order to

20   determine that factor, you have to look at the two marks

21   HyperDrive and UltraDrive, and ULTRADRIVEMINIDOCK and

22   UltraDrive Kit.  You have to look at them in their actual

23   context as they're used in the marketplace.

24         As one Court in the Northern District of Georgia

25   stated -- and this is *TriLink* at 583 F.Supp. 2d 1293 at

1  1315 -- that marks must be compared in light of what occurs in

2  the marketplace, not the courtroom.

3         Essentially, you can't compare marks in the abstract.

4  Here, Ravi Budruck, who is not a witness in this case, never

5  deposed, he mixed up ultra and hyper.  He never saw -- he

6  never saw UltraDrive used in the marketplace, using context,

7  He's just mixing them up in the abstract, which is exactly

8  what -- the type of comparison you are not allowed to do.

9  Therefore, it's not relevant to the question of similarity.

10        The jury has to determine similarity by looking at

11 the actual uses in their context in the marketplace.  They

12 shouldn't get confused by this email that predates KaiJet

13 U.S.'s first use of the term UltraDrive.  It's irrelevant and

14 it just will confuse the jury.  And for that reason, it should

15 be excluded from trial.

16        MR. HILL:  May I respond briefly to that, Your Honor?

17        THE COURT:  Very briefly.

18        MR. HILL:  Very briefly.  Page 23 of our brief, Sanho

19 Trial Exhibit 126, Kickstarter message.  We never claimed that

20 it was evidence of actual confusion.

21        When we -- when we addressed this specifically, all

22 we said was customer's state of mind, specifically his

23 understanding of the meaning of the terms.

24        Your Honor's summary judgment order indicated that

25 similarity goes to not only the visual appearance but also the

1  meanings of the terms that were at issue.  It's relevant for

2  that reason.

3          THE COURT:  All right.

4          MR. PHILBIN:  Your Honor, can I -- like one sentence.

5  The very first sentence of that section of Motion In Limine 11

6  is evidence of consumer confusion.  That's the whole paragraph

7  is evidence of consumer confusion is treated as an exception

8  to the hearsay rule.

9          And then they go into talking about the three pieces

10  of evidence, but they don't delineate that this one exhibit

11  isn't consumer confusion.  So if they didn't intend that,

12  that's fine.  But the way it reads is the way I stated it.

13          THE COURT:  All right.  I've got it.

14          Okay.  Let's take a ten-minute recess.

15          MR. PHILBIN:  Sure.

16          THE COURT:  Be back at 3:30 and we'll hear KaiJet's

17  motions in limine.

18          MR. PHILBIN:  Well, Your Honor, we didn't respond --

19  we didn't -- I didn't finish responding to Motion In Limine

20  Number 11.  There's still two more exhibits.  We can take the

21  break and I can go back to it, but --

22          THE COURT:  I'll hear those out --

23          MR. PHILBIN:  Sure.

24          THE COURT:  -- in conjunction with KaiJet's Topics 5,

25  6 and 7.

1          MR. PHILBIN:  Yeah.  Okay.

2          (Whereupon, a recess was taken.)

3          THE COURT:  You may be seated.

4          All right.  All ready to take up KaiJet's motion,

5  which is ECF 544.  And I'm hopeful that a lot of these will go

6  quickly, since that's the other side of the coin.

7          MR. PHILBIN:  Your Honor, I promise to be as fast as

8  possible.

9          The first motion in limine has to do with Plaintiff's

10 Exhibit 83, which is, I believe, about 30 photos of products

11 that were returned to Sanho from Best Buy.

12         The issue is this evidence is just not relevant.  The

13 Lanham Act cares about consumer confusion.  The relevant

14 audience is the purchasing public.  That means actual

15 confusion evidence, which is what Sanho argues these pictures

16 show is actual confusion.  It has to be of consumers, KaiJet

17 U.S.'s and Sanho's actual consumers.

18         So who are the actual consumers?

19         I feel like that's Slide 5 in our presentation.

20 People actually purchase these --

21         THE COURT:  Can Best Buy be a consumer?

22         MR. PHILBIN:  Best Buy is a consumer, yes.  We don't

23 deny that.  The issue is who at Best Buy is actually making

24 these purchasing decisions.  And it's not whoever is doing

25 returns.

1        There's specific buyers, the procurement personnel

2   that work out of the headquarters of Best Buy.  They're the

3   ones who buy from companies like KaiJet U.S. and Sanho.  They

4   buy for all of their retail stores.  They're a very

5   specialized group.

6        The returns are -- happen -- they happen at the

7   retail store level.  It can be the cashier or some random

8   employee who's -- who takes the product back and does who

9   knows what with it, and then it goes to Reverse Logistics,

10  which is a third-party that handles -- that takes in a bunch

11  of returned products and sends them out to the manufacturers.

12       Those people, people who actually return these

13  products to Sanho are not involved in making any purchasing

14  decisions on behalf of Best Buy.  They are not consumers of

15  KaiJet U.S.; therefore, whether or not they were confused,

16  whether or not they thought that KaiJet U.S.'s UltraDrives

17  were actually from Sanho, it's irrelevant, because they are

18  not the actual consumer.

19       THE COURT:  All right.

20       MR. PHILBIN:  Furthermore, if you look at Slide's 6,

21  out of these 30 photos, 26 of the photos are for irrelevant

22  products.  They're for webcams, cable adapters.  None of these

23  products are -- have UltraDrive in their name or on their box.

24  None of them have been accused of infringing Sanho's alleged

25  trade dress.  So returns of unaccused products is irrelevant

1   to this case.

2           And on the next slide, there are also a couple of

3   pictures of what look like USB-C hubs that could be

4   potentially relevant, but they aren't, because they weren't

5   returned in their box.  The trade dress is in the box.

6           The -- were it UltraDrive or ULTRADRIVEMINIDOCK or

7   UltraDrive Kit, they're on the box; they're not on the

8   products themselves.  Therefore, any confusion as to the

9   source of these products could not have been based on the

10  trademark or the trade dress.  Therefore, these are certainly

11  irrelevant, too.

12          But if, Your Honor, we -- in our motion we stated

13  that if you decide to let any of these in, like perhaps the

14  two products that were actually in their boxes, that all of

15  these come in because it shows the -- this evidence is only

16  relevant as actual confusion evidence if it's based on our --

17  if its based on KaiJet U.S.'s actions, meaning if it's based

18  on the trade dress they put on their box, if it's based on the

19  word UltraDrive.

20          But here we have evidence that 30 other random

21  products were returned to Sanho.  So it shows -- it suggests

22  that this confusion isn't based on the trademark or the

23  trade dress but some other factor, perhaps inattentiveness.

24  And so if this is all just inattentiveness, which it seems

25  like it is, based on the large number of unaccused products

1   that were returned, then all of this evidence is irrelevant.

2           THE COURT:  Okay.

3           Okay.  Who's taking this?

4           MR. HILL:  I'll take it.

5           Near the end of his argument, he touched on a very

6   important point, which they said in their moving papers, that

7   if Plaintiff's Trial Exhibit 83 comes in, it has to come in as

8   all 30 of the photographs, not any one particular photograph.

9   So we're left to say that if there's relevance to some of the

10  photographs, all the photographs should come in.

11          So it doesn't really matter whether every single

12  photograph is defensible, because they're arguing if you're

13  going to let one in, you've got to let it all in for

14  completeness sake.

15          We're not challenging that, right?

16          So all I need to do is focus on the fact that there

17  are some examples of product returns here that they're not

18  objecting to and that they admit are in the box and they are

19  UltraDrive products and they are marked Sanho on the outside,

20  even though they clearly say j5Create UltraDrive on the box

21  that's inside the pouch that was received.

22          Why is that relevant?

23          Because under the case law, a wholesaler and a

24  distributor, if they're buying the product, their returns are

25  relevant under the actual confusion prong.

1          Page 1 of our response brief docketed at 551,

2     Footnotes 2 and 3, cataloging the cases -- I'll just give you

3     one example, this *Glow Industries* case from the Central

4     District of California in 2002.  Quote:  Retailers and/or

5     wholesalers attempting to return unused copies of defendant's

6     book to plaintiff constitutes substantial evidence of actual

7     confusion.

8          Therefore relevant.  Therefore it comes in.

9          MR. PHILBIN:  Can I briefly respond to just that one

10    case?

11         THE COURT:  No.  Let's move on.  Number 2?

12         MR. PHILBIN:  KaiJet U.S. and KaiJet Taiwan's

13    Motion In Limine 2 is regarding references to settlement

14    agreements with other parties, and this is plainly not

15    relevant in this case.

16         Usually in IP cases, settlement agreements that

17    relate to the IP can be admitted as proof of what a reasonable

18    royalty would be.

19         But in this case, they're purely just going for a

20    disgorgement of profits.  Therefore, what some other party

21    paid related to the IP is irrelevant to the damages they

22    should receive because the damages they're going after is just

23    our profits.

24         Further, in their response, they cite to this Amazon

25    settlement agreement.  It was never produced in this case.

1    There's no Bates number.  The first time we saw this was a

2    week ago from today.  It's not in their trial exhibit list.

3         For that reason alone, they should not be able to

4    raise this.  And as you can see on Slide 8, there's a couple

5    of cutouts of when this -- when this agreement was signed,

6    2022.  It's 2024 now.  That's two years ago.  They can't hold

7    onto this for two years and dump it on us two weeks before

8    trial.

9         Even if this was -- even if you allowed this in, or

10   if they hadn't waived it by not including it on their trial

11   exhibit list, or if they had produced it earlier, it's still

12   irrelevant.

13        Sanho argues that it shows that they have policed

14   their IP.  But that's not contested in this case.  We don't

15   have any defenses that go to their failure to police their

16   trademark.

17        And as far as it going towards the strength of the

18   HyperDrive mark, they cite no case law to support that

19   assertion.  Amazon certainly did not acknowledge the strength

20   of the HyperDrive mark.

21        Instead, as you can see on Slide 9 at ECF 552-2, at

22   Page 2, Amazon denies each of plaintiff's claims.  You can't

23   rely on a denial of all claims to show the strength of their

24   mark.

25        And furthermore, the situation in that case is just

1  wildly different.  Sanho was accusing Amazon of under -- Sanho

2  has an Amazon page where they sell their HyperDrives.  On that

3  Amazon page there are two listed sellers, Sanho and Amazon.

4          They're accusing Amazon of funneling customers to

5  Amazon as a seller instead of Sanho.  And they were further

6  accusing that if you bought it from Amazon as a seller, Amazon

7  was sending counterfeit HyperDrives to the customer.  That's

8  just not what's happening here.

9          So for all of those reasons, this is irrelevant and

10  should not be allowed at trial.

11          THE COURT:  All right.

12          MR. AALAEI:  Thank you, Your Honor.

13          First with regard to the relevance toward the patent

14  issues in this case, plaintiff is not offering any -- any

15  evidence or reference to any prior litigation or settlement

16  agreement to support patent damages, so that was really the

17  thrust of this motion in limine, and I don't think there is

18  any dispute on that.

19          With respect to the strength of mark issue, however,

20  and the Amazon settlement agreement, what occurred with Amazon

21  would be relevant to the trademark and strength of the mark,

22  if the settlement agreement was presented.  It does include a

23  denial of the claim, but that's not the only fact relating to

24  Amazon.

25          Amazon is a marketplace.  There was infringement of

the HyperDrive trademark on the Amazon marketplace in

connection with that litigation and the settlement.  Amazon

agreed to cease and desist as well as create an Amazon email

account for plaintiff, for Sanho, specifically with regard to

the marketing of the HyperDrive and the fact that not only was

Amazon using the HyperDrive mark before the litigation, but

there were other copycats as well that were selling on Amazon

under the HyperDrive mark.

So that's what the Amazon case is about.  And it's

relevant to the strength of the mark issue only.  I don't

think is really fits in anywhere else.

THE COURT:  So is Amazon the only settlement you're

seeking to elicit?

MR. AALAEI:  Yes.

THE COURT:  And why was it not produced until a week

ago?

MR. AALAEI:  Your Honor, the date -- discovery did

close, I believe, in July of 2022.  It wasn't as if this

agreement wasn't disclosed.  It was referenced in

Mr. Cenatempo's expert report and the references that he

relied on.

So as far as the document itself, it was produced

more recently.  But the fact of the litigation, the complaint

that was filed against Amazon was disclosed very early on in

the case, so it's not as if this is new.  The issue is not a

1  new issue.

2          THE COURT:  All right.  Okay.  Issue 3?

3          MR. PHILBIN:  This one I think we can kind of get rid

4  of.  I think, based on their response that they are going to

5  constrain Cenatempo's testimony to what's within the scope of

6  expertise, based on what they've said he's going to testify in

7  his response, we have no issues with that.

8          THE COURT:  All right.  Issue 4, I believe, is

9  unopposed; is that right?

10          MR. HILL:  That's correct, Your Honor.  We had an

11  identical motion.  Our Motion 8 is their motion --

12          MR. PHILBIN:  Correct.  And we didn't oppose that one

13  either.

14          MR. HILL:  -- or their Motion 4.

15          Can I go back and be heard briefly on Motion

16  Number 3?  This relates to the scope of Dan Cenatempo's

17  testimony.

18          I think what we pointed out in our brief is that,

19  although we've had a 20-page brief narrative and most of that

20  is not coming in, but he needs to be able to establish which

21  KaiJet UltraDrive models he actually investigated.

22          And to that extent, he needs to be able to -- I mean,

23  he should be able to rely upon the portions of his report

24  where he introduces, you know, pictorially, the different

25  KaiJet model UltraDrives that he reviewed for purposes of

1  calculating infringer profits.  That was the only thing in

2  their -- in what they called his 20-page long narrative that

3  we said we do intend to -- to introduce and have him walk

4  through as a predicate to getting into the numbers, so to

5  speak.  That's on Page 3 of our opposition brief.

6          THE COURT:  Okay.

7          MR. PHILBIN:  And the KaiJet Taiwan defendants have

8  no objection with them using pictures of the products and

9  introducing what the products are, as long as he's not getting

10  too in detail about what the products are.  He's not a

11  technical expert.  He can identify the products, certainly,

12  and he can use pictures if that helps his testimony.

13          MR. HILL:  All right.  Sounds like we're at -- it

14  sounds like we have no disagreement in that.

15          THE COURT:  All right.  Now, we're getting back to

16  the overlapping 5, 6, and 7.

17          MR. PHILBIN:  Correct, yeah.  I believe we've already

18  discussed 5, that's the Kickstarter message from Ravi Budruk

19  that predates KaiJet's actual release and the use of

20  UltraDrive.  So I don't think we need to discuss

21  Motion In Limine Number 5 anymore unless you have any

22  questions.

23          THE COURT:  No.

24          MR. PHILBIN:  Motion In Limine Number 6, which is one

25  of the exhibits that was raised in Sanho's Motion In Limine

1  Number 11, it's an email from Jamie Dillion.

2         And this should be excluded because it's hearsay and

3  it does not fall under the present sense impression or state

4  of mind exceptions.

5         Simply put, there's just not enough facts here to be

6  able to know what her present sense impression or her state of

7  mind were.

8         The actual exhibit, which you can see on Page 14 of

9  our presentation, what they included in their exhibit is the

10 email.  What they failed to include was the attached receipts,

11 which are shown on the right side, and they're in the record

12 at ECF 490-20.  And what the -- what Sanho wants to say that

13 this email shows is that Ms. Dillion was under the impression

14 that Sanho was the source of his UltraDrive.  But we don't

15 know that.

16        If you look at the two receipts, you can see the one

17 on the left is a return receipt, and it shows the original

18 transaction was in -- it's a little hard to see, but it's

19 January 7th of 2018.  And it relates to SKU 6109303.  That's a

20 HyperDrive SKU.

21        So Jamie Dillion purchased, back in January of 2018,

22 a HyperDrive.  And then in -- still on that left receipt, you

23 can see at the top there's a date of June 6, 2018.  That's

24 when she tried to return the HyperDrive.

25        And then somebody -- it's not clear because Jamie

1   Dillion is not a witness in this case -- somebody wrote

2   Hypershop.com on the bottom of that receipt.  And then on that

3   same day that she tried to return the HyperDrive, the right

4   receipt shows that she bought an UltraDrive.  Most likely --

5   but this is inferring -- most likely to replace her broken

6   HyperDrive.

7          And then it's a few weeks later that she sends this

8   email to Sanho regarding, she calls it an UltraDrive, but it's

9   regarding the product she bought January 7th, 2018.  That

10  relates to the HyperDrive that she bought, as shown in that

11  left receipt.

12         So the bottom line is we don't know what she's

13  talking about.  Most likely we can infer that she's referring

14  to the product she tried to return, which is the HyperDrive,

15  because that's most likely what she would be emailing about.

16         In that case, she's emailing Sanho about her

17  HyperDrive.  There is no confusion.  Yes, she does mention

18  UltraDrive in her email, but that doesn't show that she was

19  confused as to the source.  That's inattentiveness.

20         How did that happen?

21         Probably because she grabbed that other receipt and

22  she was like, Oh, what's this thing called?

23         She sees on the receipt it says UltraDrive, because

24  that's her Best Buy receipt.  She mixed up receipts.  The

25  issue is we don't know.

1          THE COURT:  We have no idea.

2          MR. PHILBIN:  Exactly.  That's the exact issue here.

3  We don't know what happened.  That's why this is hearsay and

4  does not fall into the present sense impression or state of

5  mind.

6          Yes, quite often, confused emails fall under these

7  exceptions, but they're pretty clear-cut cases.  The cases

8  that they cite are pretty clear-cut.  For example, *Canes Bar*,

9  there's a comment about -- you know, being cited about a new

10  Cutler Bay location opening up.  So, clearly, that person

11  thinks that this new restaurant is related to the next.

12          It's okay for certain hearsay emails to come under

13  the present sense impression if it's clear that they are

14  confused as to a source or affiliation.

15          Here, we just don't know what happened.  There's too

16  many questions.  The jury would have to -- all the jury could

17  do is speculate.  They would have to speculate as to whether

18  this email is about the UltraDrive she bought in June or if

19  it's about the HyperDrive she bought in January.

20          THE COURT:  All right.  Anything more on 7?

21          MR. PHILBIN:  Not for me.  I mean, they have a bunch

22  of case law that I could go at, but -- oh, sorry, 7.  I

23  thought we were -- yes, I do have stuff on 7.  I don't know if

24  you want to allow them to respond to 6, though.

25          THE COURT:  Go ahead with 7 and then I'll hear them

1    together.

2            MR. PHILBIN:  Yeah.  So 6 is about the Amazon review

3    that we briefly discussed earlier; it's Plaintiff's Trial

4    Exhibit 78.  A lot of the same issues are here.

5            This is hearsay.  It is offered -- it is being

6    offered for the truth of the matter asserted.  Specifically,

7    you can see on Slide 15 -- I highlighted it:  We contacted j5

8    for support.

9            They're going to offer this evidence to show that

10   this customer contacted j5 for customer support, and -- but

11   again, we just are missing way too many facts here to allow

12   this to come in under either of the hearsay exceptions.

13           Sanho's story is that this customer, HudsAL, whoever

14   they are, an anonymous reviewer, certainly not a witness in

15   this case.  They bought an UltraDrive but thought it was a

16   HyperDrive, but still contacted j5, whoever that is, for, you

17   know, to give them the benefit of the doubt, that that's

18   shorthand for j5create and it's supposed to refer to KaiJet

19   U.S.  We don't know that.  But okay.

20           So they contacted j5 for customer support and then

21   they left a review on the HyperDrive, even though they bought

22   an UltraDrive but thought it was a HyperDrive.  But it's a

23   very confusing story, but this singular review just cannot --

24   it cannot support that story.

25           First of all, UltraDrive wasn't sold on Amazon, not

1  at that time, so how would this person have bought an

2  UltraDrive?

3          But if they did buy an UltraDrive, they contacted j5,

4  j5create, KaiJet U.S.?  So that's not confusion.  They

5  contacted the right party about their product.

6          Furthermore, yeah, there's no evidence that this

7  person ever saw an UltraDrive or an ULTRADRIVEMINIDOCK or an

8  UltraDrive Kit.  The review doesn't say UltraDrive anywhere.

9  And it's on a HyperDrive Amazon webpage.

10         So again, it's -- just there's too many questions.

11 And these are questions that we could have -- you know, if

12 this person was a witness, we could get into and figure out

13 were they confused?

14         Did they think -- well, first of all, did they buy an

15 UltraDrive or did they buy a HyperDrive?

16         What product did they actually get?

17         We don't know.

18         And if they did, if they bought a HyperDrive, why

19 would they leave a review on Amazon?

20         Because if they did buy an UltraDrive, it wasn't from

21 Amazon, not at that time.

22         There is, again, speculation what could have

23 happened.  This person tried to buy a HyperDrive from Amazon

24 and per Sanho's lawsuit against Amazon, Amazon seller,

25 apparently, was shipping out counterfeit HyperDrives.

1          So it's possible that, you know, some drop seller ran

2     out of HyperDrives or, you know, decided, oh, I'll replace it

3     with an UltraDrive.

4          So it's possible that she tried to buy a HyperDrive,

5     was actually sent an UltraDrive for some reason.  And then,

6     because she got the UltraDrive and it says j5create on it, she

7     contacted j5create customer support, and then when she was

8     unhappy, she left a review on Amazon because -- on the Amazon

9     hyper page because that's where she bought it from.

10          But again, all speculation.  We don't know a single

11     thing about this.  All we know is she wrote we contacted j5

12     support, and then she summarizes what j5, quote/unquote, told

13     her.

14          What she -- this is all hearsay.  She's just

15     summarizing a phone call and facts that happened.  The -- what

16     j5create, whoever that is, that's double hearsay.  Yeah.

17          So at bottom, this evidence only allows the jury to

18     speculate, which is impermissible.  And without any evidence

19     that this person actually ever saw any of the accused

20     products, it's irrelevant.

21          THE COURT:  All right.  Thank you.

22          Response to 6 and 7?

23          MR. HILL:  Sure.  Starting with 6.  Plaintiff's Trial

24     Exhibit 92, that -- that email on its face reflects a confused

25     state of mind.  And that's why it's -- it's the state of --

1  it's the same state of mind basis that's at issue in almost

2  every modern internet age trademark case.

3        The -- what they're doing is they're pointing out

4  that they have ways of challenging how much weight the jury

5  should give the example in Plaintiff's Trial Exhibit 92.  And

6  I don't begrudge them that.

7        But the Eleventh Circuit said in the *Playnation* case:

8  Nothing in the actual confusion analysis requires the

9  plaintiff to produce the most careful consumer who diligently

10 researched and meticulously examined the inner and outer

11 packaging to determine the province of the product she

12 purchased.

13        The cases are legion at this point, and we've

14 cited -- we've cited many in our opposition brief, that these

15 types of incoming customer emails confusing the products, one

16 for the other, the infringing products, that is evidence of --

17 it is some evidence of actual confusion.  How much weight the

18 jury decides to give it is for, you know, zealous advocacy

19 between the two counsel, using all of the facts and

20 surrounding circumstances that they can marshal.  But it is

21 admissible as -- under the state of mind exception, at a

22 minimum.

23        As for Motion In Limine --

24        THE COURT:  How about authenticity?  I mean, how do

25 we authenticate it?

1          MR. HILL:  Because it's not being introduced for its

2     truth.  The email is -- is authenticated -- can be

3     authenticated by the recipient at hyper -- I mean at Sanho,

4     who receives the email.

5          And, you know, because it is -- this is -- this is

6     not -- this is the official product return email for the

7     company.  So this is where all emails come in where someone is

8     seeking a return of their -- of their product through an

9     established RMA practice.

10         And so these are -- these are business records

11    under -- under that group of the company that is responsible

12    for handling product returns.

13         THE COURT:  All right.

14         MR. HILL:  As to Motion In Limine Number 7, PTX 78,

15    this is the Amazon review.  I don't want to belabor the

16    discussion of the case law.

17         But again, if you look at the footnotes on Pages 10

18    and 11 of our brief, we're citing a significant amount of case

19    law that includes evidence of some confusion that includes a

20    customer posting an online review where they are referring to

21    the wrong source with the wrong product.  And that's what

22    we -- that's -- that's all that's being shown in PTX 78.

23         We aren't seeking to introduce it for its truth.  It

24    evidences a state of mind that there is a -- that the consumer

25    believes that there is a relationship between j5 and

1    HyperDrive, which is the page where this review was posted.

2    I'll stop there.

3           THE COURT:  All right.  Number 8, I believe, is

4    uncontested?

5           MR. PHILBIN:  That's our belief, yes.

6           MR. HILL:  Yeah.  Our only -- our only issue here is

7    that Mr. Shankwiler did have a pre-LKQ report.  We believe,

8    based on the way his post-LKQ report reads, that they intend

9    that to be a complete replacement of his prior report.

10          But his prior report does contain certain statements

11   and opinions that were he to -- were he to attempt to refer to

12   them and Mr. Bressler had addressed them in the rebuttal

13   report that he had originally done, we should be entitled to

14   rebut accordingly.  I don't think it's going to happen, but

15   that was -- that was our only concern.

16          THE COURT:  Right.  My understanding is that the

17   supplemental reports sort of supersede the previous report?

18          MS. GENTES:  Yes, Your Honor.

19          MR. HILL:  For them, that's true.

20          But for Mr. Bressler -- much of what was in

21   Mr. Shankweiler's post-LKQ report was mere restatement of

22   things that he had said verbatim in his original report.

23          And so Mr. Bressler didn't see the need to restate

24   everything verbatim, simply referred to the fact that he had

25   already -- he had already addressed that in certain paragraphs

1  in his earlier report.

2         THE COURT:  Okay.  All right.  Let's see.

3         Number 9.

4         MR. PHILBIN:  Yes, Your Honor.  This motion in limine

5  is regarding evidence of Sanho's alter ego theory, trying to

6  connect KaiJet U.S. and KaiJet Taiwan as one singular company.

7         Part of your summary judgment order, you found that

8  because KaiJet Taiwan had sufficient activities in the U.S.,

9  it was subject to jurisdiction in this case, and therefore,

10 alter ego didn't have to be reached as an issue.

11        And now Sanho has pivoted what it's using its alter

12 ego theory for.  They say it's relevant to KaiJet Taiwan's

13 notice of allegations, their access to the copyrighted box,

14 and whether profits should be awarded, presumably saying that

15 willful conduct could be -- if KaiJet U.S. is found to be

16 willful, then KaiJet Taiwan is also willful.

17        But they provide no case law to support the ability

18 to impute either notice, access, or willfulness from one

19 company to another, halfway around the world.

20        Furthermore, in Sanho's proposed jury instructions,

21 there is nothing on alter ego.  So as its fundamental error

22 instructions to leave the jury to speculate as to an essential

23 point of law -- and that's from *Scott v. United States*,

24 776 F.App. 612 at 615.  It's an Eleventh Circuit case from

25 2019.  It's KaiJet's position that Sanho has now dropped the

1  issue of alter ego since they have failed to instruct the

2  jury -- they have failed to provide any jury instructions on

3  the issue.

4        THE COURT:  Let me just dissuade you of that.  The

5  jury instructions, I think my trial lawyer made clear that the

6  parties can supplement their jury instructions until the close

7  of the evidence.  So that -- the deadline to file prior to

8  trial is not the last final word on jury instructions.

9        MR. PHILBIN:  Okay.  And I assume it's the same for

10  the verdict form, because there's no question as to alter ego

11  on their verdict form --

12        THE COURT:  Yes.

13        MR. PHILBIN:  -- so although they may be able to

14  supplement it, it's -- I guess it's confusing as to why they

15  didn't include any instructions as to alter ego at this point,

16  if they're planning to still argue the point.

17        THE COURT:  Okay.

18        MR. AALAEI:  Thank you, Your Honor.

19        It depends on what they mean by alter ego.  Alter ego

20  can be used to refer just to the interrelatedness of the

21  companies, as this Court found in Doc 185, which determined

22  that KaiJet Taiwan and KaiJet U.S. were alter egos for

23  discovery purposes.

24        The Court cited a case called *Superfund* or --

25  sorry -- *Super Firm* of America, and there were five factors

1  there that the Court went on to analyze on the discovery

2  issue, which will also play out at trial.

3       Those include issues at -- such as commonality of

4  ownership, exchange or intermingling of directors, officers,

5  employees.

6       THE COURT:  Well, I guess let me ask you, do you --

7  are you intending to ask the jury to make a finding of alter

8  ego status?

9       That's -- I guess that's a term of art, and I'm not

10  sure if -- we need to be careful about using that word if

11  we're meaning that more factually than legally.

12       MR. AALAEI:  Sure, Your Honor.

13       We're -- if -- it -- if Your Honor's concern is with

14  the word alter ego being used during the trial and then

15  somehow confusing the jury with respect to the legal

16  determinations they need to make, I don't think that's going

17  to be an issue, because it -- at this time, we're not -- at

18  least at the outset, we're not going to ask them from the very

19  beginning to pierce the veil, you know, in our opening

20  statement.

21       But we do intend to argue the issues of notice that

22  KaiJet Taiwan had, based on KaiJet U.S. and vice versa, also

23  with respect to Starview, as well as the access issue on the

24  copyright, because the companies are so closely related and

25  could, in common usage, be referred to as alter egos.

1          But I don't think there will be any source of

2    confusion because the jury is not going to be asked to pierce

3    the corporate veil, at least from the outset.

4          And then there's no prejudice either.  These

5    companies have overlapping agents.  They use the same FCC

6    registration, all kinds of commonality and overlapping.  So

7    there's no prejudice at the end of the day, anyway.

8          THE COURT:  All right.  So what I'm hearing -- just

9    to be clear then, what I hear you saying is you don't have any

10   intent of using alter ego as a term of art?

11         MR. AALAEI:  Correct, Your Honor.

12         THE COURT:  All right.  Does that resolve your issue?

13         MR. PHILBIN:  No.  I mean, it partially resolves the

14   issue.  But if they're just arguing that the companies are so

15   close that if KaiJet U.S. knows something that KaiJet Taiwan

16   must know it, too, there's no case law to support imputing

17   between two separate companies, imputing knowledge.

18         And there is -- so it makes it irrelevant.  And at

19   most, you would be asking the jury to speculate that, well, if

20   this person at KaiJet U.S. knew X, then there's a good chance

21   they probably told somebody at KaiJet Taiwan because they

22   email back and forth so much.  That's just speculation.  It's

23   not -- which goes to the relevance of these arguments and

24   evidence about how closely related the two companies are.

25         It doesn't make infringement more likely, it doesn't

167

1   make -- it doesn't make infringement of any of the IP more

2   likely.  It doesn't -- you know, without case law to support

3   imputation of notice, access, or willfulness, it doesn't make

4   anything more likely.

5           THE COURT:  All right.

6           MS. THORPE:  Your Honor, may I interject for

7   Starview?

8           THE COURT:  Sure.

9           MS. THORPE:  Yes.  I would be remiss not to raise

10  this issue, especially now that we are talking about the alter

11  ego issue.

12          The Eleventh Circuit held in *Smith v. Miorelli*, which

13  is 930 F. 4 -- F.4th 1206.  In that case, the Eleventh Circuit

14  overruled the Distinct Court order granting the plaintiffs

15  relief that they didn't assert in their complaint.  And there

16  is other case law where the Court has held that there can be

17  no relief if there is no claim for relief.

18          And that is an example in *Clay v. United Health

19  Group*, 376 F.3d 1092.  That was an Eleventh Circuit case in

20  2004.

21          And then there is another case where the Court

22  refused to grant the plaintiff recision relief because it

23  wasn't asserted in the complaint.  And I would like to cite

24  that case for you.  That was *International Harvester Credit

25  Corp. v. East Coast Truck*, 547 F. 2d. 888.  The Court said

1    the remedy of recision cannot stand.  In its complaint,

2    *East Coast* did not ask for recision.

3         The reason I bring all of that up is because in this

4    case, at least with respect to Starview, there has been no

5    allegation of an independent infringement.  It's all been

6    under this alter ego theory.  And if you examine the complaint

7    against Starview, it's all under this alter ego theory.

8         In your Honor's most recent order, it was stated that

9    they've raised two theories, one being that Starview imported

10   into the United States, or this alter ego theory.

11        Your Honor cites to their pleadings in the summary

12   judgment briefs.  But you have to look -- respectfully look

13   back at the complaint and see what it is that they have

14   alleged.  And that is what they have alleged in this case is

15   alter ego theory.  And that is all they have alleged.  They do

16   not allege in their complaint that Starview imports anything

17   as Starview, such that an independent ground for infringement

18   can be had.

19        They allege it under this alter ego theory throughout

20   the complaint.  There's no other cause of theory or cause of

21   action, if you will.

22        And now that they are asserting that they may not

23   even raise this issue, I think that is problematic because

24   there has been no notice.  They did not assert any other

25   grounds of infringement.

1          And so we think that under a standing on

2  jurisdictional grounds that this Court should not hear the

3  allegations of infringement, especially with respect to

4  Starview, based on their original complaint.

5          THE COURT:  Okay.  I'll let you have the last word on

6  that, if there is anything you want to say.

7          MR. AALAEI:  Your Honor, I thought this was resolved

8  when we received your order denying Starview's motion for

9  reconsideration.  The complaint clearly alleges separate.  It

10  uses the word separate.  So I don't have anything further to

11  add on this.  Also it's not Starview's motion in limine.

12          THE COURT:  I think they have adopted it, but that's

13  a good point.

14          MR. AALAEI:  Okay.  Thank you.

15          THE COURT:  All right.  Number 10.

16          MR. PHILBIN:  We're almost getting to the end.

17          So motion in limine 10 is about precluding Sanho's

18  attorneys and witnesses from referring to KaiJet U.S. and

19  KaiJet Taiwan as a singular j5 group or j5create group.

20          The prejudice is clear that they're trying to --

21  trying to group two separate companies together in order to --

22  and refer to them as one in order to convince the jury that we

23  are just one company, the two KaiJet's companies.

24          And they confirm that in their response, j5

25  group -- this is on Slide 19 of our presentation.  J5 group is

used to denote that j5create is an organization comprised of

KaiJet U.S. and KaiJet Taiwan.  The term is used to denote the

closeness and cohesiveness of the relationship of KaiJet U.S.

and KaiJet Taiwan.

        The jury needs to come to that conclusion based on

evidence presented, not based on subliminal messaging from

Sanho's attorneys in referencing to the two companies as one.

        Furthermore, it's just going to create jury

confusion.  All parties and attorneys should be referring to

each party by the same name.  And I think we've pretty much

all agreed to refer to -- to use the names KaiJet U.S.,

KaiJet Taiwan, Starview, Sanho.

        To start using different terms -- if they were to

start using j5create while we are saying KaiJet defendants, or

KaiJet U.S. and KaiJet Taiwan, it's just going to confuse the

jury.  And there's -- there's zero prejudice to preventing

them from referring to KaiJet U.S. and KaiJet Taiwan

collectively as j5create group.

        MR. AALAEI:  Thank you, Your Honor.

        Defendants refer to themselves as j5create; the

different defendants all do.  We're not -- plaintiff is not

the only person or entity that has determined the companies

are the same.

        Plaintiff's Exhibit 130 is a letter from the FCC

finding that KaiJet U.S. and KaiJet Taiwan are the same

1  company.  So KaiJet Taiwan owns the j5create trademark --

2  we're talking about j5create on this MIL -- and the other

3  defendants use that mark.  So a group is -- you know, I don't

4  have the exact definition in front of me, but it's more than

5  one, and here we have three.

6            THE COURT:  All right.  11?

7            MR. PHILBIN:  This is --

8            THE COURT:  Same issue?

9            MR. PHILBIN:  This is -- it's -- I mean, it's

10  related.  All of these kind of relate to the all three

11  relatedness issues, but this is specific to Plaintiff's Trial

12  Exhibit 129, which is a presentation that was created by a

13  KaiJet U.S. employee, a marketing assistant, who at the time

14  had worked there for a few weeks and she left a few weeks

15  later.

16            This is not relevant for the purposes of -- for the

17  same reasons that I've explained why alter ego is not at

18  issue, and so I won't get into that.

19            But this is also hearsay.  This is clearly an

20  out-of-court statement offered for the truth of the matter

21  asserted.  They're going to offer this presentation to say

22  that KaiJet U.S. and KaiJet Taiwan are all part of j5create

23  group, or I believe they call it j5create company in the

24  presentation.

25            If you'll look on Slide 20, this is just an example

1  of the inaccuracies of this presentation.  On the left is a

2  picture of -- in the presentation of Chuck Akins, who is the

3  sales VP of the company.  On the right, that's the actual

4  Chuck Akins.  They are clearly not the same person.

5        Sanho argues that this comes under the opposing party

6  statement exception, 801(d)(2)(D), but it doesn't.  Frankly --

7  like this person had just started at the company.  They are a

8  marketing assistant.

9        What the corporate structure and relationships of

10  KaiJet U.S. and how it relates to KaiJet Taiwan, not within

11  the scope of her employment, not within the scope of her

12  duties.  She was never asked to create this presentation.  She

13  created it instead for the sole purpose of showing off what

14  types of presentations she could create using this tool called

15  Prezi, which is kind of like a PowerPoint tool.

16        But simply put, this is outside of the scope of her

17  employment, so the exception does not apply, and it's clearly

18  hearsay.

19        THE COURT:  All right.

20        MR. AALAEI:  Thank you, Your Honor.

21        It is a statement of a party opponent.  Mr. Akins

22  himself, when he reviewed this PowerPoint presentation, said

23  this looks great.  And we attached that to our reply on this

24  motion in limine.  That's KaiJet's Bates 11539.  So even

25  Mr. Akins, the defendant's 30(b)(6) witness, exclaimed that

1  this looks great.

2          Now, what in the PowerPoint presentation is

3  inaccurate?  Nothing.  They haven't identified anything that's

4  inaccurate about the -- other than the picture of Mr. Akins.

5          So Mr. Akins' supplemental declaration now where he

6  says -- you know, attempts to try to cast doubt on it, I mean,

7  that -- that really conflicts with his present sense reaction

8  when he saw this presentation.  He thought it looked great.

9          And I agree with counsel that it does go to the issue

10  of the interrelatedness of the defendants' notice, access,

11  sharing of documents and corporate structure.

12          THE COURT:  Okay.  Number 12, I believe, is

13  unopposed.

14          MR. PHILBIN:  That's our understanding, yes.

15          THE COURT:  Is that right?

16          MR. HILL:  That's correct.

17          THE COURT:  13?

18          MR. PHILBIN:  Motion In Limine 13, I believe we're in

19  substantial agreement, for the most part.

20          If you look at our Slide 22, the only -- the only

21  remaining issue is that Sanho wants to still allow Mr. Chin to

22  offer testimony that the UltraDrive copied the HyperDrive

23  based on testimony and evidence that he would see at trial.

24          Clearly, that is impermissible, improper lay opinion

25  testimony.  For lay opinion testimony to come in, that's under

174

1    Federal Rule of Evidence 701, it has to be helpful to the

2    clear understanding of the witness's testimony or to

3    determining the facts in issue.  And it's not helpful.

4          If you look at the next slide, Slide 23, this is an

5    Eleventh Circuit case that dealt with the same issue and held

6    that because it's a lay witness and he's viewing the same

7    evidence, in this case it was a video and he wrote up what he

8    thought happened in the video.

9          Because it's evidence -- it's an opinion based on

10   evidence that the jury is also going to see and is equally as

11   capable of coming to the ultimate conclusion about, it's not

12   helpful to the jury and it usurps the jury's role.

13         It's the same here.  They're saying that Mr. Chin is

14   going to see the same testimony, same evidence that the jury

15   is going to see.  He's going to give his opinion that the

16   UltraDrive was a copy of the HyperDrive.

17         That's the jury's role to do.  They're going to see

18   the same evidence.  They're equally as capable of determining

19   whether or not the UltraDrive is a copy of the HyperDrive.

20   And they should do that based upon evidence, not Mr. Chin's

21   opinion, which is also clearly biased, but that's it, yeah.

22         THE COURT:  Okay.

23         MR. AALAEI:  Thank you, Your Honor.

24         Mr. Chin is the owner of the business.  He witnessed

25   what occurred.  He had personal knowledge about all of the

1    events that transpired.  And he should be allowed to testify

2    about the copying of his company's product.

3         This is not a 702 issue.  In the case of *Donlin v.*

4    *Philips Lighting North America Corp.*, 581 F.3d 73 at 81, it's

5    the Third Circuit, 2009.  When a lay witness has a

6    particularized knowledge by virtue of his experience, he may

7    testify even if the subject matter is specialized or technical

8    under 702.  So Mr. Chin is -- doesn't have to be an expert to

9    give testimony about his -- what he himself perceived.

10        In a case cited by KaiJet on Slide 23, the facts,

11   they appear very different.  They're talking about some video

12   that someone saw.  And I haven't heard any argument about who

13   Lieutenant Tummond was in that case.

14        But very different than here, where it's an IP

15   infringement case, the owner of the business and the inventor

16   lived through this.  And to preclude him from giving testimony

17   on why we're all here right now, it -- there's no basis to

18   exclude.

19            THE COURT:  All right.  14 is unopposed, I believe.

20            MR. PHILBIN:  Correct.

21            MR. HILL:  That's correct.

22            THE COURT:  Same with 15.

23            MR. PHILBIN:  Correct.

24            MR. HILL:  Correct.

25            THE COURT:  16.

```
1              MR. PHILBIN:  This is the last one.  This is about --
2     it's about buyout programs at Best Buy.  So -- and we have
3     this on our Slide 26.
4              Best Buy occasionally offers or allows its suppliers
5     to buy out other competing suppliers in order to essentially
6     have the whole shelf to themselves so that there is only one
7     product at issue.
8              And plaintiffs have included on their exhibit list
9     Exhibits 116 and 102, which both refer to potential buyouts.
10    And they want to offer this as evidence to KaiJet's intention
11    to capitalize on plaintiff's goodwill and likelihood of
12    confusion.
13             So, in essence, they want to say that this -- these
14    emails show that there is an intent to confuse, that it's
15    support that there was intent by KaiJet U.S. to cause
16    confusion between Sanho's HyperDrive and its own UltraDrive
17    products.
18             But first of all, as you can see on Slides 26 and 27,
19    the emails are from 2018; one is from December 19th, 2018, the
20    other is August of 2018.
21             The UltraDrive hit the market the year before, so
22    whether there is an intent to confuse in choosing the name
23    UltraDrive or choosing the trade dress of the box, that
24    happened a year before these emails.  So these emails can't go
25    to prove -- can't be relevant to their intent.
```

1          And further, they simply don't evidence any intent to

2   confuse.  What they do show is an intent to compete, which is

3   different.  And is perfectly permissible in the marketplace.

4          They cite to *J-B Weld*, saying that, you know, if --

5   you know, just because there's an intent to compete doesn't

6   mean that there isn't also intent to confuse.  No, we don't

7   disagree with that.

8          But the issue here is that these -- this evidence

9   doesn't show an intent to confuse.  It just shows an intent to

10  compete.

11         So as bottom -- these two pieces of -- these two

12  emails and any discussion of KaiJet potentially buying out

13  HyperDrive from Best Buy is just going to prejudice the jury.

14  That's the only purpose of it is to cast KaiJet U.S. as the

15  big bad guy at Best Buy who's bullying Sanho.

16         But that's simply just not the case.  If you look at

17  Slide 27, it shows that they weren't specifically targeting

18  HyperDrive.  They were talking about being the sole accessory

19  guy for Apple at Best Buy.

20         And then they discuss Belkin as really the bigger

21  target, because they're a bigger company than Sanho.  They

22  mention Belkin multiple times.

23         And Sanho references we pick up a big chunk of

24  business getting them out of there.  And they say that that

25  shows we were trying to pick up their goodwill.

1    But it's clear from these emails on their face that

2  they're talking about picking up HyperDrive and Belkin's

3  business of what they're selling at Best Buy, not an intent to

4  confuse or leach off of goodwill.

5    They want to be the only guys in Best Buy, so if you

6  go into Best Buy, you purchase -- you have to purchase a j5, a

7  KaiJet U.S., a KaiJet Taiwan product.  And that is a big chunk

8  of business because, right now, at that time, they're having

9  to compete with multiple other producers.  If they're the only

10  ones, then they're going to pick up a big chunk of business.

11    So simply put, there is just no evidence of any

12  intent to cause confusion or to steal HyperDrive's goodwill,

13  when they're actually trying to push them away so there is no

14  comparison between HyperDrive and the UltraDrive at Best Buy.

15    THE COURT:  All right.

16    MR. AALAEI:  Thank you, Your Honor.

17    Maybe we're both right.  Maybe it's an intent to

18  compete and intent to copy.  Because you can intend to compete

19  with someone unfairly by copying them.

20    So with regard to the specific email, the date of it,

21  just because it's after they started selling UltraDrive, it

22  doesn't matter.  There's no requirement that the evidence be

23  confined to one specific point in time when someone at KaiJet

24  came up with the idea to either compete or to copy.

25    So buying out HyperDrive or really, what it is,

1  paying Best Buy to drop HyperDrive from Best Buy is

2  circumstantial evidence, as well, that they are seeking to

3  compete unfairly by replacing HyperDrive.  It's all part of

4  the same scheme.

5         One way to do that is to copy it, copy the product

6  and sell a similar product.  So it just all goes hand in hand

7  with the scheme.  And that's actually what the *J-B Weld v.*

8  *Gorilla* case said, to distinguish the case that KaiJet cited,

9  that when there is substantial evidence of copying, like in

10 this case, then, you know, again, there's no -- there's no

11 reason to exclude this type of evidence.  It's proper and it's

12 probative.

13        THE COURT:  Okay.  All right.  Well, thank you for

14 that.

15        Let's take one more recess so that I can get my

16 thoughts in order.  And I'll come back with some rulings.

17 I'll come back at 4:45.

18        Ms. Brye, are you good to stay?

19        COURTROOM DEPUTY:  I'm good.

20        THE COURT:  Okay.  Ms. Brye is going to hang on for

21 you, so we're going to get to that technology piece.

22        Thank you for your patience.  We should be -- I

23 imagine, once I come back, we should be able to wrap up within

24 30 minutes.

25        Okay.

1           All right.  I'll see you back at 4:45.

2           (Whereupon, a recess was taken.)

3           THE COURT:  You-all may be seated.

4           All right.  That took longer than I anticipated.  Let

5    me turn first to the motions to exclude.

6           First was Sanho's motion to exclude Sarabia.  It is

7    granted in part and denied in part.

8           With regard to the argument that Sarabia is

9    unqualified, that is granted in part.  Sarabia's

10   three-decade-plus experience in working with trademarks,

11   trade dress and copyright in the context of consumer goods is

12   sufficient to qualify him as a trademark expert.

13          To the extent that Sanho asserts that Sarabia's legal

14   background has the potential to mislead the jury, that

15   objection is cured by defendant's agreement not to elicit

16   testimony about Sarabia's legal background or training, which

17   I will order them to abide by over the course of the trial.

18          To the extent that Sanho asserts that Sarabia will

19   weave incorrect legal standards into his analysis, Sanho is

20   not precluded from objecting to explicit or implied references

21   to misstatements of the law.

22          With regard to Sarabia's -- the objections to

23   Sarabia's quantitative methodology as being unreliable, that

24   relating to Sections 4 and 5 of his report, that is denied.

25          With regard to Sarabia -- the objection to Sarabia's

1  opinion on secondary meaning as an incorrect statement of the

2  law, which is Section 6, that is granted.

3        Sarabia's precluded from testifying as to the legal

4  standard applicable to the secondary meaning analysis and

5  precluded from testifying as to his ultimate opinion on

6  secondary meaning.

7        On the basis that Sarabia improperly used subparts of

8  the HyperDrive mark in analyzing the mark's commercial

9  strength, which is Section 7, that is denied.

10        Defendants are not legally precluded from focusing on

11  the subparts of HyperDrive as long as the jury ultimately

12  considers the mark as a whole.

13        Sarabia is not precluded from analyzing hyper and

14  drive separately from referencing trademark registrations for

15  other Class 9 products or from referencing the existence of

16  trademark registrations for ULTRADRIVEMINIDOCK and Ultradrive

17  Kit, but I do invite Sanho to propose a limiting instruction,

18  if they wish, concerning those coexisting trademarks and the

19  decisions from the trademark office.

20        With regard to the use of the reference to priority

21  or senior user, which is Section 8 of the report, that is

22  denied.

23        Sanho is not precluded from objecting to Sarabia's

24  use of those terms and other legal conclusions at any point

25  during his testimony.

1    Section 9, which is the objection with regard to

2  Sanho's conduct or course of standard of care in the course of

3  dealings with China, that is granted.

4    And Section 10 of the report, which is Sarabia's

5  testimony about his Best Buy visit, that is denied without

6  prejudice.  That is not -- I agree that's not expert

7  testimony, and I don't believe that the contention is that it

8  is.

9    I will say that I'm denying without prejudice, but I

10  am -- I am skeptical that it will be admitted ultimately.  I'm

11  going to need to hear the context of the testimony and what

12  the basis is for the objection at the time, but I am skeptical

13  that that will be ultimately admissible testimony.

14    I believe that resolves the Sarabia report.

15    Any questions about that?

16    And by the way, we will -- I will be entering a

17  written order that fleshes this out a little bit.  I just

18  wanted to get you some guidance today.

19    MR. CARLSON:  Thank you, Your Honor.

20    No questions from the defendants.

21    MR. HILL:  No questions.  Thank you.

22    THE COURT:  All right.  With regard to the Baker

23  report and the motion to exclude it, that is denied without

24  prejudice, in large part because of the representation that he

25  will be a rebuttal witness.  And so I'm just going to need to

1   hear how the cases-in-chief go.

2          And KaiJet is invited to renew this motion prior to

3   the opening of Sanho's rebuttal case.

4          With regard to Bressler, that motion is granted in

5   part and denied in part.  On the basis that Bressler is

6   unqualified, that is denied.  Bressler is clearly an expert in

7   product design and is qualified to offer his opinion as to

8   product design.

9          As to the basis that his testimony would be unhelpful

10  to the jury, that is denied.

11         Bressler is not precluded from testifying about his

12  three-way analysis in which he compares the claimed and

13  accused designs to instances of relevant prior art one by one.

14         To the extent the defendants believe that considering

15  the prior art one by one is not probative under the ordinary

16  observer test, they're certainly not precluded from pursuing

17  that line of argument through cross-examination and through

18  the testimony of their own witnesses.

19         With regard, on Section C, that Bressler is

20  unreliable; that is, that his methodology is unreliable, that

21  is granted in part.  Bressler is precluded from invoking his

22  hierarchy theory of visual elements to justify the conclusions

23  about how designs will be perceived by an ordinary consumer

24  when purchasing products.

25         I didn't find any -- any basis for -- or authority

1  for that, for that theory that he has articulated.  So that --

2  to the extent that his opinion is premised on that, he is

3  precluded from referencing that hierarchy.

4         Any questions about those rulings?

5         MS. GENTES:  No, Your Honor.

6         MR. HILL:  No, Your Honor.

7         THE COURT:  All right.  So let's turn now to the

8  motions in limine.  And let me just say at the start, the way

9  I treat motions in limine, generally, which is we follow the

10 rules of evidence, and the rules of evidence control, and no

11 matter how I've ruled today, the rules of evidence still apply

12 at trial.  And so if there is an objection to be raised at

13 trial, then you're not precluded from raising it at trial.

14        Just because I have ruled, perhaps, against you on a

15 certain issue today does not mean that you will not ultimately

16 prevail at trial.  What it means is that I'm not prepared as a

17 pretrial matter to admit it or exclude it.

18        I view this as sort of the start of the conversation

19 and it's helpful for me to hear this out in this setting to be

20 able to hear out your fleshed-out arguments, so that when the

21 evidence is presented at trial, I have that background and

22 context and I feel better informed to make that sort of

23 on-the-fly decision.  So this is simply sort of preliminary

24 rulings on these matters and you're free to renew them at

25 trial.

1    On Sanho's omnibus motion, Motion In Limine Number 1,

2  that the defendants should be precluded from introducing

3  evidence or argument contesting that HyperDrive is a strong

4  mark, that is denied.

5    Number 2, that defendants should be precluded from

6  introducing evidence of the date of their first use of ultra

7  and arguing that they are senior users with superior trademark

8  rights, that is denied without prejudice.

9    Again, plaintiff is free to object to the use of any

10 legal terms, legal terminology, and are free to make a request

11 for a limiting instruction in that regard, if that's

12 appropriate.

13    Motion in Limine Number 3, that the KaiJet defendants

14 should not be able to introduce evidence or argument about

15 other UltraDrive trademark registrations in Class 9, including

16 their own post-suit trademark registrations, that is denied,

17 again with the invitation to propose a limiting instruction.

18    Motion in Limine Number 4, the KaiJet defendants

19 should not be able to introduce evidence or argument relating

20 to the coexistence of unrelated hyper and ultra trademark

21 registrations, that, too, is denied with the invitation for a

22 limiting instruction.

23    Number 5, that the defendants should be barred from

24 introducing evidence or arguing at trial, that Sanho lacks

25 standing to pursue any of its claims or that the Court lacks

1  subject matter jurisdiction over this matter based on lack of

2  standing, that motion is granted with regard to what is

3  presented before the jury.

4       I think the best way to handle this issue is that --

5  given where we are and the timing, to the extent that there is

6  evidence to be presented on the issue of the legitimacy of the

7  rights that have been transferred, the trial is your

8  opportunity to present that evidence.

9       Sanho has a burden to show that it has the right to

10 bring these claims and it sounds like you intend to do that

11 during your case-in-chief.

12      If KaiJet has evidence to the contrary or wishes to

13 challenge that with its own evidence, you're free to present

14 that at trial.

15      But that's not an argument to be made to the jury.

16 To the extent that you believe you have a colorable basis for

17 challenging standing, I'll instruct you to file that motion at

18 the close of the evidence or prior to, but before the jury has

19 returned a verdict.  So you should be prepared to do that.

20      Depending on how things go, I may or may not be able

21 to rule on that before the jury comes back.  But it seems that

22 this is an issue that even post-verdict, we can -- we can

23 resolve once the evidence has been -- has been heard.

24      Of course, in response to that motion, you'll have an

25 opportunity to argue waiver and any other defenses that you

187

1  have to that, to that motion.

2       The same with regard to Motion In Limine Number 6,

3  that the defendant should be precluded from asserting, arguing

4  or attempting to introduce evidence showing that Targus is an

5  indispensable party to this litigation.  Again, that's granted

6  with regard to what is presented to the jury.  But you're free

7  to make that argument by motion by the close of the evidence.

8       Number 7, that KaiJet Taiwan and Starview should be

9  precluded from introducing evidence and/or arguments that its

10  sales of UltraDrives to KaiJet U.S. are foreign sales that are

11  extraterritorial and therefore beyond the reach of U.S. law,

12  that motion is granted.  And at the appropriate time, I'm

13  happy to take that offer of proof that you've requested, once

14  the jury has been recessed for the day.

15       On Motion In Limine Number 8, that the defense should

16  be precluded from mentioning in the presence of the jury the

17  withdrawal or dismissal of any claims or counterclaims in the

18  case, that is granted.

19       Number 9, that the defendants should be precluded

20  from introducing evidence or argument that the HyperDrive did

21  not practice the Sanho design patents, the false marking

22  claim, that is granted without prejudice.

23       Number 10, that the KaiJet defendants should be

24  precluded from introducing evidence or argument that Sanho was

25  involved in any unauthentic or fake product reviews or

1  unauthentic review campaigns, that is granted without

2  prejudice.

3           Number 11, that the Court should admit Sanho --

4  certain Sanho trial evidence of consumer state of mind and

5  present sense impression as exceptions to the hearsay rule,

6  business records of Sanho, or both, that is denied without

7  prejudice.

8           Again, particularly when we are talking about

9  specific emails and exhibits, I'm just going to have to hear

10 the evidence as it's presented at trial.  So I'm just not

11 prepared to make a ruling on that, one way or the other,

12 pretrial.

13          I believe that is all for Sanho; is that correct?

14          Turning to KaiJet's Motion Number 1, to preclude

15 Sanho from introducing evidence, argument or inferences

16 relating to Best Buy returns, that is denied without

17 prejudice.

18          Number 2, to preclude Sanho from introducing

19 evidence, argument, or inferences relating to other settlement

20 agreements, that is granted, but granted based on the late

21 disclosure of the settlement agreement.

22          Number 3, to preclude Sanho's expert witness,

23 Cenatempo, from testifying to matters outside of the scope of

24 his expertise, that's denied without prejudice.  Although

25 that's -- again, following the rules of evidence, that's

1  always true.

2        Number 4, to preclude Sanho from introducing

3  evidence, argument, or inferences relating to claims dismissed

4  from this case, that is granted.

5        Number 5, to preclude Sanho from introducing

6  evidence, argument, or inferences relating to the Kickstarter

7  message, that's denied without prejudice.

8        Number 6, to preclude Sanho from introducing

9  evidence, argument, or inferences relating to the Jamie

10  Dillion email, that's denied without prejudice.

11        Number 7, to preclude Sanho from introducing

12  evidence, argument, or inferences relating to the Amazon

13  review by HudsAL, that's denied without prejudice.

14        Number 8, to preclude Sanho from introducing

15  evidence, argument, questions, or inferences related to expert

16  opinions on designs, patent invalidity prior to *LQK Corp.*

17  ruling, that's granted.

18        Number 9, preclude Sanho from introducing evidence or

19  argument that KaiJet U.S. and KaiJet Taiwan are alter egos,

20  that is granted with regard to the use of the term alter egos

21  as a legal conclusion, but denied as to the remainder.

22        Number 10, to preclude any references to the j5create

23  group, that's denied.

24        Number 11, to preclude Sanho from introducing

25  evidence, argument, or inferences relating to the j5create

1    company profile presentation, that's denied without prejudice.

2        Number 12, to preclude Sanho from introducing

3    evidence, argument, or inferences to KaiJet's use of

4    UltraDrive as being counterfeit, that is granted.

5        Number 13, to preclude the improper testimony from

6    Daniel Chin, that's denied without prejudice.

7        Number 14, to preclude Sanho from asserting to the

8    jury that it is entitled to or should be awarded treble or

9    enhanced damages in this matter, that is granted.

10        15, precluding Sanho from asserting to the jury that

11    it is entitled to or should be awarded attorneys' fees or

12    costs in this matter, that is granted.

13        16, to preclude Sanho from introducing evidence,

14    argument, or inferences relating to the potential buyout of

15    HyperDrive at Best Buy, that is denied without prejudice.

16        Does that resolve all of KaiJet's issues?

17        MR. PHILBIN:  Yes, Your Honor.

18        THE COURT:  All right.  All right.  Long day.

19        Anything else you'd like to take up?

20        MR. HILL:  What time will the courtroom be open on

21    Tuesday morning?

22        COURTROOM DEPUTY:  8:15.

23        THE COURT:  8:15.  And I believe also on Monday, to

24    the extent you want to bring things in advance.

25        On Monday, we will have court until what?

1              COURTROOM DEPUTY:  Hopefully 4:00.

2              THE COURT:  Until 4:00.  So if you want to come late

3    in the day, you're welcome to store your materials in here,

4    and at that time, the courtroom will be locked.

5              All right.  I can't get let you go without talking

6    about settlement.  It's never too late.

7              And one thing I know about sophisticated companies is

8    that they don't like to lose control, and they're about to

9    lose a lot of control.  So I know you're professionals on both

10   sides.  And I hope you're having those candid conversations

11   with your clients because juries are very unpredictable.  And

12   one thing that a resolution can get you is control and

13   certainty about where things land.

14             So I encourage you to keep having that conversation

15   and don't get so blinded by the finish line that you forget to

16   keep considering the best interest of your clients in that

17   regard.

18             All right?

19             I know it's a holiday week.  And so sorry that you're

20   going to -- your holiday week is not going to be what it

21   probably usually is.

22             But we are available to you as issues arise.  Again,

23   I want to try to front issues as much as possible, so if there

24   is something that you think would be helpful to resolve before

25   Tuesday, the most efficient way to do that is to email

1    Ms. Brye and we can jump on a Zoom call or a phone call and

2    try to make some headway on it so that we have less to worry

3    about next week.

4            Okay?

5            Hope you get some rest.

6            Thank you to all the back table folks who are doing

7    all the hard work.  And we're in recess.

8

9            (Whereupon, the proceedings were adjourned at 5:15

10   p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTERS CERTIFICATE

I, Jana B. Colter, Official Court Reporter for the United States District Court for the Northern District of Georgia, with offices at Atlanta, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on July 2, 2024, in the matter of *Sanho Corporation v. KaiJet Technology International Limited, Inc., et al,* Case Number 1:18-CV-05385-SDG; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate record of the proceedings.

This the 3rd day of July, 2024.


_____
/s/ Jana B. Colter, FAPR, RDR, CRR, CRC
         Official Court Reporter

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

**0**

**09** [2] 17/819/9

---

**1**

**10** [18] 6/217/98/218/2413/113/213/4
13/813/1113/1225/19137/3161/17
169/15169/17182/4187/23189/22
**100 percent** [3] 68/1173/9101/16
**102** [1] 176/9
**1051** [3] 49/1149/1849/23
**1092** [1] 167/19
**11** [10] 139/2139/3140/23143/5143/20
154/1161/18171/6188/3189/24
**1114** [1] 132/1
**1115** [3] 118/4118/11119/6
**1119** [1] 49/2
**1125** [1] 132/2
**11539** [1] 172/24
**116** [1] 176/9
**11:30** [1] 48/14
**12** [4] 125/14132/12173/12190/2
**120** [1] 46/11
**1206** [1] 167/13
**126** [2] 140/23142/19
**129** [1] 171/12
**1293** [1] 141/25
**12:20** [1] 77/23
**12:30** [3] 91/1491/1791/19
**13** [13] 6/227/98/218/2513/113/213/16
13/1817/621/19173/17173/18190/5
**130** [1] 170/24
**1315** [1] 142/1
**14** [5] 83/1284/15154/8175/19190/7
**14-word** [1] 111/4
**1456** [1] 2/22
**14th** [1] 141/5
**15** [15] 32/532/1349/285/2286/1486/15
88/2597/11110/3110/9118/4119/6157/7
175/22190/10
**15 percent** [1] 73/10
**15 U.S.C. 1051** [1] 49/11
**15 years** [1] 6/5
**15-minute** [2] 48/1391/12
**16** [8] 13/1917/721/1924/224/2025/18
175/25190/13
**17** [2] 34/24112/9
**18-cv-5385** [1] 4/10
**180s** [1] 76/13
**185** [1] 164/21
**19** [2] 25/18169/25
**1949** [1] 2/20
**1995** [1] 128/3
**19th** [1] 176/19
**1:00** [1] 81/9
**1:18-CV-05385-SDG** [2] 2/6193/10
**1:30** [5] 77/2378/678/2380/1191/16

---

**2**

**2.32** [1] 50/3
**20** [6] 84/1487/288/288/5154/12171/25
**20 percent** [1] 68/12
**20-page** [2] 152/19153/2
**2002** [1] 148/4
**2004** [1] 167/20
**2009** [1] 175/5
**2012** [5] 22/1823/21115/1116/17116/23
**2014** [1] 123/8
**2017** [3] 116/18141/5141/7

**2018** [8] 140/4154/19154/21154/23
155/19156/13147/8157/6
155/19156/13147/8157/20
**2019** [2] 119/18163/25
**2020** [1] 119/19
**2022** [3] 125/6149/6151/18
**2023** [1] 122/24126/22
**2024** [7] 2/144/479/6122/24149/6193/8
193/14
**215-1456** [1] 2/22
**22** [1] 173/20
**22200** [1] 128/4
**23** [4] 139/24142/18174/4175/10
**23rd** [1] 119/19
**26** [3] 145/21176/3176/18
**262** [2] 125/23125/24
**27** [2] 176/18177/17
**29** [3] 16/17110/18111/5
**2d** [2] 141/25167/25

---

**3**

**30** [10] 16/2492/2092/2292/25144/10
145/21146/20147/8172/25179/24
**30303** [1] 2/21
**32** [2] 55/20119/5
**34** [1] 55/20
**35** [1] 52/12
**37 CFR 2.32** [1] 50/3
**376** [1] 167/19
**3:00** [2] 95/695/7
**3:30** [1] 143/16
**3rd** [1] 193/14

---

**4**

**40** [1] 67/6
**40 percent** [1] 73/10
**400** [1] 45/20
**402** [2] 109/9110/7
**403** [6] 19/219/3109/9110/9113/16
113/22
**404** [1] 2/22
**41** [1] 140/21
**42** [1] 141/11
**45** [4] 85/2285/2486/986/10
**46** [1] 49/3
**47** [2] 67/1667/16
**48** [2] 50/967/16
**49** [1] 50/13
**490-20** [1] 154/12
**4:00** [3] 81/4191/1191/2
**4:45** [2] 179/17180/1

---

**5**

**50** [3] 67/571/473/9
**50 percent** [1] 68/11
**521** [1] 6/2
**526-2** [1] 67/15
**5385** [1] 4/10
**54** [1] 53/25
**542** [3] 108/3109/16114/9
**543** [1] 112/9
**544** [1] 144/5
**547** [1] 167/25
**55** [2] 34/24112/10
**551** [1] 148/1
**552-2** [1] 149/21
**58** [1] 64/8
**581** [1] 175/4
**583** [1] 141/25
**5:00** [5] 90/1190/1590/1690/2091/2

---

**COURTROOM DEPUTY: [4]** 26/22
179/19190/22191/1
**MR. AALAEI: [12]** 150/12151/14151/17
164/18165/12166/11169/7169/14170/19
172/20174/23178/16
**MR. CARLSON: [48]** 4/2026/926/18
26/2027/227/927/1328/630/231/2131/25
34/1438/638/2440/2341/2542/548/477/9
78/1979/281/1981/2482/182/487/13
87/1587/2187/2189/1089/1692/1592/24
98/198/698/998/1998/24105/24106/4
106/10110/14110/14116/13117/2119/4
120/9182/19
**MR. HILL: [94]** 4/136/58/912/2112/25
13/713/1213/1715/2516/419/321/20
21/2223/824/2026/742/1742/1944/7
44/1279/1979/2280/180/580/1080/18
80/2381/681/1482/2289/2192/1397/14
97/1797/1997/2199/499/24100/6101/4
102/8102/19103/10103/17103/21103/23
104/1104/7104/105/1105/5106/12107/6
107/15107/19107/24108/4108/7108/12
108/14108/17109/16109/19109/20114/2
115/9115/11115/22115/24117/6117/15
118/22134/15134/17135/22137/4138/9
139/3142/16142/18147/4152/10152/14
153/13159/23161/1161/14162/6162/19
173/16175/21175/24182/21184/6190/20
**MR. HU: [3]** 4/2582/992/19
**MR. LUDWIG: [26]** 56/756/2262/11
62/1562/2171/472/1072/1574/1275/5
75/7121/2121/6121/24122/2190/21
122/16122/19123/25124/5124/14124/17
124/20130/17132/23133/8
**MR. PHILBIN: [38]** 133/12133/19
133/23133/25138/13140/21143/4143/15
143/18143/23144/1144/7144/22145/20
148/9148/12152/3152/12153/7153/17
153/24156/2156/21157/2162/5163/4
164/9164/13166/13166/16171/7171/9
173/14173/18175/20175/23176/1190/17
**MR. ROBERTS: [2]** 81/2381/25
**MS. GENTES: [46]** 26/1026/1426/17
26/2327/848/1953/854/2056/660/1962/1
62/2263/1267/1268/2176/379/879/12
79/1880/8104/4104/6104/6105/3105/6
105/20126/4126/10126/7127/13127/18
128/17129/2129/14129/23130/8131/4
131/9131/25132/10133/1134/3135/10
136/13162/18184/5
**MS. THORPE: [5]** 5/25/1082/13167/6
167/9
**MS. TOMLINSON: [1]** 5/6
**THE COURT: [251]**
**THE WITNESS: [2]** 9/1934/7

---

**'**

**'290** [3] 74/2275/1475/15
**'707** [3] 48/2549/949/15

---

**-**

**-- in** [1] 143/24
**-- just** [1] 12/22
**-- Roberts** [1] 82/1

---

**/**

**/s** [1] 193/18

**5:15** [1] 192/9

**6**

**60** [3] 65/1397/997/10
**60 minutes** [1] 85/20
**6109303** [1] 154/19
**612** [1] 163/24
**615** [1] 163/24
**65** [1] 70/13

**7**

**701** [1] 174/1
**702** [2] 175/3175/8
**703** [1] 8/11
**71** [2] 35/2546/23
**73** [1] 175/4
**75** [1] 2/21
**776 F.App** [1] 163/24
**78** [4] 137/17157/4161/14161/22
**7th** [1] 155/9

**8**

**801** [1] 172/6
**81** [1] 175/4
**83** [2] 144/10147/7
**888** [1] 167/25
**8:00 a.m** [1] 91/1
**8:15** [2] 190/22190/23

**9**

**90** [4] 1/497/697/697/10
**92** [4] 139/23139/23159/24160/5
**930** [1] 167/13
**99 percent** [1] 14/24
**9:00** [2] 90/1190/25
**9:00 a.m** [2] 90/1390/14
**9th** [1] 5/13

**A**

**a.m** [3] 90/1390/1491/1
**AALAEI** [3] 3/24/1681/16
**abide** [1] 180/17
**ability** [4] 114/15135/5135/6163/17
**able** [29] 12/812/1020/1321/1343/19
57/973/2578/384/590/590/1491/1092/1
100/18116/8131/16132/17138/18149/3
152/20152/22152/23154/6164/13179/23
184/20185/14185/19186/20
**about** [172] 6/56/177/1710/410/412/7
13/2315/515/1415/1416/117/1118/321/2
21/322/1024/1324/2125/2026/527/10
28/1028/1529/1429/1529/2530/232/19
32/2233/1233/1333/2133/2234/1635/16
37/1338/338/1838/2539/139/1939/839/18
40/641/342/1042/2543/2245/647/16
48/1048/1148/1948/2349/149/1149/22
50/2551/251/751/851/1452/1252/14
52/1754/154/1655/1555/2260/2260/24
61/563/2364/2365/865/866/1767/1967/22
68/168/368/768/968/2369/269/569/16
69/2076/578/778/978/1078/1882/1683/77
84/2589/491/1491/2292/1694/594/796/9
97/2197/2299/25101/13102/19105/6
106/13107/8107/17108/5113/16116/7
117/9117/18118/3120/3133/5134/13
135/20136/6136/10136/19137/18137/19
143/9144/10144/13151/9153/10155/13

**155/15155/16156/9156/9156/18156/19**
157/2158/5159/11160/24165/10166/24
167/10169/17171/2173/4174/11174/25
175/2175/9175/11175/12176/1176/2
177/18178/2180/16182/5182/15183/11
183/23184/4185/14188/8191/6191/7
191/8191/13192/3
**above** [1] 94/13
**absence** [2] 120/21124/21
**absolute** [1] 60/11
**absolutely** [2] 19/21105/20
**abstract** [2] 142/3142/7
**AC** [5] 53/1356/1256/1757/457/4
**accept** [1] 100/9
**acceptable** [2] 90/6106/4
**accepted** [5] 69/1269/1369/1769/20
71/18
**accepts** [1] 36/9
**access** [6] 21/12163/13163/18165/23
167/3173/10
**accessories** [4] 10/1112/215/1032/15
**accessory** [4] 51/1855/2113/7177/18
**accommodating** [1] 5/15
**accomplish** [1] 65/1
**accordingly** [2] 59/12162/14
**account** [3] 17/2520/25151/4
**accounted** [3] 8/454/1661/23
**accounting** [2] 43/566/3
**accumulating** [1] 47/19
**accuracy** [1] 107/17
**accurate** [3] 107/13116/6193/13
**accusation** [1] 121/10
**accused** [14] 28/2049/1352/2164/18
65/1666/1171/174/1674/2375/1476/16
145/24159/19183/13
**accusing** [3] 150/1150/4150/6
**acknowledge** [1] 149/19
**acknowledging** [2] 66/273/4
**acquiescence** [1] 24/25
**acquiescence-based** [1] 24/25
**acquisition** [3] 121/17122/6122/23
**across** [1] 37/14
**Act** [2] 118/11144/13
**action** [5] 2/522/1149/5119/9168/21
**actions** [2] 40/14146/17
**activities** [1] 163/8
**actual** [31] 9/1740/1240/1640/25119/21
131/22134/11139/11139/17139/18
140/24141/5141/7141/15141/16141/22
142/11142/20144/2144/14144/16144/17
144/18145/18146/18146/147/25148/6153/17
154/8160/8160/17172/3
**actually** [34] 7/2311/711/1212/1513/7
15/917/2117/2132/644/1845/2246/20
47/851/451/1859/290/14113/6113/15
133/2134/23134/25138/9144/20144/23
145/12145/17146/14152/21158/16159/5
159/19178/13179/7
**adapt** [3] 59/2460/2161/2
**adapter** [48] 52/352/852/1353/353/10
53/1654/354/454/1054/1355/355/855/14
55/1655/2155/2356/1156/1156/1456/16
56/1956/2456/2557/157/1058/458/658/8
58/1358/1558/2159/359/1559/1659/19
59/2360/660/1360/1461/361/461/14
61/1762/362/1662/1863/363/7
**adapters** [10] 53/1955/2255/2557/3
57/657/1857/2159/1763/4145/22

**adaption** [1] 59/8
**adapts** [1] 61/18
**add** [1] 169/11
**added** [1] 121/14
**additional** [5] 21/188/397/21111/19
112/3
**address** [2] 5/21108/9
**addressed** [6] 29/841/1043/2142/21
162/12162/25
**addressing** [3] 31/1931/21102/12
**adds** [1] 102/23
**adjourned** [1] 192/8
**Administrator** [1] 2/19
**admissibility** [3] 33/499/12109/9
**admissible** [6] 118/3119/10139/7139/8
160/21182/13
**admission** [1] 141/12
**admit** [6] 124/13127/18141/16147/18
184/17188/3
**admits** [1] 52/271/4124/11
**admitted** [5] 94/2296/696/7148/17
182/10
**admittedly** [1] 18/16
**admitting** [1] 70/20
**adopt** [1] 65/11
**adopted** [1] 169/12
**advance** [4] 86/593/497/1190/24
**advances** [2] 16/1917/7
**advantaged** [1] 115/13
**advertised** [3] 9/99/1455/6
**advertising** [1] 137/8
**advisement** [1] 48/10
**advocacy** [1] 160/18
**advocate** [3] 8/138/1655/10
**advocated** [1] 65/11
**advocating** [1] 18/11
**affect** [2] 5/2270/21
**affects** [1] 67/20
**affiliation** [1] 156/14
**affirmative** [3] 122/20122/25126/14
**affirmatively** [4] 135/24136/4136/6
138/10
**afford** [1] 95/13
**afforded** [1] 18/25
**after** [13] 1/720/1250/2280/1180/15
80/2180/2191/1194/23100/23102/11
148/22178/21
**afternoon** [2] 102/11102/12
**again** [47] 11/1614/416/2317/1721/18
26/2029/1630/2430/1932/1332/1833/3
33/1537/1137/2338/867/2076/487/392/8
93/2294/2596/19109/13112/8112/16
113/3113/10113/19112/10114/21122/25/16
131/19134/17140/5157/1158/10158/22
159/10161/1179/10185/9185/17187/5
188/8188/25191/22
**against** [9] 11/1112/1430/632/1897/4
151/24158/24168/7184/14
**age** [1] 160/2
**agents** [1] 166/5
**ago** [4] 90/22149/2149/6151/16
**agree** [10] 43/1947/948/389/19102/1
102/17123/25137/23173/9182/6
**agreed** [7] 45/285/15100/9101/14
106/17151/3170/11
**agreed-upon** [2] 85/15101/14
**agreement** [16] 82/18100/8100/9
101/13127/5133/2136/24148/25149/5

**A**

**agreement... [7]** 150/16150/20150/22 151/19173/9180/15188/21

**agreements [3]** 148/14148/16188/20

**ahead [3]** 27/1280/9156/25

**AI [1]** 1/13

**aided [1]** 2/17

**aids [1]** 93/3

**airlines [1]** 17/1

**Akins [5]** 172/2172/4172/21172/25 173/4

**Akins' [1]** 173/5

**al [3]** 2/84/10193/10

**alert [1]** 100/20

**ALI [2]** 3/24/16

**aligned [2]** 75/14101/16

**all [186]** 4/84/194/245/115/175/196/16 8/129/2213/2017/1421/1826/426/630/15 31/1432/333/133/337/938/1238/1944/9 47/947/2047/2148/648/948/1548/1853/3 54/756/360/1660/2462/1263/1465/23 69/1470/1972/572/573/2174/774/10 74/1774/2077/577/677/877/1478/17 78/2278/2279/181/1982/882/1582/16 83/383/383/1984/2085/586/1186/16 86/2288/1089/2290/290/390/690/10 92/1693/193/896/1096/1196/2597/12 98/5102/18105/21108/1108/2108/23 110/13113/18113/23117/12119/3120/25 121/20121/25122/2124/9124/10126/25 127/15127/22130/14132/3133/4133/10 133/21133/24134/13136/14136/21 136/23138/12139/7139/7142/21143/3 143/13144/4144/4145/4145/19146/14 146/24147/1147/8147/10147/13147/16 149/23150/9150/11152/2152/8153/13 153/15156/16156/20157/25158/14 159/10159/11159/14159/21160/19161/7 161/13161/22162/3163/2166/6166/8 166/12167/5168/3168/5168/7168/15 169/15170/9170/11170/21171/6171/10 171/10171/22172/19174/25175/17 175/19176/18178/15179/3179/6179/13 180/1180/3180/4182/22184/7188/13 190/16190/18190/18191/5191/18192/6 192/7

**allegation [1]** 168/5

**allegations [3]** 134/14163/13169/3

**allege [2]** 168/16168/19

**alleged [5]** 124/6145/24168/14168/14 168/15

**alleges [1]** 169/9

**allow [5]** 23/1633/17156/24157/11 173/21

**allowable [1]** 61/17

**allowed [9]** 55/1061/1588/23120/5 136/5142/8149/9150/10175/1

**allowing [1]** 118/1

**allows [4]** 88/5129/4159/17176/4

**almost [3]** 14/22160/1169/16

**alone [2]** 47/14149/3

**along [2]** 49/4115/3

**already [14]** 10/1420/233/1146/747/22 57/1557/2284/1192/495/15133/9153/17 162/25162/25

**also [58]** 4/175/78/2211/611/1913/4 14/1617/626/1430/931/334/1437/13 38/1540/2442/944/2449/1856/258/2

59/1661/1169/1971/271/1272/1174/15 74/2276/1277/1082/4941/1599/11103/7 104/8105/9111/19112/19115/25117/14 120/22122/3124/11125/8125/16130/20 138/22142/25146/2163/16165/2165/22 169/11171/19174/10174/21177/6190/23

**alter [23]** 163/5163/10163/11163/21 164/1164/10164/15164/19164/19164/22 165/7165/14165/25166/10167/10168/6 168/7168/10168/15168/19171/17189/19 189/20

**alternate [2]** 88/1988/20

**alternates [1]** 83/2

**alternating [3]** 58/1959/2088/20

**although [5]** 71/20124/7152/19164/13 188/24

**altogether [1]** 135/1

**always [5]** 66/1592/394/595/20189/1

**am [8]** 26/23114/14114/17119/24 130/14182/10182/10182/12

**amalgam [1]** 140/10

**amassed [1]** 138/2

**Amazon [39]** 137/16138/5139/6140/18 148/24149/19149/22150/1150/2150/3 150/3150/4150/5150/6150/20 150/20150/24150/25151/1151/2151/3 151/6151/7151/9151/12151/24157/2 157/25158/9158/19158/21158/23158/24 158/24159/8159/8161/15189/12

**amended [1]** 122/22

**amendments [1]** 125/7

**America [2]** 164/25175/4

**among [3]** 74/2583/1186/11

**amount [2]** 52/15161/18

**amplification [3]** 19/2019/2232/8

**amplifier [1]** 10/12

**analogy [1]** 19/5

**analysis [36]** 8/49/169/1710/710/15 12/513/1314/414/714/2515/819/219/3 28/1328/1930/1031/131/1033/1433/18 34/1435/338/1644/246/1966/968/23 75/1276/1112/18113/2113/16160/8 180/19181/4183/12

**analyze [9]** 9/1216/1317/1829/130/4 37/740/247/13165/1

**analyzed [5]** 30/2231/1040/1074/19 74/20

**analyzing [5]** 30/534/1873/24181/8 181/13

**anonymous [1]** 157/14

**another [11]** 8/158/1620/339/351/14 53/1173/1975/24118/24163/19167/21

**answer [2]** 23/853/2456/1963/984/23 104/11104/13104/19122/21

**answered [1]** 84/11

**answering [1]** 102/2

**answers [6]** 84/886/287/3101/14101/17 103/1

**anticipate [4]** 92/1197/197/13100/19

**anticipated [3]** 97/3138/10180/4

**anticipating [1]** 97/14

**antithetical [1]** 24/8

**anxious [1]** 78/20

**any [125]** 1/99/129/169/2410/2411/11 12/512/1412/1614/715/1818/118/14 19/1019/1321/1325/125/325/426/127/20 37/2140/341/1542/1543/1643/1744/5 44/1045/1645/2146/1849/557/1159/22

6P/1562/2464/267/967/2168/1470/470/5 70/872/976/771/80/2389/2285/185/11 87/2388/888/989/489/1789/1790/2291/6 91/693/293/594/494/2295/695/796/20 99/199/15101/5102/4102/7102/9105/1 105/13114/4114/22116/24118/3118/5 118/7118/8119/7121/8124/25130/3 130/12130/20132/5134/20135/3137/6 138/24145/13146/8146/13147/8149/15 150/14150/14150/15150/18153/21 159/18159/19164/2164/15166/1166/9 167/1168/24175/12177/1177/2178/11 181/24182/15183/25183/25184/4185/9 185/25186/25187/17187/25189/22

**anybody [3]** 52/1980/2580/25

**anymore [1]** 153/21

**anyone [2]** 59/1891/6

**anything [24]** 6/1412/114/1114/1721/2 21/325/525/925/1243/246/153/2161/4 62/678/1789/1136/19156/20167/4 168/16169/6169/10173/3190/19

**anyway [1]** 166/7

**anywhere [10]** 9/2410/2412/1455/25 68/168/1468/2569/5151/11158/8

**apart [1]** 62/14

**apologize [2]** 8/2313/9

**app [2]** 36/1747/4

**apparatus [3]** 35/2136/336/15

**apparently [2]** 29/8158/25

**appear [4]** 100/8124/7127/25175/11

**appearance [2]** 71/11142/25

**appearances [2]** 2/224/11

**appearing [2]** 8/16106/24

**appears [4]** 35/4112/18127/1127/7

**Apple [1]** 177/19

**applicable [4]** 62/569/21130/20181/4

**applicant [2]** 49/1960/2

**application [5]** 46/1750/2360/360/10 120/4

**applied [7]** 11/549/1750/1751/2131/12 131/13131/15

**applies [4]** 23/1352/2563/1763/18

**apply [7]** 21/750/150/161/2074/10 172/17184/11

**applying [7]** 20/661/1964/565/568/8 68/1369/4

**appreciate [3]** 5/1590/4104/15

**approach [1]** 96/3

**appropriate [12]** 15/1218/2024/1234/25 37/444/1744/2572/390/4137/19185/12 187/12

**appropriateness [1]** 140/10

**approval [2]** 28/18

**approved [3]** 39/286/187/9

**approximately [1]** 13/19

**arbitrary [4]** 16/935/837/237/3

**are [261]**

**area [1]** 37/8

**areas [3]** 29/1833/954/19

**aren't [5]** 19/1154/1786/22146/4161/23

**arguably [1]** 14/18

**argue [17]** 6/2015/1522/223/1023/11 55/1461/469/13108/15108/25129/24 136/15137/25139/17164/16165/21 186/25

**argued [4]** 23/2464/1777/25123/2

**argues [6]** 9/2013/2066/13144/15 149/13172/5

**A**

**arguing [15]** 22/1323/2258/658/17 110/24116/11116/13118/15121/7130/2 147/12166/14185/7185/24187/3

**argument [61]** 5/248/158/209/2514/9 14/1016/1817/720/1521/1730/2035/18 37/1339/2243/2146/2246/2451/757/25 60/2261/10114/4117/17117/22117/22 118/19119/1119/1129/9130/12130/16 130/19132/8134/22134/22135/11137/5 137/11138/3147/5175/12180/8183/17 185/3185/14185/19186/15187/7187/20 187/24188/15188/19189/3189/6189/9 189/12189/15189/19189/25190/3190/14

**arguments [7]** 8/178/2297/5116/1 166/23184/20187/9

**arise [1]** 191/22

**around [9]** 36/2253/2476/1380/1184/19 91/796/2116/3163/19

**art [33]** 63/2164/764/864/1664/1765/16 65/2065/2566/266/1066/1170/970/10 70/1570/1670/2170/2573/2473/2574/15 74/1574/1774/1774/2075/275/1576/6 76/17116/25165/9166/10183/13183/15

**articulate [2]** 69/678/4

**articulated [1]** 184/1

**articulating [1]** 112/11

**as [273]**

**ask [29]** 27/2028/228/2276/479/580/5 80/2483/2584/1885/1085/1685/1785/20 85/2586/686/787/287/589/2390/890/12 96/898/6102/25117/8165/6165/7165/18 168/2

**asked [10]** 23/529/154/254/1773/12 83/1784/2397/6166/2172/12

**asking [15]** 84/2585/2186/2087/1 90/1390/1696/4114/15114/17123/23 128/14128/16139/13166/19

**asks [1]** 33/20

**aspects [2]** 73/573/16

**assert [4]** 31/532/17167/15168/24

**asserted [3]** 157/6167/23171/21

**asserting [6]** 48/2561/12168/22187/3 190/7190/10

**assertion [1]** 149/19

**asserts [2]** 180/13180/18

**assessed [1]** 39/16

**assessment [1]** 8/3

**assets [2]** 39/15125/2

**assign [2]** 72/1372/14

**assigned [1]** 39/10

**assistance [1]** 100/22

**assistant [2]** 171/13172/8

**assists [1]** 29/25

**associate [1]** 81/16

**associated [3]** 12/614/1260/3

**associates [1]** 4/17

**association [1]** 47/12

**assume [2]** 47/13164/9

**assumes [1]** 24/4

**assuming [2]** 85/8107/18

**ATLANTA [4]** 2/22/214/4193/6

**attached [4]** 1/5122/16154/10172/23

**attaching [1]** 1/8

**attack [1]** 139/21

**attempt [5]** 17/918/1853/1108/25 162/11

**attempted [2]** 6/19125/13

**B**

**attempting [4]** 7/425/22148/5187/4

**attempts [1]** 173/6

**attention [3]** 84/793/5100/25

**attorney [4]** 8/1621/1228/5117/25

**attorneys [3]** 3/43/73/918/1320/21 169/18170/7170/9

**attorneys' [2]** 18/13190/11

**audience [1]** 144/14

**audio [1]** 93/11

**August [1]** 176/20

**authenticate [1]** 160/25

**authenticated [2]** 161/2161/3

**authenticity [4]** 132/19133/1138/17 160/24

**authoritative [1]** 71/23

**authority [4]** 15/2234/1546/4183/25

**automobile [1]** 16/22

**availability [1]** 80/11

**available [6]** 79/1988/495/17100/10 116/17191/22

**average [8]** 50/1552/1652/2453/253/2 53/2354/970/3

**avoid [1]** 64/15

**awarded [3]** 163/14190/8190/11

**aware [7]** 21/2530/24119/20119/25 122/23125/5131/12

**away [7]** 6/1222/2094/994/995/19 128/11178/13

**awkward [1]** 95/24

**Awnings [1]** 111/24

**axiomatic [1]** 47/8

**back [40]** 19/520/1735/1443/2043/20 45/2145/2453/453/2454/660/2277/19 78/278/678/1578/1586/1388/1388/23 92/896/12105/17112/7116/23125/5 131/14143/16143/21145/8152/15153/15 154/21166/22168/13179/16179/17 179/23180/1186/21192/6

**background [6]** 30/1068/19122/13 180/14180/16184/21

**backwards [1]** 42/20

**bad [1]** 177/15

**Baker [22]** 48/2048/2353/2255/956/3 56/756/2357/958/158/558/759/159/22 60/2161/461/861/961/1161/1562/2363/6 182/22

**Baker's [5]** 52/852/1153/157/2358/25

**balance [1]** 103/6

**Bar [1]** 156/8

**Bard [1]** 128/3

**barred [4]** 121/7125/25130/2185/23

**baseball [5]** 51/351/451/851/1155/18

**based [37]** 6/2415/1622/2224/624/25 25/2327/2234/342/2345/1245/1346/23 62/2116/15125/11129/14130/4130/19 146/9146/16146/17146/17146/18146/22 146/25152/4152/6162/8165/22169/4 170/5170/6173/23174/9174/20186/1 188/20

**basic [1]** 72/15

**basically [6]** 20/556/1673/21129/6 135/16137/11

**basis [14]** 38/2053/1568/1470/794/23 116/9160/1175/17181/7182/12183/5 183/9183/25186/16

**basket [1]** 41/5

**bat [1]** 78/2

**Bates [2]** 149/1172/24

**Bates 11539 [1]** 172/24

**Batson [1]** 81/21

**Batten [4]** 18/618/718/15117/21

**Batten's [1]** 20/17

**batter's [1]** 95/23

**Bay [1]** 156/10

**be [305]**

**bear [2]** 12/1517/3

**bearing [2]** 9/10109/21

**bears [2]** 29/1748/21

**became [1]** 122/23

**because [157]** 5/205/256/126/196/25 7/208/238/259/209/22210/3212/125 14/2515/417/117/517/2318/319/920/10 20/1720/1822/2020/2221/1122/222/6 22/1022/1623/1823/2525/928/828/23 29/1129/1633/2334/1035/135/1735/19 38/1239/1039/2039/2340/1240/1643/25 44/1545/245/845/1149/2250/2154/22 56/1158/1161/561/1861/1862/2463/9 63/1764/564/1365/465/1965/1966/21 68/1969/2270/2477/377/1684/888/5 89/2490/1691/1692/695/895/2397/2 99/25101/10101/11101/24101/24102/6 102/15102/22106/8108/18109/7109/25 111/3111/22112/1113/17114/13114/18 115/6115/9115/11115/11116/4116/16 117/3118/7119/21123/12124/7125/1 127/25128/14129/16132/2135/25138/10 139/10145/17146/14146/15147/1247/23 148/22154/2154/25155/15155/21155/23 158/20159/6159/8159/9161/1161/5 163/8164/10165/17165/24166/2166/21 167/22168/3168/23174/6174/9177/5 177/21178/20178/18178/21182/24184/14 191/11

**become [2]** 26/475/23

**bed [1]** 43/11

**been [51]** 6/59/1514/1217/1118/1744/8 51/1657/171/1277/2578/1286/186/387/9 88/488/789/691/1094/2295/496/697/3 100/17112/15116/116/17100/17/11 117/19120/18120/24122/8124/1125/5 126/6126/6126/7126/11128/25130/22 131/10132/25137/20145/24146/9168/4 168/5168/24186/7186/23186/23187/14

**been -- this [1]** 126/6

**before [48]** 2/1311/712/2014/619/6 22/1932/736/740/544/1644/2047/1252/6 52/677/1578/1879/380/683/1483/2184/3 84/484/2585/191/1093/593/2399/6 102/10102/10104/12105/14106/14108/8 116/10128/19129/6130/1130/20131/8 149/7151/6176/21176/24186/3186/18 186/21191/24

**beforehand [1]** 93/6

**begin [6]** 5/1380/690/1291/1193/593/23

**beginning [3]** 4/1148/20165/19

**begins [1]** 107/12

**begrudge [1]** 160/6

**behalf [3]** 6/342/4145/14

**behind [3]** 84/1794/5129/6

**being [42]** 8/1910/211/2111/2312/10 15/1816/2119/2121/422/122/1325/15 30/1342/1746/2347/347/349/2254/17 58/1466/872/1781/886/890/590/2592/1

**B**

being... **[15]** 100/14117/111/7114/5 118/3119/2156/9157/5161/1161/22 165/14168/9177/180/23190/4/4
**belabor [2]** 108/22161/15
**belated [1]** 121/15125/14
**belief [1]** 162/5
**believe [41]** 13/214/2318/1440/2340/23 41/2554/2076/1279/1279/1279/2489/10 95/1595/1698/25100/7100/13106/17 113/5117/14118/4131/2134/3138/14 139/4144/10151/18152/8153/17162/3 162/7171/23173/12173/18175/19182/7 182/14183/14186/16188/13190/23
**believes [1]** 161/25
**believing [2]** 15/1724/15
**Belkin [1]** 177/20177/22
**Belkin's [1]** 178/2
**below [1]** 24/22
**bench [2]** 95/2296/20
**benefit [1]** 157/17
**best [47]** 9/1625/1925/2125/2226/241/4 41/641/1141/1341/1541/2141/2342/10 42/1142/2242/2442/2543/443/654/18 60/1191/994/19140/4144/11144/21 144/22144/23145/2145/14155/24176/2 176/4177/13177/15177/19178/3178/5 178/6178/14179/1179/1182/5186/4 188/16190/15191/16
**better [5]** 11/1824/1661/1097/2184/22
**between [27]** 9/1112/617/1625/328/19 28/2030/133/146/2052/2358/2066/2 75/1576/21101/20103/6113/20114/20 115/14119/16123/9133/2160/19161/25 166/17176/16178/14
**beyond [4]** 55/355/4117/8187/11
**biased [1]** 174/21
**big [6]** 93/15127/25177/15177/23178/7 178/10
**bigger [1]** 177/20177/21
**binders [1]** 96/13
**bit [6]** 29/2342/2083/489/1499/23 182/17
**bleeds [1]** 8/24
**blinded [1]** 191/15
**blindness [1]** 67/17
**blue [1]** 73/1
**Bob [1]** 4/21
**boils [2]** 11/411/13
**bold [1]** 115/4
**bond [2]** 119/1119/1
**book [7]** 67/1668/169/271/2171/21 71/22148/6
**border [1]** 45/20
**both [18]** 17/1919/919/1053/2254/154/2 55/1558/1082/991/21102/20104/2 105/25127/6176/9178/17188/6191/9
**bottom [6]** 32/636/9155/2155/12159/17 177/11
**bought [11]** 150/6155/4155/9155/10 156/18156/19157/15157/21158/1158/18 159/9
**bound [1]** 110/15
**box [31]** 6/78/1611/220/520/523/11 24/1227/1427/1528/2028/2129/1129/12 29/2252/1884/1684/1793/1994/1498/15 102/25106/9145/23146/5146/5146/7 146/18147/18147/20163/13176/23

**boxes [4]** 28/2030/488/17146/14
**brain [2]** 67/1268/24
**brand [1]** 137/21
**break [17]** 77/1877/2378/1878/2190/19 91/1491/1591/1893/2396/2398/1898/20 100/20102/11102/12103/9143/21
**breaks [1]** 91/12
**Bressler [25]** 63/1363/1464/264/566/6 67/2170/270/1370/2071/472/675/24 75/2476/1979/1579/14162/12162/20 162/23183/4183/5183/6183/11183/19 183/21
**Bressler's [2]** 65/574/7
**brief [23]** 24/2124/2425/925/1034/24 46/2358/965/976/3108/1814/8124/6 124/15137/10139/24140/8142/18148/1 152/18152/19153/5160/14161/18
**briefing [8]** 29/730/1930/2333/2434/19 35/750/2555/2
**briefings [1]** 5/24
**briefly [10]** 41/342/1642/1749/1142/16 142/17142/18148/9152/15157/3
**briefs [1]** 168/12
**bring [13]** 63/588/1393/4100/25107/11 121/4124/10126/8138/24138/24168/3 186/10190/24
**bringing [1]** 91/25
**broad [2]** 60/2586/21
**broaden [2]** 50/2250/24
**broken [2]** 85/21155/5
**brought [5]** 68/669/16120/24138/9 138/10
**Brye [8]** 88/1692/494/21103/16105/16 179/18179/20192/1
**bucket [3]** 12/2313/1013/15
**Budruck [1]** 142/4
**Budruk [1]** 153/18
**buffers [2]** 65/2165/22
**building [1]** 91/16
**bullying [1]** 78/17
**bunch [2]** 145/10156/21
**burden [7]** 29/929/1748/2168/569/17 74/18186/9
**burning [1]** 78/17
**business [12]** 27/1827/2228/834/17 161/10174/24175/15177/24178/3178/8 178/10188/6
**buy [49]** 9/1625/1925/2125/2226/241/4 41/641/1141/1341/1541/2141/2342/10 42/1142/2242/2442/2543/6140/4144/11 144/21144/22144/23145/2145/3145/4 145/14155/24158/3158/14158/15158/20 158/23159/4176/2176/4176/5177/13 177/15177/19178/3178/5178/6178/14 179/1179/1182/5188/16190/15
**buyers [1]** 145/1
**buying [3]** 147/24177/12178/25
**buyout [2]** 176/2190/14
**buyouts [1]** 176/9

**C**

**cable [1]** 145/22
**cafeteria [1]** 91/16
**calculating [1]** 153/1
**California [1]** 148/4
**call [12]** 4/87/147/1515/671/1597/3 102/6127/12159/15171/23192/1192/1
**called [14]** 12/1322/1751/663/164/13

107/3114/16123/5128/7137/6153/2 153/23164/24172/14
**calling [1]** 61/24
**calls [2]** 138/17155/8
**came [2]** 29/7178/24
**campaign [2]** 137/139/13
**campaigns [1]** 188/1
**can [134]** 7/168/98/1812/2222/222/3 23/824/630/330/830/830/1533/636/15 36/2336e/2537/1143/1045/445/1646/24 46/2547/947/1348/150/2352/1754/11 54/1557/2060/960/1760/1861/2266/15 71/272/2475/1677/1980/2081/1384/20 86/2387/787/891/791/1993/593/1994/9 95/1796/2397/197/697/797/1098/498/6 98/1498/1898/2299/1399/21100/21 101/2101/14101/16102/4102/11102/17 103/11103/11104/2104/23105/11105/12 105/16105/18106/21106/24107/11 107/17108/14108/24113/19114/8117/16 120/14121/4123/5124/21126/15126/18 128/10130/18132/4132/11137/23137/25 138/1140/8140/8140/15143/4143/20 143/21144/21145/7148/9148/17149/4 149/21152/3152/15153/1153/12154/8 154/16154/23155/13157/7160/20161/2 164/6164/20167/16168/18176/18178/18 179/15186/22186/22191/12192/1
**can't [27]** 7/18/710/2511/1421/733/17 50/2150/2250/2367/969/670/2591/17 93/1394/25102/1107/1107/19108/6 108/7108/24142/3149/6149/22176/24 176/25191/5
**cancel [1]** 52/5
**canceled [1]** 51/12
**cancellation [1]** 49/7
**candid [1]** 191/10
**Canes [1]** 156/8
**cannot [7]** 20/322/495/13106/22157/23 157/24168/1
**capable [2]** 174/11174/18
**capitalize [1]** 176/11
**car [7]** 57/658/658/1358/2073/1873/19 73/19
**card [3]** 36/1036/2136/22
**care [3]** 24/2248/2182/2
**career [1]** 71/8
**careful [3]** 32/25160/9165/10
**carefully [2]** 44/1085/7
**cares [1]** 144/13
**CARLSON [9]** 3/54/2126/1042/2245/6 48/397/25108/4117/7
**Carpet [1]** 111/23
**carried [2]** 9/1810/16
**carry [2]** 15/2436/22
**carve [1]** 20/8
**case [157]** 4/84/106/1010/215/215/3 15/315/415/1415/1416/618/618/2319/18 20/1722/923/1323/2524/1524/1625/3 33/2234/934/2034/2335/2336/237/537/7 39/639/840/1546/747/1651/151/1351/14 51/1551/1656/2162/2063/1065/1069/19 83/1984/1387/1887/2087/2295/1496/14 97/1598/399/1799/19100/11104/21 105/4105/5107/20110/25111/3111/6 111/16111/18111/20112/10112/17 114/21115/17117/19117/20118/9118/9 119/21120/10121/19121/19122/5122/5

**C**

**case... [77]** 123/6123/8124/10124/12
124/21125/1125/19125/20125/22126/6
126/15126/20128/2128/5128/10129/3
129/4129/14129/14130/8132/14132/15
132/22139/5140/10140/14141/11142/4
146/1147/23148/3148/10148/15148/19
148/25149/14149/18149/25150/14151/9
151/25155/1155/16156/22157/15160/2
160/7161/16161/18163/9163/17163/24
164/24166/16167/2167/13167/16167/19
167/21167/24168/4168/14174/5174/7
175/3175/10175/13175/15177/16179/8
179/8179/10183/3186/11187/18189/4
193/10
**Case Number [1]** 193/10
**cases [19]** 15/2516/418/1766/2366/24
69/2183/7120/14123/3123/14123/16
140/19141/13148/2148/16156/7156/7
160/13183/1
**cashier [1]** 145/7
**cast [2]** 173/6177/14
**catalog [1]** 109/22
**cataloged [1]** 108/19
**cataloging [1]** 148/2
**catalogs [2]** 65/23109/3
**categories [1]** 40/22
**category [1]** 86/25
**caught [1]** 95/5
**causation [1]** 40/17
**cause [9]** 22/1188/688/888/11118/9
168/20168/20176/20176/15178/12
**cease [1]** 151/3
**Cenatempo [1]** 188/23
**Cenatempo's [3]** 151/20152/5152/16
**center [2]** 43/143/3
**central [2]** 6/20148/3
**centrifuges [1]** 12/4
**certain [7]** 50/1875/10156/12162/10
162/25184/15188/4
**certainly [22]** 30/830/1530/2333/533/7
34/934/1734/1738/1638/1761/22113/11
113/13113/20120/1120/2120/14146/10
149/153/11157/14183/16
**certainty [1]** 191/13
**certificate [2]** 121/13193/1
**Certified [1]** 1/14
**certify [1]** 193/6
**CFR [1]** 50/3
**chains [1]** 9/15
**challenge [1]** 186/13
**challenges [3]** 88/988/1188/14
**challenging [6]** 49/1463/1379/14
147/15160/4186/17
**chance [1]** 166/20
**change [9]** 5/1546/1950/2152/2254/14
61/9125/3125/5131/12
**changed [3]** 126/7126/11141/1
**changes [3]** 61/561/6102/9
**chapter [1]** 119/9
**characterizations [1]** 125/21
**characterize [2]** 19/125/12
**characters [1]** 45/20
**charge [1]** 44/17
**charger [4]** 55/2158/758/1358/21
**charging [1]** 57/6
**CHARLENA [1]** 3/8
**Charlotte [1]** 5/3

**check [10]** 101/9101/15101/21102/1
104/9104/20106/21106/21106/22107/2
**chemist [1]** 69/22
**chess [1]** 89/2
**chief [13]** 56/2162/2063/1097/1598/3
99/1799/19100/19100/11105/4105/5132/22
183/1186/11
**childcare [1]** 90/17
**Chin [5]** 173/21174/13174/24175/8
190/6
**Chin's [2]** 43/1174/20
**China [6]** 24/2325/425/525/1325/16
182/3
**Chinese [6]** 40/740/1943/9101/8104/11
106/18
**choose [2]** 47/1388/25
**choosing [2]** 176/22176/23
**chop [2]** 55/1455/17
**chores [1]** 82/7
**chose [1]** 67/8
**Chuck [2]** 172/2172/4
**chunk [3]** 177/23178/2178/10
**cigarette [1]** 57/7
**circle [1]** 78/15
**Circuit [19]** 9/29/1811/1715/2018/20
22/2334/2134/2244/364/1264/23112/11
160/7163/24167/12167/13167/19174/5
175/5
**Circuit's [3]** 10/154/22116/7
**circumstances [1]** 43/7111/11160/20
**circumstantial [1]** 179/2
**citation [1]** 35/15
**cite [13]** 1/515/234/2467/971/20112/10
123/3141/13148/24149/18156/8167/23
177/4
**cited [13]** 18/734/1937/2151/1660/1
67/14119/6156/9160/14160/14164/24
175/10179/8
**cites [1]** 67/1267/1673/10118/2123/14
125/19168/11
**citing [2]** 35/6161/18
**civil [3]** 2/583/787/22
**claim [8]** 55/2117/3132/2132/2136/2
150/23167/17187/22
**claimed [8]** 64/1665/1666/1166/1271/1
76/17142/19183/12
**claims [11]** 30/6121/8130/3131/24
132/1149/22149/23185/26185/26108/17117/17
189/3
**clarification [1]** 134/5
**clarified [1]** 123/9
**clarify [2]** 134/12135/10
**clarifying [1]** 55/11
**clarity [1]** 100/5
**class [21]** 14/1114/1314/1514/1714/1
14/1914/2117/817/2019/931/1432/333/2
35/1760/2361/1117/19118/13118/17
181/15185/15
**Class 09 [1]** 19/9
**Class 9 [17]** 14/1114/1314/1514/17
14/1714/1914/2117/2031/1432/333/2
60/2361/1117/19118/17181/15185/15
**classified [1]** 57/20
**classify [1]** 53/18
**Clay [1]** 167/18
**Cleaning [1]** 111/24
**clear [18]** 7/1122/2343/1145/1592/21
114/13116/23128/13136/14154/25156/7

156/8156/13164/5166/9169/20174/2
176/24
**clear-cut [2]** 156/7156/8
**clearer [1]** 72/24
**clearly [9]** 147/20156/10169/9171/19
172/4172/17173/24174/21183/6
**clerk [2]** 39/1139/14
**Clerk's [1]** 107/9
**client [2]** 36/636/17
**client's [1]** 119/25
**clients [2]** 191/11191/16
**clip [1]** 102/9
**clips [1]** 102/16
**clock [1]** 85/23
**close [14]** 32/2533/1376/2290/1590/19
93/893/1294/797/3151/6154/6166/15
186/18187/7
**closed [1]** 129/16
**closely [2]** 165/24166/24
**closeness [2]** 113/19170/3
**closer [7]** 66/1171/172/572/2576/9
121/4126/8
**closes [1]** 91/16
**closest [1]** 74/15
**closing [3]** 93/2197/5116/2
**closings [1]** 94/15
**CM [1]** 1/21/3
**CM/ECF [1]** 1/21/3
**Coast [2]** 167/25168/2
**Code [2]** 49/2250/2
**coexist [2]** 19/943/25
**coexistence [4]** 33/1137/1438/3185/20
**coexisting [2]** 17/7181/18
**cognac [2]** 15/533/23
**cognizant [2]** 36/1087/10
**cohesiveness [1]** 170/3
**coin [2]** 124/23144/6
**coined [1]** 10/7
**collateral [2]** 6/1010/6
**colleague [2]** 82/484/18
**collectively [1]** 170/18
**colorable [1]** 186/16
**COLTER [3]** 2/19193/4193/18
**column [1]** 66/16
**combined [2]** 100/14111/23
**come [27]** 33/1843/1946/749/253/1
62/2378/278/683/1590/1390/25137/12
138/1140/15140/16146/15147/7147/10
156/12157/12161/17170/5173/25179/16
179/17179/23191/2
**comes [11]** 22/822/2023/1841/17107/5
118/5127/24147/7148/8172/5186/21
**coming [9]** 8/2511/616/2524/2553/24
58/8137/14152/20174/11
**comment [5]** 35/5116/15117/10137/18
156/9
**commentary [3]** 74/24101/11101/16
**comments [1]** 42/16
**commerce [2]** 22/722/8
**commercial [9]** 14/615/1515/2116/14
17/417/543/2447/2354/12109/2109/6
109/25110/9181/8
**commercially [1]** 14/314/2415/19
**common [17]** 35/2050/1051/2452/8
54/1254/1955/355/755/2457/1160/560/6
60/1373/1686/7118/25165/25
**commonality [2]** 165/3166/6
**commonly [1]** 53/12

**companies [16]** 24/2227/2440/740/19 145/3164/21165/24166/5166/14166/17 166/24169/21169/23170/7170/22191/7

**company [15]** 9/119/239/2310/24161/7 161/11163/6163/19169/23171/1171/23 172/3172/7177/21190/1

**company's [1]** 175/2

**comparable [1]** 128/10

**comparators [1]** 19/14

**compare [2]** 20/10142/3

**compared [1]** 142/1

**compares [3]** 74/1474/22183/12

**comparing [2]** 19/773/18

**comparison [3]** 31/8142/8178/14

**comparisons [1]** 20/10

**compatible [2]** 54/892/1

**compete [8]** 177/2177/5177/10178/9 178/18178/18178/24179/3

**competes [1]** 10/10

**competing [1]** 176/5

**complaint [16]** 39/740/13119/22122/22 137/19138/3151/23167/15167/23168/1 168/6168/13168/16168/20169/4169/9

**complaints [1]** 28/1

**complete [2]** 95/2162/9

**completed [1]** 88/7

**completely [1]** 45/10119/12

**completeness [2]** 80/3147/14

**complicated [2]** 89/2126/5

**comply [1]** 49/19

**component [2]** 14/1816/11

**components [2]** 32/1071/19

**comprised [1]** 170/1

**computer [11]** 2/1710/1112/215/10 32/1532/1532/2035/1653/1761/4113/6

**computer-aided [1]** 2/17

**computers [3]** 10/1160/2461/2

**computing [1]** 35/20

**conceding [1]** 43/18

**concept [6]** 9/19/59/2022/172/1114/5

**concepts [2]** 31/343/22

**concern [7]** 6/1363/5127/127/14 137/13162/15165/13

**concerned [3]** 115/25116/1136/10

**concerning [2]** 42/2181/18

**concerns [2]** 6/1728/15

**conclude [2]** 21/1640/2

**concludes [2]** 6/2575/1

**concluding [1]** 53/15

**conclusion [16]** 14/117/1921/821/10 35/244/1152/1162/1763/7111/10112/12 112/20112/22170/5174/11189/21

**conclusions [4]** 24/744/6181/24183/22

**conclusive [1]** 38/16

**conduct [3]** 25/3163/15182/2

**conference [3]** 5/1280/1695/16

**conferences [1]** 96/20

**conferring [2]** 121/22124/9

**confidence [1]** 27/2

**confined [2]** 111/3178/23

**confirm [3]** 94/21117/16169/24

**confirmed [3]** 56/1358/1259/3

**confirming [1]** 76/14

**confirms [1]** 76/10

**conflation [1]** 30/20

**conflict [2]** 85/385/4

**conflict-related [2]** 85/385/4

**conflicts [1]** 173/7

**confuse [15]** 15/1720/624/1552/954/12 55/2363/21142/14170/15176/14176/22 177/2177/6177/9178/4

**confused [6]** 6/1620/366/5118/13 140/16140/19142/12145/15155/19156/6 156/14158/13159/24

**confusing [12]** 22/2041/641/744/13 55/1356/277/1116/5157/23160/15 164/14165/15

**confusingly [2]** 39/2139/23

**confusion [58]** 6/86/1111/518/318/19 18/2219/1119/1220/720/1621/1121/14 23/2338/738/1140/343/2544/246/646/9 112/12112/13118/17119/16120/21 120/23137/22139/11139/17139/18 140/24141/5141/7141/15141/16119/19 142/20143/6143/7143/11144/13144/15 144/16146/8146/16146/22147/25148/7 155/17158/4160/8160/17161/19166/2 170/9176/12176/16178/12

**Congress [1]** 39/10

**conjunction [2]** 47/7143/24

**connect [2]** 47/11163/6

**connected [5]** 26/2226/2352/1557/20 59/11

**connection [4]** 49/13122/12151/2 193/11

**connector [1]** 36/8

**connotes [1]** 51/11

**consider [7]** 39/2043/644/1972/16 75/10110/12139/11

**considerable [1]** 28/17

**considerably [1]** 112/2

**consideration [3]** 11/2174/4112/21

**considered [5]** 45/445/472/2111/7 130/11

**considering [3]** 44/19183/14191/16

**considers [3]** 35/271/22181/12

**consistent [3]** 58/458/1464/3

**consistently [1]** 71/16

**constitute [1]** 59/8

**constitutes [1]** 148/6

**constitutional [5]** 123/3123/11123/15 123/18125/17

**constrain [1]** 152/5

**construction [1]** 55/3

**consultant [1]** 27/23

**consumer [19]** 24/2245/1453/271/8 137/22140/8140/14143/6143/7143/11 144/13144/21144/22145/18160/9161/24 180/11183/23188/4

**consumers [5]** 71/10144/16144/17 144/18145/14

**consuming [3]** 9/1134/536/14

**contacted [8]** 157/7157/10157/16 157/20158/3158/5159/7159/11

**contain [1]** 162/10

**contemplated [1]** 114/11

**contend [2]** 58/21139/7

**contending [1]** 59/22

**content [2]** 46/18113/8

**contention [2]** 58/25182/7

**contentions [1]** 21/3

**contested [2]** 134/1149/14

**contesting [1]** 185/3

**context [11]** 35/7114/12120/12122/10 140/17141/23142/6142/11180/11182/11

**contextualize [1]** 76/1

**continues [1]** 76/13

**continuous [2]** 116/16

**continuously [1]** 116/17

**contract [1]** 25/15

**contradicting [2]** 57/2458/15

**contrary [5]** 33/239/9125/21131/10 186/12

**contrast [1]** 53/6

**control [6]** 3/832/23184/10191/8191/9 191/12

**controls [1]** 32/20

**controversial [2]** 101/18135/18

**conversation [2]** 184/18191/14

**conversations [1]** 191/10

**conversion [1]** 58/19

**convert [2]** 57/457/7

**converts [5]** 53/1356/1256/1759/10 59/20

**convey [1]** 57/10

**convince [3]** 19/2534/8169/22

**Cooper [1]** 73/21

**coordinated [1]** 95/15

**coordinators [1]** 83/17

**copied [1]** 173/22

**copies [4]** 26/1483/1884/2148/5

**copy [15]** 26/1527/679/1994/16107/18 110/15116/22117/16119/22174/16 174/19178/18178/24179/5179/5

**copycats [1]** 151/7

**copying [3]** 175/2178/19179/9

**copyright [16]** 6/86/96/2311/313/13 27/2428/2029/1029/1329/1645/1163/25 64/475/5165/24180/11

**copyrighted [1]** 163/13

**core [1]** 7/8

**Corp [4]** 113/15167/25175/4189/16

**corporate [3]** 166/3172/9173/11

**corporation [4]** 2/44/942/4193/9

**correct [38]** 13/1721/1921/2052/15 56/2262/2170/1789/7106/25115/21 115/22115/22116/13118/21119/15120/8 130/17131/15131/16133/7133/12133/23 133/25135/17137/2138/8138/9138/13 152/10152/12153/17166/11173/16 175/20175/21175/23175/25148/13

**correction [3]** 121/12121/13131/15

**correctly [1]** 130/14

**costs [1]** 190/12

**could [36]** 14/2315/2315/2319/519/5 22/1924/1534/234/544/1044/2247/7 52/1960/2473/1277/2379/1688/2497/2 103/3104/23118/7125/12125/13128/18 141/7146/3146/9156/16156/22158/11 158/12158/22163/15165/25172/14

**counsel [22]** 4/114/184/235/158/18 85/2386/986/1086/1386/1588/890/21 91/2192/1695/4116/1117/7118/15 131/1138/13160/19173/9

**counsel's [1]** 96/15

**count [4]** 7/147/177/1830/3

**counted [1]** 6/24

**counter [4]** 63/6104/20104/24105/7

**counter-designations [3]** 104/20 104/24105/7

**counterclaim [2]** 136/8137/9

**counterclaims [1]** 187/17

**C**

**counterfeit [3]** 150/7158/25190/4
**counterfeiting [1]** 30/5
**counting [9]** 7/97/207/257/2513/313/7 30/130/345/6
**counts [1]** 22/11
**County [1]** 4/4
**couple [6]** 27/427/1171/2090/22146/2 149/4
**course [8]** 8/934/1446/1171/8180/17 182/2182/2186/24
**court [77]** 1/31/71/91/121/142/12/204/5 10/1316/2316/2534/2135/335/1135/14 35/1635/2539/1039/1139/1339/1444/17 44/2045/149/652/657/1557/1657/2276/4 80/1384/2389/1291/1193/994/195/14 96/2498/1098/1103/13103/14104/10 106/4109/14109/24111/8111/17112/17 112/19117/8122/12123/8123/9123/24 129/13129/15129/21130/3131/3141/24 164/21164/24165/1167/14167/16167/21 167/25169/2171/20185/25188/3190/25 193/4193/5193/8193/19
**Court's [6]** 35/936/449/8106/23106/25 111/10
**courtesy [1]** 94/16
**Courthouse [1]** 2/20
**courtroom [15]** 26/2583/1584/1592/2 93/994/1395/495/2095/2295/2396/3 107/20142/2190/20191/4
**cover [1]** 110/1
**covers [3]** 61/177/6120/7
**CR [1]** 128/3
**cranky [1]** 91/18
**CRC [2]** 2/19193/18
**create [6]** 70/2476/20151/3170/8172/12 172/14
**created [3]** 9/10171/12172/13
**creates [1]** 110/10
**creation [1]** 28/18
**creative [8]** 1/9436/1736/1836/23 46/2247/451/776/20
**Credit [1]** 167/24
**criteria [1]** 113/22
**criterion [3]** 10/1811/1914/6
**critical [2]** 19/1392/10
**Critically [1]** 28/22
**criticism [2]** 61/1261/16
**cross [19]** 8/724/1124/1130/1533/6 33/1637/1237/1738/1838/2138/23 105/17113/11113/19117/20124/10/15 134/19135/6183/17
**cross-examination [6]** 33/1638/18 38/21113/11120/15183/17
**cross-examine [8]** 8/724/1124/1133/6 37/17117/24134/19135/6
**cross-examined [4]** 30/1537/1238/23 113/19
**cross-reference [1]** 105/17
**crossed [2]** 19/1327/1
**crosses [2]** 26/3117/11
**CRR [2]** 2/19193/18
**Crystal [1]** 81/21
**cumulative [2]** 89/889/25
**cumulatively [1]** 110/4
**cured [1]** 180/15
**current [4]** 58/1958/1959/2059/21
**curricula [1]** 71/17

**curriculum [1]** 71/25
**cushion [1]** 83/5
**customer [11]** 42/2140/1140/13150/7 157/10157/10157/13157/20159/7160/15 161/20
**customer's [1]** 142/22
**customers [2]** 71/10150/4
**cut [3]** 90/19156/7156/8
**Cutler [1]** 156/10
**cutouts [1]** 149/5
**cv [3]** 2/64/10193/10

**D**

**daily [1]** 94/23
**damages [14]** 40/1240/1740/2240/25 134/8134/9134/11135/11136/16136/21 148/21148/22150/16190/9
**damaging [1]** 22/20
**Dan [1]** 152/16
**Daniel [1]** 190/6
**Daniel Chin [1]** 190/6
**data [5]** 34/2335/2136/3112/10113/15
**database [1]** 44/1
**date [7]** 114/3136/16136/22151/17 154/23178/20185/6
**dating [1]** 114/11
**Daubert [6]** 33/2048/2048/2257/25 63/14108/21
**DAVID [2]** 3/34/16
**day [23]** 42/347/2448/1277/1677/21 78/478/1591/391/791/1392/894/2094/22 95/295/1098/1126/12155/3166/7187/14 190/18191/3193/14
**days [3]** 1/494/2395/14
**DC [5]** 53/1356/1256/1757/457/4
**deadline [1]** 164/7
**deal [3]** 29/1138/1752/23
**dealing [3]** 40/740/1942/3
**dealings [1]** 182/3
**deals [1]** 114/2
**dealt [1]** 174/5
**debate [2]** 46/2054/21
**decade [1]** 180/10
**decal [1]** 74/3
**December [3]** 126/22131/20176/19
**December 19th [1]** 176/19
**decide [13]** 37/141/1854/1754/1865/23 86/11123/23128/5128/6128/18128/23 128/23146/13
**decided [2]** 92/19159/2
**decides [1]** 160/18
**deciding [1]** 48/24
**decision [16]** 10/119/1020/221/1322/24 46/646/951/151/1559/2578/178/479/7 111/15116/7184/23
**decisions [16]** 11/617/1018/118/13 18/1520/1820/2021/538/445/2548/12 77/20103/8144/24145/14181/19
**deck [2]** 47/1495/23
**declaration [5]** 43/1122/3122/7122/8 173/5
**deemed [1]** 90/4
**defend [2]** 12/825/23
**defendant [3]** 22/2136/22187/3
**defendant's [3]** 148/5172/25160/7
**defendants [32]** 2/94/215/15/36/652/21 83/1188/2292/1792/24114/5114/10 114/14121/7121/14132/8136/1153/7

170/14170/20170/21171/3181/10182/20 183/9183/22183/5185/713185/18185/23 187/19187/23
**defendants' [2]** 48/20173/10
**defense [15]** 22/2224/2525/286/10 86/14100/7122/20122/20122/25123/1 125/11125/16126/14130/1187/15
**defenses [2]** 149/15186/25
**defensible [1]** 147/12
**defer [5]** 17/1019/2541/997/8102/4
**deference [2]** 38/17132/12
**define [2]** 54/2455/24
**defined [2]** 9/153/9
**definitely [2]** 55/989/23
**definition [19]** 11/953/253/453/1453/20 54/1356/1456/1656/1958/458/858/13 58/1458/1859/159/259/1459/18171/4
**definitions [1]** 53/4
**degree [3]** 28/1252/20110/19
**deliberate [1]** 83/4
**delimiting [2]** 14/2014/22
**delineate [1]** 143/10
**deliver [1]** 57/2
**delivery [4]** 55/2256/2556/2558/6
**Delta [2]** 17/117/1
**demonstrated [1]** 17/22
**demonstrates [1]** 15/19
**demonstrative [1]** 93/3
**denial [2]** 149/23150/23
**denied [24]** 180/7180/24181/9181/22 182/5182/23183/5183/6183/10185/4 185/8185/16185/21188/6188/16188/24 189/7189/10189/13189/21189/23190/1 190/6190/15
**denies [1]** 149/22
**denote [2]** 170/1170/2
**deny [2]** 38/11144/23
**denying [3]** 11/24169/8182/9
**depend [1]** 63/10
**depending [4]** 61/790/1898/1186/20
**depends [2]** 87/20164/19
**deposed [1]** 142/5
**deposition [20]** 56/1358/1259/368/2 70/1473/11100/18100/22100/23101/12 101/20101/23101/25102/7102/15102/23 103/10104/9105/4105/14
**depositions [9]** 99/25100/12100/13 101/7102/18102/20103/5107/7107/10
**depth [1]** 50/15
**describe [1]** 60/5
**description [2]** 53/960/10
**descriptive [12]** 9/716/635/1935/2436/3 36/1636/2537/646/2547/760/14113/6
**design [29]** 63/1964/364/1665/1766/11 66/1266/2166/2166/2367/667/767/25 71/171/571/671/1371/1571/2376/16 76/17101/8121/13127/22127/23131/18 131/25183/7183/8187/21
**designate [1]** 105/9
**designations [5]** 100/1102/5104/20 104/24105/7
**designer [1]** 75/9
**designing [1]** 53/17
**designs [6]** 64/1165/2470/12183/13 183/23189/16
**desist [1]** 151/3
**despite [2]** 38/1439/2
**detail [2]** 73/3153/10

D

**details [3]** 71/773/799/7
**determination [7]** 14/645/1245/1347/23 99/6128/9132/19
**determinations [1]** 165/16
**determine [10]** 9/441/1249/649/870/12 119/15138/19141/20142/10160/11
**determined [5]** 7/352/13111/18164/21 170/22
**determining [5]** 55/786/22118/6174/3 174/18
**device [15]** 35/2235/2236/452/1553/11 58/1158/2359/959/2064/1871/171/19 74/274/374/6
**devices [13]** 32/2343/453/1857/257/5 57/1257/1858/5159/1674/2374/25 91/25
**devoted [1]** 110/3
**did [38]** 17/2417/2531/2333/638/1940/3 40/640/1846/2053/1359/267/1179/10 105/8122/19122/24124/15128/5128/5 128/8134/24135/24136/20140/24149/19 151/17155/20158/3158/14158/14158/15 158/16158/18158/20162/7168/2168/24 187/20
**didn't [31]** 21/221/1229/1729/2236/21 38/1840/2140/2146/147/1065/1181/7 97/24100/2111/25112/7129/17130/10 131/17141/6141/6143/11143/18143/19 143/19152/12162/23163/10164/15 167/15183/25
**difference [5]** 29/1974/2576/21101/20 123/9
**differences [25]** 6/247/17/67/107/17 7/218/18/1413/413/728/1628/1928/24 29/229/2030/130/730/1245/745/2263/25 64/266/267/176/7
**different [24]** 16/2542/2447/1947/20 47/2155/1859/1664/1065/1567/169/7 73/9105/25106/1119/12134/22134/25 150/1152/24170/13170/21175/11175/14 177/3
**differently [1]** 5/19
**difficult [3]** 15/638/22101/12
**dig [1]** 127/3
**digging [1]** 131/22
**digital [1]** 32/11
**diligent [1]** 25/15
**diligently [1]** 160/9
**Dillion [5]** 154/1154/13154/21155/1 189/10
**dilutive [1]** 12/9
**dimension [1]** 102/22
**diminish [2]** 111/20111/25
**dire [2]** 78/1289/5
**direct [5]** 35/2458/1959/2173/14104/23
**directed [3]** 74/8108/18130/18
**direction [2]** 28/1494/11
**director [5]** 49/2049/2550/250/750/12
**directors [1]** 165/4
**disagree [3]** 102/2132/5177/7
**disagreement [1]** 153/14
**disclosed [2]** 151/19151/24
**disclosure [1]** 188/21
**discount [2]** 75/1775/20
**discovered [1]** 127/3
**discovery [4]** 129/16151/17164/23 165/1

**discrepancies [1]** 94/23
**discrete [1]** 121/9
**discretion [1]** 128/22
**discuss [5]** 89/5101/2105/23153/20 177/20
**discussed [9]** 5/1996/25108/20113/3 115/7120/12133/9153/18157/3
**discussion [9]** 35/1341/2067/1667/23 96/24110/20112/5161/16177/12
**disgorgement [1]** 148/20
**diskette [1]** 14/14
**dismiss [2]** 126/24130/24
**dismissal [1]** 187/17
**dismissed [1]** 189/3
**dismissing [1]** 137/8
**dispute [12]** 19/2422/223/3107/17 110/23112/22115/14115/16124/15 126/20132/17150/18
**disputed [5]** 121/24123/21124/3124/4 124/6
**disputes [1]** 129/12
**disrupted [1]** 122/6
**dissimilar [4]** 66/966/2066/2575/16 76/23
**dissuade [1]** 164/4
**distant [1]** 112/3
**distinct [3]** 112/3124/18167/14
**distinction [2]** 58/20120/11
**distinctive [1]** 111/19
**distinguish [1]** 179/8
**distinguishing [1]** 75/23
**distorts [1]** 45/10
**distraction [1]** 24/14
**distributor [1]** 147/24
**District [9]** 1/142/12/1128/2128/4 141/24148/4193/5193/5
**DIVISION [1]** 2/2
**do [112]** 6/66/67/157/169/2510/1113/22 14/1715/1515/2516/1518/219/2120/4 21/921/2424/1825/525/2226/136/12 37/1039/1739/2440/640/1841/2246/3 48/349/2553/2054/2054/2454/2557/3 59/1660/2163/2364/170/277/2278/4 79/2279/2280/2383/183/985/1787/8 87/1587/1688/1288/1388/1688/2389/19 92/1193/2294/996/2597/1298/1298/14 99/1399/22100/23101/4101/11102/1 102/24103/1103/11103/17104/23104/23 107/9108/5108/12108/23113/21115/2 119/13121/23126/16127/19128/13 128/19129/12131/5134/10136/18138/4 142/8144/9147/16153/3156/17156/23 160/24165/6165/21168/15170/21174/17 174/20177/2179/5181/17186/10186/19 191/25193/6
**Doc [1]** 164/21
**docket [10]** 1/679/1179/2480/482/17 114/9122/9122/11122/12125/8
**docketed [1]** 148/1
**document [1]** 1/982/19151/22
**documents [1]** 173/11
**does [66]** 7/28/139/129/1912/2313/21 18/2519/2320/1024/527/1928/1128/11 28/2429/1235/438/440/1141/941/2547/5 49/250/153/153/553/654/1358/2259/8 61/762/2366/2168/2471/2072/672/9 72/1172/1372/1373/874/1074/2174/21 81/591/693/16111/2112/12117/5117/6

**in [1]**126/2131/24139/16139/16145/8
**P[1]/[1]/[1]/[1]/[1]**
**150/2154/3154/17154/162/10166/12**
**172/17173/9184/15190/16**
**doesn't [51]** 17/317/1817/2520/2423/9 25/2525/2527/1331/534/943/1944/11 44/1247/647/1147/1149/2350/150/6 52/1954/2366/2567/268/1468/1568/19 69/569/876/792/3113/14113/21114/19 114/19127/25134/24135/3140/16147/11 155/18158/8166/25166/25167/1167/2 167/3172/6175/8177/5177/9178/22
**doing [26]** 7/198/128/138/128/728/7 36/1237/1158/2159/1466/666/768/23 70/1676/2382/689/1394/24103/7104/13 104/17106/9127/6144/24160/3192/6
**dominance [1]** 16/1
**dominant [10]** 16/1016/1134/1634/19 37/638/139/4112/16112/25120/18
**don't [130]** 9/1611/2515/1715/1721/6 23/1824/1125/125/225/925/1125/17 27/1928/228/2239/2039/2239/2440/11 40/1141/141/1742/543/1644/1546/23 47/448/1352/1753/1956/361/161/264/24 65/765/1869/279/1079/1279/1380/24 80/2581/183/783/2286/686/2587/587/6 87/787/1987/2389/689/2591/491/2293/6 94/494/695/695/796/896/2096/2298/17 98/1798/2398/25101/18101/19105/1 105/17110/23112/21114/22114/24 114/24116/14116/17118/4118/10 118/10124/7124/7126/17129/24130/6 130/9134/3134/3134/11134/20134/23 135/17135/22135/24136/10136/10 137/11138/23139/11143/10144/22 149/14150/17151/10153/20154/14 155/12155/25156/3156/15156/23157/19 158/17159/10160/6161/15162/14165/16 166/11166/9169/10171/3177/1177/6 182/7191/8191/15
**done [19]** 6/199/730/337/2538/1639/13 39/1640/740/1971/876/1980/1581/983/9 88/1590/2495/14131/16162/13
**Donlin [1]** 175/3
**doodad [2]** 36/836/20
**door [4]** 48/8137/12137/25138/15
**dots [1]** 47/12
**double [1]** 159/16
**doubt [2]** 157/17173/6
**down [11]** 11/411/1350/1860/1985/4 85/2188/1889/13102/22105/10107/5
**downstream [4]** 57/2057/2058/2359/10
**Dr [1]** 56/13
**Dr. [29]** 53/753/856/756/856/956/10 56/2356/2457/957/2358/158/358/558/7 58/858/1258/2559/159/1959/2261/25 62/662/1462/1562/2362/2363/672/6 75/24
**Dr. Baker [10]** 56/756/2357/958/158/5 58/759/159/2262/2363/6
**Dr. Baker's [2]** 57/2358/25
**Dr. Bressler [2]** 72/675/24
**Dr. Franzon [8]** 53/753/856/1056/24 59/1961/2562/662/22
**Dr. Franzon's [7]** 56/856/958/358/8 58/1262/1462/15
**drag [1]** 118/9
**dress [10]** 6/2313/1345/11145/25146/5 146/10146/18146/23176/23180/11

# P

**drink [1]** 34/12
**drive [30]** 2/2110/1915/1416/616/8
16/1235/735/1635/2035/2436/236/15
36/1636/1736/1836/1836/1836/2336/23
36/2537/246/2246/2447/347/447/747/8
94/19113/4181/14
**drives [1]** 12/4
**driving [1]** 16/22
**drop [2]** 159/1179/1
**dropped [2]** 105/11163/25
**ducks [1]** 77/24
**due [1]** 104/9
**dump [1]** 149/7
**during [22]** 41/2142/771/773/1484/10
90/2291/1293/393/2295/396/1999/16
100/10108/21110/19113/3128/15137/10
139/13165/14181/25186/11
**duties [1]** 172/12
**duty [7]** 11/1112/1312/1312/2439/11
39/17134/9
**DVD [2]** 14/1314/14

# E

**each [27]** 37/2452/1556/172/1474/22
75/176/681/1183/1084/285/2088/17
88/2094/2095/1696/1597/7100/3106/16
106/16111/8121/14121/16123/3123/14
149/22170/10
**eager [1]** 23/10
**earlier [14]** 10/1318/775/479/590/25
106/7111/15117/21126/1126/2131/8
149/11157/3163/1
**earliest [1]** 102/6
**early [6]** 22/1723/2090/1391/1101/23
151/24
**earphones [1]** 93/10
**earplugs [1]** 93/10
**easier [1]** 94/2299/14
**easiest [1]** 94/18
**East [2]** 167/25168/2
**East Coast [2]** 167/25168/2
**easy [2]** 93/24102/16
**ECF [10]** 1/21/36/239/1467/15108/3
112/9144/5149/21154/12
**economic [1]** 72/1
**economics [1]** 71/24
**economist [1]** 72/2
**edit [1]** 101/12
**editing [1]** 36/12
**education [3]** 71/1371/1771/23
**educator [1]** 71/12
**effect [3]** 12/976/17129/8
**effectively [1]** 132/16
**efficient [1]** 191/25
**efficiently [1]** 91/9
**effort [1]** 84/1
**eggs [1]** 41/4
**ego [19]** 163/5163/10163/12163/21
164/1164/10164/15164/19164/19165/8
165/14166/10167/11168/6168/7168/10
168/15168/19171/17
**egos [4]** 164/22165/25189/19189/20
**Egyptian [17]** 64/764/1365/365/465/6
65/765/1365/2066/770/770/1074/10
74/1374/1476/576/1577/4
**Egyptian Goddess [1]** 65/20
**eight [4]** 69/783/283/383/4

**either [14]** 8/485/2586/391/10100/8
103/1116/7117/7123/7123/7137/12
163/18166/4178/24
**electrical [5]** 12/332/2032/2352/24
58/10
**electronic [4]** 14/1858/1194/1894/19
**electronics [2]** 61/280/13
**elements [2]** 64/11183/22
**Eleventh [17]** 9/29/1810/111/1715/20
18/2022/2334/2144/354/22116/6160/7
163/24167/12167/13167/19174/5
**Eleventh Circuit [1]** 9/2
**elicit [5]** 28/5104/19137/1151/13180/15
**elicited [2]** 44/9135/16
**eliciting [1]** 73/14
**elicits [1]** 86/21
**else [7]** 29/1268/172/2189/11105/22
151/11190/19
**email [27]** 103/11103/15105/16139/12
139/13139/19139/22139/2243/10140/5
141/5142/12151/3154/1154/10154/13
155/8155/18156/18159/24161/2161/4
161/6166/22178/20189/10191/25
**emailing [3]** 103/16155/15155/16
**emails [15]** 139/5139/6139/8139/10
156/6156/12160/15161/7176/14176/19
176/24176/24177/12178/1188/9
**emanate [2]** 34/234/5
**emblematic [1]** 60/20
**embodies [2]** 135/13136/18
**emphasis [1]** 42/6
**emphasize [1]** 95/1
**employee [5]** 41/1642/343/6145/8
171/13
**employees [1]** 165/5
**employment [2]** 172/11172/17
**enables [1]** 113/7
**encompassed [1]** 21/18
**encourage [6]** 84/793/2296/996/14
99/10191/14
**end [17]** 7/1947/2448/1277/1577/20
78/478/1583/383/884/1985/1392/894/20
126/12147/5166/7169/16
**ending [1]** 97/16
**enforce [1]** 25/14
**enforcement [1]** 29/15
**engaged [2]** 12/5137/5
**engineer [3]** 52/2453/2375/8
**engineering [2]** 52/1954/7
**engineers [1]** 54/7
**engines [1]** 12/3
**English [8]** 101/17104/12104/13104/13
104/15104/18104/19106/18
**enhanced [1]** 190/9
**enough [14]** 5/169/825/1569/2076/22
77/2478/390/1395/195/295/6107/6
126/18154/5
**ensue [1]** 114/4
**entered [1]** 127/7
**entering [1]** 182/16
**entertaining [1]** 51/9
**entertainment [3]** 51/351/1055/17
**entire [3]** 85/9110/22110/23
**entireties [1]** 112/21
**entirely [5]** 34/2537/237/469/15119/11
**entirety [4]** 35/337/2580/15112/25
139/24
**entitled [13]** 9/2118/1419/320/2129/15

36/1738/17134/19136/15136/21162/13
190/8190/23
**entity [1]** 170/22
**entry [4]** 1/635/1682/17114/9
**envisions [1]** 118/11
**equally [2]** 174/10174/18
**equals [2]** 7/1566/12
**equation [1]** 71/25
**equipment [3]** 19/2019/2232/9
**equipped [1]** 54/18
**equivalent [2]** 13/25109/4
**error [4]** 69/1269/2570/5163/21
**especially [4]** 95/13111/12167/10169/3
**essence [1]** 176/13
**essential [1]** 163/22
**essentially [8]** 41/1154/2557/1457/24
72/674/8142/3176/5
**establish [2]** 22/24152/20
**established [9]** 11/1711/1912/1018/21
20/722/622/746/8161/9
**estimate [1]** 97/12
**et [3]** 2/84/10193/10
**evaluate [1]** 112/24
**evaluated [1]** 31/9
**even [34]** 10/1718/1719/1420/1623/19
24/425/132/1635/344/144/947/550/5
52/1758/1458/1868/969/672/173/283/15
83/2293/1199/8103/21108/8147/20
149/9149/9157/21168/23172/24175/7
186/22
**event [2]** 83/1125/1
**events [1]** 175/1
**ever [8]** 10/2414/2286/1990/1699/9
107/1158/7159/19
**every [7]** 27/1653/2484/187/5100/3
147/11160/2
**everybody [4]** 27/130/378/2084/19
**everyone [3]** 88/21104/15107/18
**everyone's [1]** 99/13
**everything [5]** 5/1829/1283/8100/16
162/24
**evidence [129]** 23/1923/2030/1335/23
36/136/237/2256/2457/957/1757/23
62/2563/699/18108/19108/24109/1
109/21109/10109/14110/11113/5114/3
114/16117/10118/3118/5119/10128/15
130/2130/16132/8134/6134/18137/5
137/12137/14137/15137/23138/15
138/25139/11139/14139/17140/6140/12
140/14140/15140/15140/24141/1141/4
141/12141/13141/15141/16142/20143/6
143/7143/10144/7144/12144/15146/15
146/16146/20147/1148/6150/15157/9158/6
159/17159/16160/15160/16161/17161/9163/5
164/7166/24170/6173/23174/1174/7
174/9174/10174/14174/18174/20176/10
177/1177/8178/11178/22179/2179/9
179/11184/10184/11184/14118/24118/5/3
185/6185/14185/19185/24186/6186/8
186/12186/13186/13186/23187/4187/7
187/9187/20187/24188/4188/10188/15
188/19188/25189/3189/6189/9189/12
189/15189/18189/25190/3190/13
**evidences [1]** 161/24
**ex [5]** 18/618/1020/1920/23117/23
**ex parte [4]** 18/618/1020/23117/23
**ex-parte [1]** 20/19
**exact [4]** 114/3114/11156/2171/4

**E**

**exactly [9]** 16/1516/1655/1664/175/4 77/12117/22142/7156/2
**examination [7]** 33/1638/1838/2173/14 113/11120/15183/17
**examinations [1]** 93/21
**examine [9]** 8/724/1124/1133/637/17 117/24134/19135/6168/6
**examined [6]** 30/1537/1238/738/23 113/19160/10
**examiner [7]** 18/438/438/1538/1838/22 38/2545/25
**examiners [5]** 17/1138/7119/20120/5 120/20
**examiners' [1]** 21/5
**examining [5]** 18/1218/1320/2121/12 117/25
**example [16]** 19/1719/1832/571/24 72/1272/1672/1775/19111/22122/21 126/2148/3156/8160/5167/18171/25
**examples [6]** 11/2211/2314/1247/15 59/5147/17
**Excellent [1]** 5/9
**except [3]** 46/277/9133/13
**exception [5]** 41/17143/7160/21172/6 172/17
**exceptions [7]** 139/9140/11141/14 154/4156/7157/12188/5
**excerpts [3]** 100/4100/14103/12
**exchange [1]** 165/4
**exchanged [1]** 86/8
**exclaimed [1]** 172/25
**exclamation [1]** 7/19
**excludable [3]** 38/1941/16120/1
**exclude [13]** 5/206/134/8112/8120/13 138/8138/22175/18179/11180/5180/6 182/23184/17
**excluded [5]** 30/17113/12138/23142/15 154/2
**excluding [4]** 18/1818/2533/837/20
**exclusion [3]** 110/20113/3113/22
**exclusive [30]** 11/1432/1121/11121/20 121/25122/2122/13124/9124/25126/18 126/21126/23127/2127/7127/11127/13 127/20127/23128/6128/8129/4129/7 129/7129/10131/19131/21132/15132/20 132/22132/24
**exclusiveness [1]** 31/1
**exclusivity [3]** 11/1611/2044/19
**excuse [1]** 83/8
**excused [1]** 88/10
**exercise [3]** 7/207/248/2
**exhibit [25]** 45/2296/696/796/7109/3 109/11122/16132/25137/17139/23 140/23142/19143/10144/10147/7149/2 149/11154/8154/9157/4159/24160/5 170/24171/12176/8
**Exhibit 126 [2]** 140/23142/19
**Exhibit 129 [1]** 171/12
**Exhibit 78 [2]** 137/17157/4
**Exhibit 83 [2]** 144/10147/7
**Exhibit 92 [3]** 139/23159/24160/5
**Exhibit D [1]** 45/22
**Exhibit J [1]** 109/11
**exhibits [16]** 93/294/1694/1794/2196/4 96/1096/1296/1696/1899/12108/20 138/1143/20153/25176/9188/9
**exist [1]** 34/9

**existence [3]** 21/239/3181/15
**exotic [1]** 88/22
**expect [6]** 21/733/536/198/2100/12 113/21
**experience [15]** 25/2127/2227/2227/23 28/828/1741/442/1042/2453/1767/671/5 72/11175/6180/10
**expert [42]** 5/206/87/107/117/127/14 7/158/128/128/178/1924/626/327/17 27/1827/1827/2128/928/1733/1845/19 57/1858/1659/259/663/2464/364/464/21 66/167/769/2571/677/6151/20153/11 175/8180/12182/6183/6188/22189/15
**expert-related [1]** 77/6
**expertise [10]** 11/329/2530/530/745/8 67/2268/2475/8152/6188/24
**experts [2]** 48/2177/11
**explain [6]** 17/2454/567/272/176/20 76/24
**explained [1]** 171/17
**explaining [3]** 18/1263/24122/4
**explains [3]** 14/459/759/7
**explanation [2]** 59/1359/1599/23
**explicit [5]** 34/134/134/1050/10180/20
**explicitly [3]** 33/1055/1125/20
**expressed [1]** 32/2
**expression [4]** 29/1029/1829/2129/23
**extend [1]** 44/22
**extent [23]** 9/139/149/1477/980/1488/9 88/1193/293/2599/13101/15101/24 103/3129/11135/7152/22180/13180/18 183/14184/2186/5186/16190/24
**external [1]** 58/11
**extra [1]** 133/15
**extrapolate [1]** 55/18
**extraterritorial [1]** 187/11
**extraterritoriality [1]** 133/16
**eye [6]** 67/967/1267/1967/2068/472/8
**eyes [4]** 29/330/472/2273/1

**F**

**F.3d [2]** 167/19175/4
**F.4th [1]** 167/13
**F.App [2]** 163/24
**F.Supp [1]** 141/25
**face [9]** 73/293/6117/7126/23127/1 131/20134/18159/24178/1
**faces [1]** 27/16
**facie [4]** 126/14129/3132/14132/14
**facilitating [1]** 57/19
**facing [2]** 93/1994/1
**fact [30]** 12/1714/819/1720/2525/23 37/138/1444/847/655/573/476/987/10 100/21120/4123/21124/3124/6125/19 127/11127/24128/21136/20138/18 139/21147/16150/23151/5151/23162/24 164/25
**factor [7]** 10/711/911/2018/2031/9 141/20146/23
**factors [13]** 6/119/1711/1730/2430/25 31/640/244/245/346/974/10141/19 164/25
**facts [29]** 6/217/58/59/1218/1218/22 19/2421/621/721/1329/662/24111/4 123/20126/7126/11126/25128/6131/6 131/10131/22132/11132/18154/5157/11 159/15160/19174/3175/10
**factual [4]** 99/1199/15129/12132/17
**factually [1]** 165/11

**failed [5]** 18/4134/10154/10164/1164/2
**failure [1]** 149/15
**fair [2]** 86/23107/6
**fairly [2]** 101/22102/16
**faith [1]** 116/8
**fake [5]** 137/6137/6138/3138/15187/25
**fakes [1]** 138/19
**fall [4]** 86/25154/3156/4156/6
**falling [1]** 24/21
**falls [1]** 52/7
**false [10]** 31/16134/7134/14134/21 135/4136/8136/19137/138/25187/21
**familiar [2]** 63/2085/11
**family [2]** 90/1891/6
**FAPR [2]** 2/19193/18
**far [8]** 19/2468/995/19100/21127/19 131/11149/17151/22
**fashioned [2]** 102/24104/18
**fast [3]** 95/4102/9144/7
**faucets [1]** 17/2
**faulted [1]** 66/1
**favor [1]** 97/4
**favorable [1]** 127/1
**FCC [2]** 166/5170/24
**feature [3]** 35/1112/15112/16
**features [13]** 66/2266/2372/772/2374/5 75/1075/1375/1975/2175/2275/2376/22 76/25
**federal [6]** 34/2264/1264/23112/11 118/5174/1
**feed [2]** 24/724/12
**feeds [3]** 35/637/1338/6
**feel [5]** 77/1996/22113/10144/19184/22
**feeling [2]** 130/21132/3
**feelings [1]** 94/6
**feels [2]** 37/16128/18
**fees [1]** 190/11
**felt [1]** 30/24
**Fender [1]** 51/15
**few [4]** 17/14155/7171/14171/14
**field [8]** 17/530/850/1669/1269/1469/18 69/2071/16
**fields [1]** 68/25
**figure [5]** 24/2352/2092/5105/10158/12
**figured [1]** 64/16
**file [6]** 2/646/1279/22125/9164/7186/17
**filed [11]** 1/21/71/920/1379/1382/17 122/8122/11125/7130/24151/24
**filing [2]** 67/14103/11
**filings [1]** 107/10
**fill [2]** 83/1783/25
**finagle [1]** 50/21
**final [2]** 42/15164/8
**finally [3]** 25/1941/346/22
**find [8]** 9/1614/2328/2370/2571/295/25 128/10183/25
**finder [1]** 139/21
**finding [7]** 35/1076/1076/1476/16 120/21165/7170/25
**fine [14]** 22/926/1667/681/683/694/18 103/15104/17106/6106/11131/20133/19 138/3143/12
**fingers [1]** 27/1
**finish [2]** 143/19191/15
**finished [1]** 98/3
**finishing [1]** 97/14
**Firestone [1]** 73/21
**Firm [1]** 164/25

**F**

**first [71]** 5/209/229/239/239/2510/210/5 10/610/810/1810/1910/1910/2010/23 11/1912/1212/2313/1013/2113/2215/23 17/1423/2326/2528/2311/132/144/19 50/1761/2466/1769/1572/1877/1384/1 84/1685/2388/1988/2597/1897/1997/22 100/18102/15102/15103/10105/23 106/18107/19108/23109/1109/1110/22 114/3125/15126/22128/25129/17135/20 140/24142/13143/5144/9149/1150/13 157/25158/14176/18180/5180/6185/6
**first-use [1]** 10/6
**firsthand [1]** 92/3
**fit [2]** 50/2058/7
**fits [6]** 14/1851/960/1461/10127/17 151/11
**fitted [1]** 36/16
**five [4]** 95/2497/21133/15164/25
**fixed [1]** 67/22
**flabbergasted [1]** 25/17
**flag [1]** 98/14
**flagged [2]** 90/2195/3
**flat [1]** 95/5
**flat-footed [1]** 95/5
**fleshed [1]** 184/20
**fleshed-out [1]** 184/20
**fleshes [1]** 182/17
**floor [1]** 95/16
**flow [1]** 86/7
**flute [3]** 51/1851/2051/21
**fly [1]** 184/23
**focus [8]** 34/1837/240/2064/2171/9 111/1123/17147/16
**focuses [1]** 112/16
**focusing [3]** 35/137/25181/10
**folds [1]** 113/2
**folks [3]** 31/1192/5192/6
**follow [9]** 49/386/286/1488/988/1290/8 105/12184/9
**follow-up [5]** 86/286/1488/988/1290/8
**following [4]** 1/168/17136/7188/25
**footed [1]** 95/5
**footnote [2]** 34/24112/9
**footnotes [2]** 148/2161/17
**force [3]** 49/2349/2550/6
**forceful [1]** 20/16
**foregoing [1]** 193/12
**foreign [1]** 187/10
**forget [1]** 191/15
**forgot [1]** 127/21
**form [11]** 39/1546/1146/1246/1446/15 46/1646/1882/23164/10164/11193/12
**forms [1]** 70/11
**formula [1]** 116/22
**forth [6]** 7/27/437/1550/1096/12166/22
**forward [2]** 16/1899/5
**found [8]** 10/1421/1047/2284/9127/11 163/7163/15164/21
**four [10]** 7/159/355/2565/1565/1865/19 65/2165/22100/7127/22
**four-part [2]** 9/365/18
**four-sided [1]** 65/22
**four-way [1]** 65/21
**frame [2]** 64/870/11
**framed [1]** 130/18
**framework [5]** 18/2171/1872/573/24 75/16

**frankly [2]** 28/8172/6
**Franzen [11]** 53/755/856/1056/2459/19 61/1261/1661/2562/662/662/22
**Franzen's [8]** 56/856/956/1358/358/8 58/1262/1462/15
**FRE [2]** 110/7110/9
**FRE 402 [1]** 110/7
**FRE 403 [1]** 110/9
**free [6]** 90/7184/24185/9185/10186/13 187/6
**frequently [1]** 27/17
**freshest [1]** 42/21
**Friday [7]** 97/1597/1797/1897/1997/22 98/298/2
**front [14]** 23/1247/1793/1698/13106/24 128/15128/16128/19130/22136/20137/1 137/5171/4191/23
**full [1]** 1/8
**Fulton [1]** 4/4
**function [2]** 49/889/18
**fundamental [1]** 163/21
**funneling [1]** 150/4
**further [4]** 148/24150/5169/10177/1
**furthermore [5]** 145/20149/25158/6 163/20170/8

**G**

**gained [1]** 69/1
**games [2]** 51/351/11
**garbage [2]** 21/621/6
**gatekeeper [1]** 33/17
**gathering [1]** 127/4
**gave [1]** 53/19
**general [3]** 53/1653/1983/20
**generally [5]** 50/1153/1390/1091/12 184/9
**generate [1]** 7/5
**generic [1]** 35/17
**GENTES [5]** 3/54/2360/1781/20134/17
**GEORGIA [6]** 2/12/214/4128/3141/24 193/6
**get [44]** 5/145/1626/1138/455/264/6 66/1866/2571/972/972/2477/2478/3 83/2284/384/485/1388/188/290/1490/18 93/2495/1497/699/18100/4105/8106/14 113/24128/19133/19136/20142/12152/3 158/12158/16171/18179/15179/21 182/18191/5191/12191/15192/5
**gets [4]** 44/2072/1072/25138/23
**getting [10]** 27/1058/2583/2491/18 131/10153/4153/9153/15169/16177/24
**give [30]** 14/1221/645/161/2063/15 64/1068/1168/1473/877/1477/2478/2 81/1181/1385/2491/1299/22104/18 105/18117/9126/25129/7138/20139/21 148/2157/17160/5160/18174/15175/9
**given [18]** 10/110/111/2017/417/12 17/1348/248/471/1489/2495/13112/15 118/16126/22131/19135/23135/23186/5
**gives [10]** 19/1827/230/1039/2244/21 49/1053/2463/1672/1683/4
**giving [6]** 23/1559/1868/1069/291/17 175/16
**Global [5]** 3/85/15/382/1082/14
**Glow [1]** 148/3
**go [48]** 8/312/2019/527/1230/2433/3 45/2453/1354/2366/1571/274/2176/13 77/1978/1080/983/185/2386/287/688/24

90/1491/1791/1995/497/4100/2101/23 103/24106/12124/8138/139/16139/16141/10 141/14143/9143/21144/5149/15152/15 156/22156/25173/9176/24178/6183/1 186/20191/5
**goal [1]** 89/12
**goalposts [1]** 58/3
**Goddess [16]** 64/764/1365/465/665/7 65/1365/2066/770/770/1074/1174/13 74/1476/576/1577/4
**goes [21]** 13/835/1940/146/1251/20 54/554/654/1861/666/1574/1776/1289/2 97/8110/23117/8141/10142/25145/9 166/23179/6
**going [132]** 13/113/1813/1917/619/11 20/820/1721/2224/125/825/825/2128/4 28/533/1034/1237/939/1639/2140/15 40/2542/242/643/2244/444/2244/23 44/2445/2448/948/1952/1654/856/20 61/1961/2362/262/1262/1762/1962/23 63/563/863/1064/1568/970/1572/18 72/1972/2072/2273/673/673/14 73/2074/475/2077/178/780/1080/15 81/1184/384/1084/1487/287/288/289/12 90/1944/1095/895/2496/2397/398/21 98/22100/4101/10102/6102/14102/24 103/14104/15104/20106/1106/6107/21 108/2108/9108/17108/21108/22125/5 134/17135/18136/15136/18136/23 136/25137/24137/24147/13148/19 148/22149/17152/4152/6157/9162/14 165/16165/18166/2170/8170/15171/21 174/10174/14174/15174/17 177/13178/10179/20179/21182/11 182/25188/9191/20191/20
**GoMed [2]** 128/3129/14
**good [23]** 4/74/134/194/204/244/255/2 5/65/119/2440/354/2366/167/1279/1 84/2497/2398/24116/8166/20169/13 179/18179/19
**goods [55]** 9/79/911/2112/112/612/14 12/1512/1714/514/515/615/1617/217/15 17/1617/1617/1817/2319/519/819/11 19/2131/1432/332/1232/1733/1233/13 34/234/437/1849/1249/1549/1650/350/4 50/850/1250/1850/2050/2251/1651/24 51/2452/252/555/1160/260/5109/8110/1 110/4110/5120/16180/11
**goodwill [4]** 176/11177/25178/4178/12
**Gorilla [2]** 179/8
**gospel [1]** 6/15
**got [13]** 13/1526/2436/2236/2341/5 66/16112/5129/16131/15139/1143/13 147/13159/6
**gotten [2]** 100/21105/25
**government [1]** 20/1
**grab [1]** 34/12
**grabbed [1]** 155/21
**grant [1]** 167/22
**granted [22]** 18/1848/7180/7180/9 181/2182/3183/4183/21186/2187/5 187/12187/18187/22188/1188/20188/20 189/4189/17189/20190/4190/9190/12
**granting [1]** 167/14
**gravamen [1]** 136/7
**gray [1]** 45/20
**great [12]** 15/329/1138/1752/2371/3 81/1898/5103/15105/15172/23173/1

**G**

great... [1] 173/8
greater [1] 8/1
GRIMBERG [1] 2/13
groceries [1] 112/1
gross [1] 73/5
ground [2] 18/24168/17
grounds [5] 89/8130/25138/23168/25169/2
group [4] 140/1145/5161/11167/19169/19169/19169/21169/25169/25170/18171/3171/23189/23
group -- this [1] 169/25
groups [1] 71/9
guess [14] 27/2331/2162/2298/1123/17128/24129/23130/21132/3132/10133/1164/14165/6165/9
guidance [7] 50/1460/177/15101/5111/3128/20182/18
guise [2] 8/178/19
guy [3] 82/2177/15177/19
guys [1] 178/5

**H**

had [49] 11/1012/836/636/1740/441/451/251/1660/2471/1275/479/186/1988/2090/2595/599/1104/10104/10106/12107/1114/16114/24116/10121/19125/1125/11129/16131/7131/12131/23134/9134/23137/20139/12149/11152/10152/19162/12162/13162/22162/24162/25163/8165/22168/18171/14172/7174/25
hadn't [1] 149/10
half [4] 92/13100/15110/24125/5
halfway [1] 163/19
hammer [1] 99/7
Hammonds [1] 81/17
hand [9] 19/2483/2184/2493/1896/4123/10123/11179/6179/6
handing [1] 96/12
handle [3] 105/13108/10186/4
handles [1] 145/10
handling [1] 161/12
handy [1] 24/18
hang [1] 179/20
happen [6] 80/1598/4145/6145/20155/20162/14
happened [8] 42/392/5156/3156/15158/23159/15174/8176/24
happening [2] 99/23150/8
happens [3] 16/1141/1380/14
happy [2] 28/7187/13
hard [8] 26/1426/1527/646/163/977/14154/18192/7
hardware [1] 32/2036/20
harkening [1] 53/4
harps [1] 67/5
Harvester [1] 167/24
has [116] 1/76/196/197/48/38/39/79/89/89/99/109/139/139/149/25010/710/1011/1911/2012/812/1012/1614/1718/2020/2212/2322/2124/2424/327/2127/2528/1730/430/731/937/2338/1539/1040/243/1643/1744/845/2046/747/2250/353/2055/557/1557/1657/2258/560/167/2169/1370/2070/2271/471/771/1271/1272/2273/173/173/2074/1976/17

77/2588/788/1788/2093/1096/6106/17107/18108/23109/12116/4116/10118/16119/15120/17121/24122/2122/8123/2124/5124/25125/4126/6128/25130/22130/24132/25142/10144/9144/146147/7150/2163/11163/25167/16168/4168/24170/2174/1175/5180/14184/1186/9186/9186/12186/18186/23187/14
hash [1] 138/6
hasn't [3] 12/517/2119/13
hate [2] 77/1890/16
have [302]
haven't [8] 25/469/1569/1785/791/1992/19173/3175/12
having [20] 22/1524/1332/2252/1464/1992/1093/695/19102/22103/8104/8107/8114/5126/1126/25135/16135/19178/8191/10191/14
Hayes [1] 4/21
he [225]
He'll [1] 44/19
he's [57] 6/237/197/198/1518/219/1420/424/425/2225/2325/2425/2527/1627/1627/2030/330/2333/1837/1742/2543/243/2144/946/1147/1647/1954/254/555/2055/2161/1962/1764/568/568/868/968/1668/2369/269/469/1071/1271/1473/473/1573/1573/2175/775/775/882/5142/1752/6153/9153/10174/6174/15
heading [2] 63/263/3
headquarters [1] 145/2
heads [1] 101/6
headway [1] 192/2
Health [1] 167/18
hear [18] 5/2442/1645/846/193/13126/3127/10130/7143/16143/22156/25166/9169/2182/11183/1184/19184/20188/9
heard [6] 62/878/14134/15152/15175/12186/23
hearing [12] 80/2290/2295/396/19102/3106/8116/24128/16128/19132/5166/8193/11
hearings [1] 91/1
hears [1] 44/16
hearsay [15] 26/441/1541/1743/7143/8154/2156/3156/12157/5157/12159/14159/16171/19172/18188/5
heavy [1] 12/4
held [8] 57/16109/5109/14109/24167/12167/16174/15193/8
help [8] 39/575/25101/24101/25102/17103/5108/6108/7
helpful [35] 7/118/1130/1333/1934/2037/1039/2545/1552/955/761/861/1863/1763/2464/364/572/3373/2374/874/2475/976/877/1683/2186/2291/24103/25105/19120/22121/5174/1174/3174/12184/19191/24
helpfulness [3] 48/2348/2470/7
helping [1] 120/23
helps [2] 51/20153/12
her [10] 154/6154/6155/5155/16155/18155/24159/13172/11172/11172/16
here [62] 5/126/76/167/158/2510/2216/616/720/1622/1127/2029/1831/1031/1836/736/1636/2037/537/2538/2242/2047/152/674/175/776/1980/2488/2

90/1290/2496/21106/5106/14113/1115/24115/1915/1915/2017/1117/20121/9120/13120/17120/24121/9125/24134/2137/2137/4142/4146/20147/17150/8154/5156/2156/15157/4157/11162/6171/5174/13175/14175/17177/8191/3
here's [3] 42/776/7137/13
hereby [1] 193/6
herring [1] 29/24
herself [1] 107/4
Hi [2] 18/7117/20
Hi-Tech [2] 18/7117/20
hierarchy [10] 66/2267/467/2468/769/869/1171/1472/5183/22184/3
highlighted [1] 157/7
highlights [1] 21/4
HILL [3] 3/24/146/427/1328/1529/830/2031/1231/1731/2333/233/233/633/1533/2134/835/637/1642/1563/2375/489/19113/21119/5
Hill's [2] 48/260/22
Hill, [1] 4/15
Hill, Kertscher [1] 4/15
him [18] 8/714/1023/524/1124/1124/1227/1527/2028/229/130/1041/1656/1561/2473/12153/3175/3175/6180/12
himself [4] 72/1107/4172/22175/9
hinges [1] 101/20
hiper [1] 47/20
his [120] 6/216/227/27/58/48/58/228/259/99/1110/610/1811/912/1113/114/116/1917/920/925/2027/2227/2328/828/1528/2329/2530/1030/1030/1630/2542/2343/643/2045/847/1152/1252/1253/353/853/1453/1554/1554/1855/1255/2056/1458/1359/259/359/559/561/1762/462/1763/1666/666/1366/1767/567/867/868/268/1468/2269/1570/670/1471/771/871/1471/1471/2071/2172/1572/1673/1373/1473/1573/1873/1875/875/876/1179/1479/1579/17117/8142/22147/5152/7152/23153/2153/12154/14162/8162/9162/10162/22163/1173/7174/15175/2175/6175/9180/19180/24181/5181/25182/5183/7183/9183/11183/20183/21184/2188/24
history [1] 125/9
hit [2] 45/25176/21
Ho [3] 10/222/23116/7
hoc [1] 20/25
hold [3] 80/24126/18149/6
holder [1] 49/10
holiday [2] 191/19191/20
Honor [94] 4/34/204/255/27/2211/2315/1116/716/1621/2523/1526/1427/928/634/1540/842/1347/2248/449/356/756/2262/1162/2174/1276/379/879/2080/581/681/1481/1982/989/1092/1592/2098/6100/6100/20101/6102/10104/4105/20106/12108/10109/5109/5110/14114/15114/17119/4121/2122/17123/25124/14126/14126/25128/17129/19130/8130/17130/20131/4131/9132/10132/23133/8133/12134/4136/13142/16143/4143/18144/7146/12150/12151/17152/10162/18163/4164/18165/12166/11167/6168/11169/7170/19172/20174/23

**H**

**Honor... [5]** 178/16182/19184/5184/6 190/17
**Honor's [9]** 11/899/5100/22101/1 128/22137/7142/24165/13168/8
**HONORABLE [1]** 2/13
**hook [2]** 49/2449/24
**hope [3]** 79/1191/10192/5
**hopeful [1]** 144/5
**hopefully [2]** 99/7191/1
**hoping [1]** 88/5
**Hospitallers [1]** 111/9
**hot [1]** 82/1
**hour [6]** 91/1491/1892/13100/14100/15 103/2
**hours [2]** 81/195/8
**how [72]** 7/29/39/1210/1511/419/23 23/1324/631/842/1143/1646/953/553/6 53/1254/954/1554/2454/2455/555/658/2 60/2360/2461/164/2365/365/2367/19 67/2068/1569/670/1270/1670/1870/20 71/771/1071/1571/1872/1372/1375/10 78/1085/785/1786/1192/1192/1695/1 97/897/12101/11102/2108/10114/10 121/23124/21127/17138/19155/20158/1 160/4160/17160/24160/24166/24172/10 183/1183/23184/11186/20
**however [3]** 1/819/1150/19
**HU [2]** 3/84/25
**hub [2]** 35/2063/2
**hubs [3]** 55/2263/1146/3
**HudsAL [2]** 157/13189/13
**human [1]** 72/17
**humans [2]** 70/1770/18
**hundreds [1]** 6/24
**hurdle [1]** 66/8
**Hurricane [1]** 111/24
**hurt [2]** 25/644/12
**hybrid [3]** 32/1932/19118/25
**hyper [49]** 9/2310/1310/2011/1211/22 12/1913/2313/2414/815/915/1415/24 16/916/1217/817/1220/220/922/1924/5 32/1935/837/337/737/839/439/2039/23 40/547/1447/1447/20109/3109/4113/1 115/11116/20118/23118/25118/25 118/25120/18139/25141/3142/5159/9 161/3181/13185/20
**hyper-related [1]** 17/12
**HyperDrive [115]** 8/239/219/2410/9 10/2110/2411/1211/2212/114/215/15 15/1616/2016/2118/2219/1519/1719/19 20/920/1021/1122/1323/123/223/632/7 32/732/935/1738/138/1539/2046/13 46/1546/2147/247/1049/1652/152/7 52/1352/1753/553/1555/555/856/1057/5 57/1358/2258/2459/859/1459/1560/14 61/561/1361/1762/362/1662/1863/163/7 110/5113/4115/15116/11116/22119/16 119/21137/19139/12139/16141/2141/21 149/18149/20151/1151/5151/6151/8 154/20154/22154/24155/3155/6155/10 155/14155/17156/19157/16157/21 157/22158/9158/15158/18158/23159/4 162/1173/22174/16174/19176/16177/13 177/18178/2178/14178/25179/1179/3 181/8181/11185/3187/20190/15
**HyperDrive's [1]** 178/12
**HyperDrive/UltraDrive [1]** 20/9

**HyperDrives [4]** 150/2150/7158/25 159/2
**hyperflow [1]** 32/22
**hypers [1]** 47/20
**Hypershop.com [1]** 155/2
**hypersonic [3]** 17/1619/737/15
**hypothetically [1]** 47/6
**Hypotheticals [1]** 46/25

**I**

**I'd [10]** 5/2477/2279/1789/2393/22 94/2096/9100/4112/7123/17
**I'll [32]** 24/1124/1726/927/640/1041/9 42/1542/1649/164/678/182/1084/18 86/1090/1291/1296/2199/22102/10 104/2117/8143/22147/4148/2156/25 159/2162/2169/5179/16179/17180/1 186/17
**I'm [85]** 4/144/214/255/78/2213/1814/9 17/620/821/2522/1023/1024/124/125/8 25/825/1625/1628/731/1731/2134/12 43/1743/1844/2244/2344/2345/2448/9 48/1949/250/967/1767/1768/1771/2 77/1478/178/980/1482/984/1388/489/7 89/1790/190/1396/2497/697/2298/22 102/3102/14102/19103/6103/8107/8 107/17107/21108/2108/9108/2108/22 109/16115/18116/24117/6117/15126/10 127/17128/13130/6132/5134/17144/5 165/9166/8179/19182/9182/10182/25 184/16187/12188/9188/10
**I've [17]** 6/614/1215/2515/2524/2147/5 47/586/1989/690/2599/9107/1107/20 115/4143/13171/17184/11
**idea [4]** 15/22132/6156/1178/24
**identical [1]** 109/12109/23139/4152/11
**identification [1]** 50/10
**identified [4]** 36/758/774/18173/3
**identify [7]** 32/2538/10101/23102/16 108/15109/17153/11
**identifying [3]** 30/130/632/21
**illustrates [1]** 50/12
**illustrative [1]** 50/7
**images [3]** 67/2273/2574/23
**imagine [6]** 63/1077/1682/2191/4 107/19179/23
**immediately [1]** 108/7
**impact [3]** 131/24131/25132/1
**impacted [1]** 12/24
**impeachment [1]** 107/9
**impermissible [1]** 159/18173/24
**implicates [1]** 123/12
**implicit [2]** 33/2544/14
**implicitly [1]** 46/3
**implied [1]** 180/20
**importance [2]** 72/1475/21
**important [21]** 11/718/322/130/1245/7 72/872/2372/2373/273/1773/2074/274/4 75/2391/893/895/1110/1110/11116/20 147/6
**imported [1]** 168/9
**imports [1]** 168/16
**impossible [1]** 14/22
**impression [13]** 22/21110/10139/9 139/15140/7140/11141/14154/3154/6 154/13156/4156/13188/5
**imprimatur [1]** 118/16
**improper [6]** 112/13118/18118/18

119/23173/24190/5
**improperly [1]** 181/7
**imputation [1]** 167/3
**impute [1]** 163/18
**imputing [2]** 166/16166/17
**inaccuracies [1]** 172/1
**inaccurate [2]** 173/3173/4
**inappropriate [3]** 16/1226/246/8
**inappropriately [1]** 136/12
**inattentiveness [1]** 146/23146/24 155/19
**INC [2]** 2/7193/10
**include [7]** 49/1285/4104/11150/25 154/10164/15165/3
**included [3]** 67/13154/9176/8
**includes [8]** 32/1057/357/457/657/11 57/12161/19161/19
**including [3]** 58/18149/10185/15
**incoming [1]** 160/15
**inconvenient [1]** 95/11
**incorporate [1]** 104/20
**incorporated [1]** 11/18
**incorrect [2]** 180/19181/11
**incumbent [1]** 119/23
**indeed [4]** 35/435/1235/24112/18
**independent [2]** 168/5168/17
**independently [1]** 90/3
**indicate [1]** 23/9
**indicated [2]** 16/8142/24
**indicating [1]** 140/14
**indication [2]** 75/9132/7
**indicative [1]** 140/18
**indicator [1]** 16/2
**indirectly [1]** 68/3
**indispensable [1]** 124/12124/20187/5
**individual [4]** 88/1288/1396/12111/1
**individuals [1]** 88/10
**industrial [2]** 67/771/5
**Industries [2]** 128/3148/3
**inevitable [1]** 113/15
**inevitably [1]** 90/17
**infer [2]** 18/2155/13
**inferences [10]** 188/15188/19189/3 189/6189/9189/12189/15189/25190/3 190/14
**inferring [1]** 155/5
**infinitely [1]** 118/9
**information [9]** 38/1978/783/2183/23 85/186/8112/23114/11127/4
**informed [3]** 59/5131/14184/22
**informs [1]** 64/9112/4
**infringe [2]** 22/464/22
**infringed [1]** 22/13
**infringement [37]** 6/86/96/96/236/237/1 7/37/77/217/2422/328/128/2443/24 43/2445/1145/1246/1363/1966/1266/16 70/2571/276/1076/1476/1877/279/14 136/2150/25166/25167/1168/5168/17 168/25169/3175/15
**infringer [1]** 153/1
**infringer's [1]** 43/12
**infringes [1]** 17/12
**infringing [3]** 136/23145/24160/16
**initial [4]** 50/2386/988/3103/4
**initially [1]** 84/14
**injury [7]** 40/1440/1640/1843/1043/15 43/1643/18
**inner [1]** 160/10

inside [2] 17/11147/21
insight [1] 117/24
insisted [1] 59/19
installation [1] 47/4
instances [2] 38/12120/17183/13
instead [7] 9/1963/2196/11125/15
149/21150/5172/13
institution [1] 20/1
instruct [3] 23/15164/1186/17
instructing [1] 55/4
instruction [13] 9/343/1444/1544/21
45/145/254/1655/11117/9181/17185/11
185/17185/22
instructions [14] 11/840/2443/1154/21
54/2282/20136/15163/20163/22164/2
164/5164/6164/8164/15
instrument [1] 51/2051/21
instruments [1] 51/17
intellectual [3] 39/15121/18121/21
intelligent [1] 21/13
intend [21] 14/1027/1927/1928/228/22
39/2440/340/1241/2260/2062/25103/12
116/14117/2137/15143/11153/3162/8
165/21178/18186/10
intending [3] 66/14136/14165/7
intent [20] 40/141/1982/21120/3138/4
166/10176/14176/15176/25177/1
177/2177/5177/6177/9177/9178/3
178/12178/17178/18
intention [4] 35/10132/21134/6176/10
inter [4] 18/518/838/9125/6
inter partes [1] 38/9
interact [1] 96/4
interaction [1] 96/1
interchangeable [1] 141/3
interest [2] 119/25191/16
interesting [3] 111/6111/6
interface [1] 80/13
interject [2] 136/5167/6
intermingling [1] 165/4
INTERNATIONAL [17] 2/74/1014/11
14/1314/1514/1614/1714/1914/2117/8
17/2019/931/1460/23117/19167/24
193/9
internet [1] 160/2
interpret [1] 71/15
interpretation [1] 59/4
interpreter [7] 101/15101/15101/21
101/21104/9106/17106/23
interpreters [1] 102/22
interrelatedness [2] 164/20173/10
interweaves [2] 13/213/3
Intesis [1] 125/20
introduce [14] 81/11103/12114/15
118/7134/18135/7137/15140/5140/6
153/3161/23185/14185/19187/4
introduced [2] 116/18161/1
introduces [1] 152/24
introducing [18] 153/9185/2185/6
185/24187/9187/20187/24188/15188/18
189/2189/5189/8189/11189/14189/18
189/24190/2190/13
introductory [1] 83/23
intuitive [1] 72/16
invalidation [1] 60/12
invalidity [2] 79/15189/16
invented [1] 70/22

inventor [4] 191/7121/14125/7175/15
inventorship [7] 125/4125/1125/3/21
127/22131/11131/13131/16
investigated [2] 27/25152/21
investigation [3] 28/1841/1442/8
investigator [4] 25/2425/2527/2541/12
invitation [2] 185/17185/21
invite [1] 181/17
invited [1] 183/2
invoking [1] 183/21
involved [2] 145/13187/25
IP [6] 148/16148/17148/21148/22
175/14
iPhone [1] 36/9
irrelevant [19] 10/310/1011/2516/17
19/8110/25119/12119/14142/13145/17
145/21145/146/11147/1148/21149/12
150/9159/20166/18
is [857]
isn't [10] 15/2234/1554/1575/375/4
112/24116/21143/11146/22177/6
issue [114] 5/218/1016/719/1821/23
22/1024/924/1429/737/137/1143/10
44/1145/1046/1147/147/248/148/24
50/1955/469/375/5101/4108/23109/21
111/4111/13112/12113/1113/20114/21
115/7115/9115/16117/5117/13118/12
119/15121/9121/15121/15123/5123/18
124/1125/17125/18125/20125/21125/25
126/1126/5127/21127/23128/18128/25
129/15129/21130/9130/1131/4131/11
132/11132/17133/6133/7133/8133/16
134/1134/8135/4135/24136/137/21
138/6138/11143/1144/12144/23150/19
151/10151/25152/1152/2152/8155/25
156/2160/1162/6163/10164/1164/3
165/2165/17165/23166/12166/14167/10
167/11168/2171/8171/18173/9173/21
174/3174/5175/3176/7177/7184/15
186/4186/6186/22
issued [1] 35/11
issues [40] 5/145/226/96/1030/1630/21
33/333/333/637/1139/645/2448/1177/15
78/1478/1690/590/2391/291/10101/23
102/13102/21118/6121/10121/16123/21
124/3124/4124/23127/8150/14152/7
157/4165/3165/21171/11190/16191/22
191/23
it [421]
it's [245]
itemize [1] 40/22
items [2] 112/1
its [25] 9/1513/2418/1125/328/2133/4
35/1140/440/2243/448/2152/2154/24
55/355/355/1857/1057/1457/1657/25
58/1463/167/570/8109/24111/4118/16
121/8121/24126/23127/1130/3131/20
138/15138/16138/19139/24140/6140/16
141/9146/17159/24161/1161/23163/11
163/21168/1176/4176/18185/25186/13
187/9
itself [10] 13/2322/2535/1535/2236/20
78/1081/1082/19133/22151/22

J
J-B [2] 177/4179/7
j5 [14] 137/20140/17157/7157/10157/16
157/20158/3159/11159/12161/25169/19

169/24169/25178/6
jscrade [17] 147/26157/18158/4159/6
159/7159/16169/19170/1170/14170/1
170/20171/1171/2171/22171/23189/22
189/25
Jack [1] 106/9
James [1] 82/4
Jamie [4] 154/1154/21154/25189/9
JANA [3] 2/19193/4193/18
January [6] 125/6140/3154/219154/21
155/9156/19
January 7 [1] 140/3
January 7th [1] 155/9
January 7th of [1] 154/19
jargon [1] 60/6
Jeff [1] 81/22
Jimmy [1] 50/25
job [1] 99/14
JOHANNA [2] 3/65/7
JOHN [4] 3/34/1781/16111/9
judge [10] 18/618/718/1520/1723/14
33/17107/20117/21128/5128/9
Judge Batten [2] 18/618/15
Judge Batten's [1] 20/17
judges [1] 94/5
judgment [30] 7/2310/1411/2411/25
15/1216/816/1616/1716/1716/2422/1235/11
35/1243/147/2257/1557/1680/190/8
109/4109/5109/14109/24125/13131/21
134/21137/8138/2142/2463/7168/12
JULY [6] 2/144/45/13151/18193/8
193/14
July 9th [1] 5/13
jump [2] 21/9192/1
jumped [1] 70/20
jumps [1] 17/19
June [4] 119/19141/5154/23156/18
June 14th [1] 141/5
June 23rd [1] 119/19
junior [1] 22/4
juries [1] 191/11
jurisdiction [6] 123/4123/13127/8130/4
163/9186/1
jurisdictional [2] 125/23169/2
juror [12] 11/520/1684/2284/2484/25
85/186/2387/1787/2388/1388/2589/1
jurors [29] 6/157/1611/623/1524/830/9
30/1154/1882/1983/283/383/483/883/13
83/1583/2484/684/1184/1684/1784/20
87/1688/288/388/1088/2490/2496/24
99/22
jurors' [4] 18/1991/992/995/9
jury [155] 7/118/118/149/29/310/2311/4
12/713/2315/1717/1019/2520/622/16
22/1922/2023/1223/2524/1224/1525/20
28/933/733/1937/137/1037/2039/639/25
40/240/2443/1143/2244/544/1644/16
44/2345/145/745/1645/1645/1946/5
47/1752/752/954/1154/1654/2155/555/7
55/1055/2356/257/1057/2461/961/18
62/663/2466/1470/1170/2373/2374/9
75/1075/2576/2176/2477/278/1082/16
82/1882/2083/1684/1084/1785/1890/11
90/2493/1994/1494/1496/2098/1398/14
99/9100/19106/24110/11112/23116/20
117/9118/15119/15119/25120/22123/22
123/23124/1127/16128/15128/25129/13
129/22130/6130/15130/19132/9133/18

**J**

**jury... [45]** 134/6136/11136/14136/20
137/1137/5138/18142/10142/14156/16
156/16159/17160/4160/18163/20163/22
164/2164/2164/5164/6164/8165/7
165/15166/2166/9169/22170/5170/8
170/16174/10174/12174/14177/13
180/14181/11183/10186/3186/15186/18
186/21187/6187/14187/16190/8190/10

**jury's [2]** 174/12174/17

**just [141]** 6/147/1212/2214/1414/14
16/824/124/124/1425/825/1626/2431/13
33/133/235/736/737/241/342/742/20
42/2343/1955/457/1458/259/2460/21
62/263/2364/2164/2465/565/1466/369/1
69/1971/2172/472/1273/473/1573/15
76/778/779/1279/2380/381/1082/20
82/2485/985/1086/687/1092/1092/21
94/995/1295/1296/1696/2397/2398/6
98/1498/1898/2199/21100/24100/24
101/16101/23102/24104/13104/15
104/23105/18105/24106/5106/12106/13
107/19108/6108/12108/13109/17113/25
114/18115/18123/14123/16127/20
133/13133/16133/19134/5134/12134/13
135/10136/20136/25141/1142/7142/14
144/12146/24148/2148/9148/19148/22
149/25150/8154/5156/15157/11157/23
158/10159/14164/4164/20166/8166/14
166/22169/23170/8170/15171/25172/7
177/5177/9177/13177/16178/11178/21
179/6182/17182/25184/8184/14188/9
188/10

**justification [2]** 33/837/20

**justifies [1]** 44/13

**justify [4]** 19/2565/567/8183/22

**K**

**KAIJET [125]** 2/73/54/94/224/225/15/4
5/75/820/1221/122/1622/2124/628/20
36/638/1338/1439/739/1740/340/440/14
41/542/948/1952/2157/2558/258/558/14
58/1760/160/971/473/1073/1281/19
81/2082/1082/11121/24122/19123/2
123/14124/5124/11125/4125/19126/3
130/24133/13133/13137/21138/8141/5
141/6141/8141/8142/12144/16145/3
145/15145/16146/17148/12148/12
152/21152/25153/7157/18158/4163/6
163/6163/8163/12163/15163/16164/22
164/22165/22165/22166/15166/15
166/20166/21169/18169/19170/2170/2
170/3170/4170/11170/12170/14170/15
170/15170/17170/17170/25170/25171/1
171/13171/22171/22172/10172/10
175/10176/15177/12177/14178/7178/7
178/23179/8183/2185/13185/18186/12
187/8187/10187/23189/19189/19193/9

**KaiJet Taiwan [28]** 4/225/181/2082/10
82/11133/13133/13141/8153/7163/6
163/8163/16164/22165/22166/15166/21
169/19170/2170/4170/12170/15170/17
171/1171/22172/10178/7187/8189/19

**KaiJet Taiwan's [2]** 148/12163/12

**KaiJet's [18]** 32/1448/1457/1458/25
74/18125/11139/4143/16143/24144/4
153/19163/25169/23172/24176/10
188/14190/3190/16

**keep [5]** 53/492/2092/25191/14191/16

**keeps [1]** 53/24

**kept [1]** 70/23

**Kertscher [1]** 4/15

**key [3]** 42/1786/1886/18

**Kickstarter [5]** 139/13140/22142/19
153/18189/6

**kind [15]** 11/1124/2431/2135/537/13
39/1247/1273/2374/1111/3113/8140/12
152/3171/10172/15

**kinds [1]** 166/6

**kinks [1]** 92/6

**knew [2]** 100/3166/20

**Knights [2]** 111/9111/9

**know [118]** 5/1414/1315/1319/1921/5
23/124/824/2325/2225/1625/1925/24
28/1030/330/1933/1140/1140/1146/20
47/1547/1547/1651/1453/1153/1663/18
53/1853/2554/2455/655/955/2556/357/7
61/161/662/2563/1166/2368/268/15
68/2369/472/473/573/1673/1879/10
80/1283/2585/1486/687/387/1687/18
88/2489/190/1791/794/494/495/11100/1
100/16102/10103/4105/8107/16109/8
110/7110/8111/13112/2114/13115/1
115/11115/16117/20121/23125/9130/25
131/21132/12135/2135/22135/24136/9
138/1152/24154/6154/15155/12155/25
156/3156/9156/15156/23157/17157/19
158/11158/17159/1159/2159/10159/11
160/18161/5165/19166/16167/2171/3
173/6177/4177/10179/10191/7191/9
191/19

**knowledge [6]** 42/1150/1569/1166/17
174/25175/6

**known [3]** 69/1285/11123/7

**knows [2]** 145/9166/15

**Kumho [1]** 33/20

**L**

**lack [5]** 18/366/1866/19130/5186/1

**lacks [5]** 121/8130/3130/4185/24185/25

**land [1]** 191/13

**language [7]** 50/1460/572/6106/19
106/19119/7123/16

**Lanham [1]** 144/13

**laptop [3]** 36/2536/2561/7

**laptops [2]** 57/19113/7

**large [2]** 146/25182/24

**largest [1]** 99/9

**last [7]** 60/1760/1987/1688/22164/8
169/5176/1

**late [4]** 91/2188/20191/2191/6

**later [5]** 27/23121/20128/12155/7
171/15

**latitude [1]** 55/2

**law [40]** 3/43/73/96/156/207/119/18
11/111/523/1224/728/1129/1634/934/20
35/1037/549/2349/2550/669/19117/20
125/22129/4140/10140/14141/11147/23
149/18156/22161/16161/19163/17
163/23166/16167/2167/16180/21181/22
187/11

**lawsuit [4]** 20/1221/321/4158/24

**lawyer [13]** 6/76/146/1411/211/323/11
27/1443/2144/944/2382/5119/24164/5

**lawyers [6]** 23/2224/684/986/686/19
87/19

**lay [5]** 62/24173/24173/25174/6175/5

**laypeople [1]** 60/7

**lays [3]** 9/344/367/10

**leach [1]** 178/4

**lead [2]** 82/1082/13

**least [22]** 15/2327/931/2248/148/678/2
78/390/1194/1794/2099/8102/4102/5
103/4103/24105/13106/1114/10124/15
165/18166/3168/4

**leave [4]** 26/1899/15158/19163/22

**leaves [1]** 96/16

**Lee [1]** 4/21

**left [11]** 105/16105/19140/18147/9
154/17154/22155/11157/21159/8171/14
172/1

**legal [20]** 11/727/2027/2128/228/11
43/2244/644/1157/2470/785/2165/15
180/13180/16180/19181/3181/24185/10
185/10189/21

**legally [2]** 165/11181/10

**legion [1]** 160/13

**legislative [1]** 49/24

**legitimacy [1]** 127/16186/6

**legitimate [2]** 126/21127/12

**length [2]** 31/6108/20

**lengthy [1]** 27/21

**less [6]** 73/282/18112/14136/24141/9
192/2

**let [27]** 4/814/1124/628/1430/1842/15
42/2085/1885/1886/1091/7191/19102/10
103/3110/14117/17126/3133/5146/13
147/13147/13164/4165/6169/5180/4
184/8191/5

**let's [25]** 4/115/236/127/1048/156/5
65/2478/480/382/1689/599/25108/2
108/3108/12109/17114/1121/1133/4
133/6143/14148/11163/2179/15184/7

**letter [1]** 170/24

**level [6]** 14/145/1452/2261/675/18145/7

**levels [1]** 53/21

**Lexmark [3]** 123/8123/15125/22

**Lexus [1]** 128/4

**Liao [3]** 101/7101/25104/8

**license [24]** 121/11121/25122/1122/4
122/13122/23124/8124/9124/25126/21
126/23127/2127/7127/11128/7128/21
129/10129/17131/19131/23132/16
132/20132/22132/24

**licensed [2]** 25/2325/24

**licensee [8]** 121/20126/18127/13
127/20127/23128/8129/5129/7

**licensees [1]** 135/13

**licensor [1]** 124/11

**Lieutenant [1]** 175/13

**Lieutenant Tummond [1]** 175/13

**light [6]** 79/6100/15100/16116/6126/25
142/1

**lighter [1]** 57/7

**Lighting [1]** 175/4

**lightning [1]** 36/8

**like [61]** 5/249/1512/115/1316/2123/23
26/826/1526/2035/535/1436/1536/18
38/2141/1344/1744/2454/6566/2557/12
61/2371/976/1677/1977/2279/1780/20
87/988/190/793/2094/1694/2096/22
98/19100/4102/8102/20116/2118/6

Case 1:18-cv-05385-SDG   Document ...   Filed ...

**L**

**like... [21]** 118/25123/17132/24135/3
141/12143/4144/19145/3146/3146/13
146/25153/13153/14155/22167/23172/7
172/15179/9186/10190/19191/8
**likelihood [20]** 6/76/1118/318/1918/21
20/738/638/1040/243/2544/246/646/9
112/13118/17119/16120/21120/23
141/19176/11
**likely [9]** 103/21118/13155/4155/5
155/13155/15166/25167/2167/4
**likes [1]** 94/8
**limine [56]** 5/2218/1720/1421/2341/8
41/1077/1078/1399/6105/22106/15
108/9109/18113/12114/2115/24117/13
118/20119/2121/2121/6122/17122/18
124/17124/18132/6133/7133/10135/3
139/3140/9140/23140/25143/5143/17
143/19144/9148/13150/10153/21153/24
153/25160/23161/14163/4169/11169/17
172/24173/18184/8184/9185/1185/13
185/18187/2187/15
**limit [4]** 87/11114/15114/17114/17
**limitation [2]** 15/162/4
**limited [8]** 2/73/84/1091/1595/1397/9
112/24193/10
**limiting [5]** 117/9181/17185/11185/17
185/22
**limits [1]** 89/25
**line [10]** 1/622/924/1326/350/1984/20
117/11155/12183/17191/15
**lined [1]** 76/6
**lines [1]** 115/3
**linguistic [1]** 73/24
**linkage [1]** 9/10
**linked [1]** 137/20
**list [13]** 50/450/750/1850/2260/267/1
85/585/685/9132/25149/2149/11176/8
**listed [1]** 49/1551/2552/18125/4150/3
**listening [1]** 44/10
**listings [1]** 73/9
**litigation [9]** 39/1246/15115/13140/12
150/15151/21151/6151/23187/5
**little [14]** 18/1418/1619/136/837/16
37/2342/142/2077/2283/489/1499/22
154/18182/17
**live [2]** 100/8106/16
**lived [1]** 175/16
**LKQ [3]** 162/7162/8162/21
**loaded [1]** 23/24
**loath [1]** 96/25
**location [1]** 156/10
**locked [1]** 191/4
**logic [1]** 18/1
**logical [1]** 90/8
**logically [1]** 86/7
**logistical [1]** 78/7
**logistics [2]** 105/24145/9
**long [16]** 26/1635/240/544/2094/797/7
97/12103/24126/6129/16137/11137/23
153/2153/9181/11190/18
**longer [3]** 77/18140/4180/4
**look [30]** 10/1810/2017/1431/1632/5
34/1837/2440/1843/2352/1964/2464/25
65/2566/2170/1172/576/4112/5141/20
141/22145/20146/3154/16161/17168/12
168/12171/25173/20174/4177/16
**looked [4]** 31/1385/7131/20173/8

**looking [22]** 5/1810/1715/424/149/9
93/2288/3363/465/1565/2065/2165/22
65/2267/2569/2272/484/5100/13106/13
106/13117/15142/10
**looks [4]** 37/2476/16172/23173/1
**lose [3]** 83/5191/8191/9
**loss [1]** 132/13
**lost [1]** 134/21
**lot [23]** 27/230/1930/1931/1231/13
36/1136/1136/1241/441/849/2155/13
84/491/4100/1102/16111/2126/7126/11
128/20144/5157/4191/9
**loudly [1]** 93/12
**LQK [1]** 189/16
**Ltd [1]** 128/3
**LUDWIG [5]** 3/34/1660/2062/281/15
**lunch [1]** 77/2378/2479/180/1191/14
91/1591/18

**M**

**Mac [1]** 36/10
**MacBook [4]** 36/1359/9140/2140/3
**machine [1]** 193/7
**machinery [1]** 12/4
**Macs [1]** 36/11
**made [22]** 15/515/517/1120/221/430/6
31/1133/2335/1564/678/1299/4100/1
102/5118/19120/4128/9131/12137/18
139/19164/5186/15
**Magic [1]** 3/8
**MAHAFFEY [4]** 3/34/1781/16102/25
**maintain [2]** 43/7122/4
**maintained [2]** 103/13105/12
**major [2]** 32/1832/21
**make [58]** 5/167/168/1814/614/1021/13
28/2535/535/1039/2143/1147/1247/18
51/651/2054/759/2377/2079/1982/24
83/384/184/292/194/995/195/1795/20
95/2196/1697/2398/498/1198/1398/20
103/8115/18117/2117/9119/25127/25
129/9131/6132/19133/14134/5138/2
165/7165/16166/25167/1167/1167/3
184/22185/10187/7188/11192/2
**makes [5]** 8/159/2599/13138/21166/18
**making [7]** 8/1757/25101/12126/5
137/11144/23145/13
**Malta [1]** 111/9
**man [1]** 27/14
**management [1]** 57/1
**Mandarin [2]** 101/8106/18
**manipulated [1]** 21/11
**manner [1]** 50/10
**manual [1]** 107/10
**manufacture [1]** 24/23
**manufacturer [4]** 25/425/1325/1643/9
**manufacturers [1]** 145/11
**many [17]** 7/127/2427/2428/130/11
47/1961/184/986/2192/1795/4101/19
129/7156/16157/11158/10160/14
**mark [89]** 8/239/69/79/109/119/1310/15
10/1811/1412/1312/1512/2314/214/3
15/1315/1816/1016/1217/117/422/3
22/1025/630/1831/432/732/1834/16
34/1937/637/1437/2438/139/340/443/24
46/1346/1147/1247/2549/2549/13
49/1549/1649/1751/12108/24108/25
109/2109/7109/22110/22110/23111/1
111/4111/4111/1111/1113111/14111/21

**J**

11/22111/25112/2112/6112/15112/17
112/19114/23119/6119/19120/19134/10
135/14135/23136/18136/21149/18
149/20149/24150/19150/21151/6151/8
151/10171/3181/8181/12185/4
**mark's [1]** 181/8
**marked [3]** 135/17136/11147/19
**market [6]** 10/410/1012/912/1465/21
176/21
**marketed [1]** 57/17
**marketing [3]** 151/5171/13172/8
**marketplace [11]** 11/1118/1219/1231/8
141/23142/2142/6142/11150/25151/1
177/3
**marking [18]** 134/7134/13134/14
134/18134/19134/22134/23135/4135/6
135/7135/20135/25136/5136/6
136/8136/19187/21
**marks [37]** 12/714/1214/2415/915/16
16/2417/1618/120/320/1031/833/133/11
34/435/237/737/1037/1837/2438/238/8
39/239/239/943/25109/4112/21112/25
113/1113/20118/17120/14141/13141/18
141/20142/1142/3
**marshal [1]** 160/20
**marshaling [1]** 8/5
**Martin [7]** 15/215/233/2133/2233/25
34/134/10
**mass [3]** 35/2235/2236/4
**match [1]** 52/3
**matches [1]** 51/25
**materials [1]** 191/3
**mathematical [1]** 7/24
**matter [28]** 11/1223/1028/333/1633/16
35/1042/776/25119/11123/4123/12
124/24125/8125/9130/4130/4147/11
157/6171/20175/7178/22184/11184/17
186/1186/1190/9190/12193/8
**matters [5]** 25/227/2579/4184/24188/23
**MATTHEW [1]** 3/6
**may [39]** 1/21/54/717/2423/933/15
34/1235/2540/440/740/845/448/1749/6
49/2050/1969/669/778/2580/582/592/6
98/20101/25110/15111/20119/18134/15
136/1137/22142/16144/3164/13167/6
168/22175/6180/3186/20186/20
**maybe [7]** 61/1673/173/174/3100/14
178/17178/17
**me [39]** 4/84/164/2314/1126/1627/13
28/1430/1839/242/142/2085/485/1689/7
90/491/791/893/1699/21101/22105/16
105/18108/5110/14117/17117/24126/3
128/16130/22131/2133/5156/21164/4
165/6171/4180/5184/8184/19193/12
**mean [40]** 14/2223/1025/225/842/144/5
45/1854/254/1561/2262/1063/865/14
66/1375/386/1997/2499/17103/23105/2
107/16114/19114/19128/17128/20
130/25132/13132/13133/17140/14
152/22156/21160/24161/3164/19166/13
171/9173/6177/6184/15
**meaning [37]** 9/19/29/49/59/209/2110/3
10/410/2511/1011/1511/1712/1012/12
30/2330/2431/231/631/2543/2344/18
44/2044/2545/355/2457/1157/1159/4
90/13139/15140/19142/23146/17165/11
181/1181/4181/6
**meanings [1]** 143/1

## M

means [11] 24/444/1850/951/2151/22
83/1290/2190/25115/12144/14184/16
meant [7] 50/750/1255/1179/5106/7
118/4130/10
mechanical [1] 2/17
mechanically [1] 78/10
mechanics [1] 67/9
media [1] 36/11
medium [1] 113/9
meet [3] 6/2148/21113/21
meeting [1] 69/10
member [1] 94/20
mention [6] 65/9106/7138/5140/17
155/17177/22
mentioned [3] 72/1294/1396/19
mentioning [2] 73/15187/16
mere [1] 162/21
merely [2] 16/6115/25
meritless [1] 120/6
merits [1] 124/24
mess [1] 127/25
message [3] 142/19153/18189/7
messages [1] 140/22
messaging [1] 170/6
met [1] 69/17
method [2] 68/670/5
methodically [2] 74/1774/20
methodologically [1] 8/4
methodology [8] 7/463/1667/1068/7
69/1671/18180/23183/20
methods [1] 48/22
meticulously [1] 160/10
microphone [11] 84/2284/2493/993/11
93/1293/1493/1594/894/10121/4126/8
mid [5] 22/1893/7102/11102/12115/1
mid-2012 [2] 22/18115/1
mid-afternoon [2] 102/11102/12
mid-opening [1] 93/7
midafternoon [1] 91/13
midday [1] 98/3
midmorning [1] 91/13
might [10] 6/1527/550/2064/2067/1
75/1075/2377/19135/15135/19
MIL [5] 126/13129/2129/24134/12171/2
Military [5] 110/25111/2111/13112/5
113/14
mind [20] 9/1034/536/1442/21139/8
139/15140/7140/11140/16140/19141/14
142/22154/4154/7156/5159/25160/1
160/21161/24188/4
mini [3] 36/936/2136/21
minimum [2] 52/4160/22
minor [1] 73/7
minute [5] 48/1391/1295/24103/8
143/14
minutes [19] 84/1085/2085/2285/22
85/2486/1086/1086/1486/1587/292/20
92/2292/2597/697/797/997/11133/15
179/24
Miorelli [1] 167/12
misaligned [1] 75/15
misfile [1] 82/22
mislead [1] 180/14
misleading [2] 53/9116/4
misnomer [1] 133/1
missing [1] 157/11
misspoke [1] 13/8

misstatements [1] 180/21
mistitled [1] 82/22
mixed [2] 142/5155/24
mixing [1] 142/7
mobile [1] 84/22
model [1] 152/25
models [1] 152/21
modern [1] 160/2
modification [1] 54/21
molecules [1] 69/23
moment [2] 27/1164/6
Monday [4] 103/4103/21190/23190/25
Moore [3] 51/151/1555/17
more [38] 6/247/128/1519/220/1625/9
33/1035/150/1353/1672/772/873/673/17
73/2075/1175/2376/1695/695/795/997/1
101/6103/7108/15112/14113/17136/24
137/19143/20151/23156/20165/11
166/25167/1167/4171/4179/15
Moreover [1] 72/4
morning [15] 4/74/134/194/204/244/25
5/25/65/1677/2592/392/594/17108/21
190/21
most [14] 5/2192/19122/21126/25
152/19155/4155/5155/13155/15160/9
166/19168/8173/19191/25
motion [102] 6/111/2420/1420/2435/11
48/748/1448/2057/1457/1557/2560/18
108/3108/9108/18108/21109/16109/18
109/19109/19109/20110/3110/21112/8
113/3113/12114/24115/24117/13118/20
118/22118/23119/2120/6120/12121/2
121/6122/14122/17122/18124/17124/18
125/13125/14126/24129/21130/15
130/18130/22130/24131/1131/3131/6
132/6133/7133/10133/22135/3138/7
139/3140/23140/25143/5143/19144/4
144/9146/12148/13150/17152/11152/11
152/11152/14152/15153/21153/24
153/25160/23161/14163/4169/8169/11
169/17172/24173/18180/6182/23183/2
183/4185/1185/1185/13185/18186/2
186/17186/24187/1187/2187/7187/12
187/15188/14
Motion In Limine 2 [1] 148/13
Motion In Limine 6 [1] 133/7
motions [20] 5/205/2218/1721/2341/8
41/1077/777/1078/1399/6105/22105/25
106/15131/21139/4140/9143/17180/5
184/8184/9
mouth [1] 72/23
mouthpiece [2] 6/1426/4
move [20] 17/624/1728/1430/1836/25
50/566/984/1892/1093/1693/1993/20
93/2494/894/8108/7113/8113/25114/1
148/11
moveable [1] 93/25
moved [5] 31/1731/1946/293/24138/22
moves [1] 67/19
moving [9] 16/1831/2558/263/1368/16
70/6102/8126/24147/6
MP3 [1] 32/10
Mr [3] 26/1081/16175/8
Mr. [90] 6/46/198/322/1527/1327/16
28/1528/1629/829/1729/2230/2030/22
31/931/1231/1731/2332/233/233/633/8
33/1533/2134/334/835/637/937/1637/17
37/2137/2340/1041/241/1142/1542/22

422/2243/143/2145/645/648/248/348/5
48/1148/2060/2262/282/663/1363/14
63/2371/474/775/475/2479/581/1581/20
89/1997/25101/7102/25108/4110/20
112/9113/3113/11113/21115/3116/3
117/7117/16118/14119/5120/13151/20
162/7162/12162/20162/21162/23172/21
172/25173/4173/5173/21174/3174/20
174/24
Mr. Akins [3] 172/21172/25173/4
Mr. Akins' [1] 173/5
Mr. Bressler [8] 63/1363/1471/475/24
79/5162/12162/20162/23
Mr. Bressler's [1] 74/7
Mr. Carlson [6] 42/2245/648/397/25
108/4117/7
Mr. Cenatempo's [1] 151/20
Mr. Chin [3] 173/21174/3174/24
Mr. Chin's [2] 43/1174/20
Mr. Franzon [1] 62/6
Mr. Hill [21] 6/427/1328/1529/830/20
31/1231/1731/2333/233/633/1533/21
34/835/637/1642/1563/2375/489/19
113/21119/5
Mr. Hill's [2] 48/260/22
Mr. Liao [1] 101/7
Mr. Ludwig [3] 60/2062/281/15
Mr. Mahaffey [1] 102/25
Mr. Philbin [1] 81/20
Mr. Sarabia [24] 6/198/322/1527/16
29/1729/2230/2231/932/237/937/17
37/2340/1041/241/1142/2248/5110/20
112/9113/1115/3116/3118/14120/13
Mr. Sarabia's [9] 28/1633/834/337/21
43/2145/648/11113/3117/16
Mr. Shankweiler's [1] 162/21
Mr. Shankwiler [1] 162/7
Ms. [13] 60/1781/2081/2188/1692/4
94/21103/16105/16134/17154/13179/18
179/20192/1
Ms. Brye [8] 88/1692/494/21103/16
105/16179/18179/20192/1
Ms. Dillion [1] 154/13
Ms. Gentes [3] 60/1781/20134/17
Ms. Tomlinson [1] 81/21
much [16] 6/136/1380/2091/1792/11
94/22101/11108/4138/19141/9160/4
160/17162/20166/22170/10191/23
multiple [6] 16/1347/1552/1464/20
177/22178/9
music [2] 32/1151/20
musical [3] 51/1751/1951/21
must [10] 7/67/1214/1114/2117/20
17/2021/1059/20142/1166/16
my [42] 4/164/175/1819/524/1024/10
27/931/2241/2041/2142/746/153/17
56/1962/162/2263/568/376/1481/16
85/1393/495/498/17100/17104/17
106/14106/20107/7107/24117/15
123/20129/23130/21132/3137/139/14
140/3162/16164/5179/15
myself [3] 81/1581/20108/7

## N

nail [1] 65/21
name [8] 52/855/883/2085/187/16
145/23170/10176/22
named [1] 50/9

**N**

names [8] 50/1051/2481/1385/585/11 87/1987/24170/11
narrative [2] 152/19153/2
narrow [4] 34/748/150/2390/5
National [3] 34/23112/10113/15
native [1] 106/19
natural [2] 86/290/19
nature [6] 31/731/751/351/1087/20 125/23
naught [1] 83/9
Near [1] 147/5
necessarily [3] 35/955/1590/9
necessary [2] 59/1077/19
need [41] 5/2141/1743/1945/1948/10 55/2461/1983/1288/488/988/2490/18 90/2391/2292/1095/996/898/1799/18 100/22101/24101/25102/17103/7105/11 107/3112/23123/23131/3131/5132/17 135/24136/23138/6147/16153/20162/23 165/10165/16182/11182/25
needing [1] 92/11
needle [1] 46/2
needs [9] 25/1125/1159/2460/2169/14 90/24152/20152/22170/5
neither [4] 35/21115/15115/15127/4
never [12] 47/547/576/24131/14141/8 142/4142/5142/6142/9148/25172/12 191/6
Nevertheless [2] 39/25112/23
new [8] 26/2564/1764/1892/7151/25 152/1156/9156/11
next [20] 16/1816/1835/550/1360/18 64/1674/1391/395/2195/2598/18113/25 115/2117/13133/6141/11146/2156/11 174/4192/3
nice [1] 83/7
nine [1] 13/24109/3
NIXON [1] 3/3
no [104] 1/132/67/37/2111/1211/18 11/1811/1811/2013/314/414/715/116/10 16/1016/2417/1718/318/1519/820/21 21/1522/323/2528/2435/1835/1841/25 43/1443/2443/2544/246/546/1751/10 51/2158/2067/2369/2469/2470/770/18 78/1981/383/289/19103/18104/6104/21 105/5105/23109/7117/23117/24117/24 118/17124/24127/12129/23130/1130/21 131/1132/7132/7133/21133/24134/6 140/4141/1141/7141/11148/11149/1 149/18152/7153/8153/14153/23155/17 156/1158/6163/17164/10166/4166/7 166/13166/16167/16167/16168/4168/20 168/24175/17177/6178/11178/178/22 179/10179/10182/20182/21184/5184/6 184/10
nobody [1] 39/7
noncompetitive [1] 16/20
nondominant [2] 39/3120/18
none [3] 52/2145/22145/24
Nonfunctional [1] 140/2
nonsense [1] 37/3
normally [1] 83/1
North [1] 175/4
NORTHERN [4] 2/1128/2141/24193/5
nose [1] 72/23
not [431]
notably [1] 122/19

note [2] 1/12132/24
noted [3] 18/618/845/22
notes [1] 106/14
nothing [22] 6/248/159/2510/1119/21 29/1429/1534/2546/1853/2060/976/15 83/1989/11112/13113/16113/17120/3 137/1160/8163/21173/3
notice [14] 72/2276/21103/11118/2 121/12134/11136/2136/22163/13163/18 165/21167/3168/24173/10
noticeable [1] 73/6
notify [2] 39/11103/13
noting [1] 49/18
notion [3] 36/1438/6137/9
notwithstanding [1] 9/6
novelty [5] 64/1464/1564/2064/2164/25
November [1] 97/24
now [44] 8/2210/613/1814/920/821/22 33/538/341/1843/2048/1058/258/558/17 58/2163/963/1172/2477/2393/1897/8 107/8112/9119/11120/7121/17121/20 122/19123/2125/3125/5125/16141/1 149/6153/15163/11163/25167/10168/22 173/2173/5175/17178/8184/7
nowhere [1] 53/1
number [74] 1/61/64/105/1429/283/20 85/187/1789/1100/11105/25108/9 108/17108/18109/15111/16114/1114/2 117/13118/20118/22118/23119/2120/9 120/11121/1121/3121/6124/17132/6 133/10134/1134/2135/4137/3143/20 146/25148/11149/1152/16153/21153/24 154/1161/14162/3163/3169/15173/12 185/1185/5185/13185/18185/23187/2 187/8187/15187/19187/23188/3188/14 188/18188/22189/2189/5189/8189/11 189/14189/18189/22189/24190/2190/5 190/7193/10
Number 1 [5] 89/1108/9108/17108/18 185/1
Number 10 [4] 137/3169/15187/23 189/22
Number 11 [4] 143/20154/1188/3 189/24
Number 12 [1] 190/2
Number 13 [1] 190/5
Number 14 [1] 190/7
Number 2 [5] 114/1114/2148/11185/5 188/18
Number 3 [3] 137/13152/16188/22
Number 4 [8] 118/20118/22118/23 119/2120/9120/11185/18189/2
Number 5 [7] 121/1121/3121/6132/6 153/21185/23189/5
Number 6 [5] 87/17124/17153/24187/2 189/8
Number 7 [4] 133/10161/14187/8 189/11
Number 8 [3] 162/3187/15189/14
Number 9 [6] 134/1134/2135/4163/3 187/19189/18
numbers [3] 12/2473/12153/4
numerical [1] 73/8
numerous [2] 71/8120/17
nutshell [1] 12/11

**O**

object [2] 18/4185/9

objected [1] 132/25
objecting [3] 147/18180/20181/23
objection [24] 18/441/1543/887/190/1 93/696/2196/2198/1198/16100/3104/14 109/910/1116/25129/21133/22133/24 153/8180/15180/25182/1182/12184/12
objections [17] 44/578/1189/889/12 89/1789/2090/293/5100/16100/18102/5 103/12103/13105/11105/13116/24 180/22
obligation [1] 25/5
obligations [3] 49/1290/18127/5
observation [4] 6/2520/1741/2075/3
observations [2] 7/1771/9
observe [2] 29/245/16
observer [11] 63/2064/1064/2465/2 65/2466/467/367/2468/1070/3183/16
observer's [1] 70/21
observers [1] 70/3
obtain [2] 20/1220/13
obtained [1] 28/21
obvious [1] 141/4
obviously [9] 15/644/548/883/588/10 99/1099/13103/6138/22
occasionally [1] 176/4
occurred [2] 150/20174/25
occurs [2] 142/1
October [1] 141/7
off [7] 36/2478/196/1796/17113/8 172/13178/4
offended [1] 87/23
offer [16] 27/1927/2028/2540/862/2 98/1298/1398/20133/14141/1157/9 171/2173/22176/10183/7187/13
offered [2] 27/1730/2044/8157/5157/6 171/20
offering [2] 43/2150/14
offers [2] 28/13176/4
office [19] 17/1117/2417/2520/2121/2 21/539/839/1244/146/446/746/20107/9 118/16119/18119/19120/5120/19181/19
officer [1] 84/23
officers [1] 165/4
offices [1] 193/6
official [10] 1/11/21/31/71/142/20 106/23161/6193/4193/19
often [3] 127/24128/1156/6
oh [8] 70/1880/5105/5122/18127/19 155/22156/22159/2
okay [95] 5/55/95/2321/2126/1726/19 26/2127/831/2436/2044/763/1271/374/1 76/277/578/1778/2078/2279/1079/18 79/2181/1081/1081/1882/1282/1582/24 87/1289/589/2292/1492/2193/194/3 94/1297/2097/2397/2498/598/1998/24 98/2599/1099/2099/24101/3102/3 105/21107/15109/15115/23116/12117/5 122/10122/18124/16124/19126/3129/11 129/20133/4133/21135/9137/3137/4 138/3139/1139/3140/20143/14144/1 147/2147/3152/2153/6156/12157/19 163/2164/9164/17169/5169/14173/12 174/22179/13179/20179/25192/4
old [3] 64/13102/24104/18
old-fashioned [2] 102/24104/18
omnibus [1] 185/1
once [14] 85/1388/188/788/1591/596/6

**once... [8]** 96/696/1198/14107/12 115/12179/23186/23187/13

**one [126]** 4/178/1611/1613/1214/13 18/1019/1720/321/2324/426/826/1831/6 31/1240/140/1241/545/547/1748/151/2 55/1556/556/556/956/1160/1961/12 63/2164/1464/1964/2164/2264/2565/7 65/1065/2565/2566/966/966/1266/15 66/1567/1968/769/870/870/873/1874/21 74/2175/2376/976/1076/1276/1276/13 76/1376/1676/2376/2383/587/2288/20 91/1391/1392/2293/1693/1694/894/20 95/1498/6101/4101/7102/20103/24 104/1104/9105/13108/12111/8113/25 114/10121/10121/14123/10128/2129/14 135/25136/3139/6139/10141/18141/24 143/4143/10147/8147/13148/3148/9 152/3152/12153/24154/16160/15163/6 163/18168/9169/22169/23170/7171/5 176/1176/6176/19178/23179/5179/15 183/13183/13183/15183/15188/11191/7 191/12

**ones [5]** 85/25105/11120/11145/3 178/10

**online [1]** 161/20

**only [51]** 1/21/77/1821/423/824/10 24/1027/431/1532/234/2138/143/13 53/1554/1156/961/2362/565/968/1377/1 80/1886/1989/794/1499/11104/19 106/23119/20119/23128/10136/2137/15 142/25146/15150/23151/5151/10151/12 153/1159/17162/6162/6162/15170/22 173/20173/20176/6177/14178/5178/9

**open [6]** 4/496/2499/19137/12190/20 193/8

**opening [14]** 46/192/1192/1792/22 92/2292/2493/393/793/2194/15116/1 156/10165/19183/3

**opens [3]** 48/8137/25138/14

**operating [1]** 127/5

**operative [1]** 51/23

**opine [3]** 6/829/1729/23

**opinion [45]** 7/57/68/615/828/228/23 28/2528/2530/1633/434/938/2540/941/1 41/1948/554/1856/856/2361/1361/17 61/2062/362/1362/1763/1565/565/14 66/366/667/868/369/271/1479/1479/15 173/24173/25174/9174/15174/21181/1 181/5183/7184/2

**opinions [10]** 7/912/1827/2028/12 28/1633/834/337/21162/11189/16

**opponent [1]** 172/21

**opportunity [8]** 30/1181/1188/2198/13 100/25129/17186/8186/25

**oppose [1]** 152/12

**opposed [3]** 12/1160/572/21

**opposing [2]** 138/13172/5

**opposition [10]** 25/1046/24112/8 121/25124/6124/14135/3140/9153/5 160/14

**optimistic [1]** 81/8

**orange [1]** 45/20

**order [52]** 7/57/2310/1411/2415/1216/8 16/1616/1716/2422/1222/1235/1135/12 35/1536/540/2247/2349/666/2068/21 68/2277/2485/1587/788/2498/25100/2 105/8105/18108/13109/6109/24116/8

**127/8131/1131/6137/1137/8139/20 141/18141/19142/24163/7167/1416818 169/8169/21169/22176/5179/16180/17 182/17**

**ordinary [14]** 63/2064/964/2465/265/24 66/467/367/2468/1070/370/370/21 183/15183/23

**organization [1]** 170/1

**orientation [1]** 83/16

**oriented [1]** 83/24

**original [6]** 96/15107/10107/10154/17 162/22169/4

**originally [2]** 51/2162/13

**originals [1]** 107/11

**other [71]** 13/1313/2413/2515/1631/8 31/1031/1137/2438/245/1645/2152/2 52/352/555/1256/158/559/1659/2563/22 67/2074/578/1479/483/283/1584/1987/7 88/2389/1890/1791/593/493/1894/7 99/17101/13105/10107/7110/24111/19 113/2113/8118/23121/12123/11138/22 138/24139/19144/6146/20146/23148/14 148/20151/7155/2116017/7168/168/20 168/24171/2173/4176/5176/20178/9 181/15181/24185/15186/25188/11 188/19

**others [5]** 72/873/673/1775/1179/24

**otherwise [4]** 37/22105/7113/14123/6

**our [88]** 16/620/2421/1721/2325/925/12 25/1225/1325/1425/1526/1130/2334/19 34/2434/2435/1135/2536/636/1642/21 43/850/2565/867/1469/2077/2480/12 81/1781/2184/2390/2292/194/1995/3 95/1496/1997/1498/2100/10100/18 105/4106/1108/5109/16109/16110/15 111/5112/8112/9119/4125/21130/10 134/13135/6135/7135/11138/4139/3 139/24140/1140/8140/8140/8140/17 140/21140/25142/18144/19146/12 146/16148/1148/23152/11152/18153/5 154/9160/14161/18162/5162/6162/6 162/15165/19169/25172/23173/14 173/20176/3

**ourselves [3]** 25/728/7107/11

**out [75]** 7/228/139/39/1810/1611/22 14/2515/1116/2318/1520/820/2020/24 21/624/2327/1430/1130/2332/933/7 33/1234/1534/2134/2137/2339/1342/16 44/347/1850/252/2059/164/1767/10 76/1675/1278/682/583/1783/2585/2 86/1990/1991/1092/492/594/898/1599/7 101/13102/14105/10111/8112/10116/22 138/6143/22145/2145/11145/21152/18 158/12158/25159/2160/3165/2171/20 176/5177/12177/24178/25182/17184/19 184/20184/20

**outcome [1]** 24/9

**outer [1]** 160/10

**outlet [3]** 56/1757/358/10

**outline [2]** 72/1972/24

**outlined [1]** 89/17

**outlines [1]** 90/9

**outright [1]** 125/2

**outset [2]** 165/18166/3

**outside [8]** 46/890/2395/2295/22133/17 147/19172/16188/23

**over [15]** 8/2423/1224/528/1631/17 39/2045/2454/2166/1586/291/11105/9

**130/4180/17186/1**
**over-designate [1]** 105/9

**overall [1]** 29/21

**overarching [1]** 105/7

**overcome [1]** 66/8

**overlap [5]** 32/1132/1832/2132/24 108/14

**overlapping [3]** 153/16166/5166/6

**overlaps [1]** 21/23

**overnight [3]** 103/24104/1105/13

**overrule [1]** 90/1

**overruled [2]** 98/16167/14

**overrules [1]** 98/10

**oversees [1]** 20/1

**own [13]** 58/1591/2596/15106/17129/5 138/16138/6138/18139/140/25176/16 183/18185/16186/13

**owned [6]** 109/13109/23119/9120/10 121/18125/2

**owner [10]** 9/7126/13126/16126/17 129/4129/8132/15132/16174/24175/15

**ownership [2]** 18/11165/4

**owns [1]** 171/1

**P**

**p.m [1]** 192/10

**packager [2]** 45/845/13

**packager's [1]** 45/15

**packages [1]** 30/1

**packaging [14]** 7/1728/1828/1929/4 29/530/530/645/745/1945/2045/2163/25 114/23160/11

**packagings [1]** 29/3

**packet [1]** 119/5

**page [42]** 1/612/2413/113/113/413/8 13/813/1813/1913/1916/1716/2421/19 24/2242032/532/632/632/1334/2450/13 52/1156/965/1370/13109/16112/9114/8 135/21139/24140/21142/18148/1149/22 150/2150/3152/19153/2153/5154/8 159/9162/1

**Page 1 [1]** 148/1

**Page 10 [3]** 13/113/413/8

**Page 13 [3]** 13/113/1821/19

**Page 14 [1]** 154/8

**Page 15 [2]** 32/532/13

**Page 16 [3]** 13/1924/224/20

**Page 17 [2]** 34/24112/9

**Page 2 [1]** 149/22

**Page 23 [2]** 139/24142/18

**Page 29 [1]** 16/17

**Page 3 [1]** 153/5

**Page 30 [1]** 16/24

**Page 41 [1]** 140/21

**Page 5 [1]** 109/16

**Page 6 [1]** 114/8

**Page 60 [1]** 65/13

**Page 65 [1]** 70/13

**Page 8 [1]** 13/8

**pages [19]** 6/217/98/218/2413/213/10 13/1213/1617/617/624/1825/1858/9 67/1367/1367/1569/171/20161/17

**Pages 10 [6]** 6/217/98/218/2413/2 161/17

**Pages 13 [1]** 17/6

**Pages 16 [1]** 25/18

**Pages 7 [1]** 13/16

**Pages 8 [1]** 58/9

**P**

**paid** [1] 148/21
**panel** [4] 84/1384/1485/2188/3
**paper** [2] 88/1694/17
**papers** [1] 147/6
**paragraph** [3] 52/1276/11143/6
**Paragraph 35** [1] 52/12
**paragraphs** [4] 55/2056/976/12162/25
**Paragraphs 32** [1] 55/20
**paralegal** [1] 81/21
**parameters** [1] 87/9
**pardon** [1] 39/2
**parse** [1] 16/12
**parsing** [1] 15/13
**part** [33] 9/315/2320/721/1642/1762/19
65/665/865/965/1165/1866/770/670/22
80/181/12120/16126/14129/3132/14
132/22140/7163/7171/22173/19179/3
180/7180/7180/9182/24183/5183/5
183/21
**parte** [5] 18/618/1020/1920/23117/23
**partes** [4] 18/518/838/9125/6
**partial** [1] 1/9
**partially** [1] 166/13
**particular** [16] 10/719/1030/2534/23
35/136/1043/844/650/450/891/794/5
94/6111/24112/15147/8
**particularized** [1] 175/6
**particularly** [5] 37/5118/13120/6135/18
188/8
**parties** [12] 8/1845/265/1086/186/11
90/597/599/2115/5148/14164/6170/9
**partner** [1] 4/16
**party** [25] 14/215/1918/1024/332/8
50/1798/11106/16111/7111/11111/17
111/18119/9120/10124/12124/21127/4
132/5145/10148/20158/5170/10172/5
172/21187/5
**party's** [1] 87/8
**passage** [1] 64/8
**past** [5] 31/2577/2290/1691/191/17
**patent** [26] 39/839/1163/1964/374/15
74/2275/1475/15119/17119/19120/4
120/19126/13129/8132/1134/9134/25
135/13135/17135/23136/16136/18137/2
150/13150/16189/16
**patentee** [1] 64/20
**patentee's** [1] 66/1
**patents** [11] 101/8121/13121/14125/3
125/4125/10127/22127/23131/18132/16
187/21
**patience** [1] 179/22
**pattern** [4] 9/245/154/22127/24
**pay** [1] 84/7
**paying** [1] 179/1
**PDF** [1] 1/1
**pedigree** [1] 27/21
**peer** [1] 69/12
**pendency** [1] 119/21
**penetrating** [1] 10/4
**people** [12] 34/1836/1254/380/1280/24
81/1106/1113/7127/25144/20145/12
145/12
**per** [1] 158/24
**perceive** [2] 65/2470/12
**perceived** [5] 28/1630/944/10175/9
183/23
**percent** [8] 14/2468/1168/1168/1273/9

73/1073/10101/16
**percentages** [4] 68/1068/1369/573/8
**perception** [3] 31/2270/2170/24
**percipient** [1] 7/12
**Perfect** [1] 82/3
**perfectly** [1] 106/11177/3
**performed** [1] 28/13
**perhaps** [10] 38/1641/1641/1644/22
60/1175/1384/18146/13146/23184/14
**period** [1] 1/4129/25130/11
**peripheral** [1] 53/18
**peripherals** [1] 32/16
**permissible** [1] 177/3
**permission** [3] 96/8106/23106/25
**permitted** [1] 117/19
**permitting** [1] 110/3
**person** [26] 30/750/1552/1652/2453/3
53/2354/954/1972/1972/2172/2272/24
72/2573/173/1141/8156/10158/1158/7
158/12158/23159/19166/20170/22172/4
172/7
**personal** [2] 42/23174/25
**personnel** [1] 145/1
**perspective** [2] 64/9102/4
**persuasive** [1] 50/6
**pertinent** [2] 18/7117/20
**Pharmacies** [2] 18/7117/20
**PHILBIN** [3] 3/64/2381/20
**Philips** [1] 175/4
**phone** [4] 36/2436/24159/15192/1
**phonetic** [2] 13/25109/4
**phonetically** [2] 109/12109/23
**photograph** [2] 147/8147/12
**photographers** [1] 36/11
**photographs** [3] 147/8147/10147/10
**photos** [3] 144/10145/21145/21
**phrase** [1] 86/18
**phrased** [1] 117/11
**pick** [4] 13/18177/23177/25178/10
**picking** [1] 178/2
**picks** [2] 118/22118/23
**pictorially** [1] 152/24
**picture** [4] 65/1372/24172/2173/4
**pictures** [5] 36/24144/15146/3153/8
153/12
**piece** [10] 36/1566/1068/1870/1570/15
70/2576/676/16138/20179/21
**pieces** [4] 37/23111/1143/9177/11
**pierce** [2] 165/19166/2
**pitching** [3] 51/451/851/12
**pivotal** [1] 101/19
**pivoted** [1] 163/11
**place** [4] 23/2542/642/1294/6
**placed** [1] 107/4
**plain** [3] 57/1059/4119/7
**plainly** [4] 66/866/2076/23148/14
**plaintiff** [19] 2/53/24/124/1488/1997/10
100/6120/24127/1132/12134/9136/1
148/6150/14151/4160/9167/22170/21
185/9
**plaintiff's** [19] 85/2386/986/13104/9
110/21111/14111/21114/8137/17140/22
144/9147/7149/22157/3159/23160/5
170/24171/11176/11
**plaintiffs** [2] 167/14176/8
**plan** [9] 91/1992/1094/2497/8100/5
104/17105/7138/14138/23
**planning** [2] 105/3164/16

**play** [2] 14/14165/2
**player** [1] 32/19
**players** [1] 32/10
**Playnation** [1] 160/7
**plead** [1] 126/15
**pleading** [1] 122/25
**pleadings** [3] 122/21126/2168/11
**please** [3] 93/394/24110/13
**plenty** [3] 86/1788/5125/11
**plucked** [3] 37/23111/8116/21
**plug** [6] 36/2136/2336/2457/658/10
113/7
**plugged** [1] 61/7
**plugs** [6] 36/853/1056/1156/1658/22
58/24
**plus** [3] 7/1421/1180/10
**pocket** [1] 36/22
**podium** [3] 93/1593/1693/1894/194/6
94/9108/8
**point** [38] 7/198/815/1120/1621/16
23/2324/1025/1730/1133/744/2147/18
59/160/964/1464/1564/2565/769/19
70/1071/975/1288/888/12101/1108/22
118/15125/2126/24137/14147/6160/13
163/23164/15164/16169/13178/23
181/24
**pointed** [11] 7/2215/1116/2320/20
20/2430/2333/1234/1539/1367/25
152/18
**pointing** [6] 10/812/314/2568/2594/10
160/3
**points** [10] 8/1316/1919/2031/1832/9
42/2164/2064/2174/24101/19
**police** [4] 11/1112/1412/24149/15
**policed** [1] 149/13
**portion** [14] 1/527/934/1634/1937/6
37/738/139/439/474/7106/7113/1120/18
120/19
**portions** [2] 73/5152/23
**ports** [1] 57/20
**position** [6] 116/14116/19127/15
129/12129/20163/25
**positional** [1] 12/3
**positive** [1] 86/21
**possibility** [1] 97/9
**possible** [5] 26/11144/8159/1159/4
191/23
**post** [22] 20/25162/8162/21185/16
186/22
**post-LKQ** [1] 162/8162/21
**post-suit** [1] 185/16
**post-verdict** [1] 186/22
**postdates** [1] 23/2
**posted** [1] 162/1
**posting** [1] 161/20
**posture** [1] 115/14
**potential** [5] 100/13107/8176/9180/14
190/14
**potentially** [4] 75/1775/17146/4177/12
**pouch** [1] 147/21
**power** [83] 52/352/852/1352/1452/15
53/353/553/1053/1153/1453/1653/18
53/2053/2054/354/454/1054/1354/14
55/355/555/855/1455/1655/2255/23
55/2556/1056/1156/1256/1456/1456/16
56/1756/1756/1956/2456/2556/2557/2
57/457/757/1057/1857/1957/2058/458/8
58/1358/1558/2158/2358/2359/359/8

**P**

**power... [28]** 59/959/1059/1159/14 59/1559/1659/1959/2359/2460/660/13 60/1460/2161/261/361/461/661/661/14 61/1761/1862/362/1662/1863/263/363/3 63/7

**powered [1]** 58/11

**PowerPoint [3]** 172/15172/22173/2

**practice [5]** 6/17134/24134/25161/9 187/21

**practices [3]** 134/20135/6135/8

**pre [4]** 44/16123/15125/22162/7

**pre-Lexmark [2]** 123/15125/22

**pre-LKQ [1]** 162/7

**precedential [1]** 51/1

**precious [1]** 84/9

**precise [2]** 111/22111/24

**preclude [19]** 20/14130/15137/4175/16 188/14188/18188/22189/2189/5189/8 189/11189/14189/18189/22189/24190/2 190/5190/7190/13

**precluded [18]** 180/20181/3181/5 181/10181/13181/23183/11183/16 183/21184/3184/13185/2185/5187/3 187/9187/16187/19187/24

**precluding [3]** 129/22169/17190/10

**preclusion [1]** 114/3

**preclusive [1]** 12/9

**preconditioning [1]** 44/16

**predates [2]** 142/12153/19

**predicate [1]** 153/4

**preemptory [2]** 83/1083/11

**prefer [1]** 87/16

**preference [1]** 104/11

**prefers [1]** 108/10

**prejudice [23]** 48/889/11118/6166/4 166/7169/20170/16177/17182/6182/9 182/24185/8187/22188/2188/7188/17 188/24189/7189/10189/13190/6190/15

**prejudicial [5]** 110/10113/16113/17 113/18120/3

**preliminary [1]** 184/23

**premise [1]** 110/21

**premised [2]** 137/9184/2

**preparation [2]** 1/1391/2

**preparations [1]** 77/17

**prepared [7]** 79/679/890/25110/16 184/16186/19188/11

**prerequisite [2]** 7/38/10

**prescribed [1]** 49/20

**presence [3]** 90/23133/17187/16

**present [21]** 57/962/2566/14102/7 128/15132/8132/18132/21139/8139/15 140/7140/11141/14154/3154/6156/4 156/13173/7186/8186/13188/5

**presentation [19]** 26/1129/535/2549/3 130/15140/22144/19154/9169/25171/12 171/21171/24172/1172/2172/12172/22 173/2173/8190/1

**presentations [1]** 172/14

**presented [13]** 30/1443/1458/573/25 140/10140/14150/22170/6184/21186/3 186/6187/6188/10

**presenting [7]** 20/1544/1457/2499/16 122/12129/22134/6

**presents [2]** 56/2459/5

**preserve [2]** 98/17127/8

**preserves [1]** 135/5

**presumably [1]** 163/14

**presume [2]** 23/828/5

**presumes [1]** 19/4

**pretrial [12]** 5/1222/1240/2280/1685/14 98/25100/2105/8105/18130/25184/17 188/12

**pretty [7]** 43/674/290/1591/18156/7 156/8170/10

**prevail [1]** 184/16

**prevent [3]** 131/17132/18134/13

**preventing [1]** 170/16

**preview [1]** 101/4

**previous [2]** 86/4162/17

**previously [1]** 124/2

**Prezi [1]** 172/15

**prima [4]** 126/14129/3132/14132/14

**primarily [3]** 85/1889/13111/15

**primary [10]** 16/166/2266/2466/24 67/2368/1175/1375/1975/2276/22

**principal [1]** 119/8

**prior [43]** 63/2064/764/864/1664/17 65/1565/2065/2566/266/1066/1170/8 70/1070/1570/1570/2170/2571/1573/24 73/2574/1574/1574/1774/1974/2075/1 75/1576/676/17114/6114/12114/23 115/16117/4150/15162/9162/10164/7 183/2183/13183/15186/18189/16

**prioritize [1]** 67/24

**priority [20]** 10/221/2422/2222/2423/12 23/1623/1723/2324/224/524/1339/19 39/1939/23114/20115/4116/2116/9 116/25181/20

**priority-of-use-based [1]** 22/22

**private [1]** 27/25

**privilege [1]** 115/13

**privileged [1]** 115/13

**Pro [1]** 140/3

**probably [17]** 5/216/578/1580/281/8 82/582/692/2493/12101/10102/24103/2 105/9137/19155/2166/21191/21

**probative [6]** 19/1019/12109/6113/17 179/12183/15

**probing [1]** 12/5

**problem [16]** 7/810/610/2223/1823/22 75/487/1994/4105/1105/5114/22114/24 115/2131/17131/23134/20

**problematic [1]** 168/23

**problems [2]** 17/1464/19

**procedural [1]** 106/12

**procedurally [1]** 105/22

**procedure [7]** 89/1689/24104/6105/12 105/15131/13131/15

**proceed [4]** 5/2348/1883/688/15

**proceeding [4]** 18/518/618/1047/12

**proceedings [12]** 2/132/1718/818/9 20/1920/23125/7130/20192/9193/8 193/11193/13

**process [13]** 21/1238/941/1241/23 78/1180/182/1783/1489/4109/5117/23 117/23117/25

**processed [1]** 83/25

**procurement [1]** 145/1

**produce [2]** 74/19160/9

**produced [5]** 2/17148/25149/11151/15 151/22

**producers [1]** 178/9

**producing [1]** 130/2

**product [78]** 17/1710/910/910/2411/12 13/2916/717/522/7/29/2225/2228/21 29/1129/1235/1836/636/736/1741/13 41/2142/2442/2547/547/850/1952/1 60/1465/1671/571/671/1171/1371/15 72/773/574/1675/875/975/1475/24 114/16134/19134/24134/24135/12 135/13135/17135/23136/6136/11136/17 137/6137/15137/16138/5138/17139/6 140/18145/8147/17147/24155/9155/14 158/5158/16160/11161/6161/8161/12 161/21175/2176/7178/7179/5179/6 183/7183/8187/25

**products [39]** 9/1532/1741/547/2157/1 57/1763/263/2164/2464/2565/1570/17 70/18134/10136/25138/16141/9144/10 145/1145/13145/22145/23145/25146/8 146/9146/14146/21146/25147/19153/8 153/9153/10153/11159/2160/15160/16 176/17181/15183/24

**professional [1]** 90/8

**professionals [1]** 191/9

**professor [1]** 71/25

**profile [1]** 190/1

**profits [5]** 43/12148/20148/23153/1 163/14

**progeny [1]** 70/8

**programs [1]** 176/2

**progress [1]** 99/5

**prohibited [1]** 10/21

**prominent [3]** 72/875/11137/21

**promise [1]** 144/7

**prompt [1]** 99/21

**promptly [1]** 90/12

**promulgated [1]** 49/24

**prong [2]** 66/17147/25

**prongs [1]** 63/14

**pronouncing [1]** 67/18

**proof [6]** 98/1298/1398/20133/14 148/17187/13

**proper [8]** 23/1544/1544/2163/1863/19 90/499/21179/11

**properly [1]** 57/20

**property [3]** 39/15121/18121/21

**proportions [1]** 74/1

**proposal [1]** 100/17

**propose [2]** 181/17185/17

**proposed [6]** 54/2182/2082/2385/14 89/6163/20

**proposition [1]** 12/8

**propositions [1]** 24/7

**propounded [3]** 86/586/2487/6

**prosecuting [1]** 20/25

**protectable [1]** 29/10

**protected [3]** 29/1829/2129/23

**protection [1]** 29/13

**prove [6]** 19/2370/5135/12136/1136/3 176/25

**proves [2]** 16/1454/1

**provide [16]** 59/262/1771/1872/673/12 75/975/2579/1684/288/1696/10106/17 111/2131/5163/17164/2

**provided [6]** 57/1784/885/586/3112/20 119/9

**provides [5]** 39/1050/1364/874/2475/12

**providing [6]** 18/2151/475/775/885/1 138/15

**province [1]** 160/11

**P**

**proving** [2] 48/2169/17
**prudential** [4] 123/6123/9123/18125/17
**psychological** [1] 69/7
**psychology** [7] 67/567/968/368/20 68/2371/2172/11
**PTO** [5] 39/1539/1746/1146/1246/16
**PTX** [2] 161/14161/22
**public** [8] 9/1134/536/1439/151/11 51/22125/8144/14
**publication** [1] 96/8
**publish** [1] 96/7
**pulls** [1] 11/22
**purchase** [4] 63/21144/20178/6178/6
**purchased** [3] 140/3154/21160/12
**purchasing** [4] 144/14144/24145/13 183/24
**purely** [1] 148/19
**purport** [1] 126/23
**purported** [1] 128/6
**purpose** [3] 122/4172/13177/14
**purposes** [4] 105/24152/25164/23 171/16
**pursue** [3] 41/1130/3185/25
**pursuing** [1] 183/16
**push** [1] 178/13
**put** [17] 6/77/427/1543/1047/1764/16 80/484/14102/25115/4122/1136/1 136/22146/18154/5172/16178/11
**puts** [3] 41/449/2350/2
**putting** [6] 7/1923/1823/2060/1074/23 76/6

**Q**

**qualification** [5] 66/1868/1668/1769/3 85/2
**qualified** [6] 33/1848/2263/1567/568/5 183/7
**qualify** [3] 83/12112/19180/12
**qualitative** [1] 8/2
**quantitative** [1] 180/23
**question** [62] 17/322/1823/523/723/9 29/829/1629/2230/1831/332/139/1840/6 40/2443/945/1851/2352/652/956/15 56/1561/2162/2263/963/1479/380/5 84/2385/1087/187/387/687/1389/2498/7 104/10104/13104/19107/7113/25120/23 123/20123/22123/24124/1124/8124/24 127/16128/21128/24129/1129/13 129/15131/3132/10132/18134/24138/17 139/19141/17142/9164/10
**questioned** [1] 139/10
**questioning** [3] 88/789/13135/5
**questionnaire** [2] 83/1884/1
**questionnaires** [3] 84/284/1286/3
**questions** [41] 5/2544/678/978/12 83/2084/884/1185/385/385/485/1485/15 85/1685/2185/2586/486/586/786/20 86/2486/2587/889/489/590/390/690/8 101/17103/1106/13107/25124/6153/22 156/16156/10158/11182/15182/20 182/21184/4189/15
**queued** [1] 131/7
**quick** [2] 79/3135/10
**quickly** [2] 63/23144/6
**quite** [3] 34/2068/17156/6
**quote** [9] 45/853/2557/1658/1065/7 70/13114/9148/4159/12
**quote/unquote** [1] 159/12
**quotes** [1] 96/5
**quoting** [1] 36/4

**R**

**raise** [13] 96/21122/20122/24125/11 125/13127/9129/18135/135/19135/24 149/4167/9168/23
**raised** [11] 89/8121/15124/2124/5 125/12130/11130/18130/25153/25168/9 184/12
**raising** [3] 125/15126/1184/13
**ran** [1] 159/1
**random** [2] 145/7146/20
**range** [2] 57/157/12
**rank** [2] 43/783/20
**ranks** [1] 66/21
**rate** [3] 69/1269/2570/5
**rather** [3] 33/1659/24106/18
**rational** [2] 21/7112/14
**Ravi** [2] 142/4153/18
**Ravi Budruk** [1] 153/18
**RDR** [2] 2/19193/18
**re** [2] 50/25112/10
**reach** [1] 21/7101/13187/11
**reached** [3] 46/10137/14163/10
**reaching** [3] 101/1103/18112/11
**react** [1] 71/10
**reaction** [1] 137/3
**read** [14] 24/2125/1025/1065/1985/9 99/19100/12100/14101/14101/17103/1 137/10140/8140/8
**reading** [4] 35/2136/3130/6130/14
**reads** [2] 143/12162/8
**ready** [3] 48/1890/12144/4
**real** [6] 10/2224/824/924/1494/5135/10
**reality** [1] 95/12
**realize** [2] 81/8131/23
**realized** [1] 50/18
**really** [46] 11/1318/219/223/1423/14 23/1724/1625/125/926/127/431/1533/19 37/938/2440/2042/646/254/2358/2069/6 77/1484/786/2290/191/891/1796/2497/7 100/2102/21104/21108/18110/3111/3 112/4118/10118/10121/9132/13147/11 150/16151/11173/7177/20178/25
**Realtime** [1] 2/19
**reason** [15] 16/1130/1440/1064/12 70/23102/9104/21109/8110/7142/14 143/2149/3159/5168/3179/11
**reasonable** [1] 148/17
**reasons** [10] 9/2252/1296/25112/11 112/14114/14136/7141/4150/9171/17
**rebut** [2] 63/23162/14
**rebuttal** [13] 56/761/2462/862/1062/15 62/2376/397/1107/3113/25162/12 182/25183/3
**recall** [1] 89/7
**receipt** [8] 154/17154/22155/2155/4 155/11155/21155/23155/24
**receipts** [3] 154/10154/16155/24
**receive** [1] 148/22
**received** [5] 11/883/18119/22147/21 169/8
**receives** [2] 59/9161/4
**recent** [2] 122/21168/8
**recently** [1] 151/23
**recess** [9] 48/1348/1678/2278/24

143/14144/2179/15180/2192/7
**recessed** [1] 187/14
**recipient** [1] 161/3
**recision** [3] 167/22168/1168/2
**recognize** [1] 35/12
**reconsideration** [1] 169/9
**record** [9] 39/199/19106/22125/8131/5 133/20154/11193/13
**recorded** [1] 2/17
**records** [2] 161/10188/6
**recovery** [1] 43/15
**rectangular** [1] 93/15
**red** [1] 29/23
**redefine** [2] 6/209/20
**redefined** [1] 6/21
**reduced** [1] 193/11
**reduces** [1] 100/11
**refer** [14] 26/2027/1135/1472/1177/10 87/15112/7157/18162/11164/20169/22 170/11170/20176/9
**reference** [11] 33/2460/464/967/1068/7 69/1670/1171/23105/17150/15181/20
**referenced** [3] 57/22117/21151/19
**references** [6] 55/15148/13151/20 177/23180/20189/22
**referencing** [5] 1/6170/7181/14181/15 184/3
**referred** [3] 71/17162/24165/25
**referring** [6] 59/25155/13161/20169/18 170/9170/17
**refers** [3] 24/232/7115/5
**reflected** [1] 46/14
**reflects** [1] 159/24
**refreshing** [1] 107/22
**refused** [1] 167/22
**regard** [25] 25/546/2248/779/594/25 98/999/15116/4150/13151/4178/20 180/8180/22180/25181/20182/1182/22 183/4183/19185/19185/11186/2187/2187/6 189/20191/17
**regarding** [21] 6/157/911/712/1212/12 12/1323/1225/1232/2043/243/1445/24 62/24100/18130/12132/19133/16148/13 155/8155/9163/5
**regardless** [1] 12/15
**register** [3] 19/10119/8120/6
**registered** [13] 13/2419/2125/638/13 38/1438/1546/1349/551/17119/8119/17 119/18120/20
**registering** [3] 18/139/118/17
**registration** [20] 17/1217/1319/1922/7 28/2129/1032/832/1038/1149/649/749/9 49/1051/2552/4118/3118/8119/8119/20 166/6
**registrations** [18] 20/1221/132/1437/14 46/5109/13109/23110/4117/18118/1 118/12118/24120/10181/14181/16 185/15185/16185/21
**registry** [1] 44/1
**regulations** [2] 49/2060/2
**reinforces** [2] 68/371/22
**rejected** [2] 55/1757/15
**relate** [6] 6/1111/25123/15137/22 148/17171/10
**related** [39] 12/1612/1714/814/1114/21 15/615/1015/1617/217/1217/1317/20 17/2319/1134/441/863/177/685/385/4 118/18118/21118/24120/15120/15

**R**

**related... [14]** 120/16120/16121/15 124/18125/6127/21134/6136/19148/21 156/11165/24166/24171/10189/15
**relatedness [15]** 11/2112/614/514/5 15/117/1819/419/832/232/1133/1233/23 34/7109/7171/11
**relates [15]** 9/1623/1625/331/1115/20 121/10121/12123/3123/4123/6139/5 152/16154/19155/10172/10
**relating [19]** 8/229/1246/17109/2114/3 114/4114/12135/4150/23180/24185/19 188/16188/19189/3189/6189/9189/12 189/25190/14
**relationship [5]** 17/1725/1231/15 161/25170/3
**relationships [3]** 32/2533/13172/9
**relatively [1]** 111/22
**release [1]** 153/19
**relevance [7]** 43/443/1743/17118/6 147/9150/13166/23
**relevant [38]** 19/1619/2330/2140/8 40/1747/2348/349/2250/1654/955/13 56/174/19109/25110/8113/13120/2 120/22121/18124/7125/24141/17142/9 143/1144/12144/13146/4146/16147/22 147/25148/8148/15150/21151/10163/12 171/16176/25183/13
**reliability [4]** 66/1968/1669/469/11
**reliable [6]** 33/1848/2263/1668/668/15 70/5
**reliance [1]** 12/18
**relied [2]** 111/15151/21
**relief [4]** 167/15167/17167/17167/22
**rely [5]** 13/22136/4138/14149/23152/23
**relying [1]** 42/2
**remain [1]** 106/8
**remainder [1]** 189/21
**remaining [4]** 80/1884/17102/13173/21
**remedy [1]** 168/1
**remember [2]** 29/946/23
**remiss [1]** 167/9
**removed [1]** 19/24
**Remy [7]** 15/215/233/2133/2233/2534/1 34/10
**rendering [1]** 62/13
**renders [1]** 21/15
**renew [2]** 183/2184/24
**repeat [2]** 57/1484/25
**replace [2]** 155/5159/2
**replacement [2]** 44/14162/9
**replacing [1]** 179/3
**reply [4]** 58/965/969/21172/23
**report [57]** 6/227/212/2313/114/414/7 16/1928/2332/533/1338/541/2043/23 44/445/2347/1148/1152/1253/153/8 55/2056/959/259/666/1367/868/1468/22 71/771/2073/873/1376/1179/679/979/17 109/12114/9115/20117/14117/16151/20 152/23162/7162/8162/9162/10162/13 162/17162/21162/22163/1180/24181/21 182/4182/14182/23
**reported [1]** 193/7
**reporter [7]** 1/31/71/122/2093/9193/4 193/19
**REPORTERS [1]** 192/12
**reports [1]** 162/17
**represent [1]** 119/24

**representation [4]** 48/248/4117/8 182/24
**representative [1]** 41/23
**representing [1]** 82/9
**reproduced [1]** 139/24
**reputation [3]** 40/1440/1640/17
**reputational [4]** 43/1043/1543/1643/17
**request [2]** 98/12185/10
**requested [1]** 187/13
**requesting [1]** 101/5
**requests [1]** 121/7
**require [5]** 50/1560/298/12103/14 107/10
**required [3]** 53/14124/10124/21
**requirement [2]** 60/8178/22
**requirements [1]** 59/2369/10125/22 127/6
**requires [1]** 160/8
**researched [1]** 160/10
**reserve [2]** 97/10133/14
**resolution [1]** 191/12
**resolve [16]** 44/1188/1390/2391/293/5 94/22100/3100/18105/16117/5120/23 130/22166/12186/23190/16191/24
**resolved [2]** 123/21169/7
**resolves [4]** 124/4127/16166/13182/14
**respect [16]** 32/1358/175/175/579/14 111/11121/17125/3129/9131/17135/11 150/19165/15165/23168/4169/3
**respectfully [1]** 168/12
**respective [1]** 99/16
**respond [5]** 62/5142/16143/18148/9 156/24
**responding [2]** 56/8143/19
**response [21]** 23/423/734/2449/21 52/2156/2367/568/168/10122/14128/12 137/10138/4140/25148/1148/24152/4 152/7159/22169/24186/24
**responses [2]** 86/21120/7
**responsibilities [1]** 91/6
**responsibility [2]** 91/2399/18
**responsible [4]** 43/391/2596/15161/11
**responsive [2]** 79/9122/25
**rest [3]** 20/948/9192/5
**restate [1]** 162/23
**restatement [1]** 162/21
**restaurant [1]** 156/11
**resting [1]** 95/8
**restrict [2]** 28/628/7
**restricted [1]** 1/3
**rests [1]** 112/20
**result [2]** 60/11114/6
**retail [12]** 9/1528/1929/429/530/530/6 45/845/1245/1545/19145/4145/7
**Retailers [1]** 148/4
**retinal [1]** 67/22
**retrieve [1]** 95/25
**return [12]** 25/2241/1341/2142/25 145/12148/5154/17154/24155/3155/14 161/6161/8
**returned [6]** 144/11145/11146/5146/21 147/1186/19
**returns [10]** 41/542/1042/11144/25 145/6145/25147/17147/24161/12188/16
**Reverse [1]** 155/9
**review [29]** 48/1169/1284/4125/6128/6 137/7137/15137/15137/6138/5138/14138/16 138/18138/20138/20138/23139/6140/13140/15

140/17157/2157/21157/23158/8158/19 159/8161/15161/20162/22162/1188/1189/13
**reviewed [5]** 5/2489/690/3152/25 172/22
**reviewer [2]** 137/18157/14
**reviews [6]** 137/6138/15138/9138/24 138/25187/25
**rid [1]** 152/3
**right [132]** 4/84/194/2413/315/415/6 15/716/316/2222/522/722/822/1425/13 26/646/1148/648/948/1548/1849/649/10 56/1860/1662/1263/967/1877/577/777/8 77/1277/1277/1478/178/1778/2278/22 79/179/1680/380/1981/381/1982/882/15 82/1682/2084/1786/1689/989/1089/15 89/2290/1092/1693/193/1895/2297/8 97/1898/598/1798/23102/11105/21 107/1107/23108/1108/2110/13113/23 115/10117/12117/15119/3120/25122/1 127/9127/15129/1130/14132/3133/4 133/10133/11133/14133/2133/24 138/12143/3143/13144/4145/19147/15 150/11152/2152/8152/9153/13153/15 154/11155/3156/20158/5159/21161/13 162/3162/16163/2166/866/12167/5 169/15171/6172/3172/19173/15175/17 175/19178/8178/15178/17179/13180/1 180/4182/22184/7186/9190/18190/18 191/5191/18
**rights [19]** 24/224/324/1325/14114/6 114/20115/5115/116/3121/22122/1 122/7124/9126/19128/11129/7129/7 185/8186/7
**risks [2]** 11/511/6
**RMA [1]** 161/9
**ROBERT [1]** 3/5
**Roberts [3]** 81/2381/2482/1
**role [4]** 82/685/13174/12174/17
**roles [1]** 81/12
**Rollins [1]** 82/4
**room [4]** 83/1695/1695/1695/17
**rooms [1]** 95/19
**routes [1]** 59/11
**row [1]** 84/17
**royalty [1]** 148/18
**rubber [1]** 46/4
**rule [11]** 8/1196/2296/23107/21109/9 113/22125/14143/8174/1186/21188/5
**Rule 12 [1]** 125/14
**Rule 402 [1]** 109/9
**Rule 403 [1]** 113/22
**Rule 703 [1]** 8/11
**ruled [2]** 184/1184/14
**rules [7]** 49/1949/24118/5184/10184/10 184/11188/23
**ruling [3]** 103/14188/11189/17
**rulings [4]** 102/4179/16184/4184/24
**run [2]** 85/1886/19
**running [2]** 85/4103/7
**rush [1]** 105/8
**RYAN [2]** 3/54/23

**S**

**saccades [1]** 67/18
**safe [1]** 81/4
**Safeway [8]** 111/16111/19111/20 111/21111/23111/23111/24111/25
**said [34]** 6/1511/2516/1618/1518/16

**said...** [29] 22/1531/1440/1342/2351/10 51/2153/953/1160/2062/2364/2388/2 89/2490/792/695/19102/20107/21 112/17142/22147/6152/6153/3160/7 162/22167/25172/22179/8193/10
**Saint** [1] 111/9
**Saint John** [1] 111/9
**sake** [1] 147/14
**sale** [1] 71/9
**sales** [3] 172/3187/10187/10
**salient** [1] 43/3
**same** [51] 7/168/138/1711/2313/1417/5 28/1434/234/639/366/469/2470/180/25 84/1187/7104/8105/12105/15107/18 110/1115/7115/9117/22118/23119/2 124/23133/7133/8135/21140/13155/3 157/4160/1164/9166/5170/10170/23 170/25171/8171/17172/4174/5174/6 174/13174/14174/14174/18175/22179/4 187/2
**SANHO** [121] 2/44/96/39/139/139/22 10/1010/1710/1910/2010/2311/1012/9 23/224/525/328/2129/1731/432/1740/4 40/540/640/1240/2141/441/941/2543/4 48/2148/2549/1650/1752/252/2153/22 54/157/1665/465/1867/569/1373/1376/4 76/19109/13109/24110/6121/6121/7 121/10121/11121/17121/18122/2122/3 124/8124/10124/22124/25125/1125/7 130/2133/3137/5138/15138/19142/18 144/11144/15145/3145/13145/17146/21 147/19149/13150/1150/1150/3150/5 151/4154/12154/14155/8155/16161/3 163/11163/25170/12172/5173/21177/15 177/21177/23180/13180/18180/19 181/17181/23185/24186/9187/21187/24 188/3188/4188/6188/13188/15188/18 189/2189/5189/8189/11189/14189/18 189/24190/2190/7190/10190/13193/9
**Sanho's** [30] 6/112/929/932/932/16 49/2151/2553/968/5108/3122/5122/22 126/5131/11136/14144/17145/24153/25 157/13158/24163/5163/20169/17170/7 176/16180/6182/2183/3185/1188/22
**Sarabia** [52] 6/26/198/39/129/1911/9 12/514/2516/1919/720/2422/1527/16 28/1729/1729/2230/2231/931/1332/2 37/937/1737/2340/1041/241/1142/22 45/2347/1148/5108/20108/21109/3 109/12109/22110/20112/9113/1114/9 115/3115/25116/3117/22118/14120/13 180/6180/8180/18180/25181/7181/13 182/14
**Sarabia's** [23] 12/1815/828/1633/834/3 34/837/2143/2145/648/11113/3115/20 117/14117/16180/9180/13180/6180/22 180/23180/25181/3181/23182/4
**satisfied** [2] 33/1560/7
**save** [2] 89/14103/2
**saves** [1] 96/11
**saw** [10] 92/397/5141/8142/5142/6 149/1158/7159/19173/8175/12
**say** [53] 14/2014/2416/1423/423/725/10 26/533/133/1735/635/1937/2239/19 39/2240/1644/2446/351/1953/1353/22 53/2355/158/360/2464/2265/1866/10 66/2070/276/776/1377/981/498/2098/23
**scar** [1] 73/2
**schedule** [1] 90/10
**scheduled** [1] 5/13
**scheme** [2] 179/4179/7
**scope** [8] 54/2455/3152/5152/16172/11 172/11172/16188/23
**Scott** [1] 163/23
**screaming** [1] 93/11
**screens** [1] 26/12
**script** [2] 86/687/5
**SD** [3] 36/936/2136/21
**SDG** [2] 2/6193/10
**sealed** [1] 107/11
**seat** [2] 83/2108/5
**seated** [9] 4/74/1748/1778/2584/15 84/20106/8144/3180/3
**seater** [1] 82/1
**second** [15] 7/811/912/2313/1515/11 16/516/561/1370/689/1100/23102/20 103/18103/19109/21
**secondary** [37] 6/109/19/29/49/59/17 9/209/2110/310/310/2210/2511/911/15 11/1612/1012/1212/2330/2230/2431/2 31/631/2543/2344/1844/2044/2545/3 66/2266/2467/2368/1275/1376/22181/1 181/4181/6
**secondly** [2] 17/23109/11
**secret** [1] 115/14
**section** [30] 12/2513/513/1013/1613/18 13/2116/1921/1921/2224/1724/1924/21 25/1931/1931/2033/1048/7115/20 117/14118/11119/6125/23125/24143/5 181/2181/9181/21182/1182/4183/19
**Section 10** [1] 25/19
**Section 262** [1] 125/23
**Section 5** [2] 13/513/10
**Section 6** [1] 12/25
**Section 7** [5] 13/1821/1931/2033/10 117/14
**Section 8** [3] 21/2224/19115/20
**Section 9** [2] 24/2148/7
**Sections** [3] 13/1231/22180/24
**Sections 6** [1] 31/22
**security** [1] 84/23
**sedan** [1] 73/20
**see** [32] 5/1110/2043/1648/170/372/18 72/1972/2576/485/793/997/8108/14 114/8120/14149/4149/21154/8154/16 154/18154/23157/7162/23163/2168/13 173/23174/10174/14174/15174/17 176/18180/1
**seeing** [1] 8/167/17
**seek** [2] 40/2544/6
**seeking** [13] 43/1143/1243/1343/15

106/7107/1107/2113/4113/6113/6 140/2147/47941/720154/712154/8163/10 169/6171/21176/13177/24182/9184/8
**saying** [30] 7/2016/2523/2024/431/13 34/2535/743/2154/565/566/369/2369/25 72/773/2276/2277/392/21108/4112/11 112/19114/25115/3127/10135/23163/14 166/9170/14174/13177/4
**says** [34] 6/2217/1524/232/1333/22 33/2535/335/1746/1549/1950/354/154/2 60/966/766/2368/2682/2169/669/1976/9 76/15110/25112/20113/15115/3120/2 125/20130/1137/2140/2155/23159/6 173/6
**scar** [1] 73/2
**schedule** [1] 90/10
**scheduled** [1] 5/13
**scheme** [2] 179/4179/7
**scope** [8] 54/2455/3152/5152/16172/11 172/11172/16188/23
**Scott** [1] 163/23
**screaming** [1] 93/11

128/14136/4137/4140/5140/6151/13 161/20162/23179/2
**seeks** [1] 9/19
**seems** [9] 5/2214/1038/2164/3102/8 110/9110/21146/24186/21
**seen** [5] 6/615/2515/2547/599/9
**sees** [4] 11/1064/2470/4155/23
**segment** [1] 47/13
**segments** [1] 85/22
**select** [1] 88/1
**selection** [5] 78/1082/1684/1085/19 94/15
**sell** [2] 150/2179/6
**seller** [4] 150/5150/6158/24159/1
**sellers** [1] 150/3
**selling** [8] 50/2051/1852/1136/17141/6 151/7178/3178/21
**sells** [1] 63/3
**send** [2] 79/23104/2
**sender** [1] 140/2
**sending** [2] 43/3150/7
**sends** [1] 145/11155/7
**senior** [17] 22/122/322/422/1622/18 22/2523/539/18114/5114/19116/2116/9 116/15117/1117/3181/21185/7
**sense** [19] 35/1635/2036/236/1873/16 80/2386/7113/4139/139/15140/7 140/11141/14154/3154/6156/4156/13 173/7188/5
**sent** [5] 39/14139/13139/25141/5159/5
**sentence** [2] 143/4143/5
**separate** [8] 29/962/13127/21139/5 166/17169/9169/10169/21
**separately** [4] 63/396/8132/4181/14
**serial** [1] 83/20
**series** [2] 120/13120/14
**serve** [2] 54/1177/1
**served** [1] 79/13
**service** [3] 16/742/351/3
**services** [11] 50/350/850/1850/2050/22 51/251/1451/2451/2552/352/5
**session** [1] 91/11
**set** [9] 7/27/412/1850/1085/1599/899/9 103/5109/1
**setting** [1] 184/19
**settlement** [11] 148/13148/16148/25 150/15150/20150/22151/2151/12188/19 188/21191/6
**seven** [5] 18/2020/746/869/7141/19
**seven-factor** [1] 18/20
**seven-part** [1] 20/7
**several** [3] 13/2136/694/23
**shall** [4] 49/1249/19105/21119/10
**sham** [2] 128/7128/22
**Shankweiler's** [1] 162/21
**Shankwiler** [1] 162/7
**shape** [3] 29/1273/1974/5
**shapes** [1] 66/4
**share** [2] 83/1193/3
**sharing** [1] 173/11
**she** [33] 93/1296/2154/24155/3155/4 155/7155/8155/9155/10155/14155/15 155/17155/18155/21155/22155/23 155/24156/18156/19159/4159/6159/6 159/7159/8159/9159/11159/12159/14 160/11171/14172/172/12172/14
**she's** [4] 155/12155/13155/16159/14
**sheet** [1] 88/17

**S**

**shelf** [1] 176/6
**shifted** [1] 126/12
**shipping** [1] 158/25
**shop** [2] 70/1770/18
**shopping** [1] 71/11
**short** [1] 9/5
**shorthand** [2] 4/22157/18
**shots** [1] 139/20
**should** [67] 8/1210/1615/417/1027/1
30/1630/1640/640/1843/1850/1450/15
52/457/960/570/1170/2377/2480/24
85/2585/2586/1786/1788/388/5101/18
102/16108/4113/12123/25124/1124/24
125/25130/1130/12138/18139/21142/14
147/10148/22149/3150/10152/23154/2
160/5162/13163/14169/2170/9174/20
175/1179/22179/23185/2185/5185/14
185/19185/23186/19187/3187/8187/15
187/19187/23188/3190/8190/11
**shouldn't** [4] 23/2437/19136/5142/12
**show** [28] 12/612/1029/940/1247/10
47/1152/1858/268/568/1585/1793/2
104/22104/22126/15127/7136/14136/23
136/25141/12144/16149/23155/18157/9
176/14177/2177/9186/9
**showing** [8] 57/17100/19104/24114/22
114/23141/1172/13187/4
**shown** [8] 12/1612/1625/467/21105/14
154/11155/10161/22
**shows** [14] 14/215/917/1541/6114/10
146/15146/21149/23154/13154/17155/4
177/9177/17177/25
**shy** [1] 6/12
**sic** [1] 59/9
**side** [17] 45/2174/2374/2481/1183/10
84/285/2088/1788/2093/495/1797/7
101/13105/10106/1144/6154/11
**sidebar** [1] 96/20
**sidebars** [1] 98/10
**sided** [1] 65/22
**sides** [5] 91/21105/25124/23127/6
191/10
**sight** [2] 67/2084/20
**signed** [2] 128/11149/5
**significance** [8] 29/129/534/637/1939/5
40/564/10110/22
**significant** [12] 28/928/1229/2030/12
30/2534/2037/1967/271/13111/12
112/25161/18
**significantly** [1] 66/25
**similar** [13] 24/531/839/2139/2356/25
57/557/1771/2473/1975/2075/22116/20
179/6
**similarities** [5] 7/187/258/1464/275/17
**similarity** [10] 29/2274/25141/2141/10
141/12141/18141/18142/9142/10142/25
**similarly** [1] 58/22
**simpleton** [2] 52/2252/23
**simply** [13] 29/1232/333/134/955/12
101/12154/5162/24172/16177/1177/16
178/11184/23
**since** [8] 6/517/1942/20103/18108/20
116/17144/6164/1
**single** [2] 147/11159/10
**singular** [8] 85/10137/16138/5138/20
138/20157/23163/6169/19
**sinks** [3] 52/1453/2055/5

**sir** [1] 81/25
**sit** [4] 1/224/624/128/17/1
**situation** [4] 103/8107/2128/11149/25
**situations** [1] 16/5
**six** [7] 16/2016/2482/1884/1788/6
109/12109/22
**size** [1] 74/5
**skeptical** [2] 182/10182/12
**SKU** [2] 154/19154/20
**slide** [28] 35/2546/2349/350/950/13
52/2564/8110/18111/5118/2119/4119/5
119/6141/11141/11144/11144/19146/2149/4
149/21157/7169/25171/25173/20174/4
174/4175/10176/3177/17
**Slide 19** [1] 169/25
**Slide 27** [1] 177/17
**Slide 42** [1] 141/11
**Slide 46** [1] 49/3
**Slide 48** [1] 50/9
**Slide 49** [1] 50/13
**Slide 54** [1] 53/25
**Slide 8** [1] 149/4
**Slide 9** [1] 149/21
**Slide's** [1] 145/20
**Slide's 6** [1] 145/20
**slides** [5] 27/427/1027/11110/15176/18
**slow** [1] 102/21
**smaller** [2] 93/1894/1
**Smith** [1] 167/12
**so** [335]
**so-called** [2] 12/13137/6
**software** [3] 12/316/2132/23
**sold** [4] 9/99/1463/2157/25
**sole** [2] 172/13177/18
**solicit** [1] 48/5
**some** [83] 5/225/256/106/118/2411/6
13/2515/2215/2415/2518/1519/119/4
19/422/2124/2430/2031/1034/2035/13
36/140/2448/1048/1254/1455/255/259/7
60/461/266/2366/2472/773/473/1273/16
73/1674/2574/2475/975/976/777/1077/15
77/2078/778/978/1282/686/2488/12
90/1792/694/599/199/499/6100/5101/8
101/24108/19110/19113/8131/5131/5
133/15133/20139/20139/20145/7146/23
147/9147/17148/20159/1159/5160/17
161/19175/11179/16182/18192/2192/5
**somebody** [7] 6/616/2595/25102/25
154/25155/1166/21
**somehow** [14] 12/815/1920/124/13
24/1625/625/1346/546/1948/858/4
115/12118/16165/15
**someone** [9] 29/430/489/7132/19
139/12161/7175/12178/19178/23
**something** [37] 7/1211/418/245/451/11
51/2252/1652/1853/1056/1659/2361/10
67/2172/2072/2173/273/1374/392/9
93/2596/2297/298/1499/17104/22
105/22108/5113/10116/21126/21130/22
132/4135/15137/8139/137/24166/15191/24
**sometimes** [2] 91/295/11
**somewhat** [1] 91/15
**sonogram** [2] 14/1614/16
**sooner** [1] 98/4
**sophisticated** [2] 91/21191/7
**sorry** [6] 81/7126/10127/19156/22
164/25191/19
**sort** [28] 11/1315/2436/1640/2253/21

**59**/2367/2178/982/1883/1983/2285/10
85/1187/1995/2395/2395/2496/1298/10
99/21105/17105/18107/3123/16162/17
184/18184/22184/23
**sought** [1] 20/12
**sound** [6] 10/1219/1919/2232/885/11
135/3
**sounds** [5] 61/23132/6153/13153/14
186/10
**source** [9] 34/234/658/23146/9154/14
155/19156/14161/21166/1
**Sovereign** [5] 110/25111/2111/13112/5
113/14
**space** [1] 52/23
**speak** [5] 84/25106/22106/24110/14
153/5
**speaking** [6] 42/481/1282/684/6100/6
106/2
**speaks** [1] 106/18
**specialized** [2] 145/5175/7
**specific** [9] 53/2569/883/19113/24
145/1171/11178/20178/23188/9
**specifically** [19] 48/2349/1149/1449/19
49/2355/2165/366/166/1066/1767/4
67/1368/2179/13142/21142/22151/4
157/6177/17
**specification** [1] 49/12
**specify** [2] 50/950/12
**speculate** [5] 156/17156/17159/18
163/22166/19
**speculation** [3] 158/22159/10166/22
**spellings** [1] 47/21
**spend** [2] 87/299/6
**spending** [1] 19/25
**spends** [1] 55/13
**spent** [1] 31/12
**split** [1] 86/11
**spoke** [3] 106/5110/18110/19
**spot** [1] 98/18
**stack** [3] 47/14118/25118/25
**staff** [1] 80/13
**stamp** [1] 46/4
**stand** [6] 25/896/296/1196/17107/4
168/1
**standalone** [2] 62/13105/18
**standard** [20] 24/2233/2033/2534/1
34/134/1039/1548/248/2249/152/10
52/2252/2554/654/1254/2361/961/19
181/4182/2
**standards** [4] 6/2144/1444/15180/19
**standing** [35] 121/8121/15121/15
121/19121/22122/5122/20122/24123/2
123/4123/5123/5123/6123/7123/10
123/11123/15123/19123/23124/22
124/25125/1125/18127/12127/14127/20
128/8130/3130/5130/24131/17169/1
185/25186/2186/17
**standpoint** [1] 129/3
**start** [17] 6/143/2078/685/2102/11108/3
108/310/18121/19121/19125/1134/11
141/6170/13170/14184/8184/18
**started** [11] 27/1443/2078/383/2284/3
84/490/14131/22131/23172/7178/23
**starting** [10] 6/2113/128/1532/676/12
97/16103/22117/20140/21159/23
**starts** [4] 12/2513/413/891/5
**Starview** [16] 3/85/15/340/1482/10
82/14165/23167/7168/4168/7168/9

**S**

**Starview... [5]** 168/16168/17169/4 170/12187/8
**Starview Global [1]** 82/14
**Starview's [2]** 169/8169/11
**state [17]** 139/8139/14140/6140/11 140/16140/19141/14142/22154/3154/6 156/4159/25159/25160/1160/21161/24 188/4
**stated [5]** 34/11141/15143/12146/12 168/8
**statement [11]** 31/1632/1692/2293/3 98/1299/1165/20171/20172/6172/21 181/1
**statements [5]** 92/1292/1792/2292/25 162/10
**states [8]** 2/125/625/1456/1071/21 163/23168/10193/5
**stating [1]** 112/14
**status [1]** 165/8
**statute [8]** 39/1060/1118/3119/7120/2 125/24136/5136/17
**statutory [4]** 123/7123/10125/17125/22
**stay [3]** 90/1693/8179/18
**staying [2]** 91/194/5
**stays [1]** 93/16
**steal [1]** 178/12
**Stenograph [1]** 193/7
**Stenographic [1]** 1/12
**stenography [1]** 2/17
**step [1]** 115/3
**steroids [1]** 6/18
**Steve [1]** 4/14
**STEVEN [4]** 2/133/23/64/23
**still [22]** 25/1131/1940/1143/744/13 50/672/2583/583/1699/2100/15109/19 109/20110/15135/5143/20149/11154/22 157/16164/16173/21184/11
**stipulated [1]** 86/1
**stipulations [6]** 99/199/899/999/11 99/1299/15
**stop [1]** 162/2
**storage [4]** 35/2235/2236/4113/8
**store [3]** 111/16145/7191/3
**store's [1]** 111/21
**stores [1]** 145/4
**story [3]** 157/13157/23157/24
**straight [2]** 85/9104/15
**strategy [1]** 89/2
**strength [22]** 17/317/431/431/547/24 108/24109/2109/6109/21109/25110/9 111/12111/21111/25112/24149/17 149/19149/23150/19150/21151/10181/9
**strictly [1]** 112/24
**strike [8]** 30/788/1788/1988/2188/25 88/2588/2589/1
**strikes [8]** 42/183/1083/1188/688/16 88/1888/2288/23
**striking [1]** 88/22
**strong [5]** 17/155/1094/6108/25185/3
**struck [1]** 45/5
**structure [3]** 70/22172/9173/11
**struggle [1]** 104/8
**studies [1]** 71/8
**stuff [1]** 156/23
**subject [13]** 38/1769/11100/9113/11 123/4123/12130/4130/12137/7138/17 163/9175/7186/1

**subliminal [1]** 170/6
**submitted [5]** 46/16/1/171/122/312/27 131/21
**subpart [1]** 10/15
**subparts [3]** 16/13181/7181/11
**subpoena [1]** 100/10
**subscribed [1]** 139/12
**subsequent [1]** 121/11
**substantial [9]** 27/2129/229/21121/21 122/1124/9148/6173/19179/9
**substantially [2]** 69/23100/11
**substantive [2]** 5/21101/5
**subvert [1]** 18/18
**such [8]** 49/1957/574/5102/9102/9 113/1165/3168/17
**sue [1]** 129/5
**suffered [1]** 40/13
**sufficient [2]** 163/8180/12
**sufficiently [2]** 34/4120/16
**suggest [4]** 35/2337/446/5113/5
**suggested [2]** 89/1189/14
**suggesting [2]** 46/19136/11
**suggests [2]** 37/5146/21
**suit [2]** 46/13185/16
**sum [1]** 8/20
**summarizes [1]** 159/12
**summarizing [1]** 159/15
**summary [29]** 7/2210/1411/2411/24 15/1216/816/1516/1716/2422/1235/11 35/1243/147/2257/1557/1580/1109/4 109/5109/14109/24125/12131/21134/21 137/7138/2142/24163/7168/11
**summation [1]** 7/25
**summing [1]** 7/10
**summoned [1]** 88/4
**sun [1]** 47/21
**super [2]** 60/25164/25
**Superfund [1]** 164/24
**superior [5]** 24/324/13114/6115/5185/7
**supermarket [1]** 112/1
**supersede [1]** 162/17
**supplement [2]** 164/6164/14
**supplemental [4]** 79/679/9162/17173/5
**suppliers [1]** 176/4176/5
**supplies [1]** 58/11
**support [8]** 8/581/13125/19139/25 140/1141/11149/18150/16157/8157/10 157/20157/24159/7159/12163/17166/16 167/2176/15
**suppose [1]** 104/23
**supposed [8]** 9/49/1711/211/544/18 46/1082/23157/18
**supposedly [1]** 11/10
**Supreme [1]** 123/8123/9
**sure [39]** 5/1612/2121/2534/1340/11 43/1744/1354/767/1778/178/979/280/7 82/2489/1792/194/995/195/2095/21 96/1697/697/2398/8100/3104/1108/1 108/16115/18119/127/17131/7131/25 143/15143/23159/23165/10165/12167/8
**surprise [1]** 27/13
**surprised [2]** 33/595/5
**surrounding [1]** 160/20
**suspect [1]** 87/1
**sustains [1]** 98/11
**SUV [1]** 73/20
**SW [1]** 2/21
**swing [1]** 84/19

**sworn [2]** 119/24131/5
**syllable [1]** 15/18
**system [2]** 51/1293/11
**systems [2]** 2/1951/5

**T**

**table [7]** 4/184/2384/1993/14106/5 133/4192/6
**tackle [1]** 5/19
**Taiwan [31]** 4/225/15/45/881/2082/10 82/11133/13133/13141/8153/7163/6 163/8163/16164/22165/22166/21165 169/19170/2170/4170/12170/15170/17 170/25171/1171/22172/10178/7187/8 189/19
**Taiwan's [2]** 148/12163/12
**take [43]** 6/326/826/927/636/2444/5 48/948/1356/573/2577/1377/1877/20 77/2378/1178/1378/1878/2080/2088/8 88/1196/2397/1398/18105/2107/17 108/2110/3116/14116/24117/6131/2 132/1132/1133/3135/134/1743/14 143/20144/4147/4179/15187/13190/19
**taken [8]** 6/1548/1678/24101/8132/4 139/20144/2180/2
**takes [2]** 145/8145/10
**taking [4]** 42/172/480/14115/2147/3
**talk [19]** 13/2316/138/341/348/1148/19 49/149/2161/564/265/869/269/569/20 76/578/1882/1699/25136/19
**talked [6]** 33/1133/2133/2150/2568/9 135/19
**talking [28]** 15/522/1030/238/2539/1 43/2245/647/1648/2349/1154/155/21 55/2260/2366/1797/22102/19107/8 134/13143/9155/13167/10171/2175/11 177/18178/2188/8191/5
**talks [12]** 32/1932/2233/1334/1552/12 52/1365/867/1967/2268/168/769/16
**Tally [1]** 10/222/23116/7
**Tally-Ho [3]** 10/222/23116/7
**tantamount [1]** 20/6
**target [1]** 177/21
**targeting [1]** 177/17
**Targus [8]** 121/10121/11121/18122/3 124/11124/20133/3187/4
**Targus's [1]** 124/21
**tasked [1]** 38/10
**team [2]** 81/1294/21
**tech [3]** 18/781/17117/20
**technical [8]** 53/457/1159/159/1359/18 60/6153/11175/7
**technically [2]** 54/354/14
**technology [16]** 1/132/73/53/84/926/24 27/180/1180/1282/291/2391/2492/2 94/19179/21193/9
**Ted [1]** 2/21
**tell [17]** 10/2311/312/717/921/222/15 25/2028/433/240/1044/2345/1972/20 72/2083/891/2298/22
**tells [1]** 62/6
**ten [4]** 95/24103/8133/15143/14
**ten-minute [3]** 95/24103/8143/14
**tenants [1]** 6/20
**tend [3]** 16/495/396/13
**tends [1]** 91/9
**tenuous [1]** 43/4
**term [18]** 15/2336/344/1744/2455/16

term... **[13]** 55/2356/1457/1059/459/19 60/660/11113/6142/13165/9166/10 170/2189/20

**terminology [2]** 50/11185/10

**terms [15]** 8/511/723/2323/2455/15 56/2456/2581/1296/1116/25142/23 143/1170/13181/24185/10

**terribly [1]** 93/24

**tertiary [1]** 66/2267/168/1275/1875/21 75/2276/2176/24

**test [39]** 7/27/239/311/1715/2018/19 18/2020/723/1545/1163/1863/1964/5 64/1364/1364/1464/1565/265/665/865/9 65/1165/1966/766/1869/1169/2470/6 70/1670/2474/1174/1374/1474/1476/5 76/2377/277/4183/16

**testable [1]** 69/11

**testified [1]** 71/13

**testifies [6]** 8/1027/1727/1853/761/12 61/16

**testify [14]** 26/141/2342/2344/2355/10 56/2061/1562/23100/8106/16106/19 152/6175/1175/7

**testifying [6]** 25/2542/25181/3181/5 183/11188/23

**testimony [47]** 8/118/1212/1241/14 42/942/2243/844/1052/855/1256/257/18 57/2362/562/1462/1674/875/2577/10 97/2102/7110/20131/5133/15133/20 135/7135/16152/5152/17153/12173/22 173/23173/25173/25174/2174/14175/9 175/16180/16181/25182/5182/7182/11 182/13183/9183/18190/5

**testing [1]** 70/4

**tethered [1]** 93/10

**textbook [1]** 72/11

**than [37]** 6/247/128/18/158/1511/18 11/1816/2519/224/1633/1645/1652/3 66/1171/172/873/673/1775/1176/17 77/1882/1890/2591/594/794/2395/9 103/7106/18113/17131/8165/11171/4 173/4175/14177/21180/4

**thank [34]** 5/1026/626/727/342/1342/14 47/2560/1560/1671/376/277/580/481/6 81/782/1587/25106/10107/25113/23 120/25150/12159/21164/18169/14 170/19172/20174/23178/16179/13 179/22182/19182/21192/6

**that [1404]**

**that's [239]**

**their [118]** 11/2418/123/123/1923/19 24/2125/1025/1027/2429/1033/2435/3 35/737/2540/1341/2342/1042/1046/23 46/2447/1855/155/158/958/1561/10 64/2066/367/2568/1069/1784/2586/7 87/1987/2488/1896/1596/17101/16 114/12114/15114/18114/23117/25 122/21122/21122/25122/25124/5124/14 125/12125/14126/12129/6129/3129/5 129/24130/25132/14134/10135/5135/6 135/12137/8137/10138/4138/16138/25 140/9140/23140/25114/22142/11145/4 145/23145/23146/5146/14146/18147/6 147/24148/24149/2149/10149/14149/15 149/15149/23150/2152/4152/11152/14 153/2154/9158/5161/8161/8163/13

164/6164/11167/15168/11168/16169/4 168/22176/376/2517/723178/1183/18 185/6185/16

**them [77]** 5/247/1818/1821/621/723/15 23/1823/2030/1336/2537/2144/344/19 56/563/966/868/1574/2174/2275/25 76/2583/883/2584/584/585/985/1085/12 86/288/489/690/1290/1390/1690/17 91/1791/1996/5100/24102/14102/25 103/1104/19105/2106/2107/11108/20 113/8114/17114/22114/25116/3116/8 120/20135/16135/19116/10141/22142/7 145/11145/24153/8156/24156/25157/17 160/6162/12162/12162/19165/18169/22 170/17177/24178/13178/19180/17 184/24

**theme [1]** 92/8

**themselves [6]** 7/1645/17112/2146/8 170/20176/6

**then [104]** 6/208/1410/2513/1516/14 17/1518/2419/219/819/2021/1832/132/9 35/636/936/2247/1347/1448/1450/554/5 55/1856/2358/2058/2459/960/1863/2 63/1664/1765/1666/966/1266/1666/23 67/2268/1272/272/2272/2574/2475/1 75/1275/1675/2278/678/1478/2381/21 84/184/1685/385/1686/1386/1488/15 88/2088/2288/2591/13107/17108/2 109/11115/19118/7122/24124/21127/12 128/11128/14129/21130/8131/3132/1 132/18136/21138/3138/5138/6138/14 138/24140/25143/9145/9147/1154/22 154/25155/2155/7156/25157/20159/5 159/7159/12163/16165/14166/4166/9 166/20167/21177/20177/20178/10179/10 184/13

**theories [2]** 69/7168/9

**theory [12]** 129/6134/25163/5163/12 168/6168/7168/10168/15168/19168/20 183/22184/1

**there [150]** 7/17/17/37/67/208/312/20 15/115/2216/1016/1016/1316/1417/7 18/1518/1619/420/821/1021/1422/325/4 27/427/1028/2429/329/1930/1130/20 32/2132/2434/634/1534/1734/2535/12 35/1836/136/138/1039/1240/2046/12 46/1646/2047/1849/2151/1554/2055/14 55/1957/2259/759/2260/461/1162/4 64/1364/1965/1465/1969/672/773/15 78/1779/680/1082/1784/1884/2188/3 89/289/391/592/1792/1899/1100/1 101/11102/21104/21109/7109/11111/4 111/16111/2112/13112/25113/4113/5 113/17117/17119/16120/2120/5120/17 121/9123/20123/20124/24126/6126/6 126/11127/5127/12127/14127/19127/21 128/2129/11130/21134/1135/2141/7 146/2147/16150/3150/17150/25151/7 155/17158/22161/24161/25162/2163/21 164/25165/1166/1166/18167/15167/16 167/17167/21168/4168/24169/6171/14 176/6176/14176/15176/22177/6177/24 178/11178/13179/9184/12189/5

**there's [86]** 7/67/218/28/29/210/612/6 14/717/1919/829/142/1329/1932/23 33/2433/2537/640/2443/1444/246/17 49/552/2358/2060/966/1067/2369/24 69/2470/774/376/1590/1994/1396/21

101/9101/19103/18104/14104/22105/22 107/18106/5108/14113/16117/23117/24 118/16118/24120/3124/3127/23128/20 128/24129/23131/1132/7132/7132/16 133/2113/3137/143/20145/1147/9 149/1149/4154/5154/23156/9156/15 158/6158/10164/10166/4166/7166/16 166/20168/20170/6170/17177/5 178/22179/10179/10

**thereby [1]** 121/21

**therefore [20]** 6/166/257/2011/1417/2 18/1328/2460/7123/1125/25130/19 142/9145/15146/8146/10148/8148/8 148/20163/9187/11

**therein [1]** 120/20

**these [106]** 7/2112/412/412/1714/8 16/2016/2116/2418/818/1220/1120/18 20/1820/2020/2523/1628/2329/330/8 30/830/1531/332/333/133/333/633/8 33/1334/234/434/437/1637/1837/2438/2 38/838/1239/239/241/742/2146/447/20 47/2148/1057/1258/460/2462/2462/25 66/1569/169/469/2573/976/1376/21 76/2477/1577/1577/2078/1589/1289/17 102/18108/2108/12113/24118/1118/12 120/9120/22124/23131/6131/18132/16 139/7139/7144/5144/15144/20144/24 145/12145/21145/22146/9146/10146/13 146/15156/6158/11160/14161/10161/10 166/4166/23171/10176/13176/24176/24 177/8177/11177/11178/1184/24186/10

**thesis [1]** 118/14

**they [304]**

**they'll [1]** 129/9

**they're [89]** 12/212/214/2117/217/5 17/2318/1119/1121/522/2530/233/1 40/1540/2540/2541/641/744/1846/3 54/1754/2554/2555/258/1861/361/861/9 61/1961/2363/564/165/1465/2065/21 65/2265/2265/2368/1571/1175/1575/16 77/391/1896/17100/10110/8110/8116/9 116/11125/15127/20136/15136/15 137/11137/24141/23145/2145/4145/22 146/7146/7147/12147/17147/24148/19 148/22150/4154/11156/7157/9160/3 160/3164/16166/14169/20171/21174/13 174/17174/18175/11177/21178/2178/3 178/8178/9178/10178/13183/16191/8

**they've [9]** 11/767/2183/984/8130/25 136/1139/10152/6168/9

**thing [21]** 7/167/188/1313/2113/22 43/1345/554/1154/1364/1872/1883/7 98/10106/9113/2140/13153/1155/22 159/11191/7191/12

**things [25]** 12/513/2131/1233/740/13 43/555/1257/1259/859/1660/1961/1 61/1162/2462/2564/1469/2570/477/20 78/1095/3162/22186/20190/24191/13

**think [89]** 8/248/2420/1524/1133/11 34/2035/935/2337/339/1339/1441/1 41/1742/543/1043/1844/1345/2545/25 47/848/1049/1852/1752/2353/854/254/3 55/460/2261/1161/1562/463/874/177/2 77/679/1381/481/883/2184/1386/17 86/2587/1887/2389/1189/2591/2291/24 92/496/999/499/5101/18101/19104/6 104/14105/3106/1107/24107/24108/8 116/25117/13117/15118/10118/20129/2

think... [21] 133/5135/18136/24139/23 150/17151/11152/3152/4152/18153/20 158/14162/14164/5165/16166/1168/23 169/1169/12170/10186/4191/24
thinking [2] 55/23117/25
thinks [1] 156/11
third [10] 12/1814/215/1932/8111/7 111/11111/17111/18145/10175/5
Third Circuit [1] 175/5
third-party [6] 14/2111/7111/11111/17 111/18145/10
this [383]
THORPE [2] 3/85/3
those [73] 16/416/418/1720/1420/15 21/1523/2423/2433/739/942/1648/12 49/1650/2052/557/564/2166/367/267/13 68/1368/2469/2169/2280/2481/1383/11 84/284/384/484/884/1285/385/1185/24 86/388/1188/1488/2190/290/590/590/9 91/1094/1795/1195/1996/1196/1498/9 100/4105/13109/6110/2111/8111/10 121/14121/16124/4125/4125/9127/8 132/18132/18140/19143/22145/12150/9 165/3181/18181/24184/4191/10
though [11] 32/1638/2244/250/572/1 84/790/2193/22147/20156/24157/21
thought [12] 5/1824/2446/267/1195/5 145/16156/23157/15157/22169/7173/8 174/8
thoughts [1] 179/16
thousands [1] 28/1
three [22] 56/963/1465/665/865/965/11 70/1670/2274/1474/2374/2576/581/1 83/1088/2192/18139/5143/9171/5 171/10180/10183/12
three-decade-plus [1] 180/10
three-part [5] 65/665/865/965/1170/22
three-way [4] 70/1674/1476/5183/12
threshold [1] 19/13
through [40] 5/145/175/186/227/98/21 8/2413/213/1917/722/625/1828/1529/3 30/461/361/666/1574/1774/2178/781/1 84/1085/1085/1387/288/197/6100/2 106/14108/8113/24127/4132/15137/12 153/4161/8175/16183/17183/17
throughout [2] 126/12168/19
throwing [1] 116/3
thrust [1] 150/17
thumb [2] 36/1894/19
tied [2] 93/10117/14
ties [1] 113/20
time [59] 5/155/1619/2527/1631/12 31/1344/2546/1649/1755/1365/977/24 78/380/1880/2080/2380/2583/2284/4 85/2486/1886/1986/1986/2087/387/10 89/1489/2591/992/992/1193/2395/9 96/1197/798/299/799/21101/2103/2 107/20108/12108/15115/12125/11 125/15126/22129/17149/1158/1158/21 165/17171/13178/178/23182/12187/12 190/20191/4
timeframe [1] 95/13
timers [1] 94/13
times [3] 84/991/1177/22
timing [2] 48/12186/5
Tire [1] 33/20
tires [2] 73/2173/21

title [1] 140/1
titled [1] 83/18
TMEP [4] 49/2250/150/550/13
today [8] 5/135/1486/2129/12149/2 182/18184/11184/15
together [5] 38/855/1676/6157/1169/21
told [9] 25/2126/239/741/1643/580/10 107/9159/12166/21
tome [1] 54/7
TOMLINSON [3] 3/65/781/21
too [13] 6/136/1319/2481/8101/19 146/11153/10156/15157/157/1158/10 166/16185/21191/6
took [1] 180/4
tool [2] 172/14172/15
top [3] 65/1567/17154/23
Topics [1] 143/24
total [3] 8/2085/2092/25
totally [1] 105/2
touched [1] 147/5
toward [1] 150/13
towards [2] 72/17149/17
track [2] 12/2231/18
tracking [1] 115/19
trade [12] 6/2313/1340/345/11115/14 145/25146/5146/10146/18146/23176/23 180/11
trade dress [6] 146/5146/10146/18 146/23176/20/23180/11
trademark [88] 6/96/209/110/1511/3 17/1117/2417/2518/418/818/1120/20 20/2121/221/522/122/422/622/2523/11 24/225/1427/2227/2428/128/931/731/7 38/438/738/1538/1838/2238/2539/8 39/1241/1244/145/2546/446/646/12 46/1948/2549/949/1052/460/360/23 109/13109/23110/4110/23111/6114/6 114/20115/24115/16116/21117/18118/8 118/8118/11118/19117/19119/19120/20 120/5120/19120/20132/1132/2140/12 146/10146/22149/16150/2151/1160/2 171/1180/12181/14181/16181/19185/7 185/15185/16185/20
trademarks [13] 13/2414/816/2017/8 20/221/1523/1634/1841/744/1114/20 180/10181/18
trained [4] 29/4119/19120/5120/20
training [6] 28/1151/551/851/1269/1 180/16
transaction [1] 154/18
transcript [8] 1/11/51/81/91/142/132/17 193/12
transcripts [1] 1/2
transferred [1] 186/7
translation [2] 102/21104/12
translator [8] 101/9101/9102/1102/2 106/21106/21106/22107/2
translators [1] 106/20
transmission [1] 57/19
transmit [2] 53/554/14
transmits [2] 53/1158/23
transmitting [1] 52/14
transpired [3] 41/2142/7175/1
travel [1] 58/6
treat [1] 184/9
treated [1] 143/7
treatment [1] 70/8
treble [1] 190/8

tremendously [1] 85/8
trial [66] 6/1220/2578/880/1281/10 81/1281/1790/1091/591/591/1394/16 94/1794/2497/1399/9100/10106/13 107/12127/17128/15128/19130/2130/10 131/8132/5132/9133/14137/16137/17 139/23140/23142/15142/19147/7149/2 149/8149/10150/10157/3159/23160/5 164/5164/8165/2165/14171/11173/23 180/17184/12184/13184/13184/16 184/21184/25185/24186/7186/14188/4 188/10
trials [1] 95/12
tried [13] 16/1524/2325/2233/251/6 51/19107/20138/2154/24155/3155/14 158/23159/4
tries [4] 53/2253/2365/469/13
TriLink [2] 141/25
Truck [1] 167/25
truckload [1] 138/1
true [14] 11/417/2130/2232/438/838/24 40/2360/162/1099/399/4162/19189/1 193/13
truly [1] 33/22
trump [1] 118/4
truth [6] 140/6140/17157/6161/2161/23 171/20
truthfully [1] 23/9
try [31] 6/615/1723/1128/1428/2529/17 39/2139/2440/840/1240/1541/1442/6 50/2163/676/1984/1484/2488/289/13 91/792/5101/13102/14116/14116/22 129/9139/20173/6191/23192/2
trying [38] 18/219/1419/2520/420/6 23/1031/431/1832/1738/1039/1952/22 54/2555/155/255/1355/1758/358/361/3 61/861/961/2064/165/170/277/1493/23 99/7100/15103/6119/13128/12163/5 169/20169/21177/25178/13
TTAB [7] 51/151/651/1051/2155/17 59/2559/25
Tuesday [10] 97/16100/17102/5102/11 102/12103/17103/21103/22190/21 191/25
Tummond [1] 175/13
turn [8] 60/1879/386/13121/1133/6 137/25180/5184/7
Turner [2] 2/21
turning [3] 8/2274/13188/14
two [66] 7/147/149/2214/1215/617/16 20/828/1930/2543/2556/1261/1163/21 64/1165/1565/2466/767/1367/1569/1 69/969/2369/2581/183/585/2191/12 92/1892/1992/2292/2495/8100/13 102/19102/22106/12108/15111/8121/9 121/13124/6124/23125/4125/5127/22 131/17139/6139/8139/10141/20143/20 146/14149/6149/7149/7150/3154/16 160/19166/17166/24168/9169/21169/23 170/7177/17177/11
two-part [1] 66/7
twofold [1] 110/22
type [15] 6/1713/2514/2522/2135/3 37/1783/2087/1887/2396/14112/18 113/6115/4142/8179/11
types [2] 160/15172/14
typewritten [1] 193/12
Tyra [1] 81/16

**U**

**U.S [34]** 1/142/204/225/781/20141/6
141/8145/3145/15148/12157/19158/4
163/6163/8163/15164/22165/22166/15
166/20169/18170/2170/3170/11170/15
170/17170/25171/13171/22172/10
176/15177/14178/7187/10189/19
**U.S. [1]** 187/11
**U.S. law [1]** 187/11
**U.S.'s [4]** 142/13144/17145/16146/17
**U.S.C [3]** 49/2118/4119/6
**U.S.C. [1]** 49/11
**ultimate [11]** 6/97/514/135/252/1161/20
62/3112/20112/22174/11181/5
**ultimately [5]** 20/4181/11182/10182/13
184/15
**ultra [33]** 17/817/1320/220/1022/16
22/1722/1824/532/1937/737/839/439/20
39/2340/4113/1114/4114/7114/12
114/14115/12116/16116/19116/22117/4
118/22118/25119/1120/18141/2142/5
185/6185/20
**ultra-related [2]** 17/13118/24
**UltraDrive [75]** 18/2219/1519/1719/20
20/920/1121/122/1423/223/632/1538/2
38/1343/346/1746/2157/674/23113/4
115/14116/10116/17117/3117/18118/13
118/18119/18139/14140/1140/3141/2
141/6141/9141/21141/22142/6142/13
145/23146/6146/7146/19147/19147/20
152/21153/20154/14155/4155/8155/18
155/23156/18157/15157/22157/25158/2
158/3158/7158/8158/8158/15158/20
159/3159/5159/6173/22174/16174/19
176/16176/21176/23178/14178/21
181/16185/15190/4
**Ultradrive Kit [1]** 32/15
**ULTRADRIVEMINIDOCK [8]** 20/11
32/1438/13119/17141/21146/6158/7
181/16
**UltraDrives [3]** 145/16152/25187/10
**ultraflow [1]** 32/22
**ultrasonic [3]** 17/1519/737/14
**UltraStation [10]** 22/1723/1939/22
114/13114/16114/18114/23114/25
116/16116/21
**unaccused [2]** 145/25146/25
**unauthentic [4]** 137/6138/25187/25
188/1
**unavoidable [2]** 35/4112/18
**uncontested [1]** 162/4
**under [51]** 8/108/118/168/188/199/18
10/1811/1711/2014/2441/1743/747/21
48/950/2052/758/1363/275/1687/10
89/16100/7110/7110/9111/10113/22
124/25127/5131/13131/15139/8147/23
147/25150/1151/8154/3154/13156/6
156/12157/12160/21161/11161/11168/6
168/7168/19169/1172/15173/25175/8
183/15
**underlying [2]** 22/8108/19
**underpin [1]** 69/8
**underpins [1]** 67/4
**understand [21]** 25/125/1125/1730/13
37/1037/1139/640/142/1952/1753/3
54/1054/1968/2268/2281/3116/21
117/25123/18131/9135/25
**understandable [2]** 50/1460/7

**understanding [13]** 14/942/1162/1
71/1671/1998/9106/20129/24150/7/4
142/23162/16173/14174/2
**understood [4]** 42/550/1153/12103/10
**undisputed [1]** 121/23
**undoubtedly [1]** 71/6
**undue [2]** 110/10118/6
**unduly [1]** 110/10
**unfair [1]** 8/20
**unfairly [2]** 178/19179/3
**Unfortunately [1]** 140/4
**unhappy [1]** 159/8
**unhelpful [1]** 183/9
**UNITED [7]** 2/125/625/14163/23167/18
168/10193/5
**United States [4]** 25/625/14163/23
168/10
**unless [10]** 5/1863/1097/21100/3
104/14105/22107/16113/24132/5153/21
**unopposed [5]** 132/7133/11152/9
173/13175/19
**unpersuasive [1]** 51/7
**unpredictable [1]** 191/11
**unqualified [2]** 180/9183/6
**unquote [2]** 45/9159/12
**unrelated [4]** 110/1110/5119/15185/20
**unreliable [3]** 180/23183/20183/20
**until [16]** 41/948/1377/2378/2388/20
102/5103/17131/16131/21134/11136/22
141/7151/15164/6190/25191/2
**untrue [1]** 136/7
**unused [1]** 148/5
**up [66]** 6/247/97/108/2513/1824/25
27/1029/745/648/1453/255/1455/17
62/2364/676/677/1377/1678/1178/13
80/2586/286/1286/1488/688/888/988/11
88/1289/190/895/2197/1098/18101/6
105/2105/21107/17108/2110/13118/22
118/23119/2127/24128/22131/2131/7
132/4132/11132/11138/24138/24142/5
142/7144/4155/24156/10168/3174/7
177/23177/25178/2178/10178/24179/23
190/19
**updated [3]** 52/479/1797/12
**upgraded [1]** 26/24
**upon [9]** 34/445/285/1598/1101/14
115/12119/23152/23174/20
**urging [1]** 34/8
**us [26]** 25/526/1127/228/639/2277/24
78/279/2279/2381/1382/783/492/15
98/20102/16103/2103/4104/6126/22
128/3129/24131/12131/14131/19134/13
149/7
**usage [8]** 10/810/1414/222/623/123/13
35/24165/25
**usages [2]** 10/1331/10
**USB [5]** 54/655/2257/457/8146/3
**USB-C [1]** 146/3
**USBs [1]** 54/8
**use [81]** 4/229/239/2410/210/210/6
10/1810/1910/1910/2010/2411/1112/12
12/2313/2318/1919/1421/2422/622/8
22/2222/2422/2423/1723/1924/624/13
31/131/231/731/732/132/144/2044/24
46/354/755/1561/361/861/986/786/18
87/387/787/2491/2391/2391/2494/2
95/1596/14105/3107/8107/11111/12
111/20114/3114/6114/11114/12114/14

116/9116/16116/23116/25117/1117/4
132/24120/1153/12153/19166/5170/11
171/3181/20181/24185/6185/9189/20
190/3
**used [47]** 1/136/126/126/179/89/13
11/1311/2211/2312/113/2515/915/18
16/2117/422/1723/2036/1737/1840/4
40/547/347/347/757/160/460/1171/16
71/2372/2108/24110/6111/19114/25
114/25115/12115/16116/10116/10
134/23141/23142/6164/20165/14170/1
170/2181/7
**useful [2]** 101/1
**user [17]** 11/1411/1922/122/322/422/16
22/1822/2523/5223/2339/18114/19116/2
116/9116/15117/3181/21
**user's [1]** 22/4
**users [3]** 36/10114/5185/7
**uses [6]** 16/13111/7111/17111/18
142/11169/10
**using [24]** 18/2223/223/2349/1650/11
51/1559/465/2371/25101/9114/18116/2
123/16141/8142/6151/6153/8160/19
163/11165/10166/10170/3170/14
172/14
**usual [1]** 77/18
**usually [4]** 90/1991/18148/16191/21
**usurps [1]** 174/12
**utilize [6]** 83/1484/1685/2491/894/14
96/10
**utilized [1]** 100/4
**utilizes [1]** 88/21
**utilizing [1]** 87/19
**utterly [2]** 10/310/9

**V**

**vague [1]** 86/21
**valid [3]** 48/2549/9121/25
**value [2]** 117/7134/18
**various [6]** 31/1865/1071/1980/1286/11
121/8
**veil [2]** 165/19166/3
**venture [1]** 14/23
**verbatim [2]** 162/22162/24
**verdict [5]** 82/23164/10164/11186/19
186/22
**versa [2]** 17/13165/22
**versus [4]** 37/1553/1954/13123/18
**very [33]** 17/2422/922/2027/1734/7
36/1053/1955/1072/1573/473/1676/3
84/1184/1689/291/291/2492/695/4
110/11114/13128/1142/17142/18143/5
145/4147/5151/24157/23165/18175/11
175/14191/11
**vice [2]** 17/13165/22
**video [11]** 14/1436/12102/18102/20
104/13104/22104/23104/24174/7174/8
175/11
**view [4]** 86/698/17117/11184/18
**viewing [1]** 174/6
**views [2]** 71/22138/25
**virtue [1]** 175/6
**visible [2]** 9/15
**vision [1]** 68/24
**visit [2]** 43/6182/5
**visual [6]** 6/257/1771/1171/19142/25
183/22
**voir [2]** 78/1289/5

**voluminous [2]** 85/885/9
**VP [1]** 172/3

# W

**wait [1]** 95/25
**waiting [1]** 99/5
**waivable [3]** 123/2123/11123/12
**waived [9]** 25/1398/23123/1125/16
126/1128/25130/11130/23149/10
**waiver [2]** 130/19186/25
**walk [2]** 96/2153/3
**walking [4]** 22/972/1796/1796/17
**wall [4]** 53/1056/1156/1757/3
**want [53]** 6/615/1419/121/921/927/5
27/1528/946/347/1750/2156/463/23
65/1878/1478/1779/2279/2280/2480/25
81/181/1085/1686/1193/2594/2100/2
101/4101/11104/22105/23114/13115/18
116/19128/22128/23129/24130/6130/11
131/2133/19135/10136/10136/10156/24
161/15169/6176/10176/13178/5190/24
191/2191/23
**wanted [9]** 77/1382/2485/1697/23
101/23118/8134/5134/12182/18
**wanting [2]** 114/14133/13
**wants [18]** 10/2311/213/2213/2213/23
14/122/1525/2026/126/128/642/2349/3
98/11106/19133/154154/12173/21
**was [171]** 1/136/136/136/149/229/23
10/1710/1910/2011/1214/1316/1720/13
21/1422/1123/524/2425/2126/227/23
32/232/2535/935/1538/1338/1439/13
42/2443/243/343/545/545/646/1646/17
46/2047/748/1649/1649/2150/251/251/4
51/1551/1853/1553/1654/156/1559/4
59/1960/2362/162/162/262/362/464/13
64/1564/1764/1865/465/973/1074/18
78/2479/679/1279/1380/1081/882/17
82/1782/1782/1982/1982/2182/2282/22
82/2389/1289/1299/1101/8104/17
104/20106/6106/13107/7107/21109/7
111/10111/22116/17116/21116/23118/11
119/11119/12120/4121/14122/4122/11
122/14122/15122/16124/8126/21127/7
127/11128/7128/9131/19132/2133/1
137/7137/9139/25141/5142/20142/22
144/2147/21148/25149/1149/5149/9
150/1150/7150/16150/22150/25151/5
151/15151/19151/22151/24151/24153/1
153/25154/10154/13154/14154/18
155/18155/22157/15157/22158/12
158/25159/5159/7162/1162/15162/15
162/20162/21163/9167/19167/24168/8
169/7171/12172/12174/174/174/16175/13
176/15180/2180/6187/24
**wasn't [12]** 10/2329/753/1453/15105/6
115/8131/20151/18151/19157/25158/20
167/23
**waste [3]** 83/2295/895/14
**wasted [1]** 86/20
**wasting [3]** 84/992/993/23
**water [1]** 34/12
**way [54]** 9/89/89/99/1711/1011/1822/20
25/1531/2244/345/1645/1846/1854/14
55/661/265/2169/2469/2470/470/570/16
74/1476/576/2083/384/1589/2392/4
93/15102/25103/1103/18104/18105/17

**ways [1]** 160/4
**we [358]**
**we'd [1]** 132/24
**we'll [20]** 4/2226/1848/1148/1471/14
78/1178/1478/2279/1983/183/25100/23
100/24100/24105/10105/12108/13
110/18113/25143/16
**we're [77]** 5/129/2110/1711/1321/22
22/927/637/2538/2439/139/2142/242/6
43/1143/1243/1343/1547/1648/2349/14
58/1868/1679/1380/1583/588/291/17
93/2396/2397/1499/5100/15100/25
102/8103/18103/22104/8105/9106/8
115/25115/25116/13119/5132/13132/13
135/2135/2135/5135/22136/4136/9
136/18136/23136/24137/4138/3138/3
138/5140/5140/6147/9147/15153/13
153/15161/18165/1165/13165/17
165/18169/15170/21171/2173/18175/17
178/17179/21192/7
**we've [14]** 39/1396/25105/25127/3
133/8138/22139/24140/9140/13152/19
153/17160/11160/12
**weak [5]** 14/314/2415/2043/23108/25
**weakness [12]** 8/2314/715/1515/21
16/1430/1843/2447/24109/7109/22
109/25111/12
**weaknesses [1]** 110/9
**weave [1]** 180/19
**webcams [1]** 145/22
**webpage [1]** 158/9
**websites [1]** 63/1
**Wednesday [3]** 98/3100/19102/7
**week [7]** 5/13131/8149/2151/15191/19
191/20192/3
**weeks [5]** 90/22149/7155/7171/14
171/14
**weigh [2]** 31/3138/18
**weighed [1]** 65/10
**weighs [1]** 31/2
**weight [18]** 15/2418/1418/1518/1619/1
19/419/420/2221/1533/435/137/1668/11
112/14138/19139/21160/4160/17
**welcome [8]** 87/2491/2393/2096/296/3
96/7106/8191/3
**Weld [2]** 177/4179/7
**well [93]** 4/84/185/115/225/256/107/22
8/259/113/2017/2423/427/1429/830/2
31/1331/1532/233/133/2535/938/238/18
38/2440/440/1841/1541/2244/448/151/7
51/1651/1954/1557/1160/1861/2263/6
63/864/2265/1866/366/2368/269/13
72/1572/1672/1974/175/777/577/14
78/1379/180/481/1682/1686/1590/9
91/2092/694/1596/1396/1498/1999/10
99/12102/19103/22104/7105/4111/10
119/2120/9123/25124/5126/9128/24
129/11131/7132/3132/21133/4135/22
143/18151/3151/7158/14165/6165/23
166/19179/2179/13
**well-defined [1]** 9/1
**went [7]** 28/1532/135/641/1164/12
131/14165/1
**were [70]** 10/519/1520/1321/324/25

**114/10116/3116/15117/10117/2135/25**
**138/21363/3213/2143/72137/11162/8**
179/5182/16183/12184/8186/4188/11
191/25

**weren't [2]** 146/4177/17
**Wharton [1]** 4/15
**what [225]**
**what's [15]** 22/1022/1122/1228/261/7
72/1776/1187/999/23104/5126/20
129/21150/8152/5155/22
**whatever [7]** 42/278/1487/894/18
102/12105/16136/6
**whatsoever [1]** 76/17
**when [59]** 8/1311/415/2016/1117/4
24/1424/2325/2126/326/335/1036/21
38/338/2239/939/1240/1941/1345/5
46/1254/267/1971/1178/278/682/19
84/2286/2088/1090/1990/2491/991/15
95/596/1699/2218/5119/5119/19125/6
127/3140/15140/15142/12142/21149/5
149/5154/24159/7169/8172/2173/8
175/5178/13178/23179/9183/24184/20
188/8
**where [64]** 6/226/228/2513/2013/24
16/518/1018/1823/1725/2033/1233/22
35/1236/137/544/2147/1749/249/552/24
56/1062/2465/1066/1868/2572/975/13
75/1375/1975/2175/2176/493/17101/1
101/20102/1102/1102/21103/4103/8
107/20108/14111/16112/10112/25
118/24121/14121/17137/18139/12141/8
150/2152/24159/9161/7161/7161/20
162/1167/16167/21173/5175/14186/5
191/13
**where's [2]** 15/8139/14
**whereas [2]** 75/14123/5
**Whereupon [5]** 48/1678/24144/2180/2
192/9
**wherever [1]** 93/20
**whether [65]** 9/69/610/510/1710/19
10/2012/1516/1317/1219/821/1425/24
29/2040/2445/1848/2449/849/1549/16
51/2352/754/1855/763/1563/1663/17
63/1763/2063/2469/2373/1873/1973/20
76/2085/1186/2293/2096/497/10102/17
102/17104/10104/11108/25118/14
118/14120/15124/8126/13126/20128/21
128/25129/12130/22133/2134/8134/9
141/10145/15145/15147/11156/17
163/14174/19176/22
**which [102]** 6/26/77/168/19/139/149/15
10/1015/316/621/421/2324/224/2232/10
40/141/543/143/649/1350/350/551/1
51/852/152/2454/656/156/858/658/21
58/2261/161/2466/883/286/1890/24
93/10100/14100/19104/21105/11105/11
109/4109/12109/24110/15112/9112/17
114/8114/9115/5115/15115/19115/15
120/17122/1123/4123/10123/11124/9
124/17131/23134/22135/4136/7137/9
137/20140/1140/23142/7144/5144/10**

**30/2537/1839/239/839/939/1639/18**
**40/1560/1951/4517751/2564/1464/19**
65/169/2269/2380/1086/589/889/899/2
100/1100/4101/15105/3107/9109/6
109/24111/7111/16111/17112/11112/2
112/3114/18115/15119/20128/7128/11
131/16136/23143/1144/1145/15145/17
146/6146/14146/21147/1150/5151/7
151/7154/7156/23158/15113/162/11162/11
164/22164/25170/13177/18177/25192/9
193/11

**W**

**which... [28]** 144/15145/10146/24147/6
152/20153/24154/8154/11155/14159/18
162/1164/21165/2166/23167/12171/12
172/15174/21176/9177/2180/16181/2
181/9181/24182/1182/4183/12184/9

**while [9]** 27/627/2261/1583/1583/24
96/196/2099/19170/14

**whittle [2]** 89/13100/15

**whittling [1]** 105/9

**who [38]** 6/322/1823/526/827/2528/17
29/430/430/734/1836/1238/759/1971/25
81/1181/1782/182/5100/8100/9101/7
119/24122/7124/3139/12142/4144/18
144/23145/3145/8145/8145/12160/9
161/4171/13172/2175/12192/6

**who's [5]** 39/18106/23145/8147/3
177/15

**whoever [5]** 95/21144/24157/13157/16
159/16

**whole [14]** 65/165/2066/2170/270/10
73/2584/491/4100/1112/6128/20143/6
176/6181/12

**wholesaler [1]** 147/23

**wholesalers [1]** 148/5

**why [36]** 8/712/612/1114/514/717/24
24/2125/125/1125/1129/1830/1130/12
37/1837/1940/1045/645/1546/2448/13
52/1254/559/1567/269/2176/2477/12
135/24147/22151/15156/3158/18159/25
164/14171/17175/17

**wide [2]** 57/157/12

**widely [2]** 71/1772/2

**Wiktionary [1]** 35/16

**wildly [1]** 150/1

**will [117]** 1/38/916/521/1623/826/25
28/2535/2336/137/1039/540/341/142/9
44/548/552/954/2055/2270/2471/10
75/2475/2578/278/678/1078/1380/21
80/2181/1581/1581/1582/582/682/13
83/483/983/1083/1183/1283/1784/184/5
84/1384/1584/1584/1684/2284/2384/24
85/285/485/985/1885/1885/2085/21
85/2385/2486/986/1086/1386/1486/15
87/2388/488/888/1088/1288/1588/16
88/1688/1988/1988/2290/1190/1190/14
90/1992/1592/1792/1892/2092/2594/14
95/1797/1399/799/15100/8103/2103/11
104/1112/19112/23113/25113/21138/24
139/17142/14144/5165/2166/1168/21
180/17180/18182/9182/10182/13182/16
182/16182/25183/23184/15190/20
190/25191/4

**willful [3]** 163/15163/16163/16

**willfulness [2]** 163/18167/3

**willing [1]** 117/6

**winds [1]** 119/1

**wine [3]** 15/515/533/23

**wisely [2]** 86/1887/4

**wish [10]** 7/1885/2587/893/296/10
99/22102/7131/17132/8181/18

**wishes [3]** 6/312/7186/12

**withdrawal [1]** 187/17

**within [27]** 17/855/2587/990/792/25
140/19152/5172/10172/1179/23

**without [27]** 48/770/496/3106/22
106/25113/25132/11135/16135/19
159/18167/2182/5182/9182/23185/8

187/22188/2188/6188/16188/24189/7
189/11189/15190/1190/8190/15191/5

**witness [41]** 6/17/138/1720/523/11
23/1756/862/962/1085/693/2195/21
95/2195/2596/196/396/1096/1196/13
96/1396/16102/2102/15103/18103/19
106/18106/24107/3107/4107/4117/8
136/25142/4155/1157/14158/12172/25
174/6175/5182/25188/22

**witness's [2]** 97/1174/2

**witnessed [1]** 174/24

**witnesses [16]** 5/2024/742/994/2595/2
95/695/795/995/1295/1897/22100/7
106/16114/18169/18183/18

**won't [2]** 137/12171/18

**wonder [1]** 105/24

**word [22]** 12/1913/2416/523/1756/14
60/660/1360/1761/369/15111/4111/23
112/2114/7114/12118/24146/19164/8
165/10165/14169/5169/10

**wording [2]** 111/23111/25

**words [14]** 21/155/1455/1855/2560/4
83/383/1588/2399/17111/8111/19112/3
115/3116/2

**work [18]** 7/1036/1142/2080/1381/5
91/791/991/1092/492/1594/1996/13
100/24101/12102/14105/10145/2192/7

**worked [1]** 171/14

**working [8]** 27/653/1792/492/999/2
105/9140/4180/10

**works [4]** 9/2410/2512/14163/19

**worry [2]** 27/10192/2

**worth [1]** 49/18

**would [100]** 10/2014/1414/2314/23
14/2415/1516/623/423/626/826/1527/11
33/535/535/1435/2437/444/2546/1853/3
54/354/1055/955/1056/257/2358/760/11
61/1662/562/763/2164/1064/2165/24
66/467/2468/1168/2570/1270/2174/8
76/2177/977/1681/481/481/481/994/16
94/1998/298/398/1998/1999/10100/12
100/17100/19100/20100/20101/1102/6
102/7103/5103/15103/25104/15104/21
105/19106/4107/2107/3114/4114/11
116/8116/10119/11121/5122/5129/15
130/20131/25132/1133/15135/15138/10
148/18150/2155/1156/16156/17158/1
158/19166/19167/9167/23173/23183/9
191/24

**wouldn't [8]** 7/147/1510/1819/1519/16
67/276/25119/13

**wrap [2]** 77/16179/23

**write [1]** 88/17

**writing [2]** 35/2136/3

**written [2]** 86/3182/17

**wrong [6]** 34/2589/7123/16131/13
161/21161/21

**wrote [5]** 24/2460/19155/1159/11174/7

———————————————————————

**Y**

**y'all [1]** 79/1

**yeah [18]** 30/287/2197/19104/16115/9
117/2122/19127/18129/2133/12133/19
144/1153/17157/2158/6159/16162/6
174/21

**year [4]** 18/7117/21176/21176/24

**years [10]** 6/536/667/567/671/572/10

125/5126/12149/6149/7

**yes [162]** 12/2524/2026/1326/2328/11
30/842/1742/1856/556/662/1168/21
74/1275/677/979/880/1780/2180/2181/6
81/781/1481/2587/1489/2189/2396/18
102/8103/20103/22103/25105/6105/20
106/3106/6107/14107/14108/11110/17
119/1121/22124/14126/4127/13129/2
131/4131/9131/11132/23134/16144/22
151/14155/17156/5156/23162/5162/18
163/4164/12167/9173/14190/17

**yet [1]** 137/14

**YITAI [2]** 3/84/25

**you [389]**

**you'd [3]** 26/2087/8190/19

**you'll [6]** 28/2272/2584/597/9171/25
186/24

**you're [34]** 15/466/1672/1872/1972/22
84/387/287/2490/791/2593/1293/2094/2
94/1095/895/896/296/396/7102/6103/4
106/8128/14130/17147/12151/12184/13
184/24186/13187/6191/3191/10
191/19

**you've [11]** 36/2236/2366/1683/1887/6
89/1695/1598/23112/5147/13187/13

**you-all [6]** 5/115/1986/1193/897/12
180/3

**your [162]** 4/134/204/255/27/2211/8
11/2315/1116/716/1621/2523/1526/14
27/928/228/634/1536/2236/2436/24
36/2436/2540/842/1347/2248/449/356/7
56/1556/2056/2262/1162/1962/2163/10
67/1967/2074/1276/377/1779/879/20
80/581/681/1281/1481/1982/982/21
84/1885/585/1485/1786/1886/2487/3
88/2589/1891/1091/791/2291/2592/15
92/2093/393/1493/2194/1195/1796/1
97/498/698/1999/599/1599/1699/19
100/6100/20100/22100/25101/1101/5
102/4102/10104/4104/5105/5105/20
106/12108/10109/5109/5110/14114/15
114/17119/4120/7121/2122/17123/25
124/14126/4126/25127/15128/17128/22
129/19129/20129/21130/8130/17130/20
131/4131/9132/10132/2132/22132/23
133/8133/12134/4136/13137/7142/16
142/24143/4143/18144/7146/12150/12
151/17152/10162/18163/4163/7164/18
165/12165/13166/11166/12167/6168/8
168/11169/7169/8170/19172/20174/23
178/16179/22182/19184/5184/6184/20
186/7186/11190/17191/3191/11191/16
191/20

**Your Honor [90]** 4/134/204/255/27/22
11/2315/1116/716/1621/2523/1526/14
27/928/228/634/1540/842/1347/2248/4
56/756/2262/1162/1692/1347/22/1276/379/8
79/2080/581/681/1481/1982/989/10
92/1592/2098/6100/6100/20100/2/10
104/4105/20106/12108/10109/5109/5
110/14114/15114/17119/4121/2122/17
123/25124/14126/4126/25128/17129/2
130/8130/17130/20131/4131/9132/22
132/23133/8133/12134/4136/13142/16
142/24143/4143/18144/7146/12150/12
151/17152/10162/18163/4163/7164/18
165/12165/13166/11166/12167/6168/8
168/11169/7169/8170/19172/20174/23
178/16179/22182/19184/5184/6184/20
186/7186/11190/17191/3191/11191/16
191/20

## Y

**your Honor's [9]** 11/899/5100/22101/1
128/22137/7142/24165/13168/8
**yourself [1]** 108/6
**yourselves [1]** 83/12

## Z

**zealous [1]** 160/18
**zealously [1]** 119/24
**zero [2]** 19/2170/16
**Zoom [1]** 192/1